# EXHIBIT 1

**29C01-1802-CT-001154**
**Hamilton Circuit Court**

Filed: 2/7/2018 4:29 PM
Tammy Baitz
Clerk
Hamilton County, Indiana

STATE OF INDIANA  ) IN THE HAMILTON COUNTY SUPERIOR COURT
         ) SS:
COUNTY OF HAMILTON ) CAUSE NO.

JOSEPH HIPPS, Individually and on )
Behalf of All Others Similarly Situated, )
          )
   Plaintiff,     )
          ) JURY TRIAL DEMANDED
  v.       )
          )
BIGLARI HOLDINGS, INC., SARDAR )
BIGLARI, PHILIP L. COOLEY, )
KENNETH R. COOPER, JAMES P. )
MASTRIAN, RUTH J. PERSON, )
NBHSA INC., and BH MERGER )
COMPANY,       )
   Defendants.

## <u>CLASS ACTION COMPLAINT</u>

Plaintiff Joseph Hipps ("Plaintiff") brings this Class Action Complaint (the "Complaint") on behalf of all other public common shareholders of Biglari Holdings Inc. ("Biglari Holdings" or the "Company") against (a) Sardar Biglari ("S. Biglari"), the Company's controlling shareholder, Chief Executive Officer ("CEO") and Chairman of the Biglari Holdings board of directors (the "Board"); (b) the other members of the Board; and (c) Biglari Holdings, NBHSA Inc. ("New BH") and BH Merger Company ("Merger Sub").  The allegations of the Complaint are based on the knowledge of Plaintiff as to himself and on information and belief, including the investigation of counsel, as to all other matters.

### INTRODUCTION

1. This class action challenges a self-interested scheme to reclassify Biglari Holdings' corporate structure for the express purpose of ensuring S. Biglari's control over the Company in perpetuity (the "Reclassification").  As detailed herein, the Reclassification will impair the rights

of the Company's public shareholders.  Worse yet, Biglari Holdings' minority public shareholders will not even have a meaningful vote on the harmful transaction because S. Biglari will control the outcome.

2.     Through a series of transactions, S. Biglari created Biglari Holdings and installed himself as the Company's CEO and Chairman.  S. Biglari subsequently exploited his positions of power to cause the Company to enter into a number of lucrative related-party transactions with himself and his immediate family, including an investment management agreement (the "Investment Management Agreement") with his personal hedge fund, through which he received more than $80 million in fees from the Company over the last four years.

3.     The proposed Reclassification is not S. Biglari's first attempt to create a dual-class capital structure for the Company.  In 2011 and 2012, S. Biglari tried to effectuate a reclassification at Biglari Holdings in which the Company would adopt a high-vote/low-vote capital structure (the "Failed Reclassification Attempt").  Among other things, a dual-class structure would allow S. Biglari to preserve his voting bloc by issuing low-vote shares in future stock-for-stock acquisitions that would cause little to no dilution of his equity stake.

4.     Unfortunately for S. Biglari—who only owned approximately 15% of the Company's outstanding shares of common stock at the time—he and the rest of the Board were never able to garner the necessary shareholder support to approve his plan.  Thus, S. Biglari abandoned the Failed Reclassification Attempt.

5.     Starting shortly after the Failed Reclassification Attempt, S. Biglari embarked on a multi-year, multi-pronged campaign to obtain majority control of Biglari Holdings, and he will now implement the dual-class structure that other Company shareholders did not support in 2011 and 2012.  By early 2016, S. Biglari reached his goal and crossed the 50% ownership threshold.

Having achieved majority voting control, S. Biglari now seeks to unilaterally impose a dual-class capital structure on Biglari Holdings, regardless of whether the Company's public shareholders oppose the plan.

6.     In November 2016, S. Biglari again proposed to the Board that the Company implement a dual-class capital structure.  The Board's Governance, Compensation and Nominating Committee (the "GCN Committee") supposedly evaluated the transaction.  The GCN Committee's actions were perfunctory at best.  To begin, at least one member of the GCN, defendant Kenneth R. Cooper ("Cooper"), has significant entanglements with S. Biglari that render him incapable of disinterestedly and independently considering S. Biglari's proposal.  Cooper's mere service on the GCN Committee undermined any chance that the Committee would act independently of S. Biglari's influence.  Additionally, the GCN Committee never retained a financial advisor to assist with its purported evaluation of the proposed transaction.  Most shockingly, the GCN Committee met only three times over a thirteen (13) month period, before unanimously recommending that the Board adopt and approve S. Biglari's proposal without modification to any of its terms. Unsurprisingly, the full five-member Board, which included S. Biglari, Cooper, and another non-independent director, unanimously determined to adopt the GCN Committee's recommendation.

7.     In connection with the Reclassification, on December 21, 2017, S. Biglari and his fellow directors caused Biglari Holdings to enter into an agreement and plan of merger (the "Reclassification Agreement") to reorganize itself as a holding company with a dual-class structure.  The Reclassification Agreement is among Defendants Biglari Holdings, New BH and BH Merger Sub.  Pursuant to the Reclassification Agreement, Merger Sub will merge with and into Biglari Holdings, with Biglari Holdings continuing as the surviving corporation and a wholly-owned subsidiary of New BH.  Upon completion of the Reclassification, New BH will be named

"Biglari Holdings Inc." and will replace the Company as the publicly-held corporation through which the Company's business is conducted.

8.     New BH will have two classes of common stock:  Class A common stock ("Class A Stock") and Class B common stock ("Class B Stock").  A share of Class B Stock will have economic rights equivalent to $1/5^{th}$ of a share of Class A Stock, but unlike the Class A Stock, will provide no voting rights.

9.     As a result of the Reclassification and Reclassification Agreement, Biglari Holdings' shareholders will become shareholders of New BH and will receive, for every ten shares of Company common stock they own immediately prior to the effective time of the Reclassification, (a) ten shares of Class B Stock and (b) one share of Class A Stock.  In other words, in connection with the Reclassification and Reclassification Agreement, Biglari Holdings shareholders will receive for each of their shares of common stock (a) one share of Class B Stock and (b) $1/10^{th}$ of one share of Class A Stock.

10.     The Company, however, will not issue any fractional shares of Class A Stock. Rather, where the Reclassification would result in the issuance of fractional Class A shares, shareholders will receive one additional share of Class B Stock for every $1/5^{th}$ of one share of Class A Stock they otherwise would have received, and cash in lieu of any remaining fractional shares of Class A Stock.  This cash-out feature of the Reclassification will increase S. Biglari's voting control over the Company, as the Company will essentially retire an unknown number of voting shares currently held by the Company's public, minority shareholders.

11.     More importantly, as a result of the Reclassification, S. Biglari will forcibly secure indefinite control over the Company.

12.     The Board took no efforts to give the Company's public shareholders a say in whether to implement the Reclassification.   Rather, the adoption and implementation of the Reclassification is contingent on the affirmative vote of a simple majority of all votes entitled to be cast by all of the Company' stockholders—including S. Biglari—at a yet-to-be-scheduled special meeting (the "Special Meeting").  Because S. Biglari proposed the Reclassification, voted in favor of the Reclassification as a director, and has already publicly indicated he intends to vote his majority equity stake in support of it, the adoption and implementation is a *fait accompli*.  In the absence of Court intervention, Biglari Holdings' public shareholders will be unable to prevent the irreparable harm that the Reclassification and Reclassification Agreement will cause them. Plaintiff therefore requests, among other things, that the Court permanently enjoin the vote on, and consummation of, the Reclassification.   Plaintiff likewise requests that the Court declare the Reclassification Agreement as invalid, void, voidable, and/or unenforceable.

## THE PARTIES

13.     Plaintiff Joseph Hipps is currently a Biglari Holdings shareholder and has been a Biglari Holdings shareholder at all times relevant to the claims asserted herein.

14.     Defendant Biglari Holdings is a holding company owning subsidiaries engaged in a number of diverse business activities, including media, property and casualty insurance, and restaurants.  Biglari Holdings is incorporated under the laws of the State of Indiana, with its principal executive offices located at 17802 IH 10 West, Suite 400, San Antonio, Texas 78257. The Company is publicly traded on the New York Stock Exchange under the ticker symbol "BH." Biglari Holdings is a party to the Reclassification Agreement.[1]

---

[1] Biglari Holdings' corporate bylaws (the "Bylaws"), filed with the U.S. Securities and Exchange Commission ("SEC") on June 4, 2015, state in relevant part that "… *the Circuit or Superior Courts of Hamilton County of the State of Indiana … shall*, to the fullest extent permitted by

15.     Defendant New BH is an Indiana corporation and a direct, wholly-owned subsidiary of Biglari Holdings.  New BH is a party to the Reclassification Agreement.

16.     Defendant Merger Sub is an Indiana corporation and a direct, wholly-owned subsidiary of New BH.  Merger Sub is a party to the Reclassification Agreement.

17.     Defendant S. Biglari has been the Company's CEO and Chairman of the Company's Board since 2008.  In addition, S. Biglari has served as chairman, CEO and sole owner of Biglari Capital Corp. ("Biglari Capital") since 2000.  Biglari Capital is the general partner of The Lion Fund, L.P. and The Lion Fund II, L.P. (collectively, "The Lion Funds"), which are both private investment partnerships.  S. Biglari served as a director of Western Sizzlin Corporation ("Western Sizzlin") from December 2005 until its acquisition in 2010, including as its chairman from 2006 to 2010.  S. Biglari also served as a director of CCA Industries, Inc. ("CCA Industries"), a manufacturer and marketer of health and beauty aids, from August 2011 to July 2014 and from October 2015 to present.  Additionally, S. Biglari served as a director of Insignia Systems, Inc. ("Insignia Systems"), a developer and marketer of point-of-purchase in-store products and services, from December 2015 to March 2017, serving as co-chairman from January 2016 to March 2017.  According to Amendment No. 33 to S. Biglari's Schedule 13D filed with the SEC on December 28, 2017, S. Biglari beneficially owns approximately 52.5% of Biglari Holdings' outstanding shares of common stock.

18.     Defendant Philip L. Cooley ("Cooley") has served as Vice Chairman of the Biglari Holdings Board since April 2009 and as a Company director since 2008.  Cooley co-founded

---

law, *be the sole and exclusive forum* for … (b) any action asserting a claim of breach of fiduciary duty owed by any director, officer, employee, agent or Affiliate of the Corporation to the Corporation or to the Corporation's shareholders, … or (d) any action asserting a claim against the Corporation governed by the internal affairs doctrine."  (Emphasis added).

Biglari Capital with S. Biglari.  Cooley has served as an advisory director of Biglari Capital since 2000 and as a director and Vice President of The Lion Funds.  Cooley served with S. Biglari as a director of CCA Industries from August 2011 to July 2014, as a director of Insignia Systems from October 2015 to March 2017, and as a director of Western Sizzlin from December 2005 to 2010, including as vice chairman of Western Sizzlin under S. Biglari from 2006 to 2010.  Cooley was S. Biglari's finance professor at Trinity University in San Antonio, and the two have had a close personal and business relationship since that time.  According to the Company's annual meeting proxy statement filed with the SEC on March 27, 2014 (the "2014 Proxy"), Cooley has personally invested in The Lion Funds.  Cooley has been described as S. Biglari's "business partner" and "right-hand man," and the two have invested together since as early as 2000.  Indeed, the Company's public filings recognize that Cooley is not an "independent" director.

19.     Defendant Cooper has served as a member of the Biglari Holdings Board since October 2010.  The Company's public filings identify Cooper as an attorney engaged in private practice.  However, according to a September 23, 2011 article in *The AmLaw Daily* titled "Firms Dine on Restaurant-Related Corporate Work," Cooper was described as "Biglari's top in-house lawyer."  Cooper served as a director of Western Sizzlin from 2007 until 2010.  Cooper was appointed as a Western Sizzlin director one year after S. Biglari and Cooley were installed as directors, and chairman and vice chairman, respectively.  Cooper has personally owned partnership interests in the The Lion Funds.  In addition, Cooper founded Ascot Management, LLC, and selected S. Biglari to serve on its board of directors.  Cooper served on the three-person GCN Committee, which purportedly evaluated and recommended the Reclassification.

20.     Defendant James P. Mastrian ("Mastrian") has served as a member of the Biglari Holdings Board since August 2012.  Mastrian also served as a director of CCA Industries from

2009 to August 2012.  Mastrian served on the three-person GCN Committee, which purportedly evaluated and recommended the Reclassification.

21.    Defendant Ruth J. Person ("Person") has served as a member of the Biglari Holdings Board since 2002.  Person served on the three-person GCN Committee, which purportedly evaluated and recommended the Reclassification.

22.    The defendants listed in paragraphs 17 to 21 are collectively referred to herein as the "Board" or "Individual Defendants."

23.    Biglari Holdings, New BH, Merger Sub and the Individual Defendants are collectively referred to herein as the "Defendants."

## I.    SUBSTANTIVE ALLEGATIONS

### A.    THE FORMATION OF BIGLARI HOLDINGS

24.    In 2000, S. Biglari launched The Lion Fund, L.P. as a private investment partnership.  Shortly thereafter, S. Biglari invited Defendant Cooley—his friend and former finance professor—to join the board of directors of The Lion Fund, L.P.

25.    In or prior to August 2005, S. Biglari, through The Lion Fund L.P., began buying stock of Western Sizzlin, and in March 2006, S. Biglari and Cooley were appointed Western Sizzlin's board chairman and vice chairman, respectively.  S. Biglari then increased his ownership in Western Sizzlin and, by December 2006, had secured enough voting power to engineer the election of a new board slate consisting of directors whom he had nominated.

26.    Between 2007 and 2008, S. Biglari acquired shares of The Steak N Shake Company ("Steak 'n Shake"), which at the time was a separate entity from Western Sizzlin.  By August 2008, S. Biglari had become CEO and chairman of the board of Steak 'n Shake as well.[2]  In March

---

[2] Cooley was also added to the Steak 'n Shake board in 2008.

2010, the two companies consolidated under S. Biglari's continued leadership through Steak 'n Shake's acquisition of Western Sizzlin.

27.     In 2010, Steak 'n Shake acquired Biglari Capital, the general partner of The Lion Fund, L.P.  That same year, S. Biglari caused the Company to change its name from Steak 'n Shake to Biglari Holdings.

**B.     S. BIGLARI UNSUCCESSFULLY ATTEMPTS TO CREATE A DUAL-CLASS CAPITAL STRUCTURE AT BIGLARI HOLDINGS**

28.     On July 5, 2011, Biglari Holdings filed a definitive proxy statement with the SEC relating to a special meeting of shareholders to be held on August 5, 2011 (the "2011 Special Meeting").  At the 2011 Special Meeting, Biglari Holdings shareholders were asked to vote on a proposed amendment to the Company's articles of incorporation (the "Charter") that would reclassify the Company's capital structure.   Specifically, shareholders were asked to vote on whether:

> To amend the [Company's] Amended and Restated Articles of Incorporation in order to (a) increase the total number of shares of all classes of stock that the [Company] is authorized to issue from the current 12,500,000 shares to 60,000,000; (b) redesignate the [Company's] existing common stock, stated value $0.50 per share, as Class A Common Stock and reduce the authorized number of shares of the redesignated Class A Common Stock from 2,500,000 to 2,000,000; and (c) authorize 48,000,000 shares of a new Class B Common Stock, each share of which would have economic rights equivalent to one-fifth (1/5th) of a share of Class A Common Stock, and would have one-one-hundredth (1/100th) of the vote of a share of Class A Common Stock.

29.     At the time, S. Biglari owned just over 15% of the Company's outstanding common stock.  S. Biglari and the Company rationalized the proposed reclassification as a way for Biglari Holdings to effectively pursue its goals as an acquisitive holding company.   The new Class B shares would purportedly be used to finance acquisitions and provide more optionality to investors in the Company.

30.     The 2011 Special Meeting commenced on August 5, 2011 but was promptly adjourned until September 2, 2011.

31.     On September 1, 2011, the Company issued a press release announcing that it decided to further delay the 2011 Special Meeting that was scheduled for September 2, 2011.

32.     At the Company's annual meeting of shareholders held on April 19, 2012, S. Biglari explained that the special meeting to consider the proposed recapitalization had been put on hold.

33.     On October 5, 2012, the Company filed a definitive proxy statement with the SEC relating to a special meeting of shareholders to be held on November 2, 2012 (the "2012 Special Meeting").  At the 2012 Special Meeting, Biglari Holdings shareholders would again be asked to amend the Company's Charter to reclassify its capital structure.  Specifically, shareholders would vote on whether:

> To amend the [Company's] Amended and Restated Articles of Incorporation in order to (a) increase the total number of shares of all classes of stock that the [the Company] is authorized to issue from the current 12,500,000 shares to 60,000,000; (b) redesignate the [Company's] existing common stock, stated value $0.50 per share, as Class A Common Stock and reduce the authorized number of shares of the redesignated Class A Common Stock from 2,500,000 to 2,000,000; and (c) authorize 48,000,000 shares of a new Class B Common Stock, each share of which would have economic rights equivalent to one-fifth (1/5th) of a share of Class A Common Stock, and would have one-one-hundredth (1/100th) of the vote of a share of Class A Common Stock.

34.     Influential proxy advisory firm Institutional Shareholder Services ("ISS") was critical of the reclassification proposal.  Among ISS's concerns was the possibility that acquisition targets would demand a premium in accepting new low-vote Biglari Holdings Class B shares in a transaction.

35.     At that time, S. Biglari still owned approximately 15% of the Company's outstanding shares.

36.     On November 2, 2012, the Company announced that it had decided to delay the 2012 Special Meeting until Friday, December 14, 2012.  Presumably because the reclassification proposal lacked necessary support, the 2012 Special Meeting was again postponed on or just before December 14, 2012, and ultimately was never held.

### C.     S. BIGLARI OBTAINS EQUITY CONTROL OF BIGLARI HOLDINGS

37.     After S. Biglari's initial efforts to implement a dual-class structure at the Company failed, he proceeded to take majority control of the Company. The Reclassification will ensure his voting control over the Company for the foreseeable future.

38.     On February 5, 2013, Biglari Holdings filed a Form S-3 registration statement with the SEC in which the Company disclosed a planned rights offering (the "2013 Rights Offering").

39.     The 2013 Rights Offering would provide existing Biglari Holdings shareholders with the ability to convert the rights into additional shares of Company stock to the extent they chose to invest the additional capital required for that exercise.  Further, if the 2013 Rights Offering was not fully subscribed by the existing shareholders, other shareholders who had exercised their prescribed rights could then "oversubscribe" and acquire the shares not taken.

40.     As originally announced, the 2013 Rights Offering aimed to raise approximately $50 million for the Company.  On August 6, 2013, however, the Board made a final announcement of the details of the 2013 Rights Offering, in which prices were set and the capital target was raised to approximately $75 million.  This 50% increase in the size of the 2013 Rights Offering made many more shares available to the shareholders who cared to oversubscribe.

41.     The Company ultimately distributed one transferable subscription right (collectively, the "Rights") for each share of its common stock to shareholders of record on August 27, 2013.  Every five Rights entitled a shareholder to subscribe for one share of common stock at

a price of $265.00.  The 2013 Rights Offering was oversubscribed and 286,767 new shares of common stock were issued.

42.     On September 16, 2013, S. Biglari purchased 2,016 shares pursuant to his basic subscription rights, and on September 20, 2013, he purchased 242 shares pursuant to oversubscription election.[3]  On September 16, 2013, The Lion Funds purchased 41,149 shares pursuant to their basic subscription rights, and on September 20, 2013, The Lion Funds purchased 4,923 additional shares pursuant to their oversubscription election.  Thereafter, S. Biglari controlled over 16% of the Company's outstanding common stock.

43.     The following year, the Company completed another rights offering through which shareholders of record on August 19, 2014, were entitled to receive one right per share, and every five rights entitled each shareholder to subscribe for one common share (the "2014 Rights Offering").  The subscription price was $250.00 which represented an approximately a 40.3% discount to the closing price of Biglari Holdings common stock on July 21, 2014, the last trading day immediately prior to the announcement of the 2014 Rights Offering, which was $418.60 per share.

44.     After the 2014 Rights Offering, Biglari's controlled approximately 18.1% of the Company's common stock.

45.     On November 21, 2014, a dissident shareholder group announced the nomination of six director candidates to run in opposition to the slate nominated by the Board for election at the Company's 2015 annual shareholder meeting.  Two of the nation's leading proxy advisory firms, ISS and Glass Lewis & Co. ("Glass Lewis"), were each critical of S. Biglari and the

---

[3] Earlier in September 2013, S. Biglari acquired approximately 7,000 shares in unrelated purchases.

incumbent slate. While the dissident slate did not receive the endorsement of nationally recognized proxy advisory firm ISS, ISS did take the extraordinary step of recommending stockholders withhold their votes for all six of the incumbent Biglari Holdings nominees.  Two of the dissident slate's nominees received the support of Glass Lewis.

46.     In its report, ISS stated that "support is not warranted for the incumbent nominees" because of "repeated failure[ ] of governance."  ISS further stated that the Board's "numerous questionable governance practices" included putting most of the Company's liquid assets of more than $600 million in a hedge fund controlled by S. Biglari alone, and a licensing deal between the Company and S. Biglari (described further below) that could pay him as much as $100 million if he is removed in a takeover.  The report summarized that there was a "significant question about the stewardship of the incumbent directors."

47.     At the Company's annual meeting on April 9, 2015, S. Biglari and the incumbent Board managed to prevail in the proxy contest.  However, without S. Biglari's voting bloc, certain incumbent Biglari Holdings directors would not have been reelected to the Board.

48.     With obstacles to S. Biglari's personal visions and interests mounting, S. Biglari undertook a series of steps to acquire majority voting control over the Company.

49.     In the spring of 2015, S. Biglari sought to increase his stake in the Company and his representatives began negotiating with the GCN – then comprised of Cooper (as chairman), Mastrian, Person and former director William Johnson—about a potential transaction between the Company and The Lion Funds, including The Lion Funds' acquisition of additional Company stock.[4]

---

[4]  As of June 3, 2015, The Lion Funds were the beneficial owner of 365,726 Company shares, representing 17.7% of the Company's outstanding shares.  This equity together with his personal stake allowed S. Biglari to control just shy of 20% of the Company's outstanding stock.

50.     On June 3, 2015, the Board adopted and approved amendments to the Company's Restated By-Laws (the "By-Laws Amendment").  Among other things, pursuant to Ind. Code § 23-1-42-5, a section was added to the Biglari Holdings By-Laws to exclude the Company from the protections and provisions of the Indiana Control Share Acquisitions Chapter, Ind. Code § 23-1-42-1, *et. seq.*  The Indiana Control Share Acquisitions Chapter limits voting rights for shares acquired in excess of statutory thresholds, unless the acquisition of the excess shares is approved by the issuer's disinterested shareholders or the corporation opts out of the statute's provisions prior to the acquisition of such excess shares by amending the corporation's articles of incorporation or bylaws.  The 20% threshold prescribed by the statute was protecting the Company's minority shareholders from a takeover by S. Biglari.  Sure enough, after the Company opted out of the protections afforded by the statute, S. Biglari promptly took majority control of the Company.

51.     The day after the By-Law Amendment, on June 4, 2015, The Lion Funds commenced a tender offer to acquire up to 575,000 shares of the common stock of Biglari Holdings not otherwise owned by affiliates of The Lion Funds at a price of $420.00 in cash per share (the "Tender Offer").

52.     On June 11, 2015, the Company's purportedly independent directors met to consider the Tender Offer and ultimately recommended to the full Board that it make no recommendation to Biglari Holdings shareholders on the advisability of the Tender Offer.

53.     On July 1, 2015, The Lion Funds completed their Tender Offer for common stock of Biglari Holdings, purchasing 616,312 shares of common stock at a price of $420.00 per share

for aggregate consideration of $258,851,040.[5]  After the Tender Offer closed, and The Lion Funds exercised their right under the Tender Offer to increase the number of shares they could acquire, S. Biglari controlled 49.5% of the Company's outstanding common stock.

54.     Notably, the Company holds nearly all of its investments in The Lion Funds.  Thus, S. Biglari was effectively using Company money to massively increase his voting control over Biglari Holdings.

55.     Subsequently, leading up to February 2, 2016, The Lion Funds made dozens of open market purchases of Company common stock that collectively increased S. Biglari's voting control over the Company to 50.6%.

56.     As of the date of this Complaint, S. Biglari controls a majority of Biglari Holdings' outstanding shares of common stock.  Specifically, as of December 28, 2017, S. Biglari beneficially owned approximately 52.5% of Biglari Holdings' outstanding common stock.

57.     As a result of his majority stake and his roles as Chairman and CEO, S. Biglari controls Biglari Holdings.  S. Biglari is able to dictate the outcome of any matter submitted to a vote of Biglari Holdings, including any vote on the proposed Reclassification.

58.     Biglari Holdings' Form 10-K filed with the SEC on February 27, 2017, describes S. Biglari's control as follows:

> **Sardar Biglari, our Chairman and CEO, beneficially owns over 50% of [the Company's] outstanding shares of common stock, enabling Mr. Biglari to exert control over matters requiring stockholder approval.**
> Mr. Biglari has the ability to control the outcome of matters submitted to our shareholders for approval, including the election or removal of directors, the amendment of our certificate of incorporation or bylaws, along with other significant transactions.  In addition, Mr. Biglari has the ability to control the management and affairs of the Company.  This control position may conflict with the interests of some or all of the Company's other shareholders.

---

[5] Pursuant to the terms of the Tender Offer, The Lion Funds elected to increase the number of Biglari Holdings shares accepted for payment by 41,312 shares.

(Emphasis in original.)

59.     The Reclassification will increase and indefinitely perpetuate S. Biglari's control over the Company.

### D.     S. BIGLARI CAUSES BIGLARI HOLDINGS TO REPEATEDLY ENTER HIGHLY-LUCRATIVE RELATED-PARTY ARRANGEMENTS

60.     The Reclassification will likewise ensure that S. Biglari is able to continue to extract value from the Company through the Investment Management Agreement and other related-party transactions.

61.     At S. Biglari's behest, the Company holds nearly of its investments by means of limited partner interests in The Lion Funds.  The Lion Funds are managed by Biglari Capital, which is solely owned by S. Biglari.  Biglari Capital (*i.e.*, S. Biglari) earns an incentive reallocation fee for the Company's investments equal to 25% of the net profits above an annual hurdle rate of 6% over the previous "high water" mark.

62.     As reflected in the chart below, this highly atypical relationship for a public company has been very lucrative for S. Biglari.  Between 2013 and 2016, S. Biglari received over ***$80 million*** as a result of the Investment Management Agreement.

| Year | Incentive Reallocation Fees |
|-------|-----------------------------|
| 2013 | $14,702,000 |
| 2014 | $34,406,000 |
| 2015 | $23,000 |
| 2016 | $31,628,000 |
| Total | $80,759,000 |

63.     S. Biglari's compensation from the Investment Management Agreement has made S. Biglari the highest paid CEO in the restaurant industry.

64.     Additionally, S. Biglari has used his influence to cause the Company to enter into a license agreement under which S. Biglari has granted the Company a license to use his name

when connected to the provision of certain products and services, as well as a sublicense agreement with Steak 'n Shake that, among other things, grants Steak 'n Shake the right to use the trademark "Steak 'n Shake *by Biglari*." (Emphasis added).

65. However, in the event of a change of control at the Company or S. Biglari's termination without cause or resignation following specified occurrences, including (a) his removal as Chairman of the Board or CEO or (b) his loss of sole capital allocation authority (*i.e.*, a change to the Investment Management Agreement), S. Biglari would be entitled to receive revenue-based royalty payments related to the usage of his name under the terms of the License Agreement for a defined period of no less than five years. According to an April 28, 2017 article in the *San Antonio Express-News* titled "Biglari Holdings may scrap controversial licensing deal with CEO," "[b]ased on the [C]ompany's 2016 revenue, that would mean [S. Biglari] could pocket a little more than *$100 million* over five years" under the License Agreement in the event of a change of control. (emphasis added)

66. S. Biglari has also used his control to put multiple members of his immediate family on the Company's payroll. For example, since at least 2014, S. Biglari's brother Shawn Biglari has worked in business development for Steak 'n Shake. Shawn Biglari received $153,200 and $141,250 in compensation from the Company during 2015 and 2016, respectively.

67. Further, since at least 2014, S. Biglari's father Ken Biglari has served as a "consultant" to Steak 'n Shake. While Ken Biglari's compensation for 2014 and 2015 has not been publicly disclosed, Ken Biglari received $124,167 in consulting fees from the Company during 2016.

68.     Additionally, S. Biglari caused Biglari Holdings to enter into a shared services agreement with Biglari Capital pursuant to which the Company provides certain services to Biglari Capital (*e.g.*, use of space at the Company's corporate headquarters).

### E.     S. BIGLARI WILL INCREASE AND CEMENT HIS CONTROL OVER BIGLARI HOLDINGS THROUGH THE RECLASSIFICATION

69.     According to Amendment No. 1 to New BH's Form S-4 registration statement filed with the SEC on February 5, 2018 (the "S-4/A"), at the regularly scheduled November 5, 2016 meeting of the Biglari Holdings Board, S. Biglari made a proposal for the Company to create a dual-class capital structure.  The Board then asked Defendants Cooper, Mastrian and Person, the three members of the GCN Committee, to evaluate the proposal.

70.     In light of Cooper's various entanglements with S. Biglari, including his prior Board service for other S. Biglari-affiliated companies, Cooper's participation fatally compromised the GCN Committee's independence.

71.     Between November 5, 2016 and December 21, 2017, the GCN Committee met a mere three times to discuss the Reclassification proposal.[6]  Purportedly, these three meetings include (a) the initial proposal of the Reclassification (*i.e.*, November 5, 2016), and (b) its approval (*i.e.*, December 21, 2017).  This means that the GCN Committee only met one time in this thirteen (13) month period to deliberate about the proposed Reclassification.

72.     Despite the significant consequences attendant to any reclassification of the Company's capital structure, the GCN Committee did not even engage a financial advisor to assist it or opine on the fairness of the transaction to the Company's minority shareholders.

---

[6] The S-4/A does not suggest ***any*** negotiation between the Committee and S. Biglari regarding any of the terms of the Reclassification.

73.     On December 21, 2017, after receiving the recommendation of the GCN Committee, Biglari Holdings entered into the Reclassification Agreement.

74.     The Reclassification Agreement is among Biglari Holdings, New BH and Merger Sub.  Pursuant to the Reclassification Agreement, Merger Sub will merge with and into Biglari Holdings, with Biglari Holdings continuing as the surviving corporation and a wholly-owned subsidiary of New BH.  Upon completion of the Reclassification, New BH will be named "Biglari Holdings Inc." and replace the Company as the publicly-held corporation through which the Company's business is conducted.

75.     New BH will have two classes of common stock: Class A Stock and Class B Stock. A share of Class B Stock will have economic rights equivalent to $1/5^{th}$ of a share of Class A Stock, but unlike the Class A Stock, will provide its holders no voting rights.

76.     As a result of the Reclassification and Reclassification Agreement, Biglari Holdings' shareholders will become shareholders of New BH and will receive, for every ten shares of Company common stock they own immediately prior to the effective time of the Reclassification, (i) ten shares of Class B Stock and (ii) one share of Class A Stock.  In other words, shareholders will receive for each share of Biglari Holdings common stock (i) one share of Class B Stock and (ii) $1/10^{th}$ of one share of Class A Stock.

77.     In lieu of fractional shares of Class A Stock, shareholders will receive one additional share of Class B Stock for every $1/5^{th}$ of one share of Class A Stock they otherwise would have received, and cash in lieu of any remaining fractional shares of Class A Stock.

78.     The primary rationale for the Reclassification is to cement S. Biglari's control over the Company, particularly in the event that the Company engages in stock-for-stock acquisitions that would have otherwise diluted said control.  Indeed, the S-4/A states that:

We are creating a new holding company to: [i]mplement a dual class structure that will allow the Company to pursue strategic objectives without diluting the voting power of its existing shareholders, including preserving Mr. Biglari's control of the Company . . . .

79.     Furthermore, the first "Reason[ ] for the Re[classification]" disclosed in the S-4/A is that it "Maintains Founder's Control."

> ***Maintains Founder's Control.***  To attain the dual goal of preserving Mr. Biglari's control of the Company, while gaining the ability to issue stock in a transaction, we think it is necessary to create a dual class structure.  Currently, a stock-for-stock acquisition involving voting stock would dilute current shareholders.  Sardar Biglari controls the direction of the Company through his beneficial ownership of approximately 52.3% of the outstanding shares of common stock.  The Company has been designed and continues to be shaped by Mr. Biglari. . . . [W]e do not want to dilute the voting power of the shares beneficially owned by the founder in a stock-for-stock transaction.  We believe that certain companies managed by founders and entrepreneurs ought to possess a dual class structure. . . . We believe the proposed capital structure, by enabling us to preserve Mr. Biglari's voting control, will help to insulate us from outside influences.  *Our purpose: To sustain the dual goal of maintaining the founder's control and of preserving the option of issuing equity in acquisitions, financings or for other purposes.*

80.     Approval of the Reclassification is conditioned on the affirmative vote of a simple majority of all votes entitled to be cast at the upcoming special meeting.  Because S. Biglari has "indicated that he . . . intends to vote in favor of the reorganization/recapitalization proposal," attainment of the requisite approval from a simple majority of votes entitled to be cast—and therefore passage and implementation of the Reclassification (absent Court intervention)—is assured.

**F.     THE RECLASSIFICATION UNFAIRLY BENEFITS S. BIGLARI TO THE DETRIMENT OF THE COMPANY'S PUBLIC SHAREHOLDERS**

81.     The numerous benefits to S. Biglari from the Reclassification are clear.  S. Biglari will increase his voting control over the Company and implement a new capital structure that will allow him to indefinitely retain that control.  As a result, S. Biglari's highly-lucrative related-party transactions with the Company will remain in place for as long as he desires.  Additionally, S.

Biglari can sell a significant portion of non-voting Class B Stock without any concern of jeopardizing his control over the Company.

82. In sharp contrast, the Reclassification provides no benefit to the Company's public shareholders. Rather, the Company's public shareholders will be stuck holding a security in a new company with a capital structure that is highly disfavored by the investment community. Influential proxy advisors Glass Lewis and ISS are both vocal critics of dual-class capital structures. According to the 2018 Proxy Paper Guidelines – An Overview of the Glass Lewis Approach to Proxy Advice:

> Glass Lewis believes dual-class voting structures are typically not in the best interests of common shareholders. Allowing one vote per share generally operates as a safeguard for common shareholders by ensuring that those who hold a significant minority of shares are able to weight in on issues set forth by the board.
>
> Furthermore, [Glass Lewis] believe[s] that the economic stake of each shareholder should match their voting power and that no small group of shareholders, family or otherwise, should have voting rights different from those of other shareholders. On matters of governance and shareholder rights, [Glass Lewis] believe[s] shareholders should have the power to speak and the opportunity to effect change. That power should not be concentrated in the hands of a few for reasons other than economic stake.
>
> [Glass Lewis] generally consider[s] a dual-class share structure to reflect negatively on a company's overall corporate governance. Because [Glass Lewis] believe[s] that companies should have share capital structures that protect the interests of non-controlling shareholders as well as any controlling entity, [Glass Lewis] typically recommend[s] that shareholders vote in favor of recapitalization proposals to eliminate dual-class share structures. Similarly, [Glass Lewis] will generally recommend against proposals to adopt a new class of common stock.

83. Similarly, ISS's United States Summary Proxy Voting Guidelines 2017 Benchmark Policy Recommendations provides:

> **Dual Class Structure**
>
> **General Recommendation:** Generally vote against proposals to create a new class of common stock unless: … [t]he new class is not designed to preserve or increase the voting power of an insider or significant shareholder.

84.     As noted in the S-4/A, the investment policies of certain institutional investors prohibit the holding of non-voting stock like the Class B Stock.

> ***The Reorganization and Recapitalization May Negatively Affect the Decision of Institutional Investors to Invest in New BH, and Could Have Implications for the Inclusion of Shares of Class A Common Stock or Class B Common Stock in Certain Stock Indices.*** The reorganization and recapitalization may negatively affect the decision by certain institutional investors to purchase or hold shares of Class B common stock. The holding of non-voting stock, such as the Class B common stock, may not be permitted by the investment policies of certain institutional investors or may be less attractive to the portfolio managers or certain institutional investors.

85.     As a result of the decision not to issue fractional shares of the Company's new Class A Stock in the Reclassification, the Company's public shareholders will lose voting rights, while S. Biglari increases his voting control. Specifically, pursuant to the terms of the Reclassification, in lieu of receiving fractional shares of high-vote Class A Stock, shareholders will receive an additional share of no-vote Class B Stock for every $1/5^{th}$ of one shares of Class A Stock they otherwise would have received, and cash in lieu of any remaining fractional shares of Class A Stock.

86.     The S-4/A concedes that the treatment of fractional shares in connection with the Reclassification may increase S. Biglari's beneficial ownership.

> **The reorganization and recapitalization could increase or prolong Sardar Biglari's control.**
> Sardar Biglari, our Chairman and CEO, currently beneficially owns over 50% of the Company's outstanding shares of common stock and thus has the ability to control the outcome of matters submitted for shareholder approval. As a result of the treatment of fractional shares in the reorganization and recapitalization, Mr. Biglari's beneficial ownership may increase.[7]

---

[7] The receipt of cash in lieu of fractional shares of Class A Stock could also trigger capital gains tax liability for the Company's public shareholders.

87.     Despite the negative consequences of the Reclassification, including the loss of, and impairment to, the voting rights of the Company's minority public stockholders, Plaintiff and the Class (defined below) will not have any meaningful vote in connection with the proposed Reclassification.

## II.     CLASS ACTION ALLEGATIONS

88.     Plaintiff brings this Action pursuant to Indiana Rule of Trial Procedure 23, individually and on behalf of all other holders of Biglari Holdings common stock (except Defendants herein and any persons, firm, trust, corporation or other entity related to or affiliated with them and their successors in interest) who are or will be threatened with injury arising from Defendants' wrongful actions, as more fully described herein (the "Class").

89.     This Action is properly maintainable as a class action.

90.     The Class is so numerous that joinder of all members is impracticable.  There are hundreds or thousands of Biglari Holdings shareholders scattered throughout the United States. As of December 21, 2017, there were 2,067,613 shares of Biglari Holdings common stock issued and outstanding.

91.     There are questions of law and fact common to the Class, including, *inter alia*, whether:

a.   S. Biglari breached his fiduciary duties owed to the Class as the Company's controlling shareholder in connection with the Reclassification;

b.   the Individual Defendants breached their fiduciary duties owed to the Class in connection with the Reclassification;

c.   the Court should issue declaratory relief pursuant to Ind. Code § 34-14-1-1 et seq. declaring that the Reclassification is void, voidable and/or unenforceable;

d.   consummation of the Reclassification should be enjoined;

     e.   Plaintiff and the other members of the Class are being and/or will continue to be injured by the wrongful conduct alleged herein and, if so, what is the proper remedy; and

     f.   Plaintiff and the other members of the Class will be damaged irreparably by the Defendants' conduct.

92.    Plaintiff is committed to prosecuting the Action and has retained competent counsel experienced in litigation of this nature.

93.    Plaintiff's claims are typical of the claims of the other members of the Class, and Plaintiff has the same interests as the other members of the Class.

94.    Plaintiff is an adequate representative of the Class.

95.    The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for Defendants or adjudications with respect to individual members of the Class that would as a practical matter be disjunctive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

96.    Defendants have acted, and/or refused to act, on grounds generally applicable to, and causing injury to, the Class and, therefore, preliminary and final injunctive relief on behalf of the Class, as a whole, is appropriate.

97.    Plaintiff and the Class have no adequate remedy at law.

## COUNT I
### DIRECT CLAIM AGAINST S. BIGLARI IN HIS CAPACITY AS CONTROLLING SHAREHOLDER FOR BREACH OF FIDUCIARY DUTY

98.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

99.    S. Biglari, as Biglari Holdings' controlling shareholder, owes fiduciary duties to the Class including the highest duties of good faith, fair dealing, due care and loyalty.

100.    S. Biglari breached his fiduciary duties by exploiting his position of control to cause the Company to enter into the Reclassification and Reclassification Agreement on terms unfairly beneficial to himself and detrimental to the Class.

101.    As a result of S. Biglari's wrongful actions, upon consummation of the Reclassification, the Class will have their voting rights impaired.

102.    Plaintiff and the Class have no adequate remedy at law.

## COUNT II
## DIRECT CLAIM AGAINST THE INDIVIDUAL DEFENDANTS
## FOR BREACH OF FIDUCIARY DUTY

103.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

104.    The Individual Defendants, as Biglari Holdings directors, are fiduciaries of the Class.  As such, they owe the Class the highest duties of good faith, fair dealing, due care and loyalty.

105.    The Individual Defendants have breached their fiduciary duties by, among other things, facilitating and approving the Reclassification, which only serves to benefit S. Biglari.

106.    As a result of the Individual Defendants' wrongful actions described herein, upon consummation of the Reclassification, the Class will have their voting rights impaired.

107.    Plaintiff and the Class have no adequate remedy at law.

## COUNT III
## DIRECT CLAIM AGAINST S. BIGLARI FOR UNJUST ENRICHMENT

108.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

109.   Upon consummation of the Reclassification, S. Biglari will be unjustly enriched by virtue of his increased voting control over the Company and his ability to maintain that voting control in perpetuity.

110.   It would be unconscionable for S. Biglari to be permitted to receive the illicit benefits that have been and will be bestowed upon him as a result of the misconduct alleged herein.

111.   As a result of the wrongful actions of S. Biglari and the Individual Defendants, Plaintiff and the Class will be damaged.

112.   Plaintiff and the Class have no adequate remedy at law.

**COUNT IV**

**DIRECT CLAIM FOR DECLARATORY RELIEF PURSUANT TO**
**IND. CODE § 34-14-1 AGAINST BIGLARI HOLDINGS, NEW BH AND MERGER SUB**

113.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

114.   Defendants Biglari Holdings, New BH and Merger Sub are each a party to the Reclassification Agreement.

115.   As detailed herein, the Reclassification Agreement is the product of breaches of fiduciary duty by S. Biglari and the other members of the Board.

116.   The transactions called for by and under the Reclassification Agreement will impair, diminish, and potentially eliminate the voting rights Plaintiff and the other Class members currently have as stockholders of the Company.  Accordingly, each of Biglari Holdings, New BH, and Merger Sub have interests adverse to Plaintiff and the Class.

117.   Thus, pursuant to Ind. Code § 34-14-1-1 et seq., Plaintiff seeks a declaration that the Reclassification Agreement among Biglari Holdings, New BH and Merger Sub is invalid, void, voidable and/or unenforceable.

118.   In the absence of the requested declaratory relief, Plaintiff and the Class have no adequate remedy at law.

## COUNT V

### DIRECT CLAIM FOR INJUNCTIVE RELIEF AGAINST
### BIGLARI HOLDINGS, NEW BH AND MERGER SUB

119.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

120.   As detailed herein, the Reclassification Agreement is the product of breaches of fiduciary duty by S. Biglari and the other members of the Board.

121.   Thus, Plaintiff requests the Court enjoin Biglari Holdings, New BH and Merger Sub from holding the Special Meeting, holding the shareholder vote on the Reclassification, and consummating the Reclassification provided for in the Reclassification Agreement.

122.   Plaintiff and the Class have no adequate remedy at law.

## RELIEF REQUESTED

**WHEREFORE**, Plaintiff demands judgment as follows:

A.    Enjoining the vote on, and consummation of, the Reclassification;

B.    Declaring that the Defendants breached their fiduciary duties owed to the Class;

C.    Declaring that S. Biglari has been unjustly enriched;

D.    Declaring that the Reclassification Agreement is invalid, void, voidable and/or enforceable;

E.    Awarding Plaintiff the costs and disbursements of this action, including attorneys', accountants', and experts' fees; and

F.    Awarding such other and further relief as is just and equitable.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated this 7th day of February, 2018.

OF COUNSEL:

**KESSLER TOPAZ MELTER & CHECK, LLP**
Eric L. Zagar
J. Daniel Albert
Justin O. Reliford
Christopher M. Windover
280 King of Prussia Road
Radnor, PA 19087
(610) 667-7706

**FRIEDMAN OSTER & TEJTEL PLLC**
Jeremy Friedman
Spencer Oster
David Tejtel
240 East 79th Street, Suite A
New York, NY 10075
(888) 529-1108

**PRICE WAICUKAUSKI JOVEN & CATLIN, LLC**

/s/ Brad A. Catlin
Brad A. Catlin
Attorney #21570-29
301 Massachusetts Avenue
Indianapolis, IN 46204
bcatlin@price-law.com
Telephone: (317) 633-8787
Facsimile: (317) 633-8797

*Counsel for Plaintiff*

**ANDREWS & SPRINGER LLC**
Peter B. Andrews
Craig J. Springer
3801 Kennett Pike
Building C, Suite 305
Wilmington, DE 19807
(302) 504-4957

*Counsel for Plaintiff*

# EXHIBIT 2

**SUMMONS**
Hamilton Circuit Court

JOSEPH HIPPS,                                    In the Hamilton County Superior Court
Individually and on Behalf
Of All Others Similarly Situated,                CAUSE NO. _____

                         Plaintiff,

        -vs-

BIGLARI HOLDINGS, INC.,
SARDAR BIGLARI, PHILIP L. COOLEY,
KENNETH R. COOPER, JAMES P. MASTRIAN,
RUTH J. PERSON, NBHSA INC., and
BH MERGER COMPANY,

                         Defendants.


TO DEFENDANT:        BH Merger Company
                     c/o Corporation Service Company, Registered Agent
                     135 N. Pennsylvania Street, Suite 1610
                     Indianapolis, IN  46204

        You are hereby notified that you have been sued by the person named as plaintiff and in the Court
indicated above.

        The nature of the suit against you is stated in the complaint which is attached to this Summons.  It also
states the relief sought or the demand made against you by the plaintiff.

        An answer or other appropriate response in writing to the complaint must be filed either by you or your
attorney within twenty (20) days, commencing the day after you receive this Summons, (or twenty-three (23)
days if this Summons was received by mail), or a judgment by default may be rendered against you for the
relief demanded by plaintiff.

        If you have a claim for relief against the plaintiff arising from the same transaction or occurrence, you
must assert it in your written answer.

Dated: _____        _____ (Seal)
              2/8/2018                Clerk, Hamilton County Superior Court


        **(The following manner of service of summons is hereby designated.)**

_____        Registered or certified mail.
_____        Service at place of employment, to-wit:
_____        Service on individual - (Personal or copy) at above address.
___X___         Service on agent.  (Via Personal or Copy Service on Registered Agent)
_____        Other service.

                     Brad A. Catlin, Atty. No. 21570-29
                     Price Waicukauski Joven & Catlin, LLC
                     301 Massachusetts Avenue
                     Indianapolis, Indiana 46204
                     Telephone: (317) 633-8787
                     Facsimile: (317) 633-8797
                     bcatlin@price-law.com

## SHERIFF'S RETURN ON SERVICE OF SUMMONS

I hereby certify that I have served this summons on the ____ day of _____, 2018.

(1) By delivering a copy of the Summons and a copy of the complaint to the defendant.

(2) By leaving a copy of the Summons and a copy of the complaint at _____

which is the dwelling place or usual place of abode of _____

and by mailing a copy of said summons to said defendant at the above address.

(3) Other Service or Remarks:

_____
Sheriff's Costs                          Sheriff

By: _____
                         Deputy

## CLERK'S CERTIFICATE OF MAILING

I hereby certify that on the ____ day of _____, 2018, I mailed a copy of this Summons and a copy of the complaint to the defendant, _____, by _____ mail, requesting a return receipt, at the address furnished by the plaintiff.

Clerk, Hamilton County Superior Court

Dated: _____, 2018.      By: _____
                                                            Deputy

## RETURN ON SERVICE OF SUMMONS BY MAIL

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint mailed to defendant _____, was accepted by the defendant on the _____ day of _____, 2018.

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint was returned not accepted on the _____ day of _____, 2018.

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint mailed to defendant _____, was accepted by _____, on behalf of said defendant on the _____ day of _____, 2018.

Clerk, Hamilton County Superior Court

By: _____
                         Deputy

29C01-1802-CT-001154
Hamilton Superior Court

Filed: 2/7/2018 4:29 PM
Tammy Baitz
Clerk
Hamilton County, Indiana

# SUMMONS

JOSEPH HIPPS,
Individually and on Behalf
Of All Others Similarly Situated,

In the Hamilton County Superior Court

CAUSE NO. _____

                          Plaintiff,

          -vs-

BIGLARI HOLDINGS, INC.,
SARDAR BIGLARI, PHILIP L. COOLEY,
KENNETH R. COOPER, JAMES P. MASTRIAN,
RUTH J. PERSON, NBHSA INC., and
BH MERGER COMPANY,

                          Defendants.


TO DEFENDANT:     Biglari Holdings, Inc.
                  c/o Corporation Service Company, Registered Agent
                  135 N. Pennsylvania Street, Suite 1610
                  Indianapolis, IN  46204

     You are hereby notified that you have been sued by the person named as plaintiff and in the Court indicated above.

     The nature of the suit against you is stated in the complaint which is attached to this Summons.  It also states the relief sought or the demand made against you by the plaintiff.

     An answer or other appropriate response in writing to the complaint must be filed either by you or your attorney within twenty (20) days, commencing the day after you receive this Summons, (or twenty-three (23) days if this Summons was received by mail), or a judgment by default may be rendered against you for the relief demanded by plaintiff.

     If you have a claim for relief against the plaintiff arising from the same transaction or occurrence, you must assert it in your written answer.

Dated: _____                    _____ (Seal)
                    2/8/2018                         Clerk, Hamilton County Superior Court


**(The following manner of service of summons is hereby designated.)**

_____     Registered or certified mail.

_____     Service at place of employment, to-wit:

_____     Service on individual - (Personal or copy) at above address.

___X___     Service on agent.  (Via Personal or Copy Service on Registered Agent)

_____     Other service.


                    Brad A. Catlin, Atty. No. 21570-29
                    Price Waicukauski Joven & Catlin, LLC
                    301 Massachusetts Avenue
                    Indianapolis, Indiana 46204
                    Telephone: (317) 633-8787
                    Facsimile: (317) 633-8797
                    bcatlin@price-law.com

# SHERIFF'S RETURN ON SERVICE OF SUMMONS

I hereby certify that I have served this summons on the ____ day of _____, 2018.

(1) By delivering a copy of the Summons and a copy of the complaint to the defendant.

(2) By leaving a copy of the Summons and a copy of the complaint at _____

which is the dwelling place or usual place of abode of _____

and by mailing a copy of said summons to said defendant at the above address.

(3) Other Service or Remarks:

_____

Sheriff's Costs                              Sheriff

                                             By: _____
                                                        Deputy

# CLERK'S CERTIFICATE OF MAILING

I hereby certify that on the ____ day of _____, 2018, I mailed a copy of this Summons and a copy of the complaint to the defendant, _____, by _____ mail, requesting a return receipt, at the address furnished by the plaintiff.

                              Clerk, Hamilton County Superior Court

Dated: _____, 2018.    By: _____
                                                        Deputy

# RETURN ON SERVICE OF SUMMONS BY MAIL

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint mailed to defendant _____, was accepted by the defendant on the _____ day of _____, 2018.

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint was returned not accepted on the _____ day of _____, 2018.

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint mailed to defendant _____, was accepted by _____, on behalf of said defendant on the _____ day of _____, 2018.

                              Clerk, Hamilton County Superior Court

                              By: _____
                                                        Deputy

29C01-1802-CT-001154
Hamilton Superior Court

Filed: 2/7/2018 4:29 PM
Tammy Baitz
Clerk
Hamilton County, Indiana

# SUMMONS

JOSEPH HIPPS,
Individually and on Behalf
Of All Others Similarly Situated,

      Plaintiff,

    -vs-

BIGLARI HOLDINGS, INC.,
SARDAR BIGLARI, PHILIP L. COOLEY,
KENNETH R. COOPER, JAMES P. MASTRIAN,
RUTH J. PERSON, NBHSA INC., and
BH MERGER COMPANY,

      Defendants.

In the Hamilton County Superior Court

CAUSE NO. _____

TO DEFENDANT:    James P. Mastrian
                    210 Bella Colinas Dr
                    Austin, TX 78738-7631

     You are hereby notified that you have been sued by the person named as plaintiff and in the Court indicated above.

     The nature of the suit against you is stated in the complaint which is attached to this Summons.  It also states the relief sought or the demand made against you by the plaintiff.

     An answer or other appropriate response in writing to the complaint must be filed either by you or your attorney within twenty (20) days, commencing the day after you receive this Summons, (or twenty-three (23) days if this Summons was received by mail), or a judgment by default may be rendered against you for the relief demanded by plaintiff.

     If you have a claim for relief against the plaintiff arising from the same transaction or occurrence, you must assert it in your written answer.

Dated: _____2/8/2018_____         _____ (Seal)

                                   Clerk, Hamilton County Superior Court

**(The following manner of service of summons is hereby designated.)**

| | |
|---|---|
| _____ | Registered or certified mail. |
| _____ | Service at place of employment, to-wit: |
| _____ | Service on individual - (Personal or copy) at above address. |
| _____ | Service on agent.  (Specify) |
| ___X___ | Other service.  Via UPS Overnight Delivery, Signature Required |



     Brad A. Catlin, Atty. No. 21570-29
     Price Waicukauski Joven & Catlin, LLC
     301 Massachusetts Avenue
     Indianapolis, Indiana 46204
     Telephone: (317) 633-8787
     Facsimile: (317) 633-8797
     bcatlin@price-law.com

## SHERIFF'S RETURN ON SERVICE OF SUMMONS

I hereby certify that I have served this summons on the ____ day of _____, 2018.

(1) By delivering a copy of the Summons and a copy of the complaint to the defendant.

(2) By leaving a copy of the Summons and a copy of the complaint at _____

which is the dwelling place or usual place of abode of _____

and by mailing a copy of said summons to said defendant at the above address.

(3) Other Service or Remarks:

_____
Sheriff's Costs                              Sheriff

By: _____
                        Deputy

## CLERK'S CERTIFICATE OF MAILING

I hereby certify that on the ____ day of _____, 2018, I mailed a copy of this Summons and a copy of the complaint to the defendant, _____, by _____ mail, requesting a return receipt, at the address furnished by the plaintiff.

Clerk, Hamilton County Superior Court

Dated: _____, 2018.     By: _____
                                                            Deputy

## RETURN ON SERVICE OF SUMMONS BY MAIL

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint mailed to defendant _____, was accepted by the defendant on the _____ day of _____, 2018.

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint was returned not accepted on the _____ day of _____, 2018.

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint mailed to defendant _____, was accepted by _____, on behalf of said defendant on the _____ day of _____, 2018.

Clerk, Hamilton County Superior Court

By: _____
                        Deputy

**29C01-1802-CT-001154**
Hamilton Circuit Court

# SUMMONS

JOSEPH HIPPS,                                    In the Hamilton County Superior Court
Individually and on Behalf
Of All Others Similarly Situated,                CAUSE NO. _____

                    Plaintiff,

        -vs-

BIGLARI HOLDINGS, INC.,
SARDAR BIGLARI, PHILIP L. COOLEY,
KENNETH R. COOPER, JAMES P. MASTRIAN,
RUTH J. PERSON, NBHSA INC., and
BH MERGER COMPANY,

                    Defendants.


TO DEFENDANT:        Kenneth R. Cooper
                     18814 Cierra Sur
                     San Antonio, TX 78258-4021

        You are hereby notified that you have been sued by the person named as plaintiff and in the Court
indicated above.

        The nature of the suit against you is stated in the complaint which is attached to this Summons.  It also
states the relief sought or the demand made against you by the plaintiff.

        An answer or other appropriate response in writing to the complaint must be filed either by you or your
attorney within twenty (20) days, commencing the day after you receive this Summons, (or twenty-three (23)
days if this Summons was received by mail), or a judgment by default may be rendered against you for the
relief demanded by plaintiff.

        If you have a claim for relief against the plaintiff arising from the same transaction or occurrence, you
must assert it in your written answer.

Dated: _____2/8/2018_____        _____ (Seal)
                                          Clerk, Hamilton County Superior Court


        **(The following manner of service of summons is hereby designated.)**
_____        Registered or certified mail.
_____        Service at place of employment, to-wit:
_____        Service on individual - (Personal or copy) at above address.
_____        Service on agent.  (Specify)
____X____        Other service.  Via UPS Overnight Delivery, Signature Required

                        Brad A. Catlin, Atty. No. 21570-29
                        Price Waicukauski Joven & Catlin, LLC
                        301 Massachusetts Avenue
                        Indianapolis, Indiana 46204
                        Telephone: (317) 633-8787
                        Facsimile: (317) 633-8797
                        bcatlin@price-law.com

# SHERIFF'S RETURN ON SERVICE OF SUMMONS

I hereby certify that I have served this summons on the ____ day of _____, 2018.

(1) By delivering a copy of the Summons and a copy of the complaint to the defendant.

(2) By leaving a copy of the Summons and a copy of the complaint at _____

which is the dwelling place or usual place of abode of _____

and by mailing a copy of said summons to said defendant at the above address.

(3) Other Service or Remarks:

_____
Sheriff's Costs                              Sheriff

By: _____
                    Deputy

# CLERK'S CERTIFICATE OF MAILING

I hereby certify that on the ____ day of _____, 2018, I mailed a copy of this Summons and a copy of the complaint to the defendant, _____, by _____ mail, requesting a return receipt, at the address furnished by the plaintiff.

Clerk, Hamilton County Superior Court

Dated: _____, 2018.     By: _____
                                                                        Deputy

# RETURN ON SERVICE OF SUMMONS BY MAIL

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint mailed to defendant _____, was accepted by the defendant on the _____ day of _____, 2018.

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint was returned not accepted on the _____ day of _____, 2018.

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint mailed to defendant _____, was accepted by _____, on behalf of said defendant on the _____ day of _____, 2018.

Clerk, Hamilton County Superior Court

By: _____
                    Deputy

29C01-1802-CT-001154
Hamilton Superior Court

Filed: 2/7/2018 4:29 PM
Tammy Baitz
Clerk
Hamilton County, Indiana

# SUMMONS

JOSEPH HIPPS,                                    In the Hamilton County Superior Court
Individually and on Behalf
Of All Others Similarly Situated,                CAUSE NO. _____

              Plaintiff,

    -vs-

BIGLARI HOLDINGS, INC.,
SARDAR BIGLARI, PHILIP L. COOLEY,
KENNETH R. COOPER, JAMES P. MASTRIAN,
RUTH J. PERSON, NBHSA INC., and
BH MERGER COMPANY,

              Defendants.

TO DEFENDANT:     NBHSA Inc.
                     c/o Corporation Service Company, Registered Agent
                     135 N. Pennsylvania Street, Suite 1610
                     Indianapolis, IN  46204

You are hereby notified that you have been sued by the person named as plaintiff and in the Court indicated above.

The nature of the suit against you is stated in the complaint which is attached to this Summons.  It also states the relief sought or the demand made against you by the plaintiff.

An answer or other appropriate response in writing to the complaint must be filed either by you or your attorney within twenty (20) days, commencing the day after you receive this Summons, (or twenty-three (23) days if this Summons was received by mail), or a judgment by default may be rendered against you for the relief demanded by plaintiff.

If you have a claim for relief against the plaintiff arising from the same transaction or occurrence, you must assert it in your written answer.

Dated: _____    2/8/2018

                                 _____ (Seal)
                           Clerk, Hamilton County Superior Court

**(The following manner of service of summons is hereby designated.)**

_____      Registered or certified mail.
_____      Service at place of employment, to-wit:
_____      Service on individual - (Personal or copy) at above address.
   X        Service on agent.  (Via Personal or Copy Service on Registered Agent)
_____      Other service.

                 Brad A. Catlin, Atty. No. 21570-29
                 Price Waicukauski Joven & Catlin, LLC
                 301 Massachusetts Avenue
                 Indianapolis, Indiana 46204
                 Telephone: (317) 633-8787
                 Facsimile: (317) 633-8797
                 bcatlin@price-law.com

## SHERIFF'S RETURN ON SERVICE OF SUMMONS

I hereby certify that I have served this summons on the \_\_\_ day of _____, 2018.

(1) By delivering a copy of the Summons and a copy of the complaint to the defendant.

(2) By leaving a copy of the Summons and a copy of the complaint at _____

which is the dwelling place or usual place of abode of _____

and by mailing a copy of said summons to said defendant at the above address.

(3) Other Service or Remarks:

_____
Sheriff's Costs                              Sheriff

By: _____
                                                        Deputy

## CLERK'S CERTIFICATE OF MAILING

I hereby certify that on the \_\_\_ day of _____, 2018, I mailed a copy of this Summons and a copy of the complaint to the defendant, _____, by _____ mail, requesting a return receipt, at the address furnished by the plaintiff.

Clerk, Hamilton County Superior Court

Dated: _____, 2018.     By: _____
                                                                                Deputy

## RETURN ON SERVICE OF SUMMONS BY MAIL

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint mailed to defendant _____, was accepted by the defendant on the _____ day of _____, 2018.

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint was returned not accepted on the _____ day of _____, 2018.

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint mailed to defendant _____, was accepted by _____, on behalf of said defendant on the _____ day of _____, 2018.

Clerk, Hamilton County Superior Court

By: _____
                                        Deputy

29C01-1802-CT-001154
Hamilton Superior Court

# SUMMONS

JOSEPH HIPPS,
Individually and on Behalf
Of All Others Similarly Situated,

Plaintiff,

        -vs-

BIGLARI HOLDINGS, INC.,
SARDAR BIGLARI, PHILIP L. COOLEY,
KENNETH R. COOPER, JAMES P. MASTRIAN,
RUTH J. PERSON, NBHSA INC., and
BH MERGER COMPANY,

        Defendants.

In the Hamilton County Superior Court

CAUSE NO. _____

TO DEFENDANT:        Philip L. Cooley
                    438 Bentley Mnr
                    Shavano Park, TX 78249-2023

You are hereby notified that you have been sued by the person named as plaintiff and in the Court indicated above.

The nature of the suit against you is stated in the complaint which is attached to this Summons.  It also states the relief sought or the demand made against you by the plaintiff.

An answer or other appropriate response in writing to the complaint must be filed either by you or your attorney within twenty (20) days, commencing the day after you receive this Summons, (or twenty-three (23) days if this Summons was received by mail), or a judgment by default may be rendered against you for the relief demanded by plaintiff.

If you have a claim for relief against the plaintiff arising from the same transaction or occurrence, you must assert it in your written answer.

Dated: _____2/8/2018_____        _____ (Seal)

                            Clerk, Hamilton County Superior Court

**(The following manner of service of summons is hereby designated.)**

| | |
|---|---|
| _____ | Registered or certified mail. |
| _____ | Service at place of employment, to-wit: |
| _____ | Service on individual - (Personal or copy) at above address. |
| _____ | Service on agent.  (Specify) |
| ___X___ | Other service.  Via UPS Overnight Delivery, Signature Required |



Brad A. Catlin, Atty. No. 21570-29
Price Waicukauski Joven & Catlin, LLC
301 Massachusetts Avenue
Indianapolis, Indiana 46204
Telephone: (317) 633-8787
Facsimile: (317) 633-8797
bcatlin@price-law.com

# SHERIFF'S RETURN ON SERVICE OF SUMMONS

I hereby certify that I have served this summons on the ____ day of _____, 2018.

(1) By delivering a copy of the Summons and a copy of the complaint to the defendant.

(2) By leaving a copy of the Summons and a copy of the complaint at _____

which is the dwelling place or usual place of abode of _____

and by mailing a copy of said summons to said defendant at the above address.

(3) Other Service or Remarks:

_____
Sheriff's Costs                          Sheriff

By: _____
                    Deputy

# CLERK'S CERTIFICATE OF MAILING

I hereby certify that on the ____ day of _____, 2018, I mailed a copy of this Summons and a copy of the complaint to the defendant, _____, by _____ mail, requesting a return receipt, at the address furnished by the plaintiff.

Clerk, Hamilton County Superior Court

Dated: _____, 2018.    By: _____
                                                            Deputy

# RETURN ON SERVICE OF SUMMONS BY MAIL

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint mailed to defendant _____, was accepted by the defendant on the _____ day of _____, 2018.

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint was returned not accepted on the _____ day of _____, 2018.

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint mailed to defendant _____, was accepted by _____, on behalf of said defendant on the _____ day of _____, 2018.

Clerk, Hamilton County Superior Court

By: _____
                    Deputy

29C01-1802-CT-001154
Filed: 2/7/2018 4:29 PM
Tammy Baitz
Clerk
Hamilton County, Indiana

Hamilton Superior Court

## SUMMONS

JOSEPH HIPPS,
Individually and on Behalf
Of All Others Similarly Situated,

In the Hamilton County Superior Court

CAUSE NO. _____

      Plaintiff,

    -vs-

BIGLARI HOLDINGS, INC.,
SARDAR BIGLARI, PHILIP L. COOLEY,
KENNETH R. COOPER, JAMES P. MASTRIAN,
RUTH J. PERSON, NBHSA INC., and
BH MERGER COMPANY,

      Defendants.

TO DEFENDANT:    Ruth J. Person
                 2404 Tamarack Ct.
                 Ann Arbor, MI 48105-9660

You are hereby notified that you have been sued by the person named as plaintiff and in the Court indicated above.

The nature of the suit against you is stated in the complaint which is attached to this Summons. It also states the relief sought or the demand made against you by the plaintiff.

An answer or other appropriate response in writing to the complaint must be filed either by you or your attorney within twenty (20) days, commencing the day after you receive this Summons, (or twenty-three (23) days if this Summons was received by mail), or a judgment by default may be rendered against you for the relief demanded by plaintiff.

If you have a claim for relief against the plaintiff arising from the same transaction or occurrence, you must assert it in your written answer.

Dated: _____     2/8/2018         _____ (Seal)
                                          Clerk, Hamilton County Superior Court

**(The following manner of service of summons is hereby designated.)**

| | |
|---|---|
| _____ | Registered or certified mail. |
| _____ | Service at place of employment, to-wit: |
| _____ | Service on individual - (Personal or copy) at above address. |
| _____ | Service on agent. (Specify) |
|   X   | Other service. Via UPS Overnight Delivery, Signature Required |



Brad A. Catlin, Atty. No. 21570-29
Price Waicukauski Joven & Catlin, LLC
301 Massachusetts Avenue
Indianapolis, Indiana 46204
Telephone: (317) 633-8787
Facsimile: (317) 633-8797
bcatlin@price-law.com

## SHERIFF'S RETURN ON SERVICE OF SUMMONS

I hereby certify that I have served this summons on the ____ day of _____, 2018.

(1) By delivering a copy of the Summons and a copy of the complaint to the defendant.

(2) By leaving a copy of the Summons and a copy of the complaint at _____

which is the dwelling place or usual place of abode of _____

and by mailing a copy of said summons to said defendant at the above address.

(3) Other Service or Remarks:

_____
Sheriff's Costs                                    Sheriff

                                                   By: _____
                                                            Deputy

## CLERK'S CERTIFICATE OF MAILING

I hereby certify that on the ____ day of _____, 2018, I mailed a copy of this Summons and a copy of the complaint to the defendant, _____, by _____ mail, requesting a return receipt, at the address furnished by the plaintiff.

                                   Clerk, Hamilton County Superior Court

Dated: _____, 2018.   By: _____
                                            Deputy

## RETURN ON SERVICE OF SUMMONS BY MAIL

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint mailed to defendant _____, was accepted by the defendant on the _____ day of _____, 2018.

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint was returned not accepted on the _____ day of _____, 2018.

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint mailed to defendant _____, was accepted by _____, on behalf of said defendant on the _____ day of _____, 2018.

                                   Clerk, Hamilton County Superior Court

                                   By: _____
                                            Deputy

29C01-1802-CT-001154

Hamilton Superior Court

Filed: 2/7/2018 4:29 PM
Tammy Baitz
Clerk
Hamilton County, Indiana

# SUMMONS

JOSEPH HIPPS,
Individually and on Behalf
Of All Others Similarly Situated,

In the Hamilton County Superior Court

CAUSE NO. _____

        Plaintiff,

    -vs-

BIGLARI HOLDINGS, INC.,
SARDAR BIGLARI, PHILIP L. COOLEY,
KENNETH R. COOPER, JAMES P. MASTRIAN,
RUTH J. PERSON, NBHSA INC., and
BH MERGER COMPANY,

        Defendants.

TO DEFENDANT:     SARDAR BIGLARI
                 138 Manchester Way
                 Shavano Park, TX 78249-2023

    You are hereby notified that you have been sued by the person named as plaintiff and in the Court indicated above.

    The nature of the suit against you is stated in the complaint which is attached to this Summons. It also states the relief sought or the demand made against you by the plaintiff.

    An answer or other appropriate response in writing to the complaint must be filed either by you or your attorney within twenty (20) days, commencing the day after you receive this Summons, (or twenty-three (23) days if this Summons was received by mail), or a judgment by default may be rendered against you for the relief demanded by plaintiff.

    If you have a claim for relief against the plaintiff arising from the same transaction or occurrence, you must assert it in your written answer.

Dated: _____            _____ (Seal)
       2/8/2018
                      Clerk, Hamilton County Superior Court

**(The following manner of service of summons is hereby designated.)**

_____    Registered or certified mail.
_____    Service at place of employment, to-wit:
_____    Service on individual - (Personal or copy) at above address.
_____    Service on agent. (Specify)
___X___    Other service. Via UPS Overnight Delivery, Signature Required



        Brad A. Catlin, Atty. No. 21570-29
        Price Waicukauski Joven & Catlin, LLC
        301 Massachusetts Avenue
        Indianapolis, Indiana 46204
        Telephone: (317) 633-8787
        Facsimile: (317) 633-8797
        bcatlin@price-law.com

## SHERIFF'S RETURN ON SERVICE OF SUMMONS

I hereby certify that I have served this summons on the _____ day of _____, 2018.

(1) By delivering a copy of the Summons and a copy of the complaint to the defendant.

(2) By leaving a copy of the Summons and a copy of the complaint at _____

which is the dwelling place or usual place of abode of _____

and by mailing a copy of said summons to said defendant at the above address.

(3) Other Service or Remarks:

_____
Sheriff's Costs                                Sheriff

By: _____
                                    Deputy

## CLERK'S CERTIFICATE OF MAILING

I hereby certify that on the _____ day of _____, 2018, I mailed a copy of this Summons and a copy of the complaint to the defendant, _____, by _____ mail, requesting a return receipt, at the address furnished by the plaintiff.

Clerk, Hamilton County Superior Court

Dated: _____, 2018.       By: _____
                                                              Deputy

## RETURN ON SERVICE OF SUMMONS BY MAIL

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint mailed to defendant _____, was accepted by the defendant on the _____ day of _____, 2018.

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint was returned not accepted on the _____ day of _____, 2018.

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint mailed to defendant _____, was accepted by _____, on behalf of said defendant on the _____ day of _____, 2018.

Clerk, Hamilton County Superior Court

By: _____
                                    Deputy

# EXHIBIT 3

Case 1:18-cv-00475-SEB-TAB   Document 1-2   Filed 02/16/18   Page 49 of 440 PageID #: 61

**29C01-1802-CT-001154**
Hamilton Circuit Court

Filed: 2/7/2018 4:29 PM
Tammy Baitz
Clerk
Hamilton County, Indiana

STATE OF INDIANA       )    IN THE HAMILTON COUNTY SUPERIOR COURT
                                 )    SS:
COUNTY OF HAMILTON    )    CAUSE NO.

| | |
|---|---|
| JOSEPH HIPPS, Individually and on Behalf of All Others Similarly Situated,   ) )<br><br>Plaintiff,   )<br><br>v.   )<br><br>BIGLARI HOLDINGS, INC., SARDAR BIGLARI, PHILIP L. COOLEY, KENNETH R. COOPER, JAMES P. MASTRIAN, RUTH J. PERSON, NBHSA INC., and BH MERGER COMPANY,   )<br><br>Defendants.   ) | )<br>)<br>)<br>)<br>)    JURY TRIAL DEMANDED<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

### APPEARANCE

1.    The undersigned attorney and all attorneys listed on this form now appear in this case for the following party member(s):

     Plaintiffs: Joseph Hipps, Individually and on Behalf of All Others Similarly Situated.

2.    Applicable attorney information for service as required by Trial Rule 5(B)(2) and for case information as required by Trial Rules 3.1 and 77(B) is as follows:

     Name:            Brad A. Catlin
     Attorney No.:      21570-29
     Firm:             PRICE WAICUKAUSKI JOVEN & CATLIN, LLC
     Address:        The Hammond Block Building
                        301 Massachusetts Avenue
                        Indianapolis, IN 46204
     Telephone:      (317) 633-8787
     Facsimile:       (317) 633-8797

3.    There are other party members: No

4.    If first initiating party filing this case, the clerk is requested to assign this case the following Case Type under administrative rule 8(b)(3): CT

5.    I will accept service by FAX: No

6.     This case involves support issues:  No

7.     There are related cases:  No

8.     This form has been served on all other parties.  Certificate of Service is attached:  No

9.     Additional information required by state or local rule:  None

Respectfully submitted,

**PRICE WAICUKAUSKI JOVEN
& CATLIN, LLC**

/s/ Brad A. Catlin
Brad A. Catlin, Atty. No. 21570-29
The Hammond Block Building
301 Massachusetts Avenue
Indianapolis, IN 46204
Phone: (317) 633-8787
Fax: (317) 633-8797
Email: bcatlin@price-law.com

# EXHIBIT 4

Filed: 2/8/2018 2:54 PM
Tammy Baitz
Clerk
Hamilton County, Indiana

| STATE OF INDIANA | ) | IN THE HAMILTON COUNTY SUPERIOR COURT |
|---|---|---|
| | ) | SS: |
| COUNTY OF HAMILTON | ) | CAUSE NO. 29C01-1802-CT-001154 |

| | |
|---|---|
| JOSEPH HIPPS, Individually and on Behalf of All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| BIGLARI HOLDINGS, INC., SARDAR BIGLARI, PHILIP L. COOLEY, KENNETH R. COOPER, JAMES P. MASTRIAN, RUTH J. PERSON, NBHSA INC., and BH MERGER COMPANY, | ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

## CERTIFICATE OF ISSUANCE OF SUMMONSES

Plaintiff, Joseph Hipps, Individually and on Behalf of All Others Similarly Situated, by his counsel Brad A. Catlin, hereby certifies that Summonses were served upon the following Defendants via UPS Overnight Delivery this 8th day of February, 2018, as follows:

Sardar Biglari
138 Manchester Way
Shavano Park, TX 78249-2023
Via UPS Overnight Delivery
Tracking No. 1Z0022392491309760

Philip L. Cooley
438 Bentley Mnr
Shavano Park, TX 78249-2023
Via UPS Overnight Delivery
Tracking No. 1Z0022392499306758

Kenneth R. Cooper
18814 Cierra Sur
San Antonio, TX 78258-4021
Via UPS Overnight Delivery
Tracking No. 1Z0022392499959964

1

James P. Mastrian
210 Bella Colinas Dr
Austin, TX 78738-7631
Via UPS Overnight Delivery
Tracking No. 1Z0022392491626373

Ruth J. Person
2404 Tamarack Ct.
Ann Arbor, MI 48105-9660
Via UPS Overnight Delivery
Tracking No. 1Z0022392492645752

Respectfully submitted,

PRICE WAICUKAUSKI JOVEN & CATLIN, LLC

/s/ Brad A. Catlin
Brad A. Catlin, Atty. No. 21570-29
The Hammond Block Building
301 Massachusetts Avenue
Indianapolis, IN 46204
Phone: (317) 633-8787
Fax: (317) 633-8797
Email: bcatlin@price-law.com

2

# EXHIBIT 5

Filed: 2/8/2018 5:21 PM
Tammy Baitz
Clerk
Hamilton County, Indiana

| | | |
|---|---|---|
| STATE OF INDIANA | ) | IN THE HAMILTON COUNTY SUPERIOR COURT |
| | ) | SS: |
| COUNTY OF HAMILTON | ) | CAUSE NO. 29C01-1802-CT-001154 |

| | |
|---|---|
| JOSEPH HIPPS, Individually and on Behalf of All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) |
| BIGLARI HOLDINGS, INC., SARDAR BIGLARI, PHILIP L. COOLEY, KENNETH R. COOPER, JAMES P. MASTRIAN, RUTH J. PERSON, NBHSA INC., and BH MERGER COMPANY, | ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

## AFFIDAVIT OF SERVICE OF SUMMONSES

Comes now Nancy A. Webb and being duly sworn upon her oath, deposes and says:

1.　I am Legal Assistant to Brad A. Catlin, counsel for Plaintiff, Joseph Hipps, Individually and on Behalf of All Others Similarly Situated.

2.　On February 8, 2018, I personally served the Defendants Biglari Holdings, Inc., NBHSA, Inc., and BH Merger Company by delivering a copy of the Complaint, Summonses and Appearance of Brad A. Catlin upon Suzanne Turpin, receptionist at the office of their Registered Agent, Corporation Service Company, at 135 N. Pennsylvania Street, Suite 1610, Indianapolis, Indiana 46204.

Further Affiant Saith Not.

_Nancy A. Webb_
Nancy A. Webb

1

STATE OF INDIANA )
        ) SS:
COUNTY OF Bartholomew )

   Before me, a Notary Public, in and for said County and State, personally appeared Nancy A. Webb who acknowledged the foregoing Affidavit this 8th day of February, 2018.


My Commission Expires:      _Valerie Bloom_
               Notary Public
_August 12, 2020_      Printed: Valerie Bloom
               County of Residence: Bartholomew

> **VALERIE BLOOM**
> Notary Public- Seal
> State of Indiana
> My Commission Expires Aug 12, 2020

# EXHIBIT 6

Filed: 2/8/2018 4:02 PM
Tammy Baitz
Clerk
Hamilton County, Indiana

STATE OF INDIANA        )   IN THE HAMILTON COUNTY SUPERIOR COURT
                          )   SS:
COUNTY OF HAMILTON   )   CAUSE NO. 29C01-1802-CT-001154

| | |
|---|---|
| JOSEPH HIPPS, Individually and on Behalf of All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) ) |
| BIGLARI HOLDINGS, INC., SARDAR BIGLARI, PHILIP L. COOLEY, KENNETH R. COOPER, JAMES P. MASTRIAN, RUTH J. PERSON, NBHSA INC., and BH MERGER COMPANY, | ) ) ) ) ) ) ) |
| Defendants. | ) ) |

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

### I.   INTRODUCTION

Pursuant to Ind. Trial Rule 65, plaintiff Joseph Hipps ("Plaintiff"), by and through the undersigned counsel, hereby moves the Court on behalf of himself and all similarly situated shareholders of Biglari Holdings Inc. ("Biglari Holdings" or the "Company") for an Order preliminarily enjoining: (i) an upcoming special meeting of Biglari Holdings shareholders (the "Special Meeting"), at which Sardar Biglari ("S. Biglari"), the Company's Chief Executive Officer ("CEO"), Chairman, and controlling shareholder, will unilaterally impose an unfair reclassification of the Company (the "Reclassification"); and (ii) the consummation of the Reclassification.[1]  The grounds for this Motion are summarized below, and will be fully set forth in Plaintiff's forthcoming brief (the "Brief") and the documents and exhibits in support thereof.

---

[1] Absent the requested relief, the Reclassification will occur pursuant to the Agreement and Plan of Merger (the "Reclassification Agreement"), dated as of December 21, 2017, by and among Biglari Holdings, NBHSA Inc. ("New BH") and BH Merger Company ("Merger Sub").

The Brief and supporting documents are hereby adopted by reference as if set forth fully herein and made an integral part hereof.  In further support of this Motion, Plaintiff also hereby adopts by reference as if set forth fully herein and made an integral part hereof the operative Class Action Complaint (the "Complaint") filed on February 7, 2018.

In support of this Motion, Plaintiff states as follows:

## II.    STATEMENT OF FACTS[2]

1.    This shareholder class action challenges, *inter alia*, breaches of fiduciary duty by S. Biglari, the Company's Chairman, CEO, and controlling stockholder, as well as the other members of the Company's board of directors (the "Board") in connection with the Reclassification.  ¶¶ 1, 98-107.

2.    As alleged in detail in the Complaint, members of the Board breached their fiduciary duties by approving the Reclassification at the behest of, and for the exclusive benefit of, S. Biglari.  ¶¶ 1, 98-107.  The Reclassification is unfair to the Company's minority shareholders and will cause them irreparable harm by irrevocably altering the Company's capital structure to ensure S. Biglari's perpetual control over the Company.  ¶¶ 12, 81-87.

3.    The Reclassification is the product of S. Biglari's self-interest and domination of his fellow directors, who facilitated the Reclassification on terms unfair to the Company's public shareholders.  ¶¶ 6, 12, 69-72, 81-87.

4.    The Reclassification will occur pursuant to the Reclassification Agreement among Defendants Biglari Holdings, New BH and Merger Sub.  ¶¶ 7, 74.  Under the Reclassification Agreement, Merger Sub will merge with and into Biglari Holdings, with Biglari Holdings

---

[2] All "¶" and "¶¶" citations refer to the numbered paragraphs of the Complaint.  Plaintiff respectfully refers the Court to the Complaint for a full summary of the facts giving rise to this action and Plaintiff's request for preliminary injunctive relief.

continuing as the surviving corporation and a wholly-owned subsidiary of New BH.  *Id*.  Upon completion of the merger, New BH will be named "Biglari Holdings Inc." and will replace the Company as the publicly-held corporation through which the Company's business is conducted. *Id*.

5.     While the Company currently has only one class of common stock, New BH will have two classes of common stock:  Class A common stock ("Class A Stock") and Class B common stock ("Class B Stock").  ¶¶ 8, 75.  A share of Class B Stock will have economic rights equivalent to 1/5th of a share of Class A Stock, but unlike the Class A Stock, will provide no voting rights.  *Id*.

6.     As a result of the Reclassification, Biglari Holdings' shareholders will become shareholders of New BH and will receive, for every ten shares of Company common stock they own immediately prior to the effective time of the Reclassification, (a) ten shares of Class B Stock and (b) one share of Class A Stock.  ¶¶ 9, 76.  In other words, in the Reclassification, shareholders will receive for each of their shares of Biglari Holdings common stock (a) one share of Class B Stock and (b) 1/10th of one share of Class A Stock.  *Id*.

7.     The Company, however, will not issue any fractional shares of Class A Stock.  ¶¶ 10, 77.  Rather, where the Reclassification would result in the issuance of fractional shares of Class A Stock, shareholders will receive one additional share of Class B Stock for every 1/5th of one share of Class A Stock they otherwise would have received, and will receive cash in lieu of any remaining fractional shares of Class A Stock.  *Id*.

8.     As a result of the Reclassification, S. Biglari will be able to maintain his voting control over the Company in perpetuity, regardless of future issuances of Company stock.  ¶¶ 11, 59, 78-79, 86.  In addition, because the Company will not issue any fractional shares of its new

voting stock, the Reclassification will also increase S. Biglari's voting control over the Company by eliminating an unknown number of voting shares currently in the hands of public shareholders. ¶¶ 10, 77, 85-86.

9.      S. Biglari orchestrated—and the Board approved and recommended—the Reclassification for the explicit purpose of indefinitely vesting control of the Company in S. Biglari.  ¶¶ 1, 78-79.  Indeed, according to the Form S-4/A filed by New BH with the U.S. Securities and Exchange Commission on February 5, 2018 in connection with the Reclassification, the Board has conceded that the purpose of the Reclassification is "[t]o sustain the dual goal of maintaining the founder's [*i.e.*, S. Biglari's] control and of preserving the option of issuing equity in acquisitions, financings or for other purposes." ¶ 79.

10.      In addition, S. Biglari, who currently controls over 52% of the Company's voting shares, will unilaterally approve the Reclassification at the Special Meeting.  ¶¶ 12, 80.  Indeed, rather than providing public shareholders with any meaningful vote on the Reclassification, approval of the Reclassification is conditioned solely on the affirmative vote of a simple majority of all shares entitled to vote at the Special Meeting.  *Id.*

11.      Notably, prior to obtaining majority control, S. Biglari attempted similar self-serving reclassifications at Biglari Holdings, but he could not garner the necessary shareholder support.  ¶¶ 3, 28-36.  Now, because S. Biglari has control of over 52% of the Company's total outstanding voting power, absent judicial relief, Plaintiff and the Company's other minority shareholders will be forced to exchange their Biglari Holdings stock for the stock of a new company that S. Biglari will control for the foreseeable future.  ¶¶ 12, 17, 26, 86.

12.      Though no date has been set for the Special Meeting, counsel for Defendants informed counsel for Plaintiff that the meeting was expected to occur within the next thirty (30) to

sixty (60) days.  Soon after S. Biglari casts his deciding vote at the Special Meeting, the Company will consummate and implement the Reclassification, forever altering the Company's capital structure and irreparably harming the Company's minority shareholders.  ¶¶ 12, 80.

13.    By promoting S. Biglari's interests above the interests of all other Company shareholders, and by taking and/or facilitating actions that will significantly impact the voting rights of Biglari Holdings' minority public shareholders, S. Biglari and the other defendant directors have breached their fiduciary duties to the Company's shareholders.  ¶¶ 98-107.

14.    Because the Reclassification resulted from these breaches of fiduciary duty and will irreparably harm Plaintiff and other public stockholders' voting rights in the Company, the Court should enjoin the Individual Defendants,[3] as well as Defendants Biglari Holdings, New BH, and Merger Sub, from holding the Special Meeting or carrying out any transactions called for by the Reclassification Agreement.  ¶¶ 101, 106, 116, 121.

15.    While Plaintiff believes that the instant Motion is meritorious, Plaintiff is contemporaneously filing a motion seeking expedited proceedings, including discovery, to help develop the factual record in advance of any hearing on or adjudication of this Motion (the "Motion to Expedite").  For the reasons more fully explained in the Motion to Expedite, expedited discovery will benefit both the parties and the Court by allowing a more robust adjudication of the merits of this Motion.  *See Edudata Corp. v. Scientific Computs., Inc.*, 599 F. Supp. 1084, 1088 (D. Minn. 1984) (ordering expedited discovery because it would "better enable the court to judge the parties' interests and respective chances for success on the merits" at preliminary injunction hearing). Accordingly, Plaintiff's Motion to Expedite likewise requests an order directing the parties to meet

---

[3] As used herein, the "Individual Defendants" means Defendants S. Biglari, Philip L. Cooley, Kenneth R. Cooper, James P. Mastrian and Ruth J. Person.

and confer regarding a full briefing schedule on this Motion following any expedited discovery ordered by the Court.

## III.   <u>ARGUMENT</u>

16.     The Court should issue an order preliminarily enjoining the Special Meeting and Reclassification until such time as the Court can hear a full trial on the merits of Plaintiff's claims for injunctive and declaratory relief.

17.     Indiana courts measure the propriety of issuing a preliminary injunction by the following factors, each of which is satisfied here:

> (1) there exists a reasonable likelihood of success at trial; (2) the remedies at law are inadequate, thus causing irreparable harm pending resolution of the substantive action; (3) the threatened injury to the movant outweighs the potential harm to the nonmovant from the granting of an injunction; and (4) the public interest would not be disserved by granting the requested injunction.

*Indiana v. Econ. Freedom Fund*, 959 N.E.2d 794, 803 (Ind. 2011).

18.     <u>First</u>, Plaintiff has demonstrated a reasonable likelihood of success at trial by establishing a prima facie case that the Individual Defendants breached their fiduciary duties to Company shareholders.  As directors of Biglari Holdings (and, with regard to S. Biglari, as the Company's controlling shareholder), the Individual Defendants owed Biglari Holdings shareholders the fiduciary duties of loyalty, good faith and fair dealing.  *See, e.g.*, *G & N Aircraft, Inc. v. Boehm*, 743 N.E.2d 227, 240 (Ind. 2001) ("The fiduciary must deal fairly, honestly, and openly with his corporation . . . [and] must not be distracted from the performance of his official duties by personal interests.") (internal citation omitted); *Lees Inns of Am., Inc. v. William R. Lee Irrevocable Tr.*, 924 N.E.2d 143, 157 (Ind. Ct. App. 2010) ("We initially observe that the 'majority shareholder owes fiduciary duties to the minority shareholders.'") (quoting *Galligan v. Galligan*, 741 N.E.2d 1217, 1228 (Ind. 2001)).

19.     By proposing the Reclassification to perpetuate his indefinite control over Biglari Holdings, voting for its approval as a director, and ensuring that his vote was the only vote that mattered on the Reclassification, S. Biglari put his interests ahead of the interests of all other Biglari Holdings shareholders, who gain nothing from this transaction. *See Gatz v. Ponsoldt*, 925 A.2d 1265, 1280 (Del. 2007) (holding that minority stockholders should be able to seek redress for a self-dealing recapitalization in which a controlling shareholder "cause[d] an expropriation of economic value and voting power from the public shareholders").

20.     The remaining four director defendants did nothing to address the divergent interests of S. Biglari and the Company's minority shareholders.  Among other things, the Board committee that initially "reviewed" this transaction: (1) did not retain a financial advisor; (2) met only three times over a thirteen month period; and (3) did not negotiate for the modification of any aspect of the Reclassification initially proposed by S. Biglari.  ¶¶ 6, 69, 71 & n.6, 72.  Simply put, the four other director defendants not only failed to make an informed decision on behalf of all shareholders, but also acted to benefit S. Biglari to the public shareholders' detriment.  The full five-member Board, including S. Biglari, then unanimously voted to approve the unfair Reclassification upon the committee's recommendation.  ¶¶ 6-7, 73.

21.     Thus, despite S. Biglari's manifest conflicts of interest, the Board did not take any precautions to mitigate any such conflicts.  The Board could have, but did not, require S. Biglari's recusal from the vote and deliberations in connection with the Reclassification.  The Board likewise declined to condition the Reclassification on the approval of a majority of the Company's

unaffiliated shareholders.[4]  ¶¶ 12, 80.  Instead, it ensured that S. Biglari's vote would dictate the outcome of the Special Meeting.

22.     S. Biglari's exploitation of his position as a director and controlling shareholder of the Company to benefit himself, and his fellow directors' failure to engage in a fair process to protect the interests of the public shareholders, constituted breaches of their respective fiduciary duties.  Thus, Plaintiff has a reasonable probability of success on these claims.  *See Sealy Mattress Co. of New Jersey, Inc. v. Sealy, Inc.*, 532 A.2d 1324, 1338 (Del. Ch. 1987) (noting that "in carrying out its affirmative duty to protect the interests of the minority, [a board] could not abdicate its obligation to make an informed decision on the fairness of the merger by simply deferring to the judgment of the controlling stockholder, particularly where, as here, the majority stockholder's interests were in unalloyed conflict with the minority."); *In re Nine Systems Corp. S'holders Litig.*, Cons. C.A. No. 3940-VCN, 2014 WL 4383127, at *47 (Del. Ch. Sept. 4, 2014) (holding that corporate fiduciaries and a controlling shareholder group breached their fiduciary duties by orchestrating a self-interested recapitalization that benefited the controlling shareholder group to the detriment of minority shareholders).

23.     Second, consummation of the Reclassification will cause Plaintiff and the Company's other minority shareholders irreparable harm.  Once S. Biglari approves the Reclassification at the Special Meeting, Biglari Holdings will promptly effectuate the permanent alteration of its capital structure and the issuance of two new classes of stock, which will immediately begin trading on national exchanges.  Courts have recognized the irreparable nature

---

[4] *See, e.g., In re John Q. Hammons Hotels Inc. S'holder Litig.*, Civil Action No. 758-CC, 2009 WL 3165613, at *12 (Del. Ch. Oct. 2, 2009) ("The majority of the minority vote, however, provides the stockholders an important opportunity to approve or disapprove of the work of the special committee and to stop a transaction they believe is not in their best interests.").

of harm to stockholders caused by corporate transactions such as recapitalizations or reclassifications.  *See Matheson v. Kaiser Aluminum Corp.*, No. CIV.A. 14900, 1996 WL 33167234, at *1 (Del. Ch. Apr. 8, 1996) (preliminarily enjoining a proposed reclassification, noting the unquantifiable nature of the harm to stockholders from a change to the company's corporate structure), *aff'd, Kaiser Aluminum Corp. v. Matheson*, 681 A.2d 392 (Del. 1996).  Once the Reclassification occurs, it will be impossible to "unscramble the eggs" by reversing the issuance of shares in New BH.  *See, e.g.*, *Catamaran Acquisition Corp. v. Spherion Corp.*, No. CIV.A. 00C-09-180JRS, 2001 WL 755387, at *4 (Del. Sup. Ct. May 31, 2001) ("the Court of Chancery would find it impossible to 'unscramble the eggs' by rescinding the Agreement"); *Police & Fire Ret. Sys. of City of Detroit v. Bernal*, Civil Action No. 4663-CC, 2009 WL 1873144, at *2 (Del. Ch. June 26, 2009) ("Moreover, it would be impossible to 'unscramble the eggs' by attempting to unwind the merger once it has been completed.").

24.    Moreover, because the Reclassification will result in the cancellation of a number of shares currently held by the Company's public shareholders and a corresponding increase in S. Biglari's voting control over the Company, its occurrence will permanently displace Biglari Holdings shareholders' voting rights.  Where a corporate restructuring transaction is intended to perpetuate control, the corresponding "loss of voting power constitutes irreparable injury." *Phillips v. Insituform of N. Am., Inc.*, Civ. A. No. 9173, 1987 WL 16285, at *11 (Del. Ch. Aug. 27, 1987).  This will also make rescission very difficult, if not impossible, and damages incalculable and unrecoverable.  *See, e.g.*, *Flight Options Int'l, Inc. v. Flight Options, LLC*, C.A. No. 1459-N, 2005 WL 6799224, at *10 (Del. Ch. July 11, 2005) (finding irreparable harm where rescission was "less facile" because of the "likelihood that further changes [would] be made in the Company's capital structure").

25.    <u>Third</u>, the balance of equities clearly favors Plaintiff.  In contrast to the irreparable harm that Plaintiff and all Biglari Holdings shareholders (other than S. Biglari) will suffer through the loss of their voting rights if the Reclassification occurs, a preliminary injunction will only preserve the status quo until the final resolution of Plaintiff's claims.  If Plaintiff's claims do not succeed, S. Biglari can still change the Company's corporate structure in the future.  Moreover, assuming S. Biglari maintains his majority voting control throughout this litigation, he will still be able to unilaterally approve the Reclassification at another Special Meeting.  *See Rees v. Panhandle E. Pipe Line Co.*, 377 N.E.2d 640, 649 (Ind. Ct. App. 1978) ("Furthermore, an interlocutory order should be granted where the injury which the defendant would suffer from its issuance is slight as compared with the damage which plaintiff would sustain from its refusal") (internal quotation omitted); *Swanson v. Futures Unlimited, Inc.*, 457 N.E.2d 241, 242 (Ind. Ct. App. 1983) (noting that one of the "factors which should be considered in determining whether to grant a party's request for preliminary injunction include . . . whether the injunction will serve to preserve the status quo").

26.    <u>Fourth</u>, it is in the public interest to grant the preliminary injunction because it will ensure that the officers and directors of a public corporation—*i.e.*, S. Biglari and the director defendants—adhere to their fiduciary obligations.  *See, e.g.*, *Sample v. Morgan*, 935 A.2d 1046, 1062 (Del. Ch. 2007) (holding that public interest would not be served by allowing breaches of fiduciary duty to go uncorrected).

## IV.    <u>CONCLUSION</u>

Accordingly, Plaintiff respectfully requests that the Court issue the proposed Order, submitted herewith: (1) enjoining Defendants from holding the Special Meeting; (2) enjoining Defendants from consummating the Reclassification; and (3) granting such other and further relief as the Court deems appropriate under the circumstances.

Dated this 8th day of February, 2018.

OF COUNSEL:

**KESSLER TOPAZ MELTER & CHECK, LLP**
Eric L. Zagar
J. Daniel Albert
Justin O. Reliford
Christopher M. Windover
280 King of Prussia Road
Radnor, PA 19087
(610) 667-7706

**FRIEDMAN OSTER & TEJTEL PLLC**
Jeremy Friedman
Spencer Oster
David Tejtel
240 East 79th Street, Suite A
New York, NY 10075
(888) 529-1108

**ANDREWS & SPRINGER LLC**
Peter B. Andrews
Craig J. Springer
3801 Kennett Pike
Building C, Suite 305
Wilmington, DE 19807
(302) 504-4957

*Counsel for Plaintiff*

**PRICE WAICUKAUSKI JOVEN & CATLIN, LLC**

/s/ Brad A. Catlin
Brad A. Catlin
Attorney #21570-29
301 Massachusetts Avenue
Indianapolis, IN 46204
bcatlin@price-law.com
Telephone: (317) 633-8787
Facsimile: (317) 633-8797

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I CERTIFY that on this 8th day of February 2018, copies of Plaintiff's Motion for Preliminary Injunction, Compendium of Authorities Contained in Plaintiff's Motion for Preliminary Injunction Not Cited in Northeastern Reporter System and [Proposed] Order Granting Plaintiff's Motion for Preliminary Injunction were served via hand-delivery upon the following:

Biglari Holdings Inc.
c/o Corporation Service Company,
Registered Agent
135 N. Pennsylvania St., Suite
1610
Indianapolis, IN 46204

BH Merger Company
c/o Corporation Service Company,
Registered Agent
135 N. Pennsylvania St., Suite 1610
Indianapolis, IN 46204

NBHSA Inc.
c/o Corporation Service Company,
Registered Agent
135 N. Pennsylvania St., Suite 1610
Indianapolis, IN 46204

I CERTIFY that on this 8th day of February 2018, copies of Plaintiff's Motion for Preliminary Injunction, Compendium of Authorities Contained in Plaintiff's Motion for Preliminary Injunction Not Cited in Northeastern Reporter System and [Proposed] Order Granting Plaintiff's Motion for Preliminary Injunction were served via UPS, Overnight Delivery upon the following:

Sardar Biglari
138 Manchester Way
Shavano Park, TX 78249

James P. Mastrian
210 Bella Colinas Dr
Austin, TX 78738

Philip L. Cooley
438 Bentley Mnr
Shavano Park, TX 78249

Ruth J. Person
2404 Tamarack Ct
Ann Arbor, MI 48105

Kenneth R. Cooper
18814 Cierra Sur
San Antonio, TX 78258

/s/ Brad A. Catlin
Brad A. Catlin

STATE OF INDIANA ) IN THE HAMILTON COUNTY SUPERIOR COURT
 ) SS:
COUNTY OF HAMILTON ) CAUSE NO. 29C01-1802-CT-001154


JOSEPH HIPPS, Individually and on )
Behalf of All Others Similarly Situated, )
 )
 Plaintiff, )
 )
 v. )
 )
BIGLARI HOLDINGS, INC., SARDAR )
BIGLARI, PHILIP L. COOLEY, )
KENNETH R. COOPER, JAMES P. )
MASTRIAN, RUTH J. PERSON, )
NBHSA INC., and BH MERGER )
COMPANY, )
 )
 Defendants. )


## COMPENDIUM OF AUTHORITIES CONTAINED
## IN PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
## NOT CITED IN NORTHEASTERN REPORTER SYSTEM

**Cases**  **Tab**

*Catamaran Acquisition Corp. v. Spherion Corp.*,
 No. CIV.A. 00C-09-180JRS, 2001 WL 755387 (Del. Sup. Ct. May 31, 2001) .......................1

*Edudata Corp. v. Scientific Computs, Inc.*,
 599 F. Supp. 1084 (D. Minn. 1984).....................................................................................2

*Flight Options Int'l, Inc. v. Flight Options, LLC*,
 C.A. No. 1459-N, 2005 WL 6799224 (Del. Ch. July 11, 2005)...............................................3

*Gatz v. Ponsoldt*,
 925 A.2d 1265.....................................................................................................................4

*In re John Q. Hammons Hotels Inc. S'holder Litig.*,
 Civil Action No. 758-CC, 2009 WL 3165613 (Del. Ch. Oct. 2, 2009)....................................5

*Matheson v. Kaiser Aluminum Corp.*,
 1996 WL 33167234 (Del. Ch. Apr. 8, 1996), *aff'd*, *Kaiser Aluminum Corp. v.*
 *Matheson*, 681 A.2d 392 (Del. 1996) .................................................................................6

*In re Nine Systems Corp. S'holders Litig.*,
    Civ. A. No. 3940-VCN, 2014 WL 4383127 (Del. Ch. Sept. 4, 2014)......................................7

*Phillips v. Insituform of N. Am., Inc.*,
    1987 WL 16285 (Del. Ch. Aug. 27, 1987) ...............................................................................8

*Police & Fire Ret. Sys. of City of Detroit v. Bernal*, Civil Action No. 4663-CC,
    2009 WL 1873144 (Del. Ch. June 26, 2009) ...........................................................................9

*Sample v. Morgan*,
    935 A.2d 1046 (Del. Ch. 2007)...............................................................................................10

*Sealy Mattress Co. of New Jersey v. Sealy, Inc.*,
    532 A.2d 1324 (Del. Ch. 1987)...............................................................................................11

Dated:  February 8, 2018

*TAB 1*

Case 1:18-cv-00475-SEB-TAB Document 1-2 Filed 02/16/18 Page 73 of 440 PageID #: 85
Catamaran Acquisition Corp. v. Spherion Corp., Not Reported in A.2d (2001)

2001 WL 755387

**2001 WL 755387**
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

Superior Court of Delaware.

CATAMARAN ACQUISITION CORP.
and CORNERSTONE EQUITY
INVESTORS, IV, L.P., Plaintiffs,
v.
SPHERION CORPORATION, Defendant.

No. CIV.A. 00C-09-180JRS.
|
Submitted: April 24, 2001.
|
Decided: May 31, 2001.

Plaintiffs Motion to Amend Complaint. Granted.
Plaintiffs Motion to Transfer to Court of Chancery.
Granted in Part and Denied in Part.

**Attorneys and Law Firms**

Daniel V. Folt, Esquire, Cozen & O'Connor, Wilmington,
Delaware, 19801. Attorneys for Plaintiffs.

Allen M. Terrell, Jr., Esquire, Frederick L. Cottrell, III,
Esquire, Dominick Gattuso, Esquire, Richards Layton
& Finger, Wilmington, Delaware, 19899. Attorneys for
Defendant.

MEMORANDUM OPINION

SLIGHTS, J.

I. INTRODUCTION

**\*1** The Court is called upon to undertake the often
difficult task of determining whether the gravamen of a
complaint sounds in law or equity. The distinction, of
course, is critical in ascertaining this Court's jurisdiction
over a controversy. The question is called in the context of
a Motion to Amend Complaint and Motion to Transfer
to the Court of Chancery filed by plaintiffs, Interim
Healthcare, Inc. ("Interim"), Catamaran Acquisition

Corp. ("Catamaran") and Cornerstone Equity Investors
IV, L.P. ("Cornerstone")(collectively "plaintiffs").

The amendments to the complaint proffered by plaintiffs
include new claims for reformation and equitable
rescission of a contract between Interim Services, Inc.,
a wholly owned subsidiary of defendant, Spherion
Corporation ("Spherion"), Catamaran, and Cornerstone.
Spherion maintains that plaintiffs' equitable claims are
not viable and that they are brought for the purpose of
divesting this Court of jurisdiction and denying Spherion
of its constitutional right to a trial by jury. The facts,
addressed in relevant part below, read like a combined
equity/civil procedure question on the Delaware bar
examination.

II. FACTS

On September 26, 1997, Spherion, Catamaran and
Cornerstone entered into a Restated Stock Purchase
Agreement (the "Agreement") which memorialized
Spherion's sale of its stock in Interim to Catamaran.
As is customary, the Agreement included various
representations regarding Interim's pending liabilities and
financial fitness.

In their initial complaint, filed on September 25, 2000,
plaintiffs allege that Spherion breached the Agreement
and committed fraud by failing to disclose during due
diligence that litigation was pending against Interim
involving alleged medical malpractice which resulted
in severe neurological compromise of a young child.
Spherion's answer to the initial complaint, filed on
December 13, 2000, denies liability on both counts
principally on the ground that the malpractice claim was
covered by insurance and, therefore, was excepted from
the Agreement's required disclosures.

The Motion to Amend proposes sweeping amendments
to the plaintiffs' initial pleading. The fraud claim is
withdrawn in its entirety. The breach of contract claim
relating to the failure to disclose the pending medical
malpractice litigation is no longer the showcase claim.
Indeed, in the proposed amended complaint, it now merits
mention in only 22 paragraphs of a pleading containing
134 paragraphs. The primary factual predicate upon
which plaintiffs now seek relief, and the only predicate
for the equitable claims, is Spherion's alleged failure

Castañaran Acquisition Corp. v. Spherion Corp., Not Reported in A.2d (2001)

2001 WL 755387

to disclose that, in the year prior to the Agreement, Interim had been overpaid approximately $18,400,000 in Medicare reimbursements. This overpayment, in turn, has created a substantial liability for plaintiffs who now must return the overpayments to Medicare. [1] The proposed amended complaint also sets forth causes of action for breach of contract arising from Spherion's failure to disclose other pending or anticipated claims and liabilities. Spherion does not oppose the Motion to Amend as it relates to these claims. [2]

[1] Spherion disputes the actual amount of the overpayments and represents that the matter is not resolved because plaintiffs have yet to pursue available appeals to the Health Care Financing Administration of the United States Department of Health and Human Services ("HCFA"). Moreover, according to Spherion, HCFA has already determined that the assessed overpayment as initially calculated was excessive and has adjusted the amount downward as much as $8 million.

[2] The proposed amended complaint also appears to add Interim as a party plaintiff. This proposed amendment is not addressed by either party. The Court assumes, therefore, that it is unopposed.

**\*2** The alleged Medicare overpayments are particularly relevant to the motions *sub judice* because they give rise to plaintiffs' contention that the purchase price for the Interim stock was grossly inflated. [3] Specifically, plaintiffs allege that the downward adjustment to Interim's revenue necessitated by the reimbursement to Medicare of overpayments to Interim should result in a reduction of the purchase price from $134,000,000 to $84,033,600. The innocent misrepresentation by Spherion that no overpayments had been received forms the basis of the equitable rescission claim. The parties' mistaken belief at the time they entered into the Agreement that no overpayments had been received by Interim forms the basis of the reformation claim.

[3] The purchase price was derived from a multiple of Interim's net income before interest, taxes, depreciation and amortization (EBITDA).

### III. DISCUSSION

#### A. The Parties' Contentions

Plaintiffs allege that a breach of contract claim is not an appropriate vehicle to recover the damages they have suffered flowing from the inflated stock purchase price. [4] And because the misrepresentations were "innocent," plaintiffs cannot even assert, much less recover, on a tort-based claim for misrepresentation. Legal rescission is also unavailable to the plaintiffs because they are not able to allege a requisite element: fraud or intentional representation. Accordingly, plaintiffs contend that their only recourse to address the inflated price they paid for Interim is to seek reformation or equitable rescission of the Agreement.

[4] Spherion does not oppose plaintiffs' motion to amend as it relates to their new claim for breach of contract which seeks indemnification from Spherion for any amounts plaintiffs are required to repay to Medicare as a result of the overpayments.

Spherion counters by emphasizing that money damages, available in this Court, can compensate plaintiffs for all the harm they allegedly have suffered at the hands of Spherion. Moreover, the timing of plaintiffs' motion to amend and the dramatic change in the focus and character of this litigation effectuated by the proposed amendments have prompted Spherion to question plaintiffs' motives and to urge the Court to scrutinize the pending motions carefully to discern their true purpose. In this regard, Spherion notes that the facts relating to the Medicare overpayments were well known to plaintiffs when they filed the initial complaint in September, 2000. The sudden shift to equity-based claims, according to Spherion, reflects plaintiffs' post-filing realization that their claims may play better at a bench trial than before a jury. Spherion urges the Court not to countenance plaintiffs' belated decision to shop its claims in another forum.

Plaintiffs dismiss as unfounded Spherion's characterization of their proposed amendments and request to transfer the case to Chancery as "gamesmanship." They claim that they delayed litigating the claims arising from the overpayments because they, along with Spherion, were attempting to negotiate a satisfactory resolution of the dispute with HCFA. Only when negotiations failed did they seek to amend the complaint to add these claims. Moreover, plaintiffs note that they have changed counsel since the first complaint was filed and argue that they should be afforded the opportunity to pursue their new counsel's strategy for the litigation.

### B. The Motion to Amend

#### 1. The Standard of Review

**\*3** Leave to amend pleadings will be granted unless there is evidence of undue delay, bad faith or dilatory motive on the part of the movant, or the futility of the claims is evident on the face of the pleading. [5] The Court must exercise its discretion when balancing the desirability of resolving litigation on the merits of all available claims against the possible prejudice or surprise to the other party. [6]

[5]  *Hess v. Carmine,* Del.Super., 396 A.2d 173, 177 (1978).

[6]  *PNC Bank, Del. v. Turner,* Del.Super., 659 A.2d 222, 225 (1995).

The Court's analysis here will focus on futility. There is no credible evidence of bad faith or dilatory motive, nor has there been a significant delay in the filing of the motion to amend. This litigation commenced in September, 2000. Since then, the parties have not initiated discovery or, until now, engaged in motion practice. The Court has yet to issue a scheduling order. Moreover, the Court is satisfied with the plaintiffs' explanations for the delay in filing the instant motions and for the rationale which precipitated the proposed amendments. Spherion's argument that the proposed amendments will cause them prejudice to the extent they result in the denial of trial by jury is misplaced in the Rule 15 context. [7] The timely introduction of new equitable claims which arise from the same facts and circumstances giving rise to the legal claims cannot form the basis for an allegation of prejudice under Rule 15. [8]

[7]  Super. Ct. Civ. R. 15.

[8]  *See Annone v. Kawasaki Motor Corp.,* Del.Supr., 316 A.2d 209, 211 (1974)(court's analysis of prejudice should be directed to the criteria set forth in Rule 15(c)).

The questions, then, for the Court to determine are whether the proposed amended claims which sound in equity are legitimate claims and, if so, whether their presence in the litigation requires that the entire controversy be transferred to the Court of Chancery. [9]

[9]  *See Guy v. Judicial Nominating Comm'n,* Del.Super., 659 A.2d 777, 786 (1995)(court will deny motion to amend when amended claim would not survive a motion to dismiss).

#### 2. The Equitable Rescission Claim

Plaintiffs' rescission claim is straightforward: Spherion knew of the possibility that a routine annual audit by an HCFA intermediary might discover significant overpayments by Medicare but honestly did not believe that overpayments had been received. Accordingly, Spherion represented that "there are no existing overpayments due and owing to HCFA...." [10] Plaintiffs likewise did not believe overpayments would be found in the HCFA audit at the time they entered into the Agreement, and were comforted in the accuracy of their belief, i.e., induced, by Spherion's misstatement. The misrepresentation, innocent though it may have been, cost plaintiffs (particularly Catamaran) an additional $50,000,000 in the form of a higher purchase price for Interim. Plaintiffs have not pled fraud and, indeed, have gone to lengths to emphasize that they possess no facts which would allow them to do so. From plaintiffs' perspective, the proposed amended complaint describes the classic case of *scienta utrimque par pares contrahentes facit:* equal knowledge on both sides make contracting parties equal. [11]

[10]  Dkt. 1, Ex. A, ¶ 3.17.

[11]  The Court must disagree with Spherion's assessment that plaintiffs' recovery on the breach of contract claim would moot the rescission claim. The breach of contract claim seeks indemnification for amounts repaid to Medicare or others as a result of the Medicare overpayments. The rescission claim seeks to address the amount plaintiffs allegedly overpaid for Interim.

It appears that plaintiffs' survey of the legal landscape upon which they traverse is accurate. At common law, a misrepresentation is not actionable unless the plaintiff can allege that the person making the statement knew or should have known of its falsity. [12] On the other hand, a court of equity can grant relief, including rescission, based upon innocent misrepresentations. [13] Plaintiffs represent that they can ascribe no culpability to Spherion in connection with the representations relating to Medicare overpayments. Thus, legal theories such as fraud or

2001 WL 755387

even negligent misrepresentation [14] are unavailable to plaintiffs. [15] And if plaintiffs have no legal claims or remedies available to address their predicament, they must turn to equity for relief. [16]

[12]    *See In re Brandywine Volkswagon,* Del.Super., 306 A.2d 24, 28 (1973).

[13]    *E.I. DuPont De Nemours & Co., v. HEM Research, Inc.,* Del. Ch., C.A. No. 10747, Allen, C. (Oct. 13, 1989)(Mem. Op. at 12 n. 12) ("It ... should be noted that in cases involving a prayer for rescission based upon a claim of *innocent* misrepresentation, the equity court has exclusive jurisdiction.").

[14]    *See Dial v. Astropower, Inc.,* Del.Super., C.A. No. 98C-08-150, Quillen, J. (June 20, 2000)(Letter Op. at 9)(defining elements of negligent misrepresentation) (citation omitted).

[15]    It should be noted that in light of plaintiffs' admission that they cannot plead fraud, Spherion has questioned whether plaintiffs can sustain a *prima facie* case for equitable rescission. Specifically, Spherion argues that plaintiffs must plead and prove a knowing misrepresentation to prevail on their rescission claim because the contract at issue is "an executed contract." *See Wilson v. Pepper,* Del. Ch., C.A. No. 962, Chandler, V.C. (Dec. 21, 1989)(Mem. Op. at 6 n. 2)("[It] has been stated that equity does not have jurisdiction to grant rescission of an executed contract absent fraud.")(citing *Holley v. Jackson,* Del. Ch., 158 A.2d 803, 806 (1959)). *But see Shore Builders, Inc. v. Dogwood, Inc.,* D. Del., 616 F.Supp. 1004, 1015-16 (1985)(predicting that the Delaware Supreme Court would not require a showing of fraud to rescind an executed contract and questioning whether *Holley* actually endorsed such a requirement); *Norton v. Poplos,* Del.Supr., 443 A.2d 1, 4 (1982)(stating that a contract may be rescinded for fraud, misrepresentation or mistake). Because the Court is not required to resolve this apparent conflict in the case law to dispose of the motions *sub judice,* it will leave resolution or reconciliation of the conflict, as the case may be, for another day.

[16]    10 *Del. C.* §§ 341, 342; *Chateau Apartments Co. v. City of Wilmington,* Del.Supr., 391 A.2d 205, 207-08 (1978).

**\*4** The boundaries of legal and equitable rescission have been well-charted by Delaware courts. As Chancellor Allen observed:

It is perhaps not commonly appreciated that rescission is a remedy awarded by law courts. A court of law may, upon adjudication of a contract dispute, determine, where the elements of the claim are proven, that a contract has been rescinded, and enter an order restoring plaintiff to his original condition by awarding money or other property of which he had been deprived. Equitable rescission, on the other hand, which is otherwise known as cancellation, is a form of remedy in which, in addition to a judicial declaration that a contract is invalid and a judicial award of money or property to restore plaintiff to his original condition is made, further equitable relief is required. Thus, the remedy of equitable rescission typically requires that the court cause an instrument, document, obligation or other matter affecting plaintiff's rights and/or liabilities to be set aside and annulled, thus restoring plaintiff to his original position and reestablishing title or recovering possession of property. [17]

[17]    *E.I. DuPont De Nemours, supra,* Mem. Op at 6-7 (citation omitted)

Rescission in its purest form, then, seeks to "unmake" or "cancel" an agreement and to return the parties to the *status quo ante.* [18] It does not appear from plaintiffs' proposed amended complaint that they want to "unmake" the Agreement. Rather, although they invoke the appropriate incantation, including a prayer for "cancellation" of the agreement, the plaintiffs' amended complaint focuses on recouping from Spherion some of the money they paid to acquire Interim. [19] According to plaintiffs, the amount they paid for Interim in excess of its actual value easily can be calculated based on a formula set forth in the Agreement. Nevertheless, the claim is couched in the proposed amended complaint as equitable rescission

of the Agreement-- an agreement which memorializes a transaction consummated more than three years ago.

18  *Norton v. Poplos,* Del.Supr., 443 A.2d 1 (1982).

19  *Compare Alejandro & Reinholz v. Hornung,* Del. Ch., C.A. No. 12442, Jacobs, V.C. (Aug. 12, 1992)(Mem. Op. at 7)(concluding that plaintiff's complaint failed to state a claim for equitable rescission because, despite its "incantation of magic words", it did not actually seek cancellation of the contract at issue); *McMahaon v. New Castle Assocs.,* Del. Ch., 532 A.2d 601, 603 (1987)("Chancery jurisdiction is not conferred by the incantation of magic words.... [The court must] go behind the facade of prayers to determine the true reason for the suit.").

The Court is satisfied (and agrees with Spherion) that the Court of Chancery would find it "impossible to 'unscramble the eggs' " by rescinding the Agreement. [20] And, therefore, the Court is satisfied that plaintiffs' equitable rescission claim-- at least in its current form-- is futile for purposes of Rule 15. [21] This conclusion does not end the inquiry, however. Rescissory damages may be appropriate when "the equitable remedy of rescission is impractical" but otherwise warranted. [22] Plaintiffs have alleged that they have suffered substantial monetary damages as a result of an innocent misrepresentation relating to a material term of the Agreement. The Court has already determined that it is unable, as a matter of law, to provide a legal remedy under these circumstances. Consequently, the Court is confronted with a rather perplexing question: can a plaintiff maintain a claim for rescissory damages (traditionally a legal remedy) in a court of equity even though he cannot do so in a court of law? Of course, the question places this Court in the awkward position of attempting to define the scope of equity's jurisdiction. Nevertheless, the procedural posture of this case requires the Court to address the question, at least to some extent, to dispose of the motions *sub judice.* The Court concludes that the Court of Chancery may, under settled tenets of equity, entertain a claim for rescissory damages even if the claim could not be prosecuted at common law. Or, stated more aptly, the Court cannot conclude that plaintiffs' rescission claim would be futile in the Court of Chancery.

20  *Harman v. Masoneilan International, Inc.,* Del. Ch., 418 A.2d 1004, 1006-07 (1980)(court can't "unscramble the eggs"); *Gimbel v. Signal Cos.,*

*Inc.,* Del. Ch., 316 A.2d 599, 603 (1974)(same). *See also Stegemeier v. Magness,* Del. Ch., 728 A.2d 557, 565 (1999)(declining to rescind land sale transaction because homes already had been built and sold to third parties); *Weinberger v. UOP, Inc.,* Del.Supr., 457 A.2d 701, 714 (1983)(finding rescission impractical to undo long completed cash out merger); *Lynch v. Vickers Energy Corp.,* Del.Supr., 429 A.2d 497, 501 (1981)(not feasible to unwind merger and other corporate changes).

21  In light of this Court's determination, as explained below, that the rescission claim should be heard in the Court of Chancery, and considering the admittedly unusual circumstance where this Court is predicting the disposition of a claim by another trial-level court, there should be no question as to whether this Court's prediction rises to the level of a claim or issue preclusion determination. It does not. Plaintiffs are free to make their pitch for cancellation of the Agreement in the Court of Chancery within the confines of their Rule 11 obligations. This Court's prediction of the Court of Chancery's disposition of the cancellation claim was a necessary step in the logical progression (at least from one judge's perspective) of the Court's analysis of the jurisdiction issue.

22  *See Stegemeier,* 728 A.2d at 565; *Lynch,* 429 A.2d at 501; *Strassburger v. Early,* Del. Ch., 752 A.2d 557, 581-82 (2000).

*5  "[E]quity will not suffer a wrong without a remedy...." [23] And "[e]quity's appropriate focus should be on the alleged wrong, not the nature of the claim which is no more than a vehicle for reaching the remedy for the wrong." [24] Thus, the mere existence of a possible remedy at law will not *ipso jure* divest the Court of Chancery of subject matter jurisdiction. [25] "To preclude concurrent equitable jurisdiction, the alternative legal remedy at a minimum must be available to the plaintiff as a matter of right and must offer full, fair and complete relief...." [26] Here, the wrong alleged is an innocent misrepresentation relating to a material term of a contract. While breach of contract damages may be available, this Court cannot afford a complete remedy for all damages allegedly suffered by the plaintiffs as a result of the misrepresentation. The Court of Chancery, on the other hand, can afford full, fair and complete relief. [27] Accordingly, plaintiffs will have their opportunity to

Castañara Acquisition Corp. v. Spherion Corp., Not Reported in A.2d (2001)

2001 WL 755387

seek rescission or rescissory damages in the Court of Chancery. [28]

[23]    *Fischer v. Fischer,* Del. Ch., C.A. No. 16864, Steele, V.C. (Nov. 4, 1999)(Mem. Op. at 10).

[24]    *Id.*

[25]    See *El Paso Natural Gas Co. v. Transmission Gas Co.,* Del.Supr., 669 A.2d 36, 39 (1995).

[26]    Wolfe & Pettinger, *Corporate and Commercial Practice in the Delaware Court of Chancery,* § 2-3[b] at 2-43 (2000) (citations omitted).

[27]    See *E.I. DuPont De Nemours & Co., supra,* Mem. Op. at 12 n. 12 ("It should be noted that in cases involving a prayer for rescission based upon a claim of innocent misrepresentation, the equity court has exclusive jurisdiction") (citation omitted); *Dick v. Reeves,* Del.Supr., 206 A.2d 671, 674-75 (1965)(lack of knowledge of misrepresentation not a defense to rescission claim in equity). *See also DuPont v. Delaware Trust Co.,* Del. Ch., 364 A.2d 157, 160-61 (1975)(awarding rescissory damages when cancellation was not practical).

[28]    Spherion alleges that plaintiffs cannot justifiably contend that they were mistaken with respect to the possibility of a Medicare overpayment. Spherion argues that this fact alone renders plaintiffs' rescission claim futile, even if alleged innocent misrepresentations animate the claim. While this argument ultimately may prove dispositive, it is more appropriate at summary judgment. For now, the Court must accept the well plead allegations of the amended complaint as true. *Nix v. Sawyer,* Del.Supr., 466 A.2d 407 (1983).

The Motion For Leave to Amend the Complaint to add a claim for Equitable Rescission is GRANTED. Plaintiffs may also amend their complaint to add a prayer for rescissory damages.

**b. The Reformation Claim**

In addition to rescission, plaintiffs seek reformation of the Agreement on the ground that all parties to the Agreement at the time of consummation were mistaken as to the existence of overpayments from Medicare. The reformation claim is pled as an alternative to equitable rescission as is permitted by the rules of this Court. [29] Reformation of a contract is undertaken for the purpose

of rectifying a failure of the contract to reflect the true intent of the parties thereto. Thus, it has been said that "rescission differs from reformation in that reformation does not seek to 'unmake' or cancel an agreement but to enforce an agreement as intended, notwithstanding that the written instrument, as a result of fraud or mutual mistake, does not accurately reflect the agreement actually reached." [30] In essence, the court amends or rewrites the instrument in accordance with its interpretation of the parties' expectations at the time the contract was made. [31]

[29]    *Super. Ct. Civ. R. 8(e)(2).*

[30]    Wolfe, *Corporate and Commercial Practice in the Delaware Court of Chancery,* § 12.4[a], at 12-45 (2000).

[31]    *In re Enstar Corp.,* Del.Supr., 604 A.2d 404, 413 (1992).

That a party to the contract may have a claim for damages on either the unreformed or reformed contract does not extinguish a party's right to reformation. [32] Reformation of the agreement supplements or compliments the damages award; it does not substitute for damages or vice versa. [33] In Delaware, reformation is available only in the Court of Chancery. [34] Thus, assuming they have pled a viable reformation claim, plaintiffs may pursue reformation in the Court of Chancery notwithstanding the availability of rescissory damages or damages for breach of contract.

[32]    See *The Travelers Indem. Co. v. North American Phillips Corp .,* Del. Ch., C.A. No. 12,029, Berger, V.C. (Aug. 26, 1992)(Mem. Op. at 3-4)(claim for declaratory relief, damages, and legal rescission did not extinguish claim for reformation); *66 Am.Jur.2d* Reformation of Instruments, § 78 at 600 (1973)("Although a party may bring his suit in the first instance for the reformation of the instrument and in the same proceeding ask for a decree for the damages he seeks, his election to obtain his remedy at law does not estop him from seeking reformation in equity").

[33]    *Id.*

[34]    *Hessler, Inc. v. Ellis,* Del. Ch., 167 A.2d 848, 850 (1961).

Spherion contends that plaintiffs' reformation claim is futile. Specifically, Spherion argues that plaintiffs cannot establish that either party to the Agreement was

Case 1:18-cv-00475-SEB-TAB Document 1-2 Filed 02/16/18 Page 79 of 440 PageID #: 91
Catamaran Acquisition Corp. v. Spherion Corp., Not Reported in A.2d (2001)

2001 WL 755387

mistaken with respect to the potential that Interim may be assessed with overpayment liability to Medicare. [35] According to Spherion, overpayment liability was contemplated by both parties as a real possibility after the fiscal intermediary's audit of Interim's Medicare reimbursements. The proposed amended complaint, however, alleges that both parties labored under a mistake with respect to the existence of, (and/or the extent of) Medicare overpayments. The allegation is well pled and will be accepted as true. [36]

[35]   See Amer v. NVF Co., Del. Ch., C.A. No. 11812, Allen, C. (June 15, 1994)(Mem. Op. at 16)(mutual mistake or fraud requisite element of reformation).

[36]   Itek Corp. v. Chicago Aerial Indus., Inc., Del.Super., 257 A.2d 232, 233 (1969).

**\*6** Plaintiffs' Motion to Amend Complaint to add a claim for reformation is GRANTED.

### B. The Motion to Transfer

Because the Court has determined that plaintiffs may amend their complaint to add claims over which this Court has no jurisdiction, the Court must next determine whether to retain jurisdiction over any portion of this litigation or whether the entire controversy should be litigated in the Court of Chancery. Plaintiffs have requested that the entire matter be transferred to the Court of Chancery; [37] Spherion opposes the request because it wants to exercise its demand for a jury trial, at least with respect to the purely legal claims. Accordingly, Spherion suggests that the Court "bifurcate" the claims and transfer only the rescission and reformation claims to Chancery. Alternatively, Spherion suggests that I seek appointment as a Vice Chancellor so that I can preside over both the legal claims as they are tried to a jury, and the equitable claims as they are tried to the Court. [38]

[37]   10 Del. C. § 1902.

[38]   See Art. IV, Sect. 13(2) of the Delaware Constitution of 1897. See e.g., Monsanto Company v. Aetna Casualty & Surety Co., Del.Super., C.A. No. 88C-JA-118, Martin, J. (Sept. 29, 1090)(Mem. Op. at 7) (Superior Court judge seeks appointment as Vice Chancellor to preside over severed legal and equitable claims).

Pursuant to the so-called "clean-up doctrine," the Court of Chancery, in its discretion, could hear all claims, both equitable and legal, and afford complete relief, including money damages if appropriate. [39] The exercise of ancillary jurisdiction, however, is permissive; the Court of Chancery may decline to hear strictly legal claims and allow such claims to be presented to a jury. [40]

[39]   American Appliance v. State ex rel. Brady, Del.Supr., 712 A.2d 1001, 1003 (1998); Herzing v. Priestly, Del. Ch., C.A. No. 11704, Chandler, V.C. (Apr. 15, 1992) (Mem.Op.).

[40]   See, e.g., Getty Refining & Marketing v. Park Oil Co., Del. Ch., 385 A.2d 147, 151 (1978), aff'd, Del.Supr., 407 A.2d 533 (1979).

"[S]ince its inception in 1776, the Delaware Constitution has afforded its citizens the right to jury trials in both criminal and civil proceedings... expressly preserv[ing] all of the fundamental features of the jury system as they existed at common law." [41] "The sine qua non of that common law jurisprudence is the principle that either party shall have the right to demand a jury trial upon an issue of fact in an action at law." [42] And "[t]he fact that the plaintiff joins legal and equitable claims in a Complaint should not automatically deprive a defendant of the right to a trial by jury on the purely legal issues." [43] Of particular importance in the determination of whether to sever legal and equitable claims is the extent to which the claims are so "intertwined" as to make separation impractical or impossible. [44] While these concepts have been developed in the context of the Court of Chancery's ancillary jurisdiction over legal claims, the Court can discern no reason why the concepts would not apply equally to this Court's determination of whether to transfer legal claims (poised for trial by jury in this Court) to the Court of Chancery along with equitable claims over which this Court has no jurisdiction.

[41]   McCool v. Gehret, Del.Supr., 657 A.2d 269, 282 (1995) (citation omitted).

[42]   Id.

[43]   Getty Refining, 385 A.2d at 151(citations omitted) (noting that to hold otherwise would allow a plaintiff to "deprive a defendant of a jury trial merely by adding spurious equitable claims").

44    *Id.* at 150.

Counts I through IV of the Amended Complaint are breach of contract claims. Of these claims, only Count I addresses the Medicare overpayments. Counts II, III and IV address Spherion's alleged failure to disclose other material claims or liabilities in breach of the Agreement. These claims are purely legal and entirely separate from the equitable claims and the Court will order that they be severed from the remaining claims and retain jurisdiction over them. The inconvenience and expense caused by severance, if any, is outweighed by this Court's respect for the right to trial by jury of common law claims.

 *7  Count I presents a more complicated issue. It is clear that the rescission, reformation and breach of contract claims arising from the Medicare overpayments present factual issues in common including, but not limited to, the exact amount of the overpayment and the extent to which the overpayment was or should have been anticipated by both parties to the Agreement. Even Spherion tacitly has acknowledged that Count I is intertwined with the equitable claims when it observed at oral argument that the resolution of Count I may render moot Counts V (reformation) and VI (equitable rescission). [45] Severance of Count I from Counts V and VI would work an unmanageable hardship on the courts and the parties.

45    Transcript at 26-27.

Finally, with respect to the equitable claims, clearly they must be severed and transferred to the Court of Chancery.

## IV. CONCLUSION

Based on the foregoing, the Motion to Amend is GRANTED. Plaintiffs may further amend the complaint to add a prayer for rescissory damages in accordance with this decision. The Motion to Transfer is GRANTED in part and DENIED in part. The Court will sever the claims, retain jurisdiction over Counts II through IV, and transfer Counts I, V, and VI to the Court of Chancery in accordance with 10 *Del. C.* § 1902. Once these claims are transferred to the Court of Chancery, either party may petition for, or either court may *sua sponte* initiate, proceedings to consolidate the cases before one judge (or Chancellor) in accordance with Art. IV Sect. 13(2) of the Delaware Constitution of 1897.

IT IS SO ORDERED.

**All Citations**

Not Reported in A.2d, 2001 WL 755387

*TAB 2*

599 F.Supp. 1084
United States District Court,
D. Minnesota, Fourth Division.

EDUDATA CORPORATION, Plaintiff,

v.

SCIENTIFIC COMPUTERS, INC., Hubert H.
Humphrey, III, Attorney General of the State of
Minnesota, and Michael A. Hatch, Commissioner of
Commerce of the State of Minnesota, Defendants.
SCIENTIFIC COMPUTERS, INC.,
a Minnesota corporation, Plaintiff,

v.

EDUDATA CORPORATION, a Delaware
corporation, Shamrock Associates, a New Jersey
Limited Partnership, Sun Equities Corporation, a
Delaware corporation, and Paul Koether and Natalie
Koether, Residents of New Jersey, Defendants.

Civ. Nos. 4–84–968, 4–84–978.
|
Sept. 28, 1984.

**Synopsis**
Company making tender offer filed complaint against
takeover target, State Attorney General, and State
Commissioner of Commerce seeking judgment declaring
that certain provisions of the Minnesota Corporate Take-
Overs Act and Minnesota Business Corporation Act were
unconstitutional as applied to its tender offer and were
preempted by the Williams Act. Takeover target filed
complaint against company making tender offer and
others alleging violations of federal and state statutes.
Upon motions of company making offer and takeover
target for temporary restraining orders, the District
Court, Diana E. Murphy, J., held that: (1) company
making tender offer was not entitled to temporary
restraining order, and (2) takeover target was entitled
to temporary restraining order suspending tender offer
pending further hearing.

Order accordingly.

Order affirmed in part and dismissed in part, 8 Cir., 746
F.2d 429.

**West Headnotes (4)**

**[1]** **Injunction**
👈 Grounds in general;multiple factors

Whether temporary injunctive relief may be
granted is determined by consideration of four
factors, namely, the threat of irreparable harm
to movant, state of the balance between this
harm and the injury that granting injunction
will inflict on other parties litigant, probability
that movant will succeed on merits and the
public interest.

Cases that cite this headnote

**[2]** **Injunction**
👈 Mergers and acquisitions;anti-takeover
measures

Company making tender offer was not
entitled to temporary restraining order
preventing target company from enforcing
certain provisions of the Minnesota
Corporate Take-Overs Act and Minnesota
Business Corporation Act, and from
commencing any judicial proceeding relating
to those laws in any other forum, in that Take-
Overs Act differed from statutes found to be
unconstitutional in other cases, commissioner
of commerce was currently expanding factual
record with his investigation and his
subsequent action might moot constitutional
question, and public interest would be
furthered by full disclosure of all material
information concerning tender offer. M.S.A.
§ 80B.01 et seq.; Minn.St.1984, §§ 302A.011,
subds. 37–39, 302A.449, subd. 7, 302A.671.

1 Cases that cite this headnote

**[3]** **Injunction**
👈 Mergers and acquisitions;anti-takeover
measures

Takeover target was entitled to a temporary
restraining order suspending tender offer
pending further hearing, in that company
making tender offer had not shown that its

harm from delay was irreparable, restraining order would protect it from criminal and civil penalties it feared because of any possible conflict between state and federal law and harm to takeover target, the value of its shares, and jobs for its employees were of legal concern if law were violated. M.S.A. § 80B.01 et seq.; Minn.St.1984, §§ 302A.011, subds. 37–39, 302A.449, subd. 7, 302A.671.

Cases that cite this headnote

[4]    Federal Civil Procedure
          👉 Grounds and Objections

Takeover target's motion for expedited discovery would be granted since further development of record before preliminary injunction hearing concerning tender offer would better enable court to judge parties' interests and respective chances for success on the merits.

12 Cases that cite this headnote

**Attorneys and Law Firms**

**\*1085** Theodore Altman, Gordon, Hurwitz, Butowsky, Weitzen, Shalov & Wein, New York City, Thomas E. Glennon and Richard Primuth, Lindquist & Vennum, Minneapolis, Minn., for Edudata Corp.

Roger Magnuson and Linda Freyer, Dorsey & Whitney, Minneapolis, Minn., for Scientific Computers, Inc.

Barry Greller, Asst. Atty. Gen., St. Paul, Minn., for Hubert H. Humphrey, III and Michael A. Hatch.

ORDER

DIANA E. MURPHY, District Judge.

These companion cases arise from a tender offer commenced by Edudata Corporation (Edudata), a Delaware corporation, on September 20, 1984, for all outstanding shares of the common stock of Scientific Computers, Inc. (SCI), a Minnesota corporation.

**\*1086** Edudata filed a verified complaint against SCI, Hubert Humphrey III, Attorney General of Minnesota, and Michael A. Hatch, Commissioner of Commerce in Minnesota, in this court on the same day. Edudata seeks a judgment declaring that certain recently-enacted provisions of the Minnesota Corporate Take-Overs Act, Minn.Stat. Ch. 80B, and the Minnesota Business Corporation Act, Minn.Stat. §§ 302A.011, subd. 37, 38, 39; 302A.449, subd. 7 and 302A.671, are unconstitutional as applied to Edudata's tender offer and are preempted by the "Williams Act", 82 Stat. 454, et seq. codified at 15 U.S.C. §§ 78m(d)–(e) and 78n(d)–(f), amendments to the Securities Exchange Act of 1934. The complaint also requested temporary, preliminary and permanent injunctive relief restraining SCI from enforcing the above provisions of Minnesota law and from commencing any judicial proceeding relating to these laws in any other forum. Jurisdiction is alleged under 28 U.S.C. §§ 1331(a), 1332, 1337(a), 1343(3) and (4), and 15 U.S.C. § 78aa.

SCI filed a verified complaint in this court on September 26, 1984 against Edudata, Shamrock Associates (Shamrock), Sun Equities Corporation (SECC), Paul Koether and Natalie Koether. SCI also bases part of its claim on violations of the Williams Act. In addition, it charges violations of the Minnesota Business Corporation Act, the Minnesota Corporate Take-Overs Act, and fraud. Jurisdiction is alleged under 15 U.S.C. § 78aa, 28 U.S.C. §§ 1331, 1332 and pendent jurisdiction.

These matters are now before the court upon motions of Edudata and SCI for temporary restraining orders and upon SCI's motion to expedite discovery.

In addition to the actions commenced in this court, the parties are involved in state judicial and administrative proceedings. On September 24, Michael Hatch, the Minnesota Commissioner of Commerce, issued an Order suspending the registration by Edudata of its tender offer pursuant to Minn.Stat. § 80B.03 subd. 4a. Hatch found that the takeover materials did not provide full disclosure of all material information as Edudata failed to specify its future plans concerning the target company (SCI), to identify adequately Edudata's background and affiliates and to specify any potential liability Edudata may have due to misstatements or omissions of material fact made in its public offering of July 1984. Hatch also ordered a hearing on October 4, 1984 to determine whether the suspension shall be terminated or made

permanent. Edudata asks this court to set aside Hatch's order suspending its tender offer.

SCI has also initiated a suit in state court against Edudata and Craig-Hallum, Inc., a Minnesota corporation. On September 26, 1984, Judge Irving Iverson issued a temporary restraining order in that action, enjoining defendants from proceeding with, causing or aiding and abetting the tender offer by Edudata to purchase shares of SCI from residents of Minnesota or engaging in any activities in furtherance of the tender offer, and from accepting tenders of shares of SCI stock. Judge Iverson also enjoined Edudata from consummating the control share acquisition of SCI prior to a special shareholders meeting which, pursuant to Minn.Stat. § 302A.671, subd. 3 (1984), has been called for November 15, 1984.

At the hearing before this court on September 26, 1984, the parties addressed the effect of this state court order. Counsel for Edudata stated that the case was being removed to this court, but SCI's counsel responded that removal is improper because there is not complete diversity. SCI asserts that a federal restraining order is needed to enjoin Edudata from proceeding nationally since the state order only protects Minnesota citizens.

DISCUSSION

[1]  Whether temporary injunctive relief may be granted is determined by consideration of four factors: (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that the movant will succeed on the merits; and (4) the public interest. Dataphase *1087 Systems, Inc. v. C L Systems, Inc., 640 F.2d 109, 114 (8th Cir.1981).

[2]  Edudata argues that enforcement of the Minnesota statutes will cause immediate irreparable injury, not only to Edudata and its shareholders, but also to SCI and its shareholders, no matter what approach Edudata takes. If it abandons its tender offer, it will be deprived of its right under the Williams Act to make a national tender offer. Yet, if Edudata proceeds with its tender offer in disregard of Minnesota law, it may be subject to criminal and civil penalties, and the validity of tenders and ownership of SCI stock may be in doubt. Finally, Edudata argues that compliance with the Minnesota statutes could result in civil liabilities for failure to comply with federal law, unreasonable delay, commitment of substantial amounts

of money to prepare and participate in the hearing provided for by the Minnesota law, and disruption of the market in securities of SCI.

Edudata argues that other prerequisites of injunctive relief are also satisfied. It alleges that SCI will suffer no harm by suspension of the Minnesota statutes because the Williams Act serves the same purpose of investor protection; that success on the merits is "virtually certain"; and that the public interest is best served by allowing Edudata to proceed with its federally protected rights, thus offering SCI shareholders and the investing public a unique investment opportunity.

The major thrust of Edudata's motion is devoted to its chances of success on the merits. It relies heavily on Edgar v. Mite Corporation, 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982), and National City Lines Inc. v. LLC Corp., 687 F.2d 1122 (8th Cir.1982), for the proposition that the Minnesota statutes are unconstitutional and preempted by federal law. It argues that the October 4 hearing before Commissioner Hatch is precisely the type of disruption found to be unconstitutional in Mite and National City Lines.

The state defendants argue that both cases are distinguishable and that the Minnesota legislature was aware of both cases and crafted Minn.Stat. § 80B—the only provision properly before the court—to avoid the problems presented there. It points out that the Illinois Act struck down in Mite contained three key provisions which are not part of the Minnesota statute: 1) a precommencement notification period requirement, 2) a hearing procedure with no strict time deadlines, and 3) a procedure where the Secretary of State would pass on the substantive fairness of the tender offer.

At the hearing, SCI opposed Edudata's motion for constitutional and practical reasons. It argued that this matter is not ripe for constitutional resolution. The Commissioner of Commerce is currently expanding the factual record with his investigation and his subsequent action may moot the constitutional question. Although Edudata seeks to prohibit SCI from bringing any other proceeding in another forum, SCI has already filed a state court claim. SCI argues that the doctrine of Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and considerations of comity prevent this court from enjoining those pending state court's proceedings.

SCI also alleges that Edudata appears to be a shell corporation with three employees, no management experience and limited assets before its public offering in July, 1984. SCI asserts that Edudata has conspired, with the Koethers, Shamrock and SECC, to take over SCI through a series of fraudulent disclosures and material omissions and to loot it of its assets. SCI contends that it will suffer irreparable injury if the shares tendered in response to Edudata's offer are transferred in that, among other things, Edudata will have acquired effective control of SCI; the price and liquidity of the public market for SCI stock will drop; SCI's long-standing customer/supplier relationships may be destroyed; and many SCI employees may either lose their jobs or their innovative spirit.

The court recognizes that important interests are at stake on all sides of this dispute. Delay is a potent weapon in a **\*1088** tender offer fight, at times enabling entrenched management to defeat what may be a beneficial tender offer to shareholders and targeted company alike. On the other hand, federal and state policy favors adequate disclosure so that shareholders and investors may make informed decisions. Serious constitutional issues have been raised, as well as serious allegations of violations of federal and state law. The state law challenged by Edudata differs from that at issue in *Mite* and *National City Lines.* Further development of the parties' legal positions and the record is necessary before the court can determine the likelihood of success on the merits in these actions.

The public interest would be furthered by full disclosure of all material information concerning Edudata's tender offer. One of the main goals of the Williams Act is to protect shareholders and investors by furnishing them with the necessary information required to exercise an informed choice. [1] *Edgar v. Mite,* 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982). Commissioner Hatch used almost identical criteria as in the Williams Act to determine that Edudata's tender offer materials do not provide full disclosure of key information concerning Edudata's background, affiliates, and future plans. SCI and the state defendants have made a sufficient showing to justify delaying this tender offer to permit closer examination of the offering disclosures. Injunctive relief may be appropriate pending determination whether federal law requires additional disclosures or until all necessary information is disclosed. *See Pacific Realty Trust v. APC Investments,* 685 F.2d 1083 (9th Cir.1982);

*Whittaker Corporation v. Edgar,* 535 F.Supp. 933 (D.C.Ill.1982).

[1]   The act provides in pertinent part: It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request or invitation. 15 U.S.C. § 78n(e). *See also* the disclosure requirements in 15 U.S.C. §§ 78m(d) and 78n(d).

**[3]**   Although both parties claim irreparable harm, the court finds that the balance of harm favors SCI and that a temporary restraining order should issue suspending Edudata's tender offer pending further hearing. This will obviously delay Edudata's tender offer to its disadvantage, but Edudata has not shown that its harm is irreparable. Moreover, a restraining order will protect Edudata from the criminal and civil penalties it fears because of any possible conflict between state and federal law. Edudata claims that SCI shareholders would be irreparably harmed by a delay or defeat of its offer, but shareholders could also be harmed by false or misleading disclosures. SCI claims it would be irreparably harmed if effective control of the corporation were obtained by Edudata. In the absence of violation of federal or state law, this would be of no legal concern. However, harm to SCI, the value of its shares, and jobs for its employees are of legal concern if the law were violated. All that this court can determine at this point is that closer examination is warranted.

Neither side has addressed the issue of a bond or its amount. SCI, however, filed a bond in the amount of $5000 with its motion for a restraining order. No objection to that bond has been made, and on this record the court finds it to be sufficient until further hearing.

**[4]**   Finally, the court finds that SCI's motion for expedited discovery should be granted. Further development of the record before the preliminary injunction hearing will better enable the court to judge the parties' interests and respective chances for success on the merits.

Edudata Corp. v. Scientific Computers, Inc., 599 F.Supp. 1084 (1984)

## ORDER

Accordingly, based upon the above and all the files, records, and proceedings herein,

IT IS HEREBY ORDERED that:

1. The motion of Edudata Corporation for a temporary restraining order is denied.

 **\*1089**  2. The motion of Scientific Computers, Inc. for a temporary restraining order is granted, and Edudata Corporation, Shamrock Associates, Sun Equities Corporation, Paul Koether, Natalie Koether, their agents and all persons in active participation with them, are hereby enjoined from proceeding with, causing or aiding and abetting the tender offer by Edudata Corporation to purchase shares of Scientific Computers, Inc., or engaging in any activities in furtherance of Edudata Corporation's tender offer, and from accepting tenders of shares of Scientific Computers, Inc. stock.

3. This restraining order shall be effective immediately and will remain in effect until midnight on October 18, 1984 or further order of this court.

4. A hearing will be held on the parties' request for preliminary injunctions on October 17, 1984 at 2:00 p.m.

5. The parties shall furnish to this court and opposing counsel by October 11, 1984 any additional memoranda, affidavits, or exhibits applicable to these motions.

6. The motion of Scientific Computers, Inc. for expedited discovery is granted allowing it to proceed with the depositions of the officers, directors and managing agents of the Edudata Corporation, Shamrock Associates and Sun Equities Corporation, beginning on October 1, 1984.

**All Citations**

599 F.Supp. 1084

---

**End of Document** © 2018 Thomson Reuters. No claim to original U.S. Government Works.

*TAB 3*

Case 1:18-cv-00475-SEB-TAB Document 1-2 Filed 02/16/18 Page 88 of 440 PageID #: 100
Flight Options Intern. Inc. v. Flight Options, LLC, Not Reported in A.2d (2005)

2005 WL 6799224

2005 WL 6799224
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

Court of Chancery of Delaware,
New Castle County.

FLIGHT OPTIONS INTERNATIONAL,
INC., a Delaware corporation, Plaintiff,
v.
FLIGHT OPTIONS, LLC, a Delaware
limited liability company, Kathryn Gilchrist
Simpson, Louise Francesconi, Charles E.
Franklin, and William Lynn, Defendants.

C.A. No. 1459–N.
|
Submitted: July 7, 2005.
|
Decided: July 11, 2005.

**Attorneys and Law Firms**

Melanie K. Sharp, Esquire, James P. Hughes, Jr., Esquire, Seth J. Reidenberg, Esquire of Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware, Robert S. Fischler, Esquire of Ropes & Gray LLP, New York, New York, and Justin J. Wolosz, Esquire of Ropes & Gray LLP, Boston, Massachusetts, Attorneys for Plaintiff Flight Options International, Inc.

Jesse A. Finkelstein, Esquire, Lisa A. Schmidt, Esquire, Lisa M. Zwally, Esquire, Michael R. Robinson, Esquire, and Harry Tashjian, IV, Esquire of Richards, Layton & Finger, Wilmington, Delaware, John F. Cambria, Esquire, Gregory F, Hauser, Esquire, and Adam J. Biegel, Esquire of Alston & Bird LLP, New York, New York, and David E. Brown, Jr., Esquire of Alston & Bird LLP, Washington, DC, Attorneys for Defendants Kathryn Gilchrist Simpson, Louise Francesconi, Charles E. Franklin, and William Lynn.

Kenneth J. Nachbar, Esquire and Megan Ward Cascio, Esquire of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware, Attorneys for Defendant Flight Options, LLC.

**MEMORANDUM OPINION**

NOBLE, Vice Chancellor.

**\*1** Plaintiff Flight Options International, Inc. ("FOI") owns approximately 31% of Defendant Flight Options, LLC, a Delaware limited liability company (the "Company"). Raytheon Travel Air Company ("RTA") owns approximately 69% of the Company. The Company has serious financial problems: debt obligations are coming due and it has insufficient funds to meet those obligations. RTA is prepared to provide $50 million to the Company, but only as an equity investment. [1] RTA and the Company have agreed through the Common Units Purchase Agreement (the "Purchase Agreement"), dated June 9, 2005, that RTA will issue 5 billion "Common Units" of common equity in the Company at $0.01 per unit. FOI has preemptive rights allowing it to participate on the same terms as RTA, but it has chosen not to exercise those rights. Recognizing, however, that consummation of the Purchase Agreement, now scheduled for as soon as the close of business on July 11, 2005, would dilute its equity interest in the Company to 1%, it brought this action to enjoin the Company from implementing the Purchase Agreement pending arbitration of their substantive disputes. FOI alleges that the Purchase Agreement violates the Second Amended and Restated Limited Liability Company Agreement of Flight Options, LLC (the "LLC Agreement") [2] and is the product of the failure of the RTA-designated managers of the Company to discharge their fiduciary duties in accordance with Delaware law and to meet their obligations under the LLC Agreement. For the reasons set forth below, the Court will enjoin the proposed transaction for a period of 30 days to afford FOI the opportunity to seek continued interim relief in the arbitration forum which the parties have chosen for dispute resolution.

[1]     Since commencement of this action, RTA has formally offered to lend the Company another $32.4 million, but only if its proposed equity investment transaction closes.

[2]     Verified Compl. Ex. C.

Case 1:18-cv-00475-SEB-TAB Document 1-2 Filed 02/16/18 Page 89 of 440 PageID #: 101
Flight Options LLC v. Flight Options, LLC, Not Reported in A.2d (2005)
2005 WL 6799224

# I. BACKGROUND

The Company does two things: (1) it is the world's second largest provider of fractional and aviation membership services; [3] and (2) it loses money.

[3]     With headquarters in Cleveland, Ohio, the Company has approximately 1,300 employees and 209 aircrafts and, in 2004, had revenues of $625 million.

The current structure of the Company, with RTA and FOI as its two members, traces back to March 2002 when the fractional aviation interests of RTA and its affiliates and of FOI and its affiliates were combined. [4] Since the formation of the Company, Raytheon and its affiliates have supported the Company with more than $300 million in debt and preferred equity investments. In contrast, FOI and its principals have contributed a paltry $2 million. As of June 2003, Raytheon had provided $48 million out of the $50 million contributed by the members of the Company. At that time, the parties entered into the LLC Agreement and the Investment and Restructuring Agreement (the "Restructuring Agreement"). [5] As a result of the restructuring, RTA purchased additional common and preferred units of the Company, increasing its equity stake from 50.1% and gaining the right to appoint a majority of the Company's Board of Managers (the "Board"). [6]

[4]     RTA is a wholly owned subsidiary of Raytheon Aircraft Holdings, Inc, which, in turn, is a wholly owned subsidiary of Raytheon Company ("Raytheon")For convenience, reference to "Raytheon" may include its subsidiaries.

[5]     Cambria Aff., Ex. A.

[6]     Before the restructuring, FOI had held approximately 49.9% of the equity interest in the Company. Also, before the restructuring, RTA and FOX had appointed an equal number of managers to the Board.

Under the LLC Agreement, the Company is governed by the Board which is supposed to have seven members. Four of its current members, Defendants Kathryn Gilchrist Simpson, Louise Francesconi, Charles E. Franklin, and William Lynn serve as designees of RTA and are employees or officers of Raytheon (the "RTA Managers"). Two other managers, Travis R. Metz and

Robert P. Pinkas, were designated by FOI The seventh position, reserved for the Company's chief executive officer, is vacant because there is no permanent chief executive officer.

 **\*2** The Company's need for additional cash infusions did not abate with the restructuring. By the end of 2004, Raytheon's separate investments had reached approximately $250 million. The Board members, including Metz and Pinkas, were well aware of the Company's credit problems. For example, the October 5, 2004, Board minutes reflect the following: (1) counsel advised the Board of its duties "in a zone of insolvency context"; (2) the Company's management reported that Raytheon was resisting efforts to extend debt repayment deadlines; and (3) Raytheon was encouraging the Company to seek equity from some other source. [7]

[7]     Cambria Aff., Ex. C.

The Board gathered a week later to approve a forbearance agreement that had been negotiated with Raytheon to delay repayment of debt owed by the Company. The minutes of that meeting also describe the fiscal exigencies that the Company was confronting and would be confronting on an ongoing basis. [8] Thus, by the end of 2004, the Board knew that 2005 would present significant debt management questions for its consideration.

[8]     Cambria Aff., Ex. D.

The Board met on March 9, 2005. The Company's chief financial officer, Mark Brody, projected the need for additional cash flow of $4–5 million in April and in each of the next several months. Clearly, additional funding would be needed. Pinkas expressed his view that a third-party investment was unlikely until a permanent chief executive officer was installed and the Company's operating performance had improved. Company management was asked to "formulate a plan and process for the Board to consider regarding how the Company could obtain an equity capital infusion in the longer term, and ... outline for the Board how the Company would fund its short-term cash needs on its own." [9] In addition, Raytheon's proposal that the Company issue additional preferred equity units to RTA in connection with a new $20 million loan and certain forbearances by Raytheon was also addressed.

9
    The minutes of the March 9, 2005, Board meeting appear at Cambria Aff., Ex. F.

Company management had been assessing options for obtaining funding from other sources. As early as 2004, it had worked with Seabury Group LLC ("Seabury"), an investment banking, restructuring, and management consulting firm engaged in the transportation sector.

> Seabury identified the Company's maintenance and aircraft dispatch availability issues as one source of its financial problems. Seabury learned that the Company had a fleet wide reliability rate of approximately 65 percent, meaning that the Company was able to provide Company-owned aircraft to its subscribers requesting air transportation only approximately 65 percent of the time, often due to maintenance issues. For the remaining approximately 35 percent of requests, the Company had to charter aircraft to serve its customers. The markedly higher cost incurred by the Company for charter aircraft was one of the reasons that the Company was not profitable. [10]

10
    Clauss Decl. at ¶ 13.

From its review of the Company's operational and financial circumstances, Seabury drew the following conclusions which it reported to Company management in March 2005:

> **\*3** [U]ntil the Company's fleet wide reliability, and associated maintenance problems, were greatly improved, the Company was highly unlikely to be able to raise capital from external sources and would need to continue to rely on funding from Raytheon .... [and] the Company likely would need to fix its maintenance and reliability issues and show profitability in two consecutive calendar quarters before

it would be able to attract any interest from equity investors. [11]

11
    *Id.* at ¶ 14. The Defendants point to a "report" prepared by Seabury. *Id.,* Ex. A. While more in the nature of a presentation demonstrative, it does recite, at 4, that "[i]t is likely, in Seabury's opinion, that current equity shareholders will be wiped out, and that creditors will receive pennies on the dollar under all possible [restructuring] scenarios."

At its April 4, 2005, meeting, the Board was informed of Seabury's gloomy conclusions. The Board approved, unanimously, the Company's borrowing from a Raytheon affiliate of $20 million with a maturity date of May 27, 2005 (the "Overline Loan"). Also approved was a forbearance agreement extending maturity of $17 million indebtedness to a Raytheon affiliate from March 2005 to May 31, 2005.

Company management also presented the Board with the results of an appraisal of the Company's common equity units by Standard and Poor's ("S & P"). The purpose was to support the Company's purchase of 6.5 million common units held by its former chief executive officer for no value. The repurchase of all of the units for the normal consideration of one dollar was supported by the Board, including Metz and Pinkas. [12] The S & P draft report suggested that the Company's fair market value was in the range of negative $150–200 million. The final version of the S & P report [13] was received by the Company in mid-May and it was updated on May 26, 2005. The report, premised primarily upon Company financials and management projections, concluded that shareholder equity, as of December 31, 2004, was a negative $199 million and that it would be at that level or worse through 2010. Accordingly, S & P assigned only "*de minimis*" value to the Company's equity units. S & P's report reflected: Company losses of $31.6 million in 2003 and $42.1 million in 2004; a projected loss of $50 million in 2005; and a projected profit first occurring in 2008.

12
    Metz distances himself from the implications of this vote by noting that the chief executive officer had been terminated under circumstances that left him with little, if any, bargaining room. Metz Reply Aff. at ¶¶ 13–20. That, however, does not explain a similar stance with respect to the repurchase a month later of

75,000 common units for no value from an employee who departed the Company, but without any cloud.

13      Verified Compl., Ex. B.

In the middle of April 2005, Charles F. Mueller, Raytheon's director of corporate development, contacted Jeffries Quarterdeck ("Jeffries"), a firm providing services relating to mergers and acquisitions, financing, and restructuring for companies in the aerospace and defense industries. After obtaining financial information from the Company and consulting with its chief financial officer, Jeffries was "unwilling to propose any type of financing for the Company because of its financial condition." [14] Indeed, it noted that the Company "lost money for every hour its planes were in the air." [15] Jeffries drew the following conclusions: (1) "[u]ntil the Company addressed the underlying operational causes for its losses, ... there was no possibility of arranging external debt or equity financing for the Company at that time" and (2) any "external financing could be accomplished only at extraordinary interest rates or by essentially giving up equity control of the Company." [16] These conclusions were reported to the Board on May 13, 2005.

14      Richter Decl. at ¶ 6.

15      Id.

16      Id. at ¶¶ 7–8. Neither Jeffries nor S & P would provide any formal opinion to the Company regarding either the fair value of the common units or of the Purchase Agreement.

**\*4** The Company owed Madison Capital, one of its few third-party lenders, $14 million that was due on May 27, 2005. The debt had been guaranteed by Metz and Pinkas, but they were refusing to extend their guarantees. Accordingly, at the May 13, 2005, Board meeting, in addition to reporting Jeffries' conclusions, Company management informed the Board of the guarantors' decision and the Company's need for (1) $14 million to repay Madison Capital; and (2) $23 million to meet projected cash flow needs for the balance of 2005. On May 10, 2005, RTA had submitted a term sheet for its purchase of new equity. [17] That term sheet, which would form the basis for the Purchase Agreement now challenged by FOI provided: (1) an increase in the Overline Loan from $20 million to $50 million ($14 million of which was to repay the Madison Capital loan); (2) a maturity date for the increased Overline Loan of June 30, 2005;

(3) the issuance on June 30, 2005, of $50 million worth of common units of the Company, valued at $0.01 per unit, to RTA and to any other equity holder who chose to exercise preemptive rights in connection with the issuance; and (4) a forbearance by Raytheon until March 2006 of approximately $18 million of debt that would come due in 2005. The sale price for the equity units of $0.01 per unit was subject to confirmation by an independent appraiser that the fair market value was equal to or less than the specified unit price.

17      Cambria Aff., Ex. I.

Pinkas opposed the proposed equity financing and indicated that there were third parties interested in investing in the Company. He did not identify those third parties, except for Apollo Management, L.P., a firm that representatives of RTA had already contacted. The Board unanimously approved the additional debt financing proposals and it authorized, although over the opposition of Pinkas and Metz, Company management to negotiate with RTA over the terms of the equity financing and to retain S & P to value the common equity units.

Raytheon had been meeting the cash needs of the Company for more than two years without any assistance from FOI. With the forbearance agreements and increasing indebtedness, it was becoming more deeply involved in its apparent role as lender of last resort. Indeed, the Overline Loan was intended to be of short duration, but it was obvious that the Company would have great difficulty in repaying it when it became due on June 30. Raytheon's position evolved to a willingness to delay repayment of certain debt and to extend additional financing, but all would be conditioned upon the closing of the Purchase Agreement. [18] Thus, as of June 9, 2005, the Company and Raytheon executed the Purchase Agreement and another forbearance and deferral agreement. On July 1, 2005, after the filing of this action, Raytheon also submitted a term sheet offering to provide new financing in the amount of $32.4 million. [19]

18      The sale of the 5 billion common units to RTA would provide the Company with no new cash. Instead, it would accomplish a conversion of debt to equity.

19      Mueller Decl., Ex. B.

After the May 13 Board meeting, when it had become obvious that an RTA equity investment would occur, the

Company's outside counsel contacted Metz and Pinkas for assistance in negotiating with RTA for a more favorable price. No response was received. On May 24, 2005, Company management wrote to representatives of RTA and FOI asking that they identify potential investors. RTA made two suggestions the next day. A week later, Pinkas identified three potential investors.

**\*5** In the intervening weeks, representatives of either the Company or Raytheon discussed possible investments in the Company with six different entities. Three, after receiving financial information, either did not respond or responded with a lack of interest. Three other entities engaged in more substantive discussions with Company management:

1. UIJ Aviation, a Canadian aviation venture, indicated that it valued the Company's equity at zero and that Raytheon would receive only "cents on the dollar" for its debt but that it might require more if it agreed to a deferred payment schedule. In addition, UIJ expressed an interest in receiving special concessions from Raytheon in contracts for aircraft maintenance. Raytheon was unwilling to relinquish its indebtedness rights and would not provide special terms to UIJ for its maintenance work; accordingly, UIJ has indicated that it is not interested in any transaction involving the Company.

2. Apollo Management, L.P. appears to have given serious thought to an investment in the Company. It took the position that the Company's equity was of "no value" and that its debt was worth less than face value. It submitted a written proposal, dated April 12, 2005, that any acquisition of the Company would provide no return for equity holders and only a partial return on debt. It also indicated that it desired to acquire certain other Raytheon assets which were not for sale. In light of that response, no further negotiations occurred.

3. Assets Solutions International, Inc. ("ASI") met with Company management on June 22, 2005. It is continuing to conduct due diligence following an expression of interest in purchasing and acquiring common equity if the Company's debt could be addressed as well. Although ASI's request for an exclusivity period until July 10, 2005, was denied, ASI has continued its due diligence and its discussions with representatives of RTA, FOI, and the Company. [20]

[20]  It is now apparent that ASI will not present a material offer before the close of business on July 11, 2005.

The Company's outside counsel, on May 31, 2005, sought to enhance the terms of the Purchase Agreement, by seeking a higher price per unit, an extension of due dates for other indebtedness, and a post-closing adjustment to the purchase price in the event any higher price was paid by a third party within a twelve month period. Raytheon rejected those efforts, but it did consent to including a "fiduciary out" in the Purchase Agreement. [21] Following execution of the Purchase Agreement, all eligible equity holders, including FOI, were sent a preemptive rights notice. No notice of intent to assert preemptive rights had been submitted by the June 30 deadline.

[21]  The "fiduciary out" feature is limited in scope and requires a "definitive written agreement" for a Superior Investment Proposal and a $50 million cash (or equivalent) payment by July 10, 2005. Purchase Agreement, Section 9.2. To be a Superior Investment Proposal, it must, *inter alia*, "as a whole, present[ ] a more favorable opportunity for Flight Options that the transactions contemplated by [the Purchase Agreement]." Purchase Agreement, Section 1.1.

The Company had a net loss of approximately $34 million through May 2005 and it was expected to lose $8 million in June. As of July 1, the Company had cash reserves of approximately $4 million but owed Raytheon Aircraft Services roughly $7 million for maintenance services. Although the Overline Loan is to be repaid by July 11, 2005, the Company does not have the ability to do so. In addition, another $20 million will be required during the balance of 2005 to satisfy working capital requirements and to pay a $3.8 million facility mortgage note to a third-party lender which becomes due in August 2005. [22]

[22]  With respect to the additional financing proposed by the July 1, 2005, term sheet in the amount of $32.4 million, $12.5 million has already been used to pay off a third party creditor which was threatening litigation. In the absence of third-party funding or further funding by Raytheon, the Company will not be able to need its financial obligations or to continue operations. Because there is no reasonable expectation that a third-party lender or investor will appear by July 11, 2005, the Company's fate, and that of whatever interest FOI may have, rests with Raytheon and how it will, in fact, exercise its

2005 WL 6799224

powers as the Company's, while not exclusive, most significant creditor.

## II. CONTENTIONS

### A. *From FOI's Perspective*

**\*6** FOI acknowledges that Raytheon and its affiliates control both the equity and the debt of the Company. The Purchase Agreement does not provide for any new funds for the Company. It simply accomplishes a conversion of Raytheon debt to Raytheon equity and whether that happens on July 11, 2005, or sometime later should make little difference to Raytheon. FOI, however, maintains that it makes a big difference to FOI because its equity interest in the Company will be eviscerated for no consideration. The decision that the Company's common equity is worthless is, according to FOI, unfair and unjustified. Because Raytheon controls "both sides" of the transaction, the actions of its representatives must be judged under the "entire fairness" standard. In addition, FOI is contractually entitled to a price set through an "arms' length" transaction. The Purchase Agreement meets neither of these standards. Thus, FOI argues, there is a reasonable probability that it would prevail on its claims before the arbitration panel. In addition, the severe reduction of its equity interest will constitute irreparable harm and a balancing of the equities favors granting it relief because it will suffer palpable harm without interim injunctive relief, but neither the Company nor RTA will suffer any adverse consequences because Raytheon will not capriciously harm an entity into which it has made such a sizeable investment.

### B. *From the Defendants' Perspective*

The Defendants vigorously contest FOI's claims. Initially, they stress that the Company only exists because of Raytheon's long and substantial commitment to funding its operations. The Company has a negative balance sheet; it loses money; and its prospects for a turn around in the short term are bleak. Equity value simply is not there. Moreover, FOI could have protected its interests through the exercise of its preemptive rights to acquire additional equity on the same terms as RTA. The Defendants also point out that irreparable harm will not result Raytheon's participation will likely be on a continuing basis and rescission may be an adequate remedy. Alternatively, the diminiution in value can be determined and, thus, damages would also be adequate

—all in what Defendants view as the unlikely event that FOI should prevail on the merits of its claims. Finally, because of the unquestioned and immediate need of the Company for additional funding, which Raytheon is now committed to accomplishing in the event the Purchase Agreement is consummated, and the history of FOI's failure to participate in meeting the Company's ongoing cash needs, the equities align against the issuance of a preliminary injunction.

## III. ANALYSIS

### A. *The Appropriate Standard*

A plaintiff seeking a preliminary injunction bears the burden of demonstrating: (1) a reasonable probability of success on the merits at trial; (2) that it will suffer imminent, irreparable harm if its application is denied; and (3) that the harm to the plaintiff, if relief is denied, outweighs the harm to the defendant if relief is granted. [23] The preliminary injunction, here, is sought in aid of arbitration. That requires an analysis of the likelihood of success prong at two levels: (1) the moving party's entitlement to arbitration; and (2) the merits of its arbitration claims. [24] The parties agree that the dispute among them is to be resolved by arbitration. [25] Moreover, "where the right to arbitrate is clear," as here, "the analysis of the merits of the underlying claims may be more limited." [26] This "more limited" standard has been framed as requiring the party seeking the preliminary injunction only to "establish a reasonable probability that its arbitration position is sound." [27]

[23] *See, e.g., SI Management, L.P. v. Wininger,* 707 A.2d 37, 40 (Del.1998); *Unitrin, Inc. v. Am. Gen. Corp.,* 651 A.2d 1361, 1371 (Del.1995).

[24] *Kansas City S. v. Grupo TMM, S.A.,* 2003 WL 22659332, at *2 (Del. Ch. Nov. 4, 2003).

[25] The LLC Agreement requires arbitration of "any dispute, controversy or claim" between a member and another member, or between a member and the Company. Section 18.2. In addition, the arbitration provisions include any dispute, controversy or claim between a member and an affiliate of a member. Affiliate is defined to include the managers of the Company, in this instance, the RTA Managers. App. at B–2.

26 *Kansas City S.,* 2003 WL 22659332, at *2 (quoting *Price Org., Inc. v. Univ. Computers Servs., Inc.,* 1992 WL 356026, at *8 (Del., Ch. Dec. 2, 1992)). *But see Suchodolski Assocs., Inc. v. Cardell Fin. Corp.,* 2004 U.S. Dist LEXIS 1427, at *12 (S.D.N.Y. Feb. 3, 2004) (rejecting a more relaxed standard of review for a "status quo" injunction pending further proceedings in arbitration).

27 *Id.* In *Kansas City Southern,* the Court did not resolve the question "as to how much the Court should limit its inquiry." *Id.* at n.10.

B. *Probability of Success on the Merits*

**\*7** FOI has not yet filed a demand for arbitration. Accordingly, it is something of a challenge to determine whether a preliminary injunction should issue in aid of an arbitration where the grounds for the arbitration have not been set forth in that forum. The Court's understanding of the claims that FOI intends to present to the arbitrators includes the following: (1) that the $0.01 per unit price at which the Company will issue to RTA new common units is unfair and unwarranted; (2) the Board failed to conduct an adequate "market check" in advance of approving the Purchase Agreement on June 9, 2005; (3) the "fiduciary out" negotiated by the Company's outside counsel is illusory because of its limited scope and short duration. The parties diverge at the outset over whether the conduct of the RTA Managers is to be judged under the "entire fairness" standard or whether their obligation is to satisfy an "arms length" standard set forth in the LLC Agreement. [28]

28 The Defendants concede that the RTA Managers "stand on both sides" of the Purchase Agreement. If they are subject to the full panoply of fiduciary duties in this case, the appropriate standard for review of their conduct would be "entire fairness;" that is, they would be required to demonstrate that the Purchase Agreement was entirely fair as to price and process.

By 6 *Del C.* § 18–1101(c), Delaware's Limited Liability Company Act (the "Act") provides:

> To the extent that, at law or in equity, a member or manager or other person has duties (including fiduciary duties) to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a limited liability company agreement, the member's or manager's or other person's duties may be expanded or restricted or eliminated by provisions in the limited liability company agreement; provided, that the limited liability company agreement may not eliminate the implied contractual covenant of good faith and fair dealing.

Thus, it is necessary to turn to the LLC Agreement. By Section 6.5(b), the LLC Agreement imposes the following standard: "Each Manager shall have the same fiduciary duties in managing the affairs of the Company as the directors of a Delaware corporation have, under applicable law, to its shareholders and others, as applicable." [29] On the other hand, by Section 6.2(1), the LLC Agreement establishes the following standard to govern transactions between the Company and any affiliate of the Company:

29 Pursuant to Section 6–6 of the LLC Agreement, "[e]ach Member shall have the same fiduciary duties to each other Member as the shareholders of a Delaware corporation have, under applicable law, to each other."

> Unless otherwise approved by a majority of disinterested Managers, all transactions between the Company on the one hand, and any Affiliate of the Company on the other hand, will be on arms' length terms and conditions, including fair market values and prices equivalent to those that would be charged and paid between parties at arms' length at the time of the entering into of the transactions in question.

The parties who are bound by the LLC Agreement are sophisticated parties, and it is the Court's burden to discern the intention of the parties in defining, through the LLC Agreement, the obligations of RTA and the RTA Managers to the Company and to other stakeholders . [30] When the LLC Agreement was negotiated, it was obvious that a majority of the Board would be comprised of RTA designees. Thus, in any transaction between the Company and Raytheon, or one of its affiliates, the RTA Managers would find themselves in a position of inherent conflict where their loyalty would always be fairly subject to question. It is with this in mind that the LLC Agreement must be construed, "It is, of course, a maxim

2005 WL 6799224

of contract interpretation that more specific contractual terms will trump those that are more general." [31] Section 6.2(1) specifically is targeted at transactions between the Company and its affiliates, and it is more specific with respect to assessing the conduct of the RTA managers in a related party transaction than would be the more general fiduciary duty provision of Section 6.5(b). In short, the LLC Agreement imposes general fiduciary duties upon the managers but, in the context of a transaction between the Company and its affiliates, those duties are limited to requiring that the transaction be on "arms' length terms and conditions" [32] and, in accordance with § 18–1110(c) of the Act, carried out in good faith and through fair dealing. [33]

[30]     See *Kier Constr., Ltd. v. Raytheon Co.,* 2005 WL 628498, at *5 (Del. Ch. Mar. 10.2005).

[31]     *Fasciana v. Elec. Data Sys. Corp.,* 829 A.2d 160, 173 n.44 (Del. Ch.2003).

[32]     The notion of arms' length terms and conditions conjures up an image of real negotiations—the process of give and take. It is doubtful that any such activity occurred between the Company and Raytheon to any significant extent. The terms and conditions of the Purchase Agreement were largely set by Raytheon. The capacity of Company management to negotiate effectively with Raytheon may be questioned because the Company apparently is in the zone of insolvency and Raytheon controls the equity and is the principal creditor. Of course, as the result of negotiations, a limited "fiduciary out" clause was added. As a practical matter, the inquiry must be one of whether the price fairly reflects what would have been the outcome of an arms' length negotiation. The reliability of a determination of price cannot be fairly assessed, at least in this context, without consideration of the process.

[33]     At issue here is the scope of the fiduciary duties owed by the RTA Managers to the Company. The definition of "Affiliate" appears in Appendix E of the LLC Agreement, It means, "with respect to any Person: (i) any Person directly or indirectly controlling, controlled by or under common control with such Person; ..." Because RTA controls the Company, whether through its ability to designate a majority of the board of managers or by its effective equity control, RTA is an "affiliate" of the Company. It should be noted that the arbitrators might take a different view. The LLC Agreement broadly

imposed fiduciary duties on the RTA Managers. A limitation on those important duties should have been, it could be determined, more precisely delineated and, if resort to a contract construction principle of the specific provision controlling the general provision is needed, then Section 6.2(1) was not adequate to achieve the results sought by the Defendants.

**\*8** In accordance with the LLC Agreement, the RTA Managers must justify their approval of the interested party transaction as one on "arms' length terms and conditions." [34] FOI does not question the terms and conditions of the Purchase Agreement other than the price and, perhaps, the provisions of the "fiduciary out" clause. Through Metz's affidavit, FOI sets up its claim relating to the price of the common units and S & P's supporting valuation. [35] Metz., who does not claim to be an independent valuation professional in this matter, [36] expresses the view that each common unit is worth $1.44. [37]

[34]     The burden of demonstrating that the Purchase Agreement is based on an arms' length price is properly imposed upon the RTA Managers because that is the standard prescribed in the LLC Agreement for them to justify their conduct, instead of the more onerous "entire fairness" standard, a burden which, if applicable, clearly would be theirs.

[35]     Metz notes that S & P used only a discounted cash flow analysis, eschewing other potential methodologies to determine value.

[36]     Metz does have experience in valuing businesses as part of his duties as a managing director of a private equity investment firm that manages more than $1.5 billion. FOI did not submit an independent cash flow analysis. The reasons for that tactical choice are not clear although one is tempted to wonder about the conclusions that might have been drawn.

[37]     Metz Aff. at ¶ 12. A detailed review of Metz's attack on the S & P discounted cash flow analysis, Metz Aff. at ¶¶ 5–12, would serve little purpose in the context of a preliminary injunction motion. It is sufficient to note that his concerns are fairly addressed in the Deetz Decl. at ¶ 7–10.

If the common units are worth $1.44 each, one wonders why the preemptive rights were not exercised. FOI chose not to do so (perhaps because it did not have the resources), but that does not

explain why FOI could not have induced others to participate (or assist it in participating) if, in fact, the units were worth 144 times the purchase price. While there is no duty to exercise preemptive rights, these sophisticated parties included no dilution protection feature in the LLC Agreement, except for the preemptive rights provision that allows each member to amass equity units on the same basis as the other member.

FOI also attacks the independence of S & P because Raytheon is an "S & P client." Verified Compl. at ¶ 33. FOI offers nothing more and what it has alleged has no suggestion of materiality and, thus, fails to cast any doubt on S & P's independence. *See, e.g., NBC Universal Inc. v. Paxson Communications Corp.,* 2005 WL 1038997, at *7–3 (Del. Ch. Apr. 29, 2005).

FOI also argues that the process adopted by the RTA Managers was so flawed as to cast doubt upon the value established through that process for the new common units. First, it points out that the Company never retained an investment adviser and it did not receive a formal opinion from either Seabury or Jeffries. Second, FOI contends, quite plausibly, that the Company has favorable future prospects. [38] The impact of potential future prosperity on current value was not, according to FOI, given appropriate weight. Third, Apollo Management's position reflected the first response to a solicitation that was then cut off by the Raytheon interests. As such, it was only the opening salvo in a negotiation that never went further. Accordingly, it is an unreliable reference.

[38]     That, of course, is premised on an assumption that the Company survives until the "future" arrives. To be sure, the Company does have serious difficulties that extend beyond its current liquidity crisis. For example, the Company's churn rate (a function of customers lost measured against customers gained) is above the industry average. *See* Deetz Decl. at ¶ 11(iv).

Thus, it is against this backdrop that the Court must determine whether FOI has "establish[ed] a reasonable probability that its arbitration position is sound." [39] That question is not whether the Court, in the absence of an agreement by the parties to submit the merits of their dispute to an arbitration panel, would enjoin the issuance of new common units to RTA. Instead, it requires an assessment, however imprecise, as to how FOI's claims would likely be received in the arbitration forum. It is not simply a question of whether the claims to be submitted to

the arbitrators are colorable; nor does it require certainty that a favorable result will be obtained. Instead, FOI must persuade the Court that the arbitration panel could find in its favor and that there is a reasonable possibility of such a result. It is important for the Court not to impress its views of this matter on the venue chosen by the parries for the resolution of their dispute. Thus, the Court must be careful in predicting the outcome in the arbitration forum. Ultimately, it is a question of whether FOI has come forward with a showing that its claim is sufficient to accommodate these considerations.

[39]     *Kansas City S.,* 2003 WL 22659332, at *2.

The evidence that the price of the new Common Units is a fair reflection of what would have been reached in an arms' length transaction consists of: (1) the S & P valuation; (2) the "opinions" from Seabury and Jeffries; and (3) a limited marketing or "market check" effort. Each has its shortcomings. The S & P valuation is not unreasonable, but it relies exclusively on the discounted cash flow method. While the discounted cash flow approach may have been the single best tool, other methodologies were not employed as a check. [40] In addition, the Company's relatively short history and the difficulty of projecting its cash flows into the future all counsel for caution. Moreover, S & P did not explore in depth the nature of the industry and its prospects. With respect to Seabury and Jeffries, the intensity of their efforts cannot readily be discerned from the affidavits presenting their conclusions. [41] In addition, Jeffries' involvement was solicited by Raytheon's director of corporate development, *i.e.,* not by anyone directly associated with the Company. Neither Jeffries nor Seabury offered a formal opinion. Again, while ultimately none of this may matter, there is room for doubt. The effort to obtain proposals—an effort to secure an accurate read of market perception—was done in a haphazard manner. The results may accurately reflect the market, but the lack of coordination and process, again, tends to undermine the results. Finally, the "fiduciary out" provision which requires a "definitive written offer" and the delivery of $50 million within approximately one month of approval of the Purchase Agreement, does not support the reliability of the established price because the short period offers only limited opportunity for any potential investor to pursue necessary due diligence and to arrange for the required funding.

40    S & P acknowledges the usefulness of other methodologies—the Guideline Company Method and the Comparable Company Method. It states that the necessary information to employ other methodologies is not available, but it is not clear why that is the case. Verified Compl., Ex. B, at ¶ 6.3.

41    Because of the compressed schedule for considering the preliminary injunction application, admittedly due largely to FOI's delay in filing this action, no depositions were taken.

**\*9** The question, of course, is not how the Court views the valuation information as a whole; it is how the arbitrators would view it. The Court is satisfied, however, that there is a likelihood that the arbitrators would find FOI's challenge to be sound: that they would conclude that the fate of a company with revenues in excess of $600 million annually and the fate of an almost one-third interest in the Company should not be based on a price established by such a process. Raytheon controlled the setting of the price; while it may eventually be sufficient for it to argue that the balance sheet and the cash demands demonstrate an absence of value in the equity, the process chosen was so informal as to undermine substantially the ability of the RTA Managers to show that the price is the equivalent of an arms' length transaction's result, at least within the projected views of an arbitration panel. 42 Accordingly, under the in aid of arbitration standard, FOI has met its merits-based burden.

42    Although the Act provides that drafters of limited liability company agreements may relieve managers of some of the burdens of fiduciary duties, the duty of good faith must remain. FOI alleges that the RTA Managers failed to meet their duty of good faith. The Court is satisfied, at least on the present record, that FOI has not demonstrated any basis for finding a breach of the duty of good faith, even under the in aid of arbitration standard. There is no reason to doubt that the RTA Managers reasonably and in good faith believed that the Common Units were of no (or *de minimis* ) value and that the proposed financing was in the Company's best interest. The balance sheet is negative, cash needs cannot be met, and the debt is substantial. In addition, they had the benefit of the S & P valuation. Their views may be wrong (or they may be right), but for these purposes, their conduct cannot be viewed as resulting from a lack of good faith.

*C. Irreparable Harm*

Without irreparable harm, there is no need for the Court to grant interim relief and the parties can fairly wait until final decision on the merits. Winning sooner, instead of later, is, of course, preferable. When a court enters a preliminary injunction, it does so frequently without a full understanding of the facts and without the parties' having had the opportunity to develop fully their advocacy positions. Thus, courts must be careful in awarding such relief; indeed, it is said that a "preliminary injunction is an extraordinary remedy," 43 and it is crucial for the successful plaintiff to demonstrate that it will suffer irreparable harm in the absence of judicial intervention.

43    *Lawson v. Meconi,* 2005 WL 1323123, at *2 (Del. Ch. May 27, 2005).

FOI starts with the argument that it need not make a showing of irreparable harm. It relies upon Section 21.13 of the LLC Agreement, which provides in pertinent part:

> **Specific Performance.** The parties acknowledge that it is impossible to measure, in money, the damages that shall accrue to a party ... from a failure of a party to perform any of the obligations under this Agreement. Therefore, if any party ... enters into any action or proceeding to enforce the provisions of this Agreement, any Person (including the Company) against whom the action or proceeding is brought waives the claim or defense that the moving party ... has or shall have an adequate remedy at law, and the Person shall not urge in the action or proceeding the claim or defense that an adequate remedy at law exists.

While this language perhaps could be read as requiring the court to be more flexible in assessing whether FOI has made the necessary showing, it is not dispositive. 44 First, it only addresses the question of an adequate remedy at law—a necessary predicate to the exercise of equitable jurisdiction without regard to whether the plaintiff seeks interim or permanent equitable relief It does not specifically address the more precise aspect of irreparable harm. In short, there are instances where there may not be an adequate remedy at law but there, at the same time, may not be the potential for irreparable harm. Second, the parties may not confer equitable subject matter jurisdiction upon this Court by agreement. 45 Thus, further consideration is required.

WESTLAW    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

44    The Defendants argue that Section 21.13 can have no application here because it bears the heading "Specific Performance" and this is not an action for specific performance. They are right: Section 21.13 of the LLC Agreement bears the heading "Specific Performance" and this is not an action for specific performance; however, by Section 21.7 of the LLC Agreement, "Section and other headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define or limit the scope or extent of this Agreement or any provision hereof." The text of Section 21.13 cannot be fairly read as limited to specific performance actions only.

45    As to the capacity of contracting parties under circumstances, not present here, to confer subject matter jurisdiction by contract, see 10 Del. C. § 346.

**\*10** Consummation of the Purchase Agreement will dilute FOI's equity interest in the Company from 31% to 1%. A severe dilution has been found to constitute irreparable harm because, at least in part, of the difficulties in restoring the injured party to its proper status through a grant of final relief. [46] However, there is no general rule that applies to all circumstances. Instead, a case-by-case analysis, considering the various potential consequences of the dilutive conduct is necessary. [47]

46    See, e.g., Suchodolski Assocs. v. Cardell Fin. Corp., 2004 U.S. Dist LEXIS 1427 (S.D.N.Y. Feb. 3, 2004). The parties all cite Solar Cells, Inc. v. True N. Partners, LLC, 2002 WL 749163 (Del. Ch. Apr. 25, 2002), which, while instructive, involves a more "injunction-friendly" set of facts. More than equity dilution (e .g., dilution of role in corporate governance) was at stake there. Also, the challenged dilution was accomplished in what the Court considered an underhanded manner. Here, Metz and Pinkas were aware of the substance of the Purchase Agreement well in advance of the June 9 meeting and, for another month, have had, although on a limited basis, the opportunity to pursue other options. There is one aspect about Solar Cells which may be viewed as putting FOI's claims in a better light. The fiscal difficulties experienced in Solar Cells resulted from claims of third-party creditors; here, the creditor of consequence—Raytheon—is also the party which is acquiring the enhanced equity position as the result of dilution of FOI's interest.

47    See Rovner v. Health–Chem Corp., 1996 WL 377027, at \*13 (Del. Ch. July 3, 1996) (considering the impact of voting power dilution).

The Defendants have cogent arguments as to why a finding of irreparable harm may not be appropriate. First, the benefits of dilution will accrue to Raytheon; Raytheon will likely, but with no guarantee, continue holding that equity; under the LLC Agreement, Raytheon will be required to give notice to FOI of any proposed transfer of its equity interest; and, thus, the arbitration panel would likely be confronted with a factual setting in which, if applicable, rescission could be accomplished. Second, the value of FOI's interest in the Company before and after the issuance of the new equity can be determined—even if imprecisely—and, thus, damages could be fairly measured. If damages are available, the Defendants point out, the harm cannot be said to be irreparable. Finally, the dilution of FOI's equity interest will not impair its right to designate two members of the Board. As the Defendants argue, but with little comfort for FOI, FOI's role in corporate governance through the Board will not be diminished.

In response, FOI notes that the LLC Agreement exculpates the RTA Managers from personal liability for money damages to the extent that "their act[s] or omission[s] [were] taken or omitted in good faith and in a manner that the Covered Person [Manager] reasonably believed to be in or not opposed to the best interests of the Company or permitted by the [LLC Agreement]." [48] On the other hand, the exculpatory provision does not extend to RTA. Nevertheless, FOI's ability to collect damages from the RTA Managers, in the event that it should prevail on the merits of its claims, is, at best, problematic.

48    LLC Agreement, Section 7.3(a).

Although rescission may be more likely in this matter to be a viable remedy than it frequently is, there remain a number of substantial impediments. These range from the possibility, even if not the likelihood, that Raytheon will sell its interests in the Company to the likelihood that further changes will be made in the Company's capital structure thereby making rescission less facile. Moreover, the process of calculating the diminishment in value (of course, assuming that there would be any) may be a daunting task.

Case 1:18-cv-00475-SEB-TAB   Document 1-2   Filed 02/16/18   Page 99 of 440 PageID #: 111
Flight Options, Inc. v. Flight Options, LLC, Not Reported in A.2d (2005)
2005 WL 6799224

In sum, reducing FOI's equity interest in the Company from 31% to 1% may fairly be characterized as irreparable harm.

### D. *Balancing of the Equities*

If the Purchase Agreement is implemented, FOI's significant equity position will be reduced to approximately 1% of the Company and, if that is done improperly, restoring to FOI its former position or fairly compensating it for its loss will be problematic. As for the Company, this is not a dispute where some third-party investor or creditor may do substantial harm to it in the absence of the proposed transaction. Raytheon, of course, will act as it chooses as creditor. If it chooses to force the issue, it can cause the parade of horribles posited by the Company—loss of jobs, closing of facilities, defaults on contracts. That harm, however, will be caused to an entity in which Raytheon holds approximately 69% of the equity. In short, in balancing the equities between the Company and FOI, the balance tips slightly in favor of FOI. The interests of the RTA Managers, as such, would not be adversely affected by the entry of a preliminary injunction.

### E. *Propriety of a Preliminary Injunction*

**\*11** FOI has succeeded, although by the barest of margins, under the relaxed standard associated with preliminary injunctions in aid of arbitration in demonstrating a likelihood of success, the occurrence of irreparable harm in the absence of interim relief, and a favorable balancing of the equities. [49] Thus, a preliminary injunction, as described below, will issue to maintain the status quo pending commencement of the arbitration proceeding between the parties and the arbitration forum's opportunity to review the need for continuing interim relief.

[49] The Defendants argue that equitable relief should be denied to FOI because of its delay in pursuing this action. It took from June 9, 2005, when the Purchase Agreement was applied (and those terms had been known for perhaps as long as a month before then) until June 27, 2005, to file this action. The defense of laches "operates to prevent the enforcement of a claim in equity if the plaintiff delayed unreasonably in asserting the claim, thereby causing the defendants to change their position to their detriment." *Scureman v. Judge,* 626 A.2d 5, 13 (Del. Ch.1992). It appears

that efforts to avoid litigation were pursued during the interim; it appears that the Defendants did not change their position during the interim; under the circumstances, it is difficult to say that the delay was unreasonable. Thus, laches is not available as a defense to FOI's motion for a preliminary injunction.

## IV. CONCLUSION

The Company's future depends upon what Raytheon plans to do with, or to, it. This Court's actions in the context of a motion for a preliminary injunction in aid of arbitration are likely to be of little, if any, long-term consequence for the Company. Raytheon controls the Company's Board of Managers, it controls the Company's equity, and its credit position is overwhelming. Although obviously dependent upon the course chosen by Raytheon, FOI's interest in the Company is likely limited in terms of both value and duration. The parties agree that their disputes should be resolved through arbitration; without a preliminary injunction, the ability of the arbitrators to protect the interests of FOI, as limited as they may be as a practical matter, might be impaired. In light of the relaxed standard for a preliminary injunction in aid of arbitration, it is appropriate for the Court to exercise its discretion to maintain the status quo.

FOI's application for interim injunctive relief is not without its unappealing aspects. It negotiated the Restructuring Agreement and the LLC Agreement which diluted its interest without securing any future protection from dilution except through the preemptive rights provision. It now has elected not to exercise those rights. Since the formation of the Company, as now constituted, FOI and its affiliates have contributed a pittance to slake the Company's thirst for cash, but it willingly allowed Raytheon to fund, and to fund, and to fund those needs. The arbitrators may well finally conclude that FOI is not entitled to relief. Moreover, they may conclude that FOI is not entitled to relief pending their final resolution of the parties' dispute. The LLC Agreement specifically authorized the pursuit of interim relief in the arbitration forum under the American Arbitration Association's Optional Rules for Emergency Measures of Protection. [50] That established the proper process for determining whether the status quo should be maintained for the duration of the arbitration proceeding and its respects the parties' agreement to submit this dispute to arbitration.

2005 WL 6799224

50      LLC Agreement, Section 18.2(a).

Accordingly, the Court will issue a preliminary injunction prohibiting consummation of the Purchase Agreement. That injunction, however, will expire, in the absence of further order, in thirty days. During this period, FOI may take its claims to the arbitration forum and seek interim relief there.

**\*12** An order will be entered to implement this Memorandum Opinion.

**All Citations**

Not Reported in A.2d, 2005 WL 6799224

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

# *TAB 4*

KeyCite Yellow Flag - Negative Treatment
Distinguished by Feldman v. Cutaia, Del.Ch., August 1, 2007

925 A.2d 1265
Supreme Court of Delaware.

Edward E. GATZ and Donald D. Graham,
individually and on behalf of those similarly
situated, and derivatively on behalf of Regency
Affiliates, Inc., Plaintiffs Below, Appellants,

v.

William R. PONSOLDT, Sr., Statesman
Group, Inc., William R. Ponsoldt, Jr., Marc
H. Baldinger, Stephanie Carey, Martin J.
Craffey, Royalty Holdings, L.L.C., Royalty
Management, Inc., Laurence Levy, Neil N. Hasson,
Stanley Fleishman, Errol Glasser and Regency
Affiliates, Inc., Defendants Below, Appellees.

No. 298,2006.
|
Submitted: Dec. 13, 2006.
|
Decided: April 16, 2007.
|
Reargument Denied May 17, 2007.

**Synopsis**

**Background:** Public shareholders who became minority
shareholders as a result of recapitalization brought
breach of fiduciary action against corporation's
directors, corporation's prior controlling shareholder, and
corporation's new majority shareholder. The Court of
Chancery, New Castle County, Chandler, Chancellor,
dismissed the action as derivative, and public shareholders
appealed.

**Holdings:** The Supreme Court, Jacobs, J., held that:

[1] public shareholders sufficiently alleged that trust and
settlor controlled corporation and owed corporation and
public shareholders a fiduciary duty;

[2] public shareholders alleged a claim that new majority
shareholder aided and abetted breaches of fiduciary duty;
and

[3] public shareholders' claims could be brought as direct
claims, though direct beneficiary of recapitalization was
the new shareholder who owned no shares prior to the
recapitalization.

Reversed and remanded.

West Headnotes (12)

[1]     **Appeal and Error**
        👉 Cases Triable in Appellate Court

        Review of an order dismissing an action
        for failure to comply with pleading rule on
        derivative actions is de novo and plenary.
        Chancery Court Rule 23.1.

        Cases that cite this headnote

[2]     **Pretrial Procedure**
        👉 Construction of pleadings

        At the motion to dismiss stage, plaintiffs are
        entitled to all reasonable factual inferences
        that logically flow from the particularized
        facts alleged. Chancery Court Rules 12(b)(6),
        23.1.

        Cases that cite this headnote

[3]     **Pretrial Procedure**
        👉 Corporations and associations;bank and
        trust companies;securities

        In determining the sufficiency of a pleading
        under the derivative action pleading rule, for
        purposes of a motion to dismiss, a court
        considers the pleading and applies statutes,
        case law and the rule's requirements to that
        pleading. Chancery Court Rule 23.1.

        Cases that cite this headnote

[4]     **Corporations and Business Organizations**
        👉 Controlling or majority shareholders and
        minority shareholders in general

        Allegations that trust had de facto control
        of corporation, that trust used such status

to effect recapitalization that resulted in new shareholder becoming majority shareholder of corporation, and that trust's settlor negotiated on behalf of trust from the time that trust first obtained its interest in corporation through the time of the recapitalization, sufficiently alleged that at all relevant times trust and settlor controlled corporation and that trust and settlor owed corporation and public shareholders a fiduciary duty, in public shareholders' action alleging that trust and settlor breached their fiduciary duties in connection with recapitalization that resulted in public shareholders becoming minority shareholders.

11 Cases that cite this headnote

**[5]**     **Fraud**
        Persons liable

To state a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must allege: (1) a fiduciary relationship; (2) a breach of that relationship; (3) that the alleged aider and abettor knowingly participated in the fiduciary's breach of duty; and (4) damages proximately caused by the breach.

15 Cases that cite this headnote

**[6]**     **Fraud**
        Persons liable

Knowing participation in a fiduciary breach requires that the third party act with the knowledge that the conduct advocated or assisted constitutes such a breach.

12 Cases that cite this headnote

**[7]**     **Fraud**
        Persons liable

In some circumstances, the terms of a negotiated transaction themselves may be so suspect as to permit, if proven, an inference of knowledge of an intended breach of trust, for purposes of an aiding and abetting a breach of fiduciary duty claim.

9 Cases that cite this headnote

**[8]**     **Corporations and Business Organizations**
        Controlling or majority shareholders and minority shareholders in general

Public shareholders that became minority shareholders as a result of corporation's recapitalization stated a claim that new shareholder who became the majority shareholder as a result of the recapitalization aided and abetted former controlling shareholder's and directors' breach of fiduciary duties, by alleging that corporation paid $5.30/share to redeem former controlling shareholder's shares, that new majority shareholder's conversion price for the shares it obtained was only $2/share, that new shareholder supplied the financing for the recapitalization, that new shareholder was aware of the terms of the recapitalization, that former controlling shareholder and new shareholder agreed that recapitalization would be structured so that it would not have to be disclosed, and that recapitalization was structured in order to avoid a vote by the public shareholders.

16 Cases that cite this headnote

**[9]**     **Corporations and Business Organizations**
        Right of shareholder or member to sue; standing

Breach of fiduciary duty and aiding and abetting breach of fiduciary duty claims, brought by public shareholders against former controlling shareholder and new shareholder who became the majority shareholder as a result of corporation's recapitalization, could be brought as a direct claim, as reorganization resulted in a dilution or expropriation of value and voting power of held by the public shareholders, who became minority shareholders as a result of the recapitalization; though the direct beneficiary of the expropriation was the new shareholder, who owned no stock before the recapitalization, controlling shareholder

acted as an intermediary who transferred the benefits of the expropriation to the new shareholder in exchange for cash or other equivalent value, and fact that recapitalization consisted of two transactions that occurred simultaneously was merely a difference in form that was a product of transactional creativity. Chancery Court Rule 23.1.

32 Cases that cite this headnote

**[10]** **Equity**
    🔑 Equity regards substance rather than form

It is the very nature of equity to look beyond form to the substance of an arrangement.

6 Cases that cite this headnote

**[11]** **Equity**
    🔑 Equity regards substance rather than form

Equity will not permit one to evade the law by dressing what is prohibited in substance in the form of that which is permissible.

2 Cases that cite this headnote

**[12]** **Fraud**
    🔑 Fiduciary or confidential relations

Equity will not permit a fiduciary to deprive his beneficiaries of their entitlement to seek direct redress for fiduciary misconduct by structuring a transaction so as to obscure that entitlement.

1 Cases that cite this headnote

**\*1267** Court Below: Court of Chancery of the State of Delaware in and for New Castle County.
Upon appeal from the Court of Chancery. **REVERSED and REMANDED.**

**Attorneys and Law Firms**

Alan J. Stone, R. Judson Scaggs, Jr. (argued), Jerry C. Harris, Jr. and Jay N. Moffitt, Esquires, of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware; Of Counsel: Thomas H. Dahlk, Michael S. Degan and Trenten P. Bausch, Esquires of Blackwell Sanders Peper Martin, Omaha, Nebraska; for Appellants.

Daniel V. Folt (argued), Gary W. Lipkin and Matt Neiderman, Esquires, of Duane Morris LLP, Wilmington, Delaware; for Appellees William R. Ponsoldt, Sr., William R. Ponsoldt, Jr., Marc H. Baldinger, Stephanie Carey and Martin J. Craffey.

Kevin R. Shannon and Brian C. Ralston, Esquires, of Potter Anderson & Corroon LLP, Wilmington, Delaware; for Appellee Statesman Group, Inc.

Gregory P. Williams, Evan O. Williford and Charles A. McCauley, III, Esquires, of Richards, Layton & Finger, P.A., Wilmington, Delaware; for Appellees Laurence Levy, Royalty Holdings, L.L.C. and Royalty Management, Inc.

Todd C. Schiltz, Esquire of Wolf Block Schorr & Solis–Cohen LLP, Wilmington, Delaware; for Appellee Regency Affiliates, Inc.

Before STEELE, Chief Justice, HOLLAND, BERGER, RIDGELY, Justices, constituting the Court en Banc.

**Opinion**

JACOBS, Justice.

The plaintiffs-below, appellants ("Appellants"), who are minority public stockholders of Regency Affiliates, Inc., a Delaware corporation ("Regency"), appeal from the dismissal of this action by the Court of Chancery. The complaint, which Appellants brought on behalf of all Regency shareholders other than the defendants and affiliated persons, alleges claims arising out of several transactions that occurred between 1992 and 2004. This appeal involves dismissed claims generated by two of those transactions: the "Recapitalization," which occurred in 2002, and the "Aggregate Sale," which occurred in 2001. Both transactions are described in Part I of this Opinion.

In a Memorandum Opinion dated November 5, 2004, the Court of Chancery granted the defendants' motion to dismiss the claims relating to the Recapitalization, holding that those claims were derivative and that the Appellants had failed to make a Rule 23.1 pre-suit demand on Regency's board of directors. The Chancellor declined, however, to dismiss the claim relating to the Aggregate Sale, finding that claim to be direct and, thus, not subject to Rule 23.1's demand requirement. [1] In February 2005, the defendants again moved to dismiss the Aggregate Sale claim, on the basis that the claim was moot because that transaction had been "unwound." By letter opinion dated October 14, 2005, the Court dismissed the Aggregate Sale claim, but with leave for Appellants to amend their complaint. [2] The Appellants filed an amended complaint, which the defendants then moved to dismiss on Rule 23.1 demand grounds. By letter Opinion dated May 26, 2006, the Court of Chancery held that the Aggregate Sale claim as alleged in the amended complaint was derivative. The Court dismissed the claim, [3] which resulted in the action being dismissed in its entirety.

1    *Gatz v. Ponsoldt,* 2004 WL 3029868 (Del.Ch.) ("2004 Mem. Op.").

2    *Gatz v. Ponsoldt,* 2005 WL 2709640 (Del.Ch.) ("2005 Ltr. Op.").

3    *Gatz v. Ponsoldt,* 2006 WL 1510467 (Del.Ch.) ("2006 Ltr. Op.").

**\*1268** Although the Chancellor found that the claims at issue were derivative based on the then-existing case law, an intervening legal development occurred while this appeal was pending: this Court decided *Gentile v. Rossette,* a case that bore importantly on the issue of whether the dismissed claims were derivative, direct, or both. [4] Having heard the parties on the impact of *Rossette,* we conclude that the claims before us are not exclusively derivative and could be brought directly. It therefore follows that the Court of Chancery's contrary conclusions were legally erroneous. Accordingly, we reverse and remand the case to the Court of Chancery for further proceedings consistent with this Opinion.

4    906 A.2d 91 (Del.2006).

## I. *FACTS*

### A. *Overview*

To describe meaningfully the transactions that generate the issues presented, we first narrate the background events that led to the Recapitalization. The end result of those events was that William R. Ponsoldt, Sr. ("Ponsoldt"), through entities owned or controlled by him, acquired a sizeable minority block of Regency shares, that gave him *de facto* control of that company. Those background events, in turn, set the stage for the Recapitalization, an intricate transaction negotiated by Ponsoldt and Lawrence Levy ("Levy"), and carried out without any approval by Regency's public shareholders, that enabled Ponsoldt to cash out most of his equity interest in Regency and to convert his *de facto* stock control of Regency into an absolute majority interest that simultaneously was transferred to an entity owned by Levy. The end result was that Regency's public shareholders—who previously had held Regency's majority stock interest—became minority shareholders in a Levy-controlled enterprise.

### B. *Background Events* [5]

5    Most of the facts recited here, all drawn from the allegations of the complaint, are summarized in the Court of Chancery's 2004 Memorandum Opinion.

Regency is a publicly traded corporation that, in 1992, had emerged from bankruptcy with few assets other than considerable net operating tax loss carry forwards ("NOLs"). In July 1993, Regency entered into a transaction with Statesman Group, Inc. ("Statesman"), a Bahamian corporation whose stock is held by the Statesman Irrevocable Trust, a trust that was settled by Ponsoldt. Through his control of the Trust, Ponsoldt controlled Statesman. [6] In that transaction, a Regency subsidiary, NRDC Delaware ("NRDC"), [7] acquired **\*1269** Statesman's interest in 75 million tons of rock ("the Aggregate"), in exchange for which Regency transferred to Statesman: (i) 28.73% of Regency's outstanding common stock, (ii) irrevocable proxies to vote an additional 5% of Regency's common stock, and (iii) 100% of Regency Series C Preferred Stock (the "Series C Preferred"). The Series C Preferred carried redemption and liquidation rights that were tied to the value of the Aggregate which, at that point in time, was valued for financial statement purposes at $15 million.

6    Statesman contended in the Court of Chancery, and contends also in this Court, that Ponsoldt does

not control Statesman because under trust law he does not control the Statesman Irrevocable Trust. Although on a fully developed factual record that may turn out to be the case, at this stage the Appellants have alleged facts from which Ponsoldt's control of Statesman can be reasonably inferred. The complaint alleges that Ponsoldt negotiated and acted on behalf of Statesman from the time Statesman first obtained its interest in Regency through the time of the Recapitalization. Ponsoldt was Levy's direct contact when Levy became interested in purchasing Statesman's Regency common stock. Nothing in the record shows that Levy ever dealt with the bank trustee that Statesman contends controlled Statesman, or that that unnamed bank trustee was involved in any of the transactions involving Statesman. In its Memorandum Opinion, the Chancellor properly inferred that "Statesman was led by defendant William Ponsoldt[;]" and that "[t]he Statesman Irrevocable Trust, settled by Ponsoldt, allegedly controls Statesman." 2004 Mem. Op., 2004 WL 3029868 at *1 n. 3.

7    In this transaction, NRDC became 80% owned by Regency, with Statesman holding the remaining 20% interest in NRDC.

This transaction enabled Statesman (acting through Ponsoldt) to designate persons to fill vacancies on Regency's board of directors. Among those Statesman designees were defendants below, appellees William Ponsoldt, Jr., who was Ponsoldt's adult son ("Ponsoldt, Jr."), Stephanie Carey and Martin Craffey, all three of whom served as Regency directors until October 2002. At the time they were appointed as directors, Ponsoldt, Jr. and Craffey received options from Statesman to purchase Regency Series C Preferred shares, and Carey received 100,000 shares of Regency common stock from Statesman.[8]

8    Later, in August 1999, defendant below, appellee Marc Baldinger became a member of the Regency board and served as Regency's Chief Financial Officer. The directors of Regency at the time of the Recapitalization, namely, Ponsoldt, Ponsoldt, Jr., Baldinger, Carey, and Craffey, together with nominal defendant Regency Affiliates, Inc., are collectively referred to in this Opinion as the "Ponsoldt defendants."

One year later, in late 1994, Regency acquired a partnership interest in Security Land Development Company L.P. ("Security Land"), a partnership that owned a large office building in Maryland leased by the United States Social Security Administration ("SSA"). In that transaction, Regency acquired the right to receive 95% of Security Land's profits through 2003, and 50% of those profits thereafter. In exchange, Regency provided Security Land with $300,000 in capital and over $60 million in NOLs. The NOLs effectively sheltered the over $12 million annual rent being generated by the SSA from income tax.

In August 1996, two years after the Security Land transaction, Ponsoldt was elected Chairman of the Regency board of directors. Ponsoldt then fired the existing CEO and President and a search for a new chief executive began. On June 3, 1997, the Regency board, without looking far, hired Ponsoldt as CEO and President. Ponsoldt's base compensation was $250,000 per year with annual cost of living increases, plus additional salary based on the overall net worth of Regency.[9] That same day (June 3, 1997), the Regency board granted to Statesman an option allowing Statesman to acquire 6.1 million shares of Regency common stock. Although Ponsoldt represented in 1997 that that option would be exercised only to prevent a hostile takeover of Regency, Statesman exercised the option in October 2001, four years later, when no hostile takeover was threatened.

9    According to the complaint, the Security Land transaction was structured so as to continually increase Regency's asset value, such that Ponsoldt's salary increased as time progressed.

During the summer of 2001, Ponsoldt began negotiations with Laurence Levy, the sole director, sole stockholder, and president of Royalty Management, Inc., a Delaware corporation. Royalty Management was the managing member of Royalty Holdings, L.L.C., a Delaware limited liability company ("Royalty").[10] The negotiations **1270** between Ponsoldt and Levy ultimately led to the Recapitalization transaction that took place on October 17, 2002. To set the stage for the Recapitalization, Ponsoldt orchestrated several intermediate transactions that are next described.

10    Levy, Royalty, and Royalty Management are referred to collectively in this Opinion as the "Levy Defendants."

As earlier noted, on October 15, 2001, Statesman exercised its option to acquire 6.1 million common shares

of Regency, in exchange for delivering to Regency a promissory note representing the $2.44 million exercise price. The effect of Statesman's exercise of that option was to reduce the percentage ownership of the public shareholder class that plaintiffs purport to represent from 89.1% to 61.1%. [11]

[11]   The Statesman $2.44 million note was never paid, and was canceled as part of the Recapitalization.

## B. *The Aggregate Sale and Other Events Leading Up To The Recapitalization*

Two months later, in December 2001, the Regency subsidiary that held the Aggregate (NRDC) was caused to sell the Aggregate to another Regency subsidiary (Iron Mountain Resources) for an eight year promissory note in the principal amount of $18.2 million. The note was payable, beginning December 2003, at 2.46% interest, in 96 equal installments. According to the complaint, this "Aggregate Sale" was intended to increase artificially the value of the Regency Series C Preferred stock held by Statesman (the value of the Series C stock being tied to the value of the Aggregate). One month later, Ponsoldt orchestrated the adoption by Regency of a 1–for–10 reverse stock split, and the reduction of the par value of Regency common stock from $.40 per share to $.01 per share.

Since 2001, Ponsoldt had been pursuing ways to generate cash to fund both his retirement and Statesman's divestiture of its interest in Regency. Initially Ponsoldt attempted to sell either Statesman's Series C Preferred or the Aggregate itself to Levy, but Levy's interest was in monetizing (*i.e.,* cashing out) Regency's partnership interest in Security Land. In pursuit of Levy's desire, in June of 2002, Regency attempted to restructure its interest in Security Land, in a transaction that would have involved: (i) a $2 million loan from the non-Regency partners of Security Land to Regency; (ii) an amendment to the Security Land partnership agreement that would reduce Regency's proportionate share of the proceeds of a sale or refinancing of the office building owned by Security Land, and (iii) granting an option to the non-Regency partners of Security Land to purchase Regency's partnership interest at a price between $36 million and $38.5 million.

In April 2002, Regency publicly disclosed the Aggregate Sale. That disclosure prompted the Appellants to bring

a lawsuit in a Nebraska federal court, asserting claims under the federal RICO statute and under state law (including breach of fiduciary duty claims), against Ponsoldt, Regency's other directors, and Statesman. [12] The Nebraska action challenged (*inter alia* ) the validity of the transaction that resulted in Statesman holding 6.1 million shares of Regency common stock. The pendency of that action prevented Statesman from selling its shares to Royalty, and obstructed Levy's plan to monetize Regency's assets, and  **\*1271**  resulted in an order by a federal magistrate judge that prevented Regency from entering into a transaction that would monetize Regency's interest in Security Land. On September 11, 2002, upon the Ponsoldt defendants' representation that a monetization of Regency's interest in Security Land was essential to the Company's continued financial health, that order was modified to allow such a transaction to proceed on certain conditions.

[12]   In July 2003, the Nebraska federal court transferred the case to the United States District Court for the District of Delaware, which, in December 2003, dismissed the RICO claims under Federal Rule 12(b) (6), and Appellants' other claims for lack of federal subject matter jurisdiction. *Gatz v. Ponsoldt,* 271 F.Supp.2d 1143 (D.Neb.2003); *Gatz v. Ponsoldt,* 297 F.Supp.2d 719 (D.Del.2003). The dismissal by the Delaware District Court led to the filing of this action in the Court of Chancery in February 2004.

After the modification of the federal magistrate's order, the plaintiffs offered to provide Regency with $17 million or more in credit on favorable terms, allegedly to avoid forfeiting Regency's rights to share in the proceeds of a sale or refinancing of the office building owned by Security Land, and also to prevent further dilution of the public shareholders' interest. The Ponsoldt defendants disregarded that offer. Instead, on September 30, 2002— almost immediately after the plaintiffs had communicated their offer—Levy forwarded to Regency a proposal that culminated months of private negotiations with Ponsoldt, and that eventually became the Recapitalization transaction.

That same day, the Regency board appointed a three-member special committee, consisting of defendants Baldinger, Carey and Craffey, to analyze Levy's proposal. The complaint alleges that the special committee process was a sham, because none of the committee members was disinterested or independent of Ponsoldt. Specifically:

(1) both Carey and Baldinger had extensive ties to Ponsoldt, Ponsoldt, Jr., and Statesman from previous business and personal dealings; moreover, unbeknownst to the other special committee members, Craffey received a $100,000 payment from Statesman shortly after he voted to approve the Recapitalization; (2) the special committee did not retain a financial advisor, or obtain current valuations of Regency's interest in Security Land or any of its assets, or secure an analysis of the effect of the Recapitalization on Regency's per share book value; (3) defendants Baldinger and Ponsoldt did not furnish the special committee with all the material information necessary to analyze the transaction; [13] and (4) the special committee was biased against the plaintiffs' alternative proposal. In any event, the special committee voted to approve the Recapitalization, which closed on October 17, 2002 and is next described.

[13]    More specifically, the complaint alleges that Ponsoldt and Baldinger knew—but did not share with Carey and Craffey—that a monetization of Regency's interest in Security Land was imminent, which would have rendered the Recapitalization unnecessary. 2004 Mem. Op., 2004 WL 3029868 at *3, n. 7.

## C. The Recapitalization

### 1. Summary of the Transaction

The Recapitalization involved three entities: Royalty (owned and controlled by Levy), Regency and Statesman (the latter two entities controlled de facto by Ponsoldt). The terms of the transaction (which were never submitted to Regency shareholders for a vote) were as follows:

(1) Royalty financed the transaction, by loaning $4.75 million cash to Regency. In exchange, Royalty received $4.75 million of Regency promissory notes, including: (i) a $3.5 million promissory note, at 5% interest, entitling Royalty to convert it into 1.75 million (post-split) Regency shares at $2 per share; and (ii) a $1,250,000 promissory note, payable at 9% interest. In effect, Royalty was given an option to receive 1.75 million Regency shares, exercisable by Royalty declaring its intent to convert and surrendering the $3.5 million note.

(2) In its separate dealings with Statesman, Regency, in turn:

(a) paid Statesman $1.02 million to redeem Statesman's 754,950 Regency **1272** shares (post-split), obtained

when Statesman exercised its option to acquire 6.1 million (pre-split) Regency shares in 2001; and

(b) canceled the $2.44 million Statesman promissory note, which represented the consideration Statesman paid for its option to acquire 6.1 million (pre-split) Regency shares; and

(c) paid Statesman $2.73 million for Statesman's consent to amend the Certificate of Designation preferences of the Regency Series C Preferred (100% held by Statesman), with the result that any preferences would be paid not in cash but with NRDC stock; and

(d) paid Statesman $250,000 in exchange for an option to acquire Statesman's interest in a Regency subsidiary. Regency also transferred certain office furniture and equipment to Statesman.

(3) On October 28, 2002, as part of the Recapitalization, all members of Regency's board of directors (including Ponsoldt) resigned and were replaced by Royalty designees, namely, Levy, Neil Hasson, Stanley Fleishman and Errol Glasser. On November 8, 2002, Royalty partially exercised the $3.5 million convertible note and thereby obtained 750,000 shares of Regency common stock, representing about 38.45% of Regency's outstanding shares. On July 3, 2003, Royalty converted the balance of the convertible note, thereby increasing its holdings to approximately 59.31 % of Regency's outstanding common stock.

### 2. Effects of the Transaction

Although the terms of the Recapitalization were intricate, the transaction's ultimate effects are easily described.

*First,* Levy (through Royalty) provided $4.75 million cash to Regency to finance the transaction, in return for which Levy/Royalty ended up with the $1.25 million Regency note, plus 59.31% majority stock control of Regency (after converting the $3.5 million Regency note), and control of Regency's board. [14]

[14]    Levy also benefited from Statesman's agreement to amend the preferences of the Series C Preferred because no dividend or liquidation preference payments by Regency (now controlled by Levy) would have to be made in cash.

*Second,* Ponsoldt (through Statesman) received $4 million of the $4.75 million cash provided by Levy/Royalty.[15] In addition, Ponsoldt/Statesman's preexisting obligation to pay Royalty $2.44 million (the exercise price for Statesman's option to acquire 6.1 million pre-split Regency shares) was canceled. Thus, it appears from the complaint that Statesman ended up holding 6.1 million Regency shares (pre-split) for no consideration, which shares Statesman then sold back to Regency (post-split) for $1.02 million.

[15]    Broken down as follows: $1.02 million to redeem Statesman's 754,950 Regency shares, $2.73 million for Statesman's "agreement" to amend the Series C Preferred designations; and $250,000 for the option to acquire Statesman's interest in a Regency subsidiary.

*Third,* Regency, now controlled by Levy (Royalty) ended up with $500,000 of the $4.75 million provided by Levy, after paying $250,000 in Recapitalization expenses.

*Fourth,* Regency's public shareholders received no financial or other economic benefit from the Recapitalization. Moreover, their combined stock ownership was diminished from a majority interest of approximately 62% to a combined minority interest of about 40%.[16]

[16]    *2004 Mem. Op., 2004 WL 3029868 at *4.* More precisely, Royalty (Levy) now holds 59.31% of Regency's outstanding common shares, and the public shareholders hold 40.69%. *Id.*

**\*1273  D.** *Unwinding of The Aggregate Sale*
In February 2005, Regency publicly disclosed that since December 2003, its 75% subsidiary, Iron Mountain Resources, had been in default on the December 2001 note representing the consideration for which Iron Mountain acquired the Aggregate from NRDC in the Aggregate Sale. In lieu of foreclosure, Iron Mountain reconveyed title to the Aggregate to NRDC, and NRDC then deemed the note satisfied. Although the Aggregate Sale was unwound to that extent, the harm alleged to have resulted from that transaction was not entirely undone: the amounts Regency paid in the Recapitalization for Statesman's consent to amend the Series C preferences—preferences that were allegedly inflated by reason of the Aggregate Sale [17]—were not repaid to Regency in the 2005 "unwinding" transaction.

[17]    The value of the Series C preferences was tied to the value of the Aggregate. In the Aggregate Sale, the Aggregate—originally valued at $15 million—was valued at $18.1 million. It is alleged that the sole purpose of the Aggregate Sale was to artificially increase the value of the Aggregate (which had minimal value to begin with) to benefit Statesman as the sole holder of the Series C Preferred.

After the unwinding transaction, the defendants moved to dismiss the Aggregate Sale claim as moot. As earlier noted, in October 2005, the Court of Chancery granted that motion without prejudice to the filing of an amended complaint. In May 2006, after an amended complaint was filed, the Court of Chancery held that the remaining Aggregate Sale claim was derivative, and dismissed the claim for failure to comply with Rule 23.1.

**II.** *THE CLAIMS OF ERROR AND THE STANDARD OF REVIEW*
On this appeal, the Appellants challenge the dismissal of only two of their original claims: those arising out of the Recapitalization and the Aggregate Sale. Both claims were found to be exclusively derivative, and, therefore, dismissible for failure to comply with the demand requirement of Court of Chancery Rule 23.1. The Appellants claim that the Court of Chancery reversibly erred by holding that the claims were exclusively derivative, on two alternative grounds.

First, Appellants argue, the Recapitalization Claim could be brought directly because the Recapitalization shifted majority control of Regency from the public shareholders to Royalty, an entity wholly owned by Levy. As a consequence, the Regency directors became subject to —and violated—the duty, imposed by *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.* ("*Revlon*"),[18] to obtain the highest value available when carrying out the Recapitalization transaction. Because *Revlon* claims may be asserted directly by public shareholders, Appellants contend, the Recapitalization claim is direct. Moreover, because the only surviving portion of the Aggregate Sale claim (the $2.73 million paid to Statesman) was part of the Recapitalization, that claim is necessarily direct as well.

[18]    506 A.2d 173 (Del.1985).

Second, and alternatively, Appellants argue that the Recapitalization transaction (including the Aggregate

WESTLAW    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Sale) could be brought as a direct claim because the Recapitalization, which resulted from the exercise by Ponsoldt of his *de facto* control, constituted (i) an expropriation of economic value and voting power from the shares held by Regency's public shareholders, and (ii) a redistribution of the expropriated economic value and voting power to Royalty/Levy, who became Regency's absolute majority stockholder. That transaction, Appellants claim, correspondingly diminished the value and voting power of the **\*1274** stock held by Regency's public shareholders, who ended up as minority stockholders. Therefore, Appellants contend, the Recapitalization claim is governed by *In re Tri–Star Pictures, Inc.* [19] and its recent progeny, *Gentile v. Rossette.* [20] Those cases hold that where a significant or controlling stockholder causes the corporation to engage in a transaction wherein shares having more value than what the corporation received in exchange are issued to the controller, thereby increasing the controller's percentage of stock ownership at the public shareholders' expense, a separate and distinct harm results to the public shareholders, apart from any harm caused to the corporation, and from which the public shareholders may seek relief in a direct action.

[19]   634 A.2d 319 (Del.1993) ("*Tri–Star*").

[20]   906 A.2d 91 (Del.2006) ("*Rossette*").

In response, all of the Appellees argue that the Appellants' claims of error have no merit, and that this Court should uphold the Court of Chancery's determination that the Recapitalization and the Aggregate Sale claims were exclusively derivative. This case is not governed by *Revlon,* Appellees urge, because (i) no sale or break up of the company took place, (ii) Regency's public shareholders were never eliminated from the enterprise and remain as stockholders of Regency; and (iii) the public shareholders were never deprived of a control premium, because Regency always had a controlling stockholder, and the Recapitalization changed only that controlling stockholder's identity.

Appellees further contend that this case is not controlled by *Tri–Star* or *Rossette.* For *Tri–Star* to be applicable, Appellees say, the transaction must have increased the voting power and economic value of the shares held by the significant stockholder (here, Statesman/Ponsoldt) at the expense of the public shareholders. In this case, the beneficiary of the claimed expropriation was a third

party—Royalty/Levy—not Statesman/Ponsoldt. *Rossette* is also inapplicable, Appellees urge, because even if the Recapitalization reduced the value and voting power of the outstanding shares owned by Regency's public shareholders, there was no corresponding increase in the value or voting power of the shares held by the corporation's controlling stockholder, *i.e.,* Statesman/Ponsoldt.

In short, Appellees contend that because the complaint does not allege facts establishing that the Recapitalization claim is direct, that claim is exclusively derivative. It further follows that the non-mooted portion of the Aggregate Sale claim, which was a component of the Recapitalization, is also derivative.

Besides the above arguments, Statesman and the Levy defendants urge separate, alternative reasons why the dismissal of the complaint should be affirmed. Statesman argues that even if this Court concludes that the claims at issue are direct, the complaint fails to allege a cognizable claim that Statesman was Regency's controlling stockholder that owed fiduciary duties to Regency and its public shareholders, or that Ponsoldt otherwise controlled Statesman. The Levy defendants separately argue that even if this Court were to conclude that the fiduciary duty claims at issue are direct, the dismissal of the complaint as to them must be affirmed, on the alternative ground that the complaint does not plead a cognizable claim that those defendants aided and abetted any fiduciary violation by Statesman and the Ponsoldt defendants.

**[1]** **[2]** **[3]**   Because the claims presented on this appeal require us to review the Court of Chancery's application of Rule 23.1, our review is *de novo* and plenary. [21] At the motion to dismiss stage, "[p]laintiffs are **\*1275** entitled to all reasonable factual inferences that logically flow from the particularized facts alleged." [22] In determining the sufficiency of a pleading under Rule 23.1, this Court, like the Court of Chancery, considers the pleading and applies statutes, case law and Rule 23.1 requirements to that pleading. To that extent, this Court's scope of review is analogous to the review of a ruling under Rule 12(b)(6). [23]

[21]   *Brehm v. Eisner,* 746 A.2d 244, 253 (Del.2000).

*Gatz v. Ponsoldt,* 925 A.2d 1265 (2007)

[22]   *White v. Panic,* 783 A.2d 543, 549 (Del.2001).

[23]   *Brehm v. Eisner,* 746 A.2d at 254.

To clear away the underbrush and provide clarity of focus, we first address, in Part III A, *infra,* the separate defenses advanced by Statesman and the Levy defendants as alternative grounds for affirmance. We conclude that those alternative arguments lack merit and that as a consequence, this appeal presents only one pivotal legal issue: whether the Recapitalization claim (including its Aggregate Sale claim component) may be brought as a direct claim. We address that issue in Part III B, *infra.*

### III. *ANALYSIS*

#### A. *The Alternative Arguments Advanced By Statesman And The Ponsoldt Defendants*

[4]   Statesman's alternative ground for affirmance is that the complaint fails to state a cognizable claim for breach of fiduciary duty by Statesman, because no facts are pled from which one can reasonably infer that Statesman controlled Regency or that Ponsoldt controlled Statesman. That argument lacks merit. In support of its argument that the complaint states no claim under *Revlon,* Statesman concedes that it had *de facto* control of Regency. Statesman's status as *de facto* controller, combined with the allegation that Ponsoldt caused Statesman to exercise that control to effect the Recapitalization, establishes, for purposes of a motion to dismiss, that Statesman owed fiduciary duties to Regency and its public shareholders.

Moreover, the complaint adequately alleges that Ponsoldt controlled Statesman. Although Ponsoldt is not alleged to be Statesman's trustee, the complaint does allege that Ponsoldt negotiated and acted on behalf of Statesman from the time Statesman first obtained its interest in Regency through the time of the Recapitalization. No pled facts show that Levy ever spoke to or dealt with the unnamed bank trustee that Statesman claims controls Statesman, or that the trustee was involved in any transaction involving Statesman. Thus, the Appellants have alleged facts that, if true, would be sufficient to establish that Statesman was controlled by Ponsoldt, and that Ponsoldt and Statesman acted in concert to control Regency in both the Aggregate Sale and the Recapitalization transactions. [24]

That is, the complaint sufficiently alleges "domination by a minority stockholder through actual exercise of direction over corporate conduct." *Gilbert v. El Paso Co.,* 490 A.2d 1050, 1055 (Del.1984) (citing *Kaplan v. Centex Corp.,* 284 A.2d 119 (Del.1971)).

[5]   Equally without merit is the Levy defendants' alternative argument that the dismissal of the complaint as to them must be affirmed, because it fails to state a claim that Levy and Royalty aided and abetted a breach of fiduciary duty by the Ponsoldt defendants. To state a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must allege (1) a fiduciary relationship; (2) a breach of that relationship; (3) that the alleged aider and abettor knowingly participated in the fiduciary's breach of duty; and (4) damages proximately caused by the breach. [25] In this **\*1276** case, the Levy defendants contest the third element; that is, they contend that the complaint fails adequately to plead that the Levy defendants knowingly participated in the remaining defendants' breaches of duty.

[25]   *Malpiede v. Townson,* 780 A.2d 1075, 1096 (Del.2001); *Gilbert v. El Paso Co., supra,* 490 A.2d at 1057; *In re Telecommunications Inc. S'holders Litig.,* 2003 WL 21543427 (Del.Ch. July 7, 2003).

[6]   [7]   "Knowing participation in a ... fiduciary breach requires that the third party act with the knowledge that the conduct advocated or assisted constitutes such a breach." [26] In some circumstances, "the terms of the negotiated transaction themselves [may be] so suspect as to permit, if proven, an inference of knowledge of an intended breach of trust." [27]

[26]   *Malpiede v. Townson, supra,* 780 A.2d at 1097.

[27]   *Id.* at n. 79 (quoting *Greenfield v. Tele–Communications,* 1989 WL 48738, (Del.Ch. May 10, 1989)).

[8]   Here, the Levy defendants contend that the complaint alleges no facts from which it can be inferred that the terms of the Recapitalization were "inherently wrongful" or that they had actual knowledge that the Ponsoldt defendants and Statesman were engaging in wrongful conduct. The Levy defendants argue that in the Recapitalization, Statesman sold its stock to Regency at "approximately market price" and that the conversion price of the

$3.5 million convertible note was "higher than market price." [28] This argument also lacks merit.

[28]    Royalty Ans. Br. at 29.

The complaint avers that in the Recapitalization, Regency paid total consideration of $4 million, or $5.30 per share, for Statesman's 754,950 shares, while Royalty's conversion price was only $2 per share. The total consideration paid for Statesman's stock is alleged to have been far in excess of its "market value." Royalty, as the entity that provided $4.75 million in financing to Regency ($4 million of which went directly to Statesman), must have been aware of the terms of the Recapitalization. It is also reasonably inferable that Royalty knew that that transaction's effect (if not its intent) was to dilute the stock interest of Regency's public shareholders to provide the means for Ponsoldt and Statesman to cash out their stock interest, and for Levy to obtain absolute majority control. Moreover, and tellingly, the complaint alleges that Levy and Ponsoldt wanted to keep their plan secret. In an October 2001 e-mail to Levy, Ponsoldt said, "We cannot sign any agreement that would be disclosable under securities laws.... We need an agreement signed and closed on the same day or something legal that does not have to be disclosed." The structure that Levy and Ponsoldt devised to allow them to "move forward," was a recapitalization that, unlike a merger or sale of all or substantially all of Regency's assets, would not require a shareholder vote or prior public disclosure. An additional pled fact showing Levy's active complicity was his suggestion that Ponsoldt tell his board of directors that the proposed Recapitalization could relieve them of potential liability in this litigation.

In summary, the complaint pleads facts from which it can be inferred that at all relevant times Ponsoldt and Statesman controlled Regency, and that the Levy defendants aided and abetted a breach or breaches of duty by the Ponsoldt defendants and Statesman in conceiving and carrying out the Recapitalization. Thus, if the claim(s) arising out of that transaction could have been brought directly against the Regency defendants, then those claims could have been brought directly against Statesman and the Levy defendants as well. Whether the Recapitalization claim [29] could be brought directly thus becomes **\*1277** the pivotal issue, to which we next turn.

[29]    Although the parties treat the Recapitalization and Aggregate Sale claims separately in their briefs, it is undisputed that the only aspect of the Aggregate Sale transaction that was not reversed by the 2005 "unwinding" transaction was the $2.3 million "fee" Regency paid to Statesman to obtain Statesman's "consent" to amend the Series C Preferred preferences. Because the $2.3 million payment constituted the only harm allegedly resulting from the Aggregate Sale that was not unwound in 2005, and because that payment was a component of the Recapitalization, all further references to the "Recapitalization claim" in this Opinion should be understood as encompassing that remaining portion of the "Aggregate Sale claim" as well.

### B. *May The Recapitalization Claim Be Brought As A Direct Claim?*

[9]    As earlier noted, the Appellants argue that their Recapitalization claim could be brought as a direct claim for two independent reasons. First (Appellants contend), that claim alleges a claim for breach of fiduciary duty under *Revlon,* which by definition is a direct claim. Specifically, the Recapitalization is alleged to have involved a transfer of majority control from Regency's public shareholders to Royalty/Levy without the payment of a control premium to the public shareholders. Second, Appellants contend, the complaint alleges a direct claim for breach of fiduciary duty under *Tri–Star* and *Rossette,* because the Recapitalization constituted an expropriation of voting power and economic value from Regency's public stockholders, and a transfer of that voting power and economic value to Levy/Royalty, to the corresponding detriment of Regency's public shareholders —all accomplished by Regency's *de facto* controlling stockholder, Statesman/Ponsoldt. Because we conclude that the Recapitalization claim may be brought as a direct claim under *Tri–Star* and *Rossette,* we do not reach or decide the Appellants' *Revlon*-based argument.

### 1. *The Tri–Star/Rossette Doctrine*

Because *Tri–Star* and *Rossette* are the foundation of our analysis, we begin by discussing those cases and the doctrine they articulate.

In *Tri–Star,* the plaintiffs, who (like the Appellants here) were a class of minority stockholders of a Delaware corporation (Tri–Star Pictures), challenged an assets-for-stock transaction between Tri–Star and its

largest stockholder, the Coca–Cola Company. Before the transaction, Coca–Cola (voting in concert with other significant stockholders aligned with it), held 56.6% of Tri-Star's common stock; the minority stockholder class held 43.4%. The plaintiffs alleged that Coca–Cola had wrongfully caused Tri–Star to issue an excessive number of Tri-Star shares to Coca–Cola in exchange for Coca–Cola shares having less value. As a result, Coca–Cola increased its stock interest in Tri–Star to about 80%, which in turn reduced the public shareholders' interest to approximately 20%. Reversing the dismissal of the complaint, this Court held that because Coca–Cola, as Tri–Star's largest stockholder, did not suffer a dilution of cash value, or of voting power, or of ownership percentage to the same extent and in the same proportion as the minority stockholders, the plaintiffs had suffered an injury that was unique to them individually, and that could be remedied by bringing a direct claim against the controlling stockholder and any other fiduciary responsible for the harm.

*Rossette* was an action by former minority stockholders of a Delaware corporation ("SinglePoint") against the company's former directors and its CEO/controlling stockholder. The claim arose from a self-dealing transaction in which the CEO/controlling stockholder forgave the corporation's **\*1278** debt to him, in exchange for being issued stock whose value allegedly exceeded the value of the forgiven debt. It was claimed that the transaction wrongfully reduced the cash value and the voting power of the public stockholders' minority interest, and increased correspondingly the value and voting power of the controller's majority interest. After the debt conversion, SinglePoint was later acquired in a merger, shortly after which the acquirer filed for bankruptcy and was liquidated. The shareholder plaintiffs then brought an action in the Court of Chancery to recover the value they claimed to have been wrongfully deprived of in the debt conversion. This Court held that that claim alleged the same kind of expropriation of economic value and voting power that was functionally indistinguishable from that alleged in *Tri–Star.* Therefore, the claim could have been brought either as a direct or as a derivative claim.

Because the issue presented here is whether the Recapitalization should be governed by the rule announced in *Tri–Star* and *Rossette,* we restate the reasoning, as set forth in *Rossette,* upon which that doctrine rests:

There is, however, at least one transactional paradigm —a species of corporate overpayment claim—that Delaware case law recognizes as being both derivative and direct in character. A breach of fiduciary duty claim having this dual character arises where: (1) a stockholder having majority or effective control causes the corporation to issue "excessive" shares of its stock in exchange for assets of the controlling stockholder that have a lesser value; and (2) the exchange causes an increase in the percentage of the outstanding shares owned by the controlling stockholder, and a corresponding decrease in the share percentage owned by the public (minority) shareholders. Because the means used to achieve that result is an overpayment (or "over-issuance") of shares to the controlling stockholder, the corporation is harmed and has a claim to compel the restoration of the value of the overpayment. That claim, by definition, is derivative.

But, the public (or minority) stockholders also have a separate, and direct, claim arising out of that same transaction. Because the shares representing the "overpayment" embody both economic value and voting power, the end result of this type of transaction is an improper transfer—or expropriation—of economic value and voting power from the public shareholders to the majority or controlling stockholder. For that reason, the harm resulting from the overpayment is not confined to an equal dilution of the economic value and voting power of each of the corporation's outstanding shares. A separate harm also results: an extraction from the public shareholders, and a redistribution to the controlling stockholder, of a portion of the economic value and voting power embodied in the minority interest. As a consequence, the public shareholders are harmed, uniquely and individually, to the same extent that the controlling shareholder is (correspondingly) benefited. In such circumstances, the public shareholders are entitled to recover the value represented by that overpayment ... directly and without regard to any claim the corporation may have. [30]

[30]    *Gentile v. Rossette, supra,* 906 A.2d at 100 (footnotes omitted).

There is one significant factual difference between this case and the facts alleged in *Tri–Star* and *Rossette:* Here, to the extent that the Recapitalization resulted in a dilution or

expropriation of value and voting power of the shares held by the Regency public stockholders, that expropriation **\*1279** did not redound directly (and correspondingly) to the benefit of Regency's controlling stockholder, Statesman/Ponsoldt. Rather, the direct beneficiary of any alleged expropriation of that voting power and economic value was a third party, Royalty/Levy, which owned no Regency stock before the Recapitalization. That factual difference, Appellees argue, is controlling, because it removes this case from the purview of *Tri–Star* and *Rossette.* The question before us is whether that factual difference, in the context alleged here, renders *Tri–Star* and *Rossette* inapplicable. We conclude that it does not and that *Tri–Star* and *Rossette* are controlling, for the reasons that follow.

### 2. *Tri–Star/Rossette* Control *The Recapitalization Claim*

The only basis for the Appellees' argument that the Recapitalization claim is not direct under *Tri–Star* and *Rossette,* is their attempted portrayal of the Recapitalization as a unitary transaction in which: (1) majority control is transferred in an arms' length exchange from the public shareholders to a non-fiduciary third party having no previous stock ownership in the corporation, and (2) the (former) controlling stockholder receives no corresponding benefit from any increased voting power or economic value expropriated from the public shareholders. This scenario, the Appellees contend, falls outside the transactional paradigm that triggers the application of *Tri–Star* and *Rossette.*

At first glance, that argument appears to have force. The argument disintegrates, however, once the Recapitalization is scrutinized more intensively and in terms of its (alleged) true substantive effect. Looking through the form of the transaction to its substance, it becomes apparent that the Recapitalization is properly analyzed as two separate transactions that Ponsoldt and Levy, by creative timing and coordination, caused simultaneously to be rolled into one. The first of those transactions (transaction # 1) was a *Tri–Star/Rossette* expropriation of voting power and economic value from the public shareholders by and to the controlling shareholder; and the second (transaction # 2) was a transfer of the benefits of that expropriation by the controlling shareholder to the third party. Causing both transactions to occur simultaneously obscures the effects

of the first transaction if the latter were considered in isolation.

To elaborate, transaction # 1 would simply substitute Ponsoldt for Regency, so that it is Ponsoldt who deals directly with Royalty/Levy. Thus: Royalty/Levy loans the same $4.75 million to Ponsoldt, rather than to Regency. In exchange, Ponsoldt delivers to Royalty/Levy his personal $4.75 million promissory note. Ponsoldt then transfers the $4.75 million to Regency (controlled by Ponsoldt). Regency then: (i) pays $4 million to Statesman (controlled by Ponsoldt) to redeem the 754,950 Regency shares held by Statesman, and (ii) pays Ponsoldt $4.75 million in the same two promissory notes, including the $3.5 million note convertible into 1.75 million Regency shares. Ponsoldt then immediately converts the $3.5 million note into 1.75 million Regency shares.

Thus, in transaction # 1, Ponsoldt, as the *de facto* controller of Regency and Statesman, ends up as the absolute majority stockholder of Regency, to the corresponding detriment of the Regency public shareholders. If in exchange (as the complaint here alleges) Regency received value that was less than the value of the 1.75 million shares newly issued to Ponsoldt, then this transaction clearly falls within the ambit of *Tri–Star/Rossette,* and any claim for redress by Regency's public stockholders could be brought directly.

In transaction # 2, Ponsoldt merely completes the circle by substituting Royalty **\*1280** /Levy for himself as the new controller of Regency, as (it is alleged) actually occurred in the Recapitalization. That is, Ponsoldt transfers his newly-acquired controlling stock interest in Regency (equivalent in value to $3.5 million), plus the $1.25 million Regency note, to Royalty/Levy. In exchange, Royalty/Levy cancels the Ponsoldt $4.75 million promissory note, and then proceeds to take control of Regency's board of directors. That is, in transaction # 2 the initial $4.75 million financing that Ponsoldt, rather than Regency, received, would simply be unwound. That done, the result is substantively identical to what in fact occurred in the Recapitalization.

If transactions # 1 and # 2 were structured and timed to occur simultaneously at a single closing, then the combined transactions would be identical to the Recapitalization in all respects—both in substance and in form. Analyzed that way, the Recapitalization would

be governed by *Tri–Star/Rossette*, because Regency's *de facto* controlling stockholder (Ponsoldt/Statesman) would have: (1) caused Regency to engage in a transaction that, by means of a stock issuance, resulted in the controller expropriating for himself, economic value and voting power from, and to the corresponding detriment of, the public shareholders; and then (2) transferred that majority stock interest to a third party—Levy/Royalty—after having monetized that controlling interest by receiving (through Statesman) all but $750,000 of the $4.75 million cash proceeds of the Recapitalization.

The question, as we view it, is whether because these two component transactions were timed to occur simultaneously rather than sequentially, Regency's public shareholders should lose their entitlement, under *Tri–Star/ Rossette*, to seek redress in a direct action. We think not. To do so would unjustly exalt form over substance in circumstances where the identical policy concerns that underlie *Tri–Star* and *Rossette* exist here. [31]

[31]    A proposition that courts, particularly courts of equity, are loathe to endorse. In the area of tax law, courts have enunciated various doctrines such as step transaction, business purpose, and substance over form, all of which allow the substantive realities of a transaction to determine the tax consequences. *Falconwood Corp. v. United States,* 422 F.3d 1339, 1349 (Fed.Cir.2005). See also, *Brown v. United States,* 329 F.3d 664, 671 (9th Cir.2003) (applying the "step transaction doctrine," which "collapses formally distinct steps in an integrated transaction in order to assess federal tax liability on the basis of a realistic view of the entire transaction...."); *Comm'r v. Court Holding Co.,* 324 U.S. 331, 334, 65 S.Ct. 707, 89 L.Ed. 981 (1945) (holding that it is impermissible to "allow the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities ... because that would seriously impair the effective administration of the tax policies of Congress.").

[10]   [11]   [12]   It is the very nature of equity to look beyond form to the substance of an arrangement. [32] "Equity will not permit one to evade the law by dressing what is prohibited in substance in the form of that which is permissible." [33] So too, equity will not permit a fiduciary to deprive his beneficiaries of their entitlement to seek direct redress for fiduciary misconduct by structuring a transaction so as to obscure that entitlement. Although

this case differs from *Rossette* in transactional form, the underlying concerns and substantive effects that justify recognizing an entitlement to sue directly are the same.

[32]    See *Monroe Park v. Metropolitan Life Ins. Co.,* 457 A.2d 734, 737 (Del.1983) ("Equity regards substance rather than form.").

[33]    *Kelley v. Mayor and Council of City of Dover,* 300 A.2d 31, 38 (Del.Ch.1972).

In this case, as in *Tri–Star* and *Rossette,* the fiduciary exercises its stock control to expropriate, for its benefit, economic value **\*1281** and voting power from the public shareholders. In the classic *Tri–Star/ Rossette* paradigm, the ultimate transferee and beneficiary of the expropriation is the fiduciary. Here, the ultimate transferee is a third party, with the controlling stockholder being an intermediary that transfers the benefits of its expropriation to the ultimate beneficiary in exchange for cash or other equivalent value.

That is how equity views the Recapitalization, despite the fact that as a matter of form, the Recapitalization consisted of two transactions that occurred simultaneously, with the result that to an outside observer, the controlling stockholder never held the benefits of the expropriation for any length of time that the naked human eye could discern. In our view, that difference in form, which is a product of transactional creativity, should not affect how the law views the substance of what truly occurred, or how the public shareholders' claim for redress should be characterized. [34]   In both cases the fiduciary exercises its control over the corporate machinery to cause an expropriation of economic value and voting power from the public shareholders. That the fiduciary does not retain the direct benefit from the expropriation but chooses instead to convert that benefit to cash by selling it to a third party, [35] is not a circumstance that can justify depriving the injured public shareholders of the right they would otherwise have to seek redress in a direct action.

[34]    See *Griffiths v. Helvering,* 308 U.S. 355, 358, 60 S.Ct. 277, 84 L.Ed. 319 (1939) (holding that liability cannot be escaped by anticipatory arrangements and contracts however skillfully devised); *Minn. Tea Co. v. Helvering,* 302 U.S. 609, 613, 58 S.Ct. 393, 82 L.Ed. 474 (1938) ("A given result at the end of a straight

path is not made a different result because reached by following a devious path.").

35    As earlier noted, Ponsoldt/Statesman received the benefit of the expropriation indirectly, by causing Statesman's stock interest to be redeemed by Regency, and then for Regency to issue a controlling stock interest (in the form of a convertible note) to Levy/Royalty. Ponsoldt/Statesman, in return, received all but $750,000 of the $4.75 million that Levy/Royalty paid to finance the transaction.

Accordingly, we conclude that although the Court of Chancery correctly determined that the Recapitalization claim could be brought derivatively, it erred in concluding that that claim was exclusively derivative.

### IV. *CONCLUSION*

For the foregoing reasons, the judgment of the Court of Chancery is reversed, and the case is remanded to that Court for further proceedings consistent with this Opinion.

**All Citations**

925 A.2d 1265

---

**End of Document**      © 2018 Thomson Reuters. No claim to original U.S. Government Works.

# *TAB 5*

Case 1:18-cv-00475-SEB-TAB Document 1-2 Filed 02/16/18 Page 118 of 440 PageID #: 130
In re John Q. Hammons Hotels Inc. Shareholder Litigation, Not Reported in A.2d (2009)

2009 WL 3165613

KeyCite Yellow Flag - Negative Treatment
Distinguished by In re Crimson Exploration Inc.Stockholder Litigation,
Del.Ch., October 24, 2014

2009 WL 3165613
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

Court of Chancery of Delaware.

In re JOHN Q. HAMMONS HOTELS
INC. SHAREHOLDER LITIGATION.

Civil Action No. 758-CC.
|
Submitted: July 2, 2009.
|
Decided: Oct. 2, 2009.

West KeySummary

1    **Judgment**

👉 Stock and stockholders, cases involving

Genuine issue of material fact as to whether
the controlling stockholder used his control
to negotiate a merger that was beneficial to
him at the expense of minority shareholders
precluded summary judgment in action
challenging the price paid for publicly held
shares. Minority shareholders alleged that an
inadequate price was paid for their shares
due to the majority shareholder negotiating
an array of private benefits for himself. The
minority stockholders received cash for their
shares, whereas the controlling shareholder
received a small equity interest in the surviving
limited partnership, a preferred interest with a
large liquidation preference, and various other
contractual rights and obligations.

35 Cases that cite this headnote

**Attorneys and Law Firms**

Norman M. Monhait, of Rosenthal Monhait & Goddess,
P.A., Wilmington, Delaware; of Counsel: Joel H.
Bernstein, Ethan D. Wohl, and Matthew C. Moehlman, of
Labaton Sucharow LLP, New York, New York; Richard
B. Brualdi and Gaitri Boodhoo, of The Brualdi Law Firm,
PC, New York, New York, Attorneys for Plaintiffs.

Thomas A. Beck and Blake Rohrbacher, of Richards,
Layton & Finger, P.A., Wilmington, Delaware; of
Counsel: Michael Thompson and Lori Sellers, of Husch
Blackwell Sanders LLP, Kansas City, Missouri, Attorneys
for Defendant John Q. Hammons.

David J. Teklits, Kevin M. Coen, and Justin B. Shane,
of Morris, Nichols, Arsht & Tunnell LLP, Wilmington,
Delaware; of Counsel: Alan J. Stone, of Milbank Tweed
Hadley & McCloy, New York, New York, Attorneys
for Defendants John Q. Hammons Hotels, Inc., JQH
Acquisition LLC, JQH Merger Corporation, John E.
Lopez-Ona, Jacqueline Anne Dowdy, Daniel L. Earley,
William J. Hart, Donald H. Dempsey, David C. Sullivan,
and James F. Moore.

*MEMORANDUM OPINION*

CHANDLER, Chancellor.

**\*1** This case arises out of the merger in September
of 2005 of John Q. Hammons Hotels, Inc. ("JQH" or
the "Company") with and into an acquisition vehicle
indirectly owned by Jonathan Eilian, pursuant to which
the holders of JQH Class A common stock received
$24 per share in cash (the "Merger"). Plaintiffs in this
purported class action seek damages for the allegedly
inadequate price paid for the publicly held Class A
shares. Plaintiffs contend that John Q. Hammons, JQH's
controlling stockholder, used his control position to
negotiate an array of private benefits for himself that were
not shared with the minority stockholders. Eilian, a third
party with no prior relationship with Hammons or JQH,
negotiated with Hammons and the special committee,
which was formed to represent and negotiate on behalf of
the minority stockholders. The result of these negotiations
was that the Class A stockholders received cash for their
shares, and Hammons, in exchange for his Class B stock
and interest in a limited partnership controlled by JQH,
received a small equity interest in the surviving limited

Case 1:18-cv-00475-SEB-TAB Document 1-2 Filed 02/16/18 Page 119 of 440 PageID #: 131
In re John Q. Hammons Hotels Inc. Shareholder Litigation, Not Reported in A.2d (2009)

2009 WL 3165613

partnership, a preferred interest with a large liquidation preference, and various other contractual rights and obligations.

Plaintiffs contend that Hammons breached his fiduciary duties as a controlling stockholder by negotiating benefits for himself that were not shared with the minority stockholders. Plaintiffs also contend that the JQH directors breached their fiduciary duties by allowing the Merger to be negotiated through an allegedly deficient process, and by voting to approve the Merger. Plaintiffs also assert claims against the Merger acquisition vehicles for aiding and abetting the breaches of fiduciary duty. Finally, plaintiffs assert four disclosure claims based on alleged misstatements and omissions in the Company's proxy statement.

Before the Court are cross-motions for summary judgment, and the threshold issue is whether the Court should apply the entire fairness or business judgment standard of review. Defendants argue that business judgment is the appropriate standard of review because (1) Hammons was not involved in the process of negotiation for the purchase of the minority shares, (2) the minority stockholders were adequately represented by the disinterested and independent special committee, and (3) a majority of the minority stockholders approved the Merger in a fully informed vote. Plaintiffs, of course, disagree, and contend that entire fairness is the appropriate standard of review because (1) the special committee was ineffective, (2) the majority of the minority vote was "illusory," and (3) Hammons was subject to a conflict of interest because he negotiated benefits for himself that were not shared with the minority stockholders. Plaintiffs assert that the minority stockholders were "coerced" into accepting the Merger because the price of the Class A stock did not reflect the Company's true value. Moreover, according to plaintiffs, Hammons's ability to block any transaction limited the special committee's ability to negotiate at arm's length and relegated it to the subservient role of negotiating only with bidders acceptable to Hammons.

**\*2** As explained below, I conclude that *Kahn v. Lynch Communication Systems, Inc.*[1] does not mandate application of the entire fairness standard of review in this case, notwithstanding any procedural protections that may have been used. Rather, the use of sufficient procedural protections for the minority stockholders

*could* have resulted in application of the business judgment standard of review in this case. The procedures used here, however, were not sufficient to invoke business judgment review. Accordingly, the appropriate standard of review is entire fairness. As explained below, defendants' motions for summary judgment are granted in part and denied in part, and plaintiffs' motion for summary judgment is granted in part and denied in part.

1    638 A.2d 1110 (Del.1994).

## I. BACKGROUND

*A. The Parties*

Defendant JQH was a Delaware corporation headquartered in Springfield, Missouri that engaged in the business of owning and managing hotels. JQH owned forty-four hotels and managed another fifteen. Most of the hotels were franchised under major trade names, such as Embassy Suites Hotels, Holiday Inn, and Marriott, and located in or near a stable "demand generator" such as a state capital, university, convention center, corporate headquarters, or office park.

JQH was formed in 1994, and used the proceeds from its initial public stock offering to purchase an approximately 28% general partnership interest in John Q. Hammons Hotels, LP ("JQHLP"). Hammons owned the remaining 72% of JQHLP as its sole limited partner. JQH conducted its business operations through JQHLP.

Ownership of JQH was held through two classes of stock. The Class A common stock was publicly traded and entitled to one vote per share. The Class B common stock was not publicly traded and was entitled to fifty votes per share. Hammons and his affiliates owned approximately 5% of the Class A common stock and all of the Class B common stock. Thus, Hammons had approximately 76% of the total vote in JQH, which in turn controlled JQHLP as its sole general partner. Plaintiffs Jolly Roger Fund, LP, Jolly Roger Offshore Fund, Ltd., and Lemon Bay Partners were purported owners of Class A common stock.

The JQH Board of Directors (the "Board") was composed of eight members at the time of the Merger. Hammons was Chairman of the Board and Chief Executive Officer. The other Board members were John E. Lopez-Ona, Daniel

2009 WL 3165613

L. Earley, William J. Hart, David C. Sullivan, Donald H. Dempsey, James F. Moore, and Jacqueline A. Dowdy.

Defendants JQH Acquisition, LLC ("Acquisition") and JQH Merger Corporation ("Merger Sub") were formed to facilitate the Merger. Eilian is the principal of Acquisition. Merger Sub is a wholly owned subsidiary of Acquisition.

### B. The Company and Hammons Before the Merger

The price of JQH Class A shares declined after the initial public offering at $16.50 per share, and, according to plaintiffs, eventually traded in the $4 to $7 range until sometime in 2004, when rumors of a possible merger first circulated. Plaintiffs suggest that low stock price could have resulted from the small number of publicly traded shares, the lack of an active trading market in those shares, the lack of any meaningful analyst coverage, and the lack of large institutional investors. Plaintiffs also contend that the shares were "burdened" by the presence of a large controlling stockholder, and that Hammons's self-dealing depressed the price of the Class A shares.

**\*3** Hammons's passion was, and is, developing hotels, and Hammons took pride in the quality of his hotels. Hammons was seen by many as a legend in the hotel business, as evidenced by his biography, *They Call Him John Q.: A Hotel Legend.* [2] It also appears, however, that the relationship between Hammons and the Board was, at least at times, tense.

[2]       Susan M. Drake, *They Call Him John Q.: A Hotel Legend* (2002).

Plaintiffs cite evidence and quote from Hammons's biography for the proposition that Hammons only reluctantly sold shares in JQH to the public, that he disliked the procedural requirements associated with public stockholders and a board of directors, and that there was tension between Hammons and the Board. Indeed, Hammons and the Board had disagreements over the Board's use of stock options as compensation and over the pace of hotel development. The latter disagreement resulted in the Board's call for a moratorium on the development of hotels by the Company. This moratorium led the Board and Hammons to negotiate an arrangement where Hammons was permitted to use Company resources for his private development activities, in exchange for giving the Company the opportunity to

manage such hotels and acquire them if they were offered for sale.

Hammons and the Board also disagreed over Hammons's decision to offer Lou Weckstein, who Hammons hired as JQH's President in 2001 without consulting the Board, a salary that the Board believed was excessive. This conflict led to deterioration of the relationship between Hammons and Hart, who was then Hammons's personal attorney, and led the Board to retain Katten Muchin Rosenman, LLP ("Katten Muchin") to advise the non-employee members of the Board on how to react to Hammons's hiring of Weckstein.

Plaintiffs point to Eilian's description in a March 7, 2005 email sent during the negotiations that Hammons practiced a " 'liberal' mixing of private and personal expenses and competitive interests." In its 2004 10-K the Company disclosed that:

> Mr. Hammons also (1) owns hotels that we manage; (2) owns an interest in a hotel management company that provides accounting and other administrative services for all of our hotels; (3) owns a 50% interest in the entity from which we lease our corporate headquarters; (4) has an agreement whereby we pay up to 1.5% of his internal development costs for new hotels in exchange for the opportunity to manage the hotels and the right of first refusal to purchase the hotels in the event they are offered for sale; (5) leases space to us in two trade centers owned by him that connect with two of our hotels; (6) has the right to require the redemption of his LP Units; (7) utilizes our administration and other services for his outside business interests, for which he reimburses us; (8) utilizes the services of certain of our employees in his personal enterprises and personally subsidizes those employees' compensation; and (9) owns the real estate underlying one

Case 1:18-cv-00475-SEB-TAB Document 1-2 Filed 02/16/18 Page 121 of 440 PageID #: 133
In re Gaylord Nat'l Hotels Inc. Shareholder Litigation, Not Reported in A.2d (2009)
2009 WL 3165613

of our hotels, which we lease from him. [3]

[3]      JQH's 2004 Form 10-K at 4.

Plaintiffs also point to a conflict surrounding rent the Company paid to Hammons for meeting space adjacent to one of the Company's hotels in Portland, Oregon. Plaintiffs cite evidence that, according to Weckstein and Paul Muellner, JQH's chief financial officer, Hammons insisted on a rent well in excess of market rates and opposed the lower rental offer they proposed.

**\*4** Around early 2004, Hammons and the Board also had conflicts over the plan to dispose of certain Holiday Inn hotels that the Board and management (other than Hammons) deemed were no longer "core assets" of the Company. Hammons, who Muellner described as having an "emotional attachment" to the Holiday Inn brand, opposed the sale of some of the hotels and even threatened to take legal action to stop the Board from selling one of the properties. On a separate occasion, without disclosure to the Board, Hammons entered into a private agreement with a listing broker that gave Hammons a right of first refusal, which would have allowed Hammons to match an offer in the event a third-party offer was approved by the Board. The arrangement was later discovered and disclosed to the Board by the Company's general counsel.

### C. The Barceló Offer and the Creation of the Special Committee

In early 2004, Hammons informed the Board that he had begun discussions with third parties regarding a potential sale of JQH or his interest in JQH. On October 15, 2004, one of these third parties, Barceló Crestline Corporation ("Barceló"), informed the Board that it had entered into an agreement with Hammons and that it was offering $13 per share for all outstanding shares of JQH Class A common stock.

The agreement Barceló reached with Hammons reflected Hammons's tax and other personal objectives. Hammons's tax situation made it essential to him that any transaction be structured to avoid the large tax liability that would result from a transaction that was deemed to be a disposition event for Hammons. To accomplish this goal, Hammons had to retain some ownership in the surviving limited partnership and continue to have capital at risk. Hammons also desired, among other

things, a line of credit that would allow him to continue to develop hotels. Thus, the deal announced by Barceló was structured such that in exchange for his interests in JQH and JQHLP, Hammons would receive a small ownership percentage in Barceló's acquisition vehicle and a preferred interest with a large liquidation preference. The Barceló transaction also provided that Hammons would receive a line of credit of up to $250 million and distribution of Chateau on the Lake Resort (the "Chateau Lake property"), one of JQH's premier properties.

Recognizing that Hammons's interests in the transaction may not have been identical to those of the unaffiliated JQH stockholders, the Board formed a special committee to evaluate and negotiate a proposed transaction on behalf of the unaffiliated stockholders and make a recommendation to the Board. The special committee consisted of Sullivan, Dempsey, and Moore. [4] Discussions at the initial meetings of the special committee in October 2004 reveal that the members realized that the special committee lacked the ability to broadly market the Company in light of Hammons's controlling interest and ability to reject any transaction. Thus, the special committee determined that its goal was to pursue the best price reasonably available to minority stockholders in any transaction the special committee was authorized to consider. The special committee also recognized its duty to recommend against a transaction if the committee concluded that the transaction was not in the best interests of the minority stockholders or if the price offered to the minority stockholders was not fair, from a financial perspective, to the minority stockholders. On the advice of its counsel, the special committee also adopted guidelines that provided that the special committee would conduct a process in which (1) stockholders would be provided a reasonable opportunity to express their views to the committee, (2) all parties interested and willing to explore a transaction would be afforded a level playing field, from the Company's perspective, on which to pursue a transaction in terms of timing and access to information, and (3) the committee and its advisors would be fully informed as to the value, merits, and probability of closing any transaction that there was a reasonable basis for believing could be consummated. The special committee retained Katten Muchin as its legal advisor and Lehman Brothers ("Lehman") as its financial advisor.

[4]      Hart and Lopez-Ona were also initially on the special committee, but withdrew in light of questions that

may have been raised regarding their relationship with the Company and Hammons. At the special committee's request, Hart continued to attend special committee meetings as an advisor.

**\*5** The special committee also discussed that, after Barceló's public announcement, Eilian had contacted members of the special committee and told them he was interested in entering into a possible transaction with the Company. Eilian indicated that Hammons had suggested that he contact the special committee if he felt he could offer a proposal superior to Barceló's. The special committee agreed that its counsel would contact Eilian and inform him that Lehman had been retained as the special committee's financial advisor.

Although Barceló's agreement with Hammons expired by its terms on November 1, 2004, both Barceló and Hammons remained interested in going forward with the transaction pursuant to a new agreement. On November 16, 2004, the Board (with Hammons abstaining) expanded the authority of the special committee to review, evaluate, and negotiate on behalf of the unaffiliated stockholders the terms of the revised Barceló proposal. The Board also gave the special committee the authority to respond to, and act on behalf of the board with respect to, any requests from interested parties.

On December 5, 2004, following a November 18, 2004 meeting with the special committee, Eilian submitted a proposal to the special committee whereby his group would acquire the interests of Hammons in the Company and make a tender offer for the unaffiliated stockholders at a price to be determined.[5] In November, the special committee met with various shareholder groups, including representatives of plaintiffs.

[5] Although the special committee had indicated that it would seek to provide "a level playing field" in terms of access to information, the special committee determined at a November 30, 2004 meeting that it would not place JQH management in a "tenuous position" by overriding Hammons's instruction to JQH's general counsel not to send due diligence materials to Eilian at that time. Hammons had expressed that he would not do a deal with Eilian under any circumstances. Nevertheless, the special committee attempted to encourage Eilian and his advisors to not let Hammons's instruction dissuade them from continuing to evaluate a possible

transaction and maintaining an open dialogue with the Company's financial advisor.

On December 6, 2004, the special committee reviewed the outstanding proposals of Barceló and Eilian. After receiving a preliminary evaluation from Lehman that Barceló's $13 per share offer was inadequate, from a financial point of view, to the minority stockholders, the special committee unanimously agreed to recommend to the Board that it reject Barceló's revised agreement with Hammons. The next day, the special committee advised the Board that Barceló's offer was not acceptable, and the Company issued a press release stating that the Company would not accept the Barceló proposal.

At a December 23, 2004 meeting, two special committee members reported that A.G. Edwards had contacted them on behalf of Eagle Hospitality Properties Trust, Inc. ("Eagle"). The committee, after observing that Eagle would need to raise significant capital, that a transaction with Eagle would involve a significant amount of strategic and financial risks, and that there was no basis to believe that Hammons would have any interest in pursuing a transaction with Eagle, concluded that the inquiry from Eagle was not worth pursuing at that point in time.

By December 28, 2004, Barceló was willing to pay $21 per share of Class A common stock if the transaction was subject to approval by a simple majority of shares, including those owned by Hammons. Barceló was willing to pay only $20 per share if a separate majority of the minority vote was required. Eilian's proposed transaction with a tender offer for the Class A shares of at least $20.50 per share had been outlined to the special committee on December 23, 2004. At the December 28 meeting, the special committee discussed both proposals and concluded that the Barceló proposal was more fully negotiated and stood a far greater chance of being consummated.

**\*6** At a December 29, 2004 meeting, the special committee was informed that Barceló was willing to increase its offer to acquire the Class A stock to $21 per share and agree that any merger be conditioned on a majority vote of the unaffiliated stockholders. Lehman advised the special committee that the $21 per share offer was fair to the minority stockholders from a financial point of view and that the allocation of consideration between the minority stockholders and Hammons was reasonable.

At a Board meeting later that day, the special committee advised the Board of Barceló's revised proposal as well as the proposal from Eilian's group that would offer $20.50 per share for all Class A shares. Hammons indicated that he was no longer interested in a transaction with Eilian. Based on the special committee's recommendation, the Board resolved to provide Barceló with exclusivity until January 31, 2005.

Negotiations proceeded between Barceló and Hammons, but Hammons was ultimately not comfortable with the proposal, particularly because he believed that the three-year commitment on the line of credit was not sufficient. An agreement was not reached by January 31, and Hammons indicated that he was unwilling to extend exclusivity with Barceló. The special committee then recommended to the Board that the Company not renew exclusivity with Barceló, and the Board followed this recommendation.

### D. The Eilian Offer

On January 31, 2005, the special committee received an offer from Eilian's group by which Acquisition would acquire all outstanding Class A common stock for $24 per share. Eilian's letter to the special committee indicated that the offer was not contingent on third-party financing and that certain Class A stockholders unaffiliated with Hammons had entered into agreements pursuant to which those stockholders agreed to support Eilian's proposal.[6] The committee informed the Board of this offer, and the Board voted to continue the existence and authorization of the special committee.

[6]     According to defendants, these unaffiliated stockholders represented approximately 23% of the public Class A common stockholders.

At a February 3, 2005 Board meeting, Hammons informed the Board that he would like to negotiate a transaction with Eilian. At the same meeting, the Board was informed that the Company had received an expression of interest from Eagle and from Corporex Companies. The Board concluded that because Eagle and Corporex did not come forward sooner after the expiration of the exclusivity period with Barceló and because of many other factors discussed at the meeting, the Board would not pursue a transaction with that group and would instead proceed expeditiously to negotiate a

transaction with Eilian. Based upon a recommendation from the special committee, the Board granted Eilian exclusivity until February 28, 2005.

Over the next several months, representatives of Eilian, Hammons, and the special committee continued to negotiate the terms of a potential deal, during which time the exclusivity agreement with Elian was renewed several times. On June 3, 2005, Hammons and Acquisition (Eilian's acquisition vehicle) informed the special committee that they had reached certain agreements and requested the special committee's approval of them. Acquisition also reaffirmed its offer to purchase all the outstanding shares of Class A common stock held by unaffiliated stockholders for $24 per share.

**\*7** On June 14, 2005, the special committee met with its advisors. Katten Muchin reviewed the process the special committee used over the previous nine months and provided an overview of the various agreements between Hammons and Acquisition. Lehman provided a presentation of its analysis and methodology in issuing its fairness opinion that the $24 per share price was fair to the minority stockholders from a financial point of view. Lehman also advised the special committee of its opinion that the allocation of the consideration between Hammons and the unaffiliated stockholders was reasonable. Lehman calculated that the value received by Hammons and his affiliates was between $11.95 and $14.74 per share. The special committee then approved the merger agreement (the "Merger Agreement") and the related agreements between Hammons and Eilian (collectively with the Merger Agreement, the "Transaction Agreements").

The Board met immediately following the June 14 special committee meeting. Hammons advised the Board that he supported the proposed transactions and then recused himself from the meeting. After presentations from Katten Muchin on the Transaction Agreements and the Board's fiduciary duties, and from Lehman on its fairness opinion, the Board voted to approve the Merger and the Transaction Agreements.

### E. The Merger and the Transaction Agreements

The Merger Agreement provided that each share of Class A common stock would be converted into the right to receive $24 per share in cash upon consummation of the Merger. The Merger was contingent on approval by a

Case 1:18-cv-00475-SEB-TAB Document 1-2 Filed 02/16/18 Page 124 of 440 PageID #: 136
In re: United Hotels Hotels Inc. Shareholder Litigation, Not Reported in A.2d (2009)

2009 WL 3165613

majority of the unaffiliated Class A stockholders, unless that requirement was waived by the special committee.[7] The Merger Agreement included a termination fee of up to $20 million and a "no shop" provision that placed limitations on the Company's ability to solicit offers from other parties. Moreover, Hammons agreed to vote his interests in favor of the Merger and against any competing proposal or other action that would prevent or hinder the completion of the Merger.

[7]     As explained below, plaintiffs discount the majority of the minority vote because it only required approval of a majority of the minority shares voting, as opposed to a majority of all the minority shares.

In addition to the Merger Agreement, Hammons and Acquisition entered into a series of other agreements, which provided for a complex, multi-step transaction designed to provide Hammons financing to continue his hotel development activities without triggering the tax liability associated with an equity or asset sale. Although each Class B share initially remained a share of common stock of the surviving corporation, those shares were eventually converted into a preferred interest in the surviving limited partnership (the "surviving LP"). In order to achieve his tax goals, Hammons had to have an ownership interest in the surviving LP and continue to have capital at risk. Accordingly, Hammons was allocated a 2% interest in the cash flow distributions and preferred equity of the surviving LP. Atrium GP, LLC, an Eilian company, became general partner of the surviving LP and received a 98% ownership interest. Hammons's preexisting limited partner interest in JQHLP was converted into a capital account associated with his preferred interest in the surviving LP, which had a liquidation preference of $328 million. When combined with the preferred interest from the conversion of his Class B shares, Hammons's capital account totaled a liquidation preference of $335 million. The partnership agreement provided for events in which the capital account could be distributed during Hammons's lifetime, but because of certain tax consequences, it was anticipated that distribution of the capital account was to occur at Hammons's death.

**\*8** The terms of the Transaction Agreements also provided Hammons other rights and obligations.[8] Importantly, Hammons received a $25 million short-term line of credit and a $275 million long-term line of credit.

Hammons also received (1) the Company's Chateau Lake property in exchange for transferring certain assets and related liabilities to an Acquisition affiliate, (2) a right of first refusal to acquire hotels sold post-merger, and (3) an indemnification agreement for any tax liability from the surviving LP's sale of any of its hotels during Hammons's lifetime. Hammons and Eilian entered into a reciprocal agreement that imposed restrictions on the development of new hotels that would compete with existing hotels owned by either party. Hammons also obtained an agreement whereby his management entity would continue to manage the hotels in exchange for payments of actual operating costs and expenses incurred (estimated to be approximately $6.5 million based on the budget for 2005) and a $200,000 annual salary to Hammons, plus benefits.[9]

[8]     There were numerous agreements required to execute the complex series of transactions associated with the Merger, some of which are not described in this opinion.

[9]     Hammons apparently had high standards for his hotels, and took pride in his organization's reputation for quality products. The management agreement allowed Hammons to ensure the hotels were maintained to his standards.

On August 24, 2005, the Company sent a proxy statement to its stockholders in connection with the vote on the Merger at a special meeting of stockholders on September 15, 2005. Of the 5,253,262 issued and outstanding shares of Class A stock, 3,821,005 shares, or over 72%, were voted to approve the Merger. In total, more than 89% of the Class A shares that voted on the Merger voted to approve it. The Merger closed on September 16, 2005.

*F. Plaintiffs' Contentions Regarding the Negotiation Process*

Plaintiffs paint a picture of the negotiation process that is dominated by Hammons's ability to walk away and block any transaction, which would have left plaintiffs holding illiquid stock that would likely trade in the $4 to $7 range.[10] According to plaintiffs, this threat relegated the special committee to a passive, tag-along role and forced them to be "friends of the deal" in an effort to prevent Hammons from backing out of the deal.

Case 1:18-cv-00475-SEB-TAB Document 1-2 Filed 02/16/18 Page 125 of 440 PageID #: 137
In re J.Q. Hammons Hotels Inc. Shareholder Litigation, Not Reported in A.2d (2009)
2009 WL 3165613

[10]    To support this assertion, plaintiffs point to statements of special committee members and others that suggest that there were numerous complex issues on Hammons's side of the deal and that, from the perspective of a potential bidder, Hammons was difficult to deal with and had a history of walking away from proposed transactions after significant negotiations.

Plaintiffs also contend that both Katten Muchin and Lehman developed conflicts of interest that biased them in favor of completing a transaction with Eilian. In March 2005, Katten Muchin informed the special committee that it would be representing the entity providing Eilian's financing, iStar Financial Inc. ("iStar"), in connection with the Merger. Plaintiffs contend that this representation gave Katten Muchin an incentive to ensure the Merger proceeded with Eilian, and that iStar played a substantial role in negotiation of the transactions between Hammons and Eilian. Defendants point out that a separate team of lawyers represented iStar and was prohibited from discussing the transaction with the team representing the special committee. The special committee discussed the matter and waived the conflict. The conflict, however, was not disclosed in the proxy statement.

Plaintiffs also assert that Lehman faced a conflict of interest because it sought a role in Eilian's planned refinancing of the Company's debt. Although Lehman did not get the business, plaintiffs contend that Lehman had multiple contacts with Eilian and that "Lehman's efforts to secure business that would have dwarfed the value of its advisory services to the Special Committee" presented a "clear conflict" that was not disclosed in the Company's proxy statement. [11] Defendants contend that the group at Lehman that contacted Eilian about the debt refinancing was separate from the group advising the special committee. Defendants further contend that the alleged conflict was not material and that there is no evidence that Lehman's opinion was affected because the contacts regarding the debt refinancing occurred after Lehman had opined to the special committee in December 2004 that a bid of $21 per share was fair to the minority stockholders.

[11]    Pls.' Br. in Supp. of their Cross-Mot. for Partial Summ. J. & in Opp'n to Defs.' Mots. for Summ. J. (Pls.' Opening Br.") 34.

*G. The Litigation*

**\*9** This action was filed on October 20, 2004. The now-operative Second Amended and Consolidated Supplemental Class Action Complaint was filed on October 3, 2006. On October 24, 2008, after discovery and an unsuccessful attempt at mediation, the defendants other than Hammons filed their motion for summary judgment. [12] The director defendants seek summary judgment on the grounds that (1) plaintiffs cannot satisfy their burden to rebut the presumption of the business judgment rule, (2) the special committee members and the director defendants are shielded from monetary liability pursuant to the Company's 8 *Del. C.* § 102(b)(7) exculpatory provision, and (3) there is no evidence to support the aiding and abetting claim. On February 20, 2009, after additional discovery, Hammons filed his motion for summary judgment. Hammons contends that he took no part in the negotiations for the purchase of the minority's shares and argues that he is entitled to summary judgment because plaintiffs cannot rebut the presumption of the business judgment rule and because even if entire fairness applies, Hammons acted fairly. On April 17, 2009, plaintiffs filed their motion for partial summary judgment. Plaintiffs seek summary judgment holding that (1) entire fairness is the applicable standard of review, (2) the special committee process and stockholder vote were ineffective and the burden of persuasion at trial remains with defendants, (3) the challenged transactions were the result of unfair dealing, (4) certain defendants are liable for aiding and abetting Hammons's breach, and (5) the only issue for trial is therefore fair price. Plaintiffs now concede that *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.* [13] does not govern the duties of the Board, that the special committee was disinterested and independent (although not free from coercion by Hammons), and that a number of the disclosure violations previously alleged should be withdrawn.

[12]    The JQH directors other than Hammons are referred to collectively as the "director defendants." JQH, Acquisition, and Merger Sub were also part of the director defendants' motion for summary judgment.

[13]    506 A.2d 173 (Del.1986).

## II. ANALYSIS

### *A. The Summary Judgment Standard*

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any

material fact" and that it is "entitled to a judgment as a matter of law." [14] The court views the evidence in the light most favorable to the nonmoving party [15] and assumes the truth of uncontroverted facts set forth in the record. [16] When the moving party shows that no genuine issue of material fact exists, "the burden shifts to the nonmoving party to substantiate its adverse claim by showing that there are material issues of fact in dispute." [17] If the nonmoving party bears the burden of proof, summary judgment is appropriate where that party fails to make a sufficient showing on any essential element of its case. [18]

[14]  Ct. Ch. R. 56(c); *see Gilbert v. El Paso Co.,* 575 A.2d 1131, 1142 (Del.1990); *Conway v. Astoria Fin. Corp.,* 837 A.2d 30, 36 (Del.Ch.2003), *aff'd,* 840 A.2d 641 (Del.2004) (TABLE).

[15]  *Conway,* 837 A.2d at 36.

[16]  *Tanzer v. Int'l Gen. Indus., Inc.,* 402 A.2d 382, 386 (Del.Ch.1979).

[17]  *Conway,* 837 A.2d at 36 (quotation omitted).

[18]  *Burkhart v. Davies,* 602 A.2d 56, 59 (Del.1991).

*B. The Standard of Review: Entire Fairness or Business Judgment?*

The threshold issue is whether the Court should apply the entire fairness standard or the business judgment standard in reviewing the Merger. Plaintiffs label the Merger a "minority squeeze-out transaction" and contend that *Kahn v. Lynch Communication Systems, Inc.* [19] mandates that the Court apply the entire fairness standard of review, while defendants urge the Court to apply the business judgment standard of review.

[19]  638 A.2d 1110 (Del.1994).

**\*10** In *Lynch* the Delaware Supreme Court held "that the exclusive standard of judicial review in examining the propriety of an interested cash-out merger transaction by a controlling or dominating shareholder is entire fairness" and that "[t]he initial burden of establishing entire fairness rests upon the party who stands on both sides of the transaction." [20] Additionally, "approval of the transaction by an independent committee of directors or an informed majority of minority shareholders" would shift the burden of proof on the issue of fairness to the

plaintiff, but would not change that entire fairness was the standard of review . [21]

[20]  *Id.* at 1117 (citations omitted).

[21]  *Id.* A different standard applies to transactions that effectively cash out minority shareholders through a tender offer followed by a short-form merger. *See In re Aquila Inc.,* 805 A.2d 184, 190-91 (Del.Ch.2002); *In re Siliconix Inc. S'holders Litig.,* 2001 WL 716787, at *6-9 (Del.Ch. June 21, 2001); *see generally In re Pure Res., Inc. S'holders Litig.,* 808 A.2d 421, 434-39 (Del.Ch.2002).

Plaintiffs contend that *Lynch* controls this case and mandates application of the entire fairness standard, regardless of any procedural protections that were used that may have protected the minority stockholders. Plaintiffs argue that Hammons stood on both sides of the transaction because he did not in fact sell his interest in the companies to Eilian, but rather restructured them in a way that accomplished his tax and financing goals while maintaining a significant interest in the surviving company, in addition to other rights. Plaintiffs point not only to Hammons's numerous contractual arrangements and continuing preferred interest in the surviving LP, but also to statements from various witnesses that the transaction was not actually a "sale" by Hammons but rather a "joint venture of some sort" or a "recapitalization" designed to accomplish Hammons's tax and liquidity needs. Thus, plaintiffs contend:

> as viewed from a legal and tax standpoint, as communicated to employees and the public, and as understood by the transaction participants themselves, the Related Transactions effected a restructuring in which Mr. Hammons brought in a business partner and obtained access to financing while retaining most of his equity (in modified form), together with substantial upside from future growth of JQH, significant veto rights over future operations of the Company, and continued direct management of the Company's hotel properties. Under these circumstances, the rule of *Lynch*-that "the exclusive standard of judicial review in examining the propriety of an interested cash-out merger transaction by a controlling or dominating shareholder is entire fairness,"-applies directly. [22]

[22]  Pls.' Opening Br. 44 (citation omitted).

Although plaintiffs' argument has some appeal, ultimately, I disagree. Unlike in *Lynch,* the controlling stockholder in this case did not make the offer to the minority stockholders; an unrelated third party did. Eilian had no prior relationship with the Company or with Hammons. Eilian negotiated separately with Hammons, who had a right to sell (or refuse to sell) his shares, and with the minority stockholders, through the disinterested and independent special committee. The rights Hammons retained after the Merger-the 2% interest in the surviving LP, the preferred interest with a $335 million liquidation preference, and various other contractual rights and obligations-do not change that *Eilian* made an offer to the minority stockholders, who were represented by the disinterested and independent special committee. Put simply, this case is not one in which Hammons stood "on both sides of the transaction." [23] Accordingly, *Lynch* does not mandate that the entire fairness standard of review apply notwithstanding any procedural protections that were used. [24]

23    *Lynch,* 638 A.2d at 1117.

24    Importantly, and as explained below, this result does not provide a final answer to the standard of review that will be applied.

 **\*11** Plaintiffs further contend that, even if Hammons did not stand on both sides of the transaction as contemplated in *Lynch,* the policy rationales underlying the *Lynch* decision warrant extending its holding to this case. In support of this position, plaintiffs cite several Court of Chancery decisions in which the Court applied or extended *Lynch.* Although I do not fully address all the cases plaintiffs cite in support of this argument, I generally reach two conclusions with respect to them: first, the cases plaintiffs cite can be factually distinguished from this case, and second, to the extent those cases extended the application of *Lynch* based on certain policy rationales, I decline to do so here.

For example, in *In re Tele-Communications, Inc. Shareholders Litigation,*[25] the evidence suggested that a majority of the board of directors was interested because they received material personal benefits from the transaction they approved. [26] Specifically, the transaction materially benefited a majority of the directors because it allocated a disproportionate amount of the merger consideration to the directors' class of stock. [27] Moreover,

only one of those directors was a controlling stockholder entitled to a control premium. [28] Thus, the interestedness of a majority of the directors led the Court to apply the entire fairness standard and to conclude that, as in *Lynch,* the approval of the transaction by the stockholders and a special committee could at most shift the burden of demonstrating entire fairness to plaintiffs . [29] Here, in contrast, Hammons negotiated with Eilian and did not participate in the negotiations between Eilian and the special committee. Nothing in *In re Tele-Communications* mandates the extension of *Lynch* to this case. [30]

25    2005 WL 3642727 (Del.Ch. Dec.21, 2005).

26    *Id.* at *8.

27    *Id.* at *7.

28    *Id.* at *14.

29    *Id.* at *8. Because of the conflict of interest of a majority of the board in that case, the Court in *In re Telecommunications* determined that entire fairness review should apply to the transaction. The Court also determined that, as in *Lynch,* approval by shareholders and a special committee could shift the burden of entire fairness to plaintiffs. Nothing in that case, however, suggests that such a rule must apply in every case in which the Court is determining whether to apply entire fairness review. In other words, the result in *Lynch*-that shareholder and special committee approval merely shifts the burden of entire fairness-does not preclude the possibility that shareholder and special committee review could be relevant in determining whether to apply business judgment or entire fairness in a case that is not governed by *Lynch.*

30    Plaintiffs also cite *In re Cysive, Inc. S'holders Litig.,* 836 A.2d 531 (Del.Ch.2003) and *In re W. Nat'l Corp. S'holders Litig.,* 2000 WL 710192 (Del.Ch. May 22, 2000).* In *Cysive,* however, the Court addressed the question of whether the stockholder, who made the buy-out proposal to the minority stockholders, was a "controlling stockholder" for purposes of *Lynch,* and concluded that the large stockholder "possess[ed] the attributes of control that motivate the *Lynch* doctrine." *Cysive,* 836 A.2d at 551-552. In *W. Nat'l,* the plaintiff challenged the merger between Western National Corporation and its 46% stockholder. The Court concluded that the record did not support a finding of control. *W. Nat'l* at *5-10. Here, in contrast, there is no dispute that Hammons was the

controlling stockholder of JQH. Hammons, however, did not make the offer to the minority stockholders or agree to a merger with JQH. Rather, an unaffiliated third-party negotiated separately with Hammons and the special committee.

In *In re LNR Property Corp. Shareholders Litigation,*[31] the complaint alleged that the board breached its fiduciary duties by allowing a conflicted controlling shareholder, who was acting as both buyer and seller in the transaction, to "personally negotiate[ ] a one-sided deal that allowed him and select members of management to continue to reap the benefits of [the company's] future growth while cutting out plaintiff and the class."[32] The complaint also alleged that the controlling shareholder dominated and controlled the board and the "sham" special committee, which did not have the authority to engage in independent negotiations.[33] Taking the allegations in the complaint in the light most favorable to plaintiffs, the Court could not, on a motion to dismiss, rule out the possibility that the entire fairness standard would apply because the controlling stockholder negotiated the transaction, including the allocation of a 20.4% stake in the resulting company for himself.[34] The Court noted, however, that "[t]here is authority for the proposition that the mere fact that a controller has or may be acquiring some interest in the buyer does not automatically trigger entire fairness review."[35] The Court noted that the business judgment standard of review may ultimately apply if, at a later stage, the defendants are able to show that the interests of the minority stockholders were adequately protected. As the *LNR Property* Court stated:

[31] 896 A.2d 169 (Del.Ch.2005).

[32] *Id.* at 176. Similarly, in *Ryan v. Tad's Enterprises, Inc.,* 709 A.2d 682 (Del.Ch.1996) and *In re Dairy Mart Convenience Stores, Inc.,* 1999 WL 350473 (Del.Ch. May 24, 1999), the Court applied entire fairness review where the controlling stockholder negotiated the transaction on behalf of the company and the minority stockholders.

[33] *Id.* at 176-77.

[34] *Id.* at 178.

[35] *Id.* at 177-78 (citing *Orman v. Cullman,* 794 A.2d 5, 21-22 n. 36 (Del.Ch.2002); *In re Budget Rent A Car Corp. S'holders Litig.,* 1991 WL 36472, at *3 (Del.Ch. Mar.15, 1991)).

**\*12** Of course, the defendants may be able to show at the summary judgment stage that Miller, as they argue, negotiated this transaction as a seller, not a buyer, and that the board and the Special Committee were entitled to repose confidence in his unconflicted motivation to obtain the maximum price for all LNR stockholders. In that case, the court may well be able to conclude that the measures taken by the board and the Special Committee to protect the interests of the minority were adequate in the circumstances to invoke the business judgment standard of review. Nonetheless, those facts and circumstances do not appear in the well pleaded allegations of the complaint.[36]

[36] *Id.* at 178.

Although I have determined that the measures taken in this case were not "adequate in the circumstances to invoke the business judgment standard of review," this result is not mandated by *Lynch.* Rather, it results from deficiencies in the specific procedures used in this case. In other words, I accept defendants' argument that *Lynch* does not mandate the application of entire fairness review in this case, notwithstanding any procedural protections for the minority stockholders.[37] In this case-which, again, I have determined is not governed by *Lynch*-business judgment would be the applicable standard of review if the transaction were (1) recommended by a disinterested and independent special committee, *and* (2) approved by stockholders in a non-waivable vote of the majority of all the minority stockholders.[38]

[37] Although I have determined that the facts of this case fall outside the ambit of *Lynch,* I am also cognizant of recent suggestions of ways to "harmonize" the standards applied to transactions that differ in form but have the effect of cashing out minority stockholders. *See In re Cox Comm'ns, Inc. S'holders Litig.,* 879 A.2d 604, 606-07, 642-48 (Del.Ch.2005); *In re Cysive, Inc. S'holders Litig.,* 836 A.2d 531, 549 n. 23 (Del.Ch.2003); *In re Pure Res.,* 808 A.2d at 443-46.

[38] Of course, it is not sufficient for the special committee to merely be disinterested and independent. Rather, the committee must be given sufficient authority and opportunity to bargain on behalf of the minority stockholders, including the ability to hire independent legal and financial advisors. Moreover, neither special committee approval nor a stockholder vote would be effective if the controlling stockholder engaged in threats, coercion, or fraud. As explained below,

2009 WL 3165613

plaintiffs contend that the price of the minority shares was depressed as a result of Hammons's improper self-dealing conduct and that as a result the special committee and the minority stockholders were coerced into accepting the Merger. If a plaintiff were able to make such a showing, even special committee approval and a majority of the minority vote would not invoke the business judgment standard of review. Similarly, a stockholder vote would not be effective for purposes of invoking the business judgment standard of review if it were based on disclosure that contained material misstatements or omissions.

I reject, however, defendants' argument that the procedures used in this case warrant application of the business judgment standard of review. Although I have determined that Hammons did not stand "on both sides" of this transaction, it is nonetheless true that Hammons and the minority stockholders were in a sense "competing" for portions of the consideration Eilian was willing to pay to acquire JQH and that Hammons, as a result of his controlling position, could effectively veto any transaction. In such a case it is paramount-indeed, necessary in order to invoke business judgment review-that there be robust procedural protections in place to ensure that the minority stockholders have sufficient bargaining power and the ability to make an informed choice of whether to accept the third-party's offer for their shares.

Here, the vote of the minority stockholders was not sufficient both because the vote could have been waived by the special committee and because the vote only required approval of a majority of the minority stockholders voting on the matter, rather than a majority of all the minority stockholders. Defendants would no doubt argue that the special committee merely had the ability to waive the vote but chose not to waive it in this case and that the Merger was in fact approved by a majority of all the minority stockholders. Importantly, however, the majority of the minority vote serves as a complement to, and a check on, the special committee. An effective special committee, unlike disaggregate stockholders who face a collective action problem, has bargaining power to extract the highest price available for the minority stockholders. The majority of the minority vote, however, provides the stockholders an important opportunity to approve or disapprove of the work of the special committee and to stop a transaction they believe is not in their best interests. Thus, to provide sufficient protection to the minority stockholders, the majority of the minority vote

must be nonwaivable, even by the special committee. [39] Moreover, requiring approval of a majority of all the minority stockholders assures that a majority of the minority stockholders truly support the transaction, and that there is not actually "passive dissent" of a majority of the minority stockholders. [40]

39      *See* In re JCC Holding Co., 843 A.2d 713, 724-25 n. 33 (Del.Ch.2003); *see also* Gesoff v. IIC Indus., Inc., 902 A.2d 1130, 1150 n. 121 (Del.Ch.2006); In re Pure Res., 808 A.2d at 445.

40      *See* In re PNB Holding Co. S'holders Litig., 2006 WL 2403999, at *15 (Del.Ch. Aug.18, 2006).

**\*13** To give maximum effect to these procedural protections, they must be preconditions to the transaction. In other words, the lack of such requirements cannot be "cured" by the fact that they would have been satisfied if they were in place. This increases the likelihood that those seeking the approval of the minority stockholders will propose a transaction that they believe will generate the support of an actual majority of the minority stockholders. Moreover, a clear explanation of the pre-conditions to the Merger is necessary to ensure that the minority stockholders are aware of the importance of their votes and their ability to block a transaction they do not believe is fair. Accordingly, entire fairness is the appropriate standard of review in this case.

### C. The Entire Fairness of the Merger

The concept of entire fairness has two components: fair dealing and fair price. These prongs are not independent, and the Court does not focus on each of them individually. [41] Rather, the Court "determines entire fairness based on all aspects of the entire transaction." [42] Fair dealing involves "questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained." [43] Fair price involves questions of "the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock." [44] That the special committee approval and the majority of the minority vote were not sufficient to invoke the business judgment standard of review does not necessarily mean

that defendants will be unable to prevail on the issue of fair dealing.

41   *Valeant Pharms. Int'l v. Jerney,* 921 A.2d 732, 746 (Del.Ch.2007) ("[T]he fair dealing prong informs the court as to the fairness of the price obtained through that process.").

42   *Id.*

43   *Emerald Partners v. Berlin,* 787 A.2d 85, 97 (Del.2001) (quoting *Weinberger v. UOP, Inc.,* 457 A.2d 701, 711 (Del.1983)).

44   *Id.* (quoting *Weinberger,* 457 A.2d at 711).

Hammons contends that he is entitled to summary judgment even if entire fairness is the applicable standard of review. Hammons asserts that he received less than $24 per share for his Class B shares and did not receive any consideration at the expense of the minority stockholders. In support of this assertion Hammons relies on Lehman's opinion that Hammons received less than $24 per share in actual value for his Class B shares and therefore received less per share than the minority stockholders. Plaintiffs, however, attack Lehman's opinion. For example, plaintiffs criticize Lehman's decision to value the $275 million line of credit at only $20 to $30 million dollars based on the cost to Hammons of a theoretical line of credit obtained in the market, notwithstanding that such a line of credit would not, in fact, have been available to Hammons in the open market. Plaintiffs also contend that Lehman erred by failing to account for the significant tax benefits Hammons received and the other benefits Hammons received that Lehman determined "do not have a quantifiable valuation from a financial point of view." Finally, plaintiffs contend that Lehman's analysis is not determinative on the issue of fair price because it does not account for the impact of Hammons's tax and other specialized requirements on the price obtained for the minority stockholders. [45] These factual and legal disputes regarding the persuasive value of Lehman's opinion on the issue of fair price preclude entry of summary judgment in defendants' favor on that issue.

45   Plaintiffs maintain that "[t]he injury to the Class is measured not by the benefit to Mr. Hammons, but by the loss suffered by Class members as a result of the personal, self-serving requirements he imposed." Pls.' Opening Br. 54.

**\*14** Because entire fairness is the appropriate standard of review and because there are material factual issues as to the fairness of the price, Hammons's motion for summary judgment on that issue is denied . [46] Similarly, the director defendants' motion for summary judgment on that issue is also denied . [47]

46   The disclosure claims, which are also addressed in Hammons's motion for summary judgment and the director defendants' motion for summary judgment, are addressed below.

47   *See Emerald Partners,* 787 A.2d at 93-94 ("[W]hen entire fairness is the applicable standard of judicial review, a determination that the director defendants are exculpated from paying monetary damages can be made only *after the basis* for their liability has been decided."); *LNR Property,* 896 A.2d at 178 & n. 54 (declining to dismiss claims on the basis of 8 Del. C. § 102(b)(7) exculpatory provision because "the entire fairness standard of review may be applicable, and, thus, 'the inherently interested nature of those transactions [may be] inextricably intertwined with issues of loyalty.' ") (quoting *Emerald Partners,* 787 A.2d at 93).

Plaintiffs contend that they have established that the Merger process involved unfair dealing, thus leaving for trial only the issue of fair price. Plaintiffs also argue that the special committee was not effective because the special committee was "coerced" to accept Hammons's offer to avoid the "worse fate" of a continuing presence of minority stockholders. I am not convinced that the special committee was ineffective merely based on the fact that Hammons was able to veto any transaction. In the first instance, there is no requirement that Hammons sell his shares. Nor is there a requirement that Hammons sell his shares to any particular buyer or for any particular consideration, should he decide in the first instance to sell them. There is no requirement that Hammons agree to a transaction that would have adverse tax implications for him. If Hammons chose not to sell his shares, the minority stockholders would have remained as minority stockholders. The mere possibility that the situation would return to the status quo, something Hammons could have chosen to do by never considering selling his shares, is not, standing alone, sufficient "coercion" to render a special committee ineffective for purposes of evaluating fair dealing.

Plaintiffs also contend, however, that the price of the minority shares before the Merger was depressed as a result of Hammons's improper self-dealing transactions. Defendants contend that any "undervaluing" of the shares merely represents the lack of control premium attributable to a minority position in the Company. I am unable, on the current record, to resolve this factual dispute, and neither plaintiffs nor defendants are entitled to summary judgment on the issue of fair dealing. Plaintiffs could prevail at trial on the issue of fair dealing if they were able to establish that the price of the minority shares was depressed as a result of Hammons's improper self-dealing conduct. If the price were depressed as a result of such conduct, then the special committee and the stockholders could have been subject to improper coercion, meaning they would have been coerced into accepting any deal, whether fair or not, to avoid remaining as stockholders. This result addresses the concern that majority stockholders may have an incentive to depress the price of minority shares through improper self-dealing so they could then buy out the minority at a low price. As explained above, however, the issues of whether the price of the minority shares was depressed as a result of such conduct, and whether, as a result, the special committee or the minority stockholders were improperly coerced into accepting the Merger, must remain for trial. Accordingly, neither plaintiffs nor defendants are entitled to summary judgment on the issue of fair dealing. [48]

[48] Although the procedural protections used in this case were not sufficient to invoke business judgment protection, they could have been sufficient to shift the burden of demonstrating entire fairness to plaintiffs. As explained below, some of plaintiffs' disclosure claims have survived summary judgment. At this stage, I cannot conclude that the majority of the minority vote shifts the burden of demonstrating entire fairness to plaintiffs. Because of the material issues of fact that remain, I also leave open the question whether the special committee's process and approval were sufficient to shift the burden of entire fairness to plaintiffs.

### D. The Disclosure Claims

**\*15** As noted above, plaintiffs agree that a number of disclosure violations previously alleged should be withdrawn, but continue to assert that the proxy statement contained four misstatements and omissions. Plaintiffs maintain that the proxy statement mischaracterized the special committee process, omitted information

regarding the alleged conflicts of interest of Lehman and Katten Muchin, and omitted information regarding a presentation Eilian made to the special committee. Defendants seek summary judgment on the disclosure claims. [49]

[49] Defendants cite *In re Transkaryotic Therapies, Inc.,* 954 A.2d 346 (Del.Ch.2008) and argue that they are entitled to summary judgment because there is no longer a remedy available for any of the alleged disclosure violations. Entire fairness, however, is the appropriate standard of review in this case, and because of the issues of loyalty "intertwined" with transactions subject to such a standard, this is not a case in which the Court will refrain from granting relief for disclosure violations because the transaction has been completed. *See LNR Property,* 896 A.2d at 178 & n. 54. In other words, this is not a case "where there is no evidence of a breach of the duty of loyalty or good faith by the directors who authorized the disclosures." *Transkaryotic,* 954 A.2d at 362; *see Emerald Partners,* 787 A.2d at 93-94. Similarly, the Board is not entitled to summary judgment at this stage under the Company's 8 *Del. C.* § 102(b)(7) exculpatory provision. *See LNR Property,* 896 A.2d at 178 & n. 54; *Emerald Partners,* 787 A.2d at 93-94.

The fiduciary duty of disclosure, which is a specific formulation of the duties of care and loyalty, requires the Board to "disclose fully and fairly all material information within the board's control...." [50] To succeed on their disclosure claims, plaintiffs must identify the facts allegedly omitted from the proxy statement and "state why they meet the materiality standard and how the omission caused injury." [51] "An omitted fact is material if there is a substantial likelihood that a reasonable stockholder would consider it important in deciding how to vote." [52] In other words, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable stockholder as having significantly altered the 'total mix' of information made available." [53] Of course, "[u]nsupported conclusions and speculation are not a substitute for facts." [54]

[50] *Skeen v. Jo-Ann Stores, Inc.,* 750 A.2d 1170, 1172 (Del.2000) (quoting *Stroud v. Grace,* 606 A.2d 75, 84 (Del.1992)).

[51] *Id.* at 1173 (*Loudon v. Archer-Daniels-Midland Co.,* 700 A.2d 135, 141 (Del.1997)).

In re Columbia Hotels Inc. Shareholder Litigation, Not Reported in A.2d (2009)
2009 WL 3165613

52   *Loudon,* 700 A.2d at 143.

53   *Skeen,* 750 A.2d at 1172 (quoting *Loudon,* 700 A.2d at 143) (internal quotation marks omitted).

54   *Id.* at 1173.

First, plaintiffs contend that the proxy statement "mischaracterized the Special Committee process as effective and independent of Mr. Hammons" and that "[b]y failing to convey the subservient, deferential approach adopted by the Special Committee, JQH's minority shareholders were led to believe that the price achieved resulted from an effective, arm's length process and not from the constrained, coerced posture occupied by the Special Committee." [55]

55   Pls.' Opening Br. 67.

Even interpreting the facts in plaintiffs' favor, I am not convinced that they have stated a claim based on the failure to disclose the "subservient, deferential approach adopted by the Special Committee." Plaintiffs point to no specific factual misrepresentation or misleading disclosure in the proxy statement. Rather, plaintiffs seek to have defendants disclose their characterization of the special committee process. This Court has clearly held that directors are not required to disclose the plaintiffs' characterization of the facts or engage in "self-flaggelation." [56] Here, I cannot conclude that defendants violated the duty of disclosure by failing to describe the special committee as "subservient" or "deferential." The proxy statement describes the special committee process and even includes disclosure of the special committee's recognition that it lacked the authority and ability to broadly market the Company in light of Hammons's ability to block any transaction and that Hammons's interest in any transaction would be influenced by, among other things, tax implications personal to Hammons and different from those of the minority stockholders. Given this disclosure and the thorough description of the other aspects of the special committee process, Delaware law does not require that the proxy statement include plaintiffs' characterization of the special committee process. [57] Accordingly, summary judgment is granted in favor of defendants on this claim.

56   *Khanna v. McMinn,* 2006 WL 1388744, at *29, 34 (Del.Ch. May 9, 2006) ("A long-standing principle of disclosure jurisprudence provides that a board need

not engage in 'self-flagellation.' Notwithstanding the requirement that directors disclose fully all material facts in the solicitation of proxies from shareholders, a board of directors is not required to 'confess to wrongdoing prior to any adjudication of guilt,' nor must it 'draw legal conclusions implicating itself in a breach of fiduciary duty from surrounding facts and circumstances prior to a formal adjudication of the matter.' ") (footnotes omitted); *In re MONY Group, Inc. S'holder Litig.,* 853 A.2d 661, 682 (Del.Ch.2004) (" '[A]s a general rule, proxy materials are not required to state 'opinions or possibilities, legal theories or plaintiffs' characterization of the facts.' ") (quoting *Seibert v. Harper & Row, Publishers, Inc.,* 10 Del. J. Corp. L. 645, 655, 1984 WL 21874, at *6 (Del.Ch. Dec.5, 1984)).

57   *See In re Lear Corp. S'holder Litig.,* 926 A.2d 94, 111 (Del.Ch.2007).

**16** Plaintiffs also bring a claim based on the failure to disclose that Lehman faced a potential conflict of interest because it had contacts with Eilian about the possibility of underwriting the nearly $700 million commercial mortgage-backed security offering planned by Eilian after completion of the Merger. Plaintiffs contend that the possibility of getting this business gave Lehman a powerful incentive to approve the transaction.

Defendants contend that the group at Lehman that had contact with Eilian about the debt refinancing was different from the group advising the special committee and that Lehman did not ultimately get the business. This Court, however, has stressed the importance of disclosure of potential conflicts of interest of financial advisors. [58] Such disclosure is particularly important where there was no public auction of the Company and "shareholders may be forced to place heavy weight upon the opinion of such an expert." [59] It is imperative that stockholders be able to decide for themselves what weight to place on a conflict faced by the financial advisor.

58   *See David P. Simonetti Rollover IRA v. Margolis,* 2008 WL 5048692, at *8 (Del.Ch. June 27, 2008) ("[I]t is imperative for the stockholders to be able to understand what factors might influence the financial advisor's analytical efforts.... A financial advisor's own proprietary financial interest in a proposed transaction must be carefully considered in assessing how much credence to give its analysis.").

59    *Braunschweiger v. Am. Home Shield Corp.,* 17 Del.
      J. Corp. L. 206, 217, 1991 WL 3920, at *6 (Del.Ch.
      Jan.7, 1991).

Defendants further contend that "there is no evidence that Lehman's opinion was affected by the purported pitch." [60] There is no rule, however, that conflicts of interest must be disclosed only where there is evidence that the financial advisor's opinion was actually affected by the conflict. Thus, defendants cannot defend the alleged omission as immaterial by arguing that any contacts between Lehman and Eilian regarding the refinancing occurred after Lehman opined in December 2004 that the then-high bid of $21 per share was fair to the minority stockholders. By an extension of the logic underlying this argument (that a conflict is not material because the current bid is higher than a bid that was previously found fair by the financial advisor), Lehman's continued engagement after the $21 bid was wholly unnecessary so long as any subsequent bid was not below $21. If this is not the case-if Lehman's judgment was still valuable and necessary even after the opinion on the $21 bid-then the financial advisor's conflict of interest would need to be disclosed in the proxy statement. There remain important factual issues about the timing and content of any contact between Lehman and Eilian regarding the refinancing, as well as whether the Board knew or should have known of the alleged conflict. Defendants, therefore, are not entitled to summary judgment on this claim.

60    Def. John. Q. Hammons's Reply in Supp. of His Mot.
      For Summ. J. & Opp'n to Pls.' Mot. for Partial Summ.
      J. 17.

Plaintiffs also assert a claim based on the failure to disclose Katten Muchin's representation of iStar. iStar is the firm that provided Eilian the financing to complete the Merger, and plaintiffs contend that iStar played a substantial role in negotiations between Hammons and Eilian. Plaintiffs argue that this conflict gave Katten Muchin an incentive to see the Merger proceed with Eilian. The special committee was informed of the conflict and that iStar would be represented by a separate team of attorneys at Katten Muchin that was prohibited from discussing the matter with the team of attorneys advising the special committee. The special committee discussed the matter and unanimously approved the representation and agreed that the matter would not compromise Katten Muchin's independence. The conflict, however, was not disclosed to stockholders in the proxy statement.

**\*17**  Again, the compensation and potential conflicts of interest of the special committee's advisors are important facts that generally must be disclosed to stockholders before a vote. This is particularly true, where, as here, the minority stockholders are relying on the special committee to negotiate on their behalf in a transaction where they will receive cash for their minority shares. Although the waiver of the conflict by the special committee may have resolved any ethical violation, the special committee's waiver of the conflict would likely be important to stockholders in evaluating the Merger and in assessing the efforts of the special committee and its advisors. For these reasons, defendants are not entitled to summary judgment on this claim.

Finally, plaintiffs bring a claim based on the failure to disclose in the proxy statement a presentation Eilian made to the special committee. The presentation, which was made to the special committee in November 2004, included a valuation of JQH shares from $35.37 to $43.01 based on the average of "peer multiples." Defendants contend that the valuation was based on a hypothetical scenario in which the Company remained public but was transformed into a new entity under Eilian's management. Plaintiffs assert that although the presentation lists several factors that result in JQH's share price being below peer multiples, the presentation does not describe the valuation as contingent on any of these hypothetical factors. Plaintiffs also contend that none of the factors listed are proper grounds for a discount from fair value under Delaware law.

After reviewing the presentation and the minutes of the November 18, 2004 special committee meeting, it is not clear to the Court whether or not the valuation in the presentation was based on a "hypothetical" scenario in which the company remained public with Eilian taking control. If the valuation was not contingent on such a hypothetical scenario, then it appears to be information that a reasonable stockholder would find relevant in determining whether to vote to approve Eilian's $24 per share offer. If, on the other hand, the valuation in the presentation was based on such a hypothetical transaction-a transaction the Board likely could have determined in good faith was highly unlikely given Hammons's objectives-then the Board would likely not have violated their duty of disclosure by failing to disclose the presentation in the proxy statement. Accordingly,

defendants are not entitled to summary judgment on this claim.

### E. The Aiding and Abetting Claims

Plaintiffs assert a claim against Acquisition and Merger Sub for aiding and abetting a breach of fiduciary duty. To prevail on an aiding and abetting claim, a plaintiff must establish " '(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, ... (3) knowing participation in that breach by the defendants,' and (4) damages proximately caused by the breach ." [61] As a controlling stockholder, Hammons owed fiduciary duties to the minority stockholders, and the issue of fair dealing and fair price cannot be decided on summary judgment and therefore must remain for trial. Defendants assert that they are entitled to summary judgment on this issue because there is no evidence that Eilian's entities knowingly participated in a breach of fiduciary duty.

[61]  *Malpiede v. Townson,* 780 A.2d 1075, 1096 (Del.2001) (quoting *Penn Mart Realty Co. v. Becker,* 298 A.2d 349, 351 (Del.Ch.1972)).

**\*18**  "Knowing participation in a board's fiduciary breach requires that the third party act with the knowledge that the conduct advocated or assisted constitutes such a breach." [62] Eilian was intimately involved in the negotiations and structuring of the transaction and understood that Hammons and the minority stockholders were in a sense "competing" for the consideration he would pay to acquire JQH. An offeror, however, may bargain at arm's-length for the lowest possible price, and Eilian was permitted to negotiate both with Hammons and the special committee, so long as he did not have knowledge that those negotiations and the resulting transaction would cause a breach of duty to the minority

stockholders. As noted above, plaintiffs contend that Hammons's improper self-dealing conduct depressed the price of the minority shares, and plaintiffs could prevail at trial on the issue of fair dealing if they were able to make such a demonstration. Plaintiffs cite evidence that Eilian was aware of those conflicts and that they may have had an effect on the price of the minority shares. For example, plaintiffs point to Eilian's October 28, 2004 letter to the special committee, which cited "[p]erceived conflicts of interest with the controlling Class B shareholder" as an explanation for the underperformance of JQH shares, and Eilian's November 17, 2004 presentation that cited "unique issues of controlling shareholder" as a source of the Company's trading discount. Accordingly, there remains a material issue of fact as to whether Eilian was aware that JQH's stock price was depressed as a result of Hammons's improper self-dealing conduct. Accordingly, defendants are not entitled to summary judgment on this claim.

[62]  *Id.* at 1097.

### III. CONCLUSION

For the foregoing reasons, defendants' motions for summary judgment are granted in part and denied in part, and plaintiffs' motion for partial summary judgment is granted in part and denied in part. Counsel shall confer and submit a form of order that implements the rulings described above.

IT IS SO ORDERED.

### All Citations

Not Reported in A.2d, 2009 WL 3165613

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

# *TAB 6*

Case 1:18-cv-00475-SEB-TAB Document 1-2 Filed 02/16/18 Page 136 of 440 PageID #: 148
Matheson v. Kaiser Aluminum Corp., Not Reported in A.2d (1996)
1996 WL 33167234

1996 WL 33167234
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

Court of Chancery of Delaware.

Donald MATHESON and Marilyn T. Page, Plaintiffs,
v.
KAISER ALUMINUM CORPORATION, Maxxam,
Inc., George T. Haymaker, Jr., Robert M.
Cruikshank, Charles E. Hurwitz, Ezra G. Levin,
Robert Marcus and Robert J. Petris, Defendants.

No. CIV.A. 14900.
|
April 8, 1996.

**Attorneys and Law Firms**

William Prickett, Esq., Ronald A. Brown, Jr., Esq.,
Elizabeth M. McGeever, Esq., Prickett, Jones, Elliott,
Kristol & Schnee, for Plaintiffs.

Robert K. Payson, Esq., Donald J. Wolfe, Jr., Esq.,
Potter, Anderson & Corroon, for Defendants Kaiser
Aluminum Corporation, Robert Marcus, Robert J. Petris,
Robert M. Cruikshank and George T. Haymaker.

Martin P. Tullly, Esq., William T. Lafferty, Esq.,
Frederick H. Alexander, Esq., Morris, Nichols, Arsht
& Tunnell, for Defendants Maxxam, Inc., Charles E.
Hurwitz and Ezra G. Levin.

COURT'S RULING ON PLAINTIFFS' MOTION
FOR TEMPORARY RESTRAINING ORDER

BALICK, Vice Chancellor.

AFTERNOON SESSION

*2:38 p.m.*

**\*1** THE COURT: Apologies in advance if my voice is a
little hoarse. In addition to being tired, that's one of the
reasons that it's not a good idea to announce a decision
right after lunch.

We are here to rule on an application for a temporary
restraining order or preliminary injunction, to restrain a
scheduled stockholder meeting or implementation of the
reclassification. The meeting is scheduled for 9:00 o'clock
on April 10th in Houston, Texas, and it is now 2:40, April
8th in Wilmington, Delaware.

The standards for these applications are well known.
Plaintiff must show a colorable claim or a reasonable
probability of success. They must show irreparable harm.
And when the hardships are balanced-that is, the risk of
harm to the defendant resulting from a wrongful restraint
against the risk of harm to the plaintiff resulting from aN
erroneous failure to restrain-the balance must favor the
plaintiff.

I'm going to use the reasonable probability of success
standard here, because I'm going to decide the application
on the interpretation of the certificate of designations.
Both sides have pointed out that that is essentially a
question of law, and that makes the question of whether
plaintiffs have had an opportunity for discovery moot.

Assuming that plaintiffs are correct-or rather, have
a reasonable probability of being correct on the
interpretation of the designations, I agree with them that
it would follow that there would be irreparable harm.

First, I agree that restitution would not be feasible where
the rights of third parties who purchase the new stock
come into play.

Secondly, I agree that damages would not be adequate
because of the exculpatory clause and also, even if that
were not in effect, because of the difficulty of proving
damages with certainty at a point when the old stock no
longer exists, and the value it would have had be subject
to dispute by experts, no doubt.

I would also point out that it would seem to follow from
a finding that plaintiffs have a reasonable probability
of being correct on the interpretation question that they
would have a reasonable probability of being correct on
the class vote question.

In other words, if the proposed recapitalization changes
their conversion privilege, then the only question would
bewhether there is an adverse effect. I would think that

Case 1:18-cv-00475-SEB-TAB Document 1-2 Filed 02/16/18 Page 137 of 440 PageID #: 149
Nutka Jo J. v. Kaiser Aluminum Corp., Not Reported in A.2d (1995)
1996 WL 33167234

in that event they would be in a similar position to the common stockholders, who are being given a class vote because it's recognized that the characteristics of their stock are being changed, and, by implication, it's recognized that there is an arguable adverse effect.

Of course, the corporation believes, according to the proxy statement, that the benefits outweigh the detriments. I realize that, but I think the giving of the class vote to the common shareholders, as a practical matter, probably means that the preferred stockholders would be entitled to a similar class vote if the rights they have are being altered. If you make that assumption, it would be very clear that there would be irreparable harm, because an injunction is the appropriate remedy protect a right to a classvote.

**\*2** I'll now turn to the primary issue, the meaning of the certificate of designations. The cases are clear on the general standards. They are easy to state. They are not always easy to apply in a specific case. I won't attempt to restate them with any completeness or care, but the main ideas are that you try to find the intent of the parties as expressed in the document. You consider the whole contract and try to reconcile the various provisions in an effort to come to an interpretation of the meaning intended in the particular provision in issue.

It's not always possible to do that. We have cases where courts have explained that they have not been able to reconcile provisions, or they find redundancies, which is something else you prefer not to find. In other words, you attempt to interpret each of the provision so that they have a meaning and don't say the same thing. It was the Holland case in which there were irreconcilable conflicts. In the Warner Communications versus Chris-craft Industries case, the Court admitted it was left with a redundancy. In the Sullivan versus FSL Holdings case, the Court admitted that it could not explain apparent surplusage. So the goal of contract interpretation is strived for, but it's not always reached. You simply have to do the best you can with what you've got.

Another important rule is that preferences must be clearly expressed. To put the same point in another way, preferences are strictly construed. I believe that rule would apply here, although we are not really talking about a preference as such. We are talking about a protection against changing a preference.

A few words about what that means I think are in order. The cases make it clear that the rule of strict construction doesn't mean that you simply rule against a preference if you find any ambiguity, although it might have perhaps been expressed that way on occasion. I believe the question is whether the preference is expressed with sufficient clarity. That was the language used by Chancellor Josiah Walkup back in 1937, and it is repeatedly cited, with approval. After all, construction of a contract should be a practical enterprise. It's rare, or at least very difficult, to express ideas in complex commercial transactions with absolute clarity.

I don't think the standard requires absolute clarity. That was explained more recently by the Supreme Court in the Rhone-Poulenc versus American Motorists case. The Court pointed out that an ambiguity does not exist where the terms are tortured to find it, and the party who has found an "ambiguity" is not then able to say "we win" because of the rule of strict construction.

There the Supreme Court was interpreting an insurance contract. The rule that such contracts are strictly construed against the insurer is well-known, and yet the Court made a reasonable interpretation in favor of the insurer based on what reasonable persons in the position of the parties would have thought the language meant.

**\*3** Certificates of designation of preferred stock are particularly complex documents. Not only do you have the fundamental problem that exists with all interpretation-namely, words don't have fixed meanings-but you have the problem that you try to deal with every conceivable contingency. And sometimes your very exercise of care can introduce unintended ambiguity.

So we are not talking about any conceivable ambiguity. Or to put it another way, if you are weighing an ambiguity based on a strained interpretation against a reasonably clear meaning, although not absolutely clear, the latter prevails. To put it still another way, the ambiguity that would call the rule of strict construction into play would be two equally plausible interpretations.

I also want to point out that there is an important policy behind giving effect to the protections in certificates of designation where they are expressed with reasonable clarity. At common law, if I can use that term here, all

presumptions were against preferences, and that remains the rule. As a result, certificates of designation include many express protections.

The reason for that is obvious. If there were no protections, investors would be afraid to take the risk. If corporations are to be able to market preferred stock, investors have to be able to rely on protections when they are expressed with reasonable clarity. I believe that the Delaware cases are consistent with that idea. In the Waggoner versus Laster case, where the Supreme Court relied on the rule of strict construction, the plaintiffs were relying on a general reservation clause, which was insufficient in the face of the section of the general corporation law that requires the authority to grant such a power, in that case a super-voting power to be set forth expressly.

Similarly, in the Sullivan versus FSL Holdings case, the Court had the phrase "or otherwise," which was argued to refer to mergers. The Court was left with the principle of strict construction. There you had a general word that could have simply been surplusage resulting from an overabundance of caution. In other words, drafters can't think of anything specific, but just in case there is something, they put in an "or otherwise," or some other general clause, and then the Court is later asked to give that meaning.

So this is a rather long summary of the general principles. What we have to do now is to get into the language of this certificate of designations. I'll start with a brief summary of the parties' contentions.

Plaintiffs' first contention is that although the certificate does give notice that there might be a reclassification, what they are doing here is not a reclassification.

The second argument is that the use of the term upper case Common Stock amounts to a clear promise to preferred stockholders tha they have a right to convert into pre-reclassification or existing common stock. And, indeed, there is an express promise to reserve enough shares for that purpose.

 **\*4**  The third contention is what I'll call the structural contention. Plaintiffs say that the protections in Section 3(d) of the designations are antidilution protections, not

antidestruction protections, which are found in Section 3(e).

They point out that the antidilution provisions speak about an adjustment of the rate of conversion, which suggests the number of the pre-reclassification shares that they are entitled to get, and not a change in the kind. They point out that the drafter knew how to provide for a change in the kind. That was done in Section 3(e). It was not done in Section 3(d).

In response, the defendants make the following basic contentions. First of all, this is a reclassification. Defendants show how the term was used in this way in various cases. And defendants bolster that by pointing to the notice provision, Section 3(f). They point out that reclassifications are grouped with mergers and similar transactions, which involve an exchange, and not with dividends, distributions, rights or warrants, which do not.

I meant to ask counsel why subdivisions or combinations are excluded from that provision, but we'll let that pass. I'm certain it's not significant.

Next defendants argue that the definition of the term upper case Common Stock supports the defendants' interpretation and is inconsistent with plaintiffs'. They point out that upper case Common Stock is defined as fully paid and nonaccessible shares of lower case common stock of the corporation, and not as existing common stock or pre-reclassification common stock. They point out that there is precedent for basing an interpretation on a definition, and Cruden versus Bank of New York, is cited for that proposition.

Finally, in answer to plaintiffs' structural argument, defendants point out that the location of the antidilution protection is explained by the fact that it concerns changes in the common stock of the corporation, Kaiser Aluminum, and not exchanges for the common stock of a different corporation, as you would have in a merger and other similar transactions.

Turning to my evaluation of these various contentions, I will say a word about the question of whether what defendants are doing is a reclassification, even though the plaintiffs didn't press the argument today.

Mattes v. Kaiser Aluminum Corp., Not Reported in A.2d (1996)
1996 WL 33167234

I think it clear that it is a reclassification. But I wanted to add a reference to the case of Wood versus Coastal States, because I think it's a significant case, showing how the Supreme Court addressed a somewhat similar issue. There, the contention of the plaintiffs was that what was being done involved a recapitalization.

I'm not going to try to describe what was being done. It was very complicated. It was a settlement of a controversy over gas rates resulting from the energy crisis and involved a spin-off of a new corporation and the distribution of shares in the new spun-off corporation to the common stockholders and not to the preferred stockholders. The preferred stockholders sued. They wanted to be treated just like the common stockholders.

**\*5** The Court pointed out that a term like recapitalization doesn't have any fixed meaning. In some sense, what was done there was a recapitalization. The Court said, What we have to do is to decide whether it's the kind of recapitalization that was meant by the use of the term in these designations. The Court pointed that out in response to plaintiffs' argument that in the event of a recapitalization, they were protected by that antidestruction clause and should receive what the common stockholders received. The Court noted that that clause dealt with a situation where the common stockholders were getting something in lieu of common stock. In other words, that clause was meant for a case where the common stock was being eliminated. The common stock was not being eliminated in that case, and therefore the Court concluded that the recapitalization clause did not apply.

This case has an interesting comparison to that case. Here the plaintiffs are arguing that when you read the core language, and some of the other provisions surrounding it, you must come to the clear conclusion that it was not intended that a reclassification would eliminate the existing common stock and change it into something different.

So this is a reclassification. The issue we have to decide is whether it's a reclassification within the meaning of this certificate of designations; that is, whether it contemplates and gives fair notice that there will be a reclassification of the common stock such that the preferred stockholders will not have a right to convert into pre-reclassification common stock, or existing common stock, but rather,

a right to convert into whatever new common stock is issued, just like the common stockholders would be.

On this issue, defendants point to the notice provision, suggesting that it supports their interpretation by grouping reclassifications with mergers and similar transactions, and by indicating that there will be an exchange of stock, not simply the creation of a new class of common stock.

I do not think great weight can be placed on this provision. It deals with notice of adjustments. It does put reclassification with merger and similar transactions, but the basis of the distinction seems to be primarily between events that are likely to have a record date, such as dividends, distributions, rights or warrants, and events that are not. For the latter class, the notice indicates the effective date and the date of entitlement to an exchange, if any, since a close reading would seem to indicate that it could either apply to a reclassification involving an exchange of stock, or to a reclassification not involving an exchange of stock, I don't think it would be safe to put much weight on that particular provision.

In sum, we do have clear notice that there might be a reclassification. What we now have to decide is whether there is clear notice that there might be a reclassification involving an exchange of stock or just a reclassification of the kind that plaintiffs admit is provided for; namely, creating a new class of common stock and simply adjusting the rate of conversion of their preferred stock into the pre-reclassification stock.

**\*6** That brings me to the question of the definition. I think if you really consider this carefully, you ultimately come to the point that the meaning of the term upper case Common Stock is what is in dispute. The dispute centers on two points: First, the definition; and second, the use. Defendants argue the definition. Plaintiffs argue the use. By that I mean the use of that term, upper case Common Stock, in the very provision that we are focused on here, Section 3(d)(i)(4).

On the issue of definition, it's interesting to consider how these arguments were made. The plaintiffs first brief made a very powerful argument in support of their position. It was only when I received the defendants' brief that I realized that plaintiffs were assuming that upper case

Matter of O-I Kaiser Aluminum Corp., Not Reported in A.2d (1996)
1996 WL 33167234

Common Stock meant existing common stock, or pre-reclassification common stock.

Defendants pointed to the definition and said that's not what it means in the certificate of designations. That argument was startling. Then I proceeded to re-read the designations carefully once more, giving the term upper case Common Stock the meaning that defendants say it has. Defendants say that upper case Common Stock means whatever common stock the corporation might issue; in effect, it's a generic term.

There are some difficulties with that position. Putting aside a common practice of using upper case to refer to something specific, rather than something generic, and realizing that you could use it to refer to more than one class of common stock, even though at the time, there is only one class in existence. You have a fact-to me, it's a very important fact-that the restated certificate of incorporation, uses upper case Common Stock as the official designation of the existing stock, what you are calling penny par common stock.

As a technical matter, the designations are part of the certificate of incorporation, and it's confusing and unusual to use the very same term with two different meanings. The argument is made that the designation is later and it amends the certificate of incorporation. I think the response to that was on point. It certainly doesn't indicate that it's doing that. I have no doubt that it was understood by all that the official designation of the existing common stock was upper case Common Stock and that that wasn't changed by the certificate of designations.

Moreover, plaintiffs point out that the prospectus that was issued to invite purchases of the PRIDES states in the third paragraph that the PRIDES will convert into one share of the company's common stock, par value one cent perfect share, and in parentheses, the Common Stock, upper case.

As was said in Rhone-Poulenc and elsewhere, we must determine how a reasonable person, in this case an average investor, would understand that. I think it clear that that would be understood to mean exactly what it says. The fact that it's subject to adjustment in certain events does not in itself give fair notice that the qualities or characteristics of the common stock into which the investor would be entitled to convert might be changed.

**\*7** I would finally point out on this issue that the "definition" itself is ambiguous. I could be read as referring to the designated upper case Common Stock, as in the prospectus, rather than a definition. Although it says exactly what I read, I believe that an average investor would be quite likely to understand the term upper case Common Stock to mean the existing common stock, as designated in the certificate of incorporation.

That brings us to perhaps the most important element of the analysis. That is the actual use of the term. Here we come to this distinction between upper case and lower case in the provision in question. It says, "If the Corporation shall either...issue by reclassification of its shares of Common Stock any shares of common stock..."-it goes on to say, and I will paraphrase here because the terminology is cumbersome, and perhaps my paraphrase will be wrong. The owners of the PRIDES will get the number of shares of upper case Common Stock that they would have been entitled to receive after the reclassification if they had converted beforehand.

how would one understand this usage? I must conclude, after careful consideration, that it reinforces the plaintiffs' interpretation greatly. Defendants' explanation that since upper case and lower case mean the same thing, it really doesn't matter. Well, I think that undermines the argument that defendants' position is strongly-based upon, the "definition." Apparently, it matters. It certainly conveys the impression that if there is a reclassification, the preferred stockholders will be entitled to convert into the old or pre-reclassification or existing, whatever you want to call it, rather than the new.

The argument was made in the brief-it wasn't repeated here, but I'll address it in case it resurfaces, that of course lower case was used, because you can't use upper case until after the actual reclassification.

I don't think that makes any sense. I mean it does in general, but the problem with it is it's inconsistent because you are using upper case when you are talking about what the preferred stockholders will get after the reclassification. Moreover, if you are using the phrase as of the time you are referring to, the language that we are interpreting talks about the issuance of "common stock." That would be after the reclassification.

Case 1:18-cv-00475-SEB-TAB Document 1-2 Filed 02/16/18 Page 141 of 440 PageID #: 153
Matter of J.P. Kaiser Aluminum Corp., Not Reported in A.2d (1996)
1996 WL 33167234

Of course, the same reasoning would apply to the provision that plaintiffs also rest on, which wasn't mentioned too much in the argument. That is what was being promised in 3(k) where the designations say, "The corporation shall at all times reserve and keep available, free from preemptive rights, out of authorized but unissued shares of Common Stock, the maximum number of shares Common Stock into which all shares of PRIDES from time to time outstanding are convertible...," so on and so forth.

In the effort to construe the contract, we inevitably find ourselves brought into a close technical reading of various provisions, and one must force oneself to step back and try to look at it as an average investor would have long before this particular controversy caused the kind of close analysis that we have been forced to do.

 **\*8** By an average investor, we don't mean someone totally ignorant of commercial affairs. Quite the contrary. On the other hand, I don't think we mean a highly sophisticated corporate drafter or attorney. We try to find what a reasonable person would have understood the term to mean. I'm inevitably led to the conclusion that it would have seemed reasonably clear that the purchaser would have the right to convert into the existing common stock designated upper case Common Stock, as explained in the prospectus, as consistent with the use of the term in the provision dealing with reclassification, so on and so forth.

One can look at it in another way. I said earlier I believe- and I will come back to it. In a way, this case can be boiled down to two parties to a contract attaching a different meaning to particular words. There are rules of construction to deal with that. We look for the objective meaning. We look at what reasonable persons in the parties's positions would have understood, as was said in Rhone-Poulenc.

This topic is covered somewhat technically in the Restatement of Contracts (Second), Section 201. What it says is something like the following. I'll paraphrase: Would the corporation have reason to know that an average investor would understand upper case Common Stock to mean existing or pre-reclassification common stock? I think so. Would an average investor have reason to know that the corporation intended that the characteristics of the upper case Common Stock might be

changed? I think not. Under those circumstances, you give the interpretation of the average investor effect.

Put it another way. Does the language in the designations indicate that the corporation contemplated this kind of reclassification when it invited investors to purchase the PRIDES? It's hard to know. I will note that the life of the PRIDES at maximum is less than four years. If I'm not mistaken, about a year-and-a-half is left. If the corporation contemplated this kind of reclassification, it certainly could have said it much clearer than it did.

I think the point can be made best by referring to a case that the defendants put great reliance on, namely, Cruden versus Bank of New York. I agree completely with the proposition that the interpretation can be controlled by a definition. But let's look at the clearly labeled, precise definition in that case: "The term "Common Stock," when used with reference to stock of the Company, shall mean; the class of stock which, at the date of execution of this Indenture as originally executed,..." That was a trust indenture. This is a certificate of designation. The same contractual principles apply. That was my interpolation. I'll go back to the text. "...is designated as common stock of the Company and stock of any other class or classes into which such common stock or any such other class may thereafter be changed or reclassified...."

There I think you have a definition that puts purchasers on clear notice that there might be a reclassification of the kind that defendants want to pursue here.

 **\*9** Defendants have argued about the general understanding of what conversion adjustment protections are, I have considered that. If you phrase that at a high enough level of generality, there is force to the point that they basically put preferred stockholders in the position of common stockholders, or treat them as you would common stockholders. There is some force to that, but it's a very general statement.

I don't think it can be used to take the focus away from the precise language in the designations which the purchasers are entitled to rely on. I don't think you can read our cases as going through a ritual and always coming to the conclusion that the argued protection isn't present.

In any event, I've attempted to apply the canons of construction, including the canon of strict construction of

1996 WL 33167234

preferences, as carefully and as impartially as I can. I come to the conclusion that the interpretation argued for by the plaintiffs has a reasonable probability of being correct.

I won't go on. I think I'll end up saying the same thing in different ways, as we all do as we wrestle with these issues. I'll simply conclude that based on the analysis of the other standards, once I find a reasonable probability of success on the interpretation issue, it follows that plaintiffs have satisfied the requirements of showing irreparable harm and that the balance of hardships favors them.

So for these reasons, I'll grant a preliminary injunction. Plaintiffs can submit a form of order, and if there is any issue on the language, we'll address it at that time.

All right? We recess.

**All Citations**

Not Reported in A.2d, 1996 WL 33167234

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

# *TAB 7*

KeyCite Yellow Flag - Negative Treatment

Distinguished by Owen v. Cannon, Del.Ch., June 17, 2015

2014 WL 4383127
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

Court of Chancery of Delaware.

In re Nine Systems Corporation
Shareholders Litigation

Consol. C.A. No. 3940-VCN
|
Submitted: April 1, 2014
|
Decided: September 4, 2014

**Attorneys and Law Firms**

Anne C. Foster, Esquire, Blake Rohrbacher, Esquire,
and Susan M. Hannigan, Esquire of Richards, Layton
& Finger, P.A., Wilmington, Delaware; Lawrence D.
Rosenberg, Esquire, Paul V. Lettow, Esquire, William G.
Laxton, Jr., Esquire, Alexander E. Blanchard, Esquire,
Bryan L. Jarrett, Esquire, and Sarah A. Hunger, Esquire,
of Jones Day, Washington, D.C., Attorneys for Plaintiffs.

Richard D. Heins, Esquire, Andrew D. Cordo, Esquire,
Stacy L. Newman, Esquire, and Phillip R. Sumpter,
Esquire of Ashby & Geddes, Wilmington, Delaware;
Adam C. Silverstein, Esquire and Stanley L. Lane, Jr.,
Esquire of Otterbourg, PC, New York, New York,
Attorneys for Defendants.

**MEMORANDUM OPINION**

NOBLE, Vice Chancellor

## I. INTRODUCTION

**\*1** The board decisions and stockholder actions at the
heart of this lawsuit present one of the long-standing
puzzles of Delaware corporate law: for a conflicted
transaction reviewed by this Court under the entire
fairness standard, "[t]o what else are shareholders entitled
beyond a fair price?" [1] The entire fairness standard of

review has long mandated a dual inquiry into "fair
dealing and fair price" [2] that this Court should weigh as
appropriate to reach a "unitary" conclusion on the entire
fairness of the transaction at issue. [3] Delaware courts have
contemplated this issue before. [4] What unites the resulting
range of explications of this area of Delaware law is the
principle that the entire fairness standard of review is
principally *contextual*. That is, there is no bright-line rule
on what is entirely fair.

[1] Ronald J. Gilson & Jeffrey N. Gordon, *Controlling
Controlling Stockholders,* 152 U. Pa. L.Rev. 785, 798
n.41 (2003) ("The court's reasoning [in *Weinberger
v. UOP, Inc.,* 457 A.2d 701 (Del.1983) ] is unclear.
Suppose the price is entirely fair, but the process is
faulty. To what else are shareholders entitled beyond
a fair price?").

[2] *Weinberger,* 457 A.2d at 711.

[3] *See Kahn v. Tremont Corp.,* 694 A.2d 422, 432
(Del.1997).

[4] *See, e.g., Reis v. Hazelett Strip–Casting Corp.,* 28
A.3d 442, 467 (Del. Ch.2011) (citing *HMG/Courtland
Props., Inc. v. Gray,* 749 A.2d 94, 116 (Del. Ch.1999))
("Depending on the facts and the nature of the loyalty
breach, the answer can be a 'fairer' price.").

Here, the Court concludes that a price that, based on the
only reliable valuation methodologies, was more than fair
does not ameliorate a process that was beyond unfair.
At least doctrinally, stockholders may be entitled to
more than merely a fair price, but the difficulty arises
in quantifying the value of that additional entitlement.
A more challenging question thus arises: what damages
may stockholder plaintiffs receive where the transaction
at issue was approved and implemented at a fair price?
This memorandum opinion contemplates one practicable
—and contextual—answer to that question.

This action centers on the 2002 recapitalization (the
"Recapitalization") of a two-year-old start-up company
in the streaming media industry: Streaming Media
Corporation, later known as Nine Systems Corporation
("SMC," "Nine Systems," or the "Company"). In
the Recapitalization, several Defendants increased their
equity, and correspondingly diluted the Plaintiffs' equity,
in the Company. Around four years later, in November
2006, the Company sold itself to Akamai Technologies,
Inc. ("Akamai") for approximately $175 million. The

Case 1:18-cv-00475-SEB-TAB Document 1-2 Filed 02/16/18 Page 145 of 440 PageID #: 157
In re Nine Systems Corporation Shareholders Litigation, Not Reported in A.3d (2014)

2014 WL 4383127

Plaintiffs, contending that the Recapitalization was a dilutive, conflicted transaction that was not entirely fair, seek over $130 million in damages, plus interest, from the Defendants.

The five members of the Company's board of directors (the "Board") were each appointed, formally or otherwise, to reflect the interests of different stockholders: (i) Art Williams ("Williams") and then Troy Snyder ("Snyder"), each as the Company's Chief Executive Officer ("CEO"), presumably represented management; (ii) Dort A. Cameron, III ("Dort Cameron") represented Wren Holdings, LLC ("Wren"); (iii) Howard Katz ("Katz") represented Javva Partners, LLC ("Javva"); (iv) Christopher Shipman ("Shipman") represented Catalyst Investors, L.P. ("Catalyst"); and (v) Abrahim Biderman ("Biderman") represented a group of minority stockholders introduced to the Company through Biderman's investment firm, Lipper & Co. ("Lipper").

 *2 By the beginning of 2002, Wren, Javva, and Catalyst owned approximately 54% of the Company's stock and held over 90% of its senior debt. The Plaintiffs owned approximately 26% of the Company's stock. Through the Recapitalization, Wren and Javva invested additional money in exchange for convertible preferred stock. In dispute is whether Catalyst received an option, formal or otherwise, to participate in the capital raise on the same terms as Wren and Javva. The new capital was to enable the Company to make two acquisitions: (a) a division of eMedia ("e-Media"); and (b) the streaming media group of NaviSite ("NaviSite SMG"). The Plaintiffs were not aware of the Recapitalization until after it was implemented.

The Board did not obtain any independent valuation of the Company, eMedia, or NaviSite SMG during the Recapitalization. Rather, the person most responsible for determining the relative values of the Company and the acquisitions, as well as the accompanying conversion rates for the convertible preferred stock, was Andrew T. Dwyer ("Dwyer"), who owned just under half of Wren. Dwyer's valuation, which he came to on his own during several weeks in December 2001 and January 2002, was admittedly "back of the envelope": a series of handwritten guesstimates scratched out on a single piece of paper. Several of the terms then changed, in favor of the Defendants who participated, from when the Board initially approved the Recapitalization in January

2002 to when it issued the convertible preferred stock in August 2002. Also in August, a majority of the Company's common stockholders—Wren, Javva, and Catalyst—approved certain necessary changes to the Company's charter. Despite a general notice sent to stockholders about the Recapitalization, specific details about its key terms—most importantly, who was receiving the convertible preferred stock and on what terms—were not disclosed to the Company's other stockholders, including the Plaintiffs.

For the better part of the four years after the Recapitalization, the Company had sporadic, if any, communications with most of its stockholders. SMC became Nine Systems and moved its headquarters across the country. Some stockholders may have been notified of certain of these or similar developments, but never more than once a year. There were no annual meetings or director elections. The Company's strongest outreach effort yielded a February 2006 informational meeting that had "[l]ess than a handful" of attendees. [5]

[5]     Trial Tr. ("Tr.") 971 (Snyder).

By mid–2006, the Company was attracting the interest of larger competitors in the streaming media industry. In June, the Company repurchased 44,000 shares of stock from one of its earliest investors, Thomas Murphy, for $1.00 per share. Later, in August, what started out as a $25 million capital raise soon evolved into a bidding war. Akamai eventually acquired the Company in November 2006 in a $175 million merger (the "Akamai Merger"), in which each stockholder of the Company received consideration worth approximately $13.00 per share.

Almost all investors made a return on their initial investment in the Company because of the Akamai Merger. Some stockholders, however, made more of a return than others. When several of the Company's minority stockholders learned details about the potential conflicts of interest in the Recapitalization (presumably through the Akamai Merger proxy materials), those former stockholders filed suit and challenged the Recapitalization's fairness. More stockholders would later bring additional claims, and this litigation has existed (in one form or another) for around six years.

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:18-cv-00475-SEB-TAB   Document 1-2   Filed 02/16/18   Page 146 of 440 PageID #: 158
In re Nine Systems Corporation Shareholders Litigation, Not Reported in A.3d (2014)
2014 WL 4383127

This case was tried over eleven days and involved approximately one thousand exhibits. The Plaintiffs' claims presented at trial were:

**\*3** • Breach of fiduciary duty and unjust enrichment against Wren, Javva, and Catalyst as a purported control group that arranged the Recapitalization on unfair terms;

• Breach of fiduciary duty against Dort Cameron, Katz, Shipman, and Snyder for (i) approving the unfair Recapitalization, and (ii) failing to disclose purportedly material information about the Recapitalization to the Company's stockholders;

• Aiding and abetting against Dwyer, Wren, Javva, and Catalyst for their conduct in the Recapitalization;

• Unjust enrichment against Cameron Family Partnership, L.P. ("CFP") for holding, at the time of the Akamai Merger, some of the convertible preferred stock that Wren had received in the Recapitalization; and

• Fraud against Dort Cameron, Katz, Shipman, and Snyder for their conduct in the Company's repurchase of stock from Thomas Murphy. [6]

The Defendants contend that the Plaintiffs' challenge to the Recapitalization must fail for lack of standing. Alternatively, the Defendants argue that the Recapitalization was entirely fair, and they also raise other defenses. Assuming that the Recapitalization was subject to entire fairness review, the parties presented expert testimony on the Company's value before, during, and after the Recapitalization.

[6]     Pretrial Stipulation and Order ("Pretrial Stip.") ¶ 29.

This post-trial memorandum opinion represents the Court's findings of fact and conclusions of law. For the following reasons, the Court concludes that: (i) the Plaintiffs have standing to challenge the Recapitalization through a direct expropriation claim because (a) Wren, Javva, and Catalyst together represented a control group that, through their collective majority ownership of the Company, effected the Recapitalization to the exclusion and dilution of the Plaintiffs, or (b) alternatively, a majority of the directors who approved the Recapitalization were conflicted due to their fiduciary relationships with the entities that received

the opportunity, not shared with the Company's other stockholders, to invest in the dilutive, convertible preferred stock; (ii) the Recapitalization, although it was approved and implemented at a fair price, was not entirely fair because of the Defendants' grossly unfair dealing; and (iii) Dwyer and (to the extent they were not a control group) Wren, Javva, and Catalyst are liable for aiding and abetting these breaches of fiduciary duty. But, given the only reliable valuation evidence, the Court concludes that the Defendants who breached their fiduciary duties or who aided and abetted those breaches are not liable for monetary damages. That said, the Plaintiffs are granted leave to petition the Court for an award of attorneys' fees and costs.

Separately, the Court also concludes that the Defendants are entitled to judgment in their favor on the Plaintiffs' other claims, including Thomas Murphy's fraud claim.

## II. THE PARTIES

A. *The Plaintiffs*

Two former stockholders of the Company (the "Dubroff Plaintiffs") filed a putative class action lawsuit against the Defendants in August 2008. In 2009, the Court dismissed the Dubroff Plaintiffs' claims other than their disclosure claim. [7] The Court then denied class certification in August 2010. [8]

[7]     See *Dubroff v. Wren Hldgs., LLC,* 2009 WL 1478697 (Del. Ch. May 22, 2009) ("*Dubroff I*").

[8]     See *Dubroff v. Wren Hldgs., LLC,* 2010 WL 3294219 (Del. Ch. Aug. 20, 2010) ("*Dubroff II*").

**\*4** Forty-three former stockholders (the "Fuchs Plaintiffs") then filed individual claims against the Defendants in November 2010. The Court dismissed the Fuchs Plaintiffs' unjust enrichment claims against Dort Cameron, Katz, Shipman, Snyder, and Dwyer, and it granted in part the Fuchs Plaintiffs' motion for permissive intervention and consolidation in 2011. [9] The Fuchs Plaintiffs are composed of three identifiable groups of former stockholders: (i) individuals who initially invested in the Company by purchasing membership interests in Streaming Media Investment Group, LLC ("SMIG"), an investment vehicle formed by Lipper for "administrative convenience" [10] that dissolved and transferred its stock

in the Company to its former members in 2002 (the "SMIG Plaintiffs"); [11] (ii) the "Preferred A Plaintiffs" on whose claims the Court granted summary judgment in the Defendants' favor in 2013; [12] and (iii) four stockholders who invested directly in the Company. [13]

[9]      See *Dubroff v. Wren Hldgs., LLC,* 2011 WL 5137175 (Del. Ch. Oct. 28, 2011) ("*Dubroff III*").

[10]      Tr. 1062 (Biderman).

[11]      The SMIG Plaintiffs are: J. Paul Amaden, James P. Amaden, David Horowitz, Howard Horowitz, Steven Horowitz, Carrie Keating, John Keating, Gregory Loprete, Michael Loprete, Caroline Reckler, Gillian Reckler, Jon Reckler, Stephanie Reckler, Shlomo Schon, Edward Strafaci, Linda Strafaci, Joanne Visovsky, and Michael Visovsky.

[12]      See *In re Nine Sys. Corp. S'holders Litig.,* 2013 WL 771897 (Del. Ch. Feb. 28, 2013) ("*Nine Sys. Corp. I*").

[13]      These four stockholders are: Morris Fuchs, Bernard Fuchs, The Greenberg Family Fund d/b/a ASR Ventures LLC, and The Golden Family Fund, LLC.

Finally, six additional stockholders (the "Kim Plaintiffs") filed claims against the Defendants in October 2012. The claims of two of the Kim Plaintiffs were dismissed in 2013. [14] The remaining Kim Plaintiffs (the "Founding Stockholders") are: (i) Rick Murphy, the Company's founder and first CEO; (ii) Thomas Murphy, Rick Murphy's father and the first investor in the Company; (iii) Rounseville Schaum ("Schaum"), the Company's first Chief Financial Officer ("CFO"); and (iv) Newport Capital Partners, Inc., the entity through which Schaum invested in the Company.

[14]      See *In re Nine Sys. Corp. S'holders Litig.,* 2013 WL 4013306 (Del. Ch. July 31, 2013) ("*Nine Sys. Corp. II*").

The remaining Fuchs Plaintiffs and the Founding Stockholders are the "Plaintiffs" for purposes of this memorandum opinion.

## B. *The Defendants*
The Defendants are: (i) three stockholders of the Company (Wren, Javva, and Catalyst); (ii) those stockholders' representatives on the Board during the Recapitalization in 2002 (Dort Cameron, Katz, and

Shipman); (iii) the Company's CEO and a director appointed in May 2002 (Snyder); [15] and (iv) an individual (Dwyer) and an entity (CFP) affiliated with Wren.

[15]      Joint Exhibit ("JX") 219.

Wren, Javva, and Catalyst were stockholders of the Company by October 2000, and they had representatives on the Board by September 2001. Dort Cameron owned approximately 50% of Wren and was its managing member. [16] Dwyer owned the other approximately 50%. [17] Katz was the managing member and principal of Javva. [18] Shipman was a partner of Catalyst, and he served as Catalyst's representative on the Board until May 2006, when an associate who worked with him on the SMC/Nine Systems investment, non-party Tyler Newton ("Newton"), took over that position. [19] These and the other Board members generally did not receive compensation for their service as directors, likely due to the Company's continually struggling financial condition. For perhaps a similar reason, the Company did not purchase directors and officers liability insurance.

[16]      Pretrial Stip. ¶ 10.

[17]      JX 684 ¶¶ 44–45.

[18]      Pretrial Stip. ¶ 8.

[19]      Pretrial Stip. ¶ 9.

Before their common investment in the Company and representation on the Board, none of Wren, Javva, or Catalyst had any material relationship with one another. The only connection among any of these entities or their representatives was that Newton was a college classmate and friend of Dort Cameron's son, Seth Cameron. [20]

[20]      JX 609 (Newton Dep.) at 29–30.

## C. *Key Non-parties*
**\*5** Biderman was the fifth member of the Board during the Recapitalization and until the Akamai Merger. He was an executive vice president at Lipper, a New York-based investment firm. Two of his junior colleagues at Lipper, Emily Grad ("Grad") and Patti Koo ("Koo"), worked with him on the SMC/Nine Systems investment. Lipper presented most of the Fuchs Plaintiffs with the opportunity to invest in the Company.

Biderman's religious practices feature somewhat prominently in the story of the Board's consideration and approval of the Recapitalization. Biderman is an observant Orthodox Jew, and, therefore, he is unable to transact any business on the Sabbath from sundown Friday to sundown Saturday. Often, he would have to leave Lipper's offices early in the afternoon on Fridays, especially in the winter months, to attend services. He made his "not negotiable" religious constraints known to the other directors "[f]rom the beginning" of his membership on the Board in June 2001. [21]

[21]      JX 645 (Biderman Dep.) at 713–14; JX 1045–0002.

## III. BACKGROUND

A. *The Founding of the Company*
In 1999, in the midst of the dot-com boom in the United States, Rick Murphy, Thomas Murphy, and Schaum founded the Company. They anticipated that it would be able to capitalize on the growth of a nascent technology: broadband streaming. [22] Thomas Murphy was the first investor. Rick Murphy was the first CEO, and Schaum was the first CFO. Wren, Javva, and Catalyst would all come to be stockholders of the Company by October 2000, and debtholders the following year.

[22]      JX 684 ¶¶ 35–37.

B. *The Early Days of the Streaming Media Industry*
The increasing speed and growing availability of broadband Internet access in the early 2000s was expected to revolutionize how consumers would interact with online content. Streaming media was thought to be one of the primary means to that end. Catalyst expected it to become "a 'killer app' that helps drive growth in broadband penetration." [23] It also had the potential to be financially lucrative: at the time, Bear Sterns estimated that the market for broadband streaming media would grow from $300 million in revenue in 2000 to approximately $5.7 billion in 2005. [24]

[23]      JX 113–0007.

[24]      *Id.*

The Company appeared to be well-positioned to take advantage of industry's anticipated growth through its broadband-focused network architecture. [25] Catalyst thought the Company owned a "high-quality, low-cost network" that provided a "distinct cost advantage over its competitors." [26] However, despite the enthusiasm of many individuals initially involved with the technology, there was a not-so-minor problem: the Company was suffering disruptive cash flow problems that threatened its continued existence.

[25]      Tr. 28 (Mountanos), 92 (Hampe).

[26]      JX 113–0001.

C. *The Capital Structure "Restart"*
In April 2001, Shipman sent a letter to Biderman at Lipper stating that Catalyst and the Company's other significant investors were contemplating a $4.6 million round of equity financing. In Shipman's words, this was "essentially a 'restart' of the Company's capital structure." [27] Javva's Katz testified that the repeated references to "we" in this letter referred to Shipman, Dort Cameron, and himself. [28] The letter noted that "we" did not believe that it was appropriate for Biderman to join the Board, despite his receiving a "firm commitment" to become a director only several months earlier. [29]

[27]      JX 111.

[28]      Tr. 2026–27 (Katz).

[29]      *Id.* 1096 (Biderman).

**\*6** The letter sought to have Biderman encourage various holders of the Company's bridge debt, who had invested by way of Lipper, to convert into equity. Shipman suggested that, absent conversion, "we" might pursue "pari passu or secured debt in front of or alongside the bridge debt." [30] However, Shipman also noted, "We would absolutely welcome new funds from Lipper and its affiliates on the same terms and conditions which we are buying in at." [31]

[30]      JX 111.

[31]      *Id.*

After some discussions, many of the Lipper-affiliated investors would convert their debt into common stock.

### D. *The Catalyst Memo*

Several days later, on April 27, 2001, Shipman, Newton, and Catalyst's controller authored a thirteen-page Investment Memorandum (the "Catalyst Memo") to Catalyst's Investment Committee outlining the prospects for the firm's continued investment in the Company. [32] The equity investment proposal shared with Biderman shifted to a possible debt investment. The authors sought approval to invest an additional $1 million during a three-to-four month "trial period" in which Wren, Javva, and Catalyst would implement an "austerity program ... to cut costs and monitor revenue traction." [33]

[32]    JX 113.

[33]    *Id.* at 0002.

Part of the planned revamp of the Company was to replace management. Specifically, Catalyst intended to replace Murphy as CEO and Schaum as CFO. The Catalyst Memo further provided that:

> The Board of Directors (namely Catalyst) will control the purse strings of the Company, and will make bi-weekly funding decisions that minimize cash outflows. All money advanced will be in the form of senior secured debt with attached warrants (double dip) at a decreased valuation ($10 million), a 2x liquidation preference, and other terms that effectively give Catalyst (and to a lesser extent, [Wren] and Javva) control over the Company. [34]

In their description of the anticipated rights that Catalyst would receive for this additional investment, the authors again noted that "Catalyst will effectively control all major decisions made by the Company." [35]

[34]    *Id.*

[35]    *Id.* at 0004.

Various persons at the Company—including Rick Murphy and Schaum—were not shown the Catalyst Memo. [36] Neither did Biderman see it. [37]

[36]    Tr. 320–21 (R. Murphy), 1554–55 (Schaum).

[37]    *Id.* 1100–06 (Biderman).

### E. *The Company's Business Plan in the Midst of Management Changes*

In late 2000, the Company engaged Daniels & Associates, L.P. ("Daniels"), a financial advisor, to raise additional capital. [38] Their business relationship appears to have had extended periods without much activity. Daniels eventually compiled an investment memorandum to solicit $5 to $8 million in senior secured debt. An early version of the memorandum was presented to the Board at a meeting in June 2001. [39] A December 2001 draft of the memorandum (the "Daniels Memo") included several years of revenue projections for the Company: $889,528 for 2001; $11,175,725 for 2002; and $31,149,000 for 2003. [40] These projections were based primarily on assumptions about expanding the Company's sales department. [41]

[38]    JX 85.

[39]    JX 1045–0044–79.

[40]    JX 154–0005. The Defendants object to the Daniels Memo and the included projections on the grounds of authenticity and hearsay. Defs.' Post–Trial Answering Br. ("Defs.' Answering Br.") 24 n.26. The Plaintiffs contend that Bob Hampe ("Hampe"), the Company's Senior Vice President for Operations at the time, authenticated the Daniels Memo and the projections. Pls.' Post–Trial Opening Br. ("Pls.' Opening Br.") 109 n.59 (citing Tr. 110–16 (Hampe)). The Court concludes that this document is admissible to the extent it is relied upon in this memorandum opinion.

[41]    Tr. 137 (Hampe).

**\*7** Daniels was generally unsuccessful in raising additional capital for the Company. [42] Instead, the Company raised several million dollars from existing investors. [43]

[42]    *Id.* 425 (R. Murphy).

[43]    JX 232–0003.

As had been contemplated in the Catalyst Memo, top management at the Company was soon replaced. Rick Murphy was asked to resign, and Williams took over as CEO and as a director in mid-to-late 2001. [44] Also, around this time, Schaum left the Company, and Lorain Granberg ("Granberg") became the Company's CFO. [45]

[44]    JX 147, 618 (Williams D ep.) at 16–17.

[45]    Tr. 344–45 (R. Murphy), 1554–55 (Schaum); JX 615 (Granberg Dep.) at 24.

On his way out of the Company, Rick Murphy sought to salvage his position (or at least good standing) by proposing that the Company look into minor acquisitions to increase its cash flows. [46] Potential targets included e-Media, which was one the Company's small competitors, and NaviSite SMG, which provided a streaming media software platform known as Stream OS. Rick Murphy continued to perform diligence on those acquisitions even after he left the Company. [47] He shared most of this information with Dwyer, Williams, and several others, but Biderman (who became a director in June 2001) was generally not informed. [48]

[46]    Tr. 347–50, 354, 372 (R. Murphy), 663–65 (Snyder).

[47]    JX 157

[48]    Tr. 1115–17 (Biderman), 1694–95 (Shipman), 2233 (Dwyer).

After he took over as CEO, Williams' business plan for the Company was, in part, to expand its customer base and revenues through small acquisitions. [49] He continued the process that Murphy had already begun with e-Media and NaviSite SMG. [50] Both potential acquisitions had stronger revenues and cash flows than the Company.

[49]    JX 618 (Williams Dep.) at 72–79.

[50]    JX 697 (R. Murphy Dep.) at 530, 546–50, 558.

F. *The Major Events of December 2001*

    1. *Stock Ownership of the Company*
By December 2001, as a result of their initial and subsequent investments, Wren, Javva, and Catalyst together owned 54% of the Company's stock. [51] Those three stockholders, which also held over 90% of the

Company's senior debt, [52] each had a designee on the Board; Wren's Dort Cameron, Javva's Katz, and Catalyst's Shipman. [53] Wren's Dwyer, although not a director himself, often attended Board meetings and would regularly lead the Board's deliberations. For comparison, the Plaintiffs collectively held approximately 26%. Biderman was thought to be the Lipper-affiliated Plaintiffs' representative on the Board.

[51]    JX 1000 at ¶ 5.

[52]    JX 0181–0006.

[53]    JX 1000 at ¶ 40.

    2. *The December 21, 2001 Board Meeting*
Near the end of 2001, the Company was facing what CFO Granberg described as "panic": it was quickly running out of money. [54] On several prior occasions, the Company had needed interim funding to meet payroll. [55] The situation came to a head this time in December.

[54]    JX 615 (Granberg Dep.) at 60.

[55]    JX 111.

On December 20, Williams scheduled a Board meeting for Friday, December 21 at 2:00 p.m. This meeting would be to discuss the possible acquisitions of e-Media and NaviSite SMG as a way to boost the Company's revenues to positive, or at least to breakeven. Although Williams would schedule Board meetings, the trial record supports the inference that several directors and Dwyer (but not Biderman [56]) would have been consulted about their availability on December 21. Part of the hurry in scheduling the meeting was a concern that any acquisition needed to close quickly; e-Media was thought to have been in poor financial condition, similar to the Company's own predicament. [57]

[56]    JX 159.

[57]    JX 185–0001, 632 (Grad Dep.) at 237–38.
         The Court notes that, although the Company was struggling through a financial crisis, this was not an unexpected emergency. Had the Defendants adequately discharged their fiduciary duties leading up to December 2001, they would have been aware of this issue well in advance of December 20.

**\*8** However, December 21 also happened to be the winter solstice, the shortest day of sunlight of the year. Biderman, because of his religious obligations, was unable to attend a Board meeting at that time of day on a Friday in winter. [58] The Board was generally aware of these restrictions on his availability, [59] but they rejected his request to reschedule this meeting. [60]

[58]    Tr. 1118–21 (Biderman), 790–91, 799–80(Koo), 1476–78 (Grad).

[59]    *Id.* 1701–02 (Shipman), 2237 (Dwyer).

[60]    *Id.* 1118 (Biderman).

3. *Dwyer Starts to Plan the Recapitalization*
Around Christmas, Williams contacted Dwyer and asked him to "figure out how [the Company] could raise money" in order to "stay alive." [61] Dwyer, generally working on his own, then began to sketch out what would become the Recapitalization. The Recapitalization would include two primary steps: (a) a conversion of certain secured debt to a new class of preferred stock; and (b) a class of convertible preferred stock to be issued in exchange for new capital that would finance the proposed acquisitions.

[61]    *Id.* 2514 (Dwyer).

4. *Biderman's Objection to the Proposal*
Biderman only learned about what happened at the December 21 Board meeting through a phone call with Dwyer the following Monday. [62] There are no minutes for this meeting in the record.

[62]    *Id.* 1123–24 (Biderman); JX 645 (Biderman Dep.) at 718–19, 731–32.

From what he was told, the meeting was to discuss the terms of the Company's proposed acquisitions. [63] On December 28, Biderman submitted a harshly worded objection to the proposal through which he expressed his strong dissatisfaction with what he thought was the unfair dilution of the Company's existing stockholders by up to 70%. His letter stated, in part:

I would expect that the Board, in the exercise of its fiduciary duty to *all* of the Company's shareholders, will give this extraordinary corporate event the proper attention, consideration and due diligence that it

deserves. Such an acquisition should, at a minimum, be reviewed and considered by the Company's Board of Directors as a whole. Moreover, all directors should be kept well-informed on a timely basis of all relevant facts concerning the acquisition and the effect of the acquisition on the Company and all of its shareholders. As a result, I would expect that the Company and the directors who are involved in the due diligence of this acquisition will forward all relevant information to all directors on a timely basis.

Moreover, as a director and shareholder of the Company, I find the possible dilution of existing shareholders' ownership interest in the Company as a result of the potential acquisition to be of great concern. In the event that the proposed acquisition were to proceed, the directors must carefully value the Company to ensure that the valuation is fair to *all* shareholders. This is especially important given that certain shareholders, who are represented on the Company's Board of Directors, may stand to benefit as a result of the transaction.

I look forward to continue working together for the best interests of Streaming Media Corporation. [64]

This letter reflected the growing tension between Dort Cameron, Katz, Shipman, and Dwyer, on the one hand, and Biderman, on the other, over what would become the Recapitalization.

[63]    JX 159.

[64]    *Id.*

There was no response to Biderman's letter. [65]

[65]    Tr. 1131 (Biderman), 1699 (Shipman).

G. *The Recapitalization Becomes Concrete in January 2002*

1. *January 7: Dwyer Proposes Initial Terms*
**\*9** The Board held its first meeting of 2002 on January 7 to discuss the latest developments in the Recapitalization. Biderman attended this meeting, along with Lipper's Grad and Koo. Wren's Dwyer and Catalyst's Newton also attended. [66]

[66]    JX 166.

Case 1:18-cv-00475-SEB-TAB Document 1-2 Filed 02/16/18 Page 152 of 440 PageID #: 164
In re Nine Systems Corporation Shareholders Litigation, Not Reported in A.3d (2014)
2014 WL 4383127

At the meeting, Dwyer outlined the economic terms of his proposal. By this time, the general terms of the acquisitions had started to take shape, but the specifics were still being negotiated. The e-Media acquisition, which was primarily for customer contract assets, was expected to cost $1 million in cash and a convertible promissory note of up to $3.6 million. The NaviSite SMG acquisition, which was largely for its successful Stream OS business, was expected to cost $1.3 million in cash up front and another $1.3 million in twelve months. [67]

[67]    *Id.* at 0004.

Dwyer presented to the Board his valuation of the Company: $4 million. [68] He had performed this calculation on his own, documented by "handwritten scribbles." [69] The Board did not review the calculations that supported this valuation because Dwyer did not share the methods he used to arrive at that figure with the directors. [70] Thus, no member of the Board was able to testify as to his understanding of how Dwyer came to value the Company at $4 million. [71]

[68]    Ironically, Dwyer thought that $4 million was such a high value for the Company that using it "would avoid this litigation." Tr. 2521 (Dwyer).

[69]    Tr. 2029–30 (Katz), 2242, 2521, 2611–12 (Dwyer), 2677 (D.Cameron).

[70]    *Id.* 2242, 2521, 2611–12 (Dwyer).

[71]    Dwyer valued the Company by comparing the revenue and acquisition prices for eMedia and NaviSite SMG and by adding an acquirer premium. *See id.* 2525 (Dwyer) ("I wanted to have a price that was greater than either of the acquisitions, because we were the acquiring company. And I thought SMC, as an acquiring company, should get some sort of premium for being the acquirer."); *id.* 2527 (Dwyer) ("So I came up with a number of $4 million, for two reasons: One, it was higher than either of the other companies, even though Streaming Media Corporation was much lower; and, two, that when you did that $4 million, even though SMC debt was impaired, which it clearly was, you had capital leases, negative working capital, and $5.7 million. There was going to be some substantial part of this enterprise that would go to SMC. And then the proposal was that the SMC secured creditors make a deal with the common shareholders where they get part of the SMC

part of the transaction. And that way, the common shareholders, who started off initially behind a whole bunch of debt in a tiny little company, would own something in a much, much bigger company that had some opportunity to be worth something some day.").

    The Court does not doubt that Dwyer believed this valuation was appropriate at the time. Whether he is correct, there may be room to doubt. Whether the process by which he valued the Company could have been better, however, there is no doubt.

Dwyer's plan provided that the new investors who facilitated the e-Media and NaviSite SMG acquisitions would own approximately 40% of the combined entity, with current stockholders owning 30% and other constituents (including management and NaviSite SMG's parent) owning the remaining 30%. [72] The post-acquisitions enterprise value of the Company was thought to be its $4 million value plus the money used to fund the acquisitions. [73] No one at the January 7 Board meeting presented any alternative to Dwyer's proposal.

[72]    JX 167.

[73]    JX 166–0004.

**\*10** Four of five directors—Dort Cameron, Katz, Shipman, and Williams—voted in favor of the Recapitalization. Consistent with his position in the December 2001 letter, Biderman abstained from this vote. [74] At trial, he explained his decision to abstain as twofold: first, he felt he did not have a chance to review the terms of the Recapitalization; and, second, he felt it was unfairly dilutive to current stockholders.

[74]    *Id.* at 0002.

Despite their contrary trial testimony, [75] various Defendants likely held two informal meetings within days of the January 7 Board meeting. [76] Biderman was not invited to participate. [77] During these conversations, the Defendants discussed the terms of the e-Media and NaviSite SMG acquisitions in advance of a Board meeting to be held on January 10.

[75]    Tr. 1977–80 (Newton), 2121 (Katz), 2504 (Dwyer).

[76]    JX 169.

[77]    Tr. 1134, 1140–42 (Biderman).

### 2. *January 10: Wren and Javva Agree to Invest*

The full Board, Dwyer, Newton, Grad, and Koo attended this second January Board meeting. According to the subsequently revised minutes, [78] Williams made clear that the Company "was no longer a viable stand-alone entity." [79] There was a choice for the Board to make, as "the alternative to securing funding and proceeding with the transactions was a complete liquidation of the business." [80] The Company did not have sufficient capital on hand to pay for either acquisition. The immediate funding necessary was $2.5 million: $1 million for the cash component of the e-Media acquisition; $1.3 million for the NaviSite SMG acquisition; and $200,000 for "integration and transaction costs." [81] Several Defendants believed that the Company would fail without these acquisitions. [82]

[78]   Throughout late 2002 and early 2003, Dort Cameron's son, Seth Cameron, was tasked with "revising" the Board minutes. JX 327. He likely did so with the assistance of the Company's counsel. Tr. 1020–22 (S. Cameron). Before this time, Seth Cameron was not actively involved with Wren's investment in the Company, and he offered conflicting testimony regarding whether he had sat in on telephonic Board meetings in his father's office. *Compare id.* 1013–14 (S.Cameron), *with* JX 607 (S. Cameron Dep.) at 25. With his instructions from the Board, Seth Cameron revised what he described as the "very thorough," contemporaneous minutes taken by Granberg. Tr. 1012, 1021 (S.Cameron). Embellishments were made, new statements were added, and certain comments were deleted, but Seth Cameron was adamant at trial that he would not have added anything that he did not know to be a truthful statement. *Id.* 1015–16, 1018–25, 1028 (S.Cameron). These revised minutes—ultimately designed to "make sure that everyone on the board was on the same page in terms of what had happened," *id.* 1013 (S.Cameron)—were ratified at a Board meeting on April 23, 2003. JX 334. Biderman did not receive the revised minutes or attend that meeting. Tr. 1219–20 (Biderman).

   Without delving into the similarities and differences of the Board-ratified minutes and Granberg's contemporaneous minutes, the Court notes that this post-hoc revision decreases the former's reliability. The Court draws on the different sets of documents as appropriate.

[79]   JX 170–0002.

[80]   *Id.*

[81]   *Id.* at 0001.

[82]   JX 1710 (Shipman), 2117 (Katz), 2531 (Dwyer).

The required majority of the Company's senior debt holders—that is, Wren, Javva, and Catalyst, who together held over 90%—gave their consents to the acquisitions, which would be funded by this new capital raise. The new investors were to receive a series of convertible preferred stock that would represent 38% of the Company's fully diluted equity. [83]

[83]   JX 170–0002.

**\*11** According to Granberg's contemporaneous minutes, Williams initiated a discussion among the Board and the other individuals present about how to fund the $2.5 million needed for the acquisitions. Responses were mixed:

> Javva agreed to fund $0.5 mm immediately and [Wren] committed to $2.0 mm. CEO Art Williams agreed to consider some contribution TBD. Catalyst deferred, saying the deal makes sense, but the timing is a problem and they had not done due diligence. Lipper also deferred, for reasons similar to those of Catalyst. [84]

Williams believed that Wren, Javva, and Catalyst each "made independent decisions for themselves." [85]

[84]   JX 170–0004.

[85]   JX 618 (Williams Dep.) at 174–75.

Based on the trial evidence, it is apparent that Dwyer and Wren suffered from the sunk cost fallacy: Wren was willing to participate in the financing, even if it "never intended to get as deep as [it] did," because it had the "most to lose" if the Company failed. [86] So too did Katz and Javva think the Recapitalization was an "all-in risk" without which the Company—and Javva's past investments—would be "gone." [87] Shipman and Catalyst, on the other hand, were aware of what it meant to throw

"good money after bad."[88] That is not to say, however, that Catalyst would not receive any material benefit in the Recapitalization.

[86]  Tr. 2513, 2530 (Dwyer).

[87]  *Id.* 2117, 2136 (Katz).

[88]  *Id.* 1720, 1847–48 (Shipman) ("So I thought God bless people who were willing to fund this, because it keeps my investment alive, and you never know what will happen.").

The revised meeting minutes also reflect that management's "pro forma valuation of SMC post closing of the proposed acquisitions [was] $23.0 million (assumed free-cash of $2.3 million; multiple of 10x)."[89] The record does not reflect any objection by the Board to this rough estimation of the Company's value after the acquisitions.

[89]  JX 170–0002.

The Board, with Biderman now dissenting for the same reasons he had abstained three days earlier,[90] approved the borrowing of $2.5 million from Wren and Javva to fund the e-Media and NaviSite SMG acquisitions.[91]

[90]  Tr. 1146–47 (Biderman).

[91]  JX 170.

Once more, outside of a formal Board meeting, some combination of Dort Cameron, Katz, Shipman, and Dwyer (and probably Williams) continued to hammer out the details of the preferred stock issue and acquisitions.[92] Any meetings or phone calls they held were without Biderman.[93]

[92]  JX 174, 175; Tr. 1983 (Newton).

[93]  Tr. 1149–50 (Biderman).

### 3. *Catalyst Receives a "Right to Invest"*

It is undisputed that while Wren and Javva participated in the Recapitalization, the Plaintiffs did not. What remained in dispute, until the Court could weigh the evidence presented at trial, was whether Catalyst received anything from the Recapitalization.

Internal Catalyst documents provide the most credible evidence revealing how Shipman and Newton viewed the

Recapitalization. In a January 18, 2002, memorandum to Catalyst's Investment Committee, Newton and Shipman noted that they did "not feel that sufficient due diligence has been performed on the acquisitions ... to make [them] comfortable with investing in this round."[94] But, as Shipman and Newton wrote, Catalyst had "the right to invest in this round (at this valuation) for the next 90 days."[95] In a separate document, Catalyst again noted that, although it had not invested, it still had "the right to invest in the current financing round on identical terms for 90 days from closing."[96]

[94]  JX 181.

[95]  *Id.* ("While we will be diluted substantially if we do not exercise our 90-day option to invest, the alternative is shutting the company down.").

[96]  JX 161–0013.

**\*12** Shipman acknowledged that, as a general matter, he would not have written something in a memorandum to Catalyst's Investment Committee if it were not true.[97] He testified at trial that there was no legal option, but he seemed to recognize that the right to invest may have been a shared understanding about Catalyst's opportunity to invest later:

> We had good relations with Javva and Wren and the Company, right, and so ... it was probably our belief that ... if we want to put more money in, we can put more money in. Let's take ninety days to figure this out....
>
> I think it [*i.e.,* the "right to invest"] was a shorthanded way of saying that if we want to put more money in, we can. Let's take a little time to look at the industry, look at these two new deals. But it wasn't ... a legal right to do it because we didn't have that.
>
> They needed our approval, and based on the relationships that we had, and based on repeated meetings where the company is saying 'we need more money, we need more money,' we just believed that if we wanted to put more money in, we could.[98]

Separately, Dwyer also recognized that it was "possible" that Catalyst had a ninety-day option to invest.[99] Other than the two internal Catalyst documents, there is no evidence in the record of an option agreement. The

Court concludes that it is more likely than not that Wren and Javva (acting through Dort Cameron or Dwyer and Katz, respectively) informally extended to Catalyst (by way of Shipman), before the Board approved the Recapitalization, an invitation to participate in this $2.5 million financing on the same terms for ninety days after the closing of the e-Media and NaviSite SMG acquisitions. [100]

[97]  Tr. 1742–43, 1746 (Shipman).

[98]  Id. 1752–54 (Shipman).

[99]  Id. 2271–72 (Dwyer).

[100]  This invitation to invest was never shared with any of the Company's minority investors that, by virtue of their most favored nation rights, most likely had preemptive rights. Tr. 1168–70 (Biderman). The Court discusses these rights in the context of the Defendants' challenge to the standing of Plaintiffs Morris and Bernard Fuchs.

4. *January 17: Biderman Acquiesces to Dwyer's Revised Terms*

During the next Board meeting on January 17, Dwyer described the current iteration of the Recapitalization. The NaviSite SMG price changed from $1.3 million at closing and $1.3 million in twelve months to $2.1 million at closing. Based on the $2.5 million in financing approved at the January 10 meeting, there was an $800,000 shortfall for the NaviSite SMG acquisition. The Board proposed to fund this gap with a senior note. [101] This particular shortfall would later disappear when the terms of the NaviSite SMG acquisition changed. [102]

[101]  JX 178.

[102]  JX 185–0003.

The Board also discussed a slightly revised capitalization table for the Company after the acquisitions. Due in part to Biderman's criticism at the last meeting, Dwyer proposed to fund the acquisitions by creating two new series of preferred stock—Preferred A and Preferred B —on slightly less dilutive terms. [103] Under this modified proposal, current stockholders would be "reduced to a final stakeholding in the Corporation after the proposed recapitalization of approximately 7% (versus 3% in [the January 10] proposal)"; the Company's senior debt would

be exchanged for Preferred A stock that would own approximately 20% of the Company; and the "new money" would receive Preferred B that would represent the rest of the Company's equity. [104]

[103]  Tr. 2264–65 (Dwyer).

[104]  JX 178–0002.

**\*13** In the midst of this discussion, Williams and the Company's management presented their pro forma revenue projections for 2002. The total pro forma projections for 2002 revenue for all three units (the Company, e-Media, and NaviSite SMG) was $15,935,074. Broken down by unit, management projected: (i) Company revenue of $7,025,560; (ii) e-Media revenue of $4,165,076; and (iii) NaviSite SMG revenue of $4,744,438. [105] The record does not contain any document in which the Board expressed its disagreement with these projections, [106] but the Board did not expressly adopt those projections at the meeting. [107]

[105]  Id. at 0005.

[106]  Tr. 1680–81 (Shipman), 2283 (Dwyer) ("I don't think we wrote anything that said we disagreed with the projections.").

[107]  JX 178.

It is likely that Catalyst's Newton was involved in creating the spreadsheets in which the Company's prior projections were presented—but not, as the Plaintiffs contend, the underlying pro forma revenue projections for 2002. The sole evidence offered by the Plaintiffs on this point was a May 2001 email in which Newton outlined to Granberg how to manipulate the data and formulas in the spreadsheets. [108] This evidence does not establish that Catalyst (or any of the other Defendants) was involved in projecting the Company's 2002 revenue for the January 17 Board meeting.

[108]  JX 1044.

During the Board's deliberation of this proposed capital structure, Biderman again objected to the dilution. He did not explicitly object to the $4 million valuation. Having been overruled on his objections earlier in January, Biderman now seemed to accept that the other members of the Board, because they represented a majority, would ultimately approve the Recapitalization regardless of his

objections. [109] Hence, Biderman tried to make the best out of the situation. He agreed to vote in favor of the Recapitalization on two conditions: first, that he remained a director through 2004 unless there was a change in control; and second, that in the event a subsequent capital raise (other than an initial public offering) did not receive unanimous board approval, "then the shareholder[s] whose Board designee dissented to the issuance would be able to redeem [their] Preferred A in cash at 1.5 times its face amount." [110] The other directors acquiesced in Biderman's conditions, and the Board unanimously voted in favor of the Recapitalization at the January 17 meeting.

[109]    Tr. 1163–64 (Biderman) ("They just wanted to rubber-stamp what they had already discussed ... and they wanted, ideally, for me to go along so it looked like it was unanimous.").

[110]    JX 178–0002.

The e-Media acquisition closed later on January 17. [111] The Company paid $1 million in cash plus a $3.6 million note convertible into approximately 15.8% of the Company, which percentage could be adjusted were the acquisition not to meet certain revenue targets. [112]

[111]    JX 185–0001.

[112]    JX 260.

H. *The Company Continues to Need Money During the Recapitalization*

1. *The NaviSite SMG Acquisition*

The NaviSite SMG closing was delayed multiple times from January to March, partially due to changes in the amount of money that the Company needed for the acquisition. In late February, the Company needed $2.6 million to complete the acquisition as it was then proposed. The Company already had commitments for $1.3 million, but the rest was still unfunded.

**\*14** On February 25, 2002, two directors (Shipman and Williams), and representatives of Wren (Dwyer), Javva, and Lipper (Grad and Koo, at Biderman's request [113]) met to discuss how to fund the additional $1.3 million that was needed due to weaker-than-expected revenues from the e-Media acquisition. This was not a Board meeting because there was no quorum. Based on some rough

numbers that Dwyer had drawn up, the participants at the meeting expected that the new $1.3 million would equate to approximately 15% of the Company after the NaviSite SMG acquisition closed. [114] These new terms were not discussed with Biderman prior to this meeting. [115] Wren committed to fund $800,000 if the remaining $500,000 could be raised, and Javva committed to fund an incremental $100,000. [116] Wren and Javva would later invest approximately $700,000 and $100,000, respectively, as equity. [117] Thus, overall, Wren and Javva together invested approximately $3.3 million in the Company, for which they were to receive convertible preferred stock.

[113]    JX 645 (Biderman Dep.) at 890–91.

[114]    JX 188.

[115]    Tr. 2286–87 (Dwyer).

[116]    JX 188.

[117]    JX 741–0003–04.

2. *A Warning from Lipper's Grad about Communications with Stockholders*

The next Board meeting was on March 6, during which the directors continued to discuss the terms of the NaviSite SMG acquisition. All directors except Biderman attended; Grad and Koo were there in his stead. [118]

[118]    JX 741.

At this meeting, Grad warned the Board that it needed to update the Company's other stockholders about the Recapitalization and the accompanying changes to the capital structure. Based on Grad's contemporaneous notes, the directors in attendance agreed, and management discussed whether to hold a stockholder meeting to approve the new stock issuances. [119] This issue was generally not discussed again, and no annual meeting was ever held.

[119]    *Id.* at 0003–04.

It is difficult to discern whether Biderman's absence from Board meetings around this time was due to his lingering dissatisfaction with the Recapitalization, to serious financial and regulatory problems at Lipper, or to some combination of these and other explanations. The Court concludes it is more likely than not that Biderman's

absence was chiefly because of the problems at Lipper. [120]
Several Defendants, including Snyder and Dwyer, were
aware of the limitations on Biderman's time due to this
stressful situation. [121]

[120]    In January 2002, the Securities and Exchange
Commission ("SEC") opened an investigation into
alleged financial fraud regarding the value of
certain Lipper-managed funds. The allegations of
impropriety at Lipper centered around the conduct of
Edward Strafaci, a Plaintiff in this action, who would
eventually serve seven years in prison. Tr. 1153–54
(Biderman).

> As a Lipper executive, Biderman became
> overwhelmed with the SEC investigation, which
> became public when it was reported in major
> newspapers in February 2002. JX 628 (Biderman
> Dep.) at 91–96, 105–106; JX 645 (Biderman
> Dep.) at 889. He gave "perfunctory" attention
> to matters unrelated to Lipper, including his
> position on the Board. Tr. 1380–81 (Biderman).
> Additionally, Lipper's counsel instructed Biderman
> not to communicate with any Lipper investors,
> which meant that he never told any of the Lipper-
> affiliated Plaintiffs, including persons with whom
> he had been friends or colleagues for years, that
> he was being excluded from Board meetings or
> that the ongoing Recapitalization was unfair. Id.
> 1216–17, 1292, 1298–1302, 1414 (Biderman). Grad
> denied that Biderman ever asked her to inform the
> Company's Lipper-affiliated investors about these
> issues. Tr. 1485–86 (Grad).

[121]    Tr. 679–81 (Snyder), 2259–60, 2299, 2373 (Dwyer).

The NaviSite SMG acquisition finally closed around
March 25, 2002. [122] There did not seem to be much time
pressure to close the acquisition, at least not that Snyder,
who was a part of the NaviSite SMG team at the time,
could recall. [123] After the acquisition, Snyder joined the
Company.

[122]    JX 185–0005.

[123]    Tr. 666–68, 676, 686 (Snyder).

### 3. Wren and Javva Loan Money to the Company as Williams is Forced Out

**\*15** Biderman testified that when he contacted Dwyer
in March 2002 to find out what was happening at
the Company, he learned that a Board meeting was

scheduled for around April 3. That date fell during
Passover, which meant that Biderman would have been
unable to attend. Biderman claims that his attempts to
reschedule the meeting were rejected by Dwyer. [124] The
record, however, does not include any minutes (formal
or otherwise) reflecting an April 3 meeting. Separately,
during the Passover holiday, the Company's counsel sent
a draft term sheet for a potential series of Preferred B–
3 stock and a 1:10 reverse stock split to both Dwyer
at Wren and a representative of Javva. Dwyer shared
the information with Catalyst, but no one shared it with
Biderman. [125]

[124]    Id. 1191 (Biderman).

[125]    JX 201; Tr. 1195 (Biderman), 2375 (Dwyer).

The Board held its next meeting on April 11. During a call
among several directors and their associates in advance of
the meeting, Dwyer proposed that Williams be replaced
as the Company's CEO. [126] Those on the phone call
agreed. [127]

[126]    Tr. 2309, 2377 (Dwyer).

[127]    JX 202; Tr. 1984 (Newton).

Biderman did not attend this April 11 Board meeting;
instead, Grad again attended. The minutes reflect that
Williams resigned as a director and as CEO, most likely
at Wren's request. [128] Due to persistent revenue problems
—now in part because the e-Media acquisition was not
performing as projected—the Company faced a $1 million
cash shortfall. No one on the Board was willing to invest
in additional equity, but Wren and Javva each agreed to
loan $400,000 to the Company. The remaining $200,000
shortfall went unfunded. [129]

[128]    JX 185–0005, 206–0001.

[129]    JX 206–0002.

### I. Other Significant Events from April through July 2002

#### 1. SMIG Dissolves

SMIG, the Lipper-formed investment vehicle by which the
SMIG Plaintiffs invested in the Company, dissolved on
April 22, 2002. [130] Biderman sent letters to the former
members of SMIG informing them that they would now

be direct stockholders of the Company.[131] The Company issued certificates to the SMIG Plaintiffs on May 30, 2002.[132]

[130]   JX 208.

[131]   JX 209, 210, 211, 212, 213.

[132]   JX 223, 227. The Defendants contend that, due to a misreading of certain documents, the Company wound up issuing more stock to Plaintiffs Morris Fuchs and Bernard Fuchs than they were entitled based on their investments. Defs.' Answering Br. 97–99. Other than noting the apparent error, the Defendants do not contend that the stock issued to the Fuchs brothers is invalid.

### 2. *Snyder is Elected CEO and Appointed to the Board*

After Snyder joined the Company as part of the NaviSite SMG acquisition, he quickly proved to be a "very capable" manager. In particular, the Board thought he would be able to lead the Company's next stage of growth, primarily through the new Stream OS product it acquired with NaviSite SMG.[133] Around the time that SMIG dissolved, the Board unanimously elected Snyder to be the Company's CEO; it also appointed him to the Board.[134] When Snyder joined the Board, the terms of the Recapitalization were not yet final.[135] Specifically, the percentages of the Company's equity to be allocated to the two new classes of preferred stock were still undefined.

[133]   Tr. 2547–48 (Dwyer).

[134]   JX 219; Tr. 694 (Snyder).

### 3. *Wren and Javva Receive Convertible Promissory Notes*

One of Snyder's first significant acts as CEO was, in May 2002, to execute convertible promissory notes to Wren and Javva for the $3.3 million they provided to the Company to fund the e-Media and NaviSite SMG acquisitions. Interest on the notes would accrue at 10% and any accrued interest would also be convertible.[136] It does not appear that the Board expressly approved the latter term. Sometime later, and apparently also without Board authorization, the interest rates were retroactively increased to 12%.[137]

[135]   Tr. 696, 712–13 (Snyder), 2386–87 (Dwyer).

[136]   JX 216, 217.

[137]   JX 743; Tr. 703–04 (Snyder).

**\*16** Wren's promissory note specified that it could receive no more than 34.65% of the Company's total outstanding equity, but it would end up receiving 39.9%. Javva's note specified no more than 9.10%, but it received 11.2%.[138] Javva also received (and later converted) an additional $50,000 convertible note that the Board does not appear to have ratified.[139]

[138]   JX 216, 217, 309; Tr. 707–09 (Snyder), 2070–71 (Katz).

[139]   JX. 249–0002, 334–0003; Tr. 2073–76 (Katz).

### 4. *The Holders of Secured Debt Consent to Convert to Preferred A Stock*

As an initial condition to the financing by Wren and Javva, the Company needed to persuade 100% of the holders of its senior debt to exchange their notes into equity.[140] But, the promissory notes that Wren and Javva received required only 85% of the senior debt to convert for the promissory notes to become convertible.[141] Because Wren, Javva, and Catalyst together held over that percentage, the consents of the holders of the remaining senior debt were not contractually required for Wren and Javva to convert their notes into common stock. Thus, the holders of the senior debt appear to have had veto power over the debt-to-Preferred-A-stock exchange, but not necessarily for the convertible-note-to-stock conversion.

[140]   JX 185–0005.

[141]   JX 216, 217; Tr. 2069 (Katz).

Although he was otherwise burdened with the financial and regulatory problems at Lipper, Biderman took charge of obtaining the consent of various individuals that, through Lipper, invested in the Company's debt.[142] To that effect, he sent a letter to at least one debtholder soliciting his consent to convert to Preferred A stock.[143] Accompanying this letter were various informational documents about the Company, but Biderman did not draft them.[144] The Company obtained all the consents it needed to exchange the senior notes for Preferred A stock.[145] The converting senior note holders were

to receive Preferred A stock that reflected a pro rata allocation of the debt and warrants they held.

<sup>142</sup>  JX 185; JX 645 (Biderman Dep.) at 946–49.

<sup>143</sup>  JX 232.

<sup>144</sup>  Tr. 1212–13 (Biderman).

<sup>145</sup>  *See, e.g.,* JX 250–0014.

### 5. Catalyst's Right to Invest

It is unclear precisely when Catalyst's 90–day option to invest in the $3.3 million round of financing was to expire. Catalyst never took advantage of the opportunity. That is not evidence, however, that the right to invest did not exist.

### J. *Final Approval and Implementation of the Recapitalization*

The Company implemented the final steps of the Recapitalization during August 2002. The Company's charter needed to be amended to adjust the number of authorized shares and to effect a 1:20 reverse stock split.<sup>146</sup> On August 1, pursuant to 8 *Del. C.* § 141(f), the Board executed a unanimous written consent authorizing the necessary amendments to the Company's charter. That same day, pursuant to 8 *Del. C.* § 228(a), a majority of the Company's stockholders—Wren, Javva, and Catalyst, which collectively held 54%—executed written consents approving the charter amendments.<sup>147</sup> Only the Defendants were solicited for their consent.<sup>148</sup>

<sup>146</sup>  The 1:10 reverse stock split that had been contemplated earlier in the year became a 1:20 reverse stock split. JX 201; Tr. 2389, 2629 (Dwyer). According to the Plaintiffs, this change was intentional and led to further dilution. They contend that the 1:20 reverse stock split, which increased the per-share price of the Preferred B–1 stock to $0.58 per share, was barely above the anti-dilution rights held by many Plaintiffs for equity issuances below $0.50 per share. JX 45, 50, 57, 124, 131–0016, 135; Tr. 2392 (Dwyer). The other directors did not ask Biderman for his input on the appropriate reverse stock split. Tr. 1216 (Biderman).

<sup>147</sup>  JX 255.

<sup>148</sup>  *See, e.g.,* Tr. 469–71 (M.Fuchs), 1558–59 (Schaum), 1910 (Horowitz).

**\*17** Next, on August 9, 2002, the Board acted by unanimous written consent to issue Preferred A stock, representing 23% of the Company's total equity, to the holders of the Company's senior secured debt in exchange for their notes.<sup>149</sup> The Defendants received approximately 92% of the Preferred A stock.<sup>150</sup> The Preferred A stock did not include the 1.5x liquidation preference that the Board had agreed to on January 17 as a condition for Biderman to approve the Recapitalization.<sup>151</sup>

<sup>149</sup>  JX 262.

<sup>150</sup>  JX 309.

<sup>151</sup>  JX 178.

Then, on August 12, the Board once more acted by unanimous written consent to issue Preferred B–1 stock, which represented approximately 51% of the Company's total equity, to Wren and Javva in proportion to the $3.3 million that they invested in the Company to acquire e-Media and NaviSite SMG.<sup>152</sup> The previously undefined conversion ratio was set at 172.41 shares of common stock per share of Preferred B–1 stock.<sup>153</sup>

<sup>152</sup>  JX 729; Tr. 2391–92 (Dwyer).

<sup>153</sup>  JX 309.

The percentage of the Company's post-acquisitions equity represented by the Preferred B–1 stock included most of the roughly 15% of the equity that had been reserved as consideration in the e-Media acquisition.<sup>154</sup> Instead of receiving 15% of the Company, e-Media's parent received Preferred B–2 stock representing 2.6% of the Company.<sup>155</sup> This adjustment was due to lower-than-expected 2002 revenue for e-Media.<sup>156</sup> Neither Biderman nor any of the Plaintiffs had been notified of the transfer of the equity reserved for the e-Media acquisition to Wren and Javva.<sup>157</sup>

<sup>154</sup>  *See, e.g.,* JX 194, 260, 309; Tr. 2389, 2613 (Dwyer).

<sup>155</sup>  JX 309.

<sup>156</sup>  JX 260.

Case 1:18-cv-00475-SEB-TAB Document 1-2 Filed 02/16/18 Page 160 of 440 PageID #: 172
In re Nine Systems Corporation Shareholders Litigation, Not Reported in A.3d (2014)
2014 WL 4383127

[157]    Tr. 2618 (Dwyer).

All told, after the final adjustments to the Recapitalization during 2002, Wren, Javva, and Catalyst's fully diluted stock ownership of the Company increased from approximately 54% in January to approximately 80% by September: Wren held 54%, Javva held 17%, and Catalyst held 9%. [158] In contrast, the Plaintiffs' fully diluted ownership decreased from approximately 26% to approximately 2%. Many of the Plaintiffs testified that, had they been contacted by the Defendants, they were ready, willing, and able to provide additional capital to the Company by participating in the Recapitalization. [159] Dwyer testified that they did not contact the Company's other stockholders because they were not "accredited investors," but he later recognized that many of the Plaintiffs had previously signed stock purchase agreements in which they represented that they were accredited investors. [160]

[158]    *See, e.g.,* JX 309.

[159]    *See, e.g.,* Tr. 464–66 (M. Fuchs), 507–08 (B. Fuchs), 626–27 (Visovsky), 1438 (Reckler), 1627 (Schaum), 1906–07 (Horowitz), 2185–86 (Minster).

[160]    *Id.* 2403–04 (Dwyer), 1540 (Schaum).

K. *Snyder Receives Options in the Company*
Soon after the Recapitalization, the Board awarded to Snyder 530,000 stock options at a post-reverse stock split strike price of $0.50. [161] The Board unanimously approved the option grant to Snyder and the underlying employee stock option plan for the Company, and Wren, Javva, and Catalyst approved the latter by written consent. [162] Dwyer claimed that the $0.50 strike price for the options granted to Snyder and other employees [163] was intended to create the right incentives for the Company to grow and thereby make a return on investment for the holders of Preferred B–1 stock—Wren and Javva. [164]

[161]    JX 314, 315, 320.

[162]    JX 314.

[163]    JX 316.

[164]    Tr. 2557–59 (Dwyer).

*18 Snyder's award represented slightly more than 4.5% of the Company's equity. He would sign his options agreement on his own behalf and for the Company. [165]

[165]    JX 315.

L. *The Company Notifies Stockholders about Some Terms of the Recapitalization*
The Company sent a document entitled SMC Update (the "Fall 2002 Update") to its stockholders at some point in the fall of 2002. [166] Snyder and Dwyer were primarily responsible for drafting the document, but they likely would have also relied on the advice of counsel. [167] In the Fall 2002 Update, the Company announced that it intended, at some indeterminate time in the future, to "re-launch with a change of corporate name to Nine Systems Corporation." The Fall 2002 Update also described the Recapitalization in general terms—the conversion of subordinated debt into "several new series of convertible preferred stock" collectively representing 8,989,786 shares of common stock; the acquisitions of e-Media and NaviSite SMG; and the 1:20 reverse stock split—but it failed to disclose who participated in the Recapitalization or on what terms. [168]

[166]    JX 774.

[167]    Tr. 747–48 (Snyder), 2413, 2560–62 (Dwyer); JX 643 (Tallan Dep.) at 149–51, 154.

[168]    JX 774.

M. *The Company's Dormant Years of 2003–2005*

1. *Communications with Stockholders*
The Board did not volunteer much information about the Company to its stockholders from the Fall 2002 Update until the beginning of 2006. That is not to say, however, that there were no material changes at the Company. The Company moved its headquarters from New Jersey to California and changed its name from SMC to Nine Systems, but no notice was sent to stockholders on either occasion. There were also no annual stockholder meetings in 2003, 2004, or 2005. [169]

[169]    JX 695 at Resp. 25.

The record does contain one letter on Nine Systems letterhead apparently sent by Snyder to certain

Case 1:18-cv-00475-SEB-TAB Document 1-2 Filed 02/16/18 Page 161 of 440 PageID #: 173
In re Nine Systems Corporation Shareholders Litigation, Not Reported in A.3d (2014)
2014 WL 4383127

stockholders of the Company.[170] But, that letter does not discuss the terms of the Recapitalization in any meaningful way, and Snyder could not recall preparing or authoring it.[171] Neither did many of the Plaintiffs recall receiving it.[172]

[170]   JX 2137A.

[171]   Tr. 967–68, 987–88 (Snyder).

[172]   *See, e.g.,* Tr. 1910 (Horowitz).

One particular scene epitomized the Defendants' conduct during this period. In January 2005, an employee and option holder (whose options had, unbeknownst to him, allegedly been cancelled) requested to see the Company's current capitalization table. Snyder flatly denied that request. As he sought Dwyer's input on how to handle the situation, Snyder explained, "[The employee] was very interested in seeing the cap table which I have denied him as I am sure he would not be happy."[173] Based on the weight of the trial evidence and testimony, the Defendants on the Board sought to avoid full and fair communications with the Company's stockholders.

[173]   JX 361.

This overall failure to communicate was, in part, due to the Board's mistaken belief that each director representative was responsible for his affiliated investors. In other words, they thought that the responsibility to inform the Lipper-affiliated stockholders (*i.e.,* most of the Plaintiffs) fell exclusively to the Lipper designee on the Board: Biderman.[174] This mistaken understanding of a director's fiduciary duties did not change even in 2002 when the Board knew that Biderman was generally prohibited from communicating with any investors associated with Lipper.[175] Moreover, any communications that Biderman could have had would have been compromised by the Board's failing to share information with him.

[174]   Tr. 1636–37 (Shipman), 2142, 2154 (Katz), 2709 (D.Cameron).
        Biderman was not immune from this view, as evidenced by his January demand for a 1.5x liquidation preference for the Preferred A stockholder "whose Board designee dissented" to a subsequent capital raise. JX 178.

[175]   Tr. 679–81 (Snyder), 1150–57 (Biderman).

### 2. *Financial Performance*

**\*19** The financial problems that the Board thought it had solved with the Recapitalization still plagued the Company's growth. For example, in 2004, Snyder asked senior management to defer their paychecks for the Company to make payroll.[176] Each of Wren, Javva, and Dwyer (in his individual capacity) would make loans to the Company during this period.[177] Given time, however, Snyder was implementing the turnaround that the Board hoped he would. By reducing costs and expenses, including through staff reductions, the Company was operating at a break-even level in late 2004 or 2005.[178] The Company would post its first annual profit for the fiscal year ended June 30, 2006.[179]

[176]   *Id.* 944 (Snyder).

[177]   *Id.* 2564 (Dwyer).

[178]   *Id.* 940–44 (Snyder).

[179]   JX 509–0006–07.

### N. *The February 2006 Letter to Stockholders*

Unexpectedly, the Company sent a letter to its stockholders in February 2006 (the "2006 Letter"). The 2006 Letter, which acknowledged "sporadic shareholder confusion related to their shareholdings after the reverse stock split three years ago," enclosed audited financials for 2004 and 2005 and invited stockholders to an "informational shareholders meeting" in New York on February 28.[180] Snyder recalled that "[l]ess than a handful" of stockholders would attend.[181] The 2006 Letter also noted that the Company planned "to send each shareholder a letter with their shareholdings shortly after the information meeting."[182] Consistent with its pattern of conduct, the Company never sent any follow-up letters to stockholders.[183]

[180]   JX 419.

[181]   Tr. 971 (Snyder).

[182]   JX 419.

[183]   Tr. 770–71 (Snyder).

O. *The Company Repurchases Stock from Thomas Murphy*

Thomas Murphy contacted the Company around May 2006, seeking to sell back some of his stock. He had conversations with several of the Defendants, including Snyder and Dwyer. The Court discusses these conversations and the surrounding circumstances when analyzing the merits of Thomas Murphy's fraud claim. For now, it suffices to note that, on June 2, 2006, Thomas Murphy executed a Stock Repurchase Agreement by which the Company repurchased 44,000 of his shares for $1.00 per share. [184]

184    JX 450.

P. *The Akamai Merger*

The 2006 Letter was part of a process undertaken by the Defendants to prepare for a possible investment or sale. [185] Dwyer and Newton (who had assumed Shipman's role as Catalyst's representative on the Board in 2006) thought the Company might be worth at least $60 million. [186] Others in the industry also thought the Company had value. Akamai, for one, approached Snyder to express an interest in a strategic investment, which Dwyer interpreted to mean that Akamai was interested in buying the Company. [187] Snyder and Dwyer were the two principal negotiators as the Board evaluated the Company' options. [188] An example of their communications is Snyder's "M & A FYI" email of May 2006 in which he informed Dwyer of his preliminary dialogues with Akamai, VitalStream, and Limelight. [189] The Court discusses this email when evaluating Thomas Murphy's claim for fraud.

185    Tr. 2422 (Dwyer).

186    *Id.* 1984–85 (Newton), 2426–27 (Dwyer).

187    *Id.* 2435–36 (Dwyer).

188    *Id.* 856 (Snyder), 1777 (Shipman), 2448–49 (Dwyer).

189    JX 443; Tr. 836–44 (Snyder).

In August 2006, the Company engaged a financial advisor, Merriman Curham Ford & Co. ("Merriman"), primarily to help raise $25 million in new equity. [190] Merriman's secondary responsibility was to identify

potential acquirers for all or part of the Company. [191] Alongside Merriman, Snyder went on a road show and received very favorable responses. [192] Based on this feedback, a decision was made to abandon the equity raise in favor of selling the Company. [193] Merriman's first meeting with Akamai about a potential acquisition of the Company was held on August 30; meetings with two other possible acquirers took place the following week. [194] After negotiations between the Company and its suitors, Akamai emerged as the highest bidder.

190    JX 457.

191    JX 2142.

192    Tr. 953–54, 981–84 (Snyder).

193    *Id.* 959, 963, 983 (Snyder); JX 484–0004.

194    JX 484–0004.

**\*20** The Board—excluding Biderman, who had not been invited to the meeting—authorized the Company to enter into a letter of intent with Akamai on September 29, 2006. [195] The letter of intent contemplated a stock merger for approximately $13.00 per share, which valued the Company at approximately $175 million. [196]

195    JX 464; Tr. 2453 (Dwyer).

196    JX 465.

The Board met on November 15, 2006, to discuss the specific terms of the Akamai Merger. Biderman was invited and attended, but he refused to approve the Akamai Merger on the grounds that the early investors in the Company "would not be receiving a comparable return on their investment as stockholders who had invested later" [197]—namely, Wren and Javva, by virtue of the Preferred B–1 stock they received in the Recapitalization. The Board, with Biderman dissenting, approved the Akamai Merger at this meeting. [198]

197    JX 497.

198    *Id.*

Two days later, on Friday, November 17, the Board held a 5:00 p.m. meeting to discuss and approve minor changes to the Akamai Merger. [199] Biderman was not aware of this meeting, [200] and Snyder did not know whether

Biderman had been invited. [201] The Court concludes that, more than knowingly excluding Biderman as it had done in December 2001, the Board now intentionally scheduled this meeting late on a Friday in the fall so that Biderman could not attend. Dwyer thought that the Biderman "had already made his dissent," and the Board "just wanted to get the deal done." [202] With Biderman absent, the other members of the Board unanimously approved the minor revisions to the Akamai Merger. [203]

[199]   JX 501.

[200]   Tr. 1238 (Biderman).

[201]   *Id.* 865 (Snyder).

[202]   *Id.* 2461–62 (Dwyer).

[203]   JX 501.

The Company delivered proxy materials to its stockholders near the end of November 2006. Those materials informed stockholders—for the first time—that the only investors who had received Preferred B–1 stock in the Recapitalization were Wren and Javva. [204] After receiving this information, a number of stockholders complained that the Recapitalization had unfairly diluted their equity. [205] One Plaintiff testified that he "felt that [he] was had." [206]

[204]   JX 510.

[205]   *See, e.g.,* JX 520; Tr. 2465 (Dwyer).

[206]   Tr. 474 (M.Fuchs).

More than 94% of the Company's stockholders voted in favor of the Akamai Merger. This percentage, however, is unsurprising given the Defendants' collective, fully diluted ownership of approximately 90% of the Company. Wren alone held approximately 52%, Javva held approximately 16%, and Catalyst approximately 9%. [207]

[207]   JX 703.

The Akamai Merger closed on December 13, 2006. The Defendants received approximately $150 million of the $175 million in consideration. [208] Those who had invested in the Preferred B–1 stock received almost a 2,000% return. [209] Altogether, the Plaintiffs received approximately $3 million in the Akamai Merger.

Although many Plaintiffs profited from their initial investments in the Company, some did not: one lost nearly 43% of his investment. [210]

[208]   JX 540.

[209]   *Id.*

[210]   JX 57, 540.

## IV. CONTENTIONS

The Plaintiffs assert purportedly direct breach of fiduciary duty, aiding and abetting, and unjust enrichment claims against the Defendants. Their claims are for expropriation —namely that, through the Recapitalization, the Defendants unfairly expropriated the economic and voting rights of the Company's stockholders who did not participate in it. The Plaintiffs articulate two different theories of liability: (i) that Wren, Javva, and Catalyst constituted a control group, and (ii) that Dort Cameron, Katz, Shipman, and Snyder were conflicted when they approved and implemented the Recapitalization because of the unique benefits they (or the entities they represented) received. In each case, the Plaintiffs contend that the Defendants failed to demonstrate the entire fairness of the Recapitalization, especially because they submit that the Company was worth $30.89 million at the time—which is considerably higher than the $4 million valuation that Dwyer attributed to the Company. The Plaintiffs also assert that Dwyer, Wren, Javva, and Catalyst aided and abetted the breaches of fiduciary duty by Dort Cameron, Katz, Shipman, and Snyder. Finally, their claim for unjust enrichment against Wren, Javva, and Catalyst is under a similar theory as their claim for breach of fiduciary duty.

**\*21** The Defendants assert various defenses to the Plaintiffs' challenge to the Recapitalization. Foremost among these is that the Plaintiffs lack standing after the Akamai Merger because they have not demonstrated that Wren, Javva, and Catalyst constituted a control group. They do not accept that, under Delaware law, the Plaintiffs would have standing to bring their claim if a majority of the Board was conflicted when it approved the Recapitalization. But, assuming standing is theoretically available to bring a direct expropriation claim against Dort Cameron, Katz, Shipman, and Snyder, they contend that the Plaintiffs failed to carry their burden to establish

Case 1:18-cv-00475-SEB-TAB   Document 1-2   Filed 02/16/18   Page 164 of 440 PageID #: 176
In re Nine Systems Corporation Shareholders Litigation, Not Reported in A.3d (2014)
2014 WL 4383127

that a majority of the Board was conflicted. Even were the Plaintiffs to establish standing, the Defendants insist that the Recapitalization was entirely fair, if for no other reason than because the Company's equity had no value when the Board approved the transaction. The Defendants also assert other standing and laches defenses to claims of certain Plaintiffs. As to the aiding and abetting and unjust enrichment claims, the Defendants primarily contend that they are entitled to judgment in their favor because the Plaintiffs failed to establish an underlying breach of fiduciary duty.

Separate from the Recapitalization, Thomas Murphy alleges that several of the Defendants defrauded him when the Company repurchased 44,000 of his shares in June 2006 without disclosing its merger negotiations with Akamai and other potential acquirers. The Defendants contend that Thomas Murphy failed to carry his burden of proof because they were under no duty to disclose those preliminary discussions. They also assert other defenses to this fraud claim.

## V. THE CLAIMS RELATED TO THE RECAPITALIZATION

A. *Standing to Challenge the Recapitalization Directly*

1. *The Standing of the Plaintiffs*
Before turning to the merits of the Plaintiffs' challenge to the Recapitalization, the Court addresses a potentially dispositive issue: standing. The parties recognize that, due to the non-fraudulent Akamai Merger, the only claims that the Plaintiffs may still have standing to assert are direct claims. The Defendants contend that the Plaintiffs lack standing because Wren, Javva, and Catalyst did not constitute a control group that expropriated the minority stockholders' economic and voting rights in the Recapitalization. [211] According to the Plaintiffs, they have standing to assert their expropriation claim directly not only because there was a control group, but also because a majority of the Board was inherently conflicted in approving the Recapitalization. [212] The Defendants reject the Plaintiffs' interpretation of Delaware law and argue that standing may exist only if there is a controlling stockholder (or a control group). But, even if Delaware law permits stockholders to assert an expropriation claim directly against a majority-conflicted board, the

Defendants contend that a majority of the Board here was not conflicted. [213]

[211] Defs.' Answering Br. 57–63.

[212] Pls.' Post–Trial Reply Br. ("Pls.' Reply Br.") 18–23; Pls.' Opening Br. 44–58.

[213] Defs.' Answering Br. 51–57.

"The party invoking the jurisdiction of [this Court] bears the burden of establishing the elements of standing." [214] In stockholder litigation, the issue of standing most often arises in the context of the continuous ownership rule. Rooted in statute [215] and reflected in *Court of Chancery Rule 23.1*, the continuous ownership rule provides that "[a] plaintiff who ceases to be a shareholder, whether by reason of a merger or for any other reason, loses standing to continue a derivative suit." [216] This Court has "closely" adhered to this "bedrock tenet of Delaware law" for decades. [217]

[214] *Dover Historical Soc'y v. City of Dover Planning Comm'n,* 838 A.2d 1103, 1109 (Del.2003).

[215] *8 Del. C. § 327* ("In any derivative suit instituted by a stockholder of a corporation, it shall be averred in the complaint that the plaintiff was a stockholder of the corporation at the time of the transaction of which such stockholder complains or that such stockholder's stock thereafter devolved upon such stockholder by operation of law.").

[216] *Lewis v. Anderson,* 477 A.2d 1040, 1049 (Del.1984); *but see Ark. Teacher Ret. Sys. v. Countrywide Fin. Corp.,* 75 A.3d 888, 894 (Del.2013) (citing *Lewis, 477 A.2d at 1046 n.10*) (reaffirming "two exceptions to the loss-of-standing rule": (i) "where the merger itself is the subject of a claim of fraud, being perpetrated merely to deprive shareholders of their standing to bring or maintain a derivative action"; and (ii) "where the merger is essentially a reorganization that does not affect the plaintiff's relative ownership in the post-merger enterprise").

[217] *See In re New Valley Corp. Deriv. Litig.,* 2004 WL 1700530, at *3 (Del. Ch. June 28, 2004).

*\*22* When the Company completed the Akamai Merger in 2006, the continuous ownership rule foreclosed continued pursuit of any derivative claims against the Defendants. Thus, if the claims asserted by the Plaintiffs

here are exclusively derivative in nature, then the Plaintiffs would lack standing to assert them, and the Defendants would be entitled to judgment in their favor. The burden is on the Plaintiffs to establish that they have standing by demonstrating that the Defendants' allegedly improper conduct may be challenged directly.

The Delaware Supreme Court defined how to distinguish between direct and derivative claims in *Tooley v. Donaldson, Lufkin & Jenrette, Inc.* [218] Under *Tooley,* the Court's inquiry involves answering two questions: "(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?" [219] Harm to the corporation or to the stockholders pro rata with their stock ownership would typically give rise to a derivative claim. [220] In contrast, harm unique to the stockholders—the classic example of which is the board's failing to disclose all material information when seeking stockholder action—would give rise to a direct claim. [221] At times, divining a direct claim from a derivative claim is not a straightforward exercise, as certain wrongful conduct appears to harm stockholders derivatively and directly. [222] "Courts have long recognized that the same set of facts can give rise both to a direct claim and a derivative claim." [223] Most relevant here, in *Gentile v. Rossette (Gentile 11)*, [224] the Delaware Supreme Court again acknowledged that the *Tooley* test is not necessarily a binary choice: "[t]here is ... at least one transactional paradigm—a species of corporate overpayment claim—that Delaware case law recognizes as being both derivative and direct in character." [225]

[218]   845 A.2d 1031 (Del.2004).

[219]   *Id.* at 1033.

[220]   *See Feldman v. Cutaia,* 951 A.2d 727, 733 (Del.2008).

[221]   *See In re J.P. Morgan Chase & Co. S'holder Litig.,* 906 A.2d 766, 772 (Del.2006).

[222]   *See In re Ebix, Inc. S'holder Litig.,* 2014 WL 3696655, at *15–16 (Del. Ch. July 24, 2014) (discussing this tension in the context of a claim challenging the board's allegedly defensive-minded conduct that purportedly had unreasonable anti-takeover effects).

[223]   *Grimes v. Donald,* 673 A.2d 1207, 1212 (Del.1996).

[224]   906 A.2d 91 (Del.2006).

[225]   *Id.* at 99.

The *Gentile* case featured allegations that a controlling stockholder who owned convertible promissory notes caused the corporation to permit him to convert the notes at a conversion rate lower than that specified in the relevant contracts. Through the debt conversion, the controlling stockholder increased his equity ownership from approximately 61% to 93.5%. The corporation then merged with a third party, and only after the merger did the plaintiffs (who were stockholders before the merger) learn the terms of the debt conversion.

**\*23** Because the plaintiffs were minority stockholders before and after the debt conversion, the trial court concluded that their breach of fiduciary duty claim was solely derivative in nature under *Tooley* such that they lost standing to pursue the claim under the continuous ownership rule. [226] The Supreme Court, however, reversed and concluded that the plaintiffs' claim for "expropriation" against the corporation's controlling stockholder could be asserted derivatively *and* directly:

A breach of fiduciary duty claim having this dual character arises where: (1) a stockholder having majority or effective control causes the corporation to issue "excessive" shares of its stock in exchange for assets of the controlling stockholder that have a lesser value; and (2) the exchange causes an increase in the percentage of the outstanding shares owned by the controlling stockholder, and a corresponding decrease in the share percentage owned by the public (minority) shareholders. Because the means used to achieve that result is an overpayment (or "over-issuance") of shares to the controlling stockholder, the corporation is harmed and has a claim to compel the restoration of the value of the overpayment. That claim, by definition, is derivative.

But, the public (or minority) stockholders also have a separate, and direct, claim arising out of that same transaction. Because the shares representing the "overpayment" embody both economic value and voting power, the end result of this type of transaction is an improper transfer—or expropriation—of economic value and voting power from the public shareholders to the majority or controlling stockholder. For that

reason, the harm resulting from the overpayment is not confined to an equal dilution of the economic value and voting power of each of the corporation's outstanding shares. A separate harm also results: an extraction from the public shareholders, and a redistribution to the controlling shareholder, of a portion of the economic value and voting power embodied in the minority interest. As a consequence, the public shareholders are harmed, uniquely and individually, to the same extent that the controlling shareholder is (correspondingly) benefited.[227]

The Recapitalization here was a stock issuance that, primarily through the Preferred B–1 stock that Wren and Javva received, proportionally diluted the Plaintiffs' stock holdings in the Company.[228] That the Recapitalization did not increase Wren and Javva's ownership of the Company "to the same extent" that it diluted Plaintiffs' equity (since investors other than the Defendants would receive Preferred A stock) does not change the Court's conclusion that the Recapitalization may have given rise to direct and derivative harm. Whether the Plaintiffs have standing to challenge this expropriation directly is a separate question.

[226]   See *Gentile v. Rossette,* 2005 WL 2810683, at *4–5 (Del. Ch. Oct. 20, 2005) ("*Gentile I* "), rev'd, *Gentile II,* 906 A.2d at 91.

[227]   *Gentile II,* 906 A.2d at 99–100.

[228]   See *Carsanaro v. Bloodhound Techs., Inc.,* 65 A.3d 618, 655 (Del. Ch.2013) ("A dilutive stock issuance can have the requisite dual character [articulated in *Gentile II* ].").

### (a) Whether Wren, Javva, and Catalyst Constituted a Control Group

Under *Gentile II,* the Plaintiffs may establish direct standing by proving that Wren, Javva, and Catalyst constituted a control group—the functional equivalent of a controlling stockholder—during the Recapitalization.[229]

[229]   See *Gentile II,* 906 A.2d at 99–100.

**\*24** A controlling stockholder under Delaware law is one that "owns a majority interest in or exercises control

over the business affairs of the corporation."[230] Because a controlling stockholder has the power, by definition, to act selfishly to the detriment of the corporation's minority stockholders, it is said to owe fiduciary duties to those stockholders in certain situations,[231] including when it "stands on both sides of [a] transaction" with the corporation.[232]

[230]   *Ivanhoe P'rs v. Newmont Min. Corp.,* 535 A.2d 1334, 1344 (Del.1987).

[231]   See *Citron v. Fairchild Camera & Instrument Corp.,* 569 A.2d 53, 70 (Del.1989).

[232]   See *Tremont Corp.,* 694 A.2d at 428.

"A group of stockholders, none of whom individually qualifies as a controlling stockholder, may collectively be considered a control group that is analogous, for standard of review purposes, to a controlling stockholder."[233] "[A] control group is accorded controlling shareholder status, and, therefore, its members owe fiduciary duties to their fellow shareholders."[234] Proving a control group is not impossible, but it is rarely a successful endeavor[235] because it is a fact-intensive inquiry that requires evidence of more than mere "parallel interests."[236] A plaintiff must prove that the group of stockholders was "connected in some legally significant way"—e.g., by contract, common ownership, agreement, or other arrangement—to work together toward a shared goal."[237] The standard does not necessarily require control "over the day-to-day operations" of a corporation; "actual control with regard to the particular transaction that is being challenged" may suffice.[238]

[233]   *Frank v. Elgamal,* 2014 WL 957550, at * 18 (Del. Ch. Mar. 10, 2014).

[234]   *Dubroff I,* 2009 W L 1478697, at *3.

[235]   The Defendants submit that only once has a Delaware court found, after a trial, that a plaintiff successfully proved the existence of a control group. See *eBay Domestic Hldgs., Inc. v. Newmark,* 16 A.3d 1, 26 (Del. Ch.2010) (citing *Dubroff I,* 2009 WL 1478697, at *3) ("Even though neither Jim nor Craig individually owns a majority of craigslist's shares, the law treats them as craigslist's controlling stockholders because they form a control group, bound together by the

Jim–Craig Voting Agreement, with the power to elect the majority of the craigslist board.").

236   *Williamson v. Cox Commc'ns, Inc.,* 2006 WL 1586375, at *6 (Del. Ch. June 5, 2006).

237   *Dubroff I,* 2009 W L 1478697, at *3 (citing *In re PNB Hldg. Co. S'holders Litig.,* 2006 WL 2403999, at *9– 10 (Del. Ch. Aug. 18, 2006); *Emerson Radio Corp. v. Int'l Jensen Inc.,* 1996 WL 483086, at *17 (Del. Ch. Aug. 20, 1996)); *see also Zimmerman v. Crothall,* 62 A.3d 676, 700 (Del. Ch.2013) (finding after trial that two stockholders that owned 65% of the company and that designated two of the board's five directors were not a control group because, in part, "[t]here [was] no showing that they acted as one unit or that one exerted control over the other").

238   *See Williamson,* 2006 WL 1586375, at *4.

The Plaintiffs assert that Wren, Javva, and Catalyst constituted a control group that used their collective ownership of a majority of the Company's stock to cause the Board to implement the Recapitalization by which they received additional equity at an unfair price. They draw on circumstantial evidence of a plan to take control of the Company and to exclude Biderman from the process, all of which, in their estimation, supports the conclusion that Wren, Javva, and Catalyst were bound in a legally significant way to effect the Recapitalization. [239] In particular, the Plaintiffs emphasize Shipman's use of the word "control" in the Catalyst Memo, and they submit that Catalyst's 90–day option to invest is compelling evidence of a control group because that option, granted by Wren and Javva, was not shared with other stockholders or disclosed to Biderman. [240] The Defendants deny that any 90–day option was granted to Catalyst. They argue that, absent the option, the proffered evidence fails to demonstrate anything more than parallel interests among Wren, Javva, and Catalyst, let alone a legally significant relationship to control the Company. [241]

239   Pls.' Opening Br. 47–58.

240   Pls.' Reply Br. 22–23.

241   Defs.' Answering Br. 57–63.

**\*25** Aside from a college friendship between Wren's Seth Cameron and Catalyst's Newton, there is no evidence of a historical relationship among Wren, Javva, and Catalyst. The weight of the evidence demonstrates that they each independently came to invest in the Company. Once they became investors, these three stockholders had parallel interests in maximizing the value of the Company.

These interests shifted to become more than parallel, however, by mid–2001. The Catalyst Memo is persuasive evidence that Wren, Javva, and Catalyst sought to "implement an austerity program at the Company to cut costs and monitor revenue traction." [242] In the words of the Catalyst Memo, "control [ling] the purse strings of the Company" and investing in senior secured debt on favorable terms would "effectively give Catalyst (and to a lesser extent, [Wren] and Javva) control over the Company." [243] At this time, these three stockholders held over 50% of the Company's stock. They executed that general plan and thereby obtained over 90% of the Company's senior secured debt. Although this evidence alone does not necessarily demonstrate that Wren, Javva, and Catalyst subsequently constituted a control group during the Recapitalization, [244] it does demonstrate their willingness to work together toward a common goal and to control the Company's business affairs.

242   JX 113–0002.

243   *Id.*

244   *See, e.g., Frank,* 2014 WL 957550, at *18 (acknowledging implicitly that different stages of a transaction may lead to different conclusions on whether there is a control group).

The initial structure of the Recapitalization was not a product of any control group. Wren's Dwyer—not anyone at Javva or Catalyst—came up with the structure and the accompanying $4 million valuation. But, once Dwyer proposed the Recapitalization at the January 7 Board meeting, the interests of Wren, Javva, and Catalyst became further aligned—to the exclusion of the interests of the Company's other stockholders—during several phone calls among their director representatives in which the Recapitalization's terms continued to evolve. The trial record is replete with evidence that Dort Cameron, Katz, and Shipman knowingly excluded Biderman from these informal phone calls among directors from December 2001 until August 2002. Personal disdain or even animosity of other directors toward Biderman does not, however, show that Wren, Javva, and Catalyst were united in interest during the Recapitalization.

Case 1:18-cv-00475-SEB-TAB   Document 1-2   Filed 02/16/18   Page 168 of 440 PageID #: 180
In re Nine Systems Corporation Shareholders Litigation, Not Reported in A.3d (2014)

2014 WL 4383127

The Court's conclusion that Wren, Javva, and Catalyst constituted a control group during the Recapitalization is ultimately supported by the facts and circumstances surrounding Catalyst's 90–day "right to invest." The Court previously concluded that, before the Board approved the Recapitalization on January 17, 2002, Catalyst received an informal right to invest in what would become the Preferred B–1 stock. Under the facts and circumstances here, the right to invest demonstrates that Wren, Javva, and Catalyst were a control group. First, this right to invest was not disclosed to the entire Board (namely, Biderman). Second, given that Catalyst received the right to invest in advance of the January 17 meeting, Wren and Javva must have together decided to provide it to Catalyst during one of the informal telephone meetings among their representatives, again without Biderman. Third, a right to invest was provided only to Catalyst, whose consent would be necessary to approve certain charter amendments by stockholder written consent instead of at a special meeting. Thus, the weight of the evidence supports the inference that, in exchange for agreeing to support the Recapitalization through Shipman's votes on the Board and Catalyst's stockholder written consent, Catalyst received the 90–day right to invest in the Recapitalization. Particularly in light of Catalyst's earlier comments in the Catalyst Memo, this conduct here demonstrates an agreement, arrangement, and legally significant relationship among Wren, Javva, and Catalyst—who together owned a majority of the Company's stock—to accomplish the Recapitalization. Catalyst's initial resistance toward investing immediately, its failure to document the right to invest, and its eventual decision not to invest do not undermine the Court's conclusion that, when the Board approved the Recapitalization on January 17, 2002, Catalyst, along with Wren and Javva, constituted a control group.

*26 Nor does the ostensible offer for Biderman to have the Lipper-affiliated investors contribute in the Recapitalization alter the weight of the evidence. With Wren and Javva having already agreed to fund $2.5 million on January 10, 2002, and Catalyst soon thereafter receiving the right to invest, those three stockholders were united in interest in excluding other investors to maximize their potential return from the Recapitalization. Granberg's contemporaneous notes from the January 10 Board meeting show that the Board offered Biderman the opportunity to ask the Lipper-affiliated investors to participate, but "Lipper ... deferred" because of concerns

about timing and lack of due diligence. [245] This supposed offer was not genuine because Biderman had already twice complained—first, in his December 2001 letter rebuking the conduct of the Board, and then, at the January 7 Board meeting—that he did not have enough time to review the Recapitalization's terms. Biderman thus did not feel confident recommending the Recapitalization transaction to the Lipper-affiliated Plaintiffs, and the other directors did not contact those individuals.

[245]   JX 170–0004.

All of this evidence undermines any contention by Wren, Javva, and Catalyst that they did not constitute a control group because Biderman was invited to participate and declined to do so. Rather, drawing on Biderman's characterization of other Board meetings, the Recapitalization was a *fait accompli*. [246]

[246]   Tr. 1146, 1148, 1375 (Biderman).

In sum, the Plaintiffs have proven, based on the evidence presented at trial, that it is more likely than not that Wren, Javva, and Catalyst constituted a control group during the Recapitalization. Thus, Wren, Javva, and Catalyst owed fiduciary duties to the Company's other stockholders. The Plaintiffs therefore have direct standing under *Gentile II* to challenge the conduct of Wren, Javva, and Catalyst in the Recapitalization.

(b) *Alternatively, Whether a Majority of the Board which Approved the Recapitalization was Conflicted*

Because of the considerable attention devoted by the parties to this issue in their post-trial briefing and at post-trial oral argument, the Court also considers whether the Plaintiffs have direct standing to challenge the Recapitalization under *Gentile II* under the theory that a majority of the directors who approved the Recapitalization suffered impermissible conflicts.

The facts of *Gentile II* involved an undisputed controlling stockholder, which framed the Supreme Court's discussion of the "transactional paradigm" that could support direct and derivative expropriation claims. Early understandings of *Gentile II* assumed that direct standing was only available in circumstances in which there was a controlling stockholder [247] or, by implication,

Case 1:18-cv-00475-SEB-TAB Document 1-2 Filed 02/16/18 Page 169 of 440 PageID #: 181
In re Nine Systems Corporation Shareholders Litigation, Not Reported in A.3d (2014)
2014 WL 4383127

a functionally equivalent control group.[248] Support for this interpretation can be found in the same case upon which *Gentile II* relied for the proposition that expropriation gives rise to a direct claim: *In re Tri–Star Pictures, Inc., Litigation,*[249] where stockholder plaintiffs alleged that a controlling stockholder stood on both sides of a dilutive, assets-for-stock transaction.[250]

[247] *See, e.g., Gatz v. Ponsoldt,* 925 A.2d 1265, 1280–81 (Del.2007) ("In this case, ... the fiduciary exercises its stock control to expropriate, for its benefit, economic value and voting power from the public shareholders.... Here, the ultimate transferee is a third party, with the controlling stockholder being an intermediary that transfers the benefits of its expropriation to the ultimate beneficiary in exchange for cash or other equivalent value."); *Feldman v. Cutaia,* 956 A.2d 644, 657 (Del. Ch.2007) ("*Gentile* and *Gatz* are predicated on the idea that transactions of this type result in an improper transfer of both economic value and voting power from the minority to the controlling stockholder. Thus, it is clear from those decisions that the Delaware Supreme Court intended to confine the scope of its rulings to only those situations where a controlling stockholder exists. Indeed, any other interpretation would swallow the general rule that equity dilution claims are solely derivative, and would cast great doubt on the continuing vitality of the *Tooley* framework."), *aff'd,* 951 A.2d 727 (Del.2008).

[248] *See, e.g., Dubroff I,* 2009 WL 1478697, at *3 (articulating some of the ways in which a group of stockholders may be deemed a control group).

[249] 634 A.2d 319 (Del.1993).

[250] *Id.* at 329, 332–33.

**\*27** By its own terms, however, *Gentile II* expressly recognized that it only addressed what was "*at least one* transactional paradigm" that had the dual nature of causing direct and derivative harm and permitting direct and derivative recovery.[251] Broader language in *Gentile II* (or in *Tri–Star* ) about situations not involving a controlling stockholder would arguably have been dictum.[252]

[251] *See Gentile II,* 906 A.2d at 99 (emphasis added).

[252] *See generally In re MFW S'holders Litig.,* 67 A.3d 496, 521 (Del. Ch.2013) ("Our Supreme Court follows the traditional definition of 'dictum,' describing it as judicial statements on issues that 'would have no effect on the outcome of [the] case.' In Delaware, such dictum is 'without precedential effect.' Thus, broad judicial statements, when taken out of context, do not constitute binding holdings.") (internal citations omitted), *aff'd sub nom., Kahn v. M & F Worldwide Corp.,* 88 A.3d 635 (Del.2014).

Thus, *Gentile II* 's holding does not necessarily warrant the interpretation that, by affording dispositive weight to the Supreme Court's discussion of the facts before it, forecloses direct standing for an expropriation claim absent a controlling stockholder. In other words, that a controlling stockholder's conduct may be challenged through an expropriation claim that is both direct and derivative under Gentile II does not mean that an expropriation claim that is both direct and derivative may only be asserted against a controlling stockholder.

This Court revisited this doctrinal question in *Carsanaro v. Bloodhound Technologies, Inc.*[253] There, a former stockholder alleged that a majority of the board of directors was conflicted when setting and approving the terms of several preferred stock issuances because an overwhelming percentage of the preferred stock was issued to the directors personally or to the venture capital firms that had nominated the directors to the board. The plaintiffs challenged those stock issuances after the corporation merged with a third party, implicating the continuous ownership rule.

[253] 65 A.3d 618 (Del. Ch.2013).

The court in *Carsanaro* concluded that the plaintiffs' breach of fiduciary duty claims were, in the language of *Gentile II,* for improper expropriation. The court then concluded, at the motion to dismiss stage, that the plaintiffs had standing to assert these expropriation claims on two independent grounds: (i) the venture capital funds and their director representatives constituted a control group; and (ii) "the board that effectuated the transaction [*i.e.,* the preferred stock issuances] lacked a disinterested and independent majority" because a majority of the directors who approved the stock issuances each "acted as a fiduciary for his affiliated fund [that received stock], creating divided loyalties giving rise to a conflict of interest."[254]

[254] *Id.* at 639, 658.

In the latter conclusion (which was actually reached first), the court presented an illustrative hypothetical in which the directors issue to themselves stock at a price that is below current market value. The court concluded that, under the "core insight" of *Gentile II*, stockholders in that hypothetical could bring a direct breach of fiduciary duty claim against the directors after a subsequent merger: "[a]lthough there was no controlling stockholder pre-merger, the directors could be said to have expropriated value from the common stockholders in the manner contemplated by *Gentile*." [255] This conduct would support a direct claim because the economic and voting rights of the corporation's stockholders would be harmed in proportion to the board's expropriation of those rights on unfair terms. [256]

[255]    *Id.* at 658.

[256]    *Id.* at 655–56.

**\*28** Under the doctrinal justifications that implicitly support *Carsanaro*, it makes little sense to hold a controlling stockholder to account to the minority for improper expropriation after a merger but to deny standing for stockholders to challenge a similar expropriation by a board of directors after a merger. After al l, Delaware law endows the board–not a controller– with the exclusive authority to manage and direct the corporation's business affairs, [257] the foremost example of which is the power to issue stock. [258] Why, then, should Delaware law hold a controlling stockholder to a higher standard than the board of directors? [259] After careful reflection, the Court has struggled to articulate a satisfactory answer.

[257]    *See* § Del. C. § 141(a); *see also, e.g., Aronson v. Lewis,* 473 A.2d 805, 811 (Del.1984) ("A cardinal precept of the General Corporation Law of the State of Delaware is that directors, rather than shareholders, manage the business and affairs of the corporation.").

[258]    *See, e.g.,* § Del. C. §§ 151–53, 157, 161, 166; *see also Grimes v. Alteon, Inc.,* 804 A.2d 256, 261 (Del.2002) ("Taken together, these provisions confirm the board's exclusive authority to issue stock and regulate a corporation's capital structure.").

[259]    On more than one occasion, this Court has emphasized how even controlling stockholders must accede to the decisions of the corporate body

bestowed with exclusive management authority—the board of directors:

> The reality is that controlling stockholders have no inalienable right to usurp the authority of boards of directors that they elect. That the majority of a company's voting power is concentrated in one stockholder does not mean that that stockholder must be given a veto over board decisions when such a veto would not also be afforded to dispersed stockholders who collectively own a majority of the votes. Like other stockholders, a controlling stockholder must live with the informed (*i.e.,* sufficiently careful) and good faith (*i.e.,* loyal) business decisions of the directors unless the DGCL requires a vote. That is a central premise of our law, which vests most managerial power over the corporation in the board, and not in the stockholders.

> *Hollinger Inc. v. Hollinger Int'l, Inc.,* 858 A.2d 342, 387 (Del. Ch.2004); *see also In re CNX Gas Corp. S'holders Litig.,* 4 A.3d 397, 415 (Del. Ch. May 25, 2010) ("[D]irector primacy remains the centerpiece of Delaware law, even when a controlling stockholder is Present[.]").

The *Carsanaro* decision is a more expansive interpretation of *Gentile II* than other decisions of this Court. [260] It is not, however, an unprecedented approach. This Court concluded in *Avacus Partners, L.P. v. Brian,* [261] under the then-prevailing "special injury" test, [262] that a stockholder stated a direct claim for dilution through allegations that the board of directors improperly issued "stock [to] friendly hands to protect against a threatened takeover." [263] Although there were allegations of entrenchment in *Avacus Partners,* there were no allegations of a controlling stockholder. The analysis of *Avacus Partners*—that a stockholder can assert an expropriation claim directly against a majority-conflicted board—remains persuasive today, particularly since both *Tri-Star* and *Gentile II* favorably cite that case for the proposition that improper stock dilution gives rise to a direct claim. [264]

[260]    *See, e.g., Di Rienzo v. Lichtenstein,* 2013 WL 5503034, at \*25 (Del. Ch. Sept. 30, 2013) ("As stated, a direct claim under *Tri–Star* and *Gentile* is against a majority or controlling shareholder only."), *appeal refused,* 80 A.3d 959 (Del.2013); *Feldman,* 956 A.2d at 657.

Case 1:18-cv-00475-SEB-TAB Document 1-2 Filed 02/16/18 Page 171 of 440 PageID #: 183
In re Nine Systems Corporation Shareholders Litigation, Not Reported in A.3d (2014)

2014 WL 4383127

261    1990 WL 161909, 16 Del. J. Corp. L. 1425 (Del. Ch. Oct. 24, 1990).

262    See *Lipton v. News Int'l, Plc,* 514 A.2d 1075, 1078 (Del.1986), *abrogated in part by Tooley,* 845 A.2d at 1038–39.

263    *Avacus P'rs, L.P.,* 16 Del. J. Corp. L. at 1432, 1439 ("Shareholders do have a right to vote their shares, however, so a claim that the board improperly acted to entrench itself by issuing stock that impacts the shareholders' voting power may state either an individual or a derivative claim. Assuming the stock is issued for an adequate consideration, the claim will be only individual. If the stock is issued for inadequate consideration, the corporation itself will be directly injured as well and both individual and derivative wrongs might be alleged.").

264    See *Gentile II,* 906 A.2d at 99 n.18; *In re Tri–Star Pictures, Inc.,* 634 A.2d at 330.

*29  *Carsanaro* may also, perhaps, exceed what the Delaware Supreme Court intends in this area of Delaware law. But, the Supreme Court has not yet had the occasion to rule explicitly on this interesting question of corporate law. Until it does, the logic and reasoning of *Carsanaro* (and of its predecessor, *Avacus Partners*) are compelling. Although reasonable minds may disagree, the Court agrees with those conclusions of Delaware law. Importantly, *Carsanaro* is consistent with, and does not swallow the whole of, the settled *Tooley* test because the circumstances that would support a dual expropriation claim, as recognized in *Gentile II,* remain narrow: "[t]he expropriation principle operates only when defendant fiduciaries (i) had the ability to use the levers of corporate control to benefit themselves and (ii) took advantage of the opportunity." 265

Thus, as an alternative ground, the Plaintiffs may also establish standing by proving that a majority of the Board was conflicted—here, meaning interested or not independent 266—when it approved and implemented the Recapitalization.

It is by no means *per se* improper for a director of a Delaware corporation to also be a fiduciary for another beneficiary. Directors frequently serve on the board of more than one company; 267 some, especially with start-up companies, may have been appointed by a venture capital firm with whom they are in a

fiduciary relationship. 268 A director with a competing fiduciary relationship may face "an inherent conflict of interest" if, when considering the merits of a particular business decision, "the interests of the beneficiaries diverge." 269 Drawing on the teachings of the Delaware Supreme Court's decision in *Weinberger v. UOP, Inc.,* this Court has described this issue as the "dual-fiduciary problem." 270

265    *Carsanaro,* 65 A.3d at 658–59.

266    Because it was not raised by the parties, the Court does not decide whether a showing that a majority of the Board was not acting in good faith or was not adequately informed–the other ways in which a plaintiff may rebut the business judgment standard of review, see *Aronson,* 473 A.2d at 812—would be sufficient for standing to bring a direct expropriation claim under *Gentile II.*

267    See, e.g., *Krasner v. Moffett,* 826 A.2d 277, 283 (Del.2003) (concluding, at the pleadings stage, that three directors were not independent when considering a transaction because they also served as directors of the counterparty in the transaction at issue); *Weinberger,* 457 A.2d at 710 (concluding in a post-trial appeal that the directors who served on the boards of a corporation and its controlling stockholder were not independent when considering the merits of a transaction between the two).

268    See, e.g., *In re Trados Inc. S'holder Litig.,* 73 A.3d 17, 51–54 (Del. Ch.2013) (concluding after trial that three directors appointed by venture capital funds to the board were in a fiduciary relationship with their respective funds); *Carsanaro,* 65 A.3d at 638 (inferring at the motion to dismiss stage that three directors were in a fiduciary relationship with the affiliated funds that appointed them to the board).

269    *In re Trados Inc.,* 73 A.2d at 47.

270    *Id* at 46–47; *Carsanaro,* 65 A.3d at 638.

Directors of Delaware corporations owe fiduciary duties of care and loyalty to the corporation and its stockholders. 271 "Essentially, the duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." 272 Thus, to discharge his or her fiduciary duties—especially the

Case 1:18-cv-00475-SEB-TAB    Document 1-2    Filed 02/16/18    Page 172 of 440 PageID #: 184
In re Nine Systems Corporation Shareholders Litigation, Not Reported in A.3d (2014)

2014 WL 4383127

duty of loyalty—a director must put the interests of the stockholders above self-interest and, by extension, the interests of the other beneficiaries to whom the director may also owe fiduciary duties. Put simply, "[t]here is no 'safe harbor' for such divided loyalties in Delaware." [273]

[271]    *See* MiIIs Acq.Co. v. MacmiIIan, Inc., 559 A.2d 1261, 1280 (Del.1989).

[272]    *Cede & Co. v. TechnicoIor, Inc.,* 634 A.2d 345, 361 (Del.1993); *see also* Guth v. Loft, Inc., 5 A.2d 503, 510 (Del.1939) ( "Corporate officers and directors are not permitted to use their position of trust and confidence to further their private interests.... The rule that requires an undivided and unselfish loyalty to the corporation demands that there be no conflict between duty and self-interest.").

[273]    *Weinberger,* 457 A.2d at 710; *see also* McMullin v. Beran, 765 A.2d 910, 923 (Del.2000) ("There is no dilution of that [duty of loyalty] in a parent subsidiary context for the individuals who acted in a dual capacity as officers or designees of [the controlling stockholder] and as directors of [the corporation].").

**\*30**    To prove that a director confronted the dual fiduciary problem, a plaintiff must establish: (i) that the interests of the second beneficiary diverged from those of the common stockholders; and (ii) that the director "faced a conflict of interest because of [his or her] competing duties." [274]   A director who approves a stock issuance not offered to all stockholders may, if he or she is in a fiduciary relationship with a recipient of the new stock, faces an inherent conflict of interest. [275]

[274]    *In re Trados Inc.,* 73 A.3d at 52–54 (concluding that three directors faced actual conflicts of interest because the beneficiaries of their fiduciary duties had conflicting interests: the corporation's stockholders were owed duties to maximize the value of the corporation for their benefit, while the venture capital firms wanted to exit the investment by selling the company in the near-term without regard to long-term value maximization).

[275]    *See* Carsanaro, 65 A.3d at 638 ("Because of their dual status as fiduciaries for the Company and for the entities purchasing the Series D Preferred, [three directors] were not independent with respect to the Series D Financing.").

    Because no member of the Board received stock individually, the Court does not address whether a

majority of directors who approve stock issuances to themselves may also face a fundamental conflict that, absent relevant procedural protections, may give rise to a direct expropriation claim under *Gentile II*.

The Plaintiffs insist that, as fiduciaries of stockholders who benefited from the Recapitalization to the detriment of the Company's other stockholders—Wren and Javva's receiving the Preferred B–1 stock and Catalyst's receiving the 90–day right to invest—Dort Cameron, Katz, and Shipman were conflicted when deciding whether to approve the Recapitalization. [276]   They further argue that Williams (and then Snyder) was interested because he intended to invest in the Recapitalization (and because Snyder received stock options after its completion), or at least because both Williams and Snyder were, each as the Company's CEO, beholden to the interested Board majority. [277]   The Defendants again contend that Catalyst did not receive any 90–day option and thus Shipman was not conflicted because he declined to participate. As to Williams and Snyder, the Defendants maintain that the weight of the evidence belies the Plaintiffs' assertion that those two directors were interested in the Recapitalization. [278]

[276]    Pls.' Opening Br. 44–47.

[277]    Pls.' Reply Br. 18–22.

[278]    Defs.' Answering Br. 54–56.

The Court analyzes potential conflicts of interests on a director-by-director basis. [279]   By a clear preponderance of the evidence, the Plaintiffs established that Dort Cameron, Katz, and Shipman were in a fiduciary relationship with their respective entities. Dort Cameron was Wren's managing member; Katz was Javva's managing member and principal; and Shipman was one of Catalyst's partners. Each of these three members of the Board would have faced a potential conflict of interest in any transaction between the Company and the entity to which he owed fiduciary duties.

[279]    *See* McMullin, 765 A.2d at 923.

It is undisputed that Dort Cameron and Katz faced an actual conflict of interest when they approved the Recapitalization because Wren and Javva invested and ultimately received Preferred B–1 stock in return. The interests of Wren and Javva diverged from the interests

of the Company's other stockholders: Wren and Javva sought to maximize the value of their investment, while the stockholders who did not participate in the Recapitalization—including the Plaintiffs—would seek to act in the best interests of the Company.

**\*31** Conversely, there is no dispute that Biderman was not in a fiduciary relationship, separate from his position as a director, with any investor who participated in the Recapitalization. The Plaintiffs thus must establish that one of the remaining directors—Williams (and then Snyder) or Shipman–also faced an actual conflict.

Neither Williams nor Snyder stood on both sides of the Recapitalization because neither invested in January 2002 or any time thereafter. Williams appears to have, at first, committed to invest $200,000 in the Company in exchange for Preferred B–1 stock, but he never did so. He may have been asked to resign before he could invest, or perhaps he did not find the investment that attractive. The parties dispute the possible reasons in their briefs, but neither cites any evidence in support of their position. [280] The Plaintiffs did not put on evidence of this issue at trial, and thus they have failed to prove that this initial commitment, assuming there was one, rendered Williams conflicted. Williams had resigned by April, and Snyder was not a member of the Board until May. The stock options that Snyder received were approved by the Board separate from the Recapitalization; there is no evidence of a quid pro quo with Snyder and any of the Defendants.

[280]    Pls.' Reply Br. 20; Defs.' Answering Br. 27.

Additionally, without deciding whether being "beholden" [281] to those who are issued stock is sufficient to render a director conflicted for purposes of asserting a direct expropriation claim, the Plaintiffs failed to demonstrate that either Williams or Snyder was beholden to Wren or Javva (or to Catalyst, for that matter). The Plaintiffs have not shown, for example, that either was appointed as a director with the understanding that he would approve the Recapitalization. Moreover, that the Board requested Williams' resignation as CEO and as a director in April 2002—in the midst of implementing and setting the final terms of the Recapitalization— undermines, rather than supports, any finding that Williams' business discretion was "sterilized." [282] Finally, the Board's appointing Snyder as CEO and electing him as a director, without further evidence, is insufficient to

demonstrate that Snyder lacked independence during the Recapitalization process. [283]

[281]    *Aronson,* 473 A.2d at 815.

[282]    *Rales v. Blasband,* 634 A.2d 927, 936 (Del.1993).

[283]    *See, e.g., In re Tyson Foods, Inc. Consol. S'holder Litig.,* 919 A.2d 563, 588 (Del. Ch.2007) ("[I]t is well-settled that a director's appointment at the behest of a controlling shareholder does not suffice to establish a lack of independence.").

This leaves Catalyst's Shipman. Given the two references to the "right to invest" in Catalyst's internal documents and Shipman's testimony that he would not have written anything in those documents that was not accurate, the Court found that, before the Board approved of the Recapitalization, Catalyst (and only Catalyst) was provided with an informal right to invest in what would become the Preferred B–1 stock. This right to invest, even if it was not legally enforceable (as the Defendants contend), was a tangible benefit that Catalyst would receive so long as Shipman voted in favor of the Recapitalization. In a way, the opportunity to see how the Company performed before investing additional money may have been a more valuable benefit than the convertible notes that the actual investors received —for while Wren and Javva had money on the table, Catalyst was able to wait and see if it was a good bet. Although not as readily apparent as with Dort Cameron and Katz, Shipman also faced the dual fiduciary problem. He faced an actual conflict of interest between his duties to the Company's stockholders and his duties to Catalyst, which was on the other side of the Recapitalization because it received something—the "right to invest" in the Preferred B–1 stock issuance—that was not shared with the Company's other stockholders. [284]

[284]    Based on this conclusion, the Court need not address the Plaintiffs' alternate theory that Shipman was conflicted because Catalyst would receive Preferred A stock in the Recapitalization. Tr. of Post–Trial Oral Arg. 21.

**\*32** As an alternative holding, the Plaintiffs have demonstrated that, of the members of the Board who approved the Recapitalization, a majority owed fiduciary duties to entities that received benefits from the Recapitalization (preferred stock or the right to invest in preferred stock) that were not shared with the

Company's other stockholders. Thus, the Plaintiffs have direct standing to challenge the Board's conduct in the Recapitalization.

### 2. *The Standing of the SMIG Plaintiffs*

"As a general matter, when the terms of a transaction are established—not when the transaction is carried out —is the proper time for assessing whether a breach of fiduciary duty occurred." [285] The SMIG Plaintiffs were owed fiduciary duties by the Board by at least May 30, 2002, the date when they individually received stock in the Company. What remains in dispute is whether the SMIG Plaintiffs have standing to challenge the Recapitalization as approved by the Board in January 2002.

[285]    *Nine Sys. Corp. I*, 2013 WL 771897, at *7 (citing *7547 P'rs v. Beck,* 682 A.2d 160, 162–63 (Del.1996)).

The SMIG Plaintiffs claim that they have standing on two, independent grounds: (i) because the Defendants changed material terms of the Recapitalization after May 2002; and (ii) because they received their stock by "operation of law" through the dissolution of SMIG. [286] The Defendants, consistent with their position that there was no breach of fiduciary duty, contend that the SMIG Plaintiffs were not harmed by any actions after May 2002. They also insist that the "operation of law" doctrine invoked by the SMIG Plaintiffs applies in derivative litigation, not for a purportedly direct claim asserted here. [287]

[286]    Pls.' Reply. Br. 51–53; Pls.' Opening Br. 105–07.

[287]    Defs.' Answering Br. 95–96.

"[I]n order to bring any type of derivative action to correct alleged acts of corporate mismanagement it is necessary that the plaintiff either be a stockholder at the time of the transaction complained of, or that his stock thereafter devolve upon him by operation of law." [288] Because, when SMIG dissolved, the SMIG Plaintiffs received stock in the Company without any action on their part, [289] they received their stock in the Company by operation of law. [290]

[288]    *Brown v. Automated Marketing Sys., Inc.,* 1982 WL 8782, at *1, 7 Del. J. Corp. L. 466, 468 (Del Ch. Mar. 22, 1982) (citing 8 *Del. C.* § 327).

[289]    *See, e.g.,* JX 209, 210, 211, 212, 213.

[290]    *Parfi Hldg. AB v. Mirror Image Internet, Inc.,* 954 A.2d 911, 937 (Del. Ch.2008) (quoting WILLIAM MEADE FLETCHER, CYCLOPEDIA OF THE LAW OF CORPORATIONS § 5981 (2013)) ("A transfer of shares by operation of law means that the shareholder acquires the shares without any act or cooperation on his or her part.").

Under the facts of this case, the Court concludes that the "operation of law" exception to the continuous ownership rule applies with equal force to the SMIG Plaintiffs' ability to assert their expropriation claims directly. Because they received their stock in the Company from SMIG by operation of law, the SMIG Plaintiffs have direct standing to challenge the Recapitalization as approved by the Board in January 2002. [291]

[291]    Alternatively, the Court concludes that the SMIG Plaintiffs have standing to challenge the Recapitalization because, after they became direct stockholders in the Company, material terms in the Recapitalization changed before it was finally implemented in August 2002.

### 3. *The Standing of Morris and Bernard Fuchs*

**\*33** The Defendants assert that Morris and Bernard Fuchs (the "Fuchs Brothers") do not have standing to challenge the Recapitalization because they were not diluted. Rather, each was "mistakenly" issued additional shares in 2001 "well in excess of the amount by which they claim to have been diluted," rendering their expropriation claims moot. The Company's mistake in 2001, according to the Defendants, was issuing stock that was thought to have been required by the Fuchs Brothers' contractual anti-dilution rights, which the Defendants now assert that the Fuchs Brothers never had. [292] The factual dispute is whether the Fuchs Brothers acquired their stock in the Company through stock purchase agreements with most favored nation ("MFN") rights. If they had MFN rights, the Fuchs Brothers would have received anti-dilution protection when Catalyst, [293] Wren, and Javva subsequently received anti-dilution rights. [294] The Fuchs Brothers insist that they signed stock purchase agreements with MFN rights, even if they have not produced those documents such that their claims are not moot. [295]

[292]    Defs.' Answering Br. 97–99.

293    JX 78.

294    JX 81; Tr. 304 (R. Murphy).

295    Pls.' Opening Br. 107–09.

The Court concludes, based on the weight of the evidence at trial, that it is more likely than not that the Fuchs Brothers signed stock purchase agreements that provided for MFN rights by which they received anti-dilution protection. The Fuchs Brothers testified to that effect. [296] More than one witness who had no interest in this issue testified that the Fuchs Brothers could not have acquired stock without signing a stock purchase agreement, [297] and the other stockholders who invested contemporaneously with the Fuchs Brothers all signed stock purchase agreements with MFN rights. [298] This evidence is credible. [299] The Defendants also treated the Fuchs Brothers as if they had anti-dilution protection, which they only could have acquired through MFN rights. It is difficult to reconcile the Defendants' litigation-minded characterization of this being a "mistake" given the magnitude of the Company's error—the Defendants contend that Morris and Bernard Fuchs were "overcompensated in the Akamai Merger by a factor of eight and eighteen, respectively." [300] The Court thus concludes that the additional shares that the Fuchs Brothers received in 2001 pursuant to their anti-dilution rights (acquired by operation of their MFN rights) do not compromise their standing to challenge the distinct, dilutive harm they purportedly suffered in the Recapitalization. [301]

296    Tr. 455–58 (M. Fuchs), 504–05 (B. Fuchs).

297    See, e.g., id. 288 (R. Murphy), 786–87, 809–10(Koo), 1542–43 (Schaum).

298    JX 45, 50, 57.

299    Cf. *Krenowsky v. Haining,* 1988 WL 90825, at *4 (Del. Ch. Aug. 30, 1988) ("I find no credible evidence of an agreement calling for Haining to transfer her assets to Hull in exchange for a deed to the Harmony Road property. No corroborating documentary evidence of such an agreement, or testimony of any disinterested witness, was presented."), *aff'd sub nom.* *Hull v. Krenowsky,* 567 A.2d 421 (Del.1989).

300    Defs.' Answering Br. 97.

301    See *Kalisman v. Friedman,* 2013 WL 1668205, at *7 (Del. Ch. Apr. 17, 2013) (citing *In re Celera Corp. S'holder Litig.,* 59 A.3d 418, 429 (Del.2012)) ("To establish standing, a plaintiff must demonstrate that (i) he suffered an injury in fact, (ii) there is a causal connection between the injury and the conduct complained of, and (iii) the injury will likely be redressed by a favorable decision.").

### B. *The Standard of Review*

The Plaintiffs have standing to challenge the Recapitalization directly because Wren, Javva, and Catalyst constituted a control group that owned more than 50% of the Company. Alternatively, they have direct standing because a majority of the Board—Dort Cameron, Katz, and Shipman—was conflicted when approving and implementing the Recapitalization.

Absent certain procedural protections not implicated here, [302] a minority stockholder's challenge to a transaction in which a controlling stockholder stands on both sides of review. [303] Most relevant here, Delaware courts have employed the entire fairness standard of review where a corporation with a controlling stockholder implements a recapitalization that benefits the controller to the detriment of other stockholders. [304] "A controlling or dominating shareholder standing on both sides of a transaction, as in a parent-subsidiary context, bears the burden of proving its entire fairness." [305] The members of the control group stood on both sides of the Recapitalization because each received a benefit not shared with the Company's other stockholders. [306] Accordingly, Wren, Javva, and Catalyst must demonstrate the entire fairness of the Recapitalization.

302    See generally *M & F Worldwide Corp.,* 88 A.3d at 645.

303    See, e.g., *Tremont Corp.* 694 A.2d at 428.

304    See, e.g., *Levco Alternative Fund Ltd. v. Reader's Digest Ass'n, Inc.,* 803 A.2d 428 (Del.2002) (TABLE) (applying, at the preliminary injunction stage, the entire fairness standard of review to a recapitalization where the corporation's voting stock (of which two funds controlled 50%) was to be treated differently than the nonvoting stock).

305  *Kahn v. Lynch Commc'n Sys., Inc.,* 638 A.2d 1110, 1115 (Del.1994).

306  *OTK Assocs., LLC v. Friedman,* 85 A.3d 696, 724 (Del. Ch.2014) ("If a challenged transaction would confer a unique benefit on a party exercising *de facto* control, then entire fairness is the standard of review.").

**\*34** The Court's default standard of review for the decisions of directors is that of business judgment. A plaintiff may rebut the deferential business judgment standard by, in addition to other ways not relevant here, demonstrating that at least half the board faced an inappropriate conflict of interest. [307] To do so, a plaintiff need not name every directive as a defendant. [308]

307  *See generally Orman v. Cullman,* 794 A.2d 5, 22 (Del. Ch.2002).

308  *See Hamilton P'rs, L.P. v. Highland Capital Mgmt., L.P.,* 2014 WL 1813340, at \*15 (Del. Ch. May 7, 2014) ("[I]t is not impermissible for a stockholder to assert a breach of fiduciary duty claim against less than half of the directors who approved a particular decision[.]").

By proving that a majority of the directors who approved a stock issuance faced an inherent conflict as dual fiduciaries with conflicting beneficiaries, a stockholder plaintiff would implicate the entire fairness standard of review. [309] Each of Dort Cameron, Katz, and Shipman was inherently conflicted due to the competing fiduciary duties he owed to the Company and his respective firm. The Defendants who were members of the Board during the Recapitalization—Dort Cameron, Katz, Shipman, and Snyder [310]—thus must establish its entire fairness.

309  *See, e.g., Paramount Commc'ns Inc. v. QVC Network Inc.,* 637 A.2d 34, 42 n.9 (Del.1994) ("Where actual self-interest is present and affects a majority of the directors approving a transaction, a court will apply even more exacting scrutiny to determine whether the transaction is entirely fair to the stockholders.").

310  Although Snyder was not a director when the Board initially approved the Recapitalization in January 2002, he was a director when the Board finally implemented the Recapitalization in August 2002. Not only did material terms change while Snyder was a director, but he also was directly involved in the process by which the Board sought to disclose the Recapitalization to the Company's stockholders.

Thus, Snyder is a proper defendant as to this breach of fiduciary duty claim.

## C. *The Entire Fairness of the Recapitalization*

Entire fairness is the "most onerous" standard of review in Delaware corporate jurisprudence. [311] This standard has two well-known components—"fair dealing and fair price," [312] which at times are referred to as "procedural fairness and substantive fairness" [313]—from which the Court must reach a unitary conclusion on the entire fairness of the business decision or transaction at issue. [314] The burden to establish the entire fairness of the Recapitalization is on the Defendants (other than Dwyer and CFP). Based on the close relationships of these Defendants (and their joint presentation at trial), the Court evaluates the breach of fiduciary duty claims against the control group (Wren, Javva, and Catalyst) and the Board (Dort Cameron, Katz, Shipman, and Snyder) together.

311  *See Reis,* 28 A.3d at 459.

312  *Weinberger,* 457 A.2d at 711.

313  *ONTI, Inc. v. Integra Bank,* 751 A.2d 904, 930 (Del. Ch.1999).

314  *See Tremont Corp.,* 694 A.2d at 432.

### 1. *Fair Dealing*

Fair dealing "embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained." [315] The Defendants conceded that "[their] process was not perfect," but they submit that, given the "exigent circumstances" of the Company's immediate need for cash, the process was fair. Their position on fair dealing centers primarily on Biderman's role in the Recapitalization: the negotiation, structure, and Board approval of the Recapitalization was a fair process because Biderman approved it without complaining to any stockholder that he was being marginalized. [316] The Plaintiffs, meanwhile, argue that little in the Defendants' process was fair. Specifically, they contend that the exclusion of Biderman, the Board's reliance on Dwyer's unsubstantiated $4 million valuation, the 90–day option granted exclusively to Catalyst, and the Board's concealment of the Recapitalization's material terms from

the Company's other stockholders all evidence grossly unfair dealing. [317]

315    *Weinberger,* 457 A.2d at 711.

316    Defs.' Answering Br. 85–88.

317    Pls.' Reply Br. 6–13, 23–25; Pls.' Opening Br. 60–65.

**\*35** The Court considers these and other relevant factors of fair dealing together in the context of five issues: (i) Biderman's role in the Recapitalization; (ii) the process by which the Board valued the Company at $4 million; (iii) Catalyst's right to invest; (iv) the terms of the Preferred B–1 stock; and (v) the Board's disclosure of the Recapitalization to stockholders.

*(a) Biderman's Role in the Board's Evaluation, Negotiation, and Approval of the Recapitalization*

The general initiation of the Recapitalization was fair. The Company was running out of money, its business plan had proven unsuccessful, and management concluded that the Company either needed to grow quickly and become cash flow positive or liquidate. But, the specific sequence of events undertaken by the Defendants to implement the Recapitalization was not fair.

There was a sense of urgency in late December 2001 that, from the very beginning, compromised the Board's ability to evaluate fully and fairly the terms of the Recapitalization. In particular, that urgency—which, after the repeated delays in closing the NaviSite SMG acquisition, would prove unwarranted—led to the exclusion of Biderman from the first important Board meeting outlining what would become the Recapitalization. He was knowingly excluded from at least one Board meeting, unaware of informal calls among directors and Dwyer between subsequent meetings, and not provided with important materials on the same timeline as the other directors. In this context, the Defendants cannot rely on Biderman's eventual approval of the Recapitalization as evidence of fair dealing because his contribution was marginalized from the start. [318]

318    *See, e.g., In re S. Peru Copper Corp. S'holder Deriv. Litig.,* 52 A.3d 761, 798 (Del. Ch.2011) ("[F]rom inception, the Special Committee fell victim to a controlled mindset and allowed [the controlling stockholder] to dictate the terms and structure of the Merger."), *aff'd sub. nom., Ams. Mining Corp. v. Theriault,* 51 A.3d 1213 (Del.2012).

Biderman was independent, but there was no effort to condition the Recapitalization on his approval or that of disinterested stockholders. Instead, the directors who owed fiduciary duties to the entities which would benefit from the Recapitalization controlled the process. Biderman's December 2001 Letter was a strong rebuke to the Board, but it prompted largely cosmetic changes, not substantive ones.

Biderman attended the key Board meetings in January, but his objections were generally trivialized. At one point, likely in light of Biderman's objections, Dwyer did revise the Recapitalization to reduce the dilution to the Plaintiffs and the Company's other stockholders, but the reduction was insignificant—and it did not cure the other procedural defects of the process by which the Board would evaluate, negotiate, and approve the Recapitalization. Moreover, one of the conditions to which the Board agreed for Biderman to approve the Recapitalization—the 1.5x liquidation preference for the Preferred A stock—was never implemented by the Board. On the key terms that mattered, including the valuation of the Company and the percentage of equity in the post-acquisitions Company to be given to the new money, Biderman had no effective bargaining power to challenge Dwyer or the other members of the Board. [319]

319    *Gentile v. Rossette,* 2010 WL 2171613, at \*8 (Del. Ch. May 28, 2010) ("*Gentile III* ") ("Rossette set the conversion rate with limited or no pushback from Bachelor, who was in no position to bargain effectively on behalf of the minority stockholders.").
The Court focuses on Biderman here because three of the other directors (Dort Cameron, Katz, and Shipman) would all get something out of the Recapitalization for their respective entities, and the fourth director (Williams and then Snyder) was more concerned about completing the Recapitalization to fund his business plan (and thereby maintain his position as CEO) than he was about the merits of what was being proposed.

**\*36** The Defendants argue that because an independent Biderman approved the Recapitalization, and because he did not inform any of the Plaintiffs that he was being marginalized in an unfair process, the interests of the Plaintiffs were fairly considered in the Recapitalization.

In re Nine Systems Corporation Shareholders Litigation, Not Reported in A.3d (2014)
2014 WL 4383127

This argument, however, is unpersuasive because it is premised on a seriously flawed understanding of the nature of fiduciary duties under Delaware law. Directors owe fiduciary duties to *all* stockholders, not just a particular subset of stockholders.[320] Biderman was not the only director who owed fiduciary duties to the Plaintiffs; rather, Dort Cameron, Katz, and Shipman owed the same fiduciary duties to the Plaintiffs as they owed (as directors) to Wren, Javva, and Catalyst. Thus, responsibility for acting in the best interest of the Plaintiffs as stockholders fell to the entire Board, not Biderman alone. "A director's failure to understand the nature of his duties can be evidence of unfairness."[321] The Board's utter failure to understand this fiduciary relationship is further evidence of an unfair process.

[320]   *See, e.g., In re Trados Inc.,* 73 A.3d at 38 ("The duty to act for the ultimate benefit of stockholders does not require that directors fulfill the wishes of a particular subset of the stockholder base."); *In re MONY Gp., Inc. S'holder Litig.,* 853 A.2d 661, 676 (Del.2004) ("The board owes its fiduciary duties to the corporation and its stockholders, not merely to a set of stockholders as of a certain record date.").

[321]   *In re Trados Inc.,* 73 A.3d at 62 (citing *In re Trans World Airlines, Inc. S'holders Litig.,* 1988 WL 111271, 14 Del. J. Corp. L. 870, 881 (Del. Ch. Oct. 21, 1988)).

### (b) *The Board's Valuation Process*

Dwyer alone calculated the $4 million valuation. No director appears to have had any material input into that valuation, and Dwyer did not share his valuation methodology with the Board. No independent valuation was solicited.

The Defendants come close to arguing that because $4 million was (they thought) more than the Company was actually worth, the valuation process was fair. This argument is unavailing because the Defendants did not establish that the directors adequately understood how Dwyer—who was conflicted because of his material relationship with Wren—came to the $4 million valuation.

There are many steps the Board could have taken that would demonstrate that the process by which it came to the $4 million valuation was fair. Although hiring an independent financial advisor is not prescribed by

Delaware law,[322] the presence of an advisor could demonstrate that the Board was reasonably informed about the Company's value. It is possible to conclude that the Board did not think it had the time or money to hire a financial advisor,[323] but that conclusion is undermined by the Company's roughly contemporaneous decision during summer 2002—while the terms of the Recapitalization continued to change—to hire three agencies to work for "months" on a possible name change.[324] Unable to rely on an independent financial advisor, the directors themselves needed to be adequately informed about what substantiated the $4 million valuation. Based on the weight of the evidence, they were not adequately informed.

[322]   *See, e.g., Chesapeake Corp. v. Shore,* 771 A.2d 293, 331 (Del. Ch.2000) ("There is no legal requirement that a board consult outside advisors, so long as the board has adequate information to make an informed judgment."); *cf. Houseman v. Sager man,* 2014 WL 1600724, at *7 (Del. Ch. Apr. 16, 2014) (concluding, in the *Revlon* context, that a board's alleged failure to obtain a fairness opinion before agreeing to a merger was not an allegation that supported an inference of a lack of good faith (under the knowing and conscious dereliction of duty theory) because the plaintiffs also alleged that the board actively evaluated whether to obtain a fairness opinion before concluding it would have been prohibitively expensive).

[323]   *See Zimmerman v. Crothall,* 2012 WL 707238, at *9 (Del. Ch. Mar. 5, 2012, revised, Mar. 27, 2012) ("The Board was under no obligation to hire financial advisors, and the Company's limited cash position likely would have made it reluctant to incur such an expense.").

[324]   Tr. 720–21 (Snyder); JX 259.

### (c) *Only Catalyst Receives a Right to Invest*

**\*37** Only Catalyst received a 90–day option to invest in the Recapitalization. This right to invest was not disclosed to the full Board (namely, Biderman), nor was it disclosed at any time to the Company's other stockholders. The option was key to Shipman and Catalyst's decision to approve the Recapitalization. Their approval meant that a majority of the Company's stockholders would be in favor of the Recapitalization, and the Defendants thereby did not need to hold a stockholder vote on the necessary

Case 1:18-cv-00475-SEB-TAB Document 1-2 Filed 02/16/18 Page 179 of 440 PageID #: 191
In re Nine Systems Corporation Shareholders Litigation, Not Reported in A.3d (2014)
2014 WL 4383127

charter amendments. Thus, by favoring their own interests over those of the Company's other stockholders, the Defendants unfairly prescribed a process that rendered the Recapitalization a *fait accompli.*

#### (d) *The Board's Communications with Stockholders about the Recapitalization* [325]

[325]    Because the Plaintiffs have not demonstrated that the Fall 2002 Update harmed them separate from the overall Recapitalization, the Court considers their contentions about the Board's inadequate disclosures in the context of the entire fairness analysis.

The Board's justifications for not inviting the Plaintiffs to participate in the Recapitalization—the urgent need to complete the acquisitions—ring hollow in light of the informal "right to invest" provided to Catalyst. But, the failure to allow the Plaintiffs to participate is not necessarily evidence of unfair dealing. Neither is the failure to disclose the terms of the Recapitalization in real-time evidence of unfair dealing because Delaware law did not require disclosure of the Board's approval of the Recapitalization in January 2002. Each of these decisions "simply deprives the defendants of otherwise helpful affirmative evidence of fairness." [326]

[326]    *In re Trados Inc.,* 73 A.3d at 65.

That said, when Wren, Javva, and Catalyst submitted stockholder consents to approve the necessary amendments to the Company's charter in August 2002, the Company's other stockholders were entitled, by statute, to "[p]rompt notice of the taking of the corporate action." [327] The Board sought to provide that notice in the Fall 2002 Update, but that document was materially misleading. "[W]hen directors communicate publicly or directly with shareholders about corporate matters the *sine qua non* of directors' fiduciary duty to shareholders is honesty." [328] Without rigidly defining the scope of information that must be disclosed under 8 *Del. C.* § 228(e), [329] the court concludes that a general principle of disclosure under Delaware law applies: "once [the directors] traveled down the road of partial disclosure ..., they had an obligation to provide the stockholders with an accurate, full, and fair characterization of those historic events." [330]

[327]    8 *Del. C.* § 228(e).

[328]    *Malone v. Brincat,* 722 A.2d 5, 10 (Del.1998).

[329]    "[T]he precise parameters of the disclosure required by § 228(e) have not yet been delineated[.]" *Dubroff III,* 2011 WL 5137175, at *9; *cf. Di Loreto v. Tiber Hldg. Corp.,* 1999 WL 1261450 (Del. Ch. June 29, 1999) (considering the consequences of the failure to provide "prompt notice" of the action taken by stockholder written consent); *cf. also Unanue v. Unanue,* 2004 WL 2521292, at *8 (Del. Ch. Nov. 3, 2004, revised, Nov. 9, 2004) (contemplating the standard of disclosure when directors solicit stockholder written consents under 8 *Del. C.* § 228).

[330]    *Arnold v. Soc'y for Sav. Bancorp, Inc.,* 650 A.2d 1270, 1280 (Del.1994); *see also Zirn v. VLI Corp.,* 681 A.2d 1050, 1056 (Del.1996) ("In addition to the traditional duty to disclose all facts material to the proffered transaction, directors are under a fiduciary obligation to avoid misleading partial disclosures.").

Under the circumstances here, in which Wren, Javva, and Catalyst gave their written consent to approve the charter amendments necessary for the Recapitalization that had been approved by their fiduciaries on the Board and after which the Plaintiffs and other stockholders would be substantially diluted, the Court concludes that the failure also to disclose in the Fall 2002 Update who participated in the Recapitalization and on what terms was materially misleading and inconsistent with the Board's fiduciary duties. The failure to disclose this material information is powerful evidence of unfair dealing.

#### (e) *The Changing Terms of the Preferred B–1 Stock*

**\*38** Finally, two additional terms of the Recapitalization inexplicably changed between the Board's approval in January 2002 and the issuance of Preferred B–1 stock in August 2002. First, the interest rates on the promissory notes increased from 10% to 12%. Second, the accrued interest became convertible. As a result of these changes —neither of which was approved by the Board—Wren received Preferred B–1 stock representing 39.9% of the Company's fully diluted equity (despite its promissory note providing for no more than 34.65%) and Javva received Preferred B–1 stock representing 11.2% (despite its promissory note limit of 9.10%). The disregard of the Board's resolutions approving the terms of the Recapitalization in January 2002 and the specific terms

of the promissory notes—which further benefited Wren and Javva to the detriment of the Company's other stockholders—compounds the evidence leading to a conclusion of unfair dealing.

### 2. Fair Price

Fair price "relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock." [331] The directors must establish that the valuation of the Company for purposes of the Recapitalization fell within the proverbial "range of fairness": [332] one "that a reasonable seller, under all of the circumstances, would regard as within a range of fair value; one that such a seller could reasonably accept." [333]

[331]    *Weinberger,* 457 A.2d at 711.

[332]    *Reis,* 28 A.3d at 466–67.

[333]    *Cinerama, Inc. v. Technicolor, Inc.,* 663 A.2d 1134, 1143 (Del. Ch.1994) ("*Cinerama I* "), *aff'd,* 663 A.2d 1156 (Del.1995) ( "*Cinerama II* ").

The Defendants assert that Dwyer's $4 million valuation was a fair price because the Company's equity had no value at the time of the Recapitalization. The Plaintiffs contend that the Company's $30.89 million value at that time rendered the $4 million valuation fundamentally unfair. Unsurprisingly, to support their widely divergent valuations, the parties make several opposing assumptions, including whether the entity to value is the Company or the Company plus the eMedia and NaviSite SMG acquisitions; whether management's one year of projections presented when the Board approved the Recapitalization at the January 17, 2002, meeting are sufficiently reliable to support a credible discounted cash flow analysis; and the resulting assumptions in their expert valuation methodologies.

The parties each submitted expert reports and elicited a full day of expert testimony on valuation issues concerning the Recapitalization. The Plaintiffs presented James Reilly ("Reilly"), an investment banker with more than thirty years of experience. The Defendants proffered Jerry Hausman ("Hausman"), a chaired professor of economics

at the Massachusetts Institute of Technology, where he has taught for approximately thirty-five years.

The Court considers three components of the fair price analysis—(i) the credibility of contemporaneous statements in the record about the Company's value in January 2002; (ii) the proper entity to be valued; and (iii) the reliability of management's January 2002 pro forma projections—before turning to the expert testimony and reaching a conclusion on fair price.

#### (a) The Contemporaneous Statements about Value are Not Credible

The Plaintiffs contend that Reilly's opinions on the Company's value after the acquisitions are consistent with, and thus supported by, evidence of the Company's value from the time when the Board approved the Recapitalization. [334] This evidence includes:

- The Company raised capital in November 2001 based on an $18.1 million valuation using bullish projections; [335]

- Williams, in an email, estimated that the Company's assets were "conservatively worth $10 million"; [336]

- Board minutes for the January 10, 2002, meeting note management's "pro forma valuation of [the Company] post-closing of the proposed acquisitions of $23.0 million (assumed free-cash of $2.3 million; multiple of 10x)"; [337]

- **\*39**  • The conversion ratio for the $3.6 million note that the Company paid to acquire e-Media implied that the Company's post-acquisitions value was approximately $22.8 million; [338] and

- The conversion ratio discussed at the January 17, 2002, Board meeting for the senior secured debt implied that the Company's post-acquisitions value was approximately $25.2 million. [339]

The Defendants reject that any of this evidence offers a reliable, contemporaneous value of the Company that might undermine Hausman's contrary opinions on the Company's value before the Recapitalization. [340]

Case 1:18-cv-00475-SEB-TAB   Document 1-2   Filed 02/16/18   Page 181 of 440 PageID #: 193
In re Nine Systems Corporation Shareholders Litigation, Not Reported in A.3d (2014)

2014 WL 4383127

334    Pls.' Opening Br. 66–69.

335    JX 1020.

336    JX 160.

337    JX 170–0002.

338    JX 667 ("Reilly Report") ¶ 93.

339    *Id.*

340    Defs.' Answering Br. 67–71.

The Court agrees with the Defendants. First, for reasons that the Court discusses when evaluating Reilly's expert testimony, the November 2001 value is not credible because it is based on unreliable projections. Second, no valuation methodology underlies Williams's statement about the Company's assets; it was an unsubstantiated opinion in a brief email. Third, the pro forma valuation is also based on unreliable projections. Finally, the fourth and fifth valuations based on the conversion ratios in the e-Media note and for the senior secured debt reflect relative, not nominal, values. The Court credits Hausman's testimony that, without knowing the actual value of those notes (rather than their face value), a reliable value for the Company cannot be calculated.[341] Thus, because none of these statements is credible, it does not bolster Reilly's consistent valuations. Similarly, that Hausman largely ignored this contemporaneous evidence does not undercut his contrary expert testimony.

341    Tr. 2875–79 (Hausman).

(b) *The Entity to be Valued is the Standalone Company*

Before the Recapitalization, the Plaintiffs were stockholders of the Company. The Plaintiffs nonetheless contend that the entity to be valued in the fair price inquiry here is the Company plus the acquisitions because those transactions were not speculative but rather contemplated by the Recapitalization.[342] The Defendants, on the other hand, contend that the Company's value before the Recapitalization should not be artificially inflated by the acquisitions that could only be completed after the Recapitalization was approved.[343]

342    Pls.' Reply Br. 25-27; Pls.' Opening Br. 75-80.

343    Defs.' Answering Br. 75-77.

In two, combined entire fairness-appraisal proceedings, this Court described some of the contexts in which it may be appropriate to include, in a fair price analysis, the expected value from a company's "specific expansion plans or changes in strategy"[344] that are "not the product of speculation."[345] In *ONTI, Inc. v. Integra Bank,* the Court determined that, where the trial record did not support the finding that a non-speculative transaction would not occur but for a cash-out merger of minority stockholders, it was appropriate to include the value of the later transaction when determining the fair value of the stock in the cash-out merger.[346] Similarly, in *Delaware Open MRI Radiology Associates, P.A. v. Kessler,* the Court concluded that the company's non-speculative expansion plans for three additional facilities, even though one would not be established until sometime after a squeeze-out merger, should be included in assessing fair value as of the time of the merger. The *Kessler* Court analogized the additional facilities as corporate opportunities, concluding that each was "(1) in the line of the corporation's business and ... of practical advantage to it; (2) within the corporation's financial[ ] ability to capture; and (3) one in which the corporation has an interest or a reasonable expectancy."[347]

344    *Del. Open MRI Radiology Assocs., P.A. v. Kessler,* 2006 WL 4764042, at *14 n.51 (Del. Ch. Apr. 26, 2006) (citing *Cede & Co. v. Technicolor, Inc.,* 684 A.2d 289, 298–300 (Del.1996)).

345    *ONTI, Inc. v. Integra Bank,* 751 A.2d 904, 910 (Del. Ch.1999) (same).

346    *Id.* at 909–11.

347    *Kessler,* 2006 WL 4764042, at *16 (citing *Guth,* 5 A.2d at 511).

**\*40** Here, although it was not speculative that the Company would acquire e-Media and NaviSite SMG (it may, however, have been speculative as to what value those acquisitions would yield), they do not fall within the bounds of either *ONTI* or *Kessler*. The trial record supports the Court's conclusion here, unlike in *ONTI,* that the Company, on its own, did not have the capital needed to fund either of the e-Media or NaviSite SMG acquisitions, let alone both of them. Reilly conceded that they could not have occurred without additional

Case 1:18-cv-00475-SEB-TAB   Document 1-2   Filed 02/16/18   Page 182 of 440 PageID #: 194
In re Nine Systems Corporation Shareholders Litigation, Not Reported in A.3d (2014)

2014 WL 4383127

capital. [348] In other words, unlike in *Kessler,* neither proposed acquisition was within the Company's financial ability to capture. The Recapitalization was what would provide the necessary cash; the "new money," not the "old money," financed those acquisitions.

[348]   Tr. 3173 (Reilly).

Even if the Recapitalization was to be accretive to the Plaintiffs by improving the Company's capital structure through converting the senior secured debt into convertible preferred stock, that higher value (and those capital structure changes) only occurred *after* the additional investments by Wren and Javva. Under these circumstances, the fair price of the Company before the Recapitalization would have been precisely that—the fair price of the Company. Accordingly, the Court concludes that the Defendants must prove that the $4 million price attributed to the Company by Dwyer for purposes of the Recapitalization was a fair price.

### (c) *The January 2002 Pro Forma Projections are Not Reliable*

The parties and their respective experts dispute the reliability of the January 2002 pro forma projections presented at the January 17 Board meeting when the Board approved the Recapitalization. Much of the Court's eventual conclusion on fair price turns on this issue. Based on their review of the relevant case law, the Defendants offer a six-factor list that the Court should consider in determining whether the Company's projections are reliable. [349] In their opinion, the projections are not reliable because, among other reasons, they were overly optimistic, contrary to the Company's two-year operating history, and not adopted by the Board when it approved the Recapitalization. [350] The Plaintiffs reject this attempt to synthesize the relevant case law. Instead, the Plaintiffs insist the projections are reliable because, also among other reasons, they were based on reasonable assumptions at the Company, conservative in comparison to the recent performance of the streaming media industry, and presented to the Board at its January 17 meeting and thereby partially formed the basis for the Board's approval of the Recapitalization. [351]

[349]   Those factors are "(i) whether the projection was created outside the ordinary course of business; (ii) whether the projection was relied upon by management in operating the company; (iii) whether the projection is overly optimistic; (iv) the persons who formulated the projection; (v) the length of the company's operating history; and (vi) whether the projection was formally approved by the board." Defs.' Answering Br. 78–79.

[350]   *Id.* at 77–84.

[351]   Pls.' Reply Br. 27–34; Pls.' Opening Br. 69–75.

The most persuasive expert valuations tend to be those derived from contemporaneous management valuations —typically, revenue or cash flow projections—because management usually has the strongest incentives to predict the company's financial future accurately and reliably. [352] A CEO who continuously misses projections may miss his or her job well before retirement. But, Delaware law has long recognized that "methods of valuation, including a discounted cash flow analysis, are only as good as the inputs to the model." [353]

[352]   *See, e.g., Gentile III,* 2010 WL 2171613, at *11 ("[C]ourts frequently pay particular attention to management's assessment of an enterprise's value, especially shortly before the start of the chain of events leading to the transaction at issue."); *Doft & Co. v. Travelocity.com Inc.,* 2004 WL 1152338, at *5 (Del. Ch. May 20, 2004) ("Delaware law clearly prefers valuations based on contemporaneously prepared management projections because management ordinarily has the best first-hand knowledge of a company's operations."); *Gilbert v. MPM Enters., Inc.,* 709 A.2d 663, 669 (Del. Ch.1997) ("[M]anagement was in the best position to forecast MPM's future before the merger[.]"), *aff'd,* 731 A.2d 790 (Del.1999).

[353]   *Neal v. Ala. By–Products Corp.,* 1990 WL 109243, at *9 (Del. Ch. Aug. 1, 1990), *aff'd,* 588 A.2d 255 (Del.1991).

***41** In a recent appraisal action, *Huff Fund Investment Partnership v. CKx, Inc.,* [354] this Court noted that management projections created in the "ordinary course of business" are generally deemed reliable for valuation purposes. The Court also identified several circumstances that may warrant disregarding management projections, such as "where the company's use of such projections

was unprecedented, where the projections were created in anticipation of litigation, or where the projections were created for the purpose of obtaining benefits outside the company's ordinary course of business." [355] Contrary to the Plaintiffs' contention, *Huff Fund* did not seek to present an exhaustive list of those occasions. Indeed, even in appraisals, Delaware courts have found projections to be too unreliable to support a credible discounted cash flow analysis where they are grossly inconsistent with the corporation's recent performance. [356] And, of course, projections tend to be speculative, and thus unreliable, if those who prepare them do so with the perspective that "because the industry was so new and volatile[,] ... reliable projections were impossible." [357]

[354]  2013 WL 5878807 (Del. Ch. Nov. 1, 2013).

[355]  *Id.* at *9.

[356]  *See, e.g., Kahn v. Household Acq. Corp.,* 591 A.2d 166, 175 (Del.1991) (recognizing, in an appraisal proceeding, that a discounted cash flow analysis that was based on management projections where the airline company had recently experienced an "erratic pattern of past operating revenues and earnings attributable to [a] prolonged pilot strike" was "not particularly meaningful"); *accord Cooper v. Pabst Brewing Co.,* 1993 WL 208763, at *4 (Del. Ch. June 8, 1993) (concluding, in an appraisal proceeding, that an expert's discounted cash flow analysis was not reliable because it "assumed that the volume of sales would increase by 1.5% per year when, despite [the company's recent] acquisitions, its volume of sales had declined every year between 1977 and 1981 and had declined further during the first nine months of 1982").

[357]  *Doft & Co.,* 2004 WL 1152338, at *5.

For the Court to credit the Defendants' expert valuations, which ignore the January 2002 projections as unreliable, the Defendants bear the burden of establishing that the Company's projections are sufficiently unreliable to warrant no weight in a fair price analysis. Through Hausman's persuasive testimony, the Defendants successfully demonstrated that management's projections were wholly unreliable and thus insufficient to support the discounted cash flow analysis performed by Reilly.

The Company's management presented only one set of projections to the Board at the January 17 meeting—the January 2002 pro forma projections. Neither Granberg's contemporaneous minutes nor the revised minutes reflect that the Board adopted those projections. Because the Daniels Memo projections were not presented to the Board at this meeting and, moreover, because they were significantly revised in the 2002 pro forma projections, the Daniels Memo projections did not reflect management's best estimate of the Company's future growth. [358] There is also no evidence that management used the Daniels Memo projections to run the Company. [359] For these reasons, the Daniels Memo projections are given no weight in the Court's fair price analysis. [360] Nonetheless, several sets of the Company's projections from 2001, including those from the Daniels Memo, are the framework through which the Court evaluates the Defendants' position on the reliability of the 2002 pro forma projections.

[358]  *See In re Emerging Commc'ns, Inc. S'holders Litig.,* 2004 WL 1305745, at *14 (Del. Ch. May 3, 2004) ("This Court has consistently expressed a preference for the most recently prepared management projections available as of the merger date.").

[359]  *See Henke v. Trilithic Inc.,* 2005 WL 2899677, at *5 (Del. Ch. Oct. 28, 2005) ("There is neither evidence that management used these projections to run the Company nor evidence concerning their creation.").

[360]  Reilly's reliance on the earlier Daniels Memo projections to derive projections for 2003 (by discounting the 2003 projections in the Daniels Memo by a similar percentage that management had revised the 2002 projections in the Daniels Memo into the January 2002 pro forma projections) is, assuming Delaware law recognizes this methodology, also given no weight. *See Cede & Co. v. JRC Acq. Corp.,* 2004 WL 286963, at *2 (Del. Ch. Feb. 10, 2004) ("[T]his Court ... holds a healthy skepticism for post-merger adjustments to management projections or the creation of new projections entirely.").

**\*42** One particular exhibit in Hausman's opening report conclusively demonstrates that the Company's management was unable to produce reliable projections. The following table [361] compares various management projections for 2001 revenue with the Company's actual revenue:

361    JX 668 ("Hausman Report") Ex. 5.

### 2001 Revenue: Projections v. Actual

| Month | Jan. 2001 Projections | Mar. 2001 Projections | June 2001 Projections | Daniels Memo | Actual |
|---|---|---|---|---|---|
| January | 180,001 | -- | -- | -- | 42,797 |
| February | 250,000 | -- | -- | -- | 66,534 |
| March | 386,437 | 62,211 | -- | -- | 68,079 |
| April | 544,936 | 79,703 | -- | -- | 83,955 |
| May | 732,313 | 98,020 | -- | -- | 95,867 |
| June | 808,655 | 128,986 | 128,105 | -- | 78,235 |
| July | 912,103 | 167,536 | 153,885 | -- | 78,351 |
| August | 1,063,032 | 209,432 | 204,885 | -- | 70,130 |
| September | 1,274,326 | 270,088 | 297,135 | 98,575 | 74,218 |
| October | 1,547,858 | 354,244 | 358,510 | 130,300 | 77,166 |
| November | 1,896,714 | 450,618 | 414,010 | 176,838 | 69,750 |
| December | 2,328,526 | 549,330 | 469,510 | 241,500 | 71,673 |

As the table demonstrates, the Company's management–even after Williams took over as CEO for Rick Murphy in mid–2001—grossly overestimated the Company's revenues, even two to three months away. The further out the projected revenue, the greater the overestimation; management was often not even in the same ballpark. For example, in September 2001, management projected that December 2001 revenue would be $241,500. Actual revenue was $71,673, meaning that management was off by more than a factor of three.

It is in this context that the Plaintiffs, through Reilly, defend against Hausman's and the Defendants' charge that the January 2002 projections are unreliable. That the January 2002 projections were arguably consistent with the recent performance of comparable companies 362 does not change the Court's conclusion. The Court cannot accept that the same people who missed projections three-months out in September 2001 by a factor of three (where there was no intervening change to the Company's business) would have been able to produce reliable projections in January 2002 for an entire year. 363 Thus, the Defendants have established that the January 2002 pro forma projections are unreliable and not credible, and the Court does not rely on any expert valuation methodology based on them. 364

362    Pls.' Opening Br. 73.

363    The Court's conclusion is not necessarily a reflection on the competence of management who created the January 2002 pro forma projections, because it is just (if not more) likely that the cause of the unreliability is the inherent difficulty in valuing a start-up company in a nascent industry. That said, the Court also notes

that the management responsible for these projections was replaced within six months.

364    To avoid any potential confusion, the Court's conclusion here is not a departure from the general preference of Delaware courts for fair price analyses to feature multiple (and preferably consistent) valuation methodologies that are derived from contemporaneous management projections. This case just happens to be the exception to that general rule on both accounts.

#### (d) *The Expert Valuations*

The expert opinions differed on two foundational issues: (i) the proper entity to value in January 2002 when the Board approved the Recapitalization; and (ii) the reliability of the management projections presented at the January 17 Board meeting. Reilly argued that the appropriate entity to value was the Company plus the e-Media and NaviSite SMG acquisitions; he did not value the Company on a standalone basis. 365 He employed four different valuation methodologies—three of which were based on the management projections—and arrived at ten different valuations, ranging from $13.96 million to $61.99 million. 366 Based on a weighted average, Reilly concluded that the equity value of the combined entity was $30.89 million. Hausman, in contrast, maintained that the proper entity to value in January 2002 was the Company on its own, without the to-be-acquired e-Media or NaviSite SMG. Based on his opinion that the single year of unreliable projections was inadequate to support a discounted cash flow analysis, Hausman presented a comparable companies analysis that yielded a range of implied equity values for the Company of negative $5.3 million to negative $4 million.

365    Tr. 3173, 3183 (Reilly).

366    Tr. 3171–72 (Reilly).

**\*43** For the reasons discussed earlier, the Court agrees with Hausman that the proper entity to value is the Company and the management projections are unreliable. With these initial conditions, the Court now considers whether Hausman has demonstrated, in light of Reilly's objections, that the $4 million valuation of the Company for the Recapitalization was a fair price.

Case 1:18-cv-00475-SEB-TAB Document 1-2 Filed 02/16/18 Page 185 of 440 PageID #: 197
In re Sycamore Corporation Shareholders Litigation, Not Reported in A.3d (2014)
2014 WL 4383127

Expert testimony on valuations can be supported "by any techniques or methods which are generally considered acceptable in the financial community." [367] Valuations based on the trading multiples or transaction multiples of comparable companies are generally recognized as valid methodologies under Delaware law. [368] An expert valuation tends to be more credible when it is based on a "blend of techniques" [369] that "serve to cross-check one another's results." [370] No expert's valuation methodology is perfect or, perhaps more accurately, beyond criticism from another expert. Some defects may be more damaging than others, however. "Expert valuations that disregard contemporaneous management projections are sometimes completely discounted." [371] But, here, for the reasons set forth earlier, it is the projections—not the expert valuations that disregard them—that must be completely discounted.

[367]   *Weinberger,* 457 A.2d at 713.

[368]   *See, e.g., Global GT LP v. Golden Telecom, Inc.,* 993 A.2d 497, 509 (Del. Ch.2010), *aff'd,* 11 A.3d 214 (Del.2010).

[369]   *In re Hanover Direct, Inc. S'holders Litig.,* 2010 WL 3959399, at *2 (Del. Ch. Sept. 24, 2010).

[370]   *S. Muoio & Co. LLC v. Hallmark Entm't Invs. Co.,* 2011 WL 863007, at *20 (Del. Ch. Mar. 9, 2011), *aff'd,* 35 A.3d 419 (Del.2011) (TABLE).

[371]   *JRC Acq. Corp.,* 2004 WL 286963, at *2.

Without reliable projections, there can be no reliable discounted cash flow analysis or the derivative "venture approach" analysis offered by Reilly. [372] Additionally, Reilly did not value the Company in January 2002 separate from the e-Media and NaviSite SMG acquisitions. Nonetheless, to test the merits of Hausman's analysis, the Court considers the multiples offered by Reilly as appropriate.

[372]   With the venture approach, Reilly valued the Company based on a combination of discounted cash flow analysis and his trading and transaction multiples. Reilly Report ¶ 47. In effect, he calculated the 2003 revenue projections for the Company (by discounting the 2003 projections in the Daniels Memo by 30%) plus e-Media and NaviSite SMG (both by assuming, conservatively, 0% growth from the pro forma 2002 revenue projections presented

to the Board on January 17, 2002), slipped the resulting $30.7 million revenue projection one year to 2004, multiplied that 2004 revenue projection by his comparable trading and public transaction multiples (2.2x as the median, 3.2x as the mean, and 3.7x as Akamai's trading multiple) to calculate an expected exit value, and then discounted that range by a 50–70% rate, as suggested by academic research based on a venture capitalist's expected return on investing in a startup company. *Id.* ¶¶ 55–66. "This provides a value range of $13.96mm at a 70% discount and $33.67mm at a 50% discount, with a mid-point average of $23.82mm." *Id.* ¶ 64. In his weighted average valuation of $30.89 million, Reilly placed the most weight (50%) on his venture approach.

The Court agrees with Hausman that, because Reilly's venture approach "is based on *ad hoc* adjustments to the DCF methodology, ... [it] is no more reliable than his DCF methodology." JX 683 (Hausman Rebuttal Report) ¶ 18.

**\*44** The Court agrees with Hausman's conclusion that, because the Company did not have any earnings or positive cash flow in January 2002, the best method to value the Company without using projections is based on last twelve months ("LTM") revenue multiples for comparable companies. [373] Hausman presented two multiples-based approaches to determine the Company's implied enterprise value from which the Company's debt could be subtracted to determine its implied equity value. First, he used the e-Media and NaviSite SMG acquisitions to generate an average private transaction multiple of 0.7625x LTM revenue. [374] Second, he used data on five comparable public companies to derive an average trading multiple of 2.80x (from a range of—1.01x to 4.85x) for LTM revenues. [375] Hausman persuasively argued that his 2.80x trading multiple should be discounted at least 20% to 2.24x based on the discount commonly applied to private company valuations. In support of his position, he presented academic research reflecting that a 20–40% discount is typically applied in situations like this because, in his opinion, "private firms typically have less sophisticated accounting systems and weaker internal controls (and thus lower quality earnings), and ... private firms typically are smaller and less diversified, leading to greater variability in sales and cash flows." [376]

[373]   Hausman Report ¶ 22.

[374]   e–Media's 2001 revenues were $4.6 million. In January 2002, the Company paid, based on

Hausman's conservative estimate, $4.6 million for e-Media ($1 million in cash plus a $3.6 million note, assumed to trade at face value). Thus, the e-Media transaction multiple was 1.0x. *Id.* ¶ 25. NaviSite SMG's 2001 revenues were approximately $4 million, and the Company ultimately paid $2.1 million in cash for it in March 2002. Thus, the NaviSite SMG transaction multiple in Hausman's estimate was 0.525x. The average of these two private transaction multiples is 0.7625x. *Id.* ¶ 27.

375     *Id.* ¶ 28.

376     *Id.* ¶¶ 28–29; *see also* Stanley Block, *The Liquidity Discount in Valuing Privately Owned Companies,* 17 J. Applied Fin. 33, 33–40 (2007).

In Reilly's opinion, neither e-Media nor NaviSite SMG was an appropriate comparable transaction, and he did not use them in any way in his valuation. Instead, he used a data set of five public companies (two of which, Akamai and RealNetworks Inc., were also in Hausman's set) to derive an average LTM revenue trading multiple of 3.7x (from a range of 1.3x to 7.2x).[377] He also produced a public transactions multiple of 2.05x, but, in his overall weighted average, he did not assign any weight to that valuation because of what he considered weaknesses in the data.[378] Reilly did not include a private company discount for his trading multiple. He did acknowledge that the private company discount is well known to investors, but he suggested that it should not apply here primarily because the Defendants were familiar with the Company and would have significant control over it.[379]

377     Reilly Report ¶ 67.

378     *Id.* ¶ 78.

379     JX 682 (Reilly Rebuttal Report) ¶¶ 34–35.

Although they are not perfect, Hausman's comparable companies are appropriate for his valuations. "The burden of proof on the question whether the comparables are truly comparable lies with the party making that assertion [.]"[380] "Where the valuation exercise rests upon data derived from companies comparable to the company being valued, it stands to reason that the more 'comparable' the company, the more reliable will be the resulting valuation information."[381] The Court concludes that the companies in the streaming media and related industries employed by Hausman to derive his private transactions and trading multiples are sufficiently

comparable to generate a reasonable range of fair values for the Company. In particular, several of the public companies were the same as those used by Reilly. Nonetheless, even if certain of the companies used by Hausman were not as comparable as others, the Court will also consider the multiples (and the underlying comparable companies) offered by Reilly in his valuation.

380     *ONTI, Inc.,* 751 A.2d at 916.

381     *Le Beau v. M.G. Bancorporation, Inc.,* 1998 WL 44993, at *8 (Del. Ch. Jan. 29, 1998), *aff'd in part and remanded,* 737 A.2d 513 (Del.1999).

The Court also accepts the private company discount submitted by Hausman. In the appraisal context, it is thought to be impermissible under Delaware law to discount the value of a private company solely because its stock is not publicly traded.[382] Here, however, the Court finds that the theoretical justifications for a private company discount cited by Hausman—chief among them being lower quality and more variable earnings—should apply to the Company. The Court thus concludes that a conservative 20% discount, at the low end of the range, is appropriate to apply to Hausman's trading multiple. Nonetheless, to represent a conservative benchmark that is most friendly to the Plaintiffs, the Court also considers Reilly's unadjusted LTM trading multiple.

382     *See Borruso v. Commc'ns Telesystems Int'l,* 753 A.2d 451, 460 (Del. Ch.1999) (citing *Cavalier Oil Corp. v. Harnett,* 564 A.2d 1137, 1145 (Del.1989) ("The application of a discount to a minority shareholder is contrary to the requirement that the company be viewed as a 'going concern.' ")).

**\*45**  In January 2002, the Company's LTM revenue was approximately $876,755.[383] The face value (exclusive of the 4x liquidation preference) of the principal and interest on its outstanding debt totaled $4,997,600.[384] Because he valued the Company plus the acquisitions, Reilly also assumed that the combined entity had no debt—that is, that the senior secured debt should be treated as Preferred A stock. But, just as the proper entity to value before the Recapitalization is the standalone Company, so too is the proper capital structure to use that of the Company before the Recapitalization. Although this debt was to be converted into Preferred A, it was still the Company's debt before the Recapitalization. Accordingly, this debt should

be subtracted from the range of enterprise values to yield a range of equity values. [385]

[383]    Hausman Report, Ex. 5. Hausman derived this figure from various trial exhibits. Reilly used a slightly higher $889,528 figure for 2001 revenue based on the numbers in the Daniels Memo. Reilly Rebuttal Report ¶ 10, n.2. Because the approximately $13,000 difference is not material to either expert's testimony, the Court need not resolve this issue.

[384]    Hausman Report, Ex. 9.

[385]    The experts disagreed whether the Company's approximately $1–1.5 million in leases were operating leases (which are not subtracted from enterprise value) or capitalized leases (which are subtracted from enterprise value). Hausman Report ¶ 31; Reilly Rebuttal Report ¶¶ 12–16. The evidence is inconclusive. For present purposes, and to adopt a conservative approach friendly to the Plaintiffs, the Court revises Hausman's valuations as if the leases were operating leases.

Applying the experts' multiples yields a range of implied enterprise values for the Company. Subtracting the Company's debt from the range of implied enterprise values yields a range of implied equity values. The following table reflects these valuations:

**Implied Valuations with LTM Revenue of $876,775 and Debt of $4,997,600**

| | | *Hausman* | | Reilly |
| --- | --- | --- | --- | --- |
| Multiple | Private Transactions: 0.7625x | Discounted Trading: 2.24x | Public Transactions: 2.05x | No Discount Trading: 3.7x |
| Implied Enterprise Value | $668,526 | $1,963,931 | $1,797,348 | $3,243,994 |
| Minus Debt | ($4,997,600) | ($4,997,600) | ($4,997,600) | ($4,997,600) |
| Implied Equity Value | ($4,329,074) | ($3,033,669) | ($3,200,252) | ($1,753,606) |

The range of implied equity values of the Company is negative $4.33 million to negative $1.75 million. Not only are these numbers less than the $4 million valuation attributed to the Company by Dwyer, but they reflect that the Company's equity had no value. Because the Defendants established that the Reilly's other valuation methodologies are based on the unreliable projections, the only credible valuations available are reflected in the table. [386] No reliable valuation offered by Reilly, based on these assumptions about the Company's revenue and debt, implied an equity value above $0. The Court need not consider the proper weighted average for this range of values because any average would still be negative. The Court thus credits Hausman's expert testimony and concludes that the equity value of the Company in January 2002 before the Recapitalization was $0.

[386]    Briefly, the Court revisits its earlier conclusion on the proper entity to value. What Reilly's inclusion of e-Media and NaviSite SMG does is grossly inflate the value of the Company post-acquisitions. To illustrate, as of January 2002, e-Media's LTM revenue was $4.6 million and NaviSite SMG's was $4 million.

Applying Reilly's 3.7x trading multiple would yield values of $17 million for e-Media and $14.8 million for NaviSite SMG. These implied values cannot be squared with the arm's-length purchase prices paid by the Company. It is possible to infer from the trial record that e-Media and NaviSite SMG may have been sold at a discount because the sellers wanted to get out of those lines of business quickly, but it is unreasonable to conclude that there was a discount of approximately 70%. It is inapposite for the Plaintiffs to assert that their common stock in the Company as of the Recapitalization included not only the value of the purchase prices of e-Media and NaviSite SMG, but also the multiples-based valuation.

**\*46** Concluding that the Company's equity had no value before the Recapitalization compels the Court also to conclude, as this Court recently did in *In re Trados Inc. Shareholder Litigation,* that the Recapitalization was approved by the majority-conflicted Board at a fair price. Regardless of how much the Plaintiffs may have been diluted in the Recapitalization, because their common stock had no value that could have been diluted, the Plaintiffs necessarily "received the substantial equivalent

Case 1:18-cv-00475-SEB-TAB   Document 1-2   Filed 02/16/18   Page 188 of 440 PageID #: 200
In re Trados Incorporated Shareholder Litigation, Not Reported in A.3d (2013)
2014 WL 4383127

in value of what they had before." [387] Although certain terms of the Recapitalization changed between January 2002 and August 2002, Reilly did not value the Company (or the Company plus the acquisitions) after January. The Plaintiffs also did not contest the post-January value of Company for purposes of the Recapitalization in their post-trial briefing, which means that the Plaintiffs waived this issue. [388] Nonetheless, if the Court did consider the relevant evidence, the Court would credit Hausman's testimony that, despite the changes to the terms of the Recapitalization, the Company's equity still had no value in May and August 2002. [389]

[387]    *In re Trados Inc.,* 73 A.3d at 76; *see also Sterling v. Mayflower Hotel Corp.,* 93 A.2d 107, 114 (Del.1952) ("[T]he test of fairness which we think the correct one [is] ... that upon a merger the minority stockholder shall receive the substantial equivalent in value of what he had before."); *In re Hanover Direct, Inc.,* 2010 WL 3959399, at *3 (Del. Ch. Sept. 24, 2010) ("[O]n the basis of evidence presented at trial and in respondent's expert report, I conclude that the company was in fact 'under water' at the time of the merger. Accordingly, a merger price above $0.00 (in this case, $0.25 per share) was entirely fair.").

[388]    *See generally Emerald P'rs v. Berlin,* 726 A.2d 1215, 1224 (Del.1999) ("Issues not briefed are deemed waived."); *see also In re IBP, Inc. S'holders Litig.,* 789 A.2d 14, 62 (Del. Ch.2001) (concluding that a party waived an argument by failing to include that argument in its otherwise "voluminous" post-trial opening brief).

[389]    Hausman testified there were no market synergies from the e-Media or NaviSite SMG acquisitions in either May or August 2002. Thus, the value that those acquisitions added to the Company was no greater than the purchase price: $1.6 million each. Hausman Report ¶ 8. After combining the $3.2 million paid to acquire e-Media and NaviSite SMG to the Company's January 2002 enterprise value to derive a range of implied enterprise values for May and August, Hausman subtracted the additional debt obligations incurred by the Company to fund those acquisitions—including the $3.3 million in convertible promissory notes held by Wren and Javva and a $600,000 note held by e-Media's parent—to yield a range of implied enterprise values. That range, just as it had been in January 2002, was negative. Tr. 2792–95 (Hausman).

### 3. *The Court's Unitary Conclusion on Entire Fairness*

The Defendants (other than Dwyer and CFP) must establish "to the court's satisfaction" that the Recapitalization was entirely fair. [390] "A strong record of fair dealing can influence the fair price inquiry, reinforcing the unitary nature of the entire fairness test. The converse is equally true: process can infect price." [391] "Merely showing that the ... price was in the range of fairness, however, does not necessarily satisfy the entire fairness burden when fiduciaries stand on both sides of a transaction and manipulate the ... process." [392]

[390]    *See Cinerama II,* 663 A.2d at 1163.

[391]    *Reis,* 28 A.3d at 467 (citing *Tremont Corp.,* 694 A.2d at 432); *see also Tremont Corp.,* 694 A.2d at 432 ("[H]ere, the process is so intertwined with price that under *Weinberger* 's unitary standard a finding that the price negotiated by the Special Committee might have been fair does not save the result."); *Gentile III,* 2010 WL 2171613, at *9 ("From a tainted process, one should not be surprised if a tainted price emerges.").

[392]    *William Penn P'ship v. Saliba,* 13 A.3d 749, 758 (Del.2011).

The parties devote considerable attention in their post-trial briefs [393] to the import of this Court's recent post-trial, entire fairness decision in *Trados.* After concluding that a third-party merger in which the common stockholders received no consideration was nonetheless approved at a fair price because the corporation's common stock had no value before the merger, the *Trados* court concluded that the majority-conflicted board's approval of the merger was entirely fair primarily because "the common stockholders received in the Merger the substantial equivalent in value of what they had before." [394] Contrary to the Defendants' contentions, the Court does not interpret *Trados* for the broad proposition that a finding of fair price, where a company's common stock had no value, forecloses a conclusion that the transaction was not entirely fair. [395] Rather, the *Trados* conclusion reinforces the defining principle of entire fairness—that a court's conclusion is *contextual.*

[393]    Pls.' Reply Br. 34–37; Defs.' Answering Br. 64–67.

[394]    *In re Trados Inc.,* 73 A.3d at 78.

Case 1:18-cv-00475-SEB-TAB Document 1-2 Filed 02/16/18 Page 189 of 440 PageID #: 201
In re Nine Systems Corporation Shareholders Litigation, Not Reported in A.3d (2014)

2014 WL 4383127

395    Even if *Trados* may be said to support a framework in which a finding of fair price strongly supports a finding of entire fairness, the facts here— where the Company's stockholders would, after the Recapitalization—remain stockholders in the Company as a going concern—are sufficiently distinguishable from the third-party merger in *Trados.*

**\*47** Approximately twenty years ago, in *Cinerama, Inc. v. Technicolor, Inc.,* this Court recognized that normative and policy-based considerations are, consciously or not, inherent in a unitary conclusion on entire fairness:

> This judgment concerning "fairness" will inevitably constitute a judicial judgment that in some respects is reflective of subjective reactions to the facts of a case. "Fairness" simply is not a term with an objective referent or clear single meaning. This does not mean its meaning is endlessly elastic and that it therefore constitutes no standard, but that it is a standard which in one set of circumstances or another reasonable minds might apply differently. [396]

Here, the Court is reluctant to conclude that the Recapitalization, even if it was conducted at a fair price, was an entirely fair transaction because of the grossly inadequate process employed by the Defendants. What particularly drives the Court's conclusion is that the fair price inquiry presented at trial was severely hampered by the unfairness of the process by which the Board came to the $4 million valuation, including, but not limited to, the combination of the lack of reliable projections, the Board's ignorance of Dwyer's valuation methodology, and the decision not to have any input from Biderman as an independent director or an independent financial advisor.

396    *Cinerama I,* 663 A.2d at 1140.

If the oft-repeated holding of the Delaware Supreme Court's decision in *Weinberger* regarding the entire fairness standard—that the analysis is *not bifurcated* but is to be a *unitary conclusion* [397]—has any purchase, then, even if the fair price component "may be the preponderant consideration" for most non-fraudulent

decisions or transactions, [398] it must hold true that a grossly unfair process can render an otherwise fair price, even when a company's common stock has no value, not entirely fair. It is not unprecedented for this Court to conclude that a price near the low end of a range of fairness, coupled with an unfair process, was not entirely fair. [399]

397    *See, e.g., William Penn P'ship,* 13 A.3d at 756–57; *Tremont Corp.,* 694 A.2d at 432; *Cinerama II,* 663 A.2d at 1163; *Lynch,* 638 A.2d at 1115; *Rosenblatt v. Getty Oil Co.,* 493 A.2d 929, 937 (Del.1985); *Weinberger,* 457 A.2d at 711.

398    *See Weinberger,* 457 A.2d at 711.

399    *See HMG/Courtland Props.,* 749 A.2d 94 at 118 ("Taken together, these factors lead me to conclude that the defendants have not demonstrated that they paid a fair price in the sense inherent in the entire fairness standard. Therefore, Gray and Fieber have failed to establish to my satisfaction that the Transactions were the product of both fair dealing and fair price.") (internal citations and quotations omitted).

After a careful and reflective weighing of the procedural and substantive fairness of the Recapitalization, the Court concludes that the Defendants (other than Dwyer and CFP) have not carried their burden of proof. Those Defendants breached their fiduciary duties because the Recapitalization was not entirely fair.

## D. *The Plaintiffs' Aiding and Abetting Claim against the Other Defendants*

Alongside their breach of fiduciary duty claim against Dort Cameron, Katz, Shipman, and Snyder, the Plaintiffs claim that Dwyer, Wren, Javva, and Catalyst aided and abetted these breaches of fiduciary duty. They focus their attention in particular on Dwyer's conduct during the Recapitalization, especially his contributions to the misleading Fall 2002 Update. [400] In opposition, the Defendants argue that, because there was no breach of fiduciary duty (since, they contend, the Recapitalization was entirely fair and the Fall 2002 Update was not materially misleading), there is no aiding and abetting liability. [401]

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:18-cv-00475-SEB-TAB Document 1-2 Filed 02/16/18 Page 190 of 440 PageID #: 202
In re Nine Systems Corporation Shareholders Litigation, Not Reported in A.3d (2014)

2014 WL 4383127

400    Pls.' Opening Br. 80, 82; Opening Pretrial Br. for the
       Fuchs and Kim Pls. ("Pls.' Pretrial Opening Br.") 40–
       41.

401    Defs.' Answering Br. 63 n.56; Defs.' Opening Pretrial
       Br. 40–41, 47 n.125.

**\*48** Under Delaware law, to recover on a claim for
aiding and abetting another's breach of fiduciary duty, a
plaintiff must prove four elements: "(i) the existence of
a fiduciary relationship, (ii) a breach of the fiduciary's
duty, (iii) knowing participation in the breach by the
non-fiduciary defendants, and (iv) damages proximately
caused by the breach." [402]  For reasons similar to the
Court's alternative conclusion that the Plaintiffs have
standing under *Gentile II* to sue Dort Cameron, Katz,
Shipman, and Snyder directly, the Court also concludes
that the Plaintiffs have standing to bring this aiding and
abetting claim directly against Dwyer, Wren, Javva, and
Catalyst. But, because the Court previously concluded
that Wren, Javva, and Catalyst breached their fiduciary
duties as a control group, their liability for aiding and
abetting is limited to the extent that they did not constitute
a control group. In other words, the Plaintiffs are limited
to one recovery—breach of fiduciary duty or aiding and
abetting—as against Wren, Javva, and Catalyst.

402    *In re Rural Metro Corp. S'holders Litig.,* 88 A.3d 54,
       80 (Del. Ch.2014) (citing *Malpiede v. Townson,* 780
       A.2d 1075, 1096 (Del.2001)).

The Plaintiffs easily satisfy the first two elements of
an aiding and abetting claim. It cannot be disputed
that the members of the Board owed fiduciary duties
to the Company's stockholders, including all of the
Plaintiffs. [403]  Additionally, as the Court explained earlier,
the director Defendants breached their fiduciary duties
by approving the Recapitalization, which was not entirely
fair.

403    *See Mills Acq. Co.,* 559 A.2d at 1280.

The Plaintiffs have also proven that Dwyer, Wren, Javva,
and Catalyst knowingly participated in that breach.
First, Dwyer was instrumental, more so than any of
the Company's directors, in defining the terms of the
Recapitalization and valuing the Company. He was in
charge of the valuation despite his conflict of interest
stemming from his material relationship with Wren—a
similar conflict faced by Dort Cameron. Despite attending
all of the relevant meetings, Dwyer did not adequately

explain the $4 million valuation when the Board approved
the Recapitalization or before Wren invested. Due to this
and similar conduct, Dwyer knowingly "participate[d] in
the breach by misleading the board [and] creating the
informational vacuum." [404]

404    *In re Rural Metro Corp.,* 88 A.3d at 97.

The weight of the trial evidence supports the
additional conclusion that Dwyer knowingly and actively
participated in the conversations in the Board meeting
during which management suggested that the Company
should inform other stockholders about the changes to
its capital structure. Dwyer was complicit in the Board's
decision to ignore that suggestion. And, furthermore,
Dwyer was involved in drafting the Fall 2002 Update,
which he intended only to provide a "businessman's
overview" of the Recapitalization. [405]  It was in Dwyer's
interest, as a member of Wren, to not disclose that Wren
was a substantial participant in the Recapitalization. [406]
In sum, Dwyer's conduct during and outside the Board
meetings was his knowing participation in the unfair
Recapitalization.

405    Tr. 2560 (Dwyer).

406    *See Houseman,* 2014 WL 1478511, at *9 (concluding
       that the plaintiffs' allegations did not support a
       reasonable inference of knowing participation by the
       corporation's financial advisor because, among other
       deficiencies, there was no allegation that the advisor
       "actively concealed information to which it knew the
       Board lacked access, or promoted the failure of a
       required disclosure by the Board").

Second, Wren, Javva, and Catalyst all knowingly
facilitated the Recapitalization by providing their
consents to convert the senior secured debt into Preferred
A stock and adopt the reverse stock split. Additionally,
Wren and Javva invested money in exchange for Preferred
B–1 stock. All three stockholders received something of
value in the Recapitalization: Wren and Javva received the
convertible promissory notes (and ultimately the Preferred
B–1 stock), and Catalyst received the right to invest
on similar terms for a designated period. Furthermore,
under a general principle of Delaware agency law, their
participation was knowing because they, as principals,
are imputed with the knowledge of their agents (and
fiduciaries) on the Board: Dort Cameron (for Wren), Katz
(for Javva), and Shipman (for Catalyst). [407]

**407**    *See In re Am. Int'l Gp., Inc., Consol. Deriv. Litig.,* 965 A.2d 763, 806 (Del. Ch.2009) ("[T]he knowledge of an agent is normally imputed to the agent's principal."), *aff'd sub nom., Teachers' Ret. Sys. of La. v. PricewaterhouseCoopers LLP,* 11 A.3d 228 (Del.2011) (TABLE).

**\*49** Finally, the Plaintiffs demonstrated causal damages by the knowing participation of Dwyer, Wren, Javva, and Catalyst. There would have been no Recapitalization without a plan and valuation (by Dwyer); Board approval by their fiduciaries and stockholder consents to the charter amendments and to exchange the secured debt into Preferred A (by Wren, Javva, and Catalyst); and money to invest (by Wren and Javva). Each of these Defendants was a proximate cause of the Plaintiffs' damages.[408]

**408**    *See In re Rural Metro Corp.,* 88 A.3d at 107 ("RBC's actions resulted in stockholders voting on the merger based on a proxy statement that contained materially false disclosures and omissions about RBC's valuation analyses and conflicts. Stockholders were denied the information necessary to make an informed decision whether to seek appraisal. Causation is satisfied.").

Therefore, the Plaintiffs have demonstrated, by a preponderance of the evidence, that Dwyer and (were they not liable for their own breaches of fiduciary duty) Wren, Javva, and Catalyst are liable for aiding and abetting Dort Cameron, Katz, Shipman, and Snyder's breaches of fiduciary duty.

#### E. *The Plaintiffs' Unjust Enrichment Claim*

The Plaintiffs allege that Wren, Javva, Catalyst, and CFP were unjustly enriched in the Recapitalization. The Plaintiffs assume these Defendants may be held liable for unjustly enriching themselves in the Recapitalization even if the Court concludes that the Plaintiffs lack standing to sue Wren, Javva, and Catalyst directly.[409] These Defendants, for their part, marshaled many of the same defenses they advanced in opposition to the underlying fiduciary duty claim. They submit, for example, that a finding that Wren, Javva, and Catalyst did not breach their fiduciary duties should foreclose recovery on the Plaintiffs' duplicative unjust enrichment claim.[410] For purposes of this analysis, the Court assumes, without

deciding, that the Plaintiffs have standing to assert this claim directly against the relevant Defendants.

**409**    Pls.' Reply Br. 39–41; Pls.' Opening Br. 58–59.

**410**    Defs.' Answering Br. 88–90.

The Delaware Supreme Court has defined unjust enrichment as "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience."[411] Under Delaware law, recovery on a claim for unjust enrichment requires proof of five elements: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law."[412]

**411**    *Fleer Corp. v. Topps Chewing Gum, Inc.,* 539 A.2d 1060, 1062 (Del.1988) (citation omitted).

**412**    *Addy v. Piedmonte*, 2009 WL 707641, at \*22 (Del. Ch. Mar. 18, 2009).

##### 1. *The Claim against Wren, Javva, and Catalyst*

The Plaintiffs' claim for unjust enrichment against Wren, Javva, and Catalyst mirrors their claims for breach of fiduciary duty and aiding and abetting. The theories of liability are the same. Thus, "[t]he elements of proof are the same, and so are the possible recoveries."[413] As the Court noted previously in this litigation, the Plaintiffs are entitled to receive only "one recovery" as between these duplicative claims.[414] The Plaintiffs conceded this point in their pre-trial briefing.[415] Because the Court concluded that Wren, Javva, and Catalyst are liable for breach of fiduciary duty (and, alternatively, for aiding and abetting), the Court need not address this unjust enrichment claim against them "which would, if resolved in the [Plaintiffs'] favor, lead to the same recovery."[416]

**413**    *See Frank,* 2014 WL 957550, at \*32.

**414**    *See Dubroff III,* 2011 WL 5137175, at \*11; *see also Frank v. Elgamal,* 2012 WL 1096090, at \*11 (Del. Ch. Mar. 30, 2012) (noting that as between a breach of fiduciary duty claim and a duplicative unjust enrichment claim, "[a] plaintiff will only receive, at most, one recovery"); *McPadden v. Sidhu,* 964 A.2d 1262, 1276 (Del.Ch.2008) ("If plaintiff has pleaded and then prevails in demonstrating that the

same conduct results in both liability for breach of Dubreville's fiduciary duties and disgorgement via unjust enrichment, plaintiff then will have to elect his remedies.").

415 Pls.' Pretrial Opening Br. 44 n.16 ("Plaintiffs concede that, insofar as they prevail on both claims [*i.e.*, (i) breach of fiduciary duty or aiding and abetting, and (ii) unjust enrichment], they are entitled to only one recovery.")

416 *QC Commc'ns v. Quartarone,* 2014 WL 3974525, at *13 (Del. Ch. Aug. 15, 2014) (declining to address the merits of alleged unjust enrichment after concluding, on cross-motions for summary judgment on a stipulated record, that the defendant breached his fiduciary duties where the theories of liability for the two claims were the same).

In any event, it would appear difficult for the Plaintiffs to establish an impoverishment where the Board approved the Recapitalization at a fair price because the Plaintiffs' stock had no value.

### 2. *The Claim against CFP (Cameron Family Partnership)*

**\*50** The only claim asserted against CFP is one for unjust enrichment for which the Plaintiffs failed to carry their burden of proof. Because CFP did not receive any Preferred B–1 stock in the Recapitalization,[417] it was not unjustly enriched. Rather, CFP only acquired Preferred B–1 stock from Wren in a separate, unrelated transfer in October 2006. The Plaintiffs have not demonstrated, through a veil-piercing theory or otherwise, that CFP should be held to account for Wren's receipt of the Preferred B–1 stock in the Recapitalization.

417 JX 729–0013.

CFP is therefore entitled to judgment in its favor on this claim.

### F. *Damages for the Breach of Fiduciary Duty and Aiding and Abetting Claims*

The Defendants (other than CFP) are liable for breach of fiduciary duty or aiding or abetting. Where a board decision is found not entirely fair, the Court engages in a director-by-director analysis to determine the nature of the breach of fiduciary duty: loyalty or care.[418] Directors whose unfair conduct implicates solely the duty of care may be exculpated from liability for monetary damages if the corporation's certificate of incorporation includes

an exculpatory provision pursuant to 8 *Del. C.* § 102(b) (7).[419] That statute does not exculpate those who aided and abetted a breach of fiduciary duty, even if the underlying breach is of solely the duty of care.[420] Nor would it apply to Wren, Javva, or Catalyst as a control group. The Company's charter included a Section 102(b) (7) provision.[421]

418 *See In re Emerging Commc'ns, Inc.,* 2004 WL 1305745, at *38 (Del. Ch. May 3, 2004).

419 *See Emerald Prs v. Berlin,* 787 A.2d 85, 98 (Del.2001) ("The director defendants can avoid personal liability for paying monetary damages only if they have established that their failure to withstand an entire fairness analysis is exclusively attributable to a violation of the duty of care.").

420 *See In re Rural Metro Corp.,* 88 A.3d at 85–89.

421 JX 2000. That provision provides:

A director of this corporation shall have no personal liability to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, provided that this provision shall not eliminate the liability of a director (i) for any breach of the director's duty of loyalty to the corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the Delaware General Corporation Law, or (iv) for any transaction from which the director derived an improper personal benefit.

"Self-dealing fiduciaries are liable because they breached their duty of loyalty if the transaction was unfair, regardless of whether they acted in subjective good faith."[422] Dort Cameron, Katz, and Shipman were interested in the unfair Recapitalization that provided unique benefits to the entities to which they owed conflicting fiduciary duties (Preferred B–1 stock for Wren and Javva and the right to invest for Catalyst); each of these three directors engaged in self-dealing and thus breached his duty of loyalty. Snyder, in contrast, did not receive any benefit in the Recapitalization. His conduct in the unfair Recapitalization was generally limited to drafting the materially misleading Fall 2002 Update and permitting certain terms of the convertible promissory notes to change without Board approval. There is no evidence that Snyder "knowingly disseminate[d]" the

Case 1:18-cv-00475-SEB-TAB Document 1-2 Filed 02/16/18 Page 193 of 440 PageID #: 205
In re Nine Systems Corporation Shareholders Litigation, Not Reported in A.3d (2014)
2014 WL 4383127

misleading information [423] or that he failed to act in good faith. [424] Thus, by operation of the Company's Section 102(b)(7) provision, Snyder is exculpated from monetary liability. The other liable Defendants, however, are not.

[422]   *In re Primedia, Inc. S'holders Litig.,* 67 A.3d 455, 489 (Del. Ch.2013).

[423]   *See Malone,* 722 A.2d at 9 ("[D]irectors who knowingly disseminate false information that results in corporate injury or damage to an individual stockholder violate their fiduciary duty, and may be held accountable in a manner appropriate to the circumstances.").

[424]   *See In re Walt Disney Co. Deriv. Litig.,* 706 A.2d 27, 67 (Del.2006).

**\*51** "Delaware law dictates that the scope of recovery for a breach of the duty of loyalty is not to be determined narrowly." [425] This Court has "very broad" power to "fashion[ ] equitable and monetary relief under the entire fairness standard as may be appropriate." [426] Indeed, this discretion is greater "when fashioning an award of damages in an action for a breach of the duty of loyalty than it would [be] when assessing fair value in an appraisal action." [427]

[425]   *Thorpe v. CERBCO, Inc.,* 676 A.2d 436, 445 (Del.1996).

[426]   *Int'l Telecharge, Inc. v. Bomarko, Inc.,* 766 A.2d 437, 440 (Del.2000).

[427]   *Id.* at 441.

The Plaintiffs proffered several damages theories, including disgorgement in the amount of $118.6 million to $133.2 million and rescissory damages in the amount of $48.9 million to $58.9 million. Delaware courts have found those damage theories to be appropriate in certain situations, [428] but those precedents do not necessarily guide the Court's discretion here. The most compelling theory offered is that the Plaintiffs should be awarded damages in the amount of consideration they would have received in the Akamai Merger had they participated in the Recapitalization pro rata; those damages, by the Plaintiffs' calculations, would be approximately $17.8 million, plus interest. Yet, what strongly undermines this theory, among other issues, is that the Defendants were under no duty to allow the Plaintiffs to participate.

Moreover, the $4 million value attributed to the Company in the Recapitalization was a fair price. And, furthermore, calculating damages for a lost opportunity to invest is too speculative based on the facts and circumstances here.

[428]   *See id.* at 440 (citing *Weinberger,* 457 A.2d at 714); *Gesoff v. IIC Indus., Inc.,* 902 A.2d 1130, 1154 (Del. Ch.2006) ("[T]he court can, and has in the past, awarded damages designed to eliminate the possibility of profit flowing to defendants from the breach of the fiduciary relationship.").

As the Plaintiffs' theories demonstrate, it is difficult to assess damages for the unfair Recapitalization in January 2002, when the fair price of the Company's equity was zero, without reference to (and a fair bit of bias from) the $175 million Akamai Merger in November 2006. It is likewise difficult to conclude that disloyal conduct when the Company's equity was worth nothing should now be remedied by an award of damages in the tens (or hundreds) of millions of dollars, especially where the trial record strongly suggests that it was Snyder's management of NaviSite SMG's Stream OS business —not the Company's legacy business—that drove the Company's growth after the Recapitalization. In other words, but for the Recapitalization, there is little evidence to suggest that the Company would have been worth any amount approaching what the Plaintiffs seek in damages. For these and related reasons, because the unfair Recapitalization was nonetheless effected at a fair price in which the Plaintiffs' stock had no value, the Court concludes, in its discretion, that it would be inappropriate to award disgorgement, rescissionary, or other monetary damages to the Plaintiffs "because of the speculative nature of the offered proof." [429]

[429]   *Weinberger v. UOP, Inc.,* 1985 WL 11546, 10 Del. J. Corp. L. 945, 955 (Del. Ch. Jan. 30, 1985), *aff'd,* 497 A.2d 792 (Del.1985) (TABLE); *see also Oliver v. Boston Univ.,* 2006 WL 1064169, at \*25 (Del. Ch. Apr. 14, 2006) ("[A]lthough the BU Defendants did breach their duty of loyalty and were unable to demonstrate the entire fairness of the Series B and C transactions, for purposes of assessing the fiduciaries' treatment of these claims in the context of negotiating the Accord Agreement, the Court does not find it appropriate to assign anything but nominal damages to these breaches.").

**\*52** That is not to say, however, that the Plaintiffs are wholly without a remedy. Based in part on its

Case 1:18-cv-00475-SEB-TAB   Document 1-2   Filed 02/16/18   Page 194 of 440 PageID #: 206
In re Nine Systems Corporation Shareholders Litigation, Not Reported in A.3d (2014)

2014 WL 4383127

inherent equitable power to shift attorneys' fees [430] and its statutory authority to shift costs, [431] this Court has exercised its discretion and concluded that, even where a transaction was conducted at a fair price, a finding that the transaction was not entirely fair may justify shifting certain of the plaintiffs' attorneys' fees and costs to the defendants who breached their fiduciary duties. [432] This case may also qualify for similar treatment, but the parties did not fairly present this issue in post-trial briefing. The Plaintiffs may petition the Court for an award of attorneys' fees and costs if they so choose.

[430]   *See* Gatz Props., LLC v. Auriga Capital Corp., 59 A.3d 1206, 1222 (Del.2012) ("The Court of Chancery, under its equitable powers, has latitude to shift attorneys' fees[.]").

[431]   *See* 10 Del. C. § 5106 ("The Court of Chancery shall make such order concerning costs in every case as is agreeable to equity.").

[432]   *See* Saliba v. William Penn P'ship, 2010 WL 1641139, at *1 (Del. Ch. Apr. 12, 2010) ("Because defendants conducted the sale in a clearly conflicted manner that resulted in a breach of fiduciary duty, I find and conclude that it would be unfair and inequitable to require plaintiffs to shoulder the costs incurred in demonstrating the unfairness of this sales process. For that reason, I award plaintiffs all of their attorneys' fees and the portion of costs that they have paid in connection with the court-appointed expert witnesses. Those who violated their fiduciary obligations and were the cause of this litigation are the parties who properly should bear the fees and costs made necessary solely by reason of their faithless conduct."), aff'd, 13 A.3d 749 (Del.2011).

G. *Laches*

In their post-trial briefing, the Defendants assert laches as an affirmative defense to the remaining Kim Plaintiffs' challenge to the Recapitalization. [433] For the Court to bar recovery on a claim as untimely under laches, a defendant must establish three elements: "first, knowledge by the claimant; second, unreasonable delay in bringing the claim; and third, prejudice to the defendant." [434]

> Although both laches and statutes of
> limitation operate to time-bar suits,
> the limitations of actions applicable
> in a court of law are not controlling

> in equity. A court of equity moves
> upon considerations of conscience,
> good faith, and reasonable diligence.
> Thus, although a statute of
> limitations defense is premised solely
> on the passage of time, the lapse of
> time between the challenged conduct
> and the filing of a suit to prevent
> or correct the wrong is not, in itself,
> determinative of laches. Instead, the
> laches inquiry is principally whether
> it is inequitable to permit a claim
> to be enforced, the touchstone of
> which is inexcusable delay leading to
> an adverse change in the condition
> or relations of the property or the
> parties. [435]

The Defendants contend that the Kim Plaintiffs unreasonably delayed in bringing their claims. They submit that this delay materially prejudiced their defense of this action by requiring additional briefing and depositions (and incurring additional legal costs) after completion of discovery on the claims asserted by the Fuchs Plaintiffs. [436] Conversely, the Kim Plaintiffs argue that their claims should not be barred by laches because, with the benefit of tolling during the pendency of several putative class actions in Delaware and elsewhere, they filed their complaint within the analogous limitations period. In any event, they suggest that the Defendants failed to demonstrate sufficient prejudice to warrant applying laches. [437]

[433]   The Court separately considers the Defendants' laches defense to Thomas Murphy's fraud claim when analyzing the merits of that claim.

[434]   Homestore, Inc. v. Tafeen, 888 A.2d 204, 210 (Del.2005).

[435]   Reid v. Spazio, 970 A.2d 176, 183 (Del.2009).

[436]   Defs.' Answering Br. 93-95.

[437]   Pls.' Reply Br. 49-51; Pls.' Opening Br. 99-102.

**\*53**   The Delaware Supreme Court recently endorsed the use of intra-jurisdictional tolling for class action lawsuits and adopted cross-jurisdictional class action tolling. "Until class action certification is denied, the individual claims remain tolled." [438] Class action tolling

reflects public policy in favor of avoiding the "wasteful and duplicative litigation" of "placeholder" lawsuits that proposed class members may have to file without this doctrine. [439]

[438]    See *Dow Chem. Corp. v. Blanco,* 67 A.3d 392, 393, 395 (Del.2013).

[439]    *See id.* at 395.

Assuming, without deciding, that the Defendants-friendly suspension doctrine applies to class action tolling in this Court—which would require the Kim Plaintiffs to assert their claims "within the amount of time left in the limitation period on the day tolling took place" [440]— then the Kim Plaintiffs' claims are within the analogous limitations period. After the Kim Plaintiffs were on inquiry notice of their claims when the Company mailed proxy materials for the Akamai Merger to them in November 2006, the analogous limitations period would have been tolled during the pendency of three putative class actions for which the Kim Plaintiffs were within the class definition: (i) from February 1, 2007, to September 21, 2007, for a class action in California dismissed on *forum non conveniens* grounds; [441] (ii) from October 19, 2007, to April 7, 2008, for a class action in New York that was discontinued in favor of litigation in this Court; [442] and (iii) from August 1, 2008, to August 20, 2010, when the Court denied class certification in *Dubroff II.* [443] The Kim Plaintiffs filed suit on October 22, 2012.

[440]    See *Nine Sys. Corp. II,* 2013 WL 4013306, at *6 (quoting Kathleen L. Cerveny, Note, *Limitation Tolling When Class Status Denied: Chardon v. Fumero Soto and Alice in Wonderland,* 60 Notre Dame L.Rev. 686, 689 (1985)).

[441]    JX 556 ¶¶ 43–44; JX 564.

[442]    JX 565 ¶¶ 44–45; JX 567.

[443]    JX 571; *see Nine Sys. Corp. II,* 2013 WL 4013306, at *5 ("Since the [Kim] Plaintiffs were not senior officers, directors or control persons of any Defendants at the time of the filing of the Class Action Complaint, they were part of the Proposed Class.").

The sum of the periods of time when there was no class action tolling is 1,004 days, which is within the analogous limitations period of 1,095 days (3 years) for breach of fiduciary duty claims. [444] That is, the Kim Plaintiffs filed

their claims with three months remaining in the analogous period. The potential prejudicial impacts identified by the Defendants—chief among them being increased litigation costs—do not warrant barring the Kim Plaintiffs' claims under laches when the Defendants were otherwise on full notice of practically identical claims asserted by the Fuchs Plaintiffs. The Kim Plaintiffs' challenge to the Defendants conduct in the Recapitalization is thus not barred by laches.

[444]    10 *Del. C.* § 8106.

## VI. THOMAS MURPHY'S FRAUD CLAIM

Thomas Murphy asserts that several Defendants— primarily Snyder, Dwyer, and Dort Cameron—defrauded him when the Company repurchased 44,000 shares of his stock in June 2006. Specifically, he claims that these individuals fraudulently induced him to sell back his stock at $1.00 per share, which they stated was fair, without disclosing ongoing merger discussions between the Company and Akamai. He seeks the difference between the $1.00 per share he received and the $13.00 per share of consideration received by stockholders in the Akamai Merger, or approximately $560,000.

### A. *Relevant Background*

 **\*54**  By early 2006, the Board had begun the process of getting ready "[t]o someday sell the business." [445] Competitors in the industry, including VitalStream, Limelight, and Akamai, were tacitly expressing their interest in the Company, and Snyder generally updated the Board about this activity. [446] For example, Snyder had received an email from the CEO of VitalStream in May. On May 27, Snyder changed the email's title from "VS/Nine" to "M & A FYI," forwarded it to Dwyer, and included his thoughts on preliminary conversations with other potential acquirers. According to the email, someone at Limelight "wants to start a process with [the Company] in about 2 weeks," and Snyder planned to schedule an overdue meeting with Akamai at some point "over the next 30 days to keep them interested." [447]

[445]    Tr. 773–76 (Snyder), 2422 (Dwyer).

[446]    *Id.* 833–36 (Snyder).

447    JX 443; Tr. 837–44 (Snyder).

Around this time, Dwyer, Newton (who would shortly replace Shipman on the Board), Snyder, and others expressed their opinions, with varying degrees of confidence, that Nine System's financial performance was exceeding their expectations. [448] Dwyer informally valued the Company's preferred stock at $57.5 million, [449] and Newton thought the Company was worth $60 to 90 million. [450] Snyder, in particular, expected the Company to have "a bang up quarter and year versus budget." [451] He made this specific comment, which the Plaintiffs emphasized heavily at trial, while trying to increase his compensation as CEO during negotiations with Dwyer.

448    JX. 433, 437, 440, 1006.

449    Tr. 2426–27 (Dwyer).

450    JX 440; Tr. 1984–85 (Newton).

451    JX 445.

Less than a week after the "M & A FYI" email, Thomas Murphy contacted the Company seeking to resell a substantial portion of his stock. He wanted the money because he was under financial pressure in light of his and his wife's health problems. [452] It is likely that he spoke with Dort Cameron, Snyder, Dwyer, and the Company's CFO, John Walpuck ("Walpuck"), although some of those individuals could not recall whether they talked or what may have been said. [453] Thomas Murphy asked about the Company's financial outlook, and someone in that group—most likely Snyder—said that things were "going okay." [454] At another point, Thomas Murphy also mentioned to Snyder that he saw that the Company had received some favorable publicity: a magazine or newspaper article had featured it alongside Akamai and well-known competitors in the streaming media industry. [455] This comment went largely ignored. [456]

452    Tr. 536, 581–82 (T. Murphy).

453    Tr. 537–41, 570–71 (T. Murphy), 2443–44 (Dwyer), 2728–29 (D.Cameron); JX 695 (Walpuck Dep.) at 385.

454    Tr. 539–40, 549 (T. Murphy).

455    Id. 541–44, 575–77 (T. Murphy). The Plaintiffs were unable to produce the exact article, but they did identify one that Thomas Murphy thought was similar. JX 444; Tr. 543–44 (T. Murphy).

456    Tr. 541–42, 573–77 (T. Murphy).

One of the Defendants with whom Thomas Murphy spoke likely proposed a $1.00 per share price, and someone at the Company drafted a stock repurchase agreement to reflect the transaction. [457] No one at the Company obtained an independent valuation of these shares. [458] Contrary to his pre- and post-trial contentions, Thomas Murphy did not prove by a preponderance of the evidence that any of the Defendants represented or otherwise assured him that $1.00 per share was a "fair" price. Rather, it is more likely than not that Thomas Murphy independently assumed, based on his expectation of how the Company should treat its first investor in a time of need, that the Defendants would only offer him a price that was fair. [459]

457    JX 447.

458    Tr. 854 (Snyder), 2448 (Dwyer).

459    Tr. 556, 581 (T. Murphy) ("I felt at that time that under my circumstances that I deserved a fair and honest square deal."); see also JX 696 (T. Murphy Dep.) at 167 ("Q. ... In what way were you assured that the price was fair? A. I can't say that there was an assurance other than the fact that that was the price mentioned and it seemed like there was no means of negotiating that.").

**\*55** On June 2, 2006, Thomas Murphy and the Company executed a Stock Repurchase Agreement by which the Company repurchased 44,000 of his shares. [460] Thomas Murphy did not negotiate any provision of the document. [461] The Stock Repurchase Agreement included a purported anti-reliance provision, which provided:

> Section 2.5 *Representations.* Shareholder acknowledges that no promises, representations or warranties whatsoever, express or implied, not contained herein concerning the Company and the subject matter hereof, have been made by the Company to induce Shareholder to execute this Agreement. Shareholder further acknowledges and warrants that he

has not entered into this Agreement or the transactions contemplated thereby in reliance on any promise, representation or warranty not contained herein, or under duress or coercion, whether economic or otherwise. [462]

After the stock repurchase, Thomas Murphy held 1,000 shares of the Company.

[460]  JX 450.

[461]  Tr. 553 (T. Murphy).

[462]  JX 450.

When he received the proxy materials for the Akamai Merger in November 2006, Thomas Murphy was upset. He felt he had been had because the shares he sold for $1.00 each in June were, less than six months later, now valued at $13.00 per share. Despite thinking that he might have had grounds to bring a lawsuit, however, Thomas Murphy did not seek legal advice because he felt he could not afford an attorney at the time. [463]

[463]  Tr. 601, 603, 612 (T. Murphy).

He eventually filed his claim against the Defendants in this Court in 2012 as one of the Kim Plaintiffs.

B. *The Parties' Contentions*

Thomas Murphy contends that he has established that the Defendants fraudulently induced him to sell back his stock, if not by representing that $1.00 per share was a fair price, then by failing to disclose the contemporaneous merger discussions with Akamai and other parties. [464] The Defendants, for their part, assert that Thomas Murphy failed to carry his burden to establish fraud against any of them [465] under the standard articulated by this Court in *Latesco, L.P. v. Wayport, Inc. (Wayport I)* [466] and *In re Wayport, Inc. Litigation (Wayport II)*. [467] Alternatively, they contend that he failed to establish justifiable reliance or damages, and, moreover, that his claims should be barred under the anti-reliance provisions of the Stock Repurchase Agreement or under laches as untimely. [468] As to these alternative arguments, Thomas Murphy maintains that, given the lack of negotiation and unequal bargaining power, any anti-reliance provision

should not be enforced—assuming it even applies to omissions, which he argues it does not. [469] Further, he asserts tolling to support his position that his claim is timely, and he posits that the additional consideration he would have received for his 44,000 shares in the Akamai Merger—the calculation of damages followed in *Wayport II*—is sufficient to establish damages here. [470]

[464]  Pls.' Reply Br. 45–46; Pls.' Opening Br. 90–94.

[465]  In the Pretrial Stipulation and Order, Thomas Murphy asserts this claim against Dort Cameron, Katz, Shipman, Snyder, and Dwyer. Pretrial Stip. ¶ 29(f). At trial, Thomas Murphy conceded that he never spoke with Shipman or Katz. Tr. 572 (T. Murphy). Neither Thomas Murphy nor Dwyer was sure if they spoke. *Id.* 570–72 (T. Murphy), 2443 (Dwyer). In post-trial briefing, Thomas Murphy primarily pursued this claim against Snyder, Dwyer, and (to a lesser extent) Dort Cameron. Pls.' Reply Br. 46 n.57. The Defendants, in their post-trial briefing, responded with language suggesting that all of the Defendants were defending against this claim. The Court's conclusions on the liability for Dort Cameron, Snyder, and Dwyer apply equally to the other Defendants.

[466]  2009 WL 2246793 (Del. Ch. July 24, 2009).

[467]  76 A.3d 296 (Del. Ch.2013).

[468]  Defs.' Answering Br. 99–105.

[469]  Pls.' Reply. Br. 46–47; Pls.' Opening Br. 94–98.

[470]  Pls.' Reply Br. 47–49; Pls.' Opening Br. 102–05.

C. *Analysis*

**\*56** To recover on a claim of fraud under Delaware law, [471] Thomas Murphy must prove:

> (i) a misrepresentation, which can take the form of a statement, omission, or active concealment of the truth; (ii) the defendant's knowledge that the representation was false; (iii) intent to induce the plaintiff to act or refrain from acting; (iv) justified reliance on the misrepresentation; and (v) damage as a result of such reliance. [472]

Case 1:18-cv-00475-SEB-TAB Document 1-2 Filed 02/16/18 Page 198 of 440 PageID #: 210
In re Nine Systems Corporation Shareholders Litigation, Not Reported in A.3d (2014)
2014 WL 4383127

Based on the evidence presented at trial, Thomas Murphy failed to establish a fraudulent statement or active concealment by any of the Defendants. No one represented to him that $1.00 per share was a fair price. Consequently, he must establish a fraudulent omission.

[471]  The parties assumed, without briefing the choice-of-law issue, that Delaware law governs this fraud claim. No party suggested that Delaware's standard is different from those of other jurisdictions whose laws may apply. Largely for this reason, the Court assumes, without deciding, that Delaware law applies. *See Vichi v. Koninklijke Philips Elecs., N.V.,* 85 A.3d 725, 778 (Del. Ch.2014) ("Because I have concluded that no material conflict exists between Delaware and Italian law as they relate to this case, I need not address the second prong of Delaware's choice of law analysis, and I apply Delaware law.").

[472]  *Great–W. Investors LP v. Thomas H. Lee P'rs, L.P.,* 2011 WL 284992, at *12 (Del. Ch. Jan. 14, 2011).

For the Defendants to be held liable for fraud for failing to disclose the conversations between Snyder and the Company's competitors about a potential acquisition, they must have been subject to a duty to disclose that information. "[M]ere silence about facts material to another party is not fraud unless the party who remains silent has a duty to disclose those facts."[473] "Generally, a duty to disclose arises when there is a fiduciary or other similar relationship of trust between the parties or where the custom or course of dealing between the parties merits disclosure."[474] This Court's decisions in the *Wayport* case are instructive in analyzing whether Thomas Murphy has carried his burden to establish that the Company's repurchasing of his stock required Snyder or any of the other Defendants to disclose additional information to him.

[473]  *Corporate Prop. Assocs. 14 Inc. v. CHR Hldg. Corp.,* 2008 WL 963048, at *6 (Del. Ch. Apr. 10, 2008).

[474]  *MetCap Sec. LLC v. Pearl Senior Care, Inc.,* 2007 WL 1498989, at *5 (Del. Ch. May 16, 2007).

The *Wayport* case involved allegations by a stockholder that the corporation, the board of directors, an officer of the company, and two major stockholders were liable for breach of fiduciary duty, fraudulent misrepresentation, and other claims for their failure to disclose certain information to the plaintiff when he sold his stock

in the corporation to the defendant stockholders. The defendants allegedly failed to disclose material information about the corporation's ongoing negotiations to sell various assets to a third party, which was information that purportedly would have increased the consideration that the plaintiff would have sought when selling his stock. In *Wayport I,* the Court dismissed the claims against the directors under Rule 12(b)(6) in part "[b]ecause there is no allegation of board action that implicates the duty of loyalty, and none of the directors ultimately purchased any stock in the second sales transactions, no claim for breach of the duty of loyalty can be maintained against them."[475] However, the Court sustained the claims against the other defendants, concluding that it was reasonably conceivable that they may "have been subject to a duty to speak which made silence about the material inside information they possessed impermissible."[476]

[475]  *Wayport I,* 2009 WL 2246793, at *8.

[476]  *Id.* at *9.

 **57  In its post-trial decision in *Wayport II,* the Court found that none of the remaining defendants was liable for failing to disclose information to the plaintiff when buying his shares.[477] In doing so, the Court concluded that Delaware law follows the "special facts" doctrine in determining what information a fiduciary must disclose before directly buying stock from, or selling stock to, a stockholder.[478] Most relevant here, a fiduciary generally assumes a duty to speak in those circumstances if the fiduciary has "knowledge of a substantial transaction, such as an offer for the whole company."[479] Under *Wayport II,* a fiduciary's failure to disclose a special fact can also establish the false misrepresentation element of a fraud claim.[480]

[477]  *Wayport II,* 76 A.3d at 320. The Court did, however, find one of the defendants liable for fraud because, after making a particular representation, it "assumed a duty to update its statement to the extent that subsequent events rendered its representation materially misleading." *Id.* at 324.

[478]  *See id.* at 315, 320 (tracing the history of the "special facts" doctrine in Delaware law and noting that, "[a]bsent further guidance from the high court, the 'special facts' doctrine remains the standard in this

context"); *see also Lank v. Steiner,* 224 A.2d 242, 244 (Del.1966) (citing *Kors v. Carey,* 158 A.2d 136 (Del. Ch.1960)) ("[T]he special circumstance rule applies only when a director is possessed of special knowledge of future plans or secret resources and deliberately misleads a stockholder who is ignorant of them.").

479 *Wayport II,* 76 A.3d at 320 (citing persuasive case law from outside Delaware in support of this definition).

480 *See id.* at 323.

The threshold for a "special fact" is higher than that for information to be deemed material. [481] Information about a possible merger or similar transaction generally becomes material when there is an "agree[ment] on the price and structure of the transaction." [482] The Court in *Wayport II* concluded that the only material omission did not rise to the level of a special fact. [483]

481 *See id.* at 321.

482 *Bershad v. Curtiss–Wright Corp.,* 535 A.2d 840, 847 (Del.1987); *cf. Rosenblatt v. Getty Oil Co.,* 493 A.2d 929, 944 (Del.1985) ("An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.").

483 *Wayport II,* 76 A.3d at 321–22.

The facts here are a slight variation on those of *Wayport.* Here, the Company repurchased stock from a stockholder. Under Delaware law, a corporation does not owe fiduciary duties to its stockholders; the board of directors and the officers do. [484] Thus, the Company cannot be liable to Thomas Murphy for breach of fiduciary duty (or for fraud) for want of a fiduciary relationship that could give rise to a duty to speak.

484 *See, e.g., In re Orchard Enters., Inc. S'holder Litig.,* 88 A.3d 1, 30 (Del. Ch.2014) (citing *Wayport II,* 76 A.3d at 322–23); *Chen v. Howard–Anderson,* 87 A.3d 648, 693 (Del. Ch.2014) (same).

Nonetheless, as the *Wayport II* court suggested, the Defendants who acted as agents of the Company in facilitating the stock repurchase, even if they did not purchase the stock, could still have liability because

they were responsible for the Company's statements and omissions to Thomas Murphy. That is, Snyder and the other members of the Board, as fiduciaries to Thomas Murphy, could be liable for fraud if they failed to disclose a special fact to him. Dwyer, as a non-fiduciary, could also be liable for fraud under an aiding and abetting theory.

**\*58** It is plain from the documentary evidence that, despite Snyder's attempts at trial to discount the import of his "M & A FYI" email, the Board was in the early stages of considering whether to sell the Company. But, Thomas Murphy did not establish that Snyder and Dwyer's conversations with competitors in May or June 2002 were anything more than preliminary. There are no contemporaneous term sheets, letters of intent, or draft agreements in the record. Any conversations with potential acquirers at that time could hardly be called negotiations. If anything, Snyder's email reveals that any serious meetings were still weeks or even months away—they did not occur in earnest until August. The Board's internal and generalized discussion of a potential transaction and their accompanying valuations of the Company would not qualify as material information. Accordingly, as the Court noted in *Wayport II,* neither does this information qualify as a special fact. [485]

485 *See Wayport II,* 76 A.3d at 321.

Because there was no special fact, there was no duty to speak. [486] Thus, failing to disclose that information to Thomas Murphy was neither a breach of fiduciary duty nor a fraudulent omission by Snyder, Dort Cameron, or anyone else on the Board. Since no director is liable for failing to disclose that information, neither Dwyer nor the other Defendants are liable under an aiding and abetting theory. [487] The Defendants are therefore entitled to judgment in their favor on Thomas Murphy's fraud claim. [488]

486 *See id.* at 323.

487 *Cf. Malpiede,* 780 A.2d at 1096.

488 Based on this conclusion, the Court need not determine whether Thomas Murphy has proven the other elements of his fraud claim. The Court also need not resolve the Defendants' laches defense or the effects of the purported anti-reliance provisions of the Stock Repurchase Agreement.

## VII. CONCLUSION

For the foregoing reasons, the Court concludes that Wren, Javva, Catalyst, Dort Cameron, Katz, Shipman, and Snyder breached their fiduciary duties, and Dwyer (and, to the extent they were not a control group, Wren, Javva, and Catalyst) aided and abetted those breaches, in the unfair Recapitalization. The Defendants are entitled to judgment in their favor on the Plaintiffs' other claims, including Thomas Murphy's fraud claim.

The Plaintiffs are not entitled to any monetary damages. The Plaintiffs are nonetheless granted leave to submit a petition for attorneys' fees and costs.

Counsel are requested to confer and to submit an implementing form of order.

**All Citations**

Not Reported in A.3d, 2014 WL 4383127

---

**End of Document** © 2018 Thomson Reuters. No claim to original U.S. Government Works.

# *TAB 8*

Case 1:18-cv-00475-SEB-TAB Document 1-2 Filed 02/16/18 Page 202 of 440 PageID #: 214

Phillips v. Insituform of North America, Inc., Not Reported in A.2d (1987)

1987 WL 16285, 13 Del. J. Corp. L. 774

KeyCite Yellow Flag - Negative Treatment

Distinguished by Angelo, Gordon & Co., L.P. v. Allied Riser Communications Corp., Del.Ch., January 30, 2002

1987 WL 16285

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle County.

I.P. PHILLIPS and D.J. Buchler, as Receivers, Plaintiffs, and

Brian Chandler and Parkwood Limited, an Isle of Man corporation, as trustee, Intervenors,

v.

INSITUFORM OF NORTH AMERICA, INC., a Delaware corporation, Paul A. Church, Robert M. Leopold, Jack Massar, Eric Wood, Hershel Krasnow, Alfred B. Delbello and William D. Ruckelshaus, Defendants.

Civ. A. No. 9173.
|
Submitted: Aug. 24, 1987.
|
Decided: Aug. 27, 1987.

**Attorneys and Law Firms**

**\*\*776** Lawrence A. Hamermesh, Kenneth J. Nachbar, Andrew M. Johnston, and Palmer L. Whisenant, of Morris, Nichols, Arsht & Tunnell, Wilmington, and Paul, Weiss, Rifkind, Wharton & Garrison, New York, and Lovell, White & King, London, of counsel, for plaintiffs.

**\*\*777** Jesse A. Finkelstein, Gregory V. Varallo, Kevin G. Abrams, Joseph J. Bodnar, and Anne F. Bugg, of Richards, Layton & Finger, Wilmington, and Krugman, Chapnick & Grimshaw, New Jersey, of counsel, for intervenors.

William Prickett, Michael Hanrahan, Joseph Grey, Esquire, Glenn D. Fugate, and Philip B. Obard, of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, and Parker, Chapin, Flattau & Klimpl, New York, of counsel, for defendants.

MEMORANDUM OPINION

ALLEN, Chancellor.

**\*1** Plaintiffs are receivers of certain Class B shares of defendant Insituform of North America, Inc. ("INA"), a Delaware corporation. They were appointed by order of the Chancery Division of the English High Court of Justice and thereafter were instructed by that court to institute this action. The action seeks an order enjoining a proposed merger that will recapitalize INA and a declaratory judgment that certain recent actions of the INA board are invalid. Among the acts specifically sought to be declared invalid are several by-law amendments and the sale of sufficient Class B stock to INA's chief executive officer to remove control of vote of the Class B stock (and, thus, under INA's structure, control of the company's board) from the block of Class B shares now held by the receivers.

The matter is now before the court on the motion of plaintiffs, joined in by intervenor Parkwood, Ltd.-also an owner of INA Class B shares-for a preliminary order restraining *pendente lite* the effectuation of a proposed merger between INA and its wholly-owned subsidiary, NU-INA, Inc. and for other preliminary relief. The stockholders' meeting to vote on the proposed merger is scheduled to be held on August 27, 1987. The proxy statement is dated August 6, 1987. This action was filed on August 17. Limited discovery has proceeded in the hurried way typical of proceedings of this type. The motion was presented on August 24.

In summary, the claim of the Class B shareholders is that the defendants are engaged in a course of conduct designed to deprive them of rights conferred upon them by INA's certificate of incorporation; that in order to protect the board's incumbency, the directors have proposed the merger and have taken improper steps in **\*\*778** an attempt to thwart plaintiffs' exercise of their lawful rights. Claims by shareholders or their representatives that corporate action, while in good form legally, constitutes in the circumstances, a violation of the board's supervening fiduciary duty are common in this era in which the non-negotiated attempt to wrest control over a corporation through an unsolicited tender offer has become the prototypical corporate transaction. This case is, however, different from the usual case in which such allegations

are raised. Here, there is no threat to existing policies or programs of the corporation posed by an outsider but, rather, an attempt by the existing board to promote a change in the distribution of corporate power among existing classes of stock assertedly in pursuit of the best interests of the corporate enterprise as a whole.

## I.

INA was incorporated in Delaware in 1980 for the purpose of acquiring and exploiting a license on a proprietary process invented by defendant Eric Wood and developed by him and Messrs. Brian Chandler, an intervenor, and Douglas Chick. The process-the Insituform process-is a technique for the repair of cracks in sewer or water pipes that permits such repair without the need to excavate the pipes. The process was originally developed by Wood, Chick and Chandler in the 1970's. Relatively early in the course of their venture, they came to depend upon the advice and assistance of defendant Paul Church, then a member of an accounting firm and a financial advisor to Mr. Chick. All of these men are residents of the British Isles and all except Chick, who is a U.S. citizen, are English.

**\*2** On the advice of Mr. Church, the three principals transferred their rights to the Insituform process to a corporation formed under the laws of the Isle of Man, International Group, Ltd. ("IGL") with the thought that IGL would license other corporations to use the process. INA was incorporated for the purpose of taking a license from IGL (or an IGL subsidiary) and exploiting it commercially in the U.S. Church appears to have been the active agency in causing INA to be formed and structured as it is.

INA's common stock is of two classes. The rights, powers and privileges of each class are identical except that the holders of Class B are entitled to elect $^2/_3$ of the board of directors of the Company. The Class A stock was underwritten publicly in the U.S. through the offices of defendant Krasnow, an officer of a brokerage firm and **\*\*779** a friend and associate of Mr. Church. Class B was issued to Ringwood Limited, an Isle of Man corporation owned (through yet another entity) by Chick, Chandler and Wood.[1]

Presently, the board of INA is composed of seven members. The B stock claims to have elected five directors: Messrs. Church, until recently Chairman of the Board, Krasnow and Wood and two officers of INA, Mr. Leopold, now CEO and Chairman of the Company, and Mr. Massar. Two outside directors, Messrs. DelBello and Ruckelshaus identify themselves as A directors. To evaluate the arguments presented, it is essential to have in mind the setting within which the directors of INA took the actions under attack. As that action was admittedly a reaction, in part at least, to developments in the English litigation which gave rise to the appointment of plaintiffs as receivers for Ringwood, a brief summary of that involved litigation will be helpful.

### A. The English Litigation

Mr. Church is apparently an energetic businessman. Once brought on the scene as an advisor, he seems to have rapidly become the principal actor in the effort to exploit the Insituform process. He organized INA, designed its dual classification of common stock, arranged with his friend Krasnow for the public sale of the Class A stock and served as managing director of Ringwood, the holder of the B stock. Mr. Chick's apparent penchant for anonymity and Mr. Wood's disinterest in the legal and financial aspects of business helped to clear the way for Church to assume the role of energetic "front man" for the enterprise. By 1981, Church thought his efforts entitled him to an equity participation in the business. In that year, the partners agreed to cede to him (*pro rata*) a 10% share in their Insituform businesses. Thus, Church, who had acted as the managing director of Ringwood, came to own beneficially a 10% interest in the INA B stock owned by Ringwood.

**\*\*780** For reasons that are not altogether plain, at some point in 1984 Messrs. Chandler and Wood decided to hold their INA B stock directly. Church, now an equity participant, resisted on the ground that the control of INA afforded by the single holding might be threatened. Chandler and Wood, and ultimately Mr. Chick as well who joined them in seeking to remove his B shares from Ringwood, finally succeeded in extracting a portion of their interest from Ringwood after they agreed to enter into a voting agreement which bound Chick, Chandler, Wood and Church not to dispose of their B stock for 5 years and to either abstain from voting or to vote that

Case 1:18-cv-00475-SEB-TAB Document 1-2 Filed 02/16/18 Page 204 of 440 PageID #: 216

Phillips Manufacturing of North America, Inc., Not Reported in A.2d (1987)

1987 WL 16285, 13 Del. J. Corp. L. 774

stock in unanimity for the existing INA B directors for a similar period.

**\*3** Not all of Ringwood's holdings of INA B stock were distributed, however. With the prospect of the distribution of the B stock from Ringwood to its beneficial owners on the horizon, Mr. Church saw his control of INA (through his influence with the "partners" and his status as managing director of Ringwood) slipping; he announced to the partners his receipt of a claim to certain of Ringwood's INA B shares from a British Virgin Islands attorney. The claim was asserted on behalf of a Liberian corporation called Chimera Securities, Inc. Church told the partners that the claim arose out of some dealings by him for the account of INA or Ringwood with certain Asian residents of Kenya. He urged that the claim be resisted but that 52% of the 1,000,000 B shares held by Ringwood, plus some cash, be kept in Ringwood in the event it became necessary to satisfy the claim. The partners agreed. Thus, while Chick, Chandler and Wood sought to remove their B shares from Ringwood, Mr. Church nevertheless persuaded them to agree to a course that left the control mechanism in place, with Mr. Church still in charge of Ringwood's affairs and thus in continued control of INA.

Suspicion of various sorts caused Chandler and Chick in 1986 to commission an audit by Touche Ross of Ringwood's affairs. In turn, the audit led to the filing of suit by Chick and Chandler against Church and others, including Wood,[2] in the High Court of Justice, **\*\*781** Chancery Division, in London. That suit is a quite complex matter. The March 10, 1987 opinion of Hoffmann, J. sustaining his jurisdiction in the matter of *Chandler, et al. v. Church, et al.* (Ch.1986C.6596), lays out a great deal of the background. Suffice it to say for the moment that much evidence has come to light indicating that Chimera Securities, Inc. is simply the audaciously named creature of Church himself and that the claim it asserted was simply a complex deception and an attempted fraud. The English Chancery Division suit therefore seeks, *inter alia,* an accounting of Ringwood's business from Church and a distribution of the B stock to its beneficial owners. These matters, however, are to be determined in a trial in the High Court now scheduled for early 1988.

On December 17, 1986, the English court extended plaintiff's receivership, earlier created, to Ringwood's INA

B shares. However, that order did not reach the whole of Ringwood's 52% holding of the INA stock.

Mr. Church had earlier brought an action in the British Virgin Islands ("BVI") against Ringwood claiming a personal right to 52,500 shares of the B stock. The BVI court preliminarily enjoined the transfer of that number of shares. Accordingly, the December, 1986 order of the English court did not require the transfer of those shares to the receiver. The balance transferred constituted 49% of the INA Class B shares. Thus, through his Virgin Island action, Church succeeded in preventing potential control of INA, through control of a majority of the B shares, from moving into other hands. However, the BVI court thereafter dissolved its order and the High Court on March 24, 1987 modified its own order to require transfer of the remaining Class B shares to the receivers.

### B. INA Board's Reaction

**\*4** While defendants Church and Wood presumably learned of this March 24 order promptly, the INA board did not learn of it until its next meeting on April 26, 1987. Its reaction to the prospect that "strangers"[3] might come to control the election of the INA board **\*\*782** was immediate. At that very meeting, the board acted to defer the 1987 annual meeting then planned for June. It is admitted that the board so acted because it could not be sure how the Class B shares would now be voted (Leopold Dep. at 235; Wood Dep. at 106).

Further and more complete reaction to the perceived threat followed. First, on June 17, 1987 the board met by telephone. The board then addressed the threat that Ringwood or another "putative holder" of Class B might seek to act by written consent and might remove the existing board. The minutes of that meeting recite that legal counsel advised:

... that a means of avoiding the possibility that a written consent could create doubt as to the validity of actions by ... the board ... would be to issue sufficient authorized but unissued shares of Class B Common Stock so that the Class B shares currently held ... by Ringwood ... would not constitute a majority.

Case 1:18-cv-00475-SEB-TAB Document 1-2 Filed 02/16/18 Page 205 of 440 PageID #: 217

Phillips v. Insituform of North America, Inc., Not Reported in A.2d (1987)

1987 WL 16285, 13 Del. J. Corp. L. 774

The board took that advice and on June 17 authorized the sale of 51,000 shares of Class B stock to defendant Leopold allowing him to pay only 10% of the price in cash.

Having thus stilled fears of immediate stockholder action by reducing the proportion of B stock in the receiver's hands to 49%,[4] defendants next took up a number of matters designed to deal with the "problem" on a more permanent basis. At a special meeting on July 2, 1987, the board approved several by-law changes and resolved to recommend to the shareholders approval of a merger that would have the effect of eliminating the B stock. In the proposed merger between INA and a wholly-owned subsidiary, NU-INA, each of the 1,051,000 shares of B stock would be converted to 1.05 shares of NU-INA. Each of the 7,889,158[5] outstanding shares of Class A stock would be converted into a single share of new common. The **783 date of the special meeting called to vote on this proposal was scheduled for August 27.

The by-law amendments adopted that day did several significant things. First, they determine that a quorum of the board is present only when a majority of the two A directors are present. Second, they dictate that the board may act only with the concurrence of a majority of the two A directors. They constitute the A directors and the Chairman of the Board as an executive committee. This committee is given power to call meetings, jurisdiction over certain matters relating to officers and power to call shareholder meetings.

None of these July 2 actions were publicly disclosed and, when the English High Court later, on July 10, directed the receiver to vote the B shares for the existing board, including Mr. Church were he to be nominated, and to vote for Mr. Chandler and a representative of Mr. Chick as well, the court was apparently not informed of the board's action of July 2nd.

## II.

*5 Plaintiffs and intervenors attack all of this as a violation of a duty that the B directors (or, alternatively, all directors) owe to them as controlling shareholders to treat them fairly and not to use the power of their directorial offices to intentionally harm their interests. More specifically, it is contended that the board has engaged in a four-step scheme to destroy the special rights of the B shareholders conferred by the INA charter and implicitly agreed to by the A shareholders at the time of the original underwriting of the A shares.

First, the board manipulated the machinery of corporate governance in order to give the directors time to take steps to deprive the receivers of the power that the Ringwood stockholders possessed, by deferring the annual meeting-for the admitted reason that the board could not know on April 26th how the receivers would vote. Second, the defendants issued new B shares to Mr. Leopold admittedly in order to deprive the Ringwood receivers of the ability to act by written consent in lieu of a meeting under Sec. 228 of Delaware's General Corporation Law. Third, the board adopted by-laws which give A directors power to veto any board action and authority over day-to-day operations. These by-laws, it is charged, stand the power relationship contemplated by the charter on its head and are invalid. Finally, the board proposed the merger with NU-INA assertedly for the express purpose of destroying the special rights of the B shareholders and, in reality, for no other reason.

**784 Plaintiffs contend that the proffered justifications for the actions-a need to restructure the capital of the firm in order to facilitate raising additional capital-is a transparent pretext and that the real purpose of it all is to remove the threat to their incumbency that a majority of the board sees in the B shares now that they are not controlled by Mr. Church-who, although he may be a malefactor insofar as Chick and Chandler's affairs are concerned, was a person with whom a comfortable *modus vivendi* had evolved for the defendants.

Defendants respond that the board acted with a view towards the obligations to shareholders as a whole. The proposed merger is said to be for the benefit, certainly, of the 86% of INA's equity owned by the A shares and for the benefit of the Company, as a distinct entity, since it will permit the Company's stock to be listed on the New York Stock Exchange and to be sold in California. Moreover, in the view of Mr. Wood at least, the merger is a good business idea because it will prevent Chick and Chandler from taking control of the Company. Their business judgment is regarded by Mr. Wood as deplorable. It is admitted, with respect to the capital raising point, that the Company has no current need for additional capital and that there are no plans to list the Company's stock.

Case 1:18-cv-00475-SEB-TAB Document 1-2 Filed 03/16/18 Page 206 of 440 PageID #: 218

Phelps v. Insurance Co. of North America, Inc., Not Reported in A.2d (1987)

1987 WL 16285, 13 Del. J. Corp. L. 774

The issuance of B stock to Mr. Leopold and the amendment of the by-laws are justified as necessary steps to permit the shareholders to have an opportunity to vote upon the merger. Without these steps, it was feared that the B stock, in pursuit of its own interests, might act to prevent such a vote.

**\*6** Defendants claim that there was neither an entrenchment motive here nor entrenchment effect. They point to the fact that Mr. Church will not be a director of NU-INA to evidence their independence from him and claim the weighty protection of the business judgment rule in the circumstances of the case.

### III.

Time, unfortunately, will not permit an analysis as detailed as this interesting case would otherwise demand. I am here required to set forth the basis of my decision more or less straightforwardly. For the reasons that follow, I conclude that defendants have here taken action of various kinds designed to thwart the exercise of perceived stockholder power; that, in quite a real sense, the board has become the committed adversary of a majority of the B shareholders and has taken action against them designed to thwart the B shares from exercising powers claimed by them under Section 228 **\*\*785** of our corporation law (*i.e.,* to act by written consent in lieu of meeting). Furthermore, I conclude that the extraordinary step of a corporation acting solely or primarily for the express purpose of depriving a shareholder of effective enjoyment of a right conferred by law, requires, when challenged, the board to demonstrate that the action taken was fair or justified given the particular business purpose sought to be achieved and the circumstances of the firm.

As explained below, I do not believe the various actions here taken can, in the light of the established case law of this jurisdiction and the nature of the threat perceived by the board on April 26th and thereafter, be made consistent with the board's obligation to the corporation and all of its shareholders. I am persuaded that plaintiffs have demonstrated a substantial likelihood that defendants have inappropriately manipulated the corporate machinery in several important ways for the purpose of removing the supervisory power conferred on the small group of B shares by the certificate of incorporation.

### IV.

A more detailed statement of the reasoning that supports this conclusion begins with an acknowledgment that promoting and recommending the merger here proposed does not itself constitute a wrong of any kind. Simply because that merger would have the effect of redistributing shareholder power does not, of course, make it a wrong to the B shares; they will have a chance to vote on it according to the voting rights conferred by the charter. [6] It has long been established that in negotiating or formulating the terms of a merger, the board owes a duty to exercise its judgment honestly and fairly in apportioning the merger consideration among classes of stockholders, *MacFarlane v. North American Cement Corp.,* Del.Ch., 157 A. 396 (1928), but that once it has done so it is no form of actionable wrong that a particular class of shares is particularly unhappy with its relative treatment in the merger, *Federal United Corp. v. Havender,* Del.Supr., 11 A.2d 331 (1940). In this instance, nothing has been shown at this stage of the proceeding that indicates that the terms of the merger are such as to constitute a constructive fraud; it seems, in the abstract, a transaction that a reasonable director might conclude **\*\*786** is fair to all sides and in the best interests of the Company. Mr. Wood's warm support of it helps support that conclusion. However, this is something that reasonable persons might differ upon; reasonable shareholders, particularly Class B shareholders, might as well conclude that the proposal is not in their best interests. Realizing this, the board acted in various ways to restrict the B stocks power to interfere with a vote on the proposal by all of the shareholders. It is the steps taken for that purpose and not the proposed merger itself that, in my opinion, give rise to a legitimate grievance on the part of the plaintiffs.

**\*7** *Unocal Corp. v. Mesa Petroleum Co.,* Del.Supr., 493 A.2d 946 (1985) teaches that the powers of the board to deal with perceived threats to the corporation extend, in special circumstances, to threats posed by shareholders themselves and a board may, in such circumstances, take action to protect the corporation even if such action discriminates against and injures the shareholder or class of shareholders that poses a special threat. However, it is extraordinary for the law to sanction the act of a fiduciary directed against the interest of his *cestui que trust* and, in such a case, it is necessary for a reviewing court to be

Case 1:18-cv-00475-SEB-TAB Document 1-2 Filed 02/16/18 Page 207 of 440 PageID #: 219

Phillips v. Insituform of North America, Inc., Not Reported in A.2d (1987)

1987 WL 16285, 13 Del. J. Corp. L. 774

satisfied that, in all of the circumstances, the act taken was justified. The *Unocal* court used the phrase "reasonable in relationship to the threat posed." 493 A.2d at 949, 955.

The actions taken by defendants to guarantee that the shareholders would have a chance to vote on the proposed recapitalization through merger were actions clearly directed *against* one class of shareholders and, in the circumstances, require the board to justify those actions by reference to a significant threat to an important corporate interest or to the achievement of a significant corporate benefit. [7] That burden is made somewhat difficult for defendants because the Class B shareholders do not represent a hostile outside force as in *Unocal* (the court there referred to "the threat posed by a corporate raider with a national reputation as a 'greenmailer,' " 493 A.2d at 956) who had only recently acquired an interest in the company. Here there is no threat from an outsider, but rather the prospect that the beneficial owners **787 of the control stock will, having discovered their manager Church engaged in active fraud, assume direct management of their stock investment. Assuming, as I do, that the INA board is not simply reacting sympathetically to Mr. Church, the record supplies scant grounds to suppose that an affirmative injury to the corporation was to be reasonably apprehended in April through July, the period in which the steps were taken that are now under attack. Putting matters in their best light, it appears that the board acted at that time in order, not to save the company from a threatened injury, but to change the capital structure of the firm so that it would be fairer to the owners of 86% of the company's equity and would make raising additional capital easier. If *Unocal* can be said to recognize that a board may take action specifically designed to injure the interests of specific stockholders only when such action is designed to promote a corporate goal and is reasonable in relationship to the end sought, we must ask if the steps here attacked satisfy that test.

This is not, of course, a judgment that needs to be made abstractly. Delaware case law provides a well-developed setting in which exercise of that judgment can be made certain. That case law is particularly helpful when the specific steps of issuance of the shares of B stock to Mr. Leopold and the deferral of the annual meeting are considered. In all events, I turn now to a review of each of the actions taken in order to determine whether, in all of the circumstances, they appear reasonable in the light of the duty of the board to treat all shareholders

evenhandedly and in the light of any threat posed or benefit sought to be achieved.

## A.

**8 I turn first to those cases dealing with the issuance of stock that has the effect of reducing the voting power of a specific shareholder.

In *Canada Southern Oils, Ltd. v. Manabi Exploration Co.,* Del.Ch., 96 A.2d 810 (1953), a 51% shareholder brought an action to prevent the issuance, transfer or voting of shares of defendant's common stock, which if issued would reduce plaintiff's stake to a minority position. This action was attacked as improper since it was assertedly done simply to deprive plaintiff of clear voting control. Defendant answered that the shares were issued to raise capital in the face of the dire financial plight of the firm. Chancellor Seitz, after a factual analysis that supported the conclusion that the stock was issued for the primary purpose of depriving plaintiff of its voting power, presaged **788 in the underscored passage below, the flexible *Unocal* -style analysis:

It is obvious that the only real justification for the issuance of these shares in the way they were issued is that defendants' financial condition required such action *and even then I am doubtful whether it was here justified without first giving plaintiff an opportunity to purchase such shares.*

96 A.2d 813 (emphasis added).

The Court concluded:

When the undisputed facts are viewed cumulatively, I find it reasonable to infer that the primary purpose behind the sale of these shares was to deprive plaintiff of the majority voting control.

This was held to be wrong and a preliminary injunction was entered. One may read *Canada Southern* as creating a black-letter rule prohibiting the issuance of shares for the purpose of diluting a large shareholder voting power, but one need not do so. It may, as well, be read as a case in which no compelling corporate purpose was presented that might otherwise justify such an unusual course. Such a reading is, in my opinion, somewhat more consistent with the recent *Unocal* case. In all events, either reading

indicates that the issuance of the Leopold shares-which admittedly were issued for the sole purpose of impeding or preventing the exercise of legitimate shareholder rights-was an invalid attempt to deprive a shareholder of the benefits of stock ownership contemplated by the corporate charter and the Delaware corporation law.

The later case of *Condec Corporation v. Lunkenheimer Company,* Del.Ch., 230 A.2d 769 (1967) also involved the issuance of shares, in that instance by an incumbent board for the purpose of retaining control in the face of a newly assembled block of common stock amounting to more than fifty percent. This court held such issuance invalid as a device that "*unjustifiably* strikes at the very heart of corporate representation." 230 A.2d at 777 (emphasis added). *See also EAC Industries, Inc. v. Frantz Manufacturing Co.,* Del.Ch., C.A. No. 8003, Walsh, V.C. (June 28, 1985) at p. 20-22.

In applying the teachings of these cases, I conclude that no justification has been shown that would arguably make the extraordinary step of issuance of stock for the admitted purpose of impeding the exercise of stockholder rights reasonable in light of the corporate **789 benefit, if any, sought to be obtained. Thus, whether our law creates an unyielding prohibition to the issuance of stock for the primary purpose of depriving a controlling shareholder of control or whether, as *Unocal* suggests to my mind, such an extraordinary step might be justified in some circumstances, the issuance of the Leopold shares was, in my opinion, an unjustified and invalid corporate act.

### B.

**9** As for the failure to hold an annual meeting, INA's by-laws establish a date for the annual meeting in June of each year. The 1986 meeting occurred in June of that year. It is admitted that the 1987 annual meeting was delayed, upon the board's learning that Ringwood's Class B shares had passed out of Mr. Church's control, in order for the board to find out how the Ringwood shares would be voted. The only issue then considered to be likely to be before the meeting was the election of directors and it was therefore their own tenure in office that was of concern.[8]

The failure to hold the annual meeting at the time provided in the by-laws or to hold it within the time

required by Section 211 of the corporation law, at the barest minimum, requires, in these circumstances, defendants to demonstrate that their action was necessary to protect an important corporate, as opposed to a personal, interest. *See Schnell v. Chris-Craft Industries, Inc.,* Del.Supr., 285 A.2d 437, 439 (1971). This, in my opinion, has not been done in this instance. On this record, it is impossible to conclude that the court-appointed receivers of the commanding block of B shares represented a threat to existing policies, programs or interests of INA as to justify, if ever it could be justified, ignoring the command of Section 211 to hold an annual meeting within 13 months of the last such meeting. Certainly the subsequent action of the English Court in authorizing the receivers to attempt to exercise such power as they have to reconstitute the board in part (about which much was made at argument of this motion) does not justify the April 26 action; it **790 is explained readily as a reaction to the course of conduct initiated by the defendants at that time.

### C.

I turn finally to a review of the law treating by-law amendments to help assess whether the action of amending the by-laws-taken as an act directed toward thwarting the potential exercise of stockholder power by a specific class of stock-is reasonable in light of a threat posed by that class of stock to the corporation or is justified by a benefit sought to be achieved for the corporation. Recall that the by-law amendments in question do several things:

FIRST: They require that a majority of the (2) A directors be present before a quorum is present and a majority of these (2) directors are required to take any action.

SECOND: Any newly created directorship is to be filled by a majority vote of *stockholders* of the class entitled to elect and not by directors.

THIRD: An Executive Committee is created consisting of the Chairman of the Board and the two Class A directors.

FOURTH: The Executive Committee is empowered to call Board meetings and to set the date for shareholder meeting and given jurisdiction over certain matters concerning officers.

Case 1:18-cv-00475-SEB-TAB   Document 1-2   Filed 02/16/18   Page 209 of 440 PageID #: 221

Phillips v. Insituform of North America, Inc., Not Reported in A.2d (1987)

1987 WL 16285, 13 Del. J. Corp. L. 774

It is, of course, elementary that by-laws may not produce effects inconsistent with the plan of corporate governance envisioned by the charter. Section 109(b) of the corporation law codifies this basic proposition. *See also Essential Enterprises Corp. v. Automatic Steel Products, Inc.,* Del.Ch., 159 A.2d 288 (1960).

**\*10** Treated individually and as an abstract matter, it a close question whether each of these by-law amendments is inconsistent with the basic scheme of corporate power created by INA's certificate of incorporation. Much of plaintiffs' argument that the by-law amendments are invalid seems premised on an assumption that a right to designate a majority of the board involves legally the right to control the board's action and thus the corporation. However, so long as the law demands of directors, as I believe it does, fidelity to the corporation and all of its shareholders and does not recognize a special duty on the part of directors elected by a special class to the class electing them, such a premise must be regarded as legally incorrect. Thus, I would not, for example, think a by-law requiring **\*\*791** certain action be authorized by a unanimous board to be inconsistent with a certificate provision of the kind contained in INA's charter. Such a by-law may be viewed as a technique governing the exercise of board power which is not inconsistent with a certificate provision providing a technique for designating board members.

The amended provision requiring, for board action, concurrence of a majority of the (two) A directors is, of course, very much like such a requirement of unanimity and, standing alone, would not seem to be inconsistent with INA's charter. The quorum provision also strikes me, when considered in isolation, as a supplementary provision consistent with the letter of the charter; it is designed to balance power between the A and B shareholders in a way not necessarily inconsistent with the charter's grant of special right to the B shareholders to designate the persons to fill a majority of board positions. However, when these two provisions are placed in context with each other and with the third amendment that creates an executive committee comprised predominantly of A directors, a realistic evaluation leads to the conclusion that a fundamental shift in the allocation of power between the A shareholders and the B shareholders has taken place and that that new arrangement is inconsistent with what would

have been the reasonable understanding of the effect of the provisions of the certificate.

Moreover, consideration of these amendments must take into account the fact that these by-laws were adopted as a second line of defense against the exercise of power under Section 228 by the B shareholders. They were designed to equip the A class of stock with an effective veto over future board action. In adopting this interrelated series of amendments, the board became, or rather continued as, intense partisans waging war against the Class B stockholders. Whether regarded as individual owners of Class A stock, [9] as office-holders acting pursuant to a plan to remove the supervising power of control shares (with a concomitant entrenchment effect) or simply as directors choosing to favor the A shares over the B shares, this particular exercise of the legal power to enact by-laws, in this setting, requires a specific justification. *Schnell v. Chris-Craft, supra.* I am persuaded that no reasonable apprehension of injury to legitimate corporate interests has been put forward that would justify, in these circumstances, this exercise by the board of the power **\*\*792** conferred on it by the charter to amend by-laws. Nor does it appear that any palpable corporate benefit was actually a motivating force for these amendments. I therefore conclude that the by-law amendments adopted on July 2, 1987 will likely be found to be invalid.

### V.

**\*11** For the foregoing reasons, I conclude that plaintiffs and the intervenors have established a clear probability of ultimate success on the merits of their claims. Given the great difficulty, and perhaps practical impossibility, of returning a merged corporation to its original constituent corporations, a preliminary injunction is the conventional remedy when a shareholder establishes that a proposed merger is likely to be found to be in violation of law or of the board's fiduciary obligations. *See, e.g., Gimbel v. Signal Cos.,* Del.Ch., 316 A.2d 599, *aff'd* Del.Supr., 316 A.2d 619 (1974). In this instance, 'unscrambling the eggs' might not be as difficult as it typically would be since the merger here is, in effect, a recapitalization of an existing enterprise and not a consolidation of distinct businesses. Nevertheless, assuming the merger proposal is approved by the shareholders and implemented, plaintiffs will lose the enhanced vote their shares currently possess. If, as currently appears, it is determined that the board

Case 1:18-cv-00475-SEB-TAB Document 1-2 Filed 02/16/18 Page 210 of 440 PageID #: 222
Kidsco Inc. v. Dinsmore America, Inc., Not Reported in A.2d (1987)

1987 WL 16285, 13 Del. J. Corp. L. 774

engaged in conduct wrongful to plaintiffs in order to get that proposal to a shareholder vote, any approval thus obtained will necessarily be invalidated. In that event, plaintiffs will be deprived during the period before a dissolution of the merger were ordered, of their right, created by the INA charter, to designate a majority of the board of that company. This loss of voting power constitutes irreparable injury. *See, e.g., Datapoint Corp. v. Plaza Securities Co.,* Del.Ch., C.A. 7932, Brown, C. (March 5, 1985) at p. 15 *aff'd,* Del.Supr., 496 A.2d 1031 (1985). Therefore, it is appropriate to enjoin, *pendente lite,* the effectuation of the merger proposed. I see no reason why the meeting itself should not go ahead for the limited purpose of taking the vote, so that a record of that vote can be made. If the grant of this injunction is hereafter found on appeal to be improvident or predicated upon an incorrect view of the applicable law, the merger may then be accomplished without the delay and expense of an additional proxy solicitation.

As to the B stock issued to Mr. Leopold, the form of preliminary injunction order shall prohibit him from voting those shares (or any shares derived therefrom), individually or by proxy, or transferring any interest therein; and the corporation shall not consider those **793** shares as outstanding shares for any purpose associated with the voting of stock (including meeting any quorum requirement). [10]

Turning finally to the relief appropriate at this stage with respect to the by-law amendments, which I am frank to say presents to my mind the most difficult aspect of the current application. I have concluded for the reasons above set out that, taken as a whole, those amendments affect such a fundamental change in the structure of this corporation's governance that, so taken, they must be considered fundamentally inconsistent with the corporation's charter and, in the circumstances, an inequitable exercise of the delegated power to adopt by-laws. A response to the reasoning that led to that conclusion could be predicated upon the assertion that the A directors owe fiduciary duties to the B shares as well as to the A shares and, thus, no irreparable injury can be posited from the by-laws conferring an effective veto on any board action by either of the A directors. I find this response unsatisfying because I have already concluded that the A directors along with the other defendants have already appeared to have adopted an adversarial relationship to the B shares. Thus, I do not think that plaintiffs should at this point

be required to depend on the fidelity of those directors to their interests. In these circumstances, I conclude that equity requires the return *pendente lite* to the status quo ante and that the defendants be directed to act, in their capacity as directors of INA, pursuant to the by-laws of the Company as they existed on July 1, 1987 and that, until such preliminary injunction order is reversed, modified or withdrawn, action taken in conformity with such by-laws be deemed in compliance with valid by-laws of the Company.

**\*12** An order in conformity with the foregoing will be entered upon notice. Bond will be in the customary form, without surety, in the amount of $5,000. Because the stockholder meeting is scheduled for today and the entry of a formal order on this opinion may require a little time to draft, defendants should, of course, in the interim, regard themselves as bound by the rulings here made. Time has not permitted consideration of the issues from the perspective of the pending motions for summary judgment. I will therefore depend on the parties to raise that matter afresh **\*794** following appeal of the order here granted, should that motion require judicial determination in any party's view.

Note upon Application for Entry of Order
and for Certification of Interlocutory Appeal

The parties have submitted alternative forms of implementing order and defendants have moved for certification of an interlocutory appeal of the order to be entered.

The only matter with respect to the form of implementing order that I believe deserves explanatory comment concerns the meaning of the language appearing at p. 33 of the foregoing opinion that "until such preliminary injunction order is reversed, modified or withdrawn, action taken in conformity with such by-laws be deemed in compliance with valid by-laws of the Company." This determination is said by defendants to constitute an advisory opinion that ought not to be implemented by order.

Interpreted in the way I intended, I do not think this is a valid criticism, but my language was not as well chosen as it might have been. I did not mean to suggest that a validly constituted board of INA should be disabled by

Case 1:18-cv-00475-SEB-TAB Document 1-2 Filed 02/16/18 Page 211 of 440 PageID #: 223

Phillips v. Insituform of North America, Inc., Not Reported in A.2d (1987)

1987 WL 16285, 13 Del. J. Corp. L. 774

injunction *pendente lite* from duly amending the by-laws of the Company but, rather, that unless and until such a board does so, an effect of the preliminary injunction to be entered enjoining action under the July 2nd amendments would be to reinstate for the time being the effectiveness of the early version of those by-laws.

As to the injunction of the proposed merger, while I have preliminarily held that "in the abstract" (p. 18) its terms do not seem to constitute "a wrong of any kind" (p. 17), the court here is not presented with a proposed merger in the abstract but with one that is a part of a course of conduct that I believe has been shown preliminarily to be improperly motivated and to constitute a violation of duty to the B shareholders. In these circumstances, it is appropriate that consummation of the merger should be enjoined *pendente lite.*

I will decline to stay the effectiveness of the order pending appeal. With respect to the application for certification of interlocutory appeal, as suggested by the language of the opinion itself, I am inclined to certify the questions here raised to the Supreme Court for immediate review pursuant to Supreme Court Rule 42. However, that Rule contemplates that the party opposing such certification shall have ten days to file papers in opposition. In this instance, **795** circumstances suggest a shortening of such time is warranted. I do regard myself as having the power under Rule to shorten time in an appropriate case. Therefore, I will direct that any paper in opposition be served and filed by the close of business on September 3rd. A reply, if desired, may be filed by noon of the following day.

 **13** A form of order on the foregoing opinion is being entered this 1st day of September.

1    I will pause for a moment to mention the proportions of their respective interests. Originally (or almost so) each of the three held an equal interest in Insituform Pipe & Structures, the first Insituform enterprise. Sometime in the 1970's Chick, whose role was chiefly as a source of seed capital, suggested that his commitments had been greater than all had originally envisioned and, as a consequence, the original equal allocation of interests, by then held in part in Ringwood, should be adjusted to 50% for him and 25% for each of Messrs. Chandler and Wood. They agreed.

2    It is not altogether clear why Wood is joined as a defendant in the English action. I do not understand plaintiffs in that action to be claiming that Mr. Wood participated in the alleged wrongs of Church. As that action seeks, among other things, to set aside the 1985 voting agreement restricting the voting of INA B stock in its signatories' hands-and for commercial reasons of his own, Mr. Wood is content to let that agreement stand-it may be that Wood was simply added as a party defendant in the High Court action in his capacity as a signatory to that agreement.

3    Wood Dep. at 100. Chick and Chandler were, of course, not strangers to Wood or Church. But, they each had reasons not to want to see Chick or Chandler assume an active part in INA. Church, of course, by this time is a committed adversary. Wood simply believes that Chick and Chandler have poor business judgment and should be kept out on that basis. *See, e.g.,* Wood Dep. at 57-58, 84-85. Messrs. Chick and Chandler are, however, strangers to others on the INA board. Mr. Leopold, for example, INA's current CEO, did not even know of the existence of Chick, who claims to own beneficially 45% of the Class B stock.

4    This step may, of course, be viewed as a reaction by the board to the Virgin Island courts releasing its injunction and the resulting extension of the receivership by the Chancery Division. The game, however, did not conclude at this point. On August 21st, the English court answered this step by requiring Mr. Church to provide to the receivers a proxy for some 47,000 shares of INA B stock that he owned personally (*i.e.,* the approximately one-half of his 10% interest in Ringwood's holding that was distributed at the time of the 1985 voting agreement). Thus, the receivers now claim to once more control more than 50% of the vote of the outstanding B shares, a fact that will doubtless lead to further developments in this litigation.

5    As of July 2, 1987. *See* INA Aug. 6, 1987 Proxy Statement, p11.

6    The charter does not confer on the B shares the right to a class vote on a merger or, indeed, in any circumstances, nor does our statute. *Compare* 8 *Del.C.* § 251 *with* 8 *Del.C.* § 242(b)(2).

7    In conceiving of this matter as one that fits conceptually into the *Unocal* framework, I reject defendants' claim that the business judgment rule with its limited form of judicial review applies to these

Case 1:18-cv-00475-SEB-TAB Document 1-2 Filed 02/16/18 Page 212 of 440 PageID #: 224

Phillips v. Insituform of North America, Inc., Not Reported in A.2d (1987)

1987 WL 16285, 13 Del. J. Corp. L. 774

actions which tend to insulate the board from the potential discipline that would flow from the charter provisions granting the B stock the right to appoint a majority of the board. *See Aprahamian v. HBO & Co.,* Del.Ch., C.A. No. 8989, Hartnett, V.C. (May 14, 1987).

8    As things turned out, this fear was, as of the April 26 date that the board set out in its course of action, completely unjustified. The English High Court in July (before it learned of the July 2 INA decision to attempt to remove the enhanced voting power of the B shares) authorized the receivers to vote for all incumbents, including Mr. Church if he were nominated. Later, in August, when the aggressive acts of the incumbents were known, the High Court changed the thrust of its directions and authorized the receivers to purport to exercise such powers as they have to promptly cause the removal of certain of the incumbents.

9    Of the seven existing board members, five own A stock or options in A stock and two, Church and Wood, own B stock.

10   The Leopold B shares will not therefore be included in any calculation for purposes of Section 228 since they will not be "shares entitled to vote" at a "meeting". *See* 8 *Del.C.* § 228(a).

### All Citations

Not Reported in A.2d, 1987 WL 16285, 13 Del. J. Corp. L. 774

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

# *TAB 9*

KeyCite Yellow Flag - Negative Treatment

Distinguished by In re MetroPCS Communications, Inc., Tex.App.-Dallas, January 8, 2013

2009 WL 1873144
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

Court of Chancery of Delaware.

Re: POLICE & FIRE RET. SYS.
OF the CITY OF DETROIT

v.

BERNAL, et al.

Civil Action No. 4663–CC.
|
Submitted: June 26, 2009.
|
Decided: June 26, 2009.

West KeySummary

**1**   **Injunction**

👉 **Mergers and acquisitions;anti-takeover measures**

Shareholders of a data company were entitled to a preliminary injunction for an alleged breach of fiduciary duty by the board of directors in connection with a sale of control transaction. The sale of control transaction was subject to deal protection measures that resulted in the deterrence of other potential bidders for the data company that might have offered a greater value for the data company's shareholders. Additionally, attempting to unwind the merger between the data company and the company it had the merger agreement with would be nearly impossible. 8 West's Del.C. § 102(b)(7).

3 Cases that cite this headnote

**Attorneys and Law Firms**

Jay W. Eisenhofer, Cynthia A. Calder, Grant & Eisenhofer, P.A., Wilmington, DE.

R. Judson Scaggs, Jr., Jay N. Moffitt, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, DE.

Donald J. Wolfe, Jr., Brian C. Ralston, Abigail M. LeGrow, Potter Anderson & Corroon LLP, Wilmington, DE.

**Opinion**

WILLIAM B. CHANDLER III, Chancellor.

**\*1** Dear Counsel:

Plaintiff, a shareholder of Data Domain, Inc., has moved for expedited proceedings in connection with its motion to enjoin certain provisions of the Agreement and Plan of Merger between Data Domain and NetApp, Inc (the "Merger Agreement"). In March 2009, the Data Domain board of directors began discussions with NetApp regarding a potential business combination. On May 11, at a meeting to continue discussing such a combination, the Data Domain board was informed of EMC Corporation's interest in meeting with Data Domain. A meeting was scheduled for May 27, 2009. On May 20, however, Data Domain and NetApp entered into the Merger Agreement whereby Data Domain would be merged into two NetApp subsidiaries, with the Data Domain shareholders receiving a combination of cash and NetApp stock worth approximately $25 for each Data Domain share.

According to plaintiff, the Merger Agreement contained a number of "deal protection mechanisms," including: (1) a "matching right" that gives NetApp five business days to revise its proposal in response to a proposal from a third party bidder; (2) a "no solicitation" clause that prevents Data Domain from soliciting the submission or announcement of another offer to acquire Data Domain; and (3) a termination fee. The board and executive officers of Data Domain also entered into a voting agreement whereby they pledged to vote their shares, representing approximately 20% of Data Domain's outstanding shares, in favor of the NetApp merger. Plaintiff argues that these measures lock up the deal between Data Domain and NetApp and dissuade interested parties from making an offer for the company. Plaintiff further alleges that

Case: 1:18-cv-09475-SEB-TAB Document 1-2 Filed 02/16/18 Page 215 of 440 PageID #: 227
Pace & Pet Sys. of City of Detroit v. Semai, Not Reported in A.2d (2009)

2009 WL 1873144

Data Domain's officers and directors will receive benefits separate and apart from Data Domain's shareholders, including: (1) assumption and conversion of their Data Domain options, (2) indemnification from liability for matters arising from the completion of the merger, and (3) for certain individuals, positions with the company after the merger.

On June 1, EMC launched an all cash tender offer for Data Domain at a tender price of $30 per share. Plaintiff contends that EMC was prepared to execute an agreement if Data Domain would terminate the NetApp agreement. On June 3, NetApp increased the cash component of the merger consideration by $5, raising the overall value of its offer to $30 per share. Data Domain's board agreed to this revised offer, and left all the deal protection measures in place. The Data Domain board has stated that it is unable to negotiate with EMC because of the deal protection provisions of the Merger Agreement, and that if it failed to reject the EMC bid, Data Domain would be at risk of losing the NetApp transaction.

In deciding whether to expedite proceedings, the Court must determine "whether in the circumstances the plaintiff has articulated a sufficiently colorable claim and shown a sufficient possibility of a threatened irreparable injury, as would justify imposing on the defendants and the public the extra (and sometimes substantial) costs of an expedited preliminary injunction proceeding ."[1] At this procedural stage, I accept as true the well-pleaded factual allegations in the complaint.

[1]  *Giammargo v. Snapple Beverage Corp.,* 1994 WL 672698, at *2 (Del.Ch. Nov.15, 1994).

**\*2** Plaintiff contends that Data Domain's directors have violated their fiduciary duties in the context of a sale of control of the company, as those duties are described in *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*[2] and its progeny. Those cases counsel that when there will be a sale of control of the company, the "board must perform its fiduciary duties in the service of a specific objective: maximizing the sale price of the enterprise."[3] Plaintiff argues that the Data Domain directors have agreed to a deal that results in a change of control because the majority of the current Data Domain shareholders' equity stakes is being paid off with cash. Thus, plaintiff alleges that the Data Domain directors breached their fiduciary duties by failing to take any steps to secure

the best price reasonably available, by granting preclusive deal protection measures that deter any other bidders, and by failing to inform themselves about the possibilities for greater value to be obtained for Data Domain shareholders through the EMC bid.

[2]  506 A.2d 173 (Del.1986).

[3]  *Lyondell Chem. Co. v. Ryan,* 970 A.2d 235, 239 (Del.2009) (quoting *Malpiede v. Townson,* 780 A.2d 1075, 1083 (Del.2001)).

Defendants, of course, contend that the board's process was reasonable, and will result in the highest reasonably available value for the Data Domain shareholders. Defendants argue that the deal protection measures are common, permissible features of merger agreements, and that the Merger Agreement advances Data Domain shareholders' interests, as evidenced by EMC's bid for Data Domain notwithstanding the deal protection measures.

While I have not done justice to the arguments presented in the parties' written submissions and during today's oral argument, I need only determine if plaintiff has stated a sufficiently *colorable* claim to justify proceeding on an expedited schedule. Here, plaintiff has stated such a colorable claim. It is well established that there is no blueprint that a board must follow to fulfill its duties in a change of control transaction. The board, however, must exercise its duties in service of obtaining the maximum price reasonably available for the company. Plaintiff has alleged facts that state a colorable claim that the Data Domain board is favoring one bidder over others, thereby deterring bids from third parties that could provide greater value to Data Domain shareholders. Moreover, on a motion for a preliminary injunction, the plaintiff does not have to overcome the hurdle of an exculpatory provision that, as permitted by 8 *Del. C.* § 102(b)(7), exculpates directors from personal liability for *monetary damages* for certain breaches of fiduciary duty.

Plaintiff has also established a sufficient likelihood of irreparable injury. Plaintiff alleges that the deal protection measures in the Merger Agreement are currently having an adverse impact on Data Domain shareholders by deterring potential bidders, including EMC. Harm resulting from such deterrence is incalculable. Moreover, it would be impossible to "unscramble the eggs" by attempting to unwind the merger once it has

Case 1:18-cv-09475-SEB-TAB Document 1-2 Filed 02/16/18 Page 216 of 440 PageID #: 228
Police & Fire Ret. Sys. of City of Detroit v. Bernal, Not Reported in A.2d (2009)
2009 WL 1873144

been completed. Defendants argue that plaintiff is not threatened with irreparable harm because the shareholders will have an opportunity to vote on the NetApp merger. The opportunity for a shareholder vote sometime in the future, however, does not address the alleged current deterrent effect of the deal protection measures.

**\*3** Finally, I note that injunctive relief may be the only relief reasonably available to shareholders for certain breaches of fiduciary duty in connection with a sale of control transaction, particularly where the company has adopted a provision exculpating its directors from personal liability for monetary damages for breaches of the duty of care. As explained in *Lyondell Chemical Co. v. Ryan,* a plaintiff faces a significant burden in showing that a board acted in bad faith by failing to reasonably inform themselves or otherwise carry out their fiduciary duties in a sale of control. [4] Thus, in cases such as this one, the shareholders' only realistic remedy for certain

breaches of fiduciary duty in connection with a sale of control transaction may be injunctive relief.

[4]    Lyondell, 970 A.2d at 243–44 ("[I]f the directors failed to do all that they should have under the circumstances, they breached their duty of care. Only if they knowingly and completely failed to undertake their responsibilities would they breach their duty of loyalty.").

For the reasons set forth above, plaintiff's motion for expedited proceedings is granted. A preliminary injunction hearing will be held at 10:00 a.m. on Thursday, August 13, 2009 in Georgetown.

IT IS SO ORDERED.

**All Citations**

Not Reported in A.2d, 2009 WL 1873144

---

End of Document          © 2018 Thomson Reuters. No claim to original U.S. Government Works.

# *TAB 10*

🚩 KeyCite Yellow Flag - Negative Treatment

Distinguished by In re American Intern. Group, Inc., Del.Ch., February 10, 2009

935 A.2d 1046
Court of Chancery of Delaware.

Gary L. SAMPLE, on behalf of himself and all persons similarly situated on Counts I, IV, V, and VI and on behalf of Nominal Defendant Randall Bearings, Inc., on Counts II, III, and VI, Plaintiff,
v.
Kent P. MORGAN, Jeffrey L. Hager, David L. Wierwille, Kenneth C. Harrod, Stephen M. Richmond, Baker & Hostetler LLP, and Joseph P. Boeckman, Defendants,
and
Randall Bearings, Inc., Nominal Defendant.

C.A. No. 1214–VCS.
|
Submitted: Sept. 6, 2007.
|
Decided: Nov. 27, 2007.

**Synopsis**

**Background:** Shareholder brought derivative breach of fiduciary duty and waste action against board of directors, alleging that shareholders' approval of stock incentive plan entrenched and enriched insider majority and was procured through materially misleading disclosures. Board of directors' motion to dismiss for failure to state a claim was denied. Shareholder added lawyer and law firm that were corporation's outside counsel as defendants. Lawyer and law firm moved to dismiss for lack of personal jurisdiction.

**Holdings:** The Court of Chancery, New Castle County, Strine, Vice Chancellor, held that:

[1] filing of certificate amendment in the state was transaction of business and tortious injury sufficient to satisfy long-arm statute, and

[2] it was reasonably foreseeable that lawyer and law firm might be sued in the state as a result of filing the certificate

amendment that satisfied due process requirement for long-arm jurisdiction.

Motion to dismiss denied.

See also 914 A.2d 647.

**West Headnotes (5)**

[1]     **Pretrial Procedure**
       👈 Matters considered in general
       **Pretrial Procedure**
       Presumptions and burden of proof

       In considering a motion to dismiss for lack of personal jurisdiction, the chancellor is not limited to the pleadings; the chancellor is permitted to rely upon the pleadings, proxy statement, affidavits, and briefs of the parties in order to determine whether the defendants are subject to personal jurisdiction, and in doing so, the chancellor must draw reasonable inferences in favor of the plaintiff. Chancery Court Rule 12(b)(2).

       9 Cases that cite this headnote

[2]     **Courts**
       👈 Actions by or Against Nonresidents, Personal Jurisdiction In;"Long-Arm" Jurisdiction

       Trial courts must give a broad reading to the terms of the long-arm statute, in order to effectuate the statute's intent to ensure that the state's court may exercise jurisdiction to the full limits permissible under the Due Process Clause. U.S.C.A. Const.Amend. 14; 10 West's Del.C. § 3104.

       3 Cases that cite this headnote

[3]     **Courts**
       👈 Professional services;malpractice

       Filing of corporate certificate amendment in the forum state by corporation's nonresident outside counsel was a transaction of business

in the state and, as part of a scheme by top managers to gain majority of voting shares, caused tortious injury to corporation incorporated in the state, which satisfied the requirements for personal jurisdiction under the long-arm statute, in derivative action alleging breach of fiduciary duty, where outside counsel were alleged to have aided and abetted top managers to accomplish their scheme. 10 West's Del.C. § 3104.

12 Cases that cite this headnote

**[4]    Courts**
👉 Business contacts and activities; transacting or doing business

The involvement of a defendant in arranging, either directly or through an agent, for the filing of a corporate instrument in Delaware that facilitated transactions under challenge in litigation in a Delaware court is sufficient to constitute the transaction of business under the state's long-arm statute for required to exercise personal jurisdiction over the defendant. 10 West's Del.C. § 3104(c)(1).

21 Cases that cite this headnote

**[5]    Constitutional Law**
👉 Banks, banking, finance, and securities

**Courts**
👉 Professional services;malpractice

It was reasonably foreseeable to corporation's nonresident outside lawyer and law firm that its action in filing certificate amendment in forum state that aided top corporate managers in entrenchment scheme might result in shareholder derivative action in the state alleging lawyer and law firm aided and abetted the top managers in their scheme, as required to satisfy due process requirement for long-arm jurisdiction. U.S.C.A. Const.Amend. 14.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*1047** Pamela S. Tikellis, Esquire, Robert J. Kriner, Jr., Esquire, A. Zachary Naylor, Esquire, Daniel J. Brown, Esquire, Chimicles & Tikellis LLP, Wilmington, Delaware, Attorneys for Plaintiff.

David A. Jenkins, Esquire, Michele C. Gott, Esquire, Smith Katzenstein & Furlow LLP, Wilmington, Delaware, Attorneys for Defendants Baker & Hostetler LLP and Joseph P. Boeckman.

James J. Merkins, Jr., Esquire, Blank Rome LLP, Wilmington, Delaware; Attorneys for Kent P. Morgan, Jeffrey L. Hager, and David L. Wierwille.

Joanne Pileggi Pinckney, Esquire, Susan E. Poppiti, Esquire, Pinckney Harris & Poppiti, LLC, Wilmington, Delaware, Attorneys for Defendants Kenneth C. Harrod and Stephen M. Richmond.

S. Mark Hurd, Esquire, Samuel T. Hirzel, II, Esquire, Morris, Nichols, Arsht & Tunnel, Wilmington, Delaware, Attorney for Nominal Defendant Randall Bearings, Inc.

OPINION

STRINE, Vice Chancellor.

*I. Introduction*

The question presented is a straightforward one. May a corporate lawyer and his law firm be sued in Delaware as to claims arising out of their actions in providing advice and services to a Delaware public corporation, its directors, and its managers regarding matters of Delaware corporate law when the lawyer and law firm: i) prepared and delivered to Delaware for filing a certificate amendment under challenge in the lawsuit; ii) advertise themselves as being able to provide coast-to-coast legal services and as experts in matters of corporate governance; iii) provided legal advice on a range of Delaware law matters at issue in the lawsuit; iv) undertook to direct the defense of the lawsuit; and v) face well-pled allegations of having aided and abetted the top managers of the corporation in breaching their fiduciary duties by entrenching and enriching themselves at the expense of the corporation and its public stockholders? The answer is yes.

The lawyer and law firm's conduct in arranging the filing of the certificate amendment in Delaware satisfies both § 3104(c)(1) and § 3104(c)(3) of Delaware's long-arm statute.[1] That Certificate Amendment was integral to an alleged scheme by the top managers of the corporation to have issued to themselves at an unfair price a large bloc of voting stock that would secure their control over the **\*1048** corporation. Thus, the scheme not only involved an act in Delaware, it also involved an injury in Delaware to the Delaware corporation.

[1]    10 *Del. C.* § 3104.

Likewise, it is constitutionally permissible to exercise jurisdiction over the lawyer and his law firm. Having directed their legal practice toward Delaware by regularly providing advice about Delaware law matters to the corporation, these defendants should have reasonably expected that they might face suit here if the managers and directors they were advising were sued for a breach of fiduciary duty related to that advice. These sophisticated defendants had to know of the strong interest Delaware has in ensuring that Delaware corporations and their stockholders have access to this court to hold corporate fiduciaries and their advisors accountable for honoring their legal and fiduciary obligations. Given their Delaware-directed conduct and the tight nexus between that conduct and this suit, these defendants have no basis to object to having to appear in Delaware to defend this suit.

Their motion to dismiss for lack of personal jurisdiction will therefore be denied.

## II. *Factual Background*

These are the relevant facts from the record, with inferences drawn in the plaintiff-friendly manner required in this procedural context.[2]

[2]    *Outokumpu Eng'g Enter., Inc. v. Kvaerner EnviroPower, Inc.,* 685 A.2d 724, 727 (Del.Super.1996).

In 2004, the three "Top Managers" of Randall Bearings, Inc., an Ohio-headquartered bronze ball bearings concern incorporated in Delaware, received 200,000 shares of the company's stock.[3] Although the Top Managers' right to ownership of the shares was subject to a vesting schedule, the shares could be voted immediately, had dividend rights, and all of the shares vested immediately in the event of a "proposed or actual change in control" of the company.[4] The 200,000 shares amounted to nearly a third of the company's voting power. The Top Managers comprised three of the board of directors' five members.

[3]    The Top Managers included CEO Kent P. Morgan, Treasurer and CFO David L. Wierville, and Vice President of Manufacturing Jeffrey L. Hager. Kenneth C. Harrod and Stephen M. Richmond rounded out the board at the time the grant of shares under the Equity Incentive Plan was approved.

[4]    Naylor Aff. Ex. 19.

The Top Managers paid a total of $200 in exchange for the shares, $199,800 less than if the corporation had not amended its certificate of incorporation to lower the par value of its shares from $1.00 to $0.001. That "Certificate Amendment" was put to the Randall Bearings stockholders at the same time as the stockholders voted to authorize an "Equity Incentive Plan," by which up to 200,000 shares of stock could be issued by the board to employees or officers for the purposes of—or so the stockholders were told—"attracting and retaining key employees for the company."[5]

[5]    Third Amended Class Action and Derivative Complaint ("Compl.") Ex. 1, at 4.

Before the full board and stockholders approved these items, the Top Managers sought advice from the company's outside counsel, defendant Joseph Boeckman of the Columbus, Ohio office of defendant Baker & Hostetler LLP. Although being paid at all relevant times by Randall Bearings to act as the company's counsel, Boeckman developed options for the Top Managers that would facilitate their objectives of voting control. These options always involved in part the issuance of **\*1049** shares by the company to the Top Managers. In providing his advice to the Top Managers, Boeckman noted that the amount of shares that the Top Managers would need to be a serious obstacle to any change of control exceeded the amount of shares that boards were typically authorized to grant to employees in compensation plans.

In the end, Boeckman and the Top Managers agreed to seek board and stockholder approval for a Certificate Amendment that would, as noted, lower the par value of the company's stock from $1.00 to $0.001 and for an Equity Incentive Plan that would authorize the board to issue up to 200,000 shares—or some 31.7% of the company's voting power—to officers and managers. The pled facts suggest that the Top Managers and Boeckman intended from the get-go for all 200,000 shares to be issued to the three Top Managers—100,000 shares to Morgan, 75,000 to Hager, and 25,000 to Wierwille—so as to accomplish their entrenchment objectives. [6] The reduction in par value would allow the Top Managers to receive the shares for a total of $200 rather than $200,000. This reduction, one can infer, was not chump change to the Top Managers, who later sought and accomplished having the company pay the taxes they owed on their receipt of the shares.

[6]    Compl. ¶ 30; *see* Naylor Aff. Ex. 7.

At the time Boeckman was providing advice about these issues, the Top Managers were insecure because the company's former CEO and largest stockholder had died. A relative of the founder and Chairman of the Board at the time of his death, Bruce Dickerson, owned a bloc of nearly 30%. The leader of the Top Managers, defendant Kent Morgan, had succeeded Bruce Dickerson as Chairman and CEO and had joined the company only a few years earlier.

The Top Managers feared that the Dickerson stock could end up in hands that were unfriendly to management. Boeckman aided the Top Managers in their efforts to manage this risk. Boeckman sent two memoranda to Morgan in late May of 2003. At first, Boeckman recommended securing an agreement from Bruce Dickerson's widow, Susan Dickerson, to put the family's shares in a voting trust whereby she would pledge support for management. At that point, Boeckman contemplated using a combination of a voting trust and the grant of a smaller, but still sizable, number of shares to the Top Managers as a method for achieving their entrenchment objectives.

When the voting trust option became either unattractive or unavailable, Boeckman altered tactics. For one thing, he then recommended that a much larger grant of shares —the 200,000 shares ultimately granted—be authorized

for issuance to the Top Managers. [7] When the Randall Bearings board approved the Certificate Amendment and the Equity Incentive Plan some months later, neither the Top Managers nor Boeckman—who was acting as the board's counsel—disclosed the memoranda Boeckman had written to the Top Managers discussing the options they had to achieve their entrenchment objectives. Nor did they disclose to the non-management director who was present that the number of shares to be included in **\*1050** the Equity Incentive Plan far exceeded that which was standard. [8]

[7]    The second of the two memoranda from Boeckman to Morgan, sent May 22, 2003, is substantially identical to the first, sent two days earlier. *Compare* Compl. 26 *with id.* 29. It downplays the voting control protection afforded against third parties, and omits discussion of the smaller size of most equity incentive plans and the voting trust with Susan Dickerson, subjects that were all covered in the May 20, 2003 memo. *Id.* 26, 29, 30.

[8]    Randall Bearing's board then included two members who were not managers. One was Susan Dickerson, who had stopped attending meetings by that point because she was feuding with the company over a contractual benefits package. The other was Kenneth Harrod, who had retired in 1997 as a senior executive at Randall Bearings after 30 years of service.

Boeckman also helped the Top Managers ensure that the Dickerson bloc ended up in hands friendly to management. Around the same time as the Randall Bearings Board approved the Certificate Amendment and Equity Incentive Plan, Boeckman told the board that Susan Dickerson wanted to sell her stake in Randall Bearings. Boeckman immersed himself in the negotiations over the terms of sale for Susan Dickerson's bloc of shares to the A Cubed Corporation. Once billed to the court by counsel to the defendants as "an entity that the Dickersons were familiar with" which "do[es]n't have a relationship with the company," [9] the defendants finally and belatedly admitted—through counsel for the nominal defendant, Randall Bearings, at oral argument on this motion—that A Cubed is affiliated with Randall Bearings' principal supplier of raw materials, Concast. [10] Taken together with the contemplated grant of 200,000 shares to the Top Managers, the sale of the 127,442–share Dickerson bloc to A Cubed would place a majority of Randall Bearing's voting power under the control of the Top Managers and A Cubed, if they acted concertedly.

9    Transcript of Oral Argument on Defendant's Motion to Dismiss the Second Amended Complaint (Nov. 6, 2006) ("Nov. 6, 2006 Tr.") at 15, 16–17.

10   Transcript of Oral Argument on Defendant's Motion to Dismiss the Third Amended Complaint (Aug. 29, 2007) ("Aug. 29, 2007 Tr.") at 59–60.

In this respect, A Cubed's supplier relationship was not the only tie that would bind together the 58% voting bloc. Notably, the arrangement with A Cubed also involved a contractual commitment on Randall Bearings' part not to issue more than 200,000 shares of stock during the next five years. That number was not coincidental. It was precisely the larger number of shares the Top Managers sought to have issued to them under the Equity Incentive Plan once the option of securing a voting trust agreement with Susan Dickerson had evaporated. Also in connection with the negotiations over the sale of the Dickerson bloc, Boeckman had the Top Managers execute a "Term Sheet" reflecting an agreement in principle with the sole owner of A Cubed, Alfred Barbour, that was signed on November 21, 2003, along with the Stock Purchase Agreement. [11] Months before stockholder approval, the Term Sheet specified that the 200,000 shares would be distributed to the Top Managers in certain proportions, stating that those shares "will be awarded" to the Top Managers. [12] Of course, as of November 21, 2003, the Randall Bearings stockholders had not yet been informed of, much less voted to approve, the Equity Incentive Plan.

11   Naylor Supp. Aff. Ex. 16.

12   *Id.*

The Term Sheet also contemplated two future agreements among the Top Managers, Barbour, and A Cubed to be executed when the Top Managers were awarded stock under the Equity Incentive Plan. One would require the Top Managers to vote their shares for a board nominee of Barbour's choosing if he requested they do so. Another agreement governed the future sale of Randall Bearings' stock by the **\*1051** signatories to the Term Sheet. This "Co–Sale Rights Agreement" included a term prohibiting any of the Top Managers, A Cubed, or any affiliate of A Cubed from selling less than all of its stock to a third party. [13] Another related term provided that if any party covered by that restriction found a buyer for its holdings then all parties would have equal rights to sell to that

buyer for the same price and on the same terms and conditions. It also granted an assignable option to the Top Managers that would allow them to purchase the Randall Bearings shares owned by A Cubed in the event Barbour ever transferred away his majority voting control over A Cubed. [14]

13   *Id.* For the purposes of this provision, the Co–Sale Rights Agreement treats A Cubed and all of its affiliates as a single stockholder.

14   Although the Term Sheet mentions an option being granted in favor of the Top Managers and the company, its other terms seem to make clear that the Top Managers control its exercise. For example, the option was assignable by the Top Managers to a third party. Moreover, the board minutes for the November 17, 2003 meeting indicate that the company's involvement in the transaction with A Cubed was "to make certain representations in the stock purchase agreement concerning corporate matters beyond the knowledge of the Dickerson Family ... solely to facilitate the transaction." Naylor Aff. Ex. 10.

When Boeckman reported the consummation of the A Cubed transaction to the board, the meeting minutes indicate he told them that: "The company's participation in the transaction was solely to facilitate the transaction." [15] It is not clear how informed the only non-management director in attendance was about these side arrangements.

15   Naylor Aff. Ex. 10.

After the board approved the Certificate Amendment and Equity Incentive Plan, Boeckman prepared and sent to Morgan a checklist listing what needed to be done to implement the Equity Incentive Plan. [16] That checklist included executing stock award agreements and stock certificates reflecting the 200,000 shares the Top Managers would receive. [17] This was in March 2004, two and a half months *before* Randall Bearings held a meeting for its stockholders to vote on the Certificate Amendment and the Equity Incentive Plan. Boeckman played the key role in drafting the proxy statement for that meeting, too.

16   Naylor Aff. Ex. 7. The checklist was attached to an email sent from Boeckman to Morgan on March 11, 2004.

**17**    *Id.*

The proxy statement is remarkable for what it did not say. It told the Randall Bearings stockholders that the purpose of the Equity Incentive Plan was to enable the company to "attract[ ] and retain[ ] key employees." [18] But it failed to mention that the Top Managers already contemplated that all 200,000 shares would be granted to the Top Managers, leaving no shares left for the "attract[ion]" of anyone, and no shares left to help "retain[ ]" any but the three Top Managers on the board itself. Likewise, the proxy statement failed to disclose anything about the contractual arrangements Randall Bearings had entered into with A Cubed. By those arrangements, Randall Bearings had bound itself not to issue any more equity for five years other than the shares contemplated by the Equity Incentive Plan. As important, the proxy statement did not disclose that A Cubed—an affiliate of Randall Bearings' major supplier—and the Top Managers would, if their plans were implemented, control over 50% of the company's voting power. And, as noted, the A Cubed agreements evidenced a plan for **\*1052** the immediate grant of all the Equity Incentive Plan shares to the Top Managers and the Top Managers' contemplated right to purchase A Cubed's shares if A Cubed sought to sell its shares. These subjects were not addressed at all in the proxy statement.

**18**    Compl. Ex. 1, at 4.

After the stockholders approved the Certificate Amendment and the Equity Incentive Plan in a close vote, a Baker & Hostetler employee under Boeckman's supervision played the key role in ensuring the Certificate Amendment he drafted was filed in Delaware with the Secretary of State. [19] The pled facts support the inference that Boeckman's firm, Baker & Hostetler, engaged the Corporation Service Company ("CSC") to accomplish the filing. Indeed, a list of "Action Items" Boeckman himself prepared for Randall Bearings identified himself as the "Responsible Party" for filing the Certificate Amendment [20] and other evidence belatedly produced in discovery demonstrates that Baker & Hostetler transmitted the Certificate Amendment to CSC in Delaware for filing. [21]

**19**    *See* Naylor Supp. Aff. Exs. 1, 2 (evidencing "preparations for and transmissions with the CSC regarding filing certificate of amendment with the

Delaware Secretary of State"); Boeckman Aff. ¶ 10 (acknowledging he "supervised all legal services performed in connection with the transactions giving rise to" the claims in this suit).

**20**    Naylor Aff. Ex. 7.

**21**    Naylor Supp. Aff. Exs. 1, 2.

Once the Certificate Amendment and the Equity Incentive Plan became effective, Boeckman then acted as the sole source of advice to the board committee that was charged with determining how and on what terms to allocate the shares authorized by the Equity Incentive Plan. Boeckman presented the committee with a proposal to grant all 200,000 shares to the Top Managers. [22] After brief meetings at which Boeckman provided the only advice, the committee agreed to do what he recommended —grant the Top Managers all the shares, with immediate voting power and dividend rights, and accelerated vesting in the event of a change of control. Not only that, the committee decided to have the company pay the $930,000 in taxes that the Top Managers owed on the shares they had received. This was a sizable sum that Randall Bearings could not pay out of available funds. Rather, it was forced to take out a five year loan to acquire the funds. During the committee's deliberations, Boeckman did not disclose his discussions with or memoranda to the Top Managers regarding their voting control objectives.

**22**    Naylor Aff. Ex. 13.

In a prior decision in this case, I denied the defendant-directors' motion to dismiss. [23] In that decision, I concluded that the plaintiff Sample had pled viable claims for breach of fiduciary duty against all the directors of Randall Bearings who served during the period relevant to the grant of 200,000 shares to the Top Managers. In so holding, I noted that the amended complaint pled facts supporting the inference "that the [Certificate] Amendment and the Equity Incentive Plan resulted from a conscious scheme of entrenchment and personal self-enrichment by the [Top Managers], facilitated by the advice of Boeckman, which was purposely concealed from the Randall Bearing stockholders when they were asked to vote on the Amendment and the Plan." [24]

**23**    *Sample v. Morgan,* 914 A.2d 647 (Del.Ch.2007).

**24**    *Id.* at 675.

After the court's decision, the plaintiff sought to further amend the complaint to **1053** state claims for aiding and abetting breaches of fiduciary duty against Boeckman and Baker & Hostetler. [25]

25    *See* Compl. ¶¶ 91, 92.

Boeckman and Baker & Hostetler have now moved to dismiss the claims against them solely on the grounds that personal jurisdiction over them cannot be had in this court. Before addressing that motion's legal merits, it is worth noting that Boeckman and Baker & Hostetler were involved in this litigation long before the third amended complaint added them as parties.

### III. *The Litigation To Date*

Since the inception of this litigation, Boeckman and Baker & Hostetler have played a major role in shaping the defense strategy, although no Baker & Hostetler lawyer sought admission pro hac vice. Oddly, until a few months ago, counsel for Randall Bearings (a nominal party in this derivative and class action) and for the defendant-directors (who themselves were until recently represented by a single counsel purporting to represent both the Top Managers and the outside directors) seem to have relied almost entirely upon Baker & Hostetler to do the key work required in connection with the production of documents. The defendant-directors' compliance with their discovery obligations has been, to put it mildly, woefully and repeatedly inadequate.

A full recitation of the repeated discovery violations committed by the defendants in this litigation could go on for dozens of pages. One glaring example is worth mentioning. Before this court issued its first decision rejecting the defendant-directors' motion to dismiss, the defendant-directors had been under an obligation to produce documents, including documents relating to the Dickerson shares and any arrangements made in connection with the sale of those shares. But it was not until July 20, 2007—six months after the prior decision was issued—that the defendants finally produced documents revealing the Top Managers' negotiations over voting, sale rights, and other issues with A Cubed. Even worse, the defendants continued to dribble out documents, and only in the same time period did they finally produce documents indicating that the

Top Managers, Boeckman, and A Cubed had already planned for the Top Managers to receive all 200,000 shares under the Equity Incentive Plan—with immediate voting and dividend rights—before the Randall Bearings stockholders were asked to vote on the Plan. The omission of these material documents from the earlier production has, to date, not been explained.

### IV. *A "Coast–To–Coast" Platform*

This substantial direction of the legal work by Baker & Hostetler for its clients regarding Delaware law matters is, of course, not surprising. Baker & Hostetler touts itself as a "Counsel to Market Leaders," including businesses that "are leaders globally, nationally, regionally[,] and locally." [26] With the strength of being "one of the nation's largest law firms" with "more than 600 lawyers" and a "unique [10 office] coast-to-coast platform" consisting of "[c]oordinated national and international practice groups," Baker & Hostetler advertises itself as being able to handle the full range of any corporation's legal needs, regardless of its location in the United States. [27] In fact, as to corporations in **1054** particular, Baker & Hostetler says that it has "200 business lawyers in all ten of [its] offices [who] work with clients in every region in the United States and many parts of the world providing comprehensive and experienced business counsel to large and small ... corporations of ... all sizes." [28] As to corporate law itself, Baker & Hostetler promotes as "practice strengths" its expertise in understanding the "evolving requirements and actions necessary to maintain or achieve compliance with fiduciary duty obligations ... and [corporate] disclosure requirements." [29]

26    Baker    Hostetler—About    Us,    http://
      www.bakerlaw.com/AboutUs.        aspx?Abs_
      WP_ID=56b84b31–3f37–41eb–8960–e42b349976f6
      (last visited Nov. 27, 2007).

27    *Id.*

28    Baker   Hostetler—Practice   Strengths—Business,
      http://www.     bakerlaw.     com/BDs.aspx?
      Abs_BD_ID=116896b2–50a8–4fde–88c9–
      21f4fa0cab48 (last visited Nov. 27, 2007).

29    Baker   Hostetler—Practice   Strengths—Business—
      Corporate   Governance,   http://www.bakerlaw.com/

BDs.aspx?Abs_BD_ID=9fd65ea7–8a93–4a79–afa9–
acceafd 19e24 (last visited Nov. 27, 2007).

## V. *The Motion To Dismiss*

Boeckman and Baker & Hostetler have not moved to dismiss the claims against them under Rule 12(b)(6). Rather, they have only challenged the complaint on the ground that they are not subject to personal jurisdiction in Delaware.

Frankly, their opening brief was an odd one in that it entirely ignored the fact that they had prepared the Certificate Amendment and caused it to be filed in Delaware. In support of that brief, Boeckman filed an affidavit that, although true in the most literal of senses, seems intended to distract attention from Baker & Hostetler's role in the Certificate Amendment filing. In Boeckman's words:

> 10. I was the Baker Hostetler attorney who supervised all legal services performed in connection with the transactions giving rise to Plaintiff's alleged claims in the above captioned matter.
>
> * * *
>
> 13. I had no cause to enter Delaware in connection with my representation, *nor did I file any documents with any court or agency in Delaware in connection with this representation.* [30]

[30]  Boeckman Aff. ¶¶ 10, 13 (emphasis added).

When the plaintiff's answering brief was filed, it understandably featured the Certificate Amendment. After that brief was submitted, more late-produced documents came in when Baker & Hostetler finally produced its billing records. The records demonstrated that a paralegal under Boeckman's supervision at Baker & Hostetler sent the Certificate Amendment to CSC in Delaware for filing. [31] Confronted with the reality— which they might have thought to disclose up-front— that they not only drafted the Certificate Amendment, but sent it to CSC *in Delaware* for filing, the moving defendants retreated to the contention that although they sent the Certificate Amendment to CSC in Delaware, CSC was the registered agent who actually filed the Certificate Amendment with the Secretary of State. Why this matters as a jurisdictional matter, they do not make clear.

[31]   Naylor Supp. Aff. Ex. 1.

Recognizing that their direct role in filing the Certificate Amendment undercut most of the arguments made in their opening brief, the moving defendants then resorted to a panoply of implausible and strained new arguments, which, if accepted, would undermine the purposes of our state's long-arm statute and the ability of stockholders of Delaware corporations to avail themselves of this court as a forum to hold parties responsible for aiding and abetting breaches of fiduciary duty. Consistent **\*1055** with the pattern of this litigation, it turns out that the briefs on this motion were drafted by attorneys at Baker & Hostetler, but filed and signed only by Delaware counsel, who argued the motion. At oral argument, Delaware counsel conceded that at least one of the arguments in the Baker & Hostetler briefs lacked any plausible basis in law or logic. [32]

[32]   That argument contended that because the director-defendants, including the Top Managers, had been served under 10 *Del. C.* § 3114, the plaintiff could not utilize the so-called "conspiracy" theory of jurisdiction to obtain jurisdiction over Boeckman and Baker & Hostetler under 10 *Del. C.* § 3104. Why this was so was not something counsel for Boeckman and Baker & Hostetler could explain. And for good reason, it makes no sense. The fact that the director-defendants were served under § 3114 does not mean that they could not have engaged in a civil conspiracy with a co-conspirator who was not subject to service under § 3114 in order to determine whether that person could be served under the long-arm statute.

Distilled down, the arguments made by Boeckman and Baker & Hostetler go essentially as follows. For starters, they note that all the legal work they did was done in offices of Baker & Hostetler outside Delaware. The only potentially relevant act that they directed toward Delaware itself as a physical place was the transmission of the Certificate Amendment to CSC in Delaware. But that action was, they say, not sufficient to constitute a qualifying act under the long-arm statute because the reduction in the Top Managers' cost of acquisition from $200,000 to $200 was simply a nice extra of the overall scheme alleged by the plaintiff. Absent the Certificate Amendment, the approval of the Equity Incentive Plan would still have enabled the Top Managers to obtain voting control over 200,000 shares, although at a much richer price.

In addition, they argue that because the Certificate Amendment was filed by the company, albeit by Baker & Hostetler sending it to CSC, the filing cannot be attributable to any of the Top Managers with whom Boeckman and Baker & Hostetler allegedly conspired. Rather, the filing was a corporate act, and a corporation cannot, say the moving parties, conspire with its own officers, directors, and lawyer. In that same vein, Boeckman and Baker & Hostetler argue that a lawyer who is simply acting for a client with only the hope of getting paid for his work cannot conspire with that client and therefore the conspiracy theory of jurisdiction cannot be used against the lawyer to hold him accountable for acts of the client in the forum state.

Finally, Boeckman and Baker & Hostetler contend that it would offend notions of due process for them to have to defend this suit in Delaware. Although they admit to having acted as outside general counsel to a Delaware corporation on matters of Delaware law as to the very matters at dispute in this lawsuit, and to regularly giving clients advice on matters of Delaware law, the fact that their "coast-to-coast" platform of offices does not include a Delaware office makes it constitutionally offensive for them to have to face suit in this state, even as to claims challenging the propriety, as a matter of Delaware law, of board actions on which they gave advice about Delaware law and of a Certificate Amendment they caused to be filed in Delaware.

## VI. *Legal Analysis*

**[1]** In considering a motion to dismiss for lack of personal jurisdiction under Court of Chancery Rule 12(b)(2), I am not limited to the pleadings. Rather, I am "permitted to rely upon the pleadings, proxy statement, affidavits, and briefs of the parties in order to determine whether **\*1056** the defendants are subject to personal jurisdiction." [33] In evaluating the record, I must draw reasonable inferences in favor of the plaintiff. [34]

[33]  *Crescent/Mach I Partners, L.P. v. Turner,* 846 A.2d 963, 974 (Del.Ch.2000).

[34]  *Outokumpu Eng'g Enter., Inc.,* 685 A.2d at 727.

There are two legal questions to be answered in considering a motion under Rule 12(b)(2). The first is whether there is a statutory basis for serving the defendants with process. [35] The second is whether this court's exercise of personal jurisdiction over the defendants is consistent with the Due Process Clause of the Fourteenth Amendment of the United States Constitution. [36]

[35]  *AeroGlobal Capital Mgmt., LLC v. Cirrus Indus., Inc.,* 871 A.2d 428, 438 (Del.2005).

[36]  *Id.*

Here, the first question is, I suppose, modestly more difficult to answer than the second, which is not close at all. Before beginning, it is useful to reiterate that the moving defendants have not challenged the viability of the claims pled against them. They accept the proposition that the plaintiff has alleged well-pled facts supporting the inference that Boeckman consciously assisted the Top Managers in conceiving and implementing a scheme to enrich and entrench the Top Managers at the expense of Randall Bearings and its stockholders. The sole determination I must now make is whether the moving defendants must defend that claim on the merits in this court.

Boeckman and Baker & Hostetler were served under Delaware's long-arm statute, 10 *Del. C.* § 3104. That statute provides in pertinent part that:

(c) As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or a personal representative, who in person or through an agent:

(1) Transacts any business or performs any character of work or service in the State; [or]

* * *

(3) Causes tortious injury in the State by an act or omission in this State.... [37]

[37]  10 *Del. C.* § 3104.

**[2]**  The Delaware Supreme Court has made clear that trial courts must give a broad reading to the terms of the long-arm statute, in order to effectuate the statute's

intent to ensure that this state's court may exercise jurisdiction to the full limits permissible under the Due Process Clause. [38] In other words, the Supreme Court has instructed that trial courts should permit service under § 3104 if the statutory language plausibly permits service, and rely upon a Due Process analysis to screen out uses of the statute that sweep too broadly. [39]

[38]    *See Hercules Inc. v. Leu Trust and Banking (Bahamas) Ltd.,* 611 A.2d 476, 480–81 (Del.1992) ("[Section] 3104(c) is to be broadly construed to confer jurisdiction to the maximum extent possible under the Due Process Clause.") (internal citations omitted).

[39]    *See Chandler v. Ciccoricco,* 2003 WL 21040185, at *10–11 (Del.Ch.2003) ("Under [the *Hercules* ] mandate, my task should be to give the words of the statute a liberal construction and to conclude that [a filing in Delaware] is a transaction of business if that can be reasonably done. Any problems of overbreadth by such a liberal construction can be policed by application of the minimum contacts analysis under the due process clause of the Fourteenth Amendment."); *cf. Assist Stock Mgmt. L.L.C. v. Rosheim,* 753 A.2d 974, 980 (Del.Ch.2000) (advocating the use of the Due Process analysis to temper potentially overbroad application of the terms of Delaware's director consent statute, 10 *Del. C.* § 3114).

**\*1057** **[3]** Here, the parties initially joined issue over whether Boeckman and Baker & Hostetler could be served under § 3104 because well-pled facts support the inference that Boeckman engaged in concerted activity with the Top Managers to entrench and enrich the Top Managers at the unfair expense of Randall Bearings and its stockholders. As an element of that scheme, Boeckman and the Top Managers proposed and obtained approval for the Certificate Amendment, which was filed in Delaware. That Certificate Amendment permitted the Top Managers to receive the disputed shares for only $200, saving themselves $199,800. Using the so-called conspiracy theory of jurisdiction, the plaintiff argues that the act of filing the Certificate Amendment can be imputed to Boeckman and Baker & Hostetler, thereby satisfying both § 3104(c)(1) and § 3104(c)(3) of the long-arm statute.

**[4]** As things turn out, the inquiry is much simpler. Discovery has since revealed that Boeckman and Baker & Hostetler themselves prepared and sent the Certificate

Amendment to CSC in Delaware for filing with the Secretary of State. [40] That is, the moving defendants themselves directly transacted business in Delaware for purposes of § 3104(c)(1). [41] The involvement of a defendant in arranging, either directly or through an agent such as CSC, for the filing of a corporate instrument in Delaware that facilitated transactions under challenge in litigation in this court has been repeatedly recognized as sufficient to constitute the transaction of business under § 3104(c)(1). [42] The Certificate Amendment is directly at issue in the claims against the moving defendants, and therefore the use of § 3104(c)(1) to serve the moving defendants is permissible. [43] Likewise, the moving defendants' filing of the Certificate Amendment in Delaware satisfies § 3104(c)(3) because that action injured Randall Bearings, a Delaware corporation. When a Delaware corporation is financially injured by faithless conduct of its directors, the corporation is injured in its legal home, this State, for purposes of § 3104(c)(3). As this court has previously observed:

[40]    Naylor Aff. Exs. 1, 2.

[41]    *Benihana of Tokyo, Inc. v. Benihana, Inc.,* 2005 WL 583828, at *6, *8 (Del.Ch.2005); *Gibralt Capital Corp. v. Smith,* 2001 WL 647837, at *6 (Del.Ch.2001).

[42]    *E.g., In re General Motors (Hughes) S'holder Litig.,* 2005 WL 1089021, at *22 (Del.Ch.2005) (certificate of merger); *Benihana,* 2005 WL 583828, at *8 (certificate of designation); *Chandler,* 2003 WL 21040185, at *11 (certificate of designation); *Parfi Holding AB v. Mirror Image Internet, Inc.,* 794 A.2d 1211, 1229 (Del.Ch.2001) (charter amendments), *rev'd on other grounds,* 817 A.2d 149 (Del.2002); *Gibralt,* 2001 WL 647837, at *6 (charter amendment and certificate of designation); *Kahn v. Lynch Commc'n Sys., Inc.,* 1989 WL 99800, at *4 (Del.Ch.1989) ("negotiating and consummating the merger at issue" constituted transaction of business under 10 *Del. C.* § 3104(c)(1) when the merger's consummation required a filing with the Secretary of State).

[43]    The "single act" or specific jurisdiction subsections of § 3104(c), such as § 3104(c)(1), only allow jurisdiction over causes of action that are closely intertwined with the jurisdictional contact. DONALD J. WOLFE, JR. & MICHAEL A. PITTENGER, CORPORATE AND COMMERCIAL PRACTICE IN THE DELAWARE COURT OF CHANCERY § 3–5[a][1] [iii] (2005); *accord* 10 *Del. C.* § 3104(c). When service is

premised on these subsections, the Delaware-related conduct must form a source of the claim. *E.g., Arnold v. Soc'y for Sav. Bancorp., Inc.,* 1993 WL 526781, at *3 (Del.Ch.1993). Here, the tight nexus between the Certificate Amendment and the entrenchment scheme forming the cause of action make service under the single act provisions of the long-arm statute unproblematic.

When conspirators commit a breach of fiduciary duty against a Delaware corporation **\*1058** that causes cognizable injury to the entity (as an unfair dilution is deemed to do) ... it is fair to say that the entity was injured in its chosen home—Delaware—the situs that reflects the center of gravity of the corporation for all issues involving its internal affairs. The balance sheet and voting dilution injuries that result in fiduciary duty cases are in some sense metaphysical, but that reality strengthens the argument that the corporation at the very least suffers these injuries in its chosen domicile. Any problems with this common sense approach are best policed by the minimum contacts tests or by the other aspects of § 3104, which for the most part require that an actual act take place in Delaware. [44]

[44]    *Chandler v. Ciccorico,* 2003 WL 21040185, at *11 n. 46 (Del.Ch.2003). This court noted in *Chandler v. Ciccorico* that the mandate to construe § 3104(c) to the constitutional limits of Due Process should warrant treatment of Delaware as the situs of injury to a Delaware corporation. Id. As *Chandler* mentioned, the seminal conspiracy jurisdiction case in Delaware, *Istituto Bancario Italiano SpA v. Hunter Engineering Co., Inc.,* 449 A.2d 210, 228 (Del.1982), may seem at first blush to preclude a holding that the situs of injury to a Delaware corporation not headquartered in Delaware that is victimized by a breach of fiduciary duty is in Delaware for purposes of § 3104(c)(3). Chandler, 2003 WL 21040185, at *11 n. 46. Upon close examination, there is not as much tension between this conclusion and the Supreme Court's decision in *Istituto* as the Chandler decision perceived. In that case, an Italian holding company in financial difficulty pledged its entire 10,000 shares of a wholly-owned Delaware subsidiary to an Italian bank. *Istituto,* 449 A.2d at 214–15. When it appeared that the loan would not be repaid, the subsidiary's board authorized additional shares and distributed 190,000 shares as a stock dividend that was then transferred to another owner, thus diluting the security interest from 100% to 5% of the subsidiary's assets. Id. On those facts it appeared clear to the Supreme Court that the

situs of the injury to the pledgee's security interest in a direct suit by the Italian bank was either the location of the pledge, or the home of the pledgee Italian bank. *Id.* at 228. In other words, *Istituto* did not involve a derivative claim. By contrast, when a Delaware resident—a Delaware corporation—is injured by a breach of fiduciary duty, it is easy to conceive of the corporation as having been injured in its chosen place of legal residence. After all, it is precisely for purposes of internal affairs that corporations—which are not physical beings—choose a legal domicile. When they suffer financial injury, that injury should, consistent with the instruction of *Hercules* and other Delaware public policies favoring a broad construction of § 3104's reach, be deemed to have been suffered in Delaware for purposes of § 3104(c)(3).

Because Boeckman and Baker & Hostetler were the parties responsible for filing the Certificate Amendment, there is, as noted, no need to impute the conduct of the Top Managers to them by using the conspiracy theory. But the moving defendants make another odd argument that I must consider. That argument—improperly advanced for the first time in the moving defendants' reply brief—consists in the notion that because the Certificate Amendment was filed on behalf of Randall Bearings as a corporation, Boeckman and Baker & Hostetler cannot be held personally responsible for the filing, for purposes of a personal jurisdiction inquiry under the long-arm statute. That is, even though the moving directors in fact were the parties who prepared the Certificate Amendment, retained CSC to file it as registered agent, and transmitted the Amendment to CSC in Delaware for filing with the Secretary of State, the fact that the Certificate Amendment was filed on behalf of Randall Bearings immunizes the moving defendants. [45] In its broadest form, a form that **\*1059** the moving defendants did not shy from advancing, the moving defendants posit that the filing of a charter amendment or other key corporate instrument with the Secretary of State in Delaware may never form the basis for serving a party sued for aiding and abetting a breach of fiduciary duty in Delaware. Why? Because such documents are formally filed by the corporation itself and thus respect for the corporation's separate legal identity requires that the individuals who caused the corporation to make the filings cannot be held personally accountable for those filings for purposes of § 3104.

[45]    The defendants cite to cases which advance a fairness-based policy rationale for protecting

corporate fiduciaries from being sued personally when jurisdiction over them is based solely on contacts initiated in their fiduciary capacity. *See Plummer & Co. Realtors v. Crisafi,* 533 A.2d 1242, 1246 (Del.Super.1987) ("The underpinning of this fiduciary shield doctrine is the notion that it is unfair to force an individual to defend a suit brought against him personally in a forum with which his only relevant contacts are acts performed not for his own benefit but for the benefit of his employer.") (quoting *Marine Midland Bank, N.A. v. Miller,* 664 F.2d 899, 902 (2d Cir.1981)); *Marketing Products Management, LLC v. HealthandBeautyDirect, Inc.,* 2004 WL 249581, at *3 (Del.Super.2004) (citing *Plummer & Co. Realtors,* 533 A.2d at 1246).

One can sleep soundly at night confident that rejection of this argument is not at odds with either logic or sound public policy. When a claim for breach of fiduciary duty is at issue, the underlying conduct almost always involves formal action of the corporation itself. After all, the very essence of a breach of corporate law fiduciary duty claim is the misuse of corporate control.[46] For example, an unfair squeeze out merger by a controlling stockholder quintessentially involves the corporation entering into a merger agreement allowing the controlling stockholder to purchase the corporation for an unfair price.[47] That is, claims of fiduciary duty ultimately rest on the proposition that a corporate fiduciary has caused the corporation to do something at odds with its own best interests, typically so that the fiduciary could secure an improper personal benefit.[48] Indeed, in fiduciary duty cases, the relief that is sought often involves enjoining or rescinding official corporate action. That is in fact the situation presented by this case, in which the plaintiff seeks rescission of the grant of the disputed shares to the Top Managers.

[46]  *E.g., Guth v. Loft, Inc.,* 5 A.2d 503, 510 (Del.1939) ( "Corporate officers and directors are not permitted to use their position of trust and confidence to further their private interests.").

[47]  *E.g., Weinberger v. UOP, Inc.,* 457 A.2d 701 (Del.1983).

[48]  *E.g., Zahn v. Transamerica Corp.,* 162 F.2d 36, 46 (3d Cir.1947) ( "[T]he directors of Axton–Fisher ... were the instruments of [a controlling stockholder,] Transamerica[,] ... voting in favor of their special interest, that of Transamerica, [and they] could not and did not exercise an independent judgment in calling the Class A stock, but made

the call for the purpose of profiting their true principal, Transamerica. In short a puppet-puppeteer relationship existed between the directors of Axton–Fisher and Transamerica. The act of the board of directors in calling the Class A stock, an act which could have been legally consummated by a disinterested board of directors, was here effected at the direction of the principal Class B stockholder in order to profit it."); *Sinclair Oil Corp. v. Levien,* 280 A.2d 717, 721 (Del.1971) ("Self-dealing occurs when the parent, by virtue of its domination of the subsidiary, causes the subsidiary to act in such a way that the parent receives something from the subsidiary to the exclusion of, and detriment to, the minority stockholders of the subsidiary."); *Bennett v. Propp,* 187 A.2d 405, 408 (Del.1962) (Chairman of the board caused a corporation to engage in unauthorized stock purchases in anticipation of a hostile tender offer. Share "purchases were made to preserve the control of the corporation in [the chairman] and his fellow directors.... The use of corporate funds for such a purpose is improper.").

Although there are sound public policy reasons for limiting the ability of contract **\*1060** and tort claimants to file certain claims against corporate officers and directors for conduct of the corporation itself,[49] those reasons have little to do with this case or other cases involving the internal affairs of corporations. When well-pled facts support the inference that a person caused a corporation to take jurisdictionally-significant conduct in Delaware and that conduct is an element in a scheme by corporate fiduciaries to unfairly advantage themselves at the expense of a Delaware corporation and its stockholders, our case law has consistently held that the long-arm statute may be used to serve that person.[50] It would be surprising were it otherwise, because a contrary ruling would turn the very essence of faithless conduct—the abuse of corporate power—into an immunity from accountability, precisely because the disloyal fiduciaries derived their wrongful gains from actions of the corporation itself, albeit corporate actions that their own conduct brought about.[51] Such an accountability-destroying reading of the long-arm statute would itself be entirely disloyal to the statute's purpose, as articulated by our Supreme Court in its *Hercules* decision.[52]

[49]  *See Allied Capital Corp. v. GC–Sun Holdings, L.P.,* 910 A.2d 1020, 1044 n. 63 (Del.Ch.2006) ("When

corporations commit intentional torts or breaches of contract, they obviously do so at the behest of some human agent and often more than one. Therefore, if corporate agents were generally capable of conspiring among themselves and with their corporate employer, many claims against corporations for their own acts could also regularly be supplemented by claims against corporate managers for conspiring with each other to cause the corporation to act illegally."); Martin H. Pritikin, *Toward Coherence in Civil Conspiracy Law: A Proposal to Abolish the Agent's Immunity Rule,* 84 NEB. L.REV. 1, 25 (2005) (explaining that because corporate principals can only act through their agents, agency relationships and breaches of contract by the corporate principal would be chilled if agents "were to absorb the cost of tort liability for inducing a breach of their principals' contracts—or, more accurately, if they internalized the risk of such liability ex ante").

50    *See, e.g., Benihana,* 2005 WL 583828, at *8; *In re General Motors (Hughes) S'holder Litig.,* 2005 WL 1089021, at *22; *Gibralt,* 2001 WL 647837, at *6 (Del.Ch.2001).

51    This is not a novel observation. In *U.S. v. Montreal Trust Co.,* for example, a New York federal court asserted jurisdiction over a corporate officer of a publicly-owned Canadian company who had been diverting funds through New York assets. 358 F.2d 239, 243 (2d Cir.1966). The officer claimed that because his only contacts with New York were in an official corporate role on behalf of the Canadian company he was charged with victimizing, he was protected by the fiduciary shield doctrine. In rejecting his argument on appeal, the Court of Appeals for the Second Circuit stated: "It would be ironic, indeed, if the very corporations whose funds [the officer] is charged with diverting were to supply him with a shield against suit for tax liability allegedly incurred in connection with this purported breach of his fiduciary duty." *Id.; see also Marine Midland Bank,* 664 F.2d at 902 (2d Cir.1981) (summarizing *Montreal Trust,* 358 F.2d at 243).

52    611 A.2d 476, 480–81 (Del.1992).

Boeckman and Baker & Hostetler assert a narrower version of the prior argument to protect them from application of the conspiracy theory of jurisdiction—that is, that the filing of the Certificate Amendment, although brought about by humans at Baker & Hostetler, was a corporate act of Randall Bearings, for which those humans may not be held responsible for purposes of a

personal jurisdiction analysis under § 3104. This narrower version centers on considerations supposedly unique to the legal profession. According to the moving defendants, case law in some other jurisdictions says that lawyers cannot be sued simply for performing services for a client if all that the lawyers get out of **\*1061** those services is a fee.[53] That is, if the only benefit of the lawyer's actions is getting a fee for the work he did, this doctrine supposedly gives the lawyer a free pass from being held civilly responsible for his actions to those who would sue their clients. The moving defendants refer to this doctrine as a version of the "intra-corporate conspiracy doctrine" or the "agent's immunity rule," whereby corporate officials acting in their official capacity are usually deemed incapable of conspiring with the corporation.[54]

53    *See, e.g., In re County of Orange,* 203 B.R. 983, 999–1000 (Bankr.C.D.Cal.1996), *rev'd on other grounds* ("The gain must be more than the fees received from the fiduciary-defendant that the nonfiduciary is accused of conspiring with."); *Cooper v. Equity Gen. Ins. Co.,* 219 Cal.App.3d 1252, 268 Cal.Rptr. 692, 696–97 (1990) (holding that an attorney working on a contingency basis did not have an independent financial stake because plaintiff did not allege that the attorney "stood to gain anything more than a fee for his work as an attorney."); *see also General Refractories Co. v. Fireman's Fund Ins. Co.,* 337 F.3d 297, 313 (3d Cir.2003) ("[T]he mere fact that attorneys have 'mixed motives' such as 'enhancing' their reputation by aggressive representation, does not remove their conduct from the scope of the agency.").

54    *See, e.g., Superior Court Chain Store Maint., Inc. v. Nat'l Glass & Gate Serv. Inc.,* 2004 WL 877599, at *11 (R.I.Super.2004) ("It is well-settled that 'a conspiracy between a corporation and its agents, acting within the scope of their employment, is a legal impossibility.' ... The policy behind the intracorporate conspiracy doctrine "is to preserve independent decision-making by business entities and their agents free of the pressure that can be generated by allegations of conspiracy.") (quoting *Marmott v. Maryland Lumber Co.,* 807 F.2d 1180, 1184 (4th Cir.1986) and *Fairley v. Andrews,* 300 F.Supp.2d 660, 668 (N.D.Ill.2004)); *see also Roth v. La Societe Anonyme Turbomeca France,* 120 S.W.3d 764, 778 (Mo.App.2003) ("Because an attorney is an alter ego

of his or her client, a conspiracy between the attorney and the client is not possible.").

Again, the problem with the moving defendants' argument is that they seek to wrench notions that are logical in some contexts into a context in which they make no sense. For certain purposes—for example, claims of tort or antitrust violations brought against a corporation and its officers—it makes little sense to describe the officers as conspiring with the corporation. [55] After all, corporations make decisions through humans, usually humans involved in collaborative activity. Indeed, if one assumes that every corporate action must involve some human actor, every corporate act could be a conspiracy between the corporation and the human causing its act. [56] This area of the law is complex and freighted with important policy questions regarding the circumstances in which both the corporation and those who cause it to act should be held accountable to third-parties and society for corporate conduct. Unsurprisingly, for example, there are distinctions in this area between civil and criminal responsibility and among various kinds of civil claims. [57]

[55]   See *Allied Capital Corp.,* 910 A.2d at 1044 n. 63 (discussing the complexities of using the tort of civil conspiracy to apply to concerted action among corporate officials); *see also* Kathleen F. Brickey, *Conspiracy, Group Danger and the Corporate Defendant,* 52. U. CIN. L.REV. 431, 432–33 (1983).

[56]   See *Allied Capital Corp.,* 910 A.2d at 1044 n. 63 ("[I]f corporate agents were generally capable of conspiring among themselves and with their corporate employer, many claims against corporations for their own acts could regularly be supplemented by claims against corporate managers for conspiring with each other to cause the corporation to act illegally.").

[57]   See Pritikin, *supra* note 49 at 4–5 ("[T]he single legal actor theory—the fiction that the agent's acts are those of the principal, and thus that the 'plurality' element of conspiracy is absent—arose where policy considerations regarding the underlying offense supported its application. The fiction is accepted in the antitrust context, on the rationale that proscribing certain intracorporate combinations that restrain trade could chill legitimate business conduct. However, the same fiction is rejected in the context of criminal conspiracy, on the rationale that the increased danger arising from a group of criminal actors that justifies punishing conspiracy generally exists even where the conspirators are all agents and

employees of a single entity."); *see also* Brickey, *supra* note 55 at 438–40 ("The incongruity of these rules is attributable to the disparate policy considerations that shaped them.").

 **\*1062**   Here, however, those complications are not present. The alleged conspiracy does not include Randall Bearings; Randall Bearings is one of the alleged victims. The conspiracy is among the Top Managers, allegedly with the knowing assistance of Boeckman and Baker & Hostetler, who were being paid to represent Randall Bearings, not the Top Managers. The conspiracy was intended to entrench and enrich the Top Managers.

Given the nature of this conspiracy, the doctrine on which the moving defendants rely does not even apply on its own terms. Well-pled facts support the inference that the moving defendants were not acting within the appropriate scope of their agency. That is, there are well-pled allegations that the moving defendants were in fact acting to unfairly advantage the Top Managers at the expense of their real client, the company. As the moving defendants admit, when an agent is alleged to have breached its duty to its principal, the so-called agent's immunity they rely upon does not apply. [58] Furthermore, it is not the case, as the moving defendants allege, that the only benefit the moving defendants got was the fees they were paid for their work. By assisting in an entrenchment scheme, the moving defendants got a benefit similar to that obtained by the Top Managers, securing their position as company counsel against the risk of displacement in a takeover. I perceive no Delaware public interest that would be served by adopting a rule that insulates advisors of managers of a Delaware corporation from accountability if can be proven that those advisors, although being paid by the corporation to advise the managers in their official capacity, consciously assisted the managers in breaching their fiduciary duties.

[58]   *E.g., Amaysing Techs. Corp v. CyberAir Commc'ns, Inc.,* 2005 WL 578972, at *7 (Del.Ch.2005) ("An exception exists to this general rule, however, when the officer or agent of the corporation steps out of her role as an officer or agent and acts pursuant to personal motives.... Courts interpreting the 'personal reasons' exception ... have read it to mean a personal animus and/or desire for financial benefit other than one's corporate salary.") (internal citations and quotations omitted); Pritikin, *supra* note 49 at 25 (The agent's privilege is "based on the agent's value to the principal in accomplishing its legitimate business

goals.... [I]f benefiting the principal is no longer the sole or primary purpose of the agent in inducing a breach, the social interest in the agent's inducement no longer outweighs the interest in upholding the contract, so the privilege is vitiated.").

Put simply, the use of § 3104 to serve the moving defendants is entirely consistent with the language and evident purpose of that statute, and with the precedent interpreting it. The requirement that there be a statutory basis for service is therefore met.

The second step in the personal jurisdiction analysis is a simple one. The United States Supreme Court has held that it is constitutionally permissible to exercise personal jurisdiction over a non-resident defendant when that defendant should have "reasonably anticipated ... that his ... actions might result in the forum state exercising personal jurisdiction over him in order to adjudicate disputes arising from **\*1063** those actions." [59] To satisfy this test, the defendant need not have ever entered the forum state physically because the Supreme Court has rightly focused the test on the more relevant question of whether the defendant has engaged in such conduct directed toward the forum state that makes it reasonably foreseeable that that conduct could give rise to claims against the defendant in the forum state's courts. [60]

[59]   *In re USACafes, L.P. Litig.,* 600 A.2d 43, 50 (Del.Ch.1991) (citing *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 292, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)).

[60]   *E.g., Asahi Metal Indus. Co. Ltd. v. California,* 480 U.S. 102, 110, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987); *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *see also* William M. Richman, *Understanding Personal Jurisdiction,* 25 ARIZ. ST. L.J. 599, 617–18 (1993) ("The Court has realized that 'it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communication across state lines, thus obviating the need for physical presence.' *Burger King,* 471 U.S. at 476, 105 S.Ct. 2174. It is enough if defendant's conduct is 'purposefully directed' at the forum. *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 774, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984).... Also, defendant may be amenable when her actions outside the state have foreseeable effects inside the state. Indeed, if the defendant's out-of-state activity is

purposeful and geographically targeted at the forum state, jurisdiction can be based on a single transaction or occurrence—the most minimal of contacts. *McGee v. Int'l Life Ins. Co.,* 355 U.S. 220, 223, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957).").

[5]   That test is easily satisfied here. As noted previously, Baker & Hostetler advertises itself as a national, indeed, international, firm that regularly advises public corporations in matters of corporate and securities law. It touts its coast-to-coast platform.

As sophisticated practitioners of corporate law, the moving defendants realize that Delaware, as a chartering state, has an important interest in regulating the internal affairs of its corporations, in order to ensure that the directors and officers of Delaware corporations honor their obligations to operate the corporation lawfully and in the best interest of the corporation's stockholders. The United States Supreme Court has long recognized the legitimacy and importance of a state's interest in regulating the internal affairs of its corporations. [61] It can also be no surprise to the moving defendants that this important interest is given life in our state by providing stockholders with access to Delaware's court system in order to assert claims of breach of fiduciary duty; after all, decisions too numerous to cite make this clear. [62] So too does § 3114 of Title 10, which makes clear that the directors **\*1064** and officers of Delaware corporations, accept, as a condition of office, the responsibility for answering official capacity suits in the court of this State. [63] Therefore, the moving defendants had to know that if the Top Managers and other defendant-directors engaged in conduct that gave rise to fiduciary duty claims, that the Top Managers and other defendant-directors were likely to be sued in Delaware. [64]

[61]   *E.g., CTS Corp. v. Dynamics Corp. of America,* 481 U.S. 69, 91, 93, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987) (recognizing that "[a] State has an interest in promoting stable relationships among parties involved in the corporations it charters" and "a substantial interest in preventing the corporate form from becoming a shield for unfair business dealing."); *cf. Edgar v. MITE Corp.,* 457 U.S. 624, 645–46, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982) (observing that no state has a legitimate interest "in regulating the internal affairs of foreign corporations").

62    *E.g., Sternberg v. O'Neil,* 550 A.2d 1105, 1125 (Del.1988) ( "The Delaware courts and legislature have long recognized a 'need for consistency and certainty in the interpretation and application of Delaware corporation law and the desirability of providing a definite forum in which shareholders can challenge the actions of corporate management without having to overcome certain procedural barriers which can be particularly onerous in the context of derivative litigation.' ") (quoting *Armstrong v. Pomerance,* 423 A.2d 174, 178 (Del.1980)); *In re Topps Co. S'holders Litig.,* 924 A.2d 951, 960 (Del.Ch.2007) ("[I]n Delaware's system of corporate law, the adjudication of cases involving the fiduciary duties of directors in new business dynamics is one of the most important methods of regulating the internal affairs of corporations, as these cases articulate the equitable boundaries that cabin directors' exercise of their capacious statutory authority."); *Ryan v. Gifford,* 918 A.2d 341, 349–50 (Del.Ch.2007) (Delaware has a "significant and substantial interest in overseeing the conduct of those owing fiduciary duties to shareholders of Delaware corporations.") (quoting *In re Chambers Dev. Co. S'holders Litig.,* 1993 WL 179335, at *8 (Del.Ch.1993)); *see also Diedenhofen–Lennartz v. Diedenhofen,* 931 A.2d 439, 451 n. 26 (Del.Ch.2007) (citing numerous cases evidencing Delaware's "compelling interest in the efficient and consistent application of its laws governing business entities").

63    *HMG/Courtland Properties, Inc. v. Gray* explains why Delaware's director consent statute is constitutionally valid:

    [T]he power of defendant directors to act in their director capacity arises exclusively under the Delaware corporation laws; defendant directors avail themselves of important privileges and legal powers and protections when they accept office as directors of Delaware corporations; by virtue of § 3114, defendant directors who accept such privileges are put on notice that they can be haled into court here to answer for breaches of Delaware corporation laws; Delaware has a legitimate interest in enforcing those laws; § 3114 is narrowly tailored to serve that legitimate interest and to compel the appearance of defendant directors only where that purpose is served; that the state's legitimate interest outweighs any burden to defendant directors; and, as a result, defendant directors

served in conformity with § 3114 can fairly be expected to defend suits here.

729 A.2d 300, 304 n. 3 (Del.1999) (summarizing *Armstrong v. Pomerance,* 423 A.2d 174 (Del.1980)).

64    *See HealthTrio, Inc. v. Margules,* 2007 WL 544156, at *6 (Del.Super.2007) (finding that a non-Delaware attorney's provision of legal services for a client in filing its certificate of incorporation in Delaware and in acting for it in connection with a prior Delaware litigation, including calls and letters to corresponding counsel in Delaware, satisfied the long-arm statute and the Due Process Clause when the lawyer was sued in Delaware for malpractice relating to the prior Delaware litigation even though the attorney never appeared in the prior Delaware litigation or physically entered Delaware).

Given these realities, it is difficult to conceive how it would shock the conscience to require the moving defendants to defend a lawsuit in Delaware. As is clear, the moving defendants purported to provide a wide range of advice and services to the board and officers of a Delaware corporation about important issues of Delaware law.[65] That advice and assistance included the conception, preparation, and **\*1065** filing of the Certificate Amendment, which culminated in a filing in Delaware. Indeed, it is difficult to find a part of the scheme attacked by the plaintiff that did not involve substantial participation by the moving defendants.

65    In fact, during the period when the Certificate Amendment and the Equity Incentive Plan were being devised and implemented, Boeckman was representing Randall Bearings in connection with a books and records request made by the lead plaintiff in this action, Gary Sample. *See* Naylor Supp. Aff. Exs. 9, 10, 11, 12, 13, 14. In the § 220 litigation, Boeckman appeared on pleadings and a response to interrogatories filed in this court as of counsel and took the lead in jousting with Sample's Delaware-based counsel over the books and records that the company would produce to Sample. *See* Answer, *Sample v. Randall Bearings, Inc.,* C.A. 491–N; Defendant Randall Bearing, Inc.'s Responses to Plaintiff's First Set of Interrogatories, *Sample v. Randall Bearings, Inc.,* C.A. 491–N; Naylor Aff. Exs. 25, 26, 28, 30. In the course of that jousting, Baker & Hostetler also gave its view on the propriety and scope of Sample's right to books and records under Delaware law. *See* Naylor Aff. Exs. 25, 26, 28. Notably, in a memorandum that Boeckman wrote

to Top Manager and Randall Bearings CEO Kent Morgan relating to the grants issued under the Equity Incentive Plan, Boeckman reminded Morgan that there are "stockholders like Gary Sample out there." Naylor Aff. Ex. 7.

For sophisticated counsel to argue that they did not realize that acting as the de facto outside general counsel to a Delaware corporation and regularly providing advice about Delaware law about matters important to that corporation and its stockholders might expose it to this court's jurisdiction fails the straight-face test. The moving defendants knew that the propriety of the corporate action taken in reliance upon its advice and through its services would be determined under Delaware corporate law, and likely in a Delaware court.

As a more general matter, the moving defendants are poorly positioned to claim a violation of Due Process. Given its own self-proclaimed national reach, Baker & Hostetler is in a graceless position to claim to be constitutionally aggrieved by an exercise of jurisdiction by this court over it in a case where the claims against it entirely rest on its actions in providing Delaware law advice to a Delaware corporation. That is especially so when Baker & Hostetler has taken the role of quarterbacking the defense of this action by drafting pleadings and briefs filed by other lawyers with this court, directing the defendants' (inadequate, incomplete, and untimely) responses to discovery, and even drafting the briefs in support of this motion.

Lastly, I reject the idea that denying the moving defendants' motion somehow will undermine the public policy of this state, by causing law firms that provide advice to Delaware corporations to fear that they will be regularly hauled into court here. This is a highly unusual case. In most fiduciary duty cases, it will be exceedingly difficult for plaintiffs to state an aiding and abetting claim against corporate counsel. But in this case, the moving defendants have conceded—as frankly the record makes clear they must—the pleading-stage viability of the claims against them.

More importantly, Delaware has no public policy interest in shielding corporate advisors from responsibility for consciously assisting the managers of Delaware corporations in breaching their fiduciary duties. If well-pled facts can be pled that support the inference that a corporate advisor knowingly assisted corporate directors in breaching their fiduciary duties, Delaware has a public policy interest in ensuring that its courts are available to derivative plaintiffs who wish to hold that advisor accountable to the corporation. The precise circumstances when corporate advisors should be deemed responsible to the corporation or its stockholders for their role in advising directors and officers should be determined by decisions addressing the merits of aiding and abetting claims, not by decisions about motions to dismiss for lack of personal jurisdiction. Lawyers and law firms, like other defendants, can be sued in this state if there is a statutory and constitutional foundation for doing so.

## VII. *Conclusion*

Both the statutory and constitutional bases for jurisdiction over defendants Boeckman and Baker & Hostetler are obvious. Their motion to dismiss is denied. IT IS SO ORDERED.

**All Citations**

935 A.2d 1046

---

           © 2018 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

# *TAB 11*

🚩 KeyCite Yellow Flag - Negative Treatment
Distinguished by In re Cox Radio, Inc. Shareholders Litigation, Del.Ch.,
May 6, 2010

532 A.2d 1324
Court of Chancery of Delaware,
New Castle County.

SEALY MATTRESS COMPANY OF NEW
JERSEY, INC., Lillian Lewis and United Jersey
Bank, co-executors of the estate of Morris
Lewis, Walter Hertz, Lorraine Klein, Howard
Lewis, Harold Naiman, and Harold and Rose
Naiman, on behalf of themselves and derivatively
on behalf of Sealy, Incorporated, Plaintiffs,
v.
SEALY, INC., The Ohio Mattress Company, Ohio–
Sealy Mattress Manufacturing Co., Sealy Merging
Corporation, Ernest M. Wuliger, Thomas Smudz,
C. Steven Kneeland and Gary Pleasant, Defendants.

Civ. A. No. 8853.
|
Date Submitted: July 7, 1987.
|
Date Decided: July 20, 1987.
|
Revised: July 24, 1987.

**Synopsis**
Individual and derivative action was filed by minority
stockholders to enjoin proposed cash-out merger of
parent corporation into wholly owned subsidiary of its
majority shareholder. The Court of Chancery In and For
New Castle County, Jacobs, Vice-Chancellor, held that
minority shareholders adequately established lack of fair
price, lack of fair dealing, and breach of fiduciary duties
by directors to minority shareholders as well as irreparable
harm, and were thus entitled to preliminary injunction of
proposed merger.

So ordered.

West Headnotes (15)

[1]     **Corporations and Business Organizations**

🔗 Fairness of transaction

Where target corporation's parent
corporation and its directors, who are
employees of and controlled by target's
majority stockholder, stand on both sides of
proposed merger and fix its terms, majority
stockholders have burden of establishing
"entire fairness" of merger, which is the most
scrupulous inherent fairness of the bargain,
sufficient to pass test of careful scrutiny by the
courts.

2 Cases that cite this headnote

[2]     **Corporations and Business Organizations**
🔗 Mergers and Consolidations

The concept of "entire fairness" as used for
corporate mergers is not restricted to matters
of valuation alone, but embraces fair dealing
as well as fair price.

Cases that cite this headnote

[3]     **Injunction**
🔗 Mergers and acquisitions;anti-takeover
measures

For purpose of preliminary injunction of
proposed merger, determination of whether
minority shareholders have shown that
proposed corporate merger will not pass
"entire fairness" test involves an assessment
of whether majority shareholders will be able
to carry their ultimate burden of persuading
court that transaction is entirely fair in the
dual sense of fair dealing and fair price.

4 Cases that cite this headnote

[4]     **Injunction**
🔗 Mergers and acquisitions;anti-takeover
measures

On motion for preliminary injunction against
proposed merger, majority shareholder failed
to carry burden of showing that it would
probably succeed in proving that book-
value merger price of $178.46 per share
was entirely fair, record did not disclose
what corporation's present fair-value price

might be, although there was evidence that corporation's fair value was significantly higher than $58 million book-value price being offered in merger, that book value to be paid to licensees for their stock was higher than proposed merger price, and that brokerage firm had valued corporation at $140 to $160 million.

1 Cases that cite this headnote

**[5]** **Injunction**
👉 Mergers and acquisitions;anti-takeover measures

Minority shareholders seeking preliminary injunction against proposed corporate merger showed that directors would probably not succeed in carrying their burden of proving that they, in their capacity as fiduciaries, dealt fairly with minority shareholders in seeking to accomplish merger; merger was timed and structured in a way that had foreseeable effect of producing an unfair result at a time when valuation of corporation was difficult because of directors' refusal to permit posttrial review of antitrust judgment, process by which merger terms were arrived at did not involve procedural protections which would have tended to assure fair result, and directors failed to fulfill obligations to make informed deliberate judgment that merger terms were fair and that merger would not become vehicle for economic oppression, and to candidly disclose all material facts concerning merger.

10 Cases that cite this headnote

**[6]** **Corporations and Business Organizations**
👉 Disclosure of information in general
**Corporations and Business Organizations**
👉 Fairness of transaction

As fiduciary seeking to "cash out" minority stockholders of Delaware corporation, majority shareholder was obliged not to time or structure transaction or to manipulate corporation's values so as to permit or facilitate forced elimination of minority stockholders at unfair price, to make

informed, deliberate judgment in good faith that merger terms including price were fair and that merger would not become vehicle for economic oppression, and to candidly disclose all material facts concerning merger so that minority shareholders could make informed decision as to whether to accept merger price or seek judicial remedies.

22 Cases that cite this headnote

**[7]** **Corporations and Business Organizations**
👉 Good faith and fiduciary duties

Evidence, that corporate merger was timed and structured in a way that had foreseeable effect if not intent of producing unfair result went to concept of whether timing and structure of merger met "fair dealing" standard; there was evidence that majority stockholder timed merger to occur at time when valuation of corporation was difficult, if not impossible, and that it used antitrust judgments to manipulate corporation's value for their benefit, as well as other evidence suggesting calculated effort to depress price of corporation until minority stockholders were eliminated.

5 Cases that cite this headnote

**[8]** **Corporations and Business Organizations**
👉 Good faith and fiduciary duties

Fact that majority stockholder unilaterally determined merger price without putting into place any of procedural protections tending to assure fair substantive result such as placing independent directors on board, employing independent representatives to negotiate on behalf of minority, and retaining independent investment banker or other financial expert or legal counsel to represent minority interests was evidence of lack of fair dealing by majority shareholder in arriving at merger terms.

3 Cases that cite this headnote

**[9]** **Corporations and Business Organizations**

👉 **Duties of directors and officers in general;business judgment rule**

Directors of parent corporation approving proposed merger of parent by subsidiary of majority shareholder breached fiduciary duties to minority shareholders by being completely uninformed and making no effort to inform themselves of material facts, and admittedly functioning in a ministerial capacity to carry out parent corporation's bidding, without making any effort to determine whether proposed price was fair, without considering facts that would bear materially on that issue, and without independent expert financial or legal advice.

4 Cases that cite this headnote

**[10]** **Corporations and Business Organizations**
👉 **Duties of directors and officers in general;business judgment rule**

Directors of parent corporation, in carrying out board's affirmative duty to protect interests of minority shareholders, could not abdicate obligation to make informed decision on fairness of merger by simply deferring to judgment of controlling shareholder particularly, where majority shareholder's interests were in unalloyed conflict with those of minority.

7 Cases that cite this headnote

**[11]** **Corporations and Business Organizations**
👉 **Disclosure of information in general**

Corporate directors breached fiduciary duty to minority shareholders to disclose all material facts pertaining to merger, evidence showed few if any facts material to informed investment decision were disclosed, that facts disclosed were, in the main, highly misleading, including implication that board had made independent informed judgment that book value was fair price, disclosures relating to book value were misleading, and information statement and supplement contained virtually no information material to any informed judgment on value.

9 Cases that cite this headnote

**[12]** **Corporations and Business Organizations**
👉 **Disclosure of information in general**

Fact that one minority shareholder was knowledgeable about facts material to informed investment decision at time of proposed corporate merger did not vitiate other directors' breach of fiduciary duties to other minority shareholders who knew virtually nothing about corporate affairs, particularly as record showed that minority shareholder had not been a director for 9 years, and had limited knowledge of material facts relating to corporate value, particularly value of antitrust judgments and corporation's future business plans, protected earnings, and prospects.

2 Cases that cite this headnote

**[13]** **Corporations and Business Organizations**
👉 **Disclosure of information to corporation and shareholders or members**

Disclosure burden owed by director of corporation as fiduciary cannot be discharged by fiduciary's lawyer to beneficiary's lawyer in context of litigation.

1 Cases that cite this headnote

**[14]** **Injunction**
👉 **Mergers and acquisitions;anti-takeover measures**

Minority shareholders of parent corporation for which merger was proposed adequately established that they would suffer irreparable harm if merger were not preliminarily enjoined; minority shareholders did not receive sufficient information to make informed decision among available alternative, board had approved merger which was preliminarily found to be in violation of state corporations law regarding disclosure obligation, and damages would be difficult to assess, particularly due to status of antitrust judgments involving corporation.

9 Cases that cite this headnote

**[15]** **Injunction**

👉 Mergers and acquisitions;anti-takeover measures

Court was not precluded from granting preliminary injunctive relief in parent-subsidiary merger given nature of conduct involved and harm likely to result in case involving his misrepresentation, self-dealing, and gross and palpable overreaching.

4 Cases that cite this headnote

**Attorneys and Law Firms**

**\*1326** Rodman Ward, Jr., Marc B. Tucker, Paul L. Regan and John G. Day of Skadden, Arps, Slate, Meagher & Flom, Wilmington, for plaintiffs.

Richard D. Kirk of Morris, James, Hitchens & Williams, Wilmington, for defendant Sealy, Inc.

Clark W. Furlow and Craig B. Smith of Lassen, Smith, Katzenstein & Furlow, Wilmington, and Frederic F. Brace, Jr. and Michael D. Craig, Chicago, Ill., for other defendants.

## OPINION

JACOBS, Vice-Chancellor.

This individual and derivative action was filed by minority stockholders of Sealy, Incorporated ("Sealy"), a Delaware corporation, on February 13, 1987, to enjoin a proposed cash-out merger of Sealy into a wholly-owned subsidiary of Ohio–Sealy Mattress Manufacturing Company ("Ohio–Sealy"), Sealy's majority stockholder. Sealy is one of the nation's leading manufacturers and distributors of bedding products, and is over 93% owned by Ohio–Sealy. The plaintiffs, who collectively own the remaining 6.1% of Sealy's stock, are its sole minority stockholders. [1] Under the terms of the proposed merger, Sealy is to be merged into Sealy Merging Corporation, a second-tier subsidiary of Ohio–Sealy, [2] and all shareholders other than Ohio–Sealy (*i.e.,* the

plaintiffs) are to receive $178.46 cash—representing Sealy's book value as of December 31, 1986—for each share of their Sealy stock.

[1] At the time that the merger was originally proposed, Ohio–Sealy owned approximately 82% of Sealy's stock, the plaintiffs owned approximately 6.1%, and Sealy Mattress Company of Michigan ("Michigan–Sealy") owned 11.95%. In April, 1987, two months after this action was filed, Michigan–Sealy's business and assets, including its stock interest in Sealy, were acquired by Ohio–Sealy.

[2] Sealy Merging Corporation is a wholly-owned subsidiary of Ohio–Sealy which in turn is wholly-owned by Ohio Mattress Corporation ("Ohio Mattress").

Upon filing this action, the plaintiffs sought a preliminary and permanent injunction against consummation of the merger. Expedited discovery was conducted during the week of February 15, 1987, and a hearing on the preliminary injunction motion was scheduled for February 23, 1987, one day before the stockholders' meeting at which the merger was to be approved. [3] In response, the defendants postponed the stockholders' meeting for the purpose of discussing settlement. Settlement was not achieved, and the plaintiffs **\*1327** advised the defendants that they (the plaintiffs) intended to press their motion for a preliminary injunction. The defendants then announced that the merger would again be deferred, this time for the stated reason that Ohio Mattress intended to complete a public offering of its stock. They announced also that the stockholders' meeting would also be postponed until further notice. [4]

[3] Approval of the merger was a foregone conclusion. The Information Statement disclosed that Ohio–Sealy intended (and still intends) to vote its 93% stock interest in favor.

[4] In addition to Ohio–Sealy and its subsidiaries, the defendants include Sealy's directors, all of whom are employees of Ohio–Sealy or of Ohio Mattress.

On February 27, 1987, the plaintiffs filed a motion for an allowance of attorneys' fees and expenses. The defendants opposed that motion on the grounds, *inter alia,* that no benefit had been achieved by the plaintiffs' efforts, because the merger had not been abandoned. The defendants also filed, and the parties subsequently briefed, a motion

to dismiss the amended complaint. [5] On May 14, 1987, the day after this Court heard argument on the fee application motion, the defendants informed the plaintiffs and the Court that a stockholders meeting to approve the merger would be convened on July 21, 1987. The plaintiffs then renewed their motion for a preliminary injunction. Further expedited discovery and briefing followed, and oral argument on the preliminary injunction motion took place on July 7, 1987.

[5]    The motion to dismiss has been denied in a separate Opinion being issued concurrently herewith.

This is the decision of the Court on the plaintiffs' motion for a preliminary injunction.

| | |
|---|---:|
| New York-Sealy | 18.66% |
| Kansas City-Sealy | 3.34% |
| Illinois-Sealy | 16.35% |
| Connecticut-Sealy | 14.96% |
| Maryland-Sealy | 8.51% |
| Memphis-Sealy | 15.59% |
| Virginia-Sealy | 2.83% |
| Michigan-Sealy | 11.95% |
| New Jersey-Sealy Group | 6.19% |
| Howard Haas [6] | 1.62% |
| | 100.00% |

[6]    All but Mr. Haas were licensees. Mr. Haas had for many years been Sealy's president and Chief Executive Officer.

For the previous 16 years, Ohio–Sealy had been involved in antitrust litigation against Sealy and certain of its licensees in the United States District Court located in Chicago, Illinois. Ohio–Sealy charged Sealy and the defendant licensees with having violated the federal antitrust laws in various respects. Michigan–Sealy, a licensee, was also a plaintiff in certain of those actions. On June 14, 1986, Ohio–Sealy obtained a verdict of $27 million against Sealy, plus a separate verdict of $50 million

I. *The Facts*

To understand the issues presented, it is necessary to discuss the facts at somewhat greater than normal length. The material facts are essentially uncontested.

Sealy's principal business consists of manufacturing bedding products. Until recently, Sealy also derived revenues from a network of licensee organizations located in different states. The licensees manufactured and marketed bedding products under the Sealy tradename. With the exception of Ohio–Sealy, the Sealy licensees were also Sealy's stockholders. Until late 1986 when Ohio–Sealy acquired majority control of Sealy, the following entities owned Sealy stock in the following percentages:

against Sealy and certain Sealy licensees that collectively owned about 58% of Sealy's stock. [7] Michigan–Sealy obtained a separate verdict of $45 million against Sealy alone. The antitrust defendants then filed post-trial motions attacking the antitrust judgments. In response, Ohio–Sealy and Michigan–Sealy pressed for an order requiring the licensee defendants to post appropriate security as a condition of their pursuing post-judgment relief.

[7]    *i.e.,* New York–Sealy, Minnesota–Sealy, Illinois–Sealy, Connecticut–Sealy and Maryland–Sealy.

Shortly after the June, 1986 verdicts, Ohio–Sealy filed new antitrust litigation against Sealy and the defendant licensees. That new litigation, combined with the $122 million of judgments, became material inducements **\*1328** for the antitrust licensee defendants to sell their businesses (including their stock holdings in Sealy) to Ohio–Sealy. Accordingly, a series of negotiations between the licensees and Ohio–Sealy, followed by sales of the licensees' business to Ohio–Sealy, took place during the last quarter of 1986.

Specifically, during the fall of 1986, New York–Sealy negotiated a sale of its business (including New York–Sealy's 18% stock interest in Sealy) to Ohio–Sealy at a price representing book value. Thereafter in December, 1986, the remaining antitrust defendant licensees (Illinois–Sealy, Connecticut–Sealy, and Maryland–Sealy), plus Kansas City–Sealy, which was not a defendant, reached agreement with Ohio–Sealy to sell their businesses. The consideration was an overall, single lump sum for all of the businesses, which sum would be allocated among the sellers as they collectively agreed. Those acquisitions gave Ohio–Sealy an additional 43.16% of Sealy's outstanding stock which, when combined with previous stock purchases, made Ohio–Sealy the 77.41% owner of Sealy. Ohio–Sealy then purchased the Bluefields, Virginia–Sealy licensee, and later the stock of Howard Haas, Sealy's then-President. Those acquisitions brought Ohio–Sealy's stock ownership of Sealy up to approximately 82%.

All of the sales of the licensees' businesses to Ohio–Sealy took place against the backdrop of both the Damoclean $122 million antitrust judgments and the prospect of continued antitrust litigation. As stated, the Sealy stock owned by each of the acquired licensees was included among the assets sold to Ohio–Sealy. The price paid by Ohio–Sealy for the licensees' respective bedding businesses was, in each case, negotiated. However, in all cases Ohio–Sealy insisted upon allocating book value to the acquired licensee's Sealy stock. Several licensees testified that the Sealy stock, standing alone, was worth significantly more, but the licensees did not oppose allocating book value as the agreed price for their Sealy stock because the overall purchase price for the combined assets was acceptable to them. How that price was to be allocated among specific acquired assets was not important.

Because Ohio–Sealy would be taking control of Sealy, Ohio–Sealy's counsel requested the federal court in the antitrust litigation to defer ruling upon the antitrust defendants' post-trial motions challenging the antitrust judgments. That court did so defer. Ohio–Sealy's counsel also instructed Sealy's antitrust counsel to take no further action to challenge the verdicts. That directive was also carried out. As of this time no steps have been or are being taken to obtain post-judgment review of the antitrust verdicts.

In late November, 1986, Frederic F. Brace, Jr., Esquire, Ohio–Sealy's Chicago, Illinois antitrust counsel, recommended to his client that it assume control of Sealy shortly after the closing on the licensee acquisitions. Mr. Brace recommended that nondirector employees of Ohio–Sealy be elected as the majority of the members of Sealy's Board, because, in Brace's view, the Clayton Act arguably prohibited electing persons who were directors of Ohio–Sealy or Ohio Mattress.

On December 29, 1986, Ohio–Sealy assumed control of Sealy, and following Brace's advice, reconstituted Sealy's Board with its own appointees. That was accomplished by a written consent executed by defendant Thomas Smudz, acting on behalf of Ohio–Sealy in its capacity as Sealy's controlling stockholder, in which he and defendants Charles Kneeland and Gary Pleasant were named as Sealy's Board of Directors. All of Sealy's new Board members are employees of Ohio–Sealy or Ohio Mattress, Ohio–Sealy's parent. Each director reports either directly to Ernest Wuliger, Chairman of Ohio Mattress, or to a person who reports to Mr. Wuliger. Mr. Smudz has worked for Ohio Mattress for eight years, during the last five of which he has been Ohio Mattress' Vice President. Mr. Kneeland has worked for Ohio–Sealy for eighteen years and since April 1986 has been its President. Mr. Pleasant has been employed by Ohio–Sealy for the last two years and currently serves as its Vice President.

**\*1329** Shortly before the change of control, Ohio–Sealy and Ohio Mattress entered into a Memorandum of Understanding with Sealy. In the Memorandum, Ohio–Sealy represented that "any offer it will make to purchase the remaining outstanding shares of Sealy that it has not previously committed to purchase will be made for cash in an amount per share of no less than $178.46, which is the amount per share paid in connection with the transaction [defendant Ohio–Sealy's impending acquisitions of the Sealy licensees] based upon the existing capitalization of Sealy." Ohio–Sealy further represented that it intended

"to fulfill its fiduciary duties in its dealings with and treatment of [the minority] stockholders...." Sealy's former directors testified that that Memorandum did not signify an understanding on their part that $178.46 per share was a fair price. They also testified that they did not know what a reasonable and fair price would be.

Apropos book value, it is important to note that during the six months intervening between the June, 1986 antitrust verdicts and Ohio–Sealy's December 29, 1986 assumption of control, several events occurred of which Ohio–Sealy and Mr. Smudz were or soon became aware. Those events indicated that Sealy's book value —the price allocated for the licensees' Sealy stock—was considerably less than Sealy's fair value. At $178.46 per share, Sealy's book value is approximately $58 million dollars ($178.46 x 325,703 shares = $58,000,000). In July, 1986, Salomon Brothers performed a valuation of Sealy to assist the antitrust defendants in meeting security and bond requirements. Salomon valued Sealy at $140 to $160 million. In October, 1986, Morgan, Lewis, Githens & Ahn performed a study that also contained relevant valuation information. In November, 1986, Shearson Lehman Brothers made an offer to acquire Sealy for approximately $150 million. In response, Sealy's President Howard Haas and Messrs. Jay and Robert Pritzker made a competing offer to acquire all of the stock of Sealy for approximately $152.5 million. Those offers were not accepted, the licensee stockholders having decided instead to sell their businesses and Sealy stock to Ohio–Sealy.[8]

[8]   Under the circumstances, the licensees had little practical choice. The Shearson and Pritzker proposals would have required that about 90% of the purchase price be placed into escrow for payment of the antitrust judgments and litigation expenses. Because of the pendency of those judgments, acceptance of the Shearson or Pritzker offers would leave the licensee-sellers in a position of uncertainty as to what amount of net proceeds that they would ultimately receive and when they would receive it. The liquidation of those judgments was largely in the control of Ohio–Sealy, subject only to post-verdict challenges and possible appellate review. There is evidence—not rebutted by the defendants—that those judgments were worth considerably less than their face amount. In a letter to Ohio Mattress' President, Mr. Brace opined that Michigan–Sealy's $45 million judgment was worth only $20 million. Moreover, the antitrust defendants' attorneys had taken the position that Ohio-Sealy's

judgment was vulnerable in several respects. No objective determination had been made of the worth of these judgments. As a $77 million judgment creditor of Sealy with the goal of obtaining control of Sealy for itself, Ohio–Sealy had no interest in resolving the issue of the validity and amount of the judgments before achieving its objective. Given Ohio–Sealy's significant leverage due to its judgment creditor status, the Sealy licensees apparently found it preferable to sell their business to Ohio–Sealy for an overall price that would be immediate and certain, rather than to accept an offer from Shearson or the Pritzkers that had built-in uncertainties and that would result in a delayed payment of most of the purchase price (in some unknowable amount) until an indefinite point in the future after what promised to be years of hard-fought litigation against Ohio–Sealy.

Lastly, Mr. Smudz, in his capacity as an Ohio–Sealy executive officer, had prepared valuations of Sealy and had sent them to Ohio–Sealy's investment banker. In a letter to Lazard, Freres & Co. dated December 2, 1986, Mr. Smudz expressed his belief that "the [Sealy] name alone (which he included among 'other intangibles—Sealy tradename, etc.' at a value of $102 million) ... might be worth $100–$300 million." That amount was in addition to the "net assets" figure of $54,187,000 at which Ohio–Sealy carried its investment in Sealy, Inc.

As a result of Ohio–Sealy's acquiring the licensees in late 1986, only two minority stockholders of Sealy remained —the plaintiffs **\*1330** (the New Jersey–Sealy group) and Michigan–Sealy, which held a $45 million antitrust judgment against Sealy. Michigan–Sealy's status as a judgment creditor placed it in a position of conflict with, and of adversity to, its erstwhile ally, Ohio–Sealy, because Ohio–Sealy now owned 82% of the judgment debtor (Sealy). Because of its interest in eliminating Michigan–Sealy as a judgment creditor, Ohio–Sealy had a strong incentive to acquire Michigan–Sealy's assets, including its $45 million judgment. Accordingly, since at least November, 1986, Ohio–Sealy had been exploring ways in which it might acquire Michigan–Sealy and thereby eliminate it from the picture.

The merger became the defendants' chosen method of bringing Michigan–Sealy (and, it was hoped, New Jersey–Sealy) to terms. In a letter written by Mr. Brace to Ronald E. Trzcinski, President of Ohio Mattress, on January 6, 1987, Mr. Brace advised:

I enclose a bare-bones communication reflecting what I think Sealy's new board should do fairly soon. Also, I think they should initiate a merger at the same time. That will put Michigan in the position of simultaneously evaluating its inconsistent positions as both a shareholder and judgment creditor of Sealy.

After summarizing his negotiation with Michigan–Sealy's representative over the issue of price, Mr. Brace concluded thusly:

Whatever else we do, we should buy Michigan's $45 million judgment against Sealy, rather than have Sealy satisfy it for a lesser amount. That will increase our advantage vis a vis Paterson [New Jersey–Sealy].

It was in that adversarial posture that the stage was set for the proposed merger that is the focus of this litigation.

On January 21, 1987, Sealy's directors held a meeting by telephone to approve the merger. The meeting lasted between fifteen minutes and one-half hour. Sherry Treston, Esquire, an attorney with a Chicago firm that acts as corporate counsel to Ohio Mattress, also participated.

Before the meeting the directors had received nothing but a copy of the resolutions, which included the proposal for the merger that they later approved *verbatim.* During the meeting the directors had no materials available to them, including financial information, other than the proposed resolutions. The $178.46 per share merger price was presented to the directors by Ms. Treston as a *fait accompli,* with no explanation other than that book value was the number that Ohio–Sealy had used in all of its negotiations to acquire the licensees' Sealy stock. That price was accepted with no deliberation as to its basis or adequacy, and no other price was discussed. No determination was made that the $178.46 price was fair or what a fair price would be, no investment banker or other financial expert was hired or consulted for any purpose, and no consideration was given to

appointing a special committee of disinterested persons to review independently the merger price or to represent the minority shareholders.

The Board neither had, nor did it request, any documentation to support the adequacy of the merger price. Nor was the Board made aware of the Salomon Brothers July, 1986 valuation of Sealy ($140–$160 million), the Shearson Lehman Brothers, Inc. offer for Sealy (approximately $150 million), the Haas/Pritzker offer in the fall of 1986 ($152.5 million), or the study by Morgan, Lewis, Githens & Ahn in October, 1986. Mr. Smudz did not share with his fellow directors his knowledge of that information or his opinion that the value of the Sealy name alone was possibly as high as $300 million.

A critical factor in any assessment of the fairness of the merger price was the value of the antitrust judgments. (*See* fn. 8, *supra* ) That issue was never addressed. There is evidence that the value of the judgments was less than the $122 million gross amount of the verdicts. Mr. Brace had earlier opined to Mr. Trzcinski that Michigan–Sealy's $45 million judgment was probably worth only $20 million, a valuation later borne out by Ohio–Sealy's subsequent acquisition of Michigan–Sealy. Mr. Brace had also opined to his client that as a **\*1331** result of Ohio–Sealy's acquisition of the licensees, "it could be argued that our [antitrust] judgments have been satisfied at least to the extent of $50 million and possibly to the extent of the full $77 million." The Board did not consult Sealy's (or Ohio–Sealy's) attorneys in the antitrust case to assess the risk that the antitrust judgments might be reversed or reduced, or otherwise to determine how those judgments might be objectively valued.

In sum, the Sealy Board, in approving the merger, acted solely as conduits to implement the will of their employers, Ohio–Sealy and Ohio Mattress. The 15 to 30 minute meeting had six important agenda items of which the merger was but one. [9] The agenda had been established by Ohio–Sealy's antitrust lawyer, Mr. Brace.

[9]    The other agenda items were: increasing Sealy's royalties to the maximum level, eliminating exclusive manufacturing territories provided in the Sealy License Agreement, authorizing discussions concerning the sale of the Des Moines plant, authorizing negotiations to end certain antitrust

litigation in Canada, and making Canada available for competition by all Sealy licensees.

One week later, the defendants mailed an Information Statement to the plaintiffs and to Michigan–Sealy, announcing the proposed merger, and noticing a special stockholders meeting for February 24, 1987, to approve the merger. The Information Statement contained only skeletal information, *viz.,* a description of the terms of the merger, including the $178.46 per share price, and statutory appraisal rights. The only financial data supplied in the Information Statement consisted of one-half page chart showing Sealy's revenue, net income, and dividend-per-share information for 1984 and 1985 and for the nine months ended September 30, 1986. Other than that, the only value pertaining to Sealy that was described in the Information Statement was book value. The Information Statement promised that the 1986 financial statements would be furnished on February 20, 1987, four days before the meeting. It further disclosed that the approval of the merger was assured, since Ohio–Sealy intended to vote in favor of it.

After receiving the Information Statement, plaintiff Walter Hertz, on behalf of the other plaintiffs, retained counsel (Skadden, Arps, Slate, Meagher & Flom) in early February, 1987. Shortly thereafter, this action was filed derivatively on behalf of Sealy and individually on behalf of the minority stockholders other than Michigan–Sealy. In their complaint the plaintiffs alleged that the merger price was unfair, that material facts had been misrepresented in the Information Statement, and that the merger terms had not been adequately considered by Sealy's Board. As previously noted, the defendants responded by postponing the stockholders meeting. They then deferred the merger until further notice.

By way of hindsight, it is apparent that Ohio–Sealy's objective in postponing the merger was to enable it to complete its acquisition of Michigan–Sealy, with which it had been negotiating since the fall of 1986, and to wage its dispute with plaintiffs in a forum of its own choosing. On February 19, 1987, Ohio–Sealy and Michigan–Sealy reached an agreement in principle for Michigan–Sealy to sell its ($45 million) judgment, its business, and its Sealy stock [10] to Ohio–Sealy for a total price of $45 million. That agreement was reduced to a written contract dated March 26, 1987. As part of the acquisition, Ohio–Sealy originally offered, and Michigan–Sealy agreed, to have Sealy pay $25 million

for the antitrust judgment. Ohio–Sealy then changed its mind and advised A. Bart Lewis, Michigan–Sealy's former president, that it had decided to allocate $35 million to the judgment in order to achieve tax benefits for itself. Thus, the portion of the total purchase price that was allocated (and that was to be paid by Sealy) for Michigan–Sealy's judgment was increased by almost $10 million dollars, and the amount allocated to Michigan–Sealy's business was correspondingly **\*1332** reduced. [11] The effect of the unilaterally increased allocation (consistent with Mr. Brace's earlier advice to "buy Michigan's $45 million judgment against Sealy rather than have Sealy satisfy it for a lesser amount" in order to "increase our advantage vis a vis [New Jersey–Sealy]") was to increase Sealy's liability to Ohio–Sealy—and thereby to decrease Sealy's asset value —by $10 million dollars. [12]

[10]    The price for the Sealy stock owned by Michigan–Sealy was to be determined by an appraiser agreed to by the parties or by an appraisal pursuant to 8 *Del.C.* § 262.

[11]    The amount allocated to Michigan–Sealy's business was reduced by $5.5 million, not by the full $10 million that had been shifted from the business to the judgment, because Ohio–Sealy added nearly $4 million to the total package to offset adverse tax consequences to Mr. Lewis that would have resulted from the inflated price paid for the judgment.

[12]    These facts were not disclosed in the Information Statements and were not uncovered until plaintiffs took Mr. Lewis' deposition during discovery.

The Michigan–Sealy purchase was consummated in early April, 1987. Having thus eliminated Michigan–Sealy from the scene, Ohio Mattress was then able to concentrate its fire upon New Jersey–Sealy, the corporation's only remaining minority stockholder. On April 10, 1987, Ohio Sealy and Sealy filed two lawsuits against New Jersey–Sealy in the United States District Court in Chicago, Illinois. In one of those actions (*Sealy, Incorporated, et al. v. Sealy Mattress Company of New Jersey*, No. 87–C–1477), [13] Ohio–Sealy alleged that New Jersey–Sealy's filing of this Chancery action constituted a violation of the federal antitrust laws, an abuse of process, and malicious prosecution, for which Ohio–Sealy claimed $2 million in compensatory damages, plus punitive damages. [14] Ohio–Sealy also initiated intensive discovery, noticing and taking eleven *seriatim* sets of depositions in this and the

Chicago federal action. Plaintiffs claim that these tactics, among others, were part of Ohio–Sealy's broader strategy to use litigation as a weapon to beat them into submission and to force them to sell their business and Sealy stock on unfavorable terms.

13 The second federal action was dismissed in June, 1987 on the motion of New Jersey–Sealy.

14 In their federal complaint, Sealy and Ohio–Sealy made allegations in which they admitted that the book value of Sealy stock was less than its going concern value. Paragraph 29 of the Ohio–Sealy's federal complaint alleges:

> 29. At no relevant time was it defendant's [New Jersey–Sealy] primary purpose or motive to obtain an adjudication from the Delaware Court on their request for a permanent injunction against Sealy, Inc.'s proposed cash-out merger. On the contrary, defendant does not want to retain *its Sealy, Inc., stock,* which pays no dividends and *can only be sold for book value, which is less than its actual going-concern value.* Defendant concedes that the Delaware Chancery Court cannot grant relief with respect to the other matters complained of in its Delaware suit, such as raising royalties, trying to end the Chicago antitrust litigation, and eliminating the exclusive manufacturing territories. (Emphasis added).

If that was Ohio–Sealy's objective, it did not succeed. Plaintiffs vigorously defended the Chicago actions and pressed their motion in this Court for attorneys' fees. In response, the defendants announced that they would revive the proposed merger that had been shelved since March, 1987, and for that purpose the defendants later noticed for a special stockholders' meeting for July 21, 1987.

The defendants also issued a Supplemental Information Statement, which consisted largely of (i) *verbatim* quotations from the "disclosure" allegations of the plaintiffs' own complaint, (ii) argumentative assertions that the Salomon Brothers valuation "did not assess any value to ongoing or pending litigation" and that the Haas/Pritzker offer required that $135 million of the offering price be escrowed for payment of the judgment and expenses, (iii) selective information about the terms of the Michigan–Sealy acquisition, and (iv) certain other matters.[15]

15 Those other matters included the following disclosure:

> "In connection with appraisals performed after the acquisitions by Ohio–Sealy Mattress Manufacturing Co. of the seven Sealy licensees, an appraisal performed by Marshall and Stevens Incorporated valued the Corporation at $117.5 million, plus or minus 20%, without assessing any value to on-going or pending litigation."

> A copy of the Marshall, and Stevens report, the existence of which had never been disclosed, was made available to plaintiffs' counsel, only a few days before the oral argument on the injunction motion.

**\*1333** However, the Supplemental Statement, like its predecessor, disclosed no information as to the process by which the book value merger price was arrived at, the directors' assessment of the value of the antitrust judgments (including the fact that $35 million had been allocated to the Michigan–Sealy judgment), or other pertinent financial information that would enable plaintiffs to assess the fairness of the merger price.

This renewed motion for a preliminary injunction followed.

## II. *The Law*

The standards governing a motion for preliminary injunctive relief are well established. The plaintiffs must demonstrate a reasonable probability that they will succeed on the merits of their claims, that they will suffer imminent irreparable harm if preliminary injunctive relief is denied, and that the harm to the plaintiffs if relief is denied outweighs the harm to the defendants if relief is granted. *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* Del.Supr., 506 A.2d 173, 179 (1986); *Gimbel v. Signal Companies,* Del.Ch., 316 A.2d 599, 602–03, *aff'd,* Del.Supr., 316 A.2d 619 (1974); *Shields v. Shields,* Del.Ch., 498 A.2d 161 (1985).

[1] It is undisputed that Sealy's parent corporation, and its directors who are employees of and are controlled by Sealy's majority stockholder, stood on both sides of the proposed merger and fixed its terms. Under those circumstances the defendants have the burden of establishing the entire fairness of the merger, *i.e.,* the "most scrupulous inherent fairness of the bargain," sufficient to pass the test of careful scrutiny by the courts. *Weinberger v. UOP, Inc.,* Del.Supr., 457 A.2d 701, 710 (1983); *Gottlieb v. Heyden Chemical Corp.,* Del.Supr., 91 A.2d 57, 58 (1952); *Sterling v. Mayflower Hotel Corp.,* Del.Supr., 93 A.2d 107, 110 (1952).

[2] [3] The concept of entire fairness is not restricted to matters of valuation alone. Fairness embraces "fair dealing" as well as "fair price." *Weinberger,* 457 A.2d at 711. Fair dealing includes fairness as to "when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained." *Id.* Thus, a determination of whether the plaintiffs have shown a likelihood of success on the merits necessarily involves an assessment, based upon the present record, of whether the defendants will be able to carry their ultimate burden of persuading the Court that the transaction is entirely fair in the dual sense of fair dealing and fair price. *Cf. David J. Greene & Co. v. Dunhill International, Inc.,* Del.Ch., 249 A.2d 427, 431 (1968). It is from that standpoint that the plaintiffs' motion is evaluated.

The plaintiffs' probability of success on the merits is treated in Part III, *infra,* of this Opinion. The issue of irreparable harm is addressed in Part IV, *infra.* [16]

[16] The third factor, the "balance of hardships," requires no extended discussion, because the defendants' "balance of hardships" argument—that no injunctive relief is available to plaintiffs as a matter of law because of the availability of a damages or appraisal remedy—goes to the issue of irreparable harm and is thus more appropriately addressed in that portion of the Opinion. Moreover, it is clear from the record that any harm that the defendants might suffer from a preliminary injunction would be *de minimis.* The defendants have not shown, nor do they claim, any reason why the effectuation of the merger should be viewed as a matter of particular urgency. When confronted with plaintiffs' injunction motion, the defendants postponed the merger indefinitely,

electing instead to do battle with the plaintiffs in their newly-filed federal court litigation in Chicago. Only after plaintiffs insisted upon pressing their motion for attorneys' fees (predicated upon the argument that the plaintiffs' litigative efforts caused the defendants to abandon the merger, thereby creating a compensable corporate benefit) did the defendants elect to revive their merger proposal. The inescapable inference from the record is that if the plaintiffs had not pressed their attorneys' fee motion, the merger would have continued in its state of dormancy while the defendants responded to plaintiffs' charges against them—not as defendants in this lawsuit but as plaintiffs in their chosen Chicago forum.

### III. *Probability of Success*

#### A. *Fair Price*

Although the plaintiffs focus primarily upon the element of fair dealing, fairness **\*1334** of price is an element of their case as well. Moreover, price considerations form much of the essential background for the analysis of the fair dealing issues. Accordingly, the matter of fair price is first addressed. Under that heading the question becomes whether, based on the present record, the defendants will probably succeed in carrying their burden of proving that the book value merger price of $178.46 per share is entirely fair. The answer, in my opinion, is clearly no.

[4] The critical fact relating to fair price is that the present record does not disclose what Sealy's present fair value or price might be. No one, including Sealy's directors, has attempted to make that determination. What the record does show is substantial (and disturbing) evidence that Sealy's fair value is significantly higher than the $58 million dollar book value price being offered in the merger.

The defendants seek to justify the book value figure on the basis of the December, 1986 Memorandum of Understanding, in which Ohio–Sealy and Sealy's former directors agreed that any offer by Ohio–Sealy to acquire Sealy would be for not less than $178.46 per share. Defendants claim that the Memorandum represents a good faith business judgment by Sealy's prior independent directors that book value is a fair price for Sealy. For that purpose the defendants also rely upon the fact that in the various licensee acquisitions which occurred in late

1986 (transactions which, the defendants assert, were the subject of hard arm's length bargaining), the licensees were willing to accept book value as the price for their Sealy stock.

The record fails to support either contention. As previously indicated, Sealy's former directors never determined that $178.46 per share was a fair price. One former director testified that the former board "had no idea what a reasonable and fair price would be, because this price ... was not ... arrived at with arm's length bargaining...." And while the licensee acquisitions might have involved arm's length bargaining, the bargaining focused upon the *overall* price for the licensees' businesses, not upon the Sealy stock that was but one of a multitude of assets being acquired. At Ohio–Sealy's insistence the parties agreed that book value would be the price allocated to the Sealy stock component. The testimony of the licensees (including Michigan–Sealy) fairly indicates that they believed that Sealy's stock, standing alone, was worth substantially more than book value, but were willing to accept book value because the overall purchase price was acceptable. One licensee testified that the Sealy stock was "worth a hell of a lot more than $58 million" but that the licensees were persuaded to accept book value because they would receive "inflated" prices for their bedding businesses and an enhanced price above book value for the Sealy stock if the closing on the stock purchase took place during 1987. [17]

[17]    Mr. Haas' sale of his Sealy stock at book value is similarly unreliable as evidence of the fair value of his Sealy stock. Haas feared that if he objected to Ohio–Sealy's proposal to pay him book value for his Sealy stock, Ohio–Sealy would terminate his more valuable severance agreement. Accordingly, Mr. Haas decided "to get out and take the money and run."

That latter point warrants elaboration. During discovery the plaintiffs learned that the book value price that was to be paid to the licensees for their Sealy stock—the price which the defendants now assert as justification for the merger price—was higher than what the defendants now propose to pay in the merger. The consideration the licensees were to receive for their Sealy stock was based on a book value of $65 million—$7 million more than the $58 million book value being used as the basis for the merger price. That higher amount was offered to any licensees whose Sealy stock was acquired in 1987. In this merger the plaintiffs are being forced to surrender their stock in

1987. Yet the merger consideration is based on a price $7 million lower than what the defendants were willing to pay to those licensees. That price differential, if offered to the plaintiffs, would represent an additional $427,000 for plaintiffs' 6.1% stock interest.

The defendants' own internal documents and in-court representations are further evidence **\*1335** that book value does not represent a fair price for the Sealy stock. The minutes of Ohio Mattress' January 10, 1987 board meeting reflect Mr. Wuliger's statement that:

> "... in his view, the recent $77 million judgment by the Company [Ohio–Sealy] made possible both the significantly favorable price paid for the [licensees'] Sealy, Incorporated stock...."

And in their federal complaint filed in Chicago in April of this year, Ohio–Sealy and Sealy judicially admitted that Sealy's book value is "less than its actual going concern value."

Finally, there are the valuations of Sealy by Salomon Brothers at $140–$160 million, the Shearson offer to acquire Sealy for approximately $150 million, the Haas/Pritzker offer to acquire Sealy for $152.5 million, and Mr. Smudz' opinion that the Sealy name alone might be worth as much as $300 million. These offers and valuations were for prices averaging two and one half times Sealy's book value. To arrive at a fair value, an appropriate adjustment would have to be made for the value of the Michigan–Sealy and Ohio–Sealy judgments, as determined in some objective manner. However, defendants have made no effort to adduce evidence of what those judgments are objectively worth. Of the $122 million face amount of the judgments, $45 million consisted of the Michigan–Sealy judgment which both Ohio and Michigan–Sealy agreed was worth $25 million. [18] And defendants have not shown that the Ohio–Sealy judgment is objectively worth its $77 million face amount. On the contrary, there is evidence that Ohio–Sealy's judgment, objectively valued, may be worth considerably less, and the defendants have adduced no evidence that shows otherwise. Moreover, by their actions defendants have made highly difficult any objective evaluation of Ohio–Sealy's antitrust judgment, because they have not permitted Sealy to pursue post-trial review of those judgments and have allowed both judgments to remain unsatisfied in their full amount.

Sealy Mattress Co. of New Jersey, Inc. v. Sealy, Inc., 532 A.2d 1324 (1987)

**18**      The unilateral allocation by Ohio–Sealy of the additional $10 million to that judgment will be disregarded for present valuation purposes.

Accordingly, I find that the plaintiffs will probably succeed in establishing at a final hearing that $178.46 per share is not a fair price for their Sealy shares.

### B. *Fair Dealing*

**[5]**    Under this heading the second question becomes whether, based upon the present record, the defendants will probably succeed in carrying their burden of proving that they, in their capacity as fiduciaries, dealt fairly with the plaintiffs in seeking to accomplish this particular merger. Again this answer must clearly be no.

**[6]**    As fiduciaries seeking to "cash out" the minority stockholders of a Delaware corporation in a non-arm's length merger, the defendants had a duty to be entirely and scrupulously fair to the plaintiffs in all respects. *Weinberger v. UOP, Inc.,* 457 A.2d at 710. The majority stockholder was obliged not to time or structure the transaction, or to manipulate the corporation's values, so as to permit or facilitate the forced elimination of the minority stockholders at an unfair price. The corporation's directors were obliged to make an informed, deliberate judgment, in good faith, that the merger terms, including the price, was fair and that the merger would not become a vehicle for economic oppression. And finally, the directors (and the majority stockholder, to the extent that it involved itself in such matters) were obliged to disclose with entire candor all material facts concerning the merger, so that the minority stockholders would be able to make an informed decision as to whether to accept the merger price or to seek judicial remedies such as appraisal, an injunction, or a post-merger damage action.

None of these fiduciary obligations were satisfied in this instance. Indeed, if one were setting out to write a textbook study on how one might violate as many fiduciary precepts as possible in the course of a single merger transaction, this case would be a good model.

**\*1336**   1. *Timing and Structure*

The concept of fair dealing, as defined in *Weinberger v. UOP, Inc.,* 457 A.2d at 711, embraces the notion of fairness as to the timing and structure of the challenged transaction. Here the merger was timed and structured in a way that had the foreseeable effect, if not the intent, of producing an unfair result.

**[7]**    First, the corporate defendants timed the merger to occur at a time when valuation of Sealy was difficult, if not impossible, because of defendants' refusal to permit post-trial review of the antitrust judgments. Moreover, the corporate defendants used those judgments, and took other steps as well, to manipulate Sealy's values for their benefit and to the plaintiffs' detriment. Rather than satisfy the Michigan–Sealy judgment at its fairly-determined value, Ohio–Sealy purchased that judgment and caused Sealy to overpay for it by $10 million dollars. The record evidence indicates that that was done deliberately. **19**

**19**      The defendants contend that their decision not to permit review of the antitrust judgments, if found to constitute unfair dealing, would be tantamount to a ruling that a merger can never occur while material litigation remains unresolved. That contention misses the point. The relevant principle is that the defendants, as fiduciaries, cannot cause the litigation to remain unresolved and then take advantage of that nonresolution for their own benefit and to the minority stockholders' detriment. The defendants had a duty to determine objectively the value of the antitrust judgments. That might be done in many ways, including (i) having the litigation resolved judicially by post-judgment review, (ii) appointing an independent committee to negotiate a settlement, or (iii) retaining independent financial and legal advice to assist the directors in a good faith determination of the value of the judgment. None of those steps was taken.

There is other evidence that values were manipulated to the minority's detriment. Defendants' corporate counsel wrote on his copy of Mr. Brace's January 6, 1987 letter the following comment: "to the extent these actions increase the value of Sealy, they should be deferred." The "actions" being referred to included the acquisition of Michigan–Sealy's antitrust judgment and business. Mr. Brace's letter, upon which the foregoing advice was noted, was written only two weeks before the directors meeting at which the merger was approved.

All of the foregoing evidence, not rebutted by defendants, suggests a calculated effort to depress the price of Sealy until the minority stockholders were eliminated by merger or some other form of acquisition. Such behavior by a majority stockholder constitutes unfair dealing. *See Roizen v. Multivest, Inc.,* Del.Ch., C.A. No. 6535, Brown, V.C. (September 25, 1981); *Jedwab v. MGM Grand Hotels, Inc.,* Del.Ch., 509 A.2d 584, 599 (1986) ( "prototype instance" of majority stockholders breach of duty involves timing of merger with resulting financial injury to minority and with commensurate gain to controlling stockholder); *Rabkin v. Philip A. Hunt Chemical Corp.,* Del.Supr., 498 A.2d 1099, 1107 (1985) (claim that merger timed so as to avoid contractual duty held to state a claim of breach of duty of fair dealing).

**[8]**  A second indicium of fair dealing, or its absence, is whether the process by which the merger terms were arrived at involved procedural protections that would have tended to assure a fair result. For example, in *Rosenblatt v. Getty Oil Co.,* Del.Supr., 493 A.2d 929 (1985) the Supreme Court held that the majority stockholder had dealt fairly with the minority in proposing a cash-out merger, where the transaction had been negotiated by an independent committee representing the minority, an investment banking firm had been retained to advise the committee, and the merger required approval by a majority of the minority stockholders. By the same token, in *Jedwab v. MGM Grand Hotels, Inc.,* 509 A.2d at 599, this Court observed that the absence of a minority stockholder "veto" and of an independent board committee to negotiate on behalf of the minority, are "pertinent factors" in assessing whether fairness was accorded to the minority.

Here the majority stockholder, Ohio–Sealy, unilaterally determined the merger price without putting into place any procedural protections, such as those described above, that would have tended to assure a **\*1337** fair substantive result. No independent directors were put on the Sealy board, no steps were taken to appoint independent representatives to negotiate on behalf of the minority, and no independent investment banker or other financial expert or legal counsel was retained to represent the minority interests. In short, the minority stockholders were were left exposed to the discretion of a majority stockholder whose interests were in direct conflict with theirs and whose approach to these matters was, and has continued to be, unremittingly hostile. The absence

of these procedural safeguards, while not actionable of themselves, is highly persuasive evidence that the merger terms were the product of unfair dealing.

### 2. *Uninformed Board Approval of the Merger*

Before making a business decision, the directors of a corporation, in discharging their duty of care, must inform themselves of all available material information. *Smith v. Van Gorkom,* Del.Supr., 488 A.2d 858, 872–873 (1985). In the case of a merger under 8 *Del.C.* § 251(b), that duty is a statutory as well as a common law obligation. Indeed, the Supreme Court has indicated that a merger that has not been the subject of a properly informed director judgment may not be submitted to shareholders. That Court said in *Smith v. Van Gorkom,* 488 A.2d at 873:

> In the specific context of a proposed merger of domestic corporations, a director has a duty under 8 *Del.C.* § 251(b), along with his fellow directors, to act in an informed and deliberate manner in determining whether to approve an agreement of merger before submitting the proposal to the stockholders. Certainly in the merger context, a director may not abdicate that duty by leaving to the shareholders alone the decision to approve or disapprove the agreement. Only an agreement of merger satisfying the requirements of 8 *Del.C.* § 251(b) may be submitted to the shareholders under § 251(c). (Citations omitted).

**[9]**  In this case it is undisputed that Sealy's directors, in approving the merger, were completely uninformed and made no effort to inform themselves of the material facts. Indeed, the defendants concede in their brief that the directors were not independent and that they "[functioned] in a ministerial capacity to carry out the parent [corporation's] bidding...." Ohio–Sealy's attorney told the Sealy directors that the $178.46 book value price was what Ohio–Sealy intended to pay. Sealy's directors, all of whom were employees of, and beholden to, Ohio–Sealy or Ohio Mattress, uncritically accepted that price.

They did so (to reiterate) without making any effort to determine whether the price was fair, without considering facts that would bear materially on that issue (including the Shearson and Pritzker offers, the Salomon evaluation, Mr. Smudz's opinion as to the value of the Sealy name, or the value of the antitrust judgments), and without independent expert financial or legal advice.

Given these circumstances, one might appropriately debate the legal characterization that most appropriately describes the conduct of the Sealy directors and of the majority stockholder to whom those directors apparently felt they owed their exclusive loyalty. For this purpose it is enough to say that the manner in which this merger was considered and blessed amounted to a fundamental breach of the directors' duty of care and violated 8 *Del. C.* § 251(b) as that statute has been interpreted in *Smith v. Van Gorkom.*

The defendants argue that even though the Sealy directors were not personally informed of the facts, they did not have to be, because they were entitled to rely upon the judgment of Ohio–Sealy, whose directors were properly informed. That position is incorrect as a matter of law and fact, and runs counter to fundamental principles of law applicable to fiduciaries of Delaware corporations.

As key employees of Ohio–Sealy and Ohio Mattress, the individual defendants were entitled, indeed obliged, to demonstrate their loyalty to their employer whose directions they were bound to follow. But **\*1338** once having assumed the position of directors of Sealy, Inc., a corporation that had stockholders other than Ohio–Sealy, those defendants became fiduciaries for the minority shareholders, with a concomitant affirmative duty to protect the interests of the minority, as well as the majority, stockholders. The fiduciary obligation they assumed was not unlike that of persons holding dual directorships in both a parent and subsidiary corporation. As to such persons, the Supreme Court admonished in *Weinberger v. UOP, Inc.,* 457 A.2d at 710–711:

> There is no dilution of this obligation where one holds dual or multiple directorships, as in a parent-subsidiary context. *Levien v. Sinclair Oil Corp.,* Del.Ch. 261 A.2d 911, 915 (1969). Thus, individuals who act in a dual capacity as directors of two corporations, one of whom is parent and the other

subsidiary, owe the same duty of good management to both corporations, and in the absence of an independent negotiating structure ... or the directors' total abstention from any participation in the matter, this duty is to be exercised in light of what is best for both companies. *Warshaw v. Calhoun,* Del.Supr., 221 A.2d 487, 492 (1966).

And again in *Smith v. Van Gorkom,* 488 A.2d at 872, the Supreme Court said:

> But fulfillment of the fiduciary function requires more than the mere absence of bad faith or fraud. Representation of the financial interests of others imposes on a director an affirmative duty to protect those interests and to proceed with a critical eye in assessing information of the type and under the circumstances present here.

*See also Valente v. Pepsico, Inc.,* 68 F.R.D. 361, 364 (D.Del.1975).

 **[10]** Thus, the Sealy board, in carrying out its affirmative duty to protect the interests of the minority, could not abdicate its obligation to make an informed decision on the fairness of the merger by simply deferring to the judgment of the controlling stockholder, particularly where, as here, the majority stockholder's interests were in unalloyed conflict with the minority. Just as there is no "safe harbor" for directors with divided loyalties, *Weinberger v. UOP, Inc.,* 457 A.2d at 710, Sealy's directors cannot erect those divided loyalties as a defense so as to excuse abdicating their fiduciary responsibility to the minority stockholders. [20]

[20]  Even if the Sealy directors were entitled to rely upon the judgment of Ohio–Sealy as to the fairness of the merger terms (which they were not), such reliance would be of no help to them, because Ohio–Sealy's Board of Directors did not, insofar as the record discloses, purport to consider the fairness of the merger from the point of view of

the minority. The Board considered the merger price only from its self-interested perspective, which was directly adverse to the minority's interests. The record is less than clear as to what materials the Ohio–Sealy Board actually did consider, but the Board did not attempt to obtain an objective valuation of Sealy's going concern value, taking into account the antitrust judgments as fairly valued. It appears that the materials concerning Sealy's value that the Ohio–Sealy Board did review were related to their decision to approve the acquisition of four licensees (and their Sealy stock) as a package for $161 million dollars.

### 3. *Disclosure of Material Facts Pertaining to the Merger*

**[11]** A third factor evidencing the presence or absence of fair dealing is whether the defendant fiduciaries disclosed to the minority stockholders all material facts pertaining to the merger. That the defendants had a fiduciary obligation to disclose all material facts in an atmosphere of complete candor is unquestioned. *Rosenblatt v. Getty Oil Co., supra,* 493 A.2d at 944; *Smith v. Van Gorkom, supra,* 488 A.2d at 890; *Weinberger v. Rio Grande Industries, Inc.,* Del.Ch., 519 A.2d 116, 121 (1986). The fact that the defendants control the outcome of the vote on the merger and seek to force an involuntary acceptance of the merger, "makes this a more compelling case for the application of the recognized disclosure standards." *Wacht v. Continental Hosts, Ltd.,* Del.Ch., C.A. No. 7954, Berger, V.C. (April 11, 1986), at 7 [Available on WESTLAW DE–CS database].

**\*1339** In this case few, if any, of the facts material to an informed investment decision were disclosed, and the facts that were disclosed were, in the main, highly misleading.

The only value discussed in the Information Statement was book value, and the disclosures pertinent to book value were presented in a manner calculated to justify that figure. Those disclosures consisted of the following single paragraph:

> In reaching the above conclusion, the Board of Directors took into consideration that the $178.46 to be paid in the merger is the same price paid after vigorous arm's length negotiations in respect to (i) stock of the Corporation held by licensees of the Corporation acquired by Ohio–Sealy in December 1986 and (ii) stock of the Corporation formerly held by Howard G. Haas and acquired by Ohio–Sealy in December 1986. In addition, the Board of Directors took into consideration the fact that the independent directors of the Corporation, prior to their resignation, entered into a Memorandum of Understanding with Ohio–Sealy to effectuate the smooth transition of ownership in a manner designed by provide for, among other things, continuity in the operation of the business and to protect the minority stockholders of the Corporation and pursuant to which Ohio–Sealy represented that any offer it would make to purchase the remaining outstanding shares of the Corporation that it had not previously committed to purchase would be made for cash in an amount per share of not less than $178.46.

That disclosure was materially false and misleading in several respects. First, it implied that the Board had made an independent, informed judgment that book value was a fair price, whereas in truth the Board's decision was neither independent nor informed. In this context the quality of the Board's decision making process was material, since in a non-arm's length transaction, minority shareholders would normally be entitled (absent any disclosure to the contrary) to assume that the Board was acting to protect their interests. *See Wacht v. Continental Hosts, Ltd., supra,* at 8; *Kahn v. United States Sugar Corp.,* Del.Ch., C.A. No. 7313, Hartnett, V.C. (December 10, 1985) [Available on WESTLAW, DE–CS database].

Second, the particular disclosures relating to book value were misleading. The Information Statement suggested that book value was a price that had been agreed to in prior "vigorous" arm's length negotiations. In fact, these negotiations were for the purchase of the licensees' entire businesses, including the Sealy stock. As previously indicated, the licensees acceded to book value as the allocated value of their Sealy shares, but did so for

reasons totally unrelated to the value of that stock. Mr. Haas agreed to accept book value for his stock only because he did not want to risk Ohio–Sealy terminating his more valuable severance agreement. The description of the Memorandum of Understanding, with its suggestion that Sealy's prior board had determined $178.46 to be a fair price, which also was materially misleading. And entirely omitted from the Information Statement was the fact that the book value amount payable to licensees who sold their Sealy stock in 1987, was higher than the book value amount that was being offered to the minority stockholders who were to be merged out during the same year. [21]

[21] None of these disclosure violations were cured in the Supplemental Information Statement.

Third, the Information Statement and the Supplement contained virtually no information material to any informed judgment on value. Nowhere disclosed were the prior offers or valuations, or the studies of Sealy that occurred during the latter part of 1986, involving values ranging from $140 to $160 million dollars. Nowhere is there any reference to or analysis of the value or effect of the antitrust judgments. And nowhere discussed are the corporation's future prospects, its business plans or **\*1340** projected revenues or income. Moreover, the antitrust judgments were allowed to remain outstanding, even though Michigan–Sealy's $45 million judgment had been satisfied by Sealy's payment of $35 million—$10 million more than the judgment creditor and debtor had agreed it was worth. A false impression was thereby created that the judgments against Sealy remained an outstanding valid liability in the amount of $122 million.

These misdisclosures and nondisclosures were, in these circumstances, highly material and constituted violations of the defendants' duty of candor. *Weinberger v. UOP, Inc., supra,* 457 A.2d at 709; *Joseph v. Shell Oil Co.,* Del.Ch., 482 A.2d 335 (1984); *Lynch v. Vickers Energy Corp.,* Del.Supr., 383 A.2d 278 (1977). So pervasive and so fundamental were those violations that it is difficult to conclude that they were unintentional. The defendants' duty of candor required them to provide the minority stockholders with sufficient information to enable them to make an informed, reasoned investment decision. *Wacht, supra,* at 7; *Weingarden & Stark v. Meehan Oil Co.,* Del.Ch., C.A. Nos. 7291 and 7310, Berger, V.C. (January 2, 1985). Clearly that was not done here.

Much of the foregoing the defendants do not seriously dispute. Their position is that the disclosures in the Information Statements do not constitute a fiduciary violation, because (i) most of the omitted facts were known to the plaintiffs, particularly Walter Hertz, at the time this lawsuit was filed, and (ii) if the plaintiffs did not know the material facts at that time, they know them now as the result of discovery. The first argument is incorrect as a matter of fact; the second is incorrect as a matter of law.

[12] The defendants argue that plaintiff Hertz is knowledgeable of the facts because of his intimate acquaintance with Sealy (he had been a member of the Sealy Board), and because he had extensive contact with the other shareholders. But the record shows that except for Mr. Hertz, the other plaintiffs knew virtually nothing about Sealy's affairs. The record also shows that Mr. Hertz has not been a Sealy director since 1978, and had very limited knowledge of the material facts relating to Sealy's value, particularly the value of the antitrust judgments and Sealy's future business plans, projected earnings, and prospects.

[13] The defendants further argue that the discovery in this case has cured any disclosure deficiencies. If that were the law no disclosure claim could ever succeed, because discovery of the proof of the merit of a disclosure claim would destroy its validity. Moreover, the disclosure burden owed by the fiduciary would be thrust upon the beneficiary to whom the duty is owed. The duty of candor must be discharged by the fiduciary directly to the beneficiary stockholder in the transaction itself, and not by the fiduciary's lawyer to the beneficiary's lawyer in the context of litigation.

For the above reasons, I find that the plaintiffs will probably succeed in establishing at final hearing that the defendants did not deal fairly with the minority stockholders in promulgating the challenged merger.

IV. *Irreparable Harm*

[14] The third and final question is whether if the merger is not preliminary enjoined, the plaintiffs will likely suffer irreparable harm. For the reasons now discussed, I find that they will.

To begin with, the plaintiffs have not received sufficient information to make an informed decision among the available alternatives, *i.e.,* whether to accept the merger price or to elect an appraisal or other judicial remedy. In this case the inability to make that choice constitutes irreparable harm, because once having foregone one remedy, the plaintiffs may be unable to obtain the economic equivalent of the others. In this case, for example, if the plaintiffs seek appraisal and it is later found that the antitrust judgments (objectively valued) reduce Sealy's fair value to less than $178.46 per share, plaintiffs would have lost their right to accept the higher merger price. *See* 8 *Del.C.* § 262(e). If plaintiffs were to accept the merger price and the values were later shown to be **\*1341** higher than the merger price, then the plaintiffs would have lost their right to a fair price through appraisal. The plaintiffs should not be required to make these choices in the informational vacuum into which the defendants have thrust them. *See, e. g., In re Anderson, Clayton Shareholders Litigation,* Del.Ch., 519 A.2d 669, 679 (1986); *Trans World Airlines, Inc. v. Icahn,* 609 F.Supp. 825, 830 (S.D.N.Y.1985). An injunction is the remedy most likely to achieve disclosure of the information necessary to an informed decision. [22]

[22]   Defendants argue that there is an air of unreality to this contention, since it is obvious that the plaintiffs have no intention of accepting the merger price. Plaintiffs point out, however, that appraisal and fraud suits are expensive to prosecute, that plaintiffs have no appetite for the expense and procedural delays of such litigation, and that if after the defendants, in compliance with the law, independently value Sealy and it becomes apparent that the merger price is a fair one, plaintiffs may accept the merger price. But, plaintiffs say, the duty of valuation must be performed by Sealy, and cannot be thrust upon the minority stockholders as the defendants have sought to do here.

Second, the Board has approved a merger that has preliminarily been found to be in violation 8 *Del.C.* § 251(b) and which, as the Supreme Court indicated in *Smith v. Van Gorkom,* may not be submitted to the shareholders under § 251(c). While situations might arise where violations of this character would arguably not warrant an injunctive remedy, in this extreme set of circumstances where (i) the Board has made no informed decision, (ii) the Board is uniquely situated to make determinations concerning Sealy's value, and (iii) the

Board has not disclosed material facts to the minority stockholders, an injunction is clearly the most appropriate remedy to vindicate the statutory mandate of § 251(b) and the policies underlying the fiduciary obligation of full disclosure.

Third, irreparable harm warranting injunctive relief is appropriate in cases where damages would be difficult to assess. *See In re Anderson, Clayton Shareholders' Litigation, supra,* 519 A.2d at 676. *Weinberger v. UOP, Inc.,* Del.Ch. C.A. No. 5642, Brown, (January 30, 1985), *aff'd,* Del.Supr., 497 A.2d 792 (1985) is an example of the difficulty of assessing damages in a parent-subsidiary merger in a trial occurring long after the event. In this case that difficulty is particularly significant, because due to the status of the antitrust judgments, damages may be highly difficult to calculate. Those difficulties are avoided by a grant of preliminary injunctive relief.

I need not decide whether any of these factors, standing alone, would constitute irreparable harm warranting injunctive relief. In this case, the presence of all three factors in combination is clearly sufficient to establish irreparable injury.

[15]   The defendants' response is that no matter how egregious their conduct may be, as a matter of law the plaintiffs are not entitled to an injunction. Defendants argue that under *Weinberger v. UOP, Inc.,* which signaled a return to the "well established principles" of *Stauffer v. Standard Brands, Inc.,* Del.Supr. 187 A.2d 78 (1962), the exclusive remedy available in a parent-subsidiary merger, particularly where (as here) the parent owns over 90% of the subsidiary's stock, is an appraisal or, alternatively, a damage action. In short, defendants appear to be arguing that as a result of *Weinberger* and its progeny, injunctive relief has been judicially eliminated as a remedy in all but the most "extremely unusual" parent-subsidiary merger cases.

To that argument I would respond as follows: To say that this Court has the power to condemn the egregious conduct involved here (as it preliminarily has done), but yet must declare itself powerless to prevent the very harmful transaction that is the object and purpose of that conduct, affronts the very notion of equity and the fiduciary standards that have been articulated time and time again by the Courts of this State. Given the nature of the conduct involved in this case and the harm that

Sealy Mattress Co. of New Jersey, Inc. v. Sealy, Inc., 532 A.2d 1324 (1987)

will likely result from it, only a clear, positive declaration by the Delaware Supreme Court proscribing injunctive relief would cause this Court to stay its hand. The defendants have cited no case which mandates **\*1342** that result. Indeed, in *Rabkin v. Philip A. Hunt Chemical Corp.,* the Supreme Court held that an appraisal is not an exclusive remedy in cases involving a breach of the duty of fair dealing, of which this case is one. It may be arguable that as a result of *Weinberger* and *Rabkin,* injunctive relief may be less appropriate in certain parent-subsidiary merger cases. But neither decision proscribes the injunctive remedy altogether. On the contrary, the Supreme Court noted in *Weinberger,* 457 A.2d at 714, and has repeated in *Rabkin,* 498 A.2d at 1104, that:

> [W]hile a plaintiff's monetary remedy ordinarily should be confined to the more liberalized appraisal proceeding herein established, we do not intend any limitation on the historic powers of the Chancellor to grant such other relief as the facts of a particular case may dictate. The appraisal remedy we approve may not be adequate in certain cases, particularly

where fraud, misrepresentation, self-dealing, deliberate waste of corporate assets, or gross and palpable overreaching are involved. *Cole v. National Cash Credit Association,* Del.Ch., 156 A. 183, 187 (1931).

In this case misrepresentation, self-dealing, and gross and palpable overreaching have been alleged and preliminarily established. Damages, in these circumstances, would not be an adequate remedy. Therefore, I find that injunctive relief is the appropriate remedy and that the plaintiffs are preliminarily entitled to it.

3

For the foregoing reasons the plaintiffs motion for a preliminary injunction is granted. An appropriate form of order will be submitted in conformity with this Opinion.

**All Citations**

532 A.2d 1324

---

End of Document

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

STATE OF INDIANA       )   IN THE HAMILTON COUNTY SUPERIOR COURT
                                  )   SS:
COUNTY OF HAMILTON     )   CAUSE NO. 29C01-1802-CT-001154

|  |  |
|---|---|
| JOSEPH HIPPS, Individually and on Behalf of All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| BIGLARI HOLDINGS, INC., SARDAR BIGLARI, PHILIP L. COOLEY, KENNETH R. COOPER, JAMES P. MASTRIAN, RUTH J. PERSON, NBHSA INC., and BH MERGER COMPANY, | ) ) ) ) ) ) ) |
| Defendants. | ) ) |

## [PROPOSED] ORDER GRANTING PLAINTIFF'S
## MOTION FOR PRELIMINARY INJUNCTION

WHEREAS, Plaintiff filed a Motion for Preliminary Injunction on February 8, 2018 (the "Motion") for an order preliminarily enjoining: (i) an upcoming special meeting of Biglari Holdings Inc. ("Biglari Holdings" or the "Company") shareholders (the "Special Meeting") at which Biglari Holdings shareholders will vote on the proposed recapitalization of the Company (the "Reclassification"); and (ii) the consummation of the Reclassification.

WHEREAS, the Motion has been fully briefed by the parties to the litigation;

WHEREAS, the Court held a hearing on the Motion on _____ ____, 2018;

NOW, this ____ day of _____, 2018, upon consideration of Plaintiff's Motion, the Court finds that:

1.     Plaintiff has demonstrated a reasonable likelihood of success on the merits of his claims;

2.      Plaintiff has demonstrated that, absent injunctive relief, Plaintiff and other shareholders of Biglari Holdings will suffer irreparable harm;

3.      The balance of the equities weighs in favor of granting the preliminary injunction because maintaining the status quo will not significantly harm the interests of defendants Biglari Holdings, Sardar Biglari, Philip L. Cooley, Kenneth R. Cooper, James P. Mastrian, Ruth J. Person, NBHSA Inc. and BH Merger Company (collectively, "Defendants"); and

4.      A preliminary injunction is in the public interest because it will ensure that corporate fiduciaries are bound by their fiduciary obligations, and there are no countervailing factors that would harm the public interest from the injunctive relief sought.

Accordingly, it is hereby ORDERED that:

1.      Plaintiff's motion to preliminarily enjoin the Special Meeting and Reclassification is hereby GRANTED.

2.      Defendants, all persons acting in concert with Defendants, and all persons with actual notice of this Order are hereby ENJOINED from conducting the Special Meeting and Reclassification.

3.      The injunction issued by this Order shall be lifted only upon further order of this Court.

IT IS SO ORDERED this _____ day of _____ 2018.


_____
STEVEN R. NATION, Judge
Hamilton Superior Court No. 1

-2-

Distribution To:

Brad Catlin
PRICE WAICUKAUSKI JOVEN &
CATLIN, LLC
301 Massachusetts Avenue
Indianapolis, IN 46204
bcatlin@price-law.com

Eric L. Zagar
J. Daniel Albert
Justin O. Reliford
Christopher M. Windover
KESSLER TOPAZ MELTZER & CHECK,
LLP
280 King of Prussia Road
Radnor, PA 19087
ezagar@ktmc.com
dalbert@ktmc.com
jreliford@ktmc.com
cwindover@ktmc.com

Peter B. Andrews
Craig J. Springer
ANDREWS & SPRINGER LLC
3801 Kennett Pike
Building C, Suite 305
Wilmington, DE 19807
pandrews@andrewsspringer.com
cspringer@andrewsspringer.com

Jeremy Friedman
Spencer Oster
David Tejtel
FRIEDMAN OSTER & TEJTEL
PLLC
240 East 79th Street, Suite A
New York, NY 10075
jfriedman@fotpllc.com
soster@fotpllc.com
dtejtel@fotpllc.com

Biglari Holdings, Inc.
17802 IH 10 West, Suite 400
San Antonio, TX 78257-2509

Philip L. Cooley
438 Bentley Mnr
Shavano Park, TX 78249-2023

Ruth J. Person
2404 Tamarack Ct.
Ann Arbor, MI 48105-9660

Kenneth R. Cooper
18814 Cierra Sur
San Antonio, TX 78258-4021

James P. Mastrian
210 Bella Colinas Dr
Austin, TX 78738-7631

Sardar Biglari
138 Manchester Way
Shavano Park, TX 78249-2023

# EXHIBIT 7

Filed: 2/8/2018 4:08 PM
Tammy Baitz
Clerk
Hamilton County, Indiana

STATE OF INDIANA      )   IN THE HAMILTON COUNTY SUPERIOR COURT
                                )   SS:
COUNTY OF HAMILTON    )   CAUSE NO. 29C01-1802-CT-001154

JOSEPH HIPPS, Individually and on     )
Behalf of All Others Similarly Situated,    )
                                        )
           Plaintiff,                  )
                                        )
       v.                           )
                                        )
BIGLARI HOLDINGS, INC., SARDAR    )
BIGLARI, PHILIP L. COOLEY,         )
KENNETH R. COOPER, JAMES P.      )
MASTRIAN, RUTH J. PERSON,         )
NBHSA INC., and BH MERGER        )
COMPANY,                            )
                                        )
          Defendants.               )

## PLAINTIFF'S MOTION FOR EXPEDITED PROCEEDINGS

Plaintiff Joseph Hipps ("Plaintiff") respectfully moves this Court, pursuant to Ind. Trial Rules 26, 30, 34, 40, 57 and 65, for an Order: (1) scheduling a hearing on Plaintiff's Motion for Preliminary Injunction, filed on February 8, 2018 (the "P.I. Motion"); (2) permitting Plaintiff to conduct limited discovery on an expedited basis in advance of the hearing on the P.I. Motion and, in connection therewith, ordering Defendants to (a) respond to Plaintiff's First Request for Production of Documents Directed to All Defendants dated February 8, 2018 (the "Document Requests") and substantially complete production of documents in response to the Document Requests within five (5) days of the date of the Order, and (b) produce a privilege and redaction log within seven (7) days of the date of the Order; and (3) directing the parties to meet and confer regarding a proposed schedule governing further proceedings in this matter including, but not limited to, discovery and a briefing schedule in connection with the P.I. Motion.

Plaintiff further requests an expedited hearing on this Motion to take place on February 20, 2018 at 10:00 a.m., a time the Court previously set aside to address a preliminary injunction motion

filed in the action styled *Hipps v. Biglari Holdings, Inc., et al.*, Cause No. 29D01-1801-CT-000760 (the "*Hipps I Action*").  This action was pending before the Court until defendants improperly removed it to federal court in an effort to avoid the Court hearing and ruling upon Plaintiff's preliminary injunction motion.  In connection with and in advance of the requested February 20, 2018 hearing on this Motion, Plaintiff further requests that the Court order (i) Defendants to respond to the Motion by February 15, 2018, and (ii) Plaintiff to file any reply in further support of the Motion by 12:00 p.m. on February 19, 2018.

On January 29, 2018, Plaintiff filed the *Hipps I Action*.  The *Hipps I Action*, like this action, sought to enjoin: (1) the shareholder vote at an upcoming special meeting of Biglari Holdings Inc. shareholders (the "Special Meeting") regarding the reclassification of Biglari Holdings Inc.'s capital structure (the "Reclassification"); and (2) the consummation of the Reclassification.  After initiating the *Hipps I Action*, counsel for Plaintiff met and conferred repeatedly with defense counsel regarding Plaintiff's request to expedite discovery in that matter.   During these conversations, defense counsel stated that the Special Meeting was likely to occur within the next thirty (30) to sixty (60) days and that defendants in the *Hipps I Action* would not agree to expedition.  Plaintiff's counsel then notified defense counsel that, on February 6, 2018, Plaintiff would file a motion seeking expedition, and that Plaintiff's counsel hoped the parties could work out a briefing schedule and hearing date (subject to the Court's approval) in connection with such a motion.

On February 5, 2018, the Court issued an Order scheduling a February 20, 2018 hearing on Plaintiff's motion for preliminary injunction in the *Hipps I Action*.  On February 6, 2018, Plaintiff's counsel sent the Court's February 5, 2018 Order to defense counsel and repeatedly attempted to contact counsel to (1) follow-up on whether the parties could agree to a briefing

schedule for Plaintiff's request for expedition, and (2) seek agreement to convert the February 20, 2018 hearing into a hearing on Plaintiff's motion for expedition.

Defense counsel did not engage with Plaintiff's counsel on these requests. Instead, defendants filed a "Notice of Removal," seeking to remove the *Hipps I Action* to federal court, notwithstanding the clear pronouncement in the Company's by-laws stating that this Court is the sole and exclusive forum for Plaintiff to litigate the *Hipps I Action*. As discussed in greater detail in the accompanying Brief in Support of Plaintiff's Motion for Expedited Proceedings (the "Brief"), the grounds purportedly supporting the Notice of Removal are specious, at best.

Nonetheless, to avoid further delay, on February 7, 2018, Plaintiff filed his Class Action Complaint, re-asserting claims brought in the *Hipps I Action* and adding additional counts for declaratory and injunctive relief against Defendants Biglari Holdings Inc., NBHSA Inc. and BH Merger Company—each of which is a citizen of this state, a signatory to the reclassification agreement at issue in this litigation, and a necessary party in Plaintiff's claims for injunctive relief. Plaintiff has also filed the P.I. Motion, which reiterates Plaintiff's request to preliminarily enjoin the Special Meeting and the Reclassification. Through this Motion, Plaintiff seeks expedition of the proceedings in this matter so that he may conduct limited discovery in advance of any hearing on the P.I. Motion. Plaintiff has not sought to meet and confer further with Defendants on the relief in this Motion, as they have made their opposition to the requested expedition clear.

The grounds for this Motion are more fully set forth in the accompanying Brief.

Dated: February 8, 2018

OF COUNSEL:

**KESSLER TOPAZ MELTER & CHECK, LLP**
Eric L. Zagar
J. Daniel Albert

**PRICE WAICUKAUSKI JOVEN & CATLIN, LLC**

/s/ Brad A. Catlin
Brad A. Catlin
Attorney #21570-29
301 Massachusetts Avenue
Indianapolis, IN 46204

Justin O. Reliford
Christopher M. Windover
280 King of Prussia Road
Radnor, PA 19087
(610) 667-7706

bcatlin@price-law.com
Telephone: (317) 633-8787
Facsimile: (317) 633-8797

*Counsel for Plaintiff*

**FRIEDMAN OSTER & TEJTEL PLLC**
Jeremy Friedman
Spencer Oster
David Tejtel
240 East 79th Street, Suite A
New York, NY 10075
(888) 529-1108

**ANDREWS & SPRINGER LLC**
Peter B. Andrews
Craig J. Springer
3801 Kennett Pike
Building C, Suite 305
Wilmington, DE 19807
(302) 504-4957

*Counsel for Plaintiff*

CERTIFICATE OF SERVICE

I CERTIFY that on this 8th day of February 2018, copies of Plaintiff's Motion for Expedited

Proceedings were served hand-delivery upon the following:

Biglari Holdings Inc.
c/o Corporation Service Company,
Registered Agent
135 N. Pennsylvania St., Suite 1610
Indianapolis, IN 46204

BH Merger Company
c/o Corporation Service Company,
Registered Agent
135 N. Pennsylvania St., Suite 1610
Indianapolis, IN 46204

NBHSA Inc.
c/o Corporation Service Company,
Registered Agent
135 N. Pennsylvania St., Suite 1610
Indianapolis, IN 46204

I CERTIFY that on this 8th day of February 2018, copies Plaintiff's Motion for Expedited

Proceedings were served via UPS, Overnight Delivery upon the following:

Sardar Biglari                      James P. Mastrian
138 Manchester Way                  210 Bella Colinas Dr.
Shavano Park, TX 78249-2023         Austin, TX 78738-7631

Philip L. Cooley                    Ruth J. Person
438 Bentley Mnr.                    2404 Tamarack Ct.
Shavano Park, TX 78249-2023         Ann Arbor, MI 48105-9660

Kenneth R. Cooper
18814 Cierra Sur
San Antonio, TX 78258-4021


                                    /s/ Brad A. Catlin
                                    Brad A. Catlin

Filed: 2/8/2018 4:08 PM
Tammy Baitz
Clerk
Hamilton County, Indiana

STATE OF INDIANA      )    IN THE HAMILTON COUNTY SUPERIOR COURT
                       )    SS:
COUNTY OF HAMILTON    )    CAUSE NO. 29C01-1802-CT-001154

|  |  |
|---|---|
| JOSEPH HIPPS, Individually and on Behalf of All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| BIGLARI HOLDINGS, INC., SARDAR BIGLARI, PHILIP L. COOLEY, KENNETH R. COOPER, JAMES P. MASTRIAN, RUTH J. PERSON, NBHSA INC., and BH MERGER COMPANY, | ) ) ) ) ) ) ) |
| Defendants. | ) ) |

**BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR EXPEDITED PROCEEDINGS**

## <u>TABLE OF CONTENTS</u>

**Page**

I.  INTRODUCTION ................................................................................................ 2

II.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY ........................ 3

    A.  Factual Background ................................................................................. 3

    B.  Procedural History .................................................................................. 7

III.  ARGUMENT ..................................................................................................... 10

    A.  Legal Standards Governing the Motion ................................................ 10

    B.  Plaintiff Is Entitled to Expedited Discovery ........................................ 12

    C.  The Court Should Set February 20, 2018 as the Hearing Date for
        this Motion and Order Expedited Briefing from Defendants ............... 16

IV.  CONCLUSION .................................................................................................. 17

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Amax Coal Co. v. Adams*,
    597 N.E.2d 350 (Ind. Ct. App. 1992)....................................................................10

*Audi of Smithtown, Inc. v. Volkswagen of Am., Inc.*,
    No. 08-CV-1773 (JFB)(AKT), 2009 WL 385541 (E.D.N.Y. Feb. 11, 2009) ...................... 8-9

*Brewer v. Brewer*,
    403 N.E.2d 352 (Ind. Ct. App. 1980).....................................................................11

*Dewing v. Perdicaries*,
    96 U.S. 193 (1877)............................................................................................8

*Edudata Corp. v. Scientific Computs., Inc.*,
    599 F. Supp. 1084 (D. Minn. 1984).............................................................3, 12, 15

*Elmhurst Consulting, LLC v. Gibson*,
    219 F.R.D. 125 (N.D. Ill. 2003).............................................................................9

*Joe Conte Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*,
    Civ. A. No. 93-4281, 1994 WL 67896 (E.D. La. Feb. 17, 1994) ...............................9

*Laboratory Corp. of Am. Holdings v. Cardinal Health Sys., Inc.*,
    No. 5:10-CV-353-D, 2010 WL 3945111 (E.D.N.C. Oct. 6, 2010)...................13-14, 15-16

*Lindsey & Osborne P'ship, L.P. v. Day & Zimmerman, Inc.*,
    No. 08-cv-2301-CM-DJW, 2008 WL 2858786 (D. Kan. July 22, 2008) ....................13, 14

*Meritain Health Inc. v. Express Scripts, Inc.*,
    No. 4:12-CV-266 CEJ, 2012 WL 1320147 (E.D. Mo. Apr. 17, 2012)............................12, 14

*North Atl. Operating Co., Inc. v. Evergreen Distribs., LLC*,
    293 F.R.D. 363 (E.D.N.Y. 2013) ........................................................................14

*Notaro v. Koch*,
    95 F.R.D. 403 (S.D.N.Y. 1982) ..........................................................................12

*Oglala Sioux Tribe v. Van Hunnik*,
    298 F.R.D. 453 (D.S.D. 2014) ......................................................................12, 15

*PowderPak Int'l, LLC v. B.F. Mach., Ltd.*,
    Civil Action File No. 4:16-cv-0026-HLM, 2016 WL 9450407 (N.D. Ga. Mar.
    1, 2016) ........................................................................................................15

*Reeder v. Harper*,
    788 N.E.2d 1236 (Ind. 2003) ...........................................................................11

*Roberts v. Cmty. Hosps. of Indiana, Inc.*,
    897 N.E.2d 458 (Ind. 2008) ............................................................................11

*Semitool, Inc. v. Tokyo Electron Am., Inc.*,
    208 F.R.D. 273 (N.D. Cal. 2002) ...................................................................14

*Smith v. Taulman*,
    20 N.E.3d 555 (Ind. Ct. App. 2014) ...............................................................10

*Stuff v. Simmons*,
    838 N.E.2d 1096 (Ind. Ct. App. 2005), *trans. denied* ..................................11

*Wachovia Sec., L.L.C. v. Stanton*,
    571 F.Supp.2d 1014 (N.D. Iowa 2008) ..........................................................15

**Statutes and Rules**

Ind. Trial Rule 30(A) ............................................................................................10

Ind. Trial Rule 33(C) ............................................................................................10

Ind. Trial Rule 34(B) ....................................................................................... 10-11

Ind. Trial Rule 57 ............................................................................................11, 16

Ind. Trial Rule 65(A)(3) ...................................................................................11, 16

**Other Authorities**

10 Arthur, *Ind. Prac., Procedural Forms With Practice Commentary* § 72.3 (3d
    ed. 2017) ..........................................................................................................10

8A Wright et al., *Federal Practice and Procedure* § 2046.1 (3d ed. 2017) ...................................12

Plaintiff Joseph Hipps ("Plaintiff"), by and through his undersigned counsel, submits this brief in support of his Motion for Expedited Proceedings (the "Motion").  Through this Motion, Plaintiff respectfully moves this Court, pursuant to Indiana Trial Rules 26, 30, 34, 40, 57 and 65, for an Order: (1) scheduling a hearing on Plaintiff's Motion for Preliminary Injunction, filed on February 8, 2018 (the "P.I. Motion"); (2) permitting Plaintiff to conduct limited discovery on an expedited basis in advance of the hearing on the P.I. Motion and, in connection therewith, ordering Defendants[1] to (a) respond to Plaintiff's First Request for Production of Documents Directed to All Defendants, dated February 8, 2018 (the "Document Requests") and substantially complete production of documents in response to the Document Requests within five (5) days of the date of the Order, and (b) produce a privilege and redaction log within seven (7) days of the date of the Order; and (3) directing the parties to meet and confer regarding a proposed schedule governing further proceedings in this matter including, but not limited to, discovery and a briefing schedule in connection with the P.I. Motion.

Plaintiff further requests an expedited hearing on this Motion to take place on February 20, 2018 at 10:00 a.m.  The Court previously set aside this time to address a preliminary injunction motion filed in the action styled *Hipps v. Biglari Holdings, Inc., et al.*, Cause No. 29D01-1801-CT-000760 (the "*Hipps I Action*"), which was pending before the Court until defendants in that case improperly removed it to federal court in an effort to avoid the Court hearing and ruling upon Plaintiff's preliminary injunction motion, as more fully described herein.  Plaintiff further requests

---

[1] As used herein, "Defendants" means defendants Biglari Holdings Inc. ("Biglari Holdings" or the "Company"), NBHSA Inc. ("New BH"), BH Merger Company ("Merger Sub"), Sardar Biglari ("S. Biglari"), Philip L. Cooley ("Cooley"), Kenneth R. Cooper ("Cooper"), James P. Mastrian ("Mastrian"), and Ruth J. Person ("Person"), collectively.

that the Court order (i) Defendants to respond to the Motion by February 15, 2018, and (ii) Plaintiff to file any reply in further support of the Motion by 12:00 p.m. on February 19, 2018.

## I.   **INTRODUCTION**

This shareholder class action challenges, *inter alia*, breaches of fiduciary duty by Biglari Holdings' Chairman, Chief Executive Officer ("CEO") and controlling shareholder, S. Biglari, and by the other members of the Company's board of directors (the "Board") in connection with a proposed change to the Company's capital structure (the "Reclassification"). Through the Reclassification, Biglari Holdings' shareholders will receive for each of their shares of Biglari Holdings common stock (a) one share of non-voting Class B common stock ("Class B Stock") in a new company, New BH, and (b) 1/10th of one share of Class A common stock ("Class A Stock") of New BH. Of these two new classes of stock, only the Class A Stock will afford voting rights to its holders. Further, instead of receiving fractional shares of Class A Stock, Biglari Holdings' shareholders will receive one additional share of Class B Stock for every 1/5th of one share of Class A Stock they otherwise would have received, and will receive cash in lieu of any remaining fractional shares of Class A Stock.

As alleged in detail in Plaintiff's Class Action Complaint (the "Complaint"), S. Biglari and his fellow directors breached their fiduciary duties by approving the Reclassification, which is grossly unfair to the Company's minority shareholders and will cause them irreparable harm. In contrast, the Reclassification will greatly benefit S. Biglari by increasing and cementing his control over the Company, and by effectively immunizing that control and his various related-party arrangements with the Company from challenge by the Company's other shareholders.

Approval of the Reclassification is conditioned on the affirmative vote of a simple majority of all votes entitled to be cast at an upcoming special meeting of shareholders (the "Special Meeting"). However, the Special Meeting—which defense counsel has indicated will likely take

place in the next thirty (30) to sixty (60) days—is nothing but a facade. As Amendment No. 1 to the Form S-4 Registration Statement (the "Amended Proxy")[2] filed by New BH with the SEC on February 5, 2018 states, S. Biglari and the other members of the Board "collectively beneficially own shares representing 53.7% of the votes entitled to be cast at the Special Meeting, and accordingly have the ability to approve the reorganization/recapitalization . . . *without the vote of any other shareholders*." (Emphasis added). Immediately following the Special Meeting, the Company will then consummate and implement the Reclassification.

Because the Reclassification will cause immediate and irreparable harm to the Company's public shareholders, Plaintiff seeks here to expedite discovery and other proceedings in this matter to ensure that the Court can fully evaluate Plaintiff's claims for injunctive and declaratory relief. Courts routinely grant similar requests for expedition where, as here, a more robust factual record will "better enable the court to judge the parties' interests and respective chances for success on the merits" at a preliminary injunction hearing. *Edudata Corp. v. Scientific Computs., Inc.*, 599 F. Supp. 1084, 1088 (D. Minn. 1984). The expedited discovery Plaintiff seeks is reasonable because it is narrowly-tailored to the issues raised by the P.I. Motion and will not unduly prejudice the Defendants. Accordingly, Plaintiff respectfully requests that the Court grant the instant Motion.

## II.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.   Factual Background[3]

Biglari Holdings is a holding company owning subsidiaries engaged in a number of diverse business activities, including media, property and casualty insurance, and restaurants. ¶ 14. S. Biglari is the Company's Chairman, CEO and controlling stockholder. ¶¶ 2, 17, 57-58.

---

[2] The original preliminary Form S-4 Registration Statement (the "Preliminary Proxy," and together with the Amended Proxy, the "Proxy Materials") was filed by New BH with the SEC on December 22, 2017.

[3] All "¶" and "¶¶" citations refer to the numbered paragraphs of the Complaint.

Defendants Cooley, Cooper, Mastrian and Person are members of the Board.  ¶¶ 18-21.  Both Cooley and Cooper have extensive ties to S. Biglari.  ¶¶ 18-19, 70.

At all times relevant hereto, Biglari Holdings has had a single class of publicly traded common stock.  *See generally* ¶¶ 28-36, 69-80.  In 2011 and 2012, S. Biglari tried to effectuate a reclassification of that common stock in which the Company would adopt a dual class (*i.e.*, high-vote, low-vote) capital structure (the "Failed Reclassification Attempt").  ¶¶ 3, 28-36.  S. Biglari—who beneficially owned approximately 15% of the Company's outstanding shares of common stock at the time—was forced to abandon the Failed Reclassification Attempt after failing to garner the necessary shareholder support for his plan.  ¶¶ 4, 30-32, 35-36.

Undeterred, S. Biglari then embarked on a multi-year, multi-pronged effort to obtain majority voting control of Biglari Holdings.  ¶¶ 5, 37-59.  By early 2016, S. Biglari achieved his goal and crossed the 50% ownership threshold.  ¶¶ 5, 55.  Armed with majority voting control, S. Biglari could now unilaterally impose a dual-class capital structure on Biglari Holdings, regardless of the wishes or interests of the Company's public shareholders.  ¶¶ 5, 57.

To this end, on November 5, 2016, S. Biglari again proposed to the Board that the Company implement a dual-class capital structure on terms strikingly similar to those contemplated in the Failed Reclassification Attempt.  ¶¶ 6, 69. The Board delegated authority to evaluate S. Biglari's proposal to the Governance, Compensation and Nominating Committee of the Board (the "GCN Committee"), which consists of Defendants Cooper, Mastrian and Person.  *Id.*  Between November 5, 2016 and December 21, 2017, the GCN Committee met only three times to discuss the reclassification proposal.  ¶¶ 6, 71.  These three meetings purportedly include (1) a November 5, 2016 meeting to discuss the initial proposal of the Reclassification, and (2) a December 21, 2017 meeting to approve the Reclassification.  ¶ 71.  This means that between the initial proposal of the

Reclassification and the GCN Committee's approval of it, the GCN Committee met just once to address the Reclassification. *Id.* Further, the Proxy Materials do not describe any negotiation between the GCN Committee and S. Biglari regarding any of the terms of the Reclassification, suggesting that none occurred. ¶¶ 6, 71 n.6. Moreover, despite the likely financial consequences of the significant change to the Company's capital structure contemplated by the Reclassification, the GCN Committee never engaged a financial advisor to assist in its purported evaluation of the S. Biglari's Reclassification proposal. ¶¶ 6, 72.

On December 21, 2017, after receiving the recommendation of the GCN Committee (which included Cooper) and approval from the full Board (which included S. Biglari, Cooley and Cooper as a majority of its constituents), Biglari Holdings entered into an agreement and plan of merger to reclassify itself as a holding company with a dual-class structure (the "Reclassification Agreement"). ¶¶ 6-7, 73. The Reclassification Agreement is among Defendants Biglari Holdings, New BH and Merger Sub. ¶¶ 7, 74. Pursuant to the Reclassification Agreement, Merger Sub will merge with and into Biglari Holdings, with Biglari Holdings continuing as the surviving corporation and a wholly-owned subsidiary of New BH. *Id.* Upon completion of the merger called for by the Reclassification Agreement, New BH will be named "Biglari Holdings Inc." and will replace the Company as the publicly-held corporation through which the Company's business is conducted. *Id.* New BH will have two classes of common stock: Class A Stock and Class B Stock. ¶¶ 8, 75. Each share of Class B Stock will have economic rights equivalent to $1/5^{th}$ of a share of Class A Stock, but unlike the Class A Stock, will have no voting rights. *Id.*

As a result of the Reclassification and Reclassification Agreement, Biglari Holdings' shareholders will become shareholders of New BH and will receive, for every ten (10) shares of Company common stock they own immediately prior to the effective time of the Reclassification,

(i) ten shares of Class B Stock and (ii) one share of Class A Stock.  ¶¶ 9, 76.  In other words, in connection with the Reclassification, shareholders will receive for each of their shares of Biglari Holdings common stock (i) one share of Class B Stock and (ii) 1/10th of one share of Class A Stock.  *Id.*  The Company will not, however, issue any fractional shares of Class A Stock.  ¶¶ 10, 77.  Rather, where the Reclassification would result in the issuance of fractional shares of Class A Stock, shareholders will receive one additional share of Class B Stock for every 1/5th of one share of Class A Stock they otherwise would have received, and will receive cash in lieu of any remaining fractional shares of Class A Stock.  *Id.*

As a result of the Reclassification, S. Biglari will be able to maintain his voting control in perpetuity, regardless of future issuances of Company stock.  ¶¶ 11, 59, 78-79, 86.  Indeed, the Preliminary Proxy expressly concedes that the purpose of the Reclassification is "[t]o sustain the dual goal of maintaining the founder's [*i.e.*, S. Biglari's] control and of preserving the option of issuing equity in acquisitions, financings or for other purposes."  ¶ 79.  In addition, because the Company will not issue any fractional shares of its new voting stock, the Reclassification will also increase S. Biglari's proportionate voting control over the Company by eliminating an unknown number of voting shares currently in the hands of public shareholders.  ¶¶ 10, 85-86.

The Company has conditioned the adoption and implementation of the Reclassification on the affirmative vote of a mere simple majority of all votes entitled to be cast by the Company's shareholders at the Special Meeting.  ¶¶ 12, 80.  Because S. Biglari has already publicly indicated he intends to vote his majority equity stake in support of the self-interested Reclassification, approval of the Reclassification at the Special Meeting is guaranteed.  *Id.*  Soon after S. Biglari casts his vote at the Special Meeting, the Company will consummate and implement the

Reclassification, forever altering the Company's capital structure and irreparably harming the Company's minority shareholders.  *Id.*

### B.     Procedural History

On January 29, 2018, Plaintiff filed the *Hipps I Action* against Biglari Holdings, S. Biglari, Cooley, Cooper, Mastrian and Person.  Like this action, the *Hipps I Action* sought to enjoin (i) the shareholder vote at the Special Meeting and (ii) the consummation of the Reclassification.  Plaintiff filed the *Hipps I Action* in this Court because the Company's Amended and Restated By-Laws (the "By-Laws") expressly provide that "the Circuit or Superior Courts of Hamilton County of the State of Indiana . . . shall, to the fullest extent permitted by law, be the sole and exclusive forum" for "any action asserting a claim of breach of a fiduciary duty owed by any director, officer, employee, agent or [a]ffiliate of the [Company] to the . . . [Company's] shareholders," or "any action asserting a claim against the [Company] governed by the internal affairs doctrine."[4]

After initiating the *Hipps I Action*, counsel for Plaintiff met and conferred repeatedly with defense counsel regarding Plaintiff's request to expedite discovery in that matter.  During these conversations, defense counsel stated that the Special Meeting was likely to occur within the next thirty (30) to sixty (60) days.  On February 5, 2018, defense counsel further indicated that defendants in the *Hipps I Action* would not agree to expedition.  Plaintiff's counsel notified defense counsel that, on February 6, 2018, Plaintiff would file a motion seeking expedition, and that Plaintiff's counsel hoped the parties could work out a briefing schedule and hearing date (subject to the Court's approval) in connection with such a motion.

---

[4] *See* ¶ 14 n.1; *see also* Art. IX, § 1, Amended and Restated By-Laws of Biglari Holdings Inc. (as amended      through      June      3,      2015),      available      at http://www.biglariholdings.com/governance/ByLaws.pdf (last visited February 8, 2018).

On February 5, 2018, the Court issued an Order scheduling a February 20, 2018 hearing on Plaintiff's motion for preliminary injunction in the *Hipps I Action*.   On February 6, 2018, Plaintiff's counsel sent the Court's February 5, 2018 Order to defense counsel and repeatedly attempted to contact counsel to (1) follow-up on whether the parties could agree to a briefing schedule for Plaintiff's request for expedition, and (2) seek agreement to convert the February 20, 2018 hearing into a hearing on Plaintiff's motion for expedited discovery.

Defense counsel did not engage with Plaintiff's counsel on these requests.   Instead, Defendants filed a "Notice of Removal," seeking to remove the *Hipps I Action* to federal court, notwithstanding the Company's By-Laws' clear pronouncement that this Court is the sole and exclusive forum for Plaintiff to litigate the *Hipps I Action*.   In support of their Notice of Removal, defendants argued that removal was appropriate because Biglari Holdings was not "properly joined and served as a defendant" in the *Hipps I Action* for purposes of 28 U.S.C. § 1441(b)(2).

The grounds supporting the Notice of Removal are specious, at best.   As an initial matter, while no breach of fiduciary duty claims were pled against Biglari Holdings in the *Hipps I Action*, Plaintiff nonetheless named the Company as a defendant because of (i) its participation in the Reclassification Agreement at issue in Plaintiff's claims and (ii) the injunctive relief Plaintiff was seeking.[5]  As Plaintiff properly served the Company on January 30, 2018, Defendants' contention

---

[5] *See Dewing v. Perdicaries*, 96 U.S. 193, 196-97 (1877) (holding that it was appropriate to name a corporation as a party where plaintiff sought to enjoin a corporation from honoring fraudulently transferred shares so that the corporation "might have effectual notice of the litigation, and be bound by the results"); *Audi of Smithtown, Inc. v. Volkswagen of Am., Inc.*, No. 08-CV-1773 (JFB)(AKT), 2009 WL 385541, at *4-5 (E.D.N.Y. Feb. 11, 2009) ("there is no absolute requirement that a party have a separate cause of action against it. . . . Instead, a necessary or indispensable party to a lawsuit, even where no specific cause of action is asserted against it, should be considered for diversity of jurisdiction purposes if it is a real party to the controversy. . . . Because plaintiffs' complaint seeks injunctive relief restraining Audi from administering its incentive programs in connection with its dealer agreement with Atlantic Imports, such relief would certainly inequitably affect Atlantic Imports by precluding Audi from providing certain

that Biglari Holdings was not "properly joined and served as a defendant" is both legally incorrect and factually erroneous.  Second, and perhaps more importantly, the Company's own By-Laws obligates Plaintiff and all other Biglari Holdings shareholders to file actions against the Company and its directors in this Court.  The removal play by defendants in the *Hipps I Action* must be seen for what it is: a strategic attempt to frustrate Plaintiff's request for expedited, injunctive relief and to avoid the prompt hearing date set by the Court.

Nonetheless, to avoid further delay, on February 8, 2018, Plaintiff filed the Complaint, re-asserting claims against S. Biglari, Cooley, Cooper, Mastrian and Person (collectively, the "Individual Defendants") for breaching their fiduciary duties and adding additional counts for declaratory and injunctive relief against Biglari Holdings, New BH and Merger Sub—each of which is a citizen of this state, a signatory to the Reclassification Agreement at issue in this litigation, and a necessary party in Plaintiff's claims for injunctive relief.  Plaintiff has also filed the P.I. Motion, which reiterates Plaintiff's request to preliminarily enjoin the Special Meeting and the Reclassification.

Through this Motion, Plaintiff seeks expedition of the proceedings in this matter so that he may conduct limited discovery in advance of any hearing on the P.I. Motion.  Plaintiff further requests an expedited hearing on this Motion to take place on February 20, 2018 at 10:00 a.m., a

---

benefits to Atlantic Imports. Therefore, plaintiffs properly named Atlantic Imports as a necessary party. . . ."); *Joe Conte Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, Civ. A. No. 93-4281, 1994 WL 67896, at 4 (E.D. La. Feb. 17, 1994) ("The removing defendants argue that the 'plaintiffs have made no claim against the LMVC', and that the LMVC should be dismissed because it is a state agency and this Court has no subject matter jurisdiction over it pursuant to the 11th amendment.  The single determinative issue, however, is whether the Louisiana Motor Vehicle Commission is a real party in interest. . . .  [O]nly the LMVC can provide Conte with the relief it seeks by way of injunction. . . .  LMVC is a real party in interest."); *Elmhurst Consulting, LLC v. Gibson*, 219 F.R.D. 125, 127-28 (N.D. Ill. 2003) ("When the absent party is a party to the contract at issue in the claim . . . the party is a necessary one.").

time the Court previously set aside to address a preliminary injunction motion filed in the *Hipps I Action*.  Plaintiff further requests that the Court order (i) Defendants to respond to the Motion by February 15, 2018, and (ii) Plaintiff to file any reply in further support of the Motion by 12:00 p.m. on February 19, 2018.  Plaintiff has not sought to meet and confer further with Defendants on the relief in this Motion because they and their counsel have made their opposition to the requested expedition clear.

## III.   ARGUMENT

### A.   Legal Standards Governing the Motion

The power to expedite proceedings, including discovery, is a matter committed to the Court's discretion.  10 Arthur, *Ind. Prac., Procedural Forms With Practice Commentary* § 72.3 (3d ed. 2017) ("the court clearly has the power to expedite matters upon motion pursuant to Trial Rule 40(A)(2) through its inherent power to control the court's trial docket").  Moreover, "it is within the discretion of the trial court to place bounds on the duration of discovery."  *Smith v. Taulman*, 20 N.E.3d 555, 563 (Ind. Ct. App. 2014); *see also Amax Coal Co. v. Adams*, 597 N.E.2d 350, 353 (Ind. Ct. App. 1992) ("[T]he sequence and timing of discovery [is] left to the almost unlimited discretion of the trial court . . . .").

The Indiana Rules of Trial Procedure acknowledge that the Court may order expedited discovery.  *See*, *e.g.*, Ind. Trial Rule 30(A) ("**Leave of court**, granted with or without notice, must be obtained only if the plaintiff seeks to take a deposition prior to the expiration of twenty [20] days after service of summons and complaint upon any defendant. . . .") (emphasis added); Ind. Trial Rule 33(C) ("The party upon whom the interrogatories have been served shall serve a copy of the answers and objections within a period designated by the party submitting the interrogatories, not less than thirty (30) days after the service thereof **or within such shorter** . . . **time as the court may allow**.") (emphasis added); Ind. Trial Rule 34(B) ("The party upon whom

the request is served shall serve a written response within a period designated in the request, not less than thirty [30] days after the service thereof **or within such shorter** . . . **time as the court may allow**.") (emphasis added).

Further, with respect to Plaintiff's claims for declaratory relief against the parties to the Reclassification Agreement, Indiana Trial Rule 57 expressly provides: "The Court may order a speedy hearing of an action for a declaratory judgment and may advance it on the calendar." Meanwhile, Indiana Trial Rule 65(A)(3) provides that the Court can "require the parties to act promptly" in connection with any request for preliminary injunctive relief.

While Plaintiff is aware of an Indiana decision that references a trial court's award of expedited discovery in connection with a motion for preliminary injunction,[6] Plaintiff is not aware of any decisions in this state articulating the legal standard that the Court must apply in considering a motion for expedited discovery. In accordance with the established practice of Indiana courts, Plaintiff therefore respectfully requests that the Court apply the legal standard applied by federal courts in these circumstances. *See Brewer v. Brewer*, 403 N.E.2d 352, 354 (Ind. Ct. App. 1980) ("The Indiana Trial Rules were patterned after the federal rules of civil procedure, and thus, because of the lack of Indiana case law on point, it is helpful to look at decisions in the federal system. . . ."); *Reeder v. Harper*, 788 N.E.2d 1236, 1241 (Ind. 2003) (explaining that cases addressing the Federal Rules of Civil Procedure are persuasive authorities when interpreting the Indiana Trial Rules); *Stuff v. Simmons*, 838 N.E.2d 1096, 1100 (Ind. Ct. App. 2005) (holding that federal analysis of Federal Rules of Civil Procedure is helpful in analyzing Indiana Trial Rules where language of rules is virtually identical), *trans. denied*.

---

[6] *See, e.g.*, *Roberts v. Cmty. Hosps. of Indiana, Inc.*, 897 N.E.2d 458, 468 (Ind. 2008) (noting trial court granted request for expedited discovery and development of robust factual record).

The approach adopted by a majority of federal courts is to "treat[] the question [as to whether to grant expedited discovery] . . . as being governed by a good cause standard." 8A Wright et al., *Federal Practice and Procedure* § 2046.1 (3d ed. 2017).  Pursuant to this approach, courts typically consider the following factors in determining whether to grant expedited discovery: (1) whether a preliminary injunction motion is pending, (2) the breadth of the discovery requests, (3) the purpose for requesting the expedited discovery, (4) the burden on defendants to comply with the discovery requests, and (5) how far in advance of the typical discovery process the request is made. *See Oglala Sioux Tribe v. Van Hunnik*, 298 F.R.D. 453, 455-56 (D.S.D. 2014).[7]

For the reasons set forth below, expedited discovery is warranted here.

**B.**     **Plaintiff Is Entitled to Expedited Discovery**

Each of the factors addressing whether good cause exists for the Court to grant expedited discovery militate in favor of Plaintiff's request.  First, Plaintiff has filed a preliminary injunction motion, currently pending before the Court, through which he seeks to enjoin the shareholder vote on, and consummation of, the Reclassification.  Courts have routinely noted that the presence of a pending preliminary injunction motion weighs heavily in favor of a finding of good cause for expedition.  *See, e.g.*, *Meritain Health Inc. v. Express Scripts, Inc.*, No. 4:12-CV-266 CEJ, 2012 WL 1320147, at *2 (E.D. Mo. Apr. 17, 2012) ("Expedited discovery is generally appropriate in cases, such as this, where a party is attempting to prepare for a preliminary injunction hearing."); *Edudata Corp.*, 599 F. Supp. at 1088 (ordering expedited discovery because it would "better enable

---

[7] A minority of federal courts employ a standard modeled on the preliminary injunction standard. *See Notaro v. Koch*, 95 F.R.D. 403, 405 (S.D.N.Y. 1982) (requiring proof of: (1) irreparable injury; (2) "some" probability of success on the merits; (3) a nexus between the discovery sought and the avoidance of irreparable injury; and (4) a balancing of the harms that will result from the expedited discovery ruling).  For the reasons stated in Plaintiff's P.I. Motion, as well as those set forth below, each of these factors likewise militates in favor of expedited discovery.

the court to judge the parties' interests and respective chances for success on the merits" at preliminary injunction hearing).

Second, Plaintiff has served narrowly-tailored document requests, and the limited breadth of those requests supports a finding of good cause for expedited discovery. Specifically, Plaintiff's eight discrete document requests encompass the following relevant topics: (1) S. Biglari's prior attempts to create a dual-class capital structure at the Company; (2) the genesis of S. Biglari's current Reclassification proposal; (3) the Board's evaluation and approval of the Reclassification; (4) any disclosed or undisclosed conflicts of interest affecting S. Biglari and the other Biglari Holdings directors that may have led them to breach their fiduciary duties in connection with the Reclassification; and (5) documents sufficient to quantify the impact of the Reclassification on the proportionate voting rights of S. Biglari and Biglari Holdings' public stockholders. *See* Exhibit A. The types of documents Plaintiff seeks on these topics primarily include, but may not be limited to, (1) Board and Board committee minutes, presentations, and other materials; (2) communications by and among the Defendants; and (3) share register information.

Each of the foregoing categories of discovery directly bears on whether the Individual Defendants breached their fiduciary duties to the Company's public shareholders in connection with the Reclassification. Courts routinely approve limited, narrowly-tailored document requests such as those propounded by Plaintiff here. *See Lindsey & Osborne P'ship, L.P. v. Day & Zimmerman, Inc.*, No. 08-cv-2301-CM-DJW, 2008 WL 2858786, at *3 (D. Kan. July 22, 2008) (allowing expedited discovery on six topics and permitting Plaintiff to propound, among other things, ten interrogatories and ten document requests); *Laboratory Corp. of Am. Holdings v. Cardinal Health Sys., Inc.*, No. 5:10-CV-353-D, 2010 WL 3945111, at *2-3 (E.D.N.C. Oct. 6, 2010) (finding plaintiff's seven document request to be reasonable for purposes of expedited

discovery); *North Atl. Operating Co., Inc. v. Evergreen Distribs., LLC*, 293 F.R.D. 363, 374 (E.D.N.Y. 2013) (allowing seven document requests in connection with expedited discovery).

In addition to the Document Requests, Plaintiff seeks to depose S. Biglari and the other members of the Board regarding their review and approval of the Reclassification.  Given the complicated issues of corporate law and fiduciary duties implicated by the Individual Defendants' conduct, as well as the significance of the transaction to the Company and its public shareholders, it is reasonable for Plaintiff to depose each of the five fiduciaries who considered, approved and recommended the Reclassification.  *See Lindsey & Osborne P'ship, L.P.*, 2008 WL 2858786, at *3 (granting five depositions and three subpoenas); *Meritian Health Inc.*, 2012 WL 1320147, at *2 (granting six depositions); *North Atl. Operating Co., Inc.*, 293 F.R.D. at 374 (granting seven depositions).  The scope of the depositions will track the five categories of discovery discussed above.  *Semitool, Inc. v. Tokyo Electron Am., Inc.*, 208 F.R.D. 273, 277 (N.D. Cal. 2002) (holding that a request was narrowly-tailored because the deponent would not be subject to a free-ranging deposition).

Third, the purpose of Plaintiff's contemplated discovery further supports a finding of good cause.  As noted above, Plaintiff seeks limited, narrowly-tailored expedited discovery to permit Plaintiff to develop a factual record in advance of the hearing on the P.I. Motion.  *See Meritian Health Inc.*, 2012 WL 13201347, at *2 ("Plaintiffs have shown good cause for expedited discovery.  The documents and depositions plaintiffs seek to discover will assist them in establishing their claims in the preliminary injunction hearing.").

At present, the factual record is incomplete and relatively sparse.  Almost the entirety of the factual record regarding the Reclassification derives from the Proxy Materials, which devote a total of roughly one page to the factual background underlying the Reclassification.  In addition,

the factual record proffered by New BH through these public filings is continually changing in a manner that raises even more questions about S. Biglari's involvement in the GCN Committee's review of the Reclassification.  Given the limited information available to Plaintiff and other public shareholders of Biglari Holdings, expedited discovery will provide the Court with a more complete record to evaluate when ruling on the P.I. Motion.  *See Edudata Corp.*, 599 F. Supp. at 1088; *Oglala Sioux Tribe*, 298 F.R.D. at 457 (finding timing and purpose for expedited discovery was appropriate where said discovery was to be used at upcoming preliminary injunction hearing).

Fourth, Plaintiff's discovery requests will not unduly prejudice or burden Defendants.  The limited universe of documents sought by Plaintiff lies within the exclusive control and custody of the Defendants.  *See PowderPak Int'l, LLC v. B.F. Mach., Ltd.*, Civil Action File No. 4:16-cv-0026-HLM, 2016 WL 9450407, at \*2 (N.D. Ga. Mar. 1, 2016) (finding good cause for expedited discovery where proposed discovery requests were reasonable in scope, narrowly tailored to issues raised by preliminary injunction papers, and sought information within exclusive possession of party from whom discovery was sought).  Moreover, to the extent that one or more of the five potential deponents reside in different locales, Plaintiff is willing to travel to locations that are mutually convenient for the parties and their counsel in order to conduct them.  Further, Plaintiff will appropriately limit and focus the scope of those examinations, further minimizing any burden on the Individual Defendants.  *See Wachovia Sec., L.L.C. v. Stanton*, 571 F.Supp.2d 1014, 1050 (N.D. Iowa 2008) (finding lack of prejudice to non-moving party where discovery was "properly limited and focused").  Unlike Defendants, who will suffer *de minimis* burden if this Motion succeeds, Plaintiff will be harmed significantly if he cannot develop a sufficient record in advance of the hearing on the P.I. Motion and, thus, is unable to avoid the irreparable harm that will result from the Reclassification absent judicial relief.  *See Laboratory Corp. of Am. Holdings*, 2010 WL

3945111, at *3 (finding allegation that plaintiff would suffer irreparable harm if expedited discovery was not granted militated in favor of granting motion).

<u>Fifth</u>, as the Special Meeting might take place in the next few weeks, the timing of expedited discovery in this matter is eminently reasonable.  Moreover, since initiating the *Hipps I Action*, counsel for Plaintiff has made good faith efforts to promptly seek discovery and present Plaintiff's request for injunctive relief to the Court on a sufficient record.  Plaintiff propounded document requests on defendants and their counsel in the *Hipps I Action* more than one week ago. The Document Requests served in this Action are substantially similar in scope.  By the time briefing likely concludes on the instant Motion, the six Defendants in this action who were defendants in the *Hipps I Action* will have been in possession of the prior document requests for almost two weeks.  Under these circumstances, Defendants should promptly respond to, and produce documents responsive to, the Discovery Requests.

### C.   <u>The Court Should Set February 20, 2018 as the Hearing Date for this Motion and Order Expedited Briefing from Defendants</u>

Given that Defendants can cause the Special Meeting to occur on a schedule of their own choosing, and given the clear gamesmanship that they have already displayed by improperly removing the *Hipps I Action* to federal court, Plaintiff respectfully requests a prompt hearing on this Motion and expedited briefing in connection with the same.[8]  The Court recognized the need for prompt and speedy action when it set February 20, 2018 as the hearing date for Plaintiff's motion for preliminary injunction in the *Hipps I Action*.  For the same reasons, the Court should require Defendants to promptly respond to—and appear for a hearing on—this Motion.

---

[8] Under Ind. Trial Rule 65(A)(3), when presented with a request for injunctive relief, the Court has the inherent authority to fix the time and place for any hearings relevant to such a request and can "require the parties to act promptly."  *Id.*; *see also* Ind. Trial Rule 57 (regarding "speedy hearings" in connection with claims for declaratory relief).

Accordingly, Plaintiff respectfully requests that the Court (i) set February 20, 2018 at 10:00 a.m. as the hearing to determine whether Plaintiff will be entitled to discovery before a future hearing on the pending P.I. Motion; (ii) order Defendants to file their opposition (if any) to this Motion on or before February 15, 2018; and (iii) permit Plaintiff to file a short reply in further support of this Motion on or before 12:00 p.m. on February 19, 2018.

## IV.    **CONCLUSION**

For all the foregoing reasons, Plaintiff respectfully requests that the Court enter the proposed Order, submitted herewith, expediting proceedings in this matter by: (1) scheduling a hearing on the P.I. Motion; (2) permitting Plaintiff to conduct limited discovery on an expedited basis in advance of the hearing on the P.I. Motion and, in connection therewith, ordering Defendants to (a) respond to Plaintiff's Document Requests and substantially complete production of documents in response to the Document Requests within five (5) days of the date of the Order, and (b) produce a privilege and redaction log within seven (7) days of the date of the Order; and (3) directing the parties to meet and confer regarding a proposed schedule governing further proceedings in this matter including, but not limited to, discovery and a briefing schedule in connection with the P.I. Motion.

Plaintiff further requests an expedited hearing on this Motion to take place on February 20, 2018 at 10:00 a.m. Plaintiff also requests that the Court order Defendants to respond to the Motion by February 15, 2018, and Plaintiff to file any reply in further support of the Motion by 12:00 p.m. on February 19, 2018.

Dated this 8th day of February, 2018.

OF COUNSEL:

PRICE WAICUKAUSKI JOVEN & CATLIN, LLC

/s/ Brad A. Catlin
Brad A. Catlin

**KESSLER TOPAZ MELTER & CHECK, LLP**
Eric L. Zagar
J. Daniel Albert
Justin O. Reliford
Christopher M. Windover
280 King of Prussia Road
Radnor, PA 19087
(610) 667-7706

**FRIEDMAN OSTER & TEJTEL PLLC**
Jeremy Friedman
Spencer Oster
David Tejtel
240 East 79th Street, Suite A
New York, NY 10075
(888) 529-1108

**ANDREWS & SPRINGER LLC**
Peter B. Andrews
Craig J. Springer
3801 Kennett Pike
Building C, Suite 305
Wilmington, DE 19807
(302) 504-4957

*Counsel for Plaintiff*

Attorney #21570-29
301 Massachusetts Avenue
Indianapolis, IN 46204
bcatlin@price-law.com
Telephone: (317) 633-8787
Facsimile: (317) 633-8797

*Counsel for Plaintiff*

-18-

## CERTIFICATE OF SERVICE

I CERTIFY that on this 8th day of February 2018, copies of Plaintiff's Motion for Expedited Proceedings, Brief in Support of Plaintiff's Motion for Expedited Proceedings, Compendium of Authorities Contained in Brief in Support of Plaintiff's Motion for Expedited Proceedings Not Cited in Northeastern Reporter System and [Proposed] Order Granting Plaintiff's Motion for Expedited Proceedings were served hand-delivery upon the following:

Biglari Holdings Inc.
c/o Corporation Service Company,
Registered Agent
135 N. Pennsylvania St., Suite
1610
Indianapolis, IN 46204

BH Merger Company
c/o Corporation Service Company,
Registered Agent
135 N. Pennsylvania St., Suite 1610
Indianapolis, IN 46204

NBHSA Inc.
c/o Corporation Service Company,
Registered Agent
135 N. Pennsylvania St., Suite 1610
Indianapolis, IN 46204

I CERTIFY that on this 8th day of February 2018, copies of Plaintiff's Motion for Expedited Proceedings, Brief in Support of Plaintiff's Motion for Expedited Proceedings, Compendium of Authorities Contained in Brief in Support of Plaintiff's Motion for Expedited Proceedings Not Cited in Northeastern Reporter System and [Proposed] Order Granting Plaintiff's Motion for Expedited Proceedings were served via UPS, Overnight Delivery upon the following:

Sardar Biglari
138 Manchester Way
Shavano Park, TX 78249-2023

James P. Mastrian
210 Bella Colinas Dr.
Austin, TX 78738-7631

Philip L. Cooley
438 Bentley Mnr.
Shavano Park, TX 78249-2023

Ruth J. Person
2404 Tamarack Ct.
Ann Arbor, MI 48105-9660

Kenneth R. Cooper
18814 Cierra Sur
San Antonio, TX 78258-4021

/s/ Brad A. Catlin
Brad A. Catlin

Filed: 2/8/2018 4:08 PM
Tammy Baitz
Clerk
Hamilton County, Indiana

# *Exhibit A*

STATE OF INDIANA          )   IN THE HAMILTON COUNTY SUPERIOR COURT
                          )   SS:
COUNTY OF HAMILTON        )   CAUSE NO. 29C01-1802-CT-001154


JOSEPH HIPPS, Individually and on          )
Behalf of All Others Similarly Situated,   )
                                           )
            Plaintiff,                     )
                                           )
    v.                                     )
                                           )
BIGLARI HOLDINGS, INC., SARDAR             )
BIGLARI, PHILIP L. COOLEY,                 )
KENNETH R. COOPER, JAMES P.                )
MASTRIAN, RUTH J. PERSON,                  )
NBHSA INC., and BH MERGER                  )
COMPANY,                                   )
                                           )
            Defendants.                    )

## PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS
## DIRECTED TO ALL DEFENDANTS

Pursuant to Ind. Trial Rules 26 and 34, plaintiff Joseph Hipps ("Plaintiff"), through his undersigned counsel, hereby requests that defendants Biglari Holdings, Inc., Sardar Biglari, Philip L. Cooley, Kenneth R. Cooper, James P. Mastrian, Ruth J. Person, NBHSA, Inc. and BH Merger Company produce the documents described below for inspection and copying at the offices of Price Waicukauski Joven & Catlin, LLC, 301 Massachusetts Avenue, Indianapolis, Indiana 46204, or at such other place as is mutually agreed upon, within thirty (30) days from the date hereof or as otherwise ordered by the Court or agreed to by the parties.

## DEFINITIONS

1.      "Advisors" means any and all investment banks, bankers, law firms, lawyers, financial advisors, consulting firms, consultants, public relations firms, public relations person(s), or other parties engaged, retained, employed or consulted by the Board, the GCN Committee, or the Company.

2.     "Biglari Holdings" or the "Company" means Biglari Holdings, Inc., including (a) any of its partners, parents, predecessors, divisions, branches, subsidiaries, affiliates, parent companies and any of their past or present directors, boards of directors, committees, officers, agents, employees, representatives and/or attorneys, and (b) any other person or entity purporting to act on their behalf.

3.     "Board" means the board of directors of Biglari Holdings, any committee or subcommittee thereof, as well as each member of the Board, individually or collectively, any Advisors to the Board, or any other person or entity acting or purporting to act on the Board's behalf.

4.     "Communications" means any exchange of information by any means of transmission, including, but not limited to, electronic recordings, voice messages, voicemail to email messages, face-to-face conversations, mail, electronic mail, instant messaging, text and multimedia messaging, telegram, overnight delivery, telephone, facsimile, or telex.

5.     "Concerning" means relating to, referring to, describing, evidencing or constituting.   Requests for documents concerning any subject matter include documents concerning communications regarding that subject matter.

6.     "Defendants" means Biglari Holdings, New BH, Merger Sub and the Individual Defendants.

7.     "Document" or "Documents" means, without limitation, regardless of whether the document is fixed in tangible medium or stored on, or in, computer tape, disk, memory or other magnetic, optical, solid-state or digital storage device or media.  The word "document" shall include, by way of example and not by way of limitation, all of the following: communications, correspondence, letter, envelope, memoranda, telegram, cable, note, message, e-mail, voice mail

-2-

message, report, study, press release, comparison, book, account, check, audio and video recording, motion picture film, pleading, testimony, article, bulletin, pamphlet, brochure, magazine, questionnaire, survey, chart, newspaper, calendar, desk calendar, pocket calendar, list, log, publication, notice, diagram, instruction, diary, minutes of meetings, corporate minutes, order, resolution, agenda, memorials or notes of oral communications, whether by telephone or face-to-face, contract, agreement, drafts of proposed contract or agreement, memoranda of understanding, letter of intent, deal memoranda, transcriptions of audio or video recording, electronic device memory, computer files, distributed databases, unclassified digital objects, photographs, charts, graphs, microfiche or any other tangible thing on which any handwriting, typing, printing, photostatic, digital form of communication or information is recorded, stored, or reproduced, together with all notations or meta-data on, or of, any of the foregoing, all originals, file copies, or other unique copies or duplications of the foregoing and all versions of drafts thereof, whether used or not and including "deleted" files on or in a computer or computer storage device or media whether located on-site or off-site.

8.    "ESI" or "Electronically Stored Information" means information or data that is generated, received, processed, and/or recorded by computers and other electronic devices, and includes, without limitation, system metadata (e.g., author, recipient, file creation date, file modification date) and user-generated metadata (e.g., spreadsheet formulas). "ESI" further includes, without limitation, the following: (i) output resulting from the use of any software program, such as word processing documents, spreadsheets, database files, charts, graphs, and outlines, (ii) electronic mail, (iii) message logs from Google Chat, WhatsApp, Viber, Facebook, Twitter, Instagram, Slack and similar programs, (iv) audio and video files, (v) internal (intranet) or external websites, and (vi) activity listings of electronic mail receipts and/or transmittals.

"ESI" includes electronic information or data wherever it resides, including, without limitation, (i) in an active file on a computer network or individual computer hard drive, (ii) in a deleted file or file fragment, (iii) on backup/storage media, (iv) on removable media, such as a floppy disk, memory stick, portable hard drive, or zip drive, and (v) on a smart phone or personal digital assistant. "ESI" also includes documents, containers and labels appended to or concerning any physical storage device associated with responsive electronic information or data.

9.     "GCN Committee" means the Governance, Compensation and Nominating Committee of the Board or any subcommittee thereof, as well as each member of the GCN Committee, individually or collectively, any Advisors to the GCN Committee, or any other person or entity acting or purporting to act on the GCN Committee's behalf.

10.    "Individual Defendants" means Sardar Biglari, Philip L. Cooley, Kenneth R. Cooper, James P. Mastrian and Ruth J. Person.

11.    "Merger Sub" means BH Merger Company, including (a) any of its partners, parents, predecessors, divisions, branches, subsidiaries, affiliates, parent companies and any of their past or present directors, boards of directors, committees, officers, agents, employees, representatives and/or attorneys, and (b) any other person or entity purporting to act on their behalf.

12.    "New BH" means NBHSA Inc., including (a) any of its partners, parents, predecessors, divisions, branches, subsidiaries, affiliates, parent companies and any of their past or present directors, boards of directors, committees, officers, agents, employees, representatives and/or attorneys, and (b) any other person or entity purporting to act on their behalf.

13.    "Or" should be construed as disjunctive and conjunctive, and "any" and "all" as used herein shall include "each" and "every."

14.     "Person" or "Persons" means any natural person or any business, legal or governmental entity or association.

15.     "Prior Reclassification Attempts" means any proposed or actual plan or attempt to change the capital structure of the Company or to create non-voting stock for the Company, including but not limited to, the proposed recapitalization(s) announced by the Company in 2011 and 2012.

16.     "Proposed Reclassification" means the proposed recapitalization of the Company pursuant to the Agreement and Plan of Merger, dated as of December 21, 2017, by and among Biglari Holdings, New BH and Merger Sub.

17.     "S. Biglari Entity" or "S. Biglari Entities" means Biglari Capital Corp., The Lion Fund, L.P., The Lion Fund II, L.P. or any other entity (other than Biglari Holdings) affiliated with Sardar Biglari, including (a) any of their partners, parents, predecessors, divisions, branches, subsidiaries, affiliates, parent companies and any of their past or present directors, boards of directors, committees, officers, agents, employees, representatives and/or attorneys, and (b) any other person or entity purporting to act on their behalf.

18.     "You" or "Your" means Defendants, collectively and/or individually, any of their predecessors, divisions, branches, subsidiaries, affiliates, parent companies, or any of their respective past or present directors, committees, officers, agents, employees, representatives, attorneys, or other persons or entities purporting to act on their behalf.

19.     The use of the singular form of any word includes the plural and vice versa; and the use of the masculine gender shall include the feminine and neuter genders and vice versa.

## INSTRUCTIONS

1.     You are requested to produce all responsive documents or things in your possession, custody, or control, regardless of whether such documents or materials are possessed

directly by your directors, officers, partners, members, agents, employees, representatives, subsidiaries, managing agents, affiliates, or by your attorneys, agents, accountants, auditors, employees, representatives, or investigators.

2.      The fact that a document is produced by another party does not relieve you of your obligation to produce your copy of the same document, even if the two documents are identical in all respects.

3.      For any claims based upon the attorney-client privilege, or any other privilege or work-product protection for any document, that document need not be produced, but you shall provide the following information with respect to each such document: (1) the type of document (e.g., letter, memorandum, etc.); (2) the date of the document; (3) the author(s) of the document and each and every other person who prepared or participated in the preparation of the document; (4) a description of the document's subject matter and physical size; (5) all addressees or recipient(s) of the original or a copy thereof, together with the date or approximate date on which such recipient(s) received said documents; (6) all other persons to whom the contents of the document have been disclosed, the date of such disclosure, the means of such disclosure, and the present location of the document and all copies thereof; (7) each and every person having custody or control of the document and all copies thereof; (8) the nature of the privilege or other rule of law relied upon and any facts supporting your position; and (9) such other information as is sufficient to identify the document, and, where not apparent, the relationship of the author, addressees, and recipients to each other.

4.      If an objection is made to part of an item or category, the part shall be specified and an inspection permitted of the remaining parts. If you object to the production of a

-6-

document on the basis of privilege or work-product claim, produce all portions of the document that are not privileged or work-product.

5.      Documents should be produced as they are kept in the usual course of business or they should be organized and labeled to correspond with the categories in this Request for Production.   All documents should be produced as they are maintained in original form, organized as they are maintained and in the sequence in which they are maintained.   Each document should be produced in its entirety, including any attachments.   No non-privileged material should be redacted.

6.      Responsive ESI shall be produced as single-page tiff images with the exception of Microsoft Excel Spreadsheets, presentation files, audio and database-type files including, without limitation, Microsoft Access and Microsoft PowerPoint—which shall be produced in native format.   Each native file should be named according to the Bates number it has been assigned, and should be linked directly to its corresponding record in the load file using the NATIVELINK field.   To the extent that either party believes that native files should be produced for a specific document or class of documents not required to be produced in native format pursuant to this paragraph, the parties agree to meet and confer on the issue in good faith. Additionally, all ESI shall be produced with a delimited, database load file that contains customary metadata fields, including (without limitation) "BEGNO," "ENDNO," "PAGES," "VOLUME," and "CUSTODIAN."   An .opt image cross reference fill will also be provided for all tiff images.   Multi-page OCR text for each document should also be provided.

7.      For all documents produced, produce documents identifying the individual who maintained those documents (and on whose behalf they were maintained), as well as information identifying the file or source from which they are produced.   These documents are to be

produced and Bates-stamped consecutively with the documents produced from that individual's office and records. In lieu of producing these identifying documents, you may simply provide a statement identifying each such individual, and identifying the Bates-stamp numbered documents that were produced from files maintained by, or on behalf of, that individual.

8.     Documents not otherwise responsive to this Request for Production shall be produced if such documents mention, discuss, refer to, or explain the documents which are called for by this Request for Production, or if such documents are attached to documents called for by this Request for Production and constitute routing slips, transmittal memoranda, or letters, comments, evaluations or similar materials.

9.     If any documents requested herein have been lost, discarded, destroyed, or are otherwise no longer in your possession, custody, or control, they shall be identified as completely as possible, including, without limitation, the following information: (1) date of disposal; (2) manner of disposal; (3) reason for disposal; (4) person authorizing the disposal; and (5) person disposing of the document.

10.    This is a continuing request for the production of documents. If you obtain or become aware of any further documents responsive to this Request for Production, you are requested to produce such additional documents as they are obtained or become available.

## **DOCUMENTS REQUESTED**

1.     All Documents and Communications exchanged by, between, among, or otherwise involving any Individual Defendant concerning (1) Prior Reclassification Attempts, or (2) the Proposed Reclassification.

2.     All minutes, notes, pre-meeting materials, and any other record of the substance of any meeting of the Board, GCN Committee, any other Board committee or subcommittee, or

Company management, at which the Prior Reclassification Attempts and/or the Reclassification was addressed, referenced, or discussed.

3.      All Documents and Communications concerning the contemplated, potential or actual engagement or retention of any Advisors in connection with the Proposed Reclassification.

4.      All Documents and Communications regarding the impact that any proposed or actual recapitalization of the Company (including the Prior Reclassification Attempts and the Proposed Reclassification) would have on the Company, its business, and/or its stockholders.

5.      All Documents and Communications exchanged between the Company, on the one hand, and any Company stockholder, proxy advisory service, or media or news outlet, on the other hand, regarding the Prior Reclassification Attempts and/or the Proposed Reclassification.

6.      Documents sufficient to identify Your financial interests, whether direct or indirect, in Biglari Holdings or any S. Biglari Entity.

7.      All Documents and Communications concerning the Board's evaluation of the independence of any of its members since January 1, 2016.

8.      Documents sufficient to quantify the anticipated or expected change in voting power and economic ownership interests of S. Biglari and the Company's public stockholders as a result of the Reclassification, including but not limited to: (a) documents sufficient to identify the amount of shares held individually by each beneficial shareholder of Biglari Holdings as of December 21, 2017 (or as close thereto as possible); (b) documents sufficient to identify the number of Class A and Class B shares of New BH that will be exchanged for the common stock held by existing Company shareholders; and (c) documents sufficient to show how many current voting shares held by Company shareholders other than S. Biglari will be exchanged for cash and

New BH Class B shares because New BH will not issue any fractional shares of Class A common stock.

Dated: February 8, 2018

**PRICE WAICUKAUSKI JOVEN & CATLIN, LLC**

OF COUNSEL:

**KESSLER TOPAZ MELTER & CHECK, LLP**
Eric L. Zagar
J. Daniel Albert
Justin O. Reliford
Christopher M. Windover
280 King of Prussia Road
Radnor, PA 19087
(610) 667-7706

**FRIEDMAN OSTER & TEJTEL PLLC**
Jeremy Friedman
Spencer Oster
David Tejtel
240 East 79th Street, Suite A
New York, NY 10075
(888) 529-1108

**ANDREWS & SPRINGER LLC**
Peter B. Andrews
Craig J. Springer
3801 Kennett Pike
Building C, Suite 305
Wilmington, DE 19807
(302) 504-4957

*Counsel for Plaintiff*

Brad A. Catlin
Attorney #21570-29
301 Massachusetts Avenue
Indianapolis, IN 46204
bcatlin@price-law.com
Telephone: (317) 633-8787
Facsimile: (317) 633-8797

*Counsel for Plaintiff*

-10-

## CERTIFICATE OF SERVICE

I CERTIFY that on this 8th day of February 2018, copies of Plaintiff's First Request for

Production of Documents Directed to All Defendants were served via First Class United States

mail upon the following:

Biglari Holdings Inc.
c/o Corporation Service Company,
Registered Agent
135 N. Pennsylvania St., Suite 1610
Indianapolis, IN 46204

BH Merger Company
c/o Corporation Service Company,
Registered Agent
135 N. Pennsylvania St., Suite 1610
Indianapolis, IN 46204

NBHSA Inc.
c/o Corporation Service Company,
Registered Agent
135 N. Pennsylvania St., Suite 1610
Indianapolis, IN 46204

I CERTIFY that on this 8th day of February 2018, copies of Plaintiff's First Request for

Production of Documents Directed to All Defendants were served via UPS, Overnight Delivery

upon the following:

Sardar Biglari
138 Manchester Way
Shavano Park, TX 78249

Kenneth R. Cooper
18814 Cierra Sur
San Antonio, TX 78258

Philip L. Cooley
438 Bentley Mnr
Shavano Park, TX 78249

James P. Mastrian
210 Bella Colinas Dr
Austin, TX 78738

Ruth J. Person
2404 Tamarack Ct
Ann Arbor, MI 48105

Brad A. Catlin

Filed: 2/8/2018 4:08 PM
Tammy Baitz
Clerk
Hamilton County, Indiana

STATE OF INDIANA          )   IN THE HAMILTON COUNTY SUPERIOR COURT
                          )   SS:
COUNTY OF HAMILTON        )   CAUSE NO. 29C01-1802-CT-001154


JOSEPH HIPPS, Individually and on          )
Behalf of All Others Similarly Situated,   )
                                           )
              Plaintiff,                    )
                                           )
      v.                                    )
                                           )
BIGLARI HOLDINGS, INC., SARDAR             )
BIGLARI, PHILIP L. COOLEY,                 )
KENNETH R. COOPER, JAMES P.                )
MASTRIAN, RUTH J. PERSON,                  )
NBHSA INC., and BH MERGER                  )
COMPANY,                                    )
                                           )
              Defendants.                   )


## COMPENDIUM OF AUTHORITIES CONTAINED IN BRIEF
## IN SUPPORT OF PLAINTIFF'S MOTION FOR EXPEDITED PROCEEDINGS
## NOT CITED IN NORTHEASTERN REPORTER SYSTEM


**Cases**                                                                    **Tab**

*Audi of Smithtown, Inc. v. Volkswagen of Am., Inc.*,
    No. 08-CV-1773 (JFB)(AKT), 2009 WL 385541 (E.D.N.Y. Feb. 11, 2009) ..........................1

*Dewing v. Perdicaries*,
    96 U.S. 193 (1877)..................................................................................................2

*Edudata Corp. v. Scientific Computs., Inc.*,
    599 F. Supp. 1084 (D. Minn. 1984)......................................................................3

*Elmhurst Consulting, LLC v. Gibson*,
    219 F.R.D. 125 (N.D. Ill. 2003).............................................................................4

*Joe Conte Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*,
    Civ. A. No. 93-4281, 1994 WL 67896 (E.D. La. Feb. 17, 1994) ..............................5

*Laboratory Corp. of Am. Holdings v. Cardinal Health Sys., Inc.*,
    No. 5:10-CV-353-D, 2010 WL 3945111 (E.D.N.C. Oct. 6, 2010)............................6

*Lindsey & Osborne P'ship, L.P. v. Day & Zimmerman, Inc.*,
    No. 08-cv-2301-CM-DJW, 2008 WL 2858786 (D. Kan. July 22, 2008)..................7

*Meritain Health Inc. v. Express Scripts, Inc.*,
No. 4:12-CV-266 CEJ, 2012 WL 1320147 (E.D. Mo. Apr. 17, 2012)....................................8

*North Atl. Operating Co., Inc. v. Evergreen Distribs., LLC*,
293 F.R.D. 363 (E.D.N.Y. 2013) .............................................................................9

*Notaro v. Koch*,
95 F.R.D. 403 (S.D.N.Y. 1982) ..........................................................................10

*Oglala Sioux Tribe v. Van Hunnik*,
298 F.R.D. 453 (D.S.D. 2014) ...........................................................................11

*PowderPak Int'l, LLC v. B.F. Mach., Ltd.*,
Civil Action File No. 4:16-cv-0026-HLM, 2016 WL 9450407 (N.D. Ga. Mar.
1, 2016) ..................................................................................................12

*Semitool, Inc. v. Tokyo Electron Am., Inc.*,
208 F.R.D. 273 (N.D. Cal. 2002)........................................................................13

*Wachovia Sec., L.L.C. v. Stanton*,
571 F.Supp.2d 1014 (N.D. Iowa 2008)..................................................................14

**Other Authorities**

10 Arthur, *Ind. Prac., Procedural Forms With Practice Commentary* § 72.3 (3d
ed. 2017) .................................................................................................15

8A Wright et al., *Federal Practice and Procedure* § 2046.1 (3d ed. 2017) ...............................16

Dated:  February 8, 2018

# *TAB 1*

2009 WL 385541
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

AUDI OF SMITHTOWN, INC. and
Audi of Huntington, Inc., Plaintiffs,
v.
VOLKSWAGEN OF AMERICA, INC.,
k/n/a Volkswagen Group of America,
Inc., d/b/a Audi of America, Inc., and
Atlantic Imports, Inc., Defendants.

No. 08-CV-1773 (JFB)(AKT).
|
Feb. 11, 2009.

**Attorneys and Law Firms**

David Clifford Burger and Russell Pries McRory,
Robinson Brog Leinwand Greene Genovese & Gluck,
P.C., New York, NY, for plaintiffs.

Eric J. Stock, Hogan & Hartson LLP, New York, NY, and
Brandon C. Prosansky, James R. Vogler and Randall L.
Oyler, Barack Ferrazzano Kirschbaum & Nagleberg LLP,
Chicago, IL, for defendant Volkswagen of America, Inc.

Mark S. Mulholland and Matthew Didora, Ruskin
Moscou Faltischek, P.C., Uniondale, NY, for defendant
Atlantic Imports.

**MEMORANDUM AND ORDER**

JOSEPH F. BIANCO, District Judge.

**\*1** Plaintiffs Audi of Smithtown, Inc. ("Audi of
Smithtown") and Audi of Huntington, Inc. ("Audi of
Huntington") (collectively, "plaintiffs") commenced this
action in the Supreme Court of the State of New York,
Suffolk County, alleging that Volkswagen Group of
America, Inc., d/b/a Audi of America, Inc. ("Audi" or
"defendant") violated several provisions of New York's
Franchised Motor Vehicle Dealer Act, Vehicle and Traffic
Law § 460 et seq. Specifically, plaintiffs, who are two
Audi dealers located in Suffolk County, allege that
certain Audi dealer incentive programs violate certain
price discrimination provisions of the Dealer Act because

they result in new dealers-namely, Atlantic Imports, Inc.
("Atlantic Imports") in West Islip, New York-payingless
than existing dealers for new and pre-owned vehicles.

On April 30, 2008, defendant Audi filed a Notice of
Removal. On June 3, 2008, plaintiffs filed a motion to
remand to state court due to lack of diversity jurisdiction.
With respect to the jurisdictional issue, it is undisputed
that there was a lack of complete diversity between the
parties to the lawsuit at the time of removal if Atlantic
Imports is a proper defendant, because plaintiffs and
defendant Atlantic Imports are New York citizens for
jurisdictional purposes. Thus, if Atlantic Imports was
properly named in this action, the parties agree that
this Court has no jurisdiction and remand is required.
However, Audi contends that diversity jurisdiction exists
and removal is proper because Atlantic Imports was
fraudulently joined to the lawsuit by plaintiffs.

For the reasons that follow, the Court concludes that
Audi has failed to meet its burden of demonstrating
fraudulent joinder and, thus, this Court lacks subject
matter jurisdiction. Accordingly, pursuant to 28 U.S.C. §
1447(c), the action must be remanded to state court.

**I. BACKGROUND**

On March 31, 2008, plaintiffs filed this lawsuit in the
Supreme Court of the State of New York, County of
Suffolk, against Audi, as well as Atlantic Imports, who is
allegedly a New York corporation and a new Audi dealer
located in West Islip, New York who entered into a dealer
agreement with Audi on May 10, 2007, and opened for
business in or about August 2007.

According to the complaint, Audi maintains two incentive
programs, under which payments are being made to
Atlantic Imports, that violate New York's Franchised
Motor Vehicle Dealer Act, Vehicle and Traffic Law §
460 et seq. (the "Dealers Act"), because Audi does not
require Atlantic Imports to meet the same requirements
for receiving payments that Audi requires of its other
existing New York dealers. The complaint asserts that,
by means of these incentive programs, Audi is violating
the Dealers Act "by (i) selling motor vehicles to Atlantic
Imports at a lower price than that charged by [Audi] to
the plaintiff Dealers and (ii) by offering to sell, or selling,
new vehicles of the same model to Atlantic Imports at

a lower price, by means of an incentive program that is not available to the plaintiff Dealers on a proportionately equal basis." (Compl. ¶ 47; *see also id.* ¶ 48.)

**\*2** The complaint asserts three causes of action against Audi: (1) a cause of action alleging a violation of Section 463 of the Dealers Act, seeking preliminary and permanent injunctive relief; (2) a cause of action alleging a violation of Section 463 of the Dealers Act, seeking recovery of money damages in an amount to be determined, but not less than $50,000; and (3) a cause of action alleging a violation of Section 463 of the Dealers Act, seeking recovery of attorney's fees, costs, and expenses. Although the complaint does not state a cause of action against Atlantic Imports or seek any relief against Atlantic Imports, the complaint seeks "preliminary and permanent injunctive relief enjoining and restraining [Audi] from administering its Incentive Programs so as to provide Atlantic Imports with any unlawful, discriminatory benefit." (*Id.* ¶ 44.) Accordingly, in the complaint, plaintiffs allege that "Atlantic Imports is a necessary party within the meaning of CPLR § 1001 because Atlantic Imports may be affected by any judgment in this action." (*Id.* ¶ 8.)

On April 30, 2008, defendants removed the instant action to this Court. On May 23, 2008, the Court "So Ordered" a stipulation between plaintiffs and Atlantic Imports in which, among other things, Atlantic Imports agreed to be bound and comply with any order of judgment of this Court granting the injunctive relief being sought in the complaint, and waived any right to challenge, oppose or appeal any such order or judgment. On May 28, 2008, pursuant to that Stipulated Order, plaintiffs voluntarily dismissed Atlantic Imports as a defendant without prejudice, pursuant to Rule 41(a)(1) of the Federal Rules of Civil Procedure.

On June 3, 2008, plaintiffs filed a motion to remand the instant action to state court because of the absence of subject matter jurisdiction. On June 20, 2008, Audi filed its opposition to that motion. On June 27, 2008, plaintiffs filed their reply. On January 15, 2009, oral argument was held. The motion is fully submitted.

## II. DISCUSSION

In the instant motion, Audi contends that Atlantic Imports was fraudulently joined as a defendant because there is no cause of action against Atlantic Imports in the complaint and, thus, removal was proper because diversity jurisdiction exists. Plaintiffs assert that Atlantic Imports was not fraudulently joined because it was a necessary party under C.P.L.R. § 1001, as its rights under its dealer agreement with Audi could be impacted in a substantial manner by the injunctive relief sought in the instant action-namely, an injunction preventing Audi from bestowing certain benefits on Atlantic Imports pursuant to incentives programs under the dealer agreement. Therefore, plaintiffs argue, the lack of complete diversity of the parties at the time of removal requires remand to state court. As set forth below, having carefully considered the submissions of the parties, there is an insufficient basis for the Court to conclude that Atlantic Imports was fraudulently joined to this lawsuit. Thus, the Court lacks jurisdiction over this lawsuit and the case must be remanded.

### A. Legal Standard

**\*3** "Generally, a defendant in an action pending in state court may remove that case to federal court only if it could have originally been commenced in federal court on either the basis of federal question jurisdiction or diversity jurisdiction." *Citibank, N.A. v. Swiatkoski,* 395 F.Supp.2d 5, 8 (E.D.N.Y.2005) (citing 28 U.S .C. § 1441(a)). "When a party challenges the removal of an action from state court, the burden falls on the removing party 'to establish its right to a federal forum by competent proof.' " *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.,* No. 1:00-CV-1898, MDL 1358(SAS), M 21-88, 2006 WL 1004725, at \*2 (S.D.N .Y. Apr. 17, 2006) (quoting *R.G. Barry Corp. v. Mushroom Makers, Inc.,* 612 F.2d 651, 655 (2d Cir.1979) (quotation omitted)). Further, "[i]n light of the congressional intent to restrict federal court jurisdiction, as well as the importance of preserving the independence of state governments, federal courts construe the removal statute narrowly, resolving any doubts against removability." *Lupo v. Human Affairs Int'l, Inc.,* 28 F.3d 269, 274 (2d Cir.1994) (citing *Shamrock Oil & Gas Corp. v. Sheets,* 313 U.S. 100, 108 (1941)); *accord Somlyo v. J. Lu-Rob Enters., Inc .,* 932 F.2d 1043, 1045-46 (2d Cir.1991); *Fed. Ins. Co. v. Tyco Int'l Ltd.,* 422 F.Supp.2d 357, 367 (S.D.N.Y.2006).

*Case of Sherman, Inc. v. Volkswagen of America, Inc., Not Reported in F.Supp.2d (2009)*
2009 WL 385541

Section 1447(c) provides, in relevant part, that "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." 28 U.S.C. § 1447(c). As such, "any party or the court *sua sponte*, at any stage of the proceedings, may raise the question of whether the court has subject matter jurisdiction." *United Food & Commercial Workers Union, Local 919, AFL-CIO v. CenterMark Properties Meriden Square, Inc.,* 30 F.3d 298, 301 (2d Cir.1994) (quoting *Manway Constr. Co. v. Housing Auth. of Hartford,* 711 F.2d 501, 503 (2d Cir.1983) (internal quotation omitted). Moreover, diversity jurisdiction is determined at the time of removal. *See Grupo Dataflux v. Atlas Global Group, L.P.,* 541 U.S. 567, 570-71 (2004); *CenterMark Properties Meriden Square, Inc.,* 30 F.3d at 301.

It is axiomatic that federal courts only have diversity jurisdiction when there is complete diversity between the parties-that is, when all plaintiffs are citizens of different states from all defendants. *See* 28 U.S.C. § 1332; *Lincoln Property Co. v. Roche,* 546 U.S. 81, 88 (2005); *Advani Enters., Inc. v. Underwriters at Lloyds,* 140 F.3d 157, 160 (2d Cir.1998). In other words, if any plaintiff shares citizenship of the same state as any defendant, complete diversity does not exist and diversity jurisdiction is lacking. However, as the Second Circuit has made clear, "a plaintiff may not defeat a federal court's diversity jurisdiction and a defendant's right of removal by merely joining as defendants parties with no real connection with the controversy." *Pampillonia v. RJR Nabisco, Inc.,* 138 F.3d 459, 460-61 (2d Cir.1998). When asserting fraudulent joinder, the removing defendant bears "a heavy burden." *Id.* at 461. Specifically, "[i]n order to show that naming a non-diverse defendant is a 'fraudulent joinder' effected to defeat diversity, the defendant must demonstrate, by clear and convincing evidence, either that there has been outright fraud committed in the plaintiff's pleadings, or that there is no possibility, based on the pleadings, that a plaintiff can state a cause of action against the non-diverse defendant in state court." *Id.; accord Whitaker v. Am. Telecasting, Inc.,* 261 F.3d 196, 207 (2d Cir.2001). Moreover, in this context, "all factual and legal issues must be resolved in favor of the plaintiff." *Pampillonia,* 138 F.3d at 461. In analyzing the fraudulent joinder issue, the court is permitted to look beyond the pleadings to resolve this jurisdictional question. *See Building and Const. Trades Council of Buffalo, N.Y. and Vicinity v. Downtown Dev., Inc.,* 448 F.3d 138, 150 (2d Cir.2006) ("Although this ruling required the district court to

look outside the pleadings, a court has discretion to do so when determining whether it has subject matter jurisdiction.") (citing *Luckett v. Bure,* 290 F.3d 493, 496-97 (2d Cir.2002)); *see also Pampillonia,* 138 F.3d at 461-62 (looking to affidavits to determine if plaintiff's complaint alleged a sufficient factual foundation to support claims); *Consol. Fen-Phen Cases,* No. 03-CV-3081 (JG), 2003 WL 22682440, at *3 (E.D.N.Y. Nov. 12, 2003) (stating that, in analyzing fraudulent joinder, "courts can look beyond the pleadings to determine if the pleadings can state a cause of action"); *Arseneault v. Congoleum Corp.,* No. 01-CV-10657 (LMM), 2002 WL 472256, at *6-*7 (S.D.N.Y. Mar. 26, 2002) (considering deposition testimony and other material outside pleadings in order to resolve claim of fraudulent joinder).

**\*4** Similarly, in order for there to be diversity jurisdiction, the amount in controversy must exceed $75,000. *See* 28 U.S.C. § 1332(a). As noted *supra*, because Audi is seeking removal of the lawsuit to federal court, it " 'has the burden of proving that it appears to a reasonable probability that the claim is in excess of the statutory jurisdictional amount.' " *Mehlenbacher v. Arzo Nobel Salt, Inc.,* 216 F.3d 291, 296 (2d Cir.2000) (quoting *CenterMark Properties Meriden Square, Inc.,* 30 F.3d at 301). Moreover, "[t]o determine whether that burden has been met, we look first to the plaintiffs' complaint and then to [defendant's] petition for removal." *Mehlenbacher,* 216 F.3d at 296 (citation omitted). Finally, "[t]he Supreme Court has long held that separate and distinct claims raised by different plaintiffs may not be aggregated to satisfy the jurisdictional amount in controversy." *Id.* (citation omitted).

### B. Analysis

As discussed below, the Court concludes that Audi has failed to demonstrate that complete diversity of the parties existed at the time of removal or that the requisite jurisdictional amount in controversy has been met. The Court will address each issue in turn.

#### 1. "Complete Diversity" Issue

In response to plaintiff's motion to remand, although Audi concedes that Atlantic Imports is a New York citizen and would destroy complete diversity as a defendant,

2009 WL 385541

it contends that Atlantic Imports should be disregarded in determining whether complete diversity of citizenship exists because it was fraudulently joined. As set forth below, the Court disagrees.

Audi relies on the language in the *Pampillonia* decision, repeated in many cases, that fraudulent joinder occurs where "there is no possibility, based on the pleadings, that a plaintiff can state *a cause of action* against the non-diverse defendant in state court." *Pampillonia,* 138 F.3d at 461 (emphasis added). Focusing on the use of the term "cause of action," Audi argues that *Pampillonia* mandates that a cause of action must exist against the non-diverse defendant in order for it to be considered for diversity purposes. (*See* Audi's Opposition Memorandum of Law, at 12 n. 6 ("the standard is not whether or not a plaintiff has 'properly joined' a defendant, but instead whether or not the plaintiff can plead a 'cause of action' against the defendant").) However, the Court disagrees with the contention that this is the applicable standard and believes that there is no absolute requirement that a party have a separate cause of action against it. The use of that "cause of action" language simply reflects the fact that generally a defendant is named because plaintiff seeks some affirmative relief against the defendant in connection with a cause of action and, under such circumstances, the jurisdictional inquiry focuses on whether a cause of action exists. Contrary to Audi's suggestion, *Pampillonia* should not be read to stand for the proposition that the existence of a "cause of action" is the sole basis upon which a defendant can properly be considered for diversity of jurisdiction purposes.[1] Instead, a necessary or indispensable party to a lawsuit, even where no specific cause of action is asserted against it, should be considered for diversity of jurisdiction purposes if it is a real party to the controversy. *See Calcote v. Texas Pac. Coal & Oil Co.,* 157 F.2d 216, 218 (5th Cir.1946) ("In diversity cases, the question of indispensable parties is inherent in the issue of federal jurisdiction ...."). Although necessary or indispensable parties should be considered, nominal or formal parties should be disregarded. *See Navarro Sav. Ass'n v. Lee,* 446 U.S. 458, 461 (1980) ("a federal court must disregard nominal or formal parties and rest jurisdiction only upon the citizenship of real parties to the controversy"). Therefore, if a party is not simply a nominal or formal party but is named because it is a necessary party under state law that has interests that will be directly affected by the adjudication of the lawsuit, then such party is properly considered for purposes of diversity of jurisdiction, even if there is no specific cause of action asserted against that party.

**\*5** In the instant case, there is no question that plaintiffs properly named Atlantic Imports as a necessary party under New York law as required under C.P.L.R. § 1001.[2] Section 1001 provides, in relevant part, the following: "Persons who ought to be parties if complete relief is to be accorded between the persons who are parties to the action or who might be inequitably affected by a judgment in the action shall be made plaintiffs or defendants." C.P.L.R. § 1001(a). Because plaintiffs' complaint seeks injunctive relief restraining Audi from administering its incentive programs in connection with its dealer agreement with Atlantic Imports, such relief would certainly inequitably affect Atlantic Imports by precluding Audi from providing certain benefits to Atlantic Imports. Therefore, plaintiffs properly named Atlantic Imports as a necessary party under Section 1001.[3] However, this Court should only consider this party if it was a real party in controversy, rather than simply a nominal or formal party. On that issue, the Court concludes that Atlantic Imports was a real party in controversy because, as noted above, it had a material interest in the subject matter of the controversy, and such interest would be directly affected by the adjudication of this lawsuit. In fact, even Audi contends (in connection with the jurisdictional amount issue) that "the injunctive relief would, if granted, enjoin Audi from making payments to Atlantic Imports in excess of $75,000." (Audi Opposition Memorandum of Law, at 5.) In short, because Atlantic Imports was properly named as a necessary party under New York law (C.P.L.R. § 1001) and it was a real party in interest to this lawsuit (rather than a nominal or formal party), it was not fraudulently joined and is properly considered for diversity jurisdiction purposes. Moreover, because Atlantic Imports' interests are clearly aligned with Audi, it was properly characterized as a defendant in the suit. *See Mattila v. Injured Patients and Families Comp. Fund,* No. 07-C-50-C, 2007 WL 5517456, at \*1 (W.D Wis. Oct. 12, 2007) ("The parties' formal designation of a party in the complaint as a plaintiff or defendant is not controlling. 'The court will look beyond the pleadings, and arrange the parties according to their sides in the dispute.'") (quoting *City of Dawson v. Columbia Ave. Sav. Fund, Safe Deposit, Title & Trust Co.,* 197 U.S. 178, 180 (1905)). Accordingly, given that Atlantic Imports destroys complete diversity of the parties, subject matter jurisdiction does not exist in this case.

Case of Charntown, Inc. v. Volkswagen of America, Inc., Not Reported in F.Supp.2d (2009)
2009 WL 385541

This Court's conclusion is consistent with numerous other courts that have considered this precise issue and held that such necessary parties, who are not simply nominal or formal parties to the suit, should be considered for diversity jurisdiction purposes. For example, in *Birnbaum v. SL & B Optical Centers, Inc.,* 905 F.Supp. 267, 269-71 (D.Md.1995), in an action brought by a minority shareholder of franchisees against franchisees and others seeking dissolution of the franchisees, the court found that the franchisees were not fraudulently joined and granted the motion to remand for lack of diversity of citizenship. Specifically, although no wrongdoing was specifically alleged against the franchisees and no causes of action were directly stated against them, the court concluded that the franchisees were proper defendants under Maryland law in a suit for dissolution. *Id.* at 270. The court also concluded that they were not nominal or formal parties and thus found jurisdiction lacking:

> **\*6** Because the property interests of the Franchisees are at stake in this suit, they cannot be considered nominal or formal parties. Although the allegations of wrongdoings in count III are not directed at the Franchisee defendants, the resolution of the claim could result in their dissolution. The Franchisees are more than mere stakeholders in the instant suit. They have a strong personal interest in the outcome of the case and thus, the Court must regard the Franchise[e]s as more than "formal or nominal" parties. Because the Franchisees are neither fraudulently joined nor are nominal or formal parties, the Court finds that it lacks jurisdiction over this suit and must grant plaintiff's motion to remand.

*Id.* at 271; *see also Baella-Silva v. Hulsey,* 454 F.3d 5, 10 (1st Cir.2006) (company was a necessary party because Puerto Rico law does not recognize attorneys' liens and, thus, properly considered for jurisdictional purposes); *Andalusia Enterprises, Inc. v. Evanston Ins.* Co., 487 F.Supp.2d 1290, 1294-96 (N.D.Ala.2007) (in state-court declaratory judgment suit brought by insureds against their insurers and tort counterclaimant, nondiverse

tort claimant was necessary party to declaratory judgment action under Alabama law and, as a proper party defendant, was not fraudulently joined to evade removal). [4] In short, the Court concludes that Audi has failed to show fraudulent joinder of Atlantic Imports to this lawsuit and there was no complete diversity of the parties at the time of removal.

Although not specifically raised in the motion papers, the Court has also considered the impact of this conclusion given that Atlantic Imports, following removal, was voluntarily dismissed by plaintiffs from this lawsuit without prejudice, pursuant to a "So Ordered" stipulation, in which Atlantic Imports agreed to be bound and comply with any order of judgment of this Court granting the injunctive relief being sought in the complaint, and waived any right to challenge, oppose or appeal any such order or judgment. As a threshold matter, the Court recognizes that, in *Caterpillar, Inc. v. Lewis,* 519 U.S. 61 (1996), the Supreme Court held that the pretrial dismissal of the only non-diverse defendant in that case pursuant to a settlement agreement cured the jurisdictional defects by the time of judgment. Lower courts continue to debate the precise contours of the Supreme Court's ruling in *Caterpillar* in terms of the circumstances in which a state case lacking complete diversity at the time of removal can be cured by the post-removal elimination of the non-diverse party. *See generally* 14B WRIGHT, MILLER & COOPER, FEDERAL PRACTICE AND PROCEDURE JURISDICTION § 3723, at 588 (3d ed. 1998) ("The somewhat more contentious and as yet undefined doctrine has emerged that even though removal may have been improper due to a lack of diversity of citizenship at the time of removal, if the defect subsequently is cured before it is noticed, the federal court has subject matter jurisdiction to enter judgment.") However, that ongoing debate is not critical under the circumstances of this case for two reasons. First, in the circumstances here-where the Court "So-Ordered" the stipulation involving Atlantic Imports and thus retained jurisdiction over the settlement-the voluntary dismissal of Atlantic Imports does not eliminate it from consideration for diversity purposes even in *Caterpillar*. In fact, this precise issue was addressed by the Second Circuit in *Herrick Co. v. SCS Commc'ns Inc.,* 251 F.3d 315 (2d Cir.2001), in which the Second Circuit found that continued jurisdiction over the settlement of the non-diverse party could not cure the jurisdictional defect:

**\*7** The assertion of supplemental jurisdiction over the settlement, precisely because it involves no independent jurisdictional basis separate from the original dispute, must be understood to imply an assertion of continued involvement in and jurisdiction over that original dispute. Accordingly, the jurisdictional defect caused by [the non-diverse party's] inclusion as a defendant remains in place-and continues to destroy federal jurisdiction over the original suit-right up through the present day.

*Id.* at 328. In reaching this decision, the Second Circuit distinguished such circumstances from *Caterpillar* where the district court did not retain jurisdiction over the settlement and voluntary dismissal. *Id.* at 328 n. 10 ("The record in *Caterpillar* reveals that when the district court dismissed the settling defendant, it neither retained jurisdiction over the settlement nor 'so-ordered' the settlement's terms as part of the dismissal. Accordingly, by the settlement, the non-diverse defendant was genuinely eliminated from the case."). Therefore, because this Court "So Ordered" the stipulation of the settlement between plaintiffs and Atlantic Imports that led to the voluntary dismissal, the lack of complete diversity is still not cured and the *Caterpillar* exception does not apply. Second, as noted below, the Court also concludes that the requisite jurisdictional amount has not been met, thus providing a second barrier to subject matter jurisdiction by this Court, even if the issue of lack of complete diversity could be cured.

### 2. The Jurisdictional Amount Issue

Even assuming *arguendo* that there was complete diversity, the Court concludes that Audi has failed to demonstrate that the amount in controversy exceeds the jurisdictional amount. It is well settled that "if the jurisdictional amount is not clearly alleged in the plaintiff's complaint, and the defendant's notice of removal fails to allege facts adequate to establish that the amount in controversy exceeds the jurisdictional amount, federal courts lack diversity jurisdiction as a basis for removing

the plaintiff's action from state court." *Lupo v. Human Affairs Int'l, Inc.,* 28 F.3d 269, 273-74 (2d Cir.1994).

The complaint seeks an award of damages "which is not less than \$50,000." (Compl. at 15.) Such a statement in the complaint is insufficient, by itself, to satisfy the \$75,000 jurisdictional requisite and confer diversity jurisdiction. *See Lupo,* 28 F.3d at 273-74 (diversity jurisdiction lacking where complaint alleged amount in controversy "in excess of \$15,000" and the then-amount-in-controversy minimum was \$50,000).

Although Audi asserts two grounds for showing that the amount in controversy exceeds the jurisdictional minimum, the Court does not find either ground sufficient. First, in its removal petition, Audi contends that "[t]he Complaint seeks to enjoin certain aspects of certain incentive programs currently being operated by Audi, pursuant to which Audi will be paying in excess of \$75,000." (Removal Petition, at 3.) Thus, Audi contends that "with respect to the injunctive relief sought by Plaintiffs, the injunctive relief would, if granted, enjoin Audi from making payments to Atlantic Imports in excess of \$75,000." (Audi Opposition Memorandum of Law, at 5.) The Court recognizes, in determining the amount in controversy, the Court should consider the injunctive relief sought. *See Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 347 (1977); *DiTolla v. Doral Dental IPA of New York, LLC,* 469 F.3d 271, 276 (2d Cir.2006); *see also A.F.A. Tours, Inc. v. Whitchurch,* 937 F.2d 82 (2d Cir.1991) ("Where the plaintiff seeks injunctive relief, the value of his claim is generally asserted with reference to the right he seeks to protect and measured by the extent of the impairment to be prevented by the injunction."). However, to the extent that Audi is seeking to rely on the value of the incentive programs that would be enjoined as to Atlantic Imports if the plaintiffs were successful in obtaining the requested injunctive relief, the Court finds such reliance misplaced because amount in controversy "is calculated from the *plaintiff's standpoint," Kheel v. Port of New York Authority,* 457 F.2d 46, 49 (2d Cir.1972) (emphasis added), rather than any defendant or third party. *See, e.g., Leyse v. Domino's Pizza LLC,* No. 04-CV-2411 (HB), 2004 WL 1900328, at \*3 (S.D.N.Y. Aug. 24, 2004) (" 'The Second Circuit has held that the amount in controversy for jurisdictional purposes should be measured strictly from the plaintiff's perspective, without regard to the amount at stake for any other party.' ") (quoting 15

MOORE'S FEDERAL PRACTICE-CIVIL § 102.109[3], at 102-99 (3d ed.1998) (internal citations omitted)); *see also Alicea v. Circuit City Stores, Inc.,* 534 F.Supp.2d 432, 435 (S.D.N.Y.2008) ("[defendant's] post-removal argument that costs of compliance may be counted to meet the jurisdictional requirement also is not objectively reasonable because the Second Circuit has held, prior to the filing of this lawsuit, that the value of the claims is measured from the plaintiff's perspective"). Therefore, the costs to Audi and/or Atlantic Imports, or benefits from the incentive programs that would be lost by Atlantic Imports, which would ensue if the injunctive relief were granted in this case, are not considered in assessing the jurisdictional amount.

**\*8** In an attempt to avoid this jurisdictional defeat, Audi contends, although not specifically asserted in the removal petition, that "even from the perspective of Plaintiffs, the value of the injunctive relief sought by each of the Plaintiffs exceeds $75,000." (Audi's Opposition Memorandum of Law, at 6.) In particular, Audi asserts that, because the complaint alleges that the incentive programs "threaten the profitability and going-concern value of the Dealers" (Compl.¶ 19) and an affidavit in another lawsuit suggests that several million dollars were invested in Audi Smithtown, the requisite jurisdictional amount is satisfied. For the same reason, Audi argues that the monetary claims will exceed $75,000. However, these conclusory statements in the removal petition and/or Audi's Opposition Memorandum of Law are insufficient to demonstrate that there is a "reasonable probability" that the jurisdictional amount will be met. *See, e.g ., United Food & Commercial Workers Union Local 919 v. CenterMark Properties Meriden Square, Inc.,* 30 F.3d 298, 305 (2d Cir.1994) ("a boilerplate demand statement setting forth an open-ended demand for an amount in excess of $15,000, without more, falls well short of the type of proof we require from defendants to establish that the $50,000 amount in controversy requirement is met in an action seeking primarily injunctive relief."); *Kaur v. Levine,* No. 07-CV-0285 (FB)(JO), 2007 WL 210416, at \*2 (E.D.N.Y. Jan. 26, 2007) ("The [*Mehlenbacher* ] decision provides no support for the proposition that a personal injury claim alleging damages in an unspecified amount over $50,000 should be assumed to exceed the $75,000 statutory jurisdictional threshold simply because the complaint alleges 'great mental pain and anguish' and involves family members of a decedent."); *see also Wood v. Option One Mortgage Corp.,* 580 F.Supp.2d 1248,

1253-54 (N.D.Ala.2008) ("While this court recognizes that the requisite amount in controversy might exist, '[i]f the court asserts jurisdiction on the basis of the defendant's speculative assertions, it implicitly accepts rank speculation as reasonable inquiry [per Rule 11]. This could undermine the requirement of reasonable inquiry not only in removal situations, but also in other contexts.' ") (quoting *Lowery v. Alabama Power Co.,* 483 F.3d 1184, 1215 n. 67 (11th Cir.2007)). For example, there is no information at all regarding the value of incentive payments of which plaintiffs have been deprived, which were allegedly made to Atlantic Imports since it was formed. The basis for the amount in controversy should not be grounded in sheer speculation by the Court about the car industry, or the nature of car dealerships and/or incentive programs. Thus, in the absence of any evidence whatsoever regarding the potential level of monetary damages in this case (or the related value of injunctive relief to plaintiffs), the generalized statement in the complaint that Audi's conduct threatens the plaintiffs' "profitability" and "going-concern value" does not provide a sufficient basis for concluding that the jurisdictional minimum amount is met in this case. [5]

**\*9** In sum, defendant has failed to show that Atlantic Imports was fraudulently joined (or was only a nominal or formal party) and has failed to show a reasonable probability that the requisite jurisdictional amount will be satisfied in this case. Accordingly, this Court lacks subject matter jurisdiction over this lawsuit and, pursuant to 28 U.S.C. § 1447(c), plaintiffs' motion to remand the action to state court is granted. [6]

### III. CONCLUSION

For the foregoing reasons, pursuant to 28 U.S.C. § 1447(c), Audi of Smithtown and Audi of Hungtington's motion to remand for lack of federal diversity jurisdiction is GRANTED. [7] The action is hereby REMANDED to the Supreme Court of the State of New York, Suffolk County.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 385541

Case 1:18-cv-00475-SEB-TAB   Document 1-2   Filed 02/16/18   Page 310 of 440 PageID #: 322
Rauch-Glidmann, Inc. v. Volkswagen of America, Inc., Not Reported in F.Supp.2d (2009)

2009 WL 385541

Footnotes

1    The strained, narrow interpretation of the *Pampillonia* decision urged by Audi is further undermined by cases where the
     Second Circuit and other courts have, in the context of Rule 19 of the Federal Rules of Civil Procedure, suggested that
     necessary and indispensable parties are considered for diversity jurisdiction purposes. *See MasterCard Int'l Inc. v. Visa
     Int'l Serv. Ass'n, Inc.,* 471 F.3d 377, 384 (2d Cir.2006) ("If the district court's ruling that Visa is not a necessary and
     indispensable party is erroneous, then, because Visa's joinder would destroy diversity jurisdiction, the underlying action
     must be dismissed for lack of subject matter jurisdiction."); *see also Burns v. Friedli,* 241 F.Supp.2d 519, 523 (D.Md.2003)
     (rejecting fraudulent joinder argument and remanding case because of existence of non-diverse company defendant as
     a party because of, among other things, the following: "It ... is plain from the face of the complaint that ... [the company]
     has interests that may be directly and substantially affected by the outcome of the suit. Moreover, it appears that the
     remedies requested, particularly the aforementioned injunctive relief, may not be accorded in [the company's] absence.")
     (internal quotation and citation omitted); *Lee v. Kim,* No. 97-CV-4406 (DC), 1998 WL 20003, at *6 (S.D.N.Y. Jan. 20,
     1998) ("I note that diversity jurisdiction does not sustain this action because an indispensable party to this action ... has
     not been joined, and joinder would destroy diversity as between the parties.").

2    Under these circumstances, where the issue is fraudulent joinder, the Court looks to state law in order to determine the
     nature of Atlantic Imports' interest in this litigation for jurisdictional purposes at the time of removal. *See, e.g., Allen v.
     Baker,* 327 F.Supp. 706, 709 (N.D.Miss.1968) ("[I]n spite of defendant's disavowals in this regard, the question necessarily
     is one of joinder, for the citizenship of these survivors only becomes relevant to the jurisdictional question here presented
     if it is determined that their interest in this action is of such a nature that this court could not proceed to the merits
     without their presence .... Where diversity of citizenship affords the jurisdictional basis, the nature of an interest in litigation
     depends upon the law of the state concerned. In a diversity case, state substantive law will govern in determining the
     rights and interests of all concerned.") (quotations and citations omitted). Audi suggests that, regardless of the propriety
     of including Atlantic Imports as a necessary party under Section 1001, Atlantic Imports is not a necessary party for federal
     proceedings after removal. (Audi Opposition Memorandum of Law, at 12 n. 7.) However, the Court disagrees with that
     contention. As plaintiffs noted, "[Audi] offers the rather remarkable argument that a non-diverse defendant, properly joined
     as a party under state law in a state court action, which would lose its right to receive substantial monetary benefits
     if plaintiffs succeed on the merits is, nevertheless, following removal, not a properly joined party and does not destroy
     diversity. In order to pull this argument off, Audi essentially argues that the act of filing a Notice of Removal can magically
     transform a properly joined adverse party under state law into a fraudulently joined party under federal law." (Plaintiffs'
     Reply Memorandum of Law, at 1.) This Court agrees with plaintiffs that the jurisdictional analysis for removal occurs at
     the time of removal based upon the necessity of the party under state law. *See Andalusia Enters., Inc. v. Evanston Ins.
     Co.,* 487 F.Supp.2d 1290, 1295 (N.D.Ala.2007) ("[The] removal statute contemplates the determination of the question
     of removability using the lineup of the parties at the time of removal, unless that lineup is facially improper. Here it was
     both proper and mandated by Alabama procedure."). In any event, the Court concludes that, whether state law (under
     Section 1001) or federal law regarding joinder of parties is applied in this case, the result is the same-Atlantic Imports
     was properly joined as a defendant in state court, would be a necessary and indispensable party under federal law that
     would destroy diversity jurisdiction, and is properly considered as a real party in interest for jurisdictional purposes.

3    In fact, Audi does not even attempt to argue in its papers that such joinder was improper under state law; rather, Audi
     simply argues it should be ignored. (*See* Audi's Opposition Memorandum of Law, at 12 ("[U]nder the standard established
     in *Pampillonia,* 'fraudulent joinder' has occurred. This result maintains even if Plaintiffs properly added Atlantic Imports
     in state court under New York CPLR § 1001.").)

4    Audi's reliance on *New York State Ins. Fund v. U.S. Liability Ins. Co.,* No. 03-CV-6652 (LMM), 2004 WL 385033 (S.D.N.Y.
     Mar. 2, 1994) to support its position is misplaced. In that case, the court concluded that the non-diverse defendants were
     nominal parties and, even if not nominal, they should be re-aligned as plaintiffs because the relief sought would benefit
     them. *Id.* at *2-*3. However, that analysis is inapposite here where Atlantic Imports is not merely a formal or nominal
     party, and its interests are clearly adverse to plaintiffs.

5    Audi correctly notes that, when pleadings are inconclusive as to the amount in the controversy, the Court may look outside
     the pleadings (or removal petition) to other evidence in the record. *See CenterMark Properties Meriden Square, Inc.,* 30
     F.3d at 305. However, the Court has found no evidence anywhere in the record to support the assertion that there is a
     "reasonable probability" in this case that the jurisdictional amount will exceed $75,000.

6    Finally, the Court notes that, because there had not been subject matter jurisdiction over this case at any point since its
     removal, the Court's "So Ordering" of the stipulation of settlement between plaintiffs and Atlantic Import is a nullity and

this Court does not have jurisdiction to enforce any settlement between those parties. *See Herrick Co. v. SCS Commc'ns Inc.,* 251 F.3d 315, 328 (2d Cir.2001) (where court had no proper federal jurisdiction over initial lawsuit, it could not retain jurisdiction over settlement); *see also Guiterrez v. Fox,* 141 F.3d 425, 426 (2d Cir.1998) ("Without jurisdiction, any decision or ruling by the court would be a nullity.").

7    In connection with the motion to remand, plaintiffs also seek an award of costs and expenses, including attorneys' fees. "Absent unusual circumstances, courts may award attorney's fees under § 1447(c) only where the removing party lacked an objectively reasonable basis for seeking removal. Conversely, when an objectively reasonable basis exists, fees should be denied." *Martin v. Franklin Capital Corp.,* 546 U.S. 132, 141 (2005); *see also Circle Indus. USA Inc. v. Parke Constr. Group, Inc.,* 183 F.3d 105, 109 (2d Cir.1999) (stating that the goal of this provision "is to deter improper removal .... While the simplicity of [the removal] procedure facilitates removal, it also exposes a plaintiff to the possibility of abuse, unnecessary expense and harassment if a defendant removes improperly, thereby requiring plaintiff to appear in federal court, prepare motion papers and litigate, merely to get the action returned to the court where the plaintiff initiated it."). Although this Court has concluded that removal was improper, Audi had an objectively reasonable basis to at least seek removal given the above-referenced issues regarding Atlantic Imports' status in the case and the ambiguities in the jurisdictional amount. Moreover, there is no evidence that the removal was done in bad faith, such as to harass or delay. In fact, the parties continued to proceed with discovery while this jurisdictional issue was being briefed. Therefore, plaintiff's request for costs and expenses, including attorneys' fees, is denied because there is no basis for such an award under the circumstances of this case.

---

**End of Document**                                 © 2018 Thomson Reuters. No claim to original U.S. Government Works.

# *TAB 2*

Dewing v. Perdicaries, 96 U.S. 193 (1877)
6 Otto 193, 24 L.Ed. 654

96 U.S. 193
Supreme Court of the United States

DEWING
v.
PERDICARIES.

October Term, 1877

**Opinion**

**\*\*1**  APPEAL from the Circuit Court of the United States for the District of South Carolina.

The facts are stated in the opinion of the court.

West Headnotes (12)

**[1]**    **Corporations and Business Organizations**
👉 What Constitutes Capital Stock

**Corporations and Business Organizations**
👉 Title or interest acquired by corporation

The capital stock and all the other property and effects of a corporation are a trust fund, and the corporation owns and holds them as a trustee.

3 Cases that cite this headnote

**[2]**    **Corporations and Business Organizations**
👉 Nature and necessity of certificate

A stock certificate is only one of the indicia of title, and stock may be held by a valid title without a certificate.

Cases that cite this headnote

**[3]**    **Corporations and Business Organizations**
👉 Effect of Transfer

Under the statute of Confederate States, and an order of the Confederate district court for the district of South Carolina, certain shares of stock of a corporation of that state were sold at public auction, on the ground that the owners were alien enemies; and the company was required to erase from its stock books the names of such owners, and issue stock

certificates to the purchasers. Held, that the purchasers of such stock have no claim against the company for indemnity, but, if they are entitled to any redress, they must seek it against the parties by whom they claim to have been defrauded.

2 Cases that cite this headnote

**[4]**    **Corporations and Business Organizations**
👉 Effect of Transfer

The right to corporate stock is in the nature of a nonnegotiable chose in action, and an assignee takes it subject to all the equities existing against it in the hands of the assignor.

2 Cases that cite this headnote

**[5]**    **Corporations and Business Organizations**
👉 Recovery to corporation rather than shareholder

**Corporations and Business Organizations**
👉 Use of Corporate Name

Where a stockholder sues in corporation's behalf after corporation has refused to proceed against directors who have made themselves personally liable for neglect or breach of duty, avails of litigation, if any, go to corporation and are part of its means as if it had itself sued and recovered.

4 Cases that cite this headnote

**[6]**    **Corporations and Business Organizations**
👉 Conditions precedent;pursuing other remedies

**Corporations and Business Organizations**
👉 Parties

**Corporations and Business Organizations**
👉 Use of Corporate Name

Where a stockholder sues in corporation's behalf after corporation has refused to proceed against directors who have made themselves personally liable for neglect or breach of duty, the corporation is an "indispensable party," and the refusal must be made distinctly to appear.

Cases that cite this headnote

**[7]**   **Corporations and Business Organizations**
    👉 Parties

Where a cause of action affects the entire interests of a corporation as such, the corporation is the proper party to sue, but where it affects specially a stockholder, he has the same right to sue according to his interest as any one else.

2 Cases that cite this headnote

**[8]**   **Corporations and Business Organizations**
    👉 Parties

Where shares of stock of a South Carolina corporation were sold at public auction under a statute of the Confederate States and an order of the Confederate district court for the district of South Carolina on ground that owners were alien enemies, and corporation was required to erase from its books that names of those owners and issue stock certificates to purchasers, corporation was properly made a party defendant in action by original owners to have their rights settled.

4 Cases that cite this headnote

**[9]**   **States**
    👉 Confederate States

An order of a Confederate district court for the district of South Carolina directing the sequestration of corporate stock pursuant to a statute of the Confederate States, the sale of stock, transfer of stock to purchasers, and new certificates issued to purchasers were all void, and neither purchasers nor their transferees acquired title to the stock.

3 Cases that cite this headnote

**[10]**   **States**
    👉 Confederate States

A thing void as to all persons and for all purposes can derive no strength from confirmation.

Cases that cite this headnote

**[11]**   **States**
    👉 Confederate States

All acts done in aid of the rebellion were illegal and of no validity.

Cases that cite this headnote

**[12]**   **Bills and Notes**
    👉 Defenses Against Holders in Due Course
**Bills and Notes**
    👉 Illegality in general

A negotiable note void ab initio because made so by statute, by public policy on account of the consideration, or by reason of the incapacity of the maker, cannot be enforced against the maker by a bona fide holder any more than it could by the payee.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*193**   Mr. *Philip Phillips* and Mr. *Edward McCrady* for the appellants.

Mr. *H. E. Young* and Mr. *W. D. Porter, contra.*

**\*\*2**   1. All acts done in aid of the rebellion were illegal and void.

2. Pursuant to a statute of the Confederate States, and to an order of the Confederate District Court for the District of South Carolina, certain shares of the stock of a corporation of that State were, upon the ground that the owners of them were alien enemies, sequestrated and sold in 1862 at public auction; and the company was required to erase from its stock-books the names of such owners, insert those of the purchasers, and issue stock certificates to them. All dividends thereafter from time to time declared were paid to the purchasers, against whom, or their assignees, and the company, this bill was filed by an original stockholder, praying for a decree that the certificates so issued be cancelled as null and void, and the defendants enjoined from selling them, bringing suits

to effect the transfer thereof, or collect dividends thereon, and the company from allowing such transfers, issuing new certificates for the same, or paying such dividends. The court decreed accordingly. *Held*, 1. That the order of sequestration, the sale, the transfer on the stock-books of the company, and the new certificates, were void, giving no right to the purchasers or to their assignees, and taking none from the original owners. 2. That the bill was well brought, and the corporation a proper party defendant. 3. That the purchasers, or their assignees, have no claim against the company for indemnity; but if, under the circumstances, entitled to any redress, they must seek it by suit against the parties by whom they claim to have been defrauded.

MR. JUSTICE SWAYNE delivered the opinion of the court.

There is no controversy about the material facts of this case. At the beginning of the late civil war, the Charleston Gaslight **\*194** Company was a body politic and corporate of the city of Charleston, in the State of South Carolina. Its capital stock consisted of thirty thousand six hundred and sixty-four shares of $25 each. A part of the stock was held by citizens of other states. Pursuant to a statute of the Confederate States, and an order of the Confederate District Court for the District of South Carolina, three thousand seven hundred and seventy-six shares were sequestrated, and sold at public auction on the 11th of April, 1862, for the alleged reason that they belonged to 'alien enemies.' Of this stock the complainant owned thirteen hundred and fifty-one shares. The defendants, except the gas company, were purchasers at this sale, or are the assignees of such purchasers. The Confederate authorities required the company to erase from its stock-book the names of the loyal owners, to insert those of the purchasers, and to issue stock certificates to the latter; all which was accordingly done. Dividends were declared from time to time, and paid to those parties or their assignees. The company acted under duress. The slightest resistance or hesitation would not have been tolerated by the Confederate authorities.

**\*\*3** In February, 1865, the military forces of the United States captured the city of Charleston, and seized all the property and effects of the gas company. The president of the company was relieved from his duties, and ordered to deliver all the records of the company to a lieutenant of the army, who was appointed to succeed him. In May, 1866, the property of the company which had

been seized was restored to it. The conditions of the restoration were that the company should erase from its books the names of those who bought the sequestrated stock and of the assignees, and replace the names of the prior stockholders, and also pay to the latter the amount of the dividends declared upon the stock since January, 1861. These requirements were fully complied with by the company.

The bill was filed by Perdicaries for himself and such other stockholders in the same situation as might choose to come in and contribute to the expenses of the litigation. The stock certificates of the original holders, and those of the purchasers or their assignees, are still outstanding.

The complainant prays that the sale may be vacated; that **\*195** the certificates still outstanding issued to the purchasers and their assignees may be declared invalid, and ordered to be delivered up and cancelled; that the claimants may be enjoined from transferring or selling the shares, and from bringing suits to effect such transfers, or for dividends; and that the company be enjoined from allowing such transfers, from issuing new certificates, and from paying dividends on the shares to those parties.

Subsequently, an amended bill was filed. It alleged that some of the defendants had commenced actions on the case against the company, alleging that it had issued the certificates fraudulently, and that it was bound to make them good, or to indemnify the holders. It was prayed that all the parties be enjoined from prosecuting or instituting such suits, and that their rights should be finally settled in this suit. There was a decree for the complainants, whereupon the defendants brought the case here.

Nothing is better settled in the jurisprudence of this court than that all acts done in aid of the rebellion were illegal and of no validity. The principle has become axiomatic. It would be a mere waste of time to linger upon the point for the purpose of discussing it. *Texas* v. *White*, 7 Wall. 700; *Hickman* v. *Jones*, 9 id. 197; *Hanauer* v. *Doane*, 12 id. 342; *Knox* v. *Lee*, id. 457; *Hanauer* v. *Woodruff*, 15 id. 439; *Cornet* v. *Williams*, 20 id. 226; *Sprott* v. *United States*, id. 459.

The transactions here in question were clearly within the category thus denounced. The order of sequestration, the sale, the transfer, and the new certificates, were all utterly void. They gave no rights to the purchasers, and took none from the loyal owners. In the view of the law, the rightful relations of both to the property were just the same

afterwards that they had been before. The purchasers had not then, and they have not now, a scintilla of title to the stock.

**\*\*4** The transferees can be no better off than their vendors. This is necessarily so, for several reasons.

A thing void as to all persons, and for all purposes, can derive no strength from confirmation. 13 Comyns, Dig., tit. Confirmation, D. 1, 4, pp. 144, 145; *Blessing* v. *House's Lessee*, 3 Gill & J. (Md.) 290.

**\*196** It is a *caput mortuum*, and nothing can give it vitality. The assignor could give no title to his assignee, when he had none himself.

The stock of such corporations may be held by a valid title without a certificate. The certificate is only one of the *indicia* of title. The right to the stock is in the nature of a non-negotiable chose in action. Angell & A. on Corp., sect. 560. The assignee takes it subject to all the equities which existed against it in the hands of the assignor. *Mechanics' bank* v. *The New York & New Haven Railroad Co.*, 13 N. Y. 599. Such is the rule applied to all choses in action not having the element of negotiability. *National Bank of Washington* v. *Texas*, 20 Wall. 72.

Even where a negotiable note is void *ab initio*, because made so by statute, or by public policy on account of the consideration, or is so by reason of the incapacity of the maker, it can no more be enforced against the maker by a *bona fide* holder than by the payee. It is alike void in the hands of both. 1 Parsons, Bills and Notes (ed. 1873), pp. 276, 277.

It is needless to pursue the subject further. The assignors and assignees occupy exactly the same ground. Neither has any right or title to the stock in question.

The suit was well brought by the complainant. The capital stock and all the other property and effects of a corporation are a trust fund. The corporation owns and holds them as a trustee. The shares are a distinct and separate property. This subject was fully considered in *Farrington* v. *Tennessee*, 95 U. S. 679. What was there said need not be repeated. Where a cause of action affects the entire interests of a corporation as such, the corporation is the proper party to sue. Where it affects specially a stockholder, he has the same right to sue *pro interesse suo* as any one else. In the latter case, it may or may not be necessary to make the corporation a party. As between the complainant and the party who bought his stock at the pretended sale, the conflict was primarily between them. The question was one of *meum* and *tuum*. But the shares represented aliquot parts of the trust fund. It was, therefore, proper that the corporation, as the trustee of that fund, should be brought before the court, that it might have **\*197** effectual notice of the litigation, and be bound by the results. The corporation, as the owner and representative of the trust fund, had, however, an interest of its own to be litigated. So far as the prior and the latter holders of the stock were concerned, it might have made them parties, and had their rights settled by a bill of interpleader. There were also questions affecting all the stockholders alike. They were, (1) whether both sets of claimants could not hold the stock claimed by them respectively, and the aggregate of the capital stock be so much increased; (2) whether the corporation, by reason of the conduct of its officers, was or was not bound to indemnify the purchasers or their assignees, if they lost the stock which they claimed to own; and (3) whether dividends should be paid to both sets of claimants, and, if not, to whom such payments should be made. In such a proceeding the original owners of the confiscated stock must have been made parties. This would have brought the same questions before the court as are now presented for consideration. The liberality and flexibility of the doctrines and practice of courts of equity are such that this could as well be done in this case as in a separate and independent proceeding instituted by the corporation. The complainant had a clear right, on account of the cloud cast upon his title, and of the injury otherwise special to himself, of which he complained, to be heard upon his bills. The entire subject and the necessary parties being before the court, and the court having jurisdiction for one purpose, might well take and exercise it as to every thing involved in the controversy. This saved time, expense, circuity of proceedings, perhaps a multiplicity of suits, and promoted the ends of justice. There is clearly no misjoinder or multifariousness in the bill.

**\*\*5** There are cases in which a corporation having refused to do its duty by suing to avert a threatened wrong, a stockholder was permitted to intervene in its stead, making the corporation a party. *Dodge* v. *Woolsey* (18 How. 331) is one of this kind. Cases are more numerous where the directors having made themselves personally liable for neglect or breach of duty, and the corporation refusing to proceed against them, a stockholder has been permitted to sue in its behalf. In such cases, the corporation **\*198** is an indispensable party. The refusal

6 Otto 193, 24 L.Ed. 654

must be made distinctly to appear; and the avails of the litigation, if there be any, go to the corporation, and are a part of its means, as if it had itself sued and recovered. See *Hodges* v. *New England Screw Co.*, 1 R. I. 312; *Foss* v. *Harbottle*, 2 Hare, 461; *Hersey* v. *Veazie*, 24 Me. 1; *Cunningham* v. *Pell*, 5 Paige (N. Y.), 607; *Smith* v. *Hurd*, 12 Metc. (Mass.) 371; *Austin, Receiver*, v. *Daniels*, 4 Den. (N. Y.) 299. But this bill does not belong to either of these classes. It is founded upon the wrong and injury special to the complainant; but it happens that his case and that of the corporation, if the latter had sued, would depend upon the same considerations, and that the decision of either would decide the other, except, perhaps, as to a single point, in regard to which we entertain no doubt. That point is the claim of a part of the appellants for indemnity from the company. To this, aside from the state of the pleadings, there are fatal objections. If they are paid by the company, they must be paid in part out of the money of the loyal men who have been wronged and forced into this litigation for the vindication of their rights. A court of equity cannot be expected to entertain such a proposition. If those who make the claim are, under the circumstances of this case, entitled to any remedy, it must be sought against the parties personally by whom they say they were defrauded. *The Western Bank of Scotland* v. *Addie*, Law Rep. 1 Scotch App. 145. That question would be alien to those arising and proper to be decided in this case. The litigation as to that subject would be multifarious.

The rights and claims of all the parties before us, as respects both the corporation and the original stockholders, may therefore well be disposed of in this case.

We think the decree of the Circuit Court is right; and it is

*Affirmed.*

**All Citations**

96 U.S. 193, 6 Otto 193, 1877 WL 18459, 24 L.Ed. 654

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

# *TAB 3*

599 F.Supp. 1084
United States District Court,
D. Minnesota, Fourth Division.

EDUDATA CORPORATION, Plaintiff,

v.

SCIENTIFIC COMPUTERS, INC., Hubert H.
Humphrey, III, Attorney General of the State of
Minnesota, and Michael A. Hatch, Commissioner of
Commerce of the State of Minnesota, Defendants.
SCIENTIFIC COMPUTERS, INC.,
a Minnesota corporation, Plaintiff,

v.

EDUDATA CORPORATION, a Delaware
corporation, Shamrock Associates, a New Jersey
Limited Partnership, Sun Equities Corporation, a
Delaware corporation, and Paul Koether and Natalie
Koether, Residents of New Jersey, Defendants.

Civ. Nos. 4–84–968, 4–84–978.
|
Sept. 28, 1984.

**Synopsis**
Company making tender offer filed complaint against
takeover target, State Attorney General, and State
Commissioner of Commerce seeking judgment declaring
that certain provisions of the Minnesota Corporate Take-
Overs Act and Minnesota Business Corporation Act were
unconstitutional as applied to its tender offer and were
preempted by the Williams Act. Takeover target filed
complaint against company making tender offer and
others alleging violations of federal and state statutes.
Upon motions of company making offer and takeover
target for temporary restraining orders, the District
Court, Diana E. Murphy, J., held that: (1) company
making tender offer was not entitled to temporary
restraining order, and (2) takeover target was entitled
to temporary restraining order suspending tender offer
pending further hearing.

Order accordingly.

Order affirmed in part and dismissed in part, 8 Cir., 746
F.2d 429.

**West Headnotes (4)**

**[1]** **Injunction**
👉 Grounds in general;multiple factors

Whether temporary injunctive relief may be
granted is determined by consideration of four
factors, namely, the threat of irreparable harm
to movant, state of the balance between this
harm and the injury that granting injunction
will inflict on other parties litigant, probability
that movant will succeed on merits and the
public interest.

Cases that cite this headnote

**[2]** **Injunction**
👉 Mergers and acquisitions;anti-takeover
measures

Company making tender offer was not
entitled to temporary restraining order
preventing target company from enforcing
certain provisions of the Minnesota
Corporate Take-Overs Act and Minnesota
Business Corporation Act, and from
commencing any judicial proceeding relating
to those laws in any other forum, in that Take-
Overs Act differed from statutes found to be
unconstitutional in other cases, commissioner
of commerce was currently expanding factual
record with his investigation and his
subsequent action might moot constitutional
question, and public interest would be
furthered by full disclosure of all material
information concerning tender offer. M.S.A.
§ 80B.01 et seq.; Minn.St.1984, §§ 302A.011,
subds. 37–39, 302A.449, subd. 7, 302A.671.

1 Cases that cite this headnote

**[3]** **Injunction**
👉 Mergers and acquisitions;anti-takeover
measures

Takeover target was entitled to a temporary
restraining order suspending tender offer
pending further hearing, in that company
making tender offer had not shown that its

harm from delay was irreparable, restraining order would protect it from criminal and civil penalties it feared because of any possible conflict between state and federal law and harm to takeover target, the value of its shares, and jobs for its employees were of legal concern if law were violated. M.S.A. § 80B.01 et seq.; Minn.St.1984, §§ 302A.011, subds. 37–39, 302A.449, subd. 7, 302A.671.

Cases that cite this headnote

**[4]**   **Federal Civil Procedure**
👉   **Grounds and Objections**

Takeover target's motion for expedited discovery would be granted since further development of record before preliminary injunction hearing concerning tender offer would better enable court to judge parties' interests and respective chances for success on the merits.

11 Cases that cite this headnote

**Attorneys and Law Firms**

**\*1085**   Theodore Altman, Gordon, Hurwitz, Butowsky, Weitzen, Shalov & Wein, New York City, Thomas E. Glennon and Richard Primuth, Lindquist & Vennum, Minneapolis, Minn., for Edudata Corp.

Roger Magnuson and Linda Freyer, Dorsey & Whitney, Minneapolis, Minn., for Scientific Computers, Inc.

Barry Greller, Asst. Atty. Gen., St. Paul, Minn., for Hubert H. Humphrey, III and Michael A. Hatch.

**ORDER**

DIANA E. MURPHY, District Judge.

These companion cases arise from a tender offer commenced by Edudata Corporation (Edudata), a Delaware corporation, on September 20, 1984, for all outstanding shares of the common stock of Scientific Computers, Inc. (SCI), a Minnesota corporation.

**\*1086**   Edudata filed a verified complaint against SCI, Hubert Humphrey III, Attorney General of Minnesota, and Michael A. Hatch, Commissioner of Commerce in Minnesota, in this court on the same day. Edudata seeks a judgment declaring that certain recently-enacted provisions of the Minnesota Corporate Take-Overs Act, Minn.Stat. Ch. 80B, and the Minnesota Business Corporation Act, Minn.Stat. §§ 302A.011, subd. 37, 38, 39; 302A.449, subd. 7 and 302A.671, are unconstitutional as applied to Edudata's tender offer and are preempted by the "Williams Act", 82 Stat. 454, et seq. codified at 15 U.S.C. §§ 78m(d)–(e) and 78n(d)–(f), amendments to the Securities Exchange Act of 1934. The complaint also requested temporary, preliminary and permanent injunctive relief restraining SCI from enforcing the above provisions of Minnesota law and from commencing any judicial proceeding relating to these laws in any other forum. Jurisdiction is alleged under 28 U.S.C. §§ 1331(a), 1332, 1337(a), 1343(3) and (4), and 15 U.S.C. § 78aa.

SCI filed a verified complaint in this court on September 26, 1984 against Edudata, Shamrock Associates (Shamrock), Sun Equities Corporation (SECC), Paul Koether and Natalie Koether. SCI also bases part of its claim on violations of the Williams Act. In addition, it charges violations of the Minnesota Business Corporation Act, the Minnesota Corporate Take-Overs Act, and fraud. Jurisdiction is alleged under 15 U.S.C. § 78aa, 28 U.S.C. §§ 1331, 1332 and pendent jurisdiction.

These matters are now before the court upon motions of Edudata and SCI for temporary restraining orders and upon SCI's motion to expedite discovery.

In addition to the actions commenced in this court, the parties are involved in state judicial and administrative proceedings. On September 24, Michael Hatch, the Minnesota Commissioner of Commerce, issued an Order suspending the registration by Edudata of its tender offer pursuant to Minn.Stat. § 80B.03 subd. 4a. Hatch found that the takeover materials did not provide full disclosure of all material information as Edudata failed to specify its future plans concerning the target company (SCI), to identify adequately Edudata's background and affiliates and to specify any potential liability Edudata may have due to misstatements or omissions of material fact made in its public offering of July 1984. Hatch also ordered a hearing on October 4, 1984 to determine whether the suspension shall be terminated or made

permanent. Edudata asks this court to set aside Hatch's order suspending its tender offer.

SCI has also initiated a suit in state court against Edudata and Craig-Hallum, Inc., a Minnesota corporation. On September 26, 1984, Judge Irving Iverson issued a temporary restraining order in that action, enjoining defendants from proceeding with, causing or aiding and abetting the tender offer by Edudata to purchase shares of SCI from residents of Minnesota or engaging in any activities in furtherance of the tender offer, and from accepting tenders of shares of SCI stock. Judge Iverson also enjoined Edudata from consummating the control share acquisition of SCI prior to a special shareholders meeting which, pursuant to Minn.Stat. § 302A.671, subd. 3 (1984), has been called for November 15, 1984.

At the hearing before this court on September 26, 1984, the parties addressed the effect of this state court order. Counsel for Edudata stated that the case was being removed to this court, but SCI's counsel responded that removal is improper because there is not complete diversity. SCI asserts that a federal restraining order is needed to enjoin Edudata from proceeding nationally since the state order only protects Minnesota citizens.

## DISCUSSION

**[1]**   Whether temporary injunctive relief may be granted is determined by consideration of four factors: (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that the movant will succeed on the merits; and (4) the public interest. *Dataphase* **\*1087** *Systems, Inc. v. C L Systems, Inc.,* 640 F.2d 109, 114 (8th Cir.1981).

**[2]**   Edudata argues that enforcement of the Minnesota statutes will cause immediate irreparable injury, not only to Edudata and its shareholders, but also to SCI and its shareholders, no matter what approach Edudata takes. If it abandons its tender offer, it will be deprived of its right under the Williams Act to make a national tender offer. Yet, if Edudata proceeds with its tender offer in disregard of Minnesota law, it may be subject to criminal and civil penalties, and the validity of tenders and ownership of SCI stock may be in doubt. Finally, Edudata argues that compliance with the Minnesota statutes could result in civil liabilities for failure to comply with federal law, unreasonable delay, commitment of substantial amounts

of money to prepare and participate in the hearing provided for by the Minnesota law, and disruption of the market in securities of SCI.

Edudata argues that other prerequisites of injunctive relief are also satisfied. It alleges that SCI will suffer no harm by suspension of the Minnesota statutes because the Williams Act serves the same purpose of investor protection; that success on the merits is "virtually certain"; and that the public interest is best served by allowing Edudata to proceed with its federally protected rights, thus offering SCI shareholders and the investing public a unique investment opportunity.

The major thrust of Edudata's motion is devoted to its chances of success on the merits. It relies heavily on *Edgar v. Mite Corporation,* 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982), and *National City Lines Inc. v. LLC Corp.,* 687 F.2d 1122 (8th Cir.1982), for the proposition that the Minnesota statutes are unconstitutional and preempted by federal law. It argues that the October 4 hearing before Commissioner Hatch is precisely the type of disruption found to be unconstitutional in *Mite* and *National City Lines.*

The state defendants argue that both cases are distinguishable and that the Minnesota legislature was aware of both cases and crafted Minn.Stat. § 80B— the only provision properly before the court—to avoid the problems presented there. It points out that the Illinois Act struck down in *Mite* contained three key provisions which are not part of the Minnesota statute: 1) a precommencement notification period requirement, 2) a hearing procedure with no strict time deadlines, and 3) a procedure where the Secretary of State would pass on the substantive fairness of the tender offer.

At the hearing, SCI opposed Edudata's motion for constitutional and practical reasons. It argued that this matter is not ripe for constitutional resolution. The Commissioner of Commerce is currently expanding the factual record with his investigation and his subsequent action may moot the constitutional question. Although Edudata seeks to prohibit SCI from bringing any other proceeding in another forum, SCI has already filed a state court claim. SCI argues that the doctrine of *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and considerations of comity prevent this court from enjoining those pending state court's proceedings.

SCI also alleges that Edudata appears to be a shell corporation with three employees, no management experience and limited assets before its public offering in July, 1984. SCI asserts that Edudata has conspired, with the Koethers, Shamrock and SECC, to take over SCI through a series of fraudulent disclosures and material omissions and to loot it of its assets. SCI contends that it will suffer irreparable injury if the shares tendered in response to Edudata's offer are transferred in that, among other things, Edudata will have acquired effective control of SCI; the price and liquidity of the public market for SCI stock will drop; SCI's long-standing customer/supplier relationships may be destroyed; and many SCI employees may either lose their jobs or their innovative spirit.

The court recognizes that important interests are at stake on all sides of this dispute. Delay is a potent weapon in a **\*1088** tender offer fight, at times enabling entrenched management to defeat what may be a beneficial tender offer to shareholders and targeted company alike. On the other hand, federal and state policy favors adequate disclosure so that shareholders and investors may make informed decisions. Serious constitutional issues have been raised, as well as serious allegations of violations of federal and state law. The state law challenged by Edudata differs from that at issue in *Mite* and *National City Lines.* Further development of the parties' legal positions and the record is necessary before the court can determine the likelihood of success on the merits in these actions.

The public interest would be furthered by full disclosure of all material information concerning Edudata's tender offer. One of the main goals of the Williams Act is to protect shareholders and investors by furnishing them with the necessary information required to exercise an informed choice. [1] *Edgar v. Mite,* 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982). Commissioner Hatch used almost identical criteria as in the Williams Act to determine that Edudata's tender offer materials do not provide full disclosure of key information concerning Edudata's background, affiliates, and future plans. SCI and the state defendants have made a sufficient showing to justify delaying this tender offer to permit closer examination of the offering disclosures. Injunctive relief may be appropriate pending determination whether federal law requires additional disclosures or until all necessary information is disclosed. *See Pacific Realty Trust v. APC Investments,* 685 F.2d 1083 (9th Cir.1982);

*Whittaker Corporation v. Edgar,* 535 F.Supp. 933 (D.C.Ill.1982).

**[3]** Although both parties claim irreparable harm, the court finds that the balance of harm favors SCI and that a temporary restraining order should issue suspending Edudata's tender offer pending further hearing. This will obviously delay Edudata's tender offer to its disadvantage, but Edudata has not shown that its harm is irreparable. Moreover, a restraining order will protect Edudata from the criminal and civil penalties it fears because of any possible conflict between state and federal law. Edudata claims that SCI shareholders would be irreparably harmed by a delay or defeat of its offer, but shareholders could also be harmed by false or misleading disclosures. SCI claims it would be irreparably harmed if effective control of the corporation were obtained by Edudata. In the absence of violation of federal or state law, this would be of no legal concern. However, harm to SCI, the value of its shares, and jobs for its employees are of legal concern if the law were violated. All that this court can determine at this point is that closer examination is warranted.

Neither side has addressed the issue of a bond or its amount. SCI, however, filed a bond in the amount of $5000 with its motion for a restraining order. No objection to that bond has been made, and on this record the court finds it to be sufficient until further hearing.

**[4]** Finally, the court finds that SCI's motion for expedited discovery should be granted. Further development of the record before the preliminary injunction hearing will better enable the court to judge the parties' interests and respective chances for success on the merits.

ORDER

Accordingly, based upon the above and all the files, records, and proceedings herein,

IT IS HEREBY ORDERED that:

1. The motion of Edudata Corporation for a temporary restraining order is denied.

 **\*1089** 2. The motion of Scientific Computers, Inc. for a temporary restraining order is granted,

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works. 4

and Edudata Corporation, Shamrock Associates, Sun Equities Corporation, Paul Koether, Natalie Koether, their agents and all persons in active participation with them, are hereby enjoined from proceeding with, causing or aiding and abetting the tender offer by Edudata Corporation to purchase shares of Scientific Computers, Inc., or engaging in any activities in furtherance of Edudata Corporation's tender offer, and from accepting tenders of shares of Scientific Computers, Inc. stock.

3. This restraining order shall be effective immediately and will remain in effect until midnight on October 18, 1984 or further order of this court.

4. A hearing will be held on the parties' request for preliminary injunctions on October 17, 1984 at 2:00 p.m.

5. The parties shall furnish to this court and opposing counsel by October 11, 1984 any additional memoranda, affidavits, or exhibits applicable to these motions.

6. The motion of Scientific Computers, Inc. for expedited discovery is granted allowing it to proceed with the depositions of the officers, directors and managing agents of the Edudata Corporation, Shamrock Associates and Sun Equities Corporation, beginning on October 1, 1984.

**All Citations**

599 F.Supp. 1084

---

Footnotes

1    The act provides in pertinent part: It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request or invitation. 15 U.S.C. § 78n(e). *See also* the disclosure requirements in 15 U.S.C. §§ 78m(d) and 78n(d).

---

**End of Document**                                                        © 2018 Thomson Reuters. No claim to original U.S. Government Works.

# *TAB 4*

Elmhurst Consulting, LLC v. Gibson, 219 F.R.D. 125 (2003)
57 Fed.R.Serv.3d 487

219 F.R.D. 125
United States District Court,
N.D. Illinois,
Eastern Division.

ELMHURST CONSULTING, LLC, a
limited liability company, Plaintiff,
v.
Wesley J. GIBSON, an individual, Defendant.

No. 03 C 2840.
|
Oct. 16, 2003.

**Synopsis**
**Background:** Holding company which was majority
shareholder of Illinois corporation brought suit against
former officer and director of corporation, alleging breach
of fiduciary duty and breach of contract.

**Holdings:** On defendant's motion to dismiss, the District
Court, Bucklo, J., held that:

[1] plaintiff was a citizen of the District of Columbia for
purposes of diversity jurisdiction;

[2] breach of fiduciary duty claim could not be brought in
direct action; and

[3] breach of contract claim would be dismissed for failure
to join a necessary party.

Motion granted.

West Headnotes (6)

**[1]    Federal Courts**
👉 **Place of business**
Under the "nerve center" test, corporation
had it principal place of business in the
District of Columbia, and thus was a citizen
of the District for purposes of diversity
jurisdiction, where its headquarters was
located in the District, and there was nothing

to suggest that the "directing intelligence"
of the corporation was not located at its
headquarters. 28 U.S.C.A. § 1332(c).

7 Cases that cite this headnote

**[2]    Corporations and Business Organizations**
👉 **Derivative or direct action**
Shareholder's claim that corporate
officer breached his fiduciary duty by
misappropriating corporate assets and
usurping corporation's business opportunities
could not be brought as a direct action against
officer; since allegations involved injuries
done to the corporation, claim could only be
brought through a shareholder derivative suit
on behalf of corporation.

9 Cases that cite this headnote

**[3]    Federal Civil Procedure**
👉 **Who are necessary parties**
Whether absent party is a necessary party
depends upon whether: (1) complete relief
can be accorded among the present parties
to the lawsuit; (2) the absent party's ability
to protect its interest will be impaired; and
(3) any existing parties might be subjected to
a substantial risk of multiple or inconsistent
obligations unless the absent party is joined.
Fed.Rules Civ.Proc.Rule 19(a), 28 U.S.C.A.

1 Cases that cite this headnote

**[4]    Federal Civil Procedure**
👉 **Corporations and business organizations**
Corporation was a necessary party to
shareholder's breach of contract claim against
corporate officer, where claim arose under
stockholders agreement to which corporation
was a party; moreover, if corporation were
not joined in action, it might be subject
to multiple adverse judgments arising from
the same actions under the same contract.
Fed.Rules Civ.Proc.Rule 19(a), 28 U.S.C.A.

1 Cases that cite this headnote

**[5]  Federal Civil Procedure**

👉 Who are indispensable parties

When determining if an absent party is indispensable, four factors are considered: (1) the extent to which a judgment entered in the absence of the party will be prejudicial to those currently before the court; (2) the extent to which such prejudice can be lessened or avoided by reshaping the judgment; (3) whether a judgment entered in the party's absence will be adequate; (4) whether the plaintiff will have an adequate remedy if the action is dismissed. Fed.Rules Civ.Proc.Rule 19(b), 28 U.S.C.A.

Cases that cite this headnote

**[6]  Federal Civil Procedure**

👉 Corporations and business organizations

Corporation was indispensable party to shareholder's breach of contract claim against corporate officer, since if judgment was entered in case without the presence of corporation, officer would potentially be subject to multiple judgments resulting from the same alleged actions; moreover, corporation was a party to contract at issue. Fed.Rules Civ.Proc.Rule 19(b), 28 U.S.C.A.

Cases that cite this headnote

**Attorneys and Law Firms**

*126 Sally D. Garr, Ronald S. Liebman, Patton, Boggs LLP, Washington, DC, Eileen M. King Bower, Scott Eric Turner, Rebecca L. Ross, Ross, Dixon & Bell, L.L.P., Chicago, IL, for Plaintiff.

Joel Gerald Chefitz, James E. Hanlon, Jr., Lisa Colleen Sullivan, Howrey, Simon, Arnold & White, LLP, Chicago, IL, for Defendant.

### *MEMORANDUM OPINION AND ORDER*

BUCKLO, District Judge.

Plaintiff Elmhurst Consulting, LLC ("Elmhurst") sues Wesley J. Gibson ("Gibson"), a former officer and director of Alaris Consulting, Inc. ("Alaris"), for alleged misconduct by Mr. Gibson that, if true, amounted to fraud and theft from Alaris. According to Elmhurst, Gibson's alleged misconduct also hurt it.

Elmhurst is a holding company incorporated in Delaware with its principal place of business in the District of Columbia. Elmhurst is wholly owned by Allied Capital ("Allied"), a District of Columbia corporation. Alaris, an Illinois corporation, was formerly known as Gibson & Associates, Inc. Elmhurst is a 95 percent shareholder of Alaris; Mr. Gibson is a 3.6 percent shareholder of Alaris. Elmhurst alleges breach of fiduciary duty and breach of contract claims against Mr. Gibson. Jurisdiction is based on diversity of citizenship. Mr. Gibson has moved to dismiss, arguing that diversity does not exist; that Elmhurst is not the real party in interest; that Alaris is a necessary party, requiring dismissal for failure to satisfy the diversity of citizenship requirement, and that the disputes are at any rate subject to a pending arbitration. I grant the motion to dismiss.

I.

**[1]** Mr. Gibson argues that Elmhurst is a corporate citizen of Illinois, not the District of Columbia, and therefore the jurisdictional basis for the claim is destroyed. Federal diversity jurisdiction requires complete diversity among the parties. A corporation is a citizen of the state where it is incorporated, as well as the state where it has its principal place of business. 28 U.S.C. § 1332(c). The Seventh Circuit has adopted a "nerve center" test for determining the location of a corporation's principal place of business. *Wisconsin Knife Works v. National Metal Crafters,* 781 F.2d 1280, 1282 (7th Cir.1986). Ordinarily, the "nerve center" of a corporation is found where the corporation's headquarters are located. *Id.* Only when the "nominal headquarters isn't the directing intelligence *127 of the corporation" should this court look beyond that location. *Id.* at 1282–83.

In this case, Elmhurst states that its headquarters are located in the District of Columbia. Nothing before me suggests that the "directing intelligence" of Elmhurst is not located at its headquarters. Its sole owner, Allied, is located in the District of Columbia. All important

management and operational decisions are made in the District of Columbia. Elmhurst's offices and bank account are also located in the District of Columbia. Under the "nerve center" test, Elmhurst has its principal place of business in the District of Columbia. Since Mr. Gibson is an Illinois citizen and Elmhurst is a citizen of Delaware (through its incorporation) and the District of Columbia, there is complete diversity between the existing parties.

## II.

Mr. Gibson argues that the claims brought by Elmhurst as a direct action should properly be brought, if at all, as a shareholder derivative suit on behalf of Alaris. If Elmhurst, as a shareholder, seeks to recover damages for an injury to the corporation, such a suit must be brought derivatively on behalf of the corporation. *Small v. Sussman,* 306 Ill.App.3d 639, 239 Ill.Dec. 366, 713 N.E.2d 1216, 1219 (1999). If, however, Elmhurst can claim a distinct personal injury, the shareholder may bring a direct suit on its own behalf. *Frank v. Hadesman and Frank,* 83 F.3d 158, 160 (7th Cir.1996).

**[2]** Elmhurst brings two claims against Gibson: breach of fiduciary duty and breach of contract. In Count I, Elmhurst alleges a breach of fiduciary duty on the part of Mr. Gibson. Specific acts alleged include misappropriating Alaris' assets and usurping business opportunities from Alaris. These allegations are classic examples of injuries done to the corporation. *Small,* 239 Ill.Dec. 366, 713 N.E.2d at 1219–1220; *Frank,* 83 F.3d at 161.[1] Redress for these injuries should have been sought through a shareholder derivative suit on behalf of Alaris, not through a direct suit on behalf of Elmhurst.[2] Mr. Gibson's motion to dismiss Count I is therefore granted.

In Count II, Elmhurst alleges breach of contract based on the Stockholders Agreement signed between Mr. Gibson and Elmhurst, *inter alia.* "An action in which the holder can prevail without showing an injury or breach of duty to the corporation should be treated as a direct action that may be maintained by the holder in an individual capacity." *Frank,* 83 F.3d at 160. Elmhurst's allegations that Mr. Gibson breached the agreement by failing to obtain prior approval before using an airplane and a training facility at least technically do not rely on an injury to Alaris, but on the fact that the Stockholders Agreement prohibits the alleged conduct. The damage is nevertheless

an injury to Alaris. It is, however, unnecessary to decide whether this claim can be brought as a direct action because it must nevertheless be dismissed for failure to join a necessary party.

**[3]** **[4]** Whether Alaris is a necessary party under FED. R. CIV. P. 19 depends upon "whether (1) complete relief can be accorded among the present parties to the lawsuit; (2) the absent party's ability to protect its interest will be impaired; and (3) any existing parties might be subjected to a substantial risk of multiple or inconsistent obligations unless the absent party is joined." *Extra Equipamentos E Exportacao v. Case Corp.,* No. 01 C 8591, 2002 WL 1888540, *2 (N.D.Ill.2002)*(Manning, J.). When the absent party is a party to the contract at issue **\*128** in the claim, the Seventh Circuit has held that the party is a necessary one. *Id.* at *3, *U.S. ex rel. Hall v. Tribal Dev. Corp.,* 100 F.3d 476, 478 (7th Cir.1996). Under this analysis, Alaris is a necessary party. Elmhurst's breach of contract claim arises under the Stockholders Agreement, to which Alaris (under its previous name, Gibson & Associates) is a party. Further, if Alaris is not joined in the present action, Mr. Gibson may be subject to multiple adverse judgments arising from the same actions under the same contract.

**[5]** **[6]** Since Alaris is a necessary party under Rule 19(a) it ordinarily should be joined. Joinder in this case, however, will destroy diversity since Alaris is an Illinois corporation. When joinder is not possible, "the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable". FED. R. CIV. P. 19(b). When determining if a party is indispensable four factors are considered: "(1) the extent to which a judgment entered in the absence of a party will be prejudicial to those currently before the court; (2) the extent to which such prejudice can be lessened or avoided by reshaping the judgment; (3) whether a judgment entered in a party's absence will be adequate; (4) whether the plaintiff will have an adequate remedy if the action is dismissed." *Moore v. Ashland Oil, Inc.,* 901 F.2d 1445, 1447 (7th Cir.1990). If judgment is entered in this case without the presence of Alaris, Mr. Gibson will potentially be subject to multiple judgments resulting from the same alleged actions. Further, Alaris is a party to the Stockholders Agreement, the contract at issue under the breach of contract claim, making it a "paradigmatic example of an indispensable party." *Extra,* 2002 WL 1888540 at *7. Finally, Elmhurst has

57 Fed.R.Serv.3d 487

an adequate alternative forum; it could pursue this claim against Mr. Gibson in state court, where jurisdiction is not constrained by 28 U.S.C. § 1332.

                        III.

I grant Mr. Gibson's motion to dismiss Counts I and II pursuant to FED. R. CIV. P. 19. The case is dismissed without prejudice. [3]

**All Citations**

219 F.R.D. 125, 57 Fed.R.Serv.3d 487

Footnotes

1       Elmhurst's reliance on *Zokoych v. Spalding,* 36 Ill.App.3d 654, 344 N.E.2d 805 (1st Dist.1976), is misplaced. As that court held, the question is whether the " 'gravamen' of the pleadings states injury to the plaintiff upon an individual claim as distinguished from an injury which indirectly affects the shareholders or affects them as a whole." 344 N.E.2d at 813. In that case, the plaintiff's essential injuries, in being removed as president and director, not getting back his pledged stock, not getting his salary, and leaving him as guarantor of the debt of the company allegedly driven into bankruptcy by defendants, were individual and separate from the injury to the company.

2       The fact that Alaris is a closely-held corporation does not alter this analysis or the result. *Small,* 239 Ill.Dec. 366, 713 N.E.2d at 1219–1220; *Frank,* 83 F.3d at 161–162.

3       Since I have dismissed this case on jurisdictional grounds I have not addressed Mr. Gibson's argument that the claims are subject to arbitration.

---

**End of Document**                                         © 2018 Thomson Reuters. No claim to original U.S. Government Works.

# *TAB 5*

Joe Conte Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc., Not Reported in F.Supp. (1994)

**1994 WL 67896**
Only the Westlaw citation is currently available.
United States District Court, E.D. Louisiana.

JOE CONTE TOYOTA, INC., et al.

v.

TOYOTA MOTOR SALES, U.S.A., INC., et al.

Civ. A. No. 93–4281, 93–4219.
|
Feb. 17, 1994.

MINUTE ENTRY

PATRICK E. CARR, District Judge.

**\*1** This matter is before the Court on plaintiffs' motion to remand. Determining in its discretion that oral argument is not necessary, the Court CANCELS the hearing that was previously scheduled, and for the reasons that follow, now GRANTS the motion to remand.

BACKGROUND

The plaintiffs brought suit against the defendants in state court alleging breach of contract and violations of state statutes, specifically, violations of the Louisiana Motor Vehicle Commission Law, LRS 32:1251–1260. Plaintiffs asked for injunctive relief against the Louisiana Motor Vehicle Commission (LMVC), a named defendant, and injunctive relief and damages against the private party defendants. The state court granted a TRO against the LMVC, preventing that agency from terminating plaintiff Conte Toyota, Inc.'s (Conte) license to operate an automobile dealership. [1] Shortly thereafter, the private defendants removed the action to federal court based on federal question and diversity jurisdiction. Conte moved to remand.

DISCUSSION

On removal, the removing party bears the burden of proving to a legal certainty that federal jurisdiction exists. *Saunders v. Rider,* 805 F.Supp. 17, 18 (E.D.La.1992) (citing *Federal Savings & Loan Ins. Corp. v. Griffin,*

935 F.2d 691, 696 (5th Cir.1991), *cert. denied sub nom, Griffin v. First Gibraltar Bank,* 502 U.S. 1092, 112 S.Ct. 1163, 117 L.Ed.2d 410 (1992); *Alphonse v. Omni Hotels Management Corp.,* 757 F.Supp. 722, 724 (E.D.La.1991)); *and Atkins v. Harcros Chemicals, Inc.,* 761 F.Supp. 444, 445 (E.D.La.1991).

1) Federal Question jurisdiction

Since *Louisville & Nashville R.R. Co v. Mottley,* 211 U.S. 149, 29 S.Ct. 42 (1908), federal question jurisdiction on removal must be based on a federal question that appears on the face of a "well pleaded complaint", assuming good faith pleading. *See City of New Orleans, St. of La. v. United Gas P.L. Co.,* 390 F.Supp. 861, 863 (E.D.La.1974) (Rubin, J.). In *City of New Orleans,* several plaintiffs filed suit in state court for damages for breach of contract, invoking their remedies under state law. The defendant removed alleging that the cases involved federal questions because the claims arise under the Natural Gas Act, 15 U.S.C. § 717 et seq., or under federal common law. Judge Rubin remanded the cases, reasoning that while federal agencies and statutes may regulate many aspects of the subject matter of the contractual relationships, the contractual relationship itself is a creature of state law. *Id.* at 865.

When the complaint relies solely on state law as a basis for its claims, it is not sufficient to base federal jurisdiction on possible defenses raised by the defendant. *Id.* (citing 1A Moore's Federal Practice ¶ 160 (1974)). Moreover, the fact that the plaintiffs' state causes of action could have been brought under similar federal statutes does not preempt state jurisdiction when the action seeks appropriate relief under the state statutory scheme. *Armstrong v. Alliance Trust Co.,* 126 F.2d 164, 165 (5th Cir.1942) *quoted in City of New Orleans,* 390 F.Supp. at 865 ("A federal question merely incidental or collateral to the main controversy is not the basis of the suit and is not enough to deprive the state court of jurisdiction upon petition for removal by the defendant.") Plaintiffs have raised no federal question on the face of their complaint. This court does not have federal question jurisdiction.

2) Diversity jurisdiction

**\*2** Section 1441(b) provides that absent federal question jurisdiction, an action "shall be removable only if none of the parties *in interest* properly joined and served as defendants is a citizen of the State in which the

action is brought." In determining diversity of citizenship for removal purposes, real parties in interest include indispensable, necessary, and proper parties. *Helms v. Ehe,* 279 F.Supp. 132, 133 (N.D.Tex.1968) ("If ... the [Texas State Highway Department] is considered a proper, necessary or indispensible party, then it becomes a 'party at interest' and diversity jurisdiction is destroyed....").

The Louisiana Motor Vehicle Commission (LMVC) is a named defendant in this lawsuit. According to LRS 32:1253(I):

> The commission shall, ..., be constituted a body politic or political corporation, invested with the powers inherent in corporations. It may sue and be sued under the style of the Louisiana Motor Vehicle Commission, and all process against the corporation shall be served on the chairman or executive director, and all suits on behalf of the commission shall be brought by the chairman.

According to the record, the LMVC has been properly served. The removing defendants argue that the "plaintiffs have made no claim against the LMVC", and that the LMVC should be dismissed because it is a state agency and this Court has no subject matter jurisdiction over it pursuant to the 11th amendment.[2]

The single determinative issue, however, is whether the Louisiana Motor Vehicle Commission is a real party in interest.[3] If it is not, then there is complete diversity of citizenship because it is only a nominal or formal party. If it is, then one of two situations presents itself, either of which destroys federal jurisdiction.

1) The LMVC is an alter ego or arm of the State of Louisiana, in which case the state is the real party in interest as a defendant. A state is not a citizen of any state, therefore its citizenship is not considered for diversity purposes, *Id.* at 134, *but* the 11th amendment prohibits prosecution of a suit against the state in federal court, absent the waiver or consent of the state, which is lacking here. *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 88, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984) (brought pursuant to state and federal law as a class

action by mentally retarded citizens challenging the fact and condition of confinement in a state institution for the mentally retarded.) The 11th amendment bars a suit against state agencies or officials when "the state is the real, substantial party in interest." *Pennhurst,* 104 S.Ct. at 908 (citations omitted). This jurisdictional bar applies *regardless of the nature of the relief sought. Id.* (emphasis supplied). Under *Pennhurst,* even when only prospective injunctive relief is sought, a federal court cannot order relief against state officials when the claim involves only state law. *Id.* at 911.

**\*3** 2) The LMVC is an entity created by but separate and distinct from the state. If the agency is an independent one, separate and distinct from the state, the agency's citizenship is considered for purposes of diversity jurisdiction. *Tradigrain v. Mississippi State Port Authority,* 701 F.2d 1131, 1132 (5th Cir.1983). Then, the LMVC is a citizen of the state of Louisiana and complete diversity is destroyed.

In a decision rendered fifty years ago, the court found that the state was a real party in interest when the relief sought (by the state as a plaintiff) would directly benefit the state. *State of Louisiana v. Texas Co.,* 38 F.Supp. 860 (E.D.La.1941). In that case, the state sought to recover occupation-license or privilege taxes. Conversely, the state would be a real party in interest as a defendant if the judgment impacted its treasury. *Barry v. Fordice,* 814 F.Supp 511, 513 (S.D.Miss.1992).

However, in *Farrell Construction Co. v. Jefferson Parish, La.,* 896 F.2d 136, 140 (5th Cir.1990), the Court noted that: "The real party in interest is the person holding the substantive right sought to be enforced, and not necessarily the person who will ultimately benefit from the recovery." Furthermore, in *Johnson v. Secretary of and U.S. Department of Housing and Urban Development,* 544 F.Supp. 925, 938 (E.D.La.1981) (Cassibry, J.), *aff'd in part, reversed in part on other grounds,* 710 F.2d 1130 (5th Cir.1983), the Court noted that "The real party in interest is the person who, according to the governing substantive law is entitled to enforce the right."

There is also authority for the proposition that a state's interest may be nominal if its only interest is the general welfare of its citizens and compliance with its laws. *Pennsylvania Human Relations Commission v. USAir, Inc.,* 615 F.Supp. 75, 78 (W.D.Pa.1985); *State of Maine v. Data*

*General Corp.,* 697 F.Supp. 23, 24–25 (D.Me.1988). On the other hand, in *Eure v. NVF Co.,* 481 F.Supp. 639, 641 (E.D.N.C.1979), the Court observed that the state had an interest in the local economy that was beyond the general interest in the enforcement of its laws. In that case, the state sued to enforce compliance with various state laws affecting corporate stock purchases.

Ultimately, the general criterion for determining when a state is a real party in interest is the *effect* of the relief sought. *Penhurst,* 104 S.Ct. at 911. *See also Barry,* 814 F.Supp. at 514 ("The State is the real party in interest if the decision rendered in a case would operate against the sovereign, expending itself on the public treasury, interfering with public administration, or *compelling the State to act or refrain from acting.* " (quoting *Pennhurst,* 104 S.Ct. at 908 (emphasis supplied)). While the statement in the context of *Pennhurst* is directed to the ultimate issue of the applicability of 11th amendment immunity, it may also serve as a guide to determine whether the LMVC is a real party in interest. Furthermore, the Fifth Circuit has recently observed, in a case where the question addressed was "mootness" of the action, that the case is not moot when "the parties still possess 'a legally cognizable interest in the outcome.' " *Cooper v. McBeath,* —— F.3d ——, 1994WL366 *4 (5th Cir. Jan. 13, 1994) (quoting *Powell v. McCormick,* 395 U.S. 486, 496, 89 S.Ct. 1944, 1951, 23 L.Ed.2d 491 (1969)).

**\*4** In the La. Motor Vehicle Commission Law, the legislature declares that the distribution and sale of motor vehicles vitally affects the general economy of the state, the public interest, and the public welfare. LSA–RS 32:1251; *Benson & Gold Chevrolet v. La. Motor Veh. Com'n,* 403 So.2d 13, 17 (La.1981) ("The regulation of automobile distribution industry is a matter of importance to the public interest...."). Under section 1253(E):

> The [LMVC] is hereby vested with the powers and duties necessary and proper to enable it to fully and effectively carry out the provisions and objects of this Chapter, and is hereby authorized and empowered to make and enforce all reasonable rules and regulations and to adopt and prescribe all forms necessary to accomplish said purpose....

State substantive law entitles and empowers the LMVC to enforce its right to regulate the parties to this suit. *Louisiana Motor Vehicle Commission v. The Wheeling Frenchman,* 235 La. 332, 344, 103 So.2d 464, 469 (1958) ("the production, transportation and marketing of automobiles is unquestionably a proper subject of regulation by the Legislature under its police power [,]" *quoted in Benson & Gold Chevrolet,* supra at 17); *Yokem Toyota v. Motor Vehicle Com'n,* 589 So.2d 1192 (La.App. 4 Cir.1991) (affirming trial court's enjoining the LMVC from issuing a license without a hearing on an oral objection).

In this case, Conte does not seek damages against the defendant LMVC; rather, the complaint asks the court to enjoin the LMVC from terminating its dealership agreement and license to operate. The underlying dispute concerns Conte's charge that the private party defendants, Toyota Motor Sales U.S.A., Inc., Gulf States Toyota, Inc., and Toyota Motor Credit Corp., have breached contracts and agreements and violated state statutes, and have notified the LMVC that Conte's Dealer Sales and Service Agreement (the Franchise) has been terminated. The Franchise Agreement is a requirement in order to hold a motor vehicle dealers' license from the LMVC, without which Conte cannot operate its business. Conte alleges that the breaches complained of will cause the LMVC to terminate Conte's license to operate its dealership.

Only LMVC can terminate Conte's license, therefore only the LMVC can provide Conte with the relief it seeks by way of injunction. It is for the state court to determine whether the relief requested is merited. Both parties have a "legally cognizable interest in the outcome". The relief sought will effect the LMVC's performance of its statutorily mandated duties, and the state has a declared interest in the enforcement of its regulation of motor vehicle sales.

The LMVC is a real party in interest. Whether the LMVC is an arm or alter ego of the state, or whether it is a separate and independent agency, i.e. a corporation, the federal court does not have diversity jurisdiction. Accordingly,

IT IS ORDERED that this action be and is hereby remanded to the Civil District Court for the Parish of Orleans, from which it was removed.

Joe Conte Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc., Not Reported in F.Supp. (1994)

**All Citations**

Not Reported in F.Supp., 1994 WL 67896

Footnotes

1    Joe Conte Toyota, Inc., et al v. Toyota Motor Sales, U.S.A., Inc., et al, No. 93–23501, Civil District Court for the Parish of Orleans, Division "M"; Temporary Restraining Order signed on Dec. 22, 1993.

2    Defendants' opposition to the motion to remand, p. 4.

3    Conte's motion to remand points out that the LMVC has not joined in the removal. "[A]ll defendants who are properly joined and served must join in the removal petition, and ... failure to do so rendered the petition defective." *Farias v. Bexar Cty. Bd of Tr. for M.H.M.R. Serv.,* 925 F.2d 866, 871 (5th Cir.1991) (citing *Getty Oil Corp., Div. of Texaco, Inc. v. Insurance Co. of N. Am.,* 841 F.2d 1254, 1262 (5th Cir.1988)). If LMVC is not a nominal party, the removal was procedurally deficient and the action must be remanded.

---

**End of Document**         © 2018 Thomson Reuters. No claim to original U.S. Government Works.

# *TAB 6*

Case 1:18-cv-00475-SEB-TAB Document 1-2 Filed 02/16/18 Page 335 of 440 PageID #: 347
Laboratory Corp. of America Holdings v. Cardinal Health..., Not Reported in...

2010 WL 3945111

2010 WL 3945111
Only the Westlaw citation is currently available.
United States District Court, E.D. North Carolina,
Western Division.

LABORATORY CORPORATION OF
AMERICA HOLDINGS, Plaintiff,
v.
CARDINAL HEALTH SYSTEM,
INC., et al., Defendants.

No. 5:10−CV−353−D.
|
Oct. 6, 2010.

**Attorneys and Law Firms**

Amie F. Carmack, K & L Gates LLP, Raleigh, NC,
Robert I. Steiner, Kelley Drye & Warren LLP, New York,
NY, for Plaintiff.

Paul J. Peralta, Nicole Marie Thompson, Moore & Van
Allen PLLC, Charlotte, NC, for Defendants.

*ORDER*

WILLIAM A. WEBB, United States Magistrate Judge.

**\*1** This cause is before the Court upon the following
motions filed by Plaintiff:

 1) Motion for a preliminary injunction [1] and expedited
 discovery (DE–7);

 2) Motion to file under seal (D E–10); and

 3) Motion for a scheduling conference (D E–16)

These motions have been referred to the undersigned
(DE–25) and are now ripe for adjudication. For the
following reasons, Plaintiff's: 1) motion for expedited
discovery (DE–7) is GRANTED; 2) motion to file
under seal (DE–10) is GRANTED; and 3) motion for
a scheduling conference (DE–16) is DENIED.

*Background*

Plaintiff provides medical laboratory tests and services.
It operates a network of testing facilities and patient

service centers across the United States. To expand
that business, Plaintiff entered into negotiations for the
purchase of PA Labs LLC ("PA Labs"), a clinical and
anatomic laboratory. In September 2007, Plaintiff agreed
to pay $74,000,000 in exchange for all the assets of PA
Labs. Defendant Cardinal Health System, Inc. ("CHS")
partially owned PA Labs at this time. As part of the
Purchase Agreement, the sellers of PA Labs, on behalf
of themselves and their affiliates, agreed to a Non–
Competition Agreement which prohibited them from
competing with Plaintiff for five years.

Effective January, 2009 Defendants Cardinal Health
System, Inc. ("CHS") and Clarian Health Partners
("Clarian") entered into a merger agreement, whereby
the two entities would provide medical services under
the Clarian name. These services included operating
a competing clinical and anatomic laboratory business
in the territories that Plaintiff gained entry into by
virtue of its $74,000,000 purchase of PA Labs. Plaintiff
asserts that this conduct "eviscerates the protections
bargained for in the Non–Competition Agreement" (DE–
9, pg.2). Accordingly, Plaintiff now seeks the issuance
of a preliminary injunction enjoining Defendants from
engaging in competition with them (DE–7, pg.1).

*Motion to Seal*

Plaintiff requests that it be allowed to file the Declaration
of Anil Asnani (DE–8) and its Memorandum of Law in
Support of its Motion for Preliminary Injunction (DE–9)
under seal.

When a district court considers entering a confidentiality
order, it must first give the public notice and a reasonable
opportunity to challenge the sealing order. *In re Knight
Publ'g Co.,* 743 F.2d 231, 234–35 (4th Cir.1984) (holding
that the district court erred in closing the courtroom and
sealing courtroom documents in a criminal case without
first giving the public notice and an opportunity to be
heard); *see also In re Washington Post Co.,* 807 F.2d
383, 390 (4th Cir.1986); *Stone v. Univ. of Md. Med. Sys.
Corp.,* 855 F.2d 178, 181 (4th Cir.1988). That is, the court
must docket the motion to seal "reasonably in advance
of their disposition so as to give the public and press an
opportunity to intervene and present their objections to
the court." *Knight Publ'g Co.,* 743 F.2d at 234. The court
must also consider less drastic alternatives to sealing and,
if it does enter a sealing order, it must provide "reasons
for its decision to seal supported by specific findings, and

Case 1:18-cv-00475-SEB-TAB   Document 1-2   Filed 02/16/18   Page 336 of 440 PageID #: 348
Laboratory Corp. of America Holdings v. Clarian Health..., Not Reported in...
2010 WL 3945111

the reasons for rejecting alternatives to sealing in order to provide an adequate record for review." *Id.* In *Stone*, the Fourth Circuit extended application of the *Knight* requirements to civil cases.

**\*2** Here, the public has been given notice and a reasonable opportunity to challenge the sealing order. In addition, Plaintiff argues that it has sued Defendants for breach of their obligations under the Non–Competition Agreement entered into as part of a purchase agreement. By its terms, the purchase agreement does not permit the parties to disclose the information contained therein because of its confidential nature. The documents Plaintiff seeks to file under seal refer to the purchase agreement extensively. As noted by Plaintiff, "[t]here are logical and sound business reasons for ... confidentiality where financial and non-public terms of a business transaction are contained in the agreement between private parties" (DE–11, pg.3). Moreover, Plaintiff has also sufficiently demonstrated that redaction is not a practical alternative due to the extent these filings refer to the purchase agreement.

For these reasons, Plaintiff's motion to file under seal (DE–10) is GRANTED.

### Motion for expedited discovery

Plaintiff also seeks expedited discovery with regard to its motion for a preliminary injunction (DE–7). Specifically, Plaintiff seeks expedited discovery on the following issues:

(1) pursuant to Federal Rule of Civil Procedure 30(b)(6), the deposition of a corporate representative to elicit testimony on topics concerning the merger and/or integration between CHS and Clarian, and the corporate structure and ownership of Clarian and Clarian Pathology;

(2) all documents concerning the merger and/or integration between CHS and Clarian, including but not limited to any letters of intent, merger agreements, articles of merger, term sheets, and other customary closing documents;

(3) all documents related to Clarian's corporate structure, including but not limited to any organizational charts and documents sufficient to reflect any directors and officers of the corporation;

(4) all documents related to Clarian's corporate ownership, including but not limited to documents sufficient to reflect any owners, parents, affiliates, partners, members, subsidiaries, investors, and stockholders;

(5) all documents related to Clarian Pathology's corporate structure, including but not limited to any organizational charts and documents sufficient to reflect any directors and officers of the corporation;

(6) all documents related to Clarian Pathology's corporate ownership, including but not limited to documents sufficient to reflect any owners, parents, affiliates, partners, members, subsidiaries, investors, and stockholders;

(7) all documents related to CHS's pre-merger and/or pre-integration corporate structure, including but not limited to any organizational charts and documents sufficient to reflect any directors and officers of the corporation; and

(8) all documents related to CHS's pre-merger and/or pre-integration corporate ownership, including but not limited to documents sufficient to reflect any owners, parents, affiliates, partners, members, subsidiaries, investors, and stockholders.

**\*3** (DE–9, pg.19–20).

Notably, Defendants do not oppose this request (DE–23).

"Federal Rules of Civil Procedure 26(d), 30(a), 33(b), 34(b) and 36 give this Court the power to adjust the timing requirements imposed under Rule 26(d) and if warranted, to expedite the time for responding to the discovery sought." *Dimension Data North America, Inc. v. NetStar–1, Inc.,* 226 F.R.D. 528, 530 (E.D.N.C. February 2, 2005) (internal quotations omitted). Generally, a request for expedited discovery is examined "on the entirety of the record to date and the reasonableness of the request in light of all the surrounding circumstances." *Id.* at 531 (internal quotations omitted).

Here, Plaintiff has already filed its motion requesting a preliminary injunction, and has set out in detail the discovery it seeks. The requested discovery is not overbroad. Moreover, Plaintiff has alleged that it will be irreparably harmed by delaying discovery (DE–9, pg.14–

Case 1:18-cv-00475-SEB-TAB   Document 1-2   Filed 02/16/18   Page 337 of 440 PageID #: 349

Laboratory Corp. of America Holdings v. Cardinal Health..., Not Reported in...

2010 WL 3945111

15). Most importantly, Defendants do not oppose the request for expedited discovery, so the possibility of prejudice is slim.

For these reasons, Plaintiff's motion for expedited discovery (DE–7) is GRANTED. The scope of this expedited discovery shall be controlled by the issues identified by Plaintiff, *supra.*

### *Motion for a scheduling conference*

Finally, Plaintiff requests a scheduling conference to, *inter alia,* "discuss the ... exchange of discovery on an expedited basis" (DE–17, pg.1). This request does not comply with the Local Civil Rules of this Court. Local Civil Rule 7.1(c) states that "[n]o motion[ ] ... relating to discovery or inspection will be considered by the court unless ... there has been a good faith effort to resolve the discovery dispute[ ] prior to the filing of any discovery motions." Local Civil Rule 7.1(c). Given that Defendants do not oppose Plaintiff's request for expedited discovery, a scheduling conference with this Court is not necessary at this time. Accordingly, Plaintiff's request for a scheduling conference (DE–16) is DENIED.

Rather, the parties are ORDERED to confer regarding this expedited discovery no later than October 13, 2010. After this conference, the parties shall file a proposed expedited discovery plan. The proposed expedited discovery plan shall:

1) provide proposed deadlines for conducting expedited discovery;

2) provide a proposed briefing schedule regarding Plaintiff's motion for preliminary injunction;

3) provide at least three proposed dates on which to conduct a hearing on Plaintiff's motion for preliminary injunction.

The proposed expedited discovery plan shall be filed no later than October 20, 2010. To the extent practicable, the proposed expedited discovery plan should be a joint filing. After the filing of the proposed expedited discovery plan, the undersigned shall enter an appropriate order.

### *Conclusion*

In accordance with the foregoing directives, Plaintiff's: 1) motion for expedited discovery (DE–7) is GRANTED; 2) motion to file under seal (DE–10) is GRANTED; and 3) motion for a scheduling conference (DE–16) is DENIED. The parties are ORDERED to confer no later than October 13, 2010 and submit a proposed expedited discovery plan no later than October 20, 2010.

**\*4** DONE AND ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2010 WL 3945111

---

Footnotes

1    Plaintiff's motion for a preliminary injunction has been referred to the undersigned for the entry of a memorandum and recommendation, but is not yet ripe.

---

**End of Document**                                          © 2018 Thomson Reuters. No claim to original U.S. Government Works.

# *TAB 7*

Case 1:18-cv-00475-SEB-TAB  Document 1-2  Filed 02/16/18  Page 339 of 440 PageID #: 351
Lindsey & Osborne Partnership, L.P. v. Day & Zimmermann, Inc., Not Reported in...
2008 WL 2858786

2008 WL 2858786
Only the Westlaw citation is currently available.
United States District Court, D. Kansas.

LINDSEY & OSBORNE
PARTNERSHIP, L.P., Plaintiff,
v.
DAY & ZIMMERMANN, INC., Defendant.

No. 08–cv–2301–CM–DJW.
|
July 22, 2008.

**Attorneys and Law Firms**

Scott A. Wissel, Thomas M. Martin, Lewis, Rice &
Fingersh, LC, Kansas City, MO, for Plaintiff.

### *MEMORANDUM AND ORDER*

DAVID J. WAXSE, United States Magistrate Judge.

 **\*1** On July 18, 2008, the Court held a telephone
hearing on Plaintiff's Motion to Expedite Discovery and
Memorandum in Support (doc. 4). Plaintiff Lindsey &
Osborne Partnership, L.P. appeared through its counsel,
Scott A. Wissel and Thomas M. Martin. Defendant Day &
Zimmermann, Inc. appeared through its counsel, William
F. Ford, Jr. At the conclusion of the telephone hearing the
Court granted in part and denied in part Plaintiff's motion
to expedite discovery. This Order memorializes the Court's
ruling during the telephone hearing.

## I. BACKGROUND

Plaintiff is in the business of storing and repairing empty
railcars. Defendant is the current contractor-operator of
the Kansas Army Ammunition Plant (the "KSAAP").
According to Defendant, the KSAAP is owned by the
federal government and Defendant operates the KSAAP
pursuant to a Facility Use Contract with the United States
Army. Defendant alleges that the Facility Use Contract
allows Defendant to sublease certain idle facilities at the
KSAAP.

Plaintiff and Defendant entered into a lease agreement in
September 1999 to sublease a railcar storage area at the
KSAAP. The lease agreement provided for an initial term

from October 1, 1999 to July 31, 2002, with five successive
options of five years each.

Under Section 2914(a) of the Defense Base Closure and
Realignment Act of 1990 (the "BRAC Act") as amended
(Pub.L. 101–510; 10 U.S.C. § 2687 note) the Secretary of
Defense is authorized to recommend military installations
inside the United States for closure and realignment. [1]
Six years after the execution of the lease agreement,
on May 16, 2005, as part of its base realignment and
closure recommendations, the Department of Defense
proposed that the KSAAP and certain other military
facilities throughout the United States be closed. [2] This
recommendation was subsequently approved by the
President, debated in Congress, and eventually became
law. On February 7, 2006, the Department of Defense
issued a notice, pursuant to Section 2905(b)(7)(B)(ii) of the
BRAC Act, providing a partial list of military installations
closing or realigning pursuant to the 2005 Defense Base
Closure and Realignment Report. [3] This list included the
KSAAP. [4]

According to the BRAC Act, the Secretary of Defense is
required to close all military installations recommended
for closure and realign all military installations
recommended for realignment. In anticipation of the
impending closure of the KSAAP, Defendant claims
that the Army did not renew the Facility Use Contract
with Defendant, and that the Facility Use Contract will
terminate on December 31, 2008 (although Defendant
claims it is currently in negotiations with the Army
and with the potential buyer of the KSAAP to allow
Defendant to remain at the KSAAP after it is sold).

Defendant sent a letter to Plaintiff dated March 17, 2008,
purporting to terminate the lease agreement effective
December 31, 2008 based on the 2005 amendments to
the BRAC Act and the subsequent decision to close the
KSAAP. Plaintiff claims that the KSAAP is not scheduled
for closure until September 15, 2011. Plaintiff argues that
if Defendant is permitted to improperly terminate the lease
agreement effective December 31, 2008, then Plaintiff will
be required to provide contract termination notices to its
customers on or before September 1, 2008.

 **\*2** On July 1, 2007, Plaintiff filed a motion for
preliminary injunction requesting that the Court enjoin
the Defendant from: (1) terminating the parties' lease

Case 1:18-cv-00475-SEB-TAB  Document 1-2  Filed 02/16/18  Page 340 of 440 PageID #: 352
Lindsey & Osborne Partnership, LLP v. Day & Zimmermann..., Not Reported in...
2008 WL 2858786

agreement; (2) removing or evicting Plaintiff; and (3) interfering with Plaintiff's business activities or opportunities. That same day, Plaintiff also filed a motion to expedite discovery asking the Court to: (1) lift the stay of discovery pending a conference under Fed.R.Civ.P. 26(f); and (2) allow written discovery and deposition discovery by all parties, including; (a) requiring Defendant to respond to any interrogatories, requests for production of documents, and/or requests for admissions within 10 business days of service of any such request; and (b) allowing interrogatories and document requests for such depositions and similar discovery on third parties possibly in possession of documents, information, and other records relevant to this action.

### III. ANALYSIS

As a general rule, discovery may not commence before the parties have conferred as required by Rule 26(f) of the Federal Rules of Civil Procedure.[5] "The court may, however, in the exercise of its broad discretion, alter the timing, sequence and volume of discovery."[6] Under Fed.R.Civ.P. 26(d), the court is authorized to expedite discovery upon a showing of "good cause."[7] Good cause has been found in cases where the plaintiff seeks a preliminary injunction.[8] "A party that seeks expedited discovery in advance of a Rule 26(f) conference has the burden of showing good cause for the requested departure from usual discovery procedures."[9]

Defendant cites *Don King Productions, Inc. v. Hopkins* for various factors a court should consider when determining whether good cause exists, including:

(1) irreparable injury;

(2) some probability of success on the merits;

(3) some connection between the expedited discovery and the avoidance of the irreparable injury;

(4) some evidence that the injury will result without expedited discovery looms greater than the injury that the defendant will suffer if the expedited relief is granted;

(5) whether the request is narrowly tailored given the time constraints; and

(6) whether the movant could have avoided such restraints by acting prior to the request.[10]

The court in *Koch Carbon, Inc. v. Isle Capital Corp.* cited and applied some of the factors discussed in *Hopkins.*[11]

While these factors do not provide a hard and fast test, they can assist the Court in determining whether good cause exists to expedite discovery. The Court has considered these factors, with the exception of Plaintiff's likelihood of prevailing on the merits, and finds that Plaintiff has shown good cause to expedite discovery.

#### 1. Irreparable Injury

According to Plaintiff's memorandum in support of its motion for preliminary injunction,[12] if Defendant is permitted to terminate the lease agreement, Plaintiff will be required to send out contract termination notices to its own customers. As a result, Plaintiff claims it will suffer irreparable harm, including: (a) permanent deprivation of its interests in and rights to unique real property, (b) permanent loss of its customers, (c) permanent loss of all of the goodwill it has developed, (d) loss of its entire investment in its business, and (e) the complete and permanent destruction of its business operations at the property. The Tenth Circuit has recognized that loss of customers, loss of goodwill, and threats to a business's viability can constitute irreparable harm.[13] In an attempt to prevent Defendant from terminating the lease agreement, Plaintiff filed a motion for preliminary injunction. In order to prepare for the motion for preliminary injunction, Plaintiff claims it must conduct expedited discovery. The Court finds that Plaintiff could suffer irreparable harm if it is prevented from conducting expedited discovery in order to prepare for its preliminary injunction hearing.

#### 2. Some Connection Between the Expedited Discovery and the Avoidance of the Irreparable Harm

**\*3** Plaintiff claims that if Defendant is permitted to terminate the lease agreement effective December 31, 2008, it will be required to send out contract termination notices to its own customers on September 1, 2008. Plaintiff filed a motion for preliminary injunction in order to stop Defendant from terminating the lease agreement and evicting Plaintiff. Plaintiff asks permission to conduct

expedited discovery to allow Plaintiff an opportunity to obtain information to prepare for the hearing on the motion for preliminary injunction. In advance of the request for a preliminary injunction, Plaintiff argues that it must obtain depositions from representatives of Defendant, the local redevelopment authority and possibly the Army. In light of such allegations, the Court finds that there is a connection between the expedited discovery and the avoidance of the irreparable harm.

### 3. Evidence That the Injury Will Result Without Expedited Discovery Looms Greater Than the Injury That the Defendant Will Suffer if the Expedited Discovery is Granted

Plaintiff claims that if it is not permitted to conduct expedited discovery, it will not be able to fully prepare for its preliminary injunction hearing and, thus, could lose its customers, its business, and its goodwill. On the other hand, it does not appear that Defendant will suffer any significant injury if Plaintiff is allowed to conduct expedited discovery. While the Defendant may suffer if the Plaintiff is permitted to conduct expedited discovery without any limitations, the Court will limit or avoid such an injury by imposing certain limitations on the expedited discovery. Thus, the Court concludes that the evidence of the injury that Plaintiff will suffer if not permitted to conduct the expedited discovery looms greater than the injury that Defendant may suffer if the request for expedited discovery is granted.

### 4. Narrowly Tailored Discovery

Plaintiff claims that it would limit the proposed expedited discovery to the following topics:

(1) The parties' lease agreement, including the negotiation and termination of the lease agreement;

(2) The Facility Use Contract between the Defendant and the Army, including the negotiation and termination of the Facility Use Contract;

(3) The sale and/or transfer of the KSAAP to the KSAAP Local Redevelopment Planning Authority;

(4) Defendant's future operations at the KSAAP property and any negotiations or agreements related to such operations;

(5) The intended use of the rail system and Plaintiff's KSAAP facilities in the event Plaintiff is evicted from the KSAAP; and

(6) Defendant's motive for acquiescing to the termination of the Facility Use Contract and the lease agreement.

The Court will further limit the proposed expedited discovery to the following type of discovery:

(1) Five depositions;

(2) Ten interrogatories;

(3) Ten requests for production of documents; and

(4) Three subpoenas.

**\*4** Based on these limits, the Court concludes that the discovery is narrowly tailored given the time constraints.

### 5. Whether Plaintiff Could Have Avoided Such Restraints by Action Prior to the Request for Expedited Discovery

It appears that Plaintiff knew of Defendant's purported termination of the lease agreement around March 17, 2008 (the date of the termination letter). Plaintiff filed its complaint July 1, 2008. Plaintiff argues that it did not delay in pursuing this action. According to Plaintiff, before filing the motion for preliminary injunction, Plaintiff investigated whether the issue could be resolved without litigation, located counsel, and assisted in the preparation of the pleadings. The Court concludes that Plaintiff could not have avoided the need for expedited discovery by acting prior to its request for expedited discovery.

### IV. CONCLUSION

For the foregoing reasons, the Court finds that good cause exists to grant in part Plaintiff's Motion to Expedite Discovery (doc. 4).

**IT IS THEREFORE ORDERED** that Plaintiff's Motion to Expedite Discovery (doc. 4) is granted in part and denied in part.

**IT IS FURTHER ORDERED** that both Plaintiff and Defendant may conducted the following expedited discovery: (1) five depositions, (2) ten interrogatories, (3) ten requests for production of documents, and (4) three subpoenas. The party responding to the discovery request shall respond within twenty business days of service of the discovery request.

**IT IS FURTHER ORDERED** that the expedited discovery will be limited to the following topics: (1) the parties' lease agreement, including the negotiation and termination of the lease agreement; (2) the Facility Use Contract between the Defendant and the Army, including the negotiation and termination of the Facility Use Contract; (3) the sale and/or transfer of the KSAAP to the KSAAP Local Redevelopment Planning Authority; (4) Defendant's future operations at the KSAAP property and any negotiations or agreements related to such operations; (5) the intended use of the rail system and Plaintiff's KSAAP facilities in the event Plaintiff is evicted from the KSAAP; and (6) Defendant's motive for acquiescing to the termination of the Facility Use Contract and the lease agreement.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 2858786

**Footnotes**

1    *See* Base Closures and Realignments, 70 Fed.Reg. 28030, 28030 (May 16, 2005).

2    *See id.* at 28054.

3    *See* Base Closure and Community Redevelopment and Homeless Assistance Act; Base Realignments and Closures, 71 Fed.Reg. 6274 (February 7, 2006).

4    *See id.* at 6275.

5    Fed.R.Civ.P. 26(d).

6    *Alpine Atlantic Asset Mgmt. AG v. Comstock,* Civ. A. No. 07–2595–JWL, 2008 WL 618627, at * 1 (D.Kan. Mar.3, 2008) (citing *Qwest Comm'cs Int'l, Inc. v. WorldQuest,* 213 F.R.D. 418, 418 (D.Colo.2003)).

7    *Koch Carbon, LLC v. Isle Capital Corp.,* No. 05–1010–MLB, 2006 U.S. Dist. LEXIS 36962, at *5 (D.Kan. Mar. 1, 2006) (citing *Pod–Ners, LLC v. Northern Feed & Bean of Lucerne Ltd.,* 204 F.R.D. 675, 676 (D.Colo.2002)).

8    *See Pod–Ners, LLC,* 204 F.R.D. at 676 (citing *Revlon Consumer Products Corp. v. Jennifer Leather Broadway, Inc.,* 858 F.Supp. 1268, 1269 (S.D.N.Y.1994), *aff'd,* 57 F.3d 1062 (2d Cir.1995)).

9    *Alpine,* 2008 WL 618627, at *1 (citing *Qwest,* 213 F.R.D. at 418; *Pod–Ners, LLC,* 204 F.R.D. at 676; *Yokohama Tire Corp. v. Dealers Tire Supply, Inc.,* 202 F.R.D. 612, 614 (D.Ariz.2001)).

10    *See Don King Productions, Inc. v. Hopkins,* No. 04 Civ. 9705(PKL), 2004 WL 2997800, at *2 (S.D.N.Y. Dec.23, 2004) (cited with favor by *Koch Carbon, LLC v. Isle Capital Corp.,* Case No. 05–1010–MLB, 2006 U.S. Dist. LEXIS 36962, at *5–6 (D.Kan. Mar. 1, 2006)).

11    *See Koch Carbon,* 2006 U.S. Dist. LEXIS 36962, at *5–6 (the court did not address the probability of Plaintiffs' likelihood of success on the merits).

12    Plaintiff incorporated its Motion for Preliminary Injunction (doc. 2) and Memorandum in Support of its Motion for Preliminary Injunction (doc. 3) in its Reply in Support of Plaintiff's Motion to Expedite Discovery (doc. 15).

13    *See e.g., Zurn Constructors, Inc. v. B.F. Goodrich Co.,* 685 F.Supp. 1172, 1181 (D.Kan.1988).

**End of Document**      © 2018 Thomson Reuters. No claim to original U.S. Government Works.

# *TAB 8*

Case 1:18-cv-00475-SEB-TAB Document 1-2 Filed 02/16/18 Page 344 of 440 PageID #: 356
Meritain Health Inc. v. Express Scripts, Inc., Not Reported in F.Supp.2d (2012)
2012 WL 1320147

2012 WL 1320147
Only the Westlaw citation is currently available.
United States District Court,
E.D. Missouri,
Eastern Division.

MERITAIN HEALTH INC. et al., Plaintiffs,
v.
EXPRESS SCRIPTS, INC., Defendant.

No. 4:12−CV−266 CEJ.
|
April 17, 2012.

**Attorneys and Law Firms**

Daniel A. Platt, Los Angeles, CA, Frederick P. Santarelli, John M. Elliott, Gregory S. Voshell, John P. Elliott, Elliot Greenleaf & Siedzikowski P.C., Blue Bell, PA, Kevin A. Sullivan, Michael L. Knepper, Sauter Sullivan, LLC, St. Louis, MO, for Plaintiffs.

Christopher A. Smith, Matthew D. Knepper, Thomas M. Dee, St. Louis, MO, for Defendant.

## *MEMORANDUM AND ORDER*

CAROL E. JACKSON, District Judge.

**\*1** This matter is before the Court on plaintiffs' motion to expedite discovery. Defendant opposes the motion and the issues are fully briefed.

### I. Background

Plaintiff Meritain Health, Inc., designs and administers health benefit plans for employers. Defendant Express Scripts, Inc., provides prescription drug services. On August 8, 2005, Meritain, through its affiliate and co-plaintiff Scrip World, LLC., entered into a contract with the defendant to provide prescription services for plaintiffs' clients. Under the contract, plaintiffs provided the defendant with a confidential list of their clients, including information regarding their clients' benefits. Plaintiffs allege that the defendant used information from the client list to contact and solicit business from plaintiffs' clients. On January 27, 2012, plaintiffs filed an amended complaint against the defendant; asserting violation of the Lanham Act, 15 U.S.C. § 1125. *et*

*seq.*(Count I), unfair competition (Count II), tortious interference with contractual relationships and business expectancies (Count III), violation of trade secrets and misappropriation of proprietary information (Count IV), breach of contract (Count V), and breach of a covenant of good faith and fair dealing (Count VI).

Plaintiffs now seek expedited discovery in preparation for the preliminary injunction hearing. Specifically, plaintiffs request that the defendant produce documents relating to its communications with plaintiffs' clients. Plaintiffs also seek to conduct six depositions of defendant's employees who either communicated with plaintiffs' clients or used plaintiffs' client list.

### I. Discussion

Rule 26(d)(1), of the Federal Rules of Civil Procedure provides that a party may not seek discovery from any source before the parties have met and conferred, unless "authorized by these rules, by stipulation, or by court order." Fed.R.Civ.P. Rule (d)(1). Here, the parties have not met and conferred. Thus, plaintiffs must seek a court order granting leave to conduct formal discovery. *Id.*

Courts use one of two standards to determine whether a party is entitled to conduct expedited discovery. Some courts apply a "good cause" or "reasonableness" standard, while others analyze a set of factors similar to those for obtaining a preliminary injunction. *See Special Situations Cayman Fund, L.P. v. Dot Com Entertainment Group, Inc.,* 2003 WL 23350128 at \*1, n. 7 (W.D.N.Y.2003). The Eighth Circuit has not adopted either standard. *See Monsanto Co. v. Woods,* 250 F.R.D. 411 (E.D.Mo.2008). But this Court has consistently applied the good cause standard. *Id.; Cook v. Williams,* 2009 WL 3246877 \*1 (E.D.Mo.2009).

Under the good cause standard, the party requesting expedited discovery must show that the need for expedited discovery, in consideration of administration of justice, outweighs prejudice to the responding party. *Semitool, Inc. v. Tokyo Electron Am., Inc.,* 208 F.R.D. 273, 276 (N.D.Cal.2002); *Qwest Comm. Int'l, Inc. v. WorldQuest Networks, Inc.,* 213 F.R.D. 418, 419 (D.Colo.2003); *Yokohama Tire Corp.v. Dealers Tire Supply, Inc.,* 202 F.R.D. 612, 613–14 (D.Ariz.2001). *Cf. Merrill Lynch, Pierce, Fenner & Smith v. O'Connor,* 194 F.R.D. 618, 624 (N.D.Ill.2000).

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Merrill Lynch v. Express Scripts, Inc., Not Reported in F.Supp.2d (2012)

2012 WL 1320147

**\*2** When a party seeks expedited discovery to prepare for a preliminary injunction hearing, the court examines the discovery request on the entirety of the record and the reasonableness of the request in light of all the surrounding circumstances. See *Merril,* 194 F.R.D. 618 at 624. Factors commonly considered in determining the reasonableness of an expedited discovery request include: (1) whether a preliminary injunction is pending; (2) the breadth of the discovery requests; (3) the purpose for requesting the expedited discovery; (4) the burden on the defendants to comply with the requests; and (5) how far in advance of the typical discovery process the request was made. *Qwest,* 213 F.R.D. 418 at 419.

Plaintiffs have shown good cause for expedited discovery. The documents and depositions plaintiffs seek to discover will assist them in establishing their claims in the preliminary injunction hearing. Expedited discovery is generally appropriate in cases, such as this, where a party is attempting to prepare for a preliminary injunction hearing. *El Pollo Loco S.A. de C.V. v. El Pollo Loco Inc.,* 344 F.Supp.2d 986, 991 (S.D.Tex.2004). Furthermore, plaintiffs have shown that their discovery request is not overly burdensome to the defendant. Defendant argues that plaintiffs' discovery request is broad. However, the Court finds that plaintiffs have narrowly tailored their request to a limited set of documents and depositions. *See Philadelphia Newspapers, Inc. v. Gannett Satellite Info.*

*Network, Inc.,* 1998 WL 404820 (E.D.Pa.1998) (citing *Irish Lesbian & Gay Org. v. Giuliani,* 918 F.Supp. 728, 730–31 (S.D.N.Y.1996)("[C]ourts generally deny motions for expedited discovery when the movant's discovery requests are overly broad.").

Accordingly,

**IT IS HEREBY ORDERED** that plaintiffs' motion for expedited discovery [# 38] is **granted.**

**IT IS FURTHER ORDERED** that plaintiffs are granted leave to propound a request for production of documents in the form attached to their motion. Pursuant to Fed.R.Civ.P. 34(b)(2)(A), the defendant shall respond to the request within 30 days after being served.

**IT IS FURTHER ORDERED** that plaintiffs are granted leave to take the depositions of the individuals named in their motion.

**IT IS FURTHER ORDERED** that all discovery authorized by this Order shall be completed by June 15, 2012.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 1320147

---

**End of Document** © 2018 Thomson Reuters. No claim to original U.S. Government Works.

*TAB 9*

86 Fed.R.Serv.3d 1165

293 F.R.D. 363
United States District Court,
E.D. New York.

NORTH ATLANTIC OPERATING COMPANY, INC.,
and National Tobacco Company, L.P., Plaintiffs,

v.

EVERGREEN DISTRIBUTORS, LLC; Douglas
Ezring; New Line Food Distribution, Inc.;
Hookah Plus, Inc., d/b/a Hookah Plus; Hussein
Hachem; Manhattan Wholesalers N.Y. Corp.,
d/b/a Manhattan Wholesalers, Inc.; Majid
Rashidzada; Majid Haroon; 23rd St. General
Market & Deli Corp., d/b/a General Market &
Deli; Gourmet Food Market; New Star Tobacco,
Inc., d/b/a New Star Tobacco; and John Does
One through Ten, inclusive, Defendants.

No. 13–CV–4974 (ERK)(VMS).
|
Oct. 4, 2013.

**Synopsis**
**Background:** Owner of trademark "ZIG-ZAG," used
in connection with cigarette paper products, filed suit
against competitors alleging sale of counterfeit products in
violation of Lanham Act. Plaintiffs moved for expedited
discovery.

**Holdings:** The District Court, Vera M. Scanlon, United
States Magistrate Judge, held that:

[1] expedited discovery was warranted, but

[2] individuals who had no clear connection to counterfeit
defendants were not subject to expedited discovery; and

[3] plaintiff failed to demonstrate good cause for issuance
of pre-discovery third-party subpoena.

Motion granted in part.

West Headnotes (10)

[1] **Federal Civil Procedure**
👉 Depositions and Discovery

Expedited discovery may be helpful in
counterfeiting cases, since it may lead
to evidence of continuing infringement
by defendant or others, future plans
to infringe, or additional infringing
merchandise. Fed.Rules Civ.Proc.Rule 26(d)
(1), 28 U.S.C.A.

Cases that cite this headnote

[2] **Federal Civil Procedure**
👉 Depositions and Discovery

In determining whether to grant request for
expedited discovery, court applies a flexible
standard of reasonableness and good cause,
requiring party seeking the discovery to prove
that the request is reasonable under the
circumstance. Fed.Rules Civ.Proc.Rule 26(d)
(1), 28 U.S.C.A.

4 Cases that cite this headnote

[3] **Federal Civil Procedure**
👉 Depositions and Discovery

Good cause for expedited discovery may be
shown when considerations of administration
of justice outweigh prejudice to the
responding party. Fed.Rules Civ.Proc.Rule
26(d)(1), 28 U.S.C.A.

1 Cases that cite this headnote

[4] **Federal Civil Procedure**
👉 Depositions and Discovery

When determining motion for expedited
discovery, court utilizes a four-factor test
considering: (1) irreparable injury; (2) some
probability of success on the merits; (3)
some connection between the expedited
discovery and the avoidance of the irreparable
injury; and (4) some evidence that the
injury that will result without expedited

discovery looms greater than the injury that defendant will suffer if the expedited relief is granted. Fed.Rules Civ.Proc.Rule 26(d)(1), 28 U.S.C.A.

2 Cases that cite this headnote

**[5]** **Trademarks**
    Nature of Confusion

**Trademarks**
    Practices or Conduct Prohibited in General;Elements

**Trademarks**
    Infringement

To establish claim for trademark infringement or false designation of origin, plaintiff must show that (1) its mark is entitled to protection, and (2) the use of its mark by defendant is likely to confuse consumers as to the sponsorship or origin of the goods.

Cases that cite this headnote

**[6]** **Federal Civil Procedure**
    Depositions and Discovery

Expedited discovery was warranted in suit alleging trademark infringement and false designation of origin against makers and distributors of counterfeit "ZIG-ZAG" trademarked cigarette papers where trademark owner demonstrated likelihood of success on the merits of claims, owner had acted without delay in seeking expedited discovery, such discovery would allow owner to quickly identify sources and locations of counterfeit products, and request could be tailored to identification of locations and documents specific to the "ZIG-ZAG" products and communications between defendants regarding them, with reasonable 10-day response time. Lanham Act, § 1 et seq., 15 U.S.C.A. § 1051 et seq.; Fed.Rules Civ.Proc.Rule 26(d)(1), 28 U.S.C.A.

1 Cases that cite this headnote

**[7]** **Federal Civil Procedure**
    Depositions and Discovery

Expedited discovery was not warranted in suit alleging trademark infringement and false designation of origin against two individuals associated with the makers and distributors of counterfeit "ZIG-ZAG" trademarked cigarette papers, since there was no clear connection between their involvement in defendants' selling or distributing counterfeit products other than a shared telephone number and address, or a sales agent relationship, with them, and plaintiff had delayed more than 15 months in seeking discovery against these individuals. Lanham Act, § 1 et seq., 15 U.S.C.A. § 1051 et seq.; Fed.Rules Civ.Proc.Rule 26(d)(1), 28 U.S.C.A.

Cases that cite this headnote

**[8]** **Witnesses**
    Subpoena duces tecum

Requests for leave to issue a subpoena to a third-party prior to the pre-discovery conference required by federal rule are subject to the same reasonableness and good cause test applied to requests for expedited discovery. Fed.Rules Civ.Proc.Rules 26(d)(1), (f), 45, 28 U.S.C.A.

2 Cases that cite this headnote

**[9]** **Witnesses**
    Subpoena duces tecum

"ZIG-ZAG" trademark owner's vague reference to a shipping label being pertinent to the distribution of counterfeit "ZIG-ZAG" products was insufficient to demonstrate good cause for issuance of pre-discovery subpoena against third-party individuals named on the label, since it was unclear whether subpoenaing these individuals would lead to identifying other defendants or information relevant to plaintiff's claims in trademark infringement and false designation of origin suit, and plaintiff had alternate means of investigating their relationship with named defendants. Lanham Act, § 1 et seq.,

15 U.S.C.A. § 1051 et seq.; Fed.Rules Civ.Proc.Rule 45, 28 U.S.C.A.

Cases that cite this headnote

[10]  **Trademarks**
   👉 Alphabetical listing
   ZIG-ZAG.

   Cases that cite this headnote


**Attorneys and Law Firms**

**\*365** Marcella Ballard, Michael Colbert Hartmere, Robert Leslie Meyerhoff, Venable LLP, New York, NY, for Plaintiffs.


### ORDER

VERA M. SCANLON, United States Magistrate Judge:

Before the Court [1] is the application by Plaintiffs North Atlantic Operating Company, Inc. ("NAOC") and National Tobacco Company, L.P. ("NTC") (collectively, "North Atlantic") for limited, expedited discovery, pursuant to Federal Rules of Civil Procedure ("FRCP") 26, 30 and 34. *See* Pls.' Proposed Findings of Fact & Conclusions of Law ("Pls.' Proposed Findings") 22, Sept. 12, 2013, ECF No. 25. This Court addressed Plaintiffs' concurrent request for a preliminary injunction in separate Reports and Recommendations filed on September 27, 2013 (the "R & R"), ECF No. 26 (concerning all Defendants except Evergreen Distributors, LLC), and September 30, 2013 (the "Evergreen R & R"), ECF No. 29 (concerning Evergreen Distributors, LLC). The Court now addresses Plaintiffs' request for expedited discovery.

For the following reasons, Plaintiffs' request for expedited discovery is granted in part and denied in part as to Defendants Evergreen Distributors, LLC ("Evergreen"), [2] Mr. Douglas Ezring ("Mr. Ezring"), Hookah Plus, Inc. ("Hookah Plus"), Mr. Hussein Hachem ("Mr. Hachem"), Manhattan Wholesalers N.Y. Corp. ("Manhattan Wholesalers") and its owner Mr. Majid Rashidzada ("Mr. Rashidzada"). Plaintiffs' request for expedited discovery is denied as to Defendants

New Line Food Distribution, Inc. ("New Line"), Mr. Majid Haroon ("Mr. Haroon"), 23rd St. General Market & Deli Corp. ("General Market"), Gourmet Food Market and New Star Tobacco, Inc. ("New Star Tobacco"). [3] Plaintiffs have leave to renew their application for expedited discovery, if necessary, should additional relevant information concerning these Defendants become available.

In addition, Plaintiffs' request for a court order to issue a third-party subpoena against common carrier DHL for documents and information related to individuals or entities **\*366** listed on a DHL shipping label is denied for the reasons stated below. Plaintiffs will also have leave to renew this application, if necessary, should additional relevant information become available. This Order expresses no view as to whether Plaintiffs could pursue the requested discovery within the discovery framework of the Federal Rules, particularly, FRCP 16 and 26.


### I. BACKGROUND

I assume the parties' familiarity with the factual and procedural background of this case, as it is set out in detail in the September 27, 2013 Report and Recommendation.

North Atlantic sells and distributes cigarette paper products in the United States, including ZIG–ZAG® brand cigarette paper products. North Atlantic alleges that the Defendants unlawfully distributed counterfeit ZIG–ZAG® 1 1/4 Size French orange cigarette papers (hereinafter, "ZIG–ZAG® Orange") from locations within this judicial district.

Counsel for Mr. Ezring and a principal for General Market appeared at the September 10, 2013 show cause hearing, *see* Show Cause Hr'g Tr. ("Hr'g Tr."), Sept. 10, 2013, ECF No. 7, and all Defendants have been served with the Summons and relevant papers in this case. *See* Hr'g Tr. 4:24–6:2 (describing service on each Defendant); ECF Nos. 9–19 & 22–23 (Proofs of Service and Affidavits of Service). Mr. Haroon filed an Answer on September 30, 3013. Haroon Answer, Sept. 30, 2013, ECF No. 27. An attorney for Manhattan Wholesalers and Mr. Rashidzada filed a Notice of Appearance on October 4, 2013. Notice of Appearance, Oct. 4, 2013, ECF No. 33. No other Defendants have appeared.

Certain Defendants have voluntarily provided discovery to Plaintiffs. The principal for General Market spoke with Plaintiffs' counsel during the show cause hearing and provided Plaintiffs with documents. Hr'g Tr. 93:6–94:11. Mr. Blaine Salter ("Mr. Salter"), a principal of Evergreen, and Mr. Gregory Disotell ("Mr. Disotell"), an agent or representative of Evergreen, offered their cooperation and documents to North Atlantic after the show cause hearing. *See* Decl. of John M. Hood III in Further Supp. of Mot. for Order Allow'g Expedited Disc. & Order to Show Cause for Prelim. Inj. ("Hood Supp. Decl.") ¶ 10, Sept. 23, 2013, ECF No. 21. Mr. John M. Hood III ("Mr. Hood"), the Director of Operations at L.S.S. Consulting, Inc. ("LSS"), a Michigan-based private investigation firm hired by Plaintiffs to investigate alleged counterfeiting, also participated in an in-person interview of Mr. Ezring on September 19, 2013. *Id.* ¶¶ 2 & 11.

During that interview, Mr. Hood and Mr. Ezring discussed a DHL shipping label that is addressed to Mr. Ezring at his Port Washington, New York address, from "FWNM NPNP CO LTD, Jerry A20, Bak Industry Park Yuan, Ling Street Shenzhen City, Guang Dong Chain, Hong Kong, Hong Kong." *See* Hood Supp. Decl. ¶¶ 12–13 & Ex. B. Mr. Hood stated, in a footnote, that this shipping label "is not offered as proof of Plaintiffs' claims, but rather to demonstrate the manner and means by which the counterfeit ZIG–ZAG® Orange described above was distributed into the United States." *Id.* ¶ 12 n. 2.[4] Mr. Hood's Supplemental Declaration provides no further information concerning the shipping label.

## II. DISCUSSION

Plaintiffs seek expedited discovery against all Defendants to advance their investigation into alleged ongoing sales of counterfeit ZIG–ZAG® Orange by these Defendants and possibly others, and to avoid the irreparable injury that would result from the destruction of evidence. At the show cause hearing and by letter, counsel for Mr. Ezring raised objections to the breadth of Plaintiffs' document requests and the proposed seven-day deadline for Defendants' responses. Hr'g **\*367** Tr. 95:1–96:5; Letter from Mr. Gregory A. Clarick to the Hon. Vera M. Scanlon, dated September 16, 2013 (the "Ezring Letter") 2.[5] No other objections to Plaintiffs' expedited discovery request have been raised.

In addition, Plaintiffs included in Mr. Hood's Supplemental Declaration a request for leave to file a third-party subpoena against DHL. Hood Supp. Decl. ¶ 13. Defendants have raised no objections to this request.

### a. The Legal Standard for Expedited Discovery

**[1]** Pursuant to FRCP 26(d)(1), "[a] party may not seek discovery from any source before the parties have conferred as required by Rule 26(f), except ... when authorized by these rules, by stipulation, or by court order." Fed.R.Civ.P. 26(d)(1). In counterfeiting cases, expedited discovery may need to be granted because discovery on "an expedited basis may very well lead to evidence of continuing infringement by this defendant or others; it may also lead to the discovery of future plans to infringe or the discovery of additional infringing merchandise." *Twentieth Century Fox Film Corp. v. Mow Trading Corp.,* 749 F.Supp. 473, 475 (S.D.N.Y.1990).

**[2]** **[3]** "Courts in this district have applied a 'flexible standard of reasonableness and good cause' in determining whether to grant a party's expedited discovery request." *Digital Sin, Inc. v. Does 1–176,* 279 F.R.D. 239, 241 (S.D.N.Y.2012) (quoting *Ayyash v. Bank Al–Madina,* 233 F.R.D. 325, 326–27 (S.D.N.Y.2005)); *see Pearson Educ., Inc. v. Doe,* No. 12 Civ. 4786(BSJ)(KNF), 2012 WL 4832816, at \*3 (S.D.N.Y. Oct. 1, 2012) (listing cases). This reasonableness test " 'requires the party seeking the discovery to prove that the requests are reasonable under the circumstances.' " *KeyBank, Nat. Ass'n v. Quality Payroll Sys., Inc.,* No. 06 Civ. 3013(JS) (AKT), 2006 WL 1720461, at \*4 (E.D.N.Y. June 22, 2006) (quoting *Better Packages, Inc. v. Zheng,* No. 05 Civ. 4477(SRC), 2006 WL 1373055, at \*2 (D.N.J. May 17, 2006)). Courts may find that there is good cause when "the need for expedited discovery, in consideration of the administration of justice, outweighs the prejudice to the responding party." *Semitool, Inc. v. Tokyo Electron Am., Inc.,* 208 F.R.D. 273, 276 (N.D.Cal.2002). For example, in *Ayyash,* the court found good cause for expedited discovery concerning defendants' assets where plaintiff "made a strong evidentiary showing of the substantiality of his claims," and where defendants "have both incentive and capacity to hide [the assets at issue]." *Ayyash,* 233 F.R.D. 325, 327 (S.D.N.Y.2005).

Case 1:18-cv-00475-SEB-TAB Document 1-2 Filed 02/16/18 Page 351 of 440 PageID #: 363
North Atlantic Operating Co., Inc. v. Evergreen Distributors, LLC, 293 F.R.D. 363 (2013)

86 Fed.R.Serv.3d 1165

 **[4]** When considering motions for expedited discovery, courts in this district have also utilized the four-factor test articulated in *Notaro v. Koch,* 95 F.R.D. 403, 405 (S.D.N.Y.1982). *See Litwin v. OceanFreight, Inc.,* 865 F.Supp.2d 385, 402 (S.D.N.Y.2011) (applying both the reasonableness and good cause test and the *Notaro* test); *KWG Partners, LLC v. Sigel,* No. 11 Civ. 2890(NGG)(JMA), 2011 WL 2837437, at *1–2 (E.D.N.Y. July 14, 2011) (same); *Cecere v. Cnty. of Nassau,* 258 F.Supp.2d 184, 186 (E.D.N.Y.2003) (applying only the *Notaro* test). [6] The *Notaro* test requires considering: "(1) irreparable injury, (2) some probability of success on the merits, (3) some connection between the expedited discovery and the avoidance of the irreparable injury, and (4) some evidence that the injury that will result without expedited discovery looms greater than the injury that the defendant will suffer if the expedited relief is granted." *Notaro,* 95 F.R.D. at 405. In comparison to the *Notaro* test, the reasonableness **\*368** standard is considered "more liberal," *Better Packages, Inc.,* 2006 WL 1373055, at *3, and "more flexible," *Stern v. Cosby,* 246 F.R.D. 453, 457 (S.D.N.Y.2007). The good cause standard can also be described as more flexible than the *Notaro* test, as the courts in *Ayyash* and *Semitool, Inc.* considered similar factors when analyzing good cause, but did not specifically limit their inquiry to *Notaro's* considerations. *See Semitool, Inc.,* 208 F.R.D. at 276 (finding it inconsistent with FRCP 1 and 26(d) that, "[t]he *Notaro* factors would not accommodate expedited discovery in circumstances even where such discovery would facilitate case management and expedite the case with little or no burden to the defendant simply because the plaintiff would not suffer 'irreparable injury.' ").

The prudent course here appears to be to blend the two tests, the *Notaro* four-factor test and the reasonableness and good cause standard. [7] The *Notaro* factors focus the analysis on the good cause aspect of the blended analysis by considering those facts that would justify a general setting aside of the usual FRCP timeline for discovery in favor of a timeline adapted to the exigencies of the circumstances. In particular, the third and fourth factors of the *Notaro* test are relevant to a finding of good cause. The reasonableness analysis considers the practical implications of the request—for example, can the requested materials physically be gathered on the proposed timeline—as well as whether the requested discovery will indeed assuage the movant's desire to limit harm that a delay might cause. *See Pearson Educ.,*

*Inc.,* 2012 WL 4832816, at *4 ("The Court will apply 'the flexible standard of reasonableness and good cause,' adopted in *Ayyash,* 233 F.R.D. at 327, and will also consider any factors relevant to the circumstances of this case....").

### b. Plaintiffs' Request for Expedited Discovery

With the modifications to Plaintiffs' request described below, North Atlantic meets its burden for a grant of expedited discovery as to Evergreen, Mr. Ezring, the Hookah Plus Defendants, Manhattan Wholesalers and Mr. Rashidzada, but not as to New Line, Mr. Haroon and the Retailer Defendants.

### 1. Good Cause

Plaintiffs established good cause for expedited discovery against some, but not all, of the Defendants. As set out in the Reports and Recommendations, North Atlantic presented credible evidence that the actions it attributed to Defendants were causing irreparable harm to North Atlantic, including loss of goodwill, negative effects on profitability and damage to its relationships with its direct clients/customers. *See* R & R at 21–23, Evergreen R & R at 9; *KeyBank, Nat. Ass'n,* 2006 WL 1720461, at *4 (plaintiff demonstrated irreparable harm based on, *inter alia,* harm to "commercial reputation in the marketplace").

This evidence included the testimony and sworn declaration of Mr. Clark Sturdivant ("Mr. Sturdivant"), the Sales Director—Metro Accounts at NTC, who is familiar with Plaintiffs' brands, trademarks, exclusive rights, sales and customer relationships. Decl. of Clark Sturdivant in Supp. of Pls.' Mot. ("Sturdivant Decl.") ¶¶ 2–4, 26–32, Sept. 5, 2013, ECF No. 1–4; Hr'g Tr. 79:18–80:2, 81:1–84:9.

 **[5]** However, as to certain Defendants, Plaintiffs neither showed some probability of success on the merits nor provided sufficient evidence that those Defendants' actions had caused or would cause the irreparable harm at issue. To establish their claims for trademark infringement or false designation of origin, a plaintiff must show that (1) its mark **\*369** is entitled to protection, and (2) the use of its mark by the defendant is likely to confuse consumers as to the sponsorship or origin of the goods.

*See Virgin Enters. Ltd. v. Nawab,* 335 F.3d 141, 146 (2d Cir.2003); *Chanel, Inc. v. Xiao Feng Ye,* No. 06 Civ. 3372(CPS)(SMG), 2007 WL 2693850, at *2 (E.D.N.Y. Sept. 12, 2007) (claims for trademark infringement and false designation of origin are analyzed using the same two-prong test); *see also* R & R 17–21, Evergreen R & R 8–9.

**[6]** Plaintiffs established their use and ownership of the rights to the trademarks at issue. *See* Hr'g Tr. 73:8–75:7; *see also* Sturdivant Decl. ¶¶ 6–7, 11 & Exs. A–B. Plaintiffs also offered sufficient evidence of the unauthorized use of those trademarks by Evergreen and Mr. Ezring [8]; the Hookah Plus Defendants [9]; and Manhattan Wholesalers and Mr. Rashidzada. [10] The counterfeit ZIG–ZAG® Orange, which is nearly identical to authentic ZIG– ZAG® Orange in appearance, is inherently likely to cause customer confusion. *See* Hr'g Tr. 24:21–25:5, 25:24– 27:3, 40:7–43:20; Sturdivant Decl. ¶ 13. Plaintiffs also submitted evidence of actual customer confusion in the form of calls to its hotline about possibly counterfeit goods. *See* Hr'g Tr. 79:18–80:2; Sturdivant Decl. ¶ 26. Thus, Plaintiffs established some likelihood of success on the merits as to their claims against Evergreen, Mr. Ezring, the Hookah Plus Defendants, Manhattan Wholesalers and Mr. Rashidzada. *See* R & R at 17–21; Evergreen R & R at 8–9.

**[7]** In contrast, North Atlantic did not offer evidence sufficient to show even some likelihood of success on the merits against New Line. North Atlantic's strongest evidence tying New Line to alleged unlawful activity is that Mr. Ezring's telephone number and New Line are registered to the same address; this link is unpersuasive because that address may be a residential and/or business address for Mr. Ezring's family members. *See* Hood Decl. ¶ 12; Hr'g Tr. 28:1–10, 57:3–7; Pls.' Hr'g Ex. A; *see also* R & R at 19.

Concerning Mr. Haroon, the only evidence presented of his involvement is that he is a sales agent for Manhattan Wholesalers. *See* Hr'g Tr. 44:11–14; R & R at 19. [11] To the extent Mr. Haroon is an agent of Manhattan Wholesalers, his actions as such will be covered by an Order against Manhattan Wholesalers, but there is insufficient evidence to warrant expedited discovery against Mr. Haroon individually.

As discussed in the September 27, 2013 Report and Recommendation, Plaintiffs presented little sworn testimony and no physical evidence specific to the Retailer Defendants' involvement in selling or distributing counterfeit product, other than Mr. Hood's very brief testimony concerning controlled buys at their locations which, according to the Complaint, occurred on May 29, 2012, over a year ago. *See* Compl. ¶¶ 60–77; Hr'g Tr. 44:15–48:5, 65:2–24, 68:19–69:22; R & R 20.

Moreover, as explained in the September 27, 2013 Report and Recommendation, undue delay on the part of the movant in seeking a preliminary injunction will weigh against a finding of irreparable harm. R & R at 22– 23. [12] That reasoning applies equally to a **\*370** request for expedited discovery. Plaintiffs' fifteen-month delay in seeking relief against the Retailer Defendants belies both their claim that the Retailer Defendants' actions caused or will cause irreparable harm and Plaintiffs' need for expedited discovery against those Defendants. In contrast, Plaintiffs presented evidence of recent participation in unlawful activity by Evergreen and Mr. Ezring [13]; the Hookah Plus Defendants [14]; and Manhattan Wholesalers and Mr. Rashidzada. [15] Plaintiffs therefore did not unduly delay in seeking expedited discovery against these Defendants.

Plaintiffs' evidence linking the proposed expedited discovery and the avoidance of irreparable injury also weighs in favor of finding good cause for granting Plaintiffs' request. This connection can only be drawn as to Defendants for whom Plaintiffs presented sufficient evidence of trademark infringement and false designation of origin: Evergreen, Mr. Ezring, the Hookah Plus Defendants, Manhattan Wholesalers and Mr. Rashidzada. Plaintiffs' contention that counterfeiters in general may hide or destroy relevant evidence, *see* Hood Decl. ¶¶ 40–46, comports with common sense. For example, as to Manhattan Wholesalers, Plaintiffs' initial investigatory visit revealed counterfeit product was available, but it was no longer present on a second visit. *See* Hr'g Tr. 44:6–14; Hood Decl. ¶¶ 36–39. That concern is particularly relevant to this case where Evergreen and the Hookah Plus Defendants have failed to appear. Moreover, North Atlantic is actively pursuing an investigation into the alleged counterfeiting. *See* Hood Supp. Decl. Expedited discovery will allow North Atlantic to act quickly to identify the sources and locations

of counterfeit ZIG–ZAG® Orange, and may provide Plaintiffs the information necessary to identify and stop continued unlawful activity, if any, by Defendants. *See* Hood Decl. ¶¶ 40–43; *Twentieth Century Fox Film Corp.,* 749 F.Supp. at 475. However, as written, Plaintiffs' request is too broad to draw a connection between expedited discovery and avoiding irreparable injury; Plaintiffs' request requires the revisions discussed below.

Finally, the comparative hardships to the Parties from granting or denying Plaintiff's request are in Plaintiffs' favor. Discovery inherently places a burden on the responding party, but in this case, that hardship is outweighed by the harm that may result to Plaintiffs if their request is denied. Indeed, given the modifications to Plaintiffs' request that this Court will require, the burden on the responding Defendants will be minimal. Thus, Plaintiffs have established good cause for expedited discovery against Evergreen, Mr. Ezring, the Hookah Plus Defendants, Manhattan Wholesalers and Mr. Rashidzada.

### 2. The Reasonableness Test

Plaintiffs' proposed expedited discovery request—the specific provisions of which are contained within Plaintiffs' proposed order for a preliminary injunction, *see* Pls.' Proposed Findings 22–26 ¶ 5, and Plaintiffs' First Request for the Production of Documents ("Plaintiffs' Document Requests" or "Pls.' Doc. Reqs."), Sept. 10, 2013, ECF No. **\*371** 24–12—fails the reasonableness test because it is overbroad, overly burdensome and not reasonable under the circumstances. *See Irish Lesbian & Gay Org. v. Giuliani,* 918 F.Supp. 728, 730–31 (S.D.N.Y.1996) (denying plaintiff's application for expedited discovery as "not reasonably tailored to the time constraints under which both parties must proceed" where plaintiff was denied a parade permit in 1996 and requested expedited discovery for "*all* documents relating to permit applications, whether granted or denied, for any parade since 1985."); *see generally Litwin,* 865 F.Supp.2d at 402 ("The sheer volume and breadth of plaintiff's discovery requests further renders them unreasonable...."). As discussed below, several of Plaintiffs' document requests seek "all documents" concerning broad topic areas not limited to ZIG–ZAG® products. These document requests are particularly problematic because Plaintiffs request a seven-day

deadline and no limitation as to the responsive time period. With the below modifications, Plaintiffs' expedited discovery request satisfies the reasonableness requirement as to Evergreen, Mr. Ezring, the Hookah Plus Defendants, Manhattan Wholesalers and Mr. Rashidzada.

The proposed seven-day deadline for the document requests, *see* Pls.' Proposed Findings 24, is extended to ten days. *See* Ezring Letter 2. Ten days is a more reasonable time frame for responding to these requests which, even with modification, are quite detailed. In addition, Defendants may still need to retain legal counsel.

Plaintiffs' Document Requests are revised as follows. No modification is necessary to Exhibit A, which provides relevant definitions. *See* Pls.' Doc. Reqs. Ex. A. However, Paragraph 8 of Exhibit B, which provides relevant instructions, is not reasonable under the circumstances of expedited discovery. *See* Pls.' Doc. Reqs. Ex. B ¶ 8. Paragraph 8 states, "Unless otherwise indicated, the time period applicable to these requests is from the date of the formation of the Defendant upon whom these requests are served to the present." *Id.* It is not reasonable to require Defendants to, within ten days, locate and search documents over so broad a time period. Moreover, Plaintiffs have not established how they will avoid irreparable injury based on information that may be many years old. *See, e.g., Union Cosmetic Castle, Inc.,* 454 F.Supp.2d at 68 (undue delay may preclude a finding of irreparable harm). In Plaintiffs' Document Request No. 2, they suggest a time period of "the immediately preceding 24 months." *See* Pls.' Doc. Reqs. No. 2. This time period will apply to every document request, because it will not be unduly burdensome on Defendants and it is reasonably calculated to lead to discovery relevant to avoiding irreparable harm. Therefore, Paragraph 8 of Exhibit B is revised to: "The time period applicable to these requests is the immediately preceding 24 months."

Plaintiffs' Document Request No. 1 seeks, "All documents and communications that You would otherwise be obligated to disclose under Federal Rule of Civil Procedure 26(a)." Pls.' Doc. Reqs. No. 1. FRCP 26(a) requires a party to provide a copy or description of "all documents .... [it] may use to support its claims or defenses." Fed. R. Civ. Proc. 26(a)(1)(A)(ii). This broad information is not necessary for expedited discovery, nor is the request reasonable under even a ten-day deadline. Therefore, Document Request No. 1 will be modified

to: "The names, addresses, and telephone numbers of individuals likely to have discoverable information, as required by FRCP 26(a)(1)(A)."

Plaintiffs' Document Requests Nos. 2 and 3 require no modification, other than to remove the time period specified in Plaintiffs' Document Request No. 2, as that time period now applies to each request. *See* Pls.' Doc. Reqs. Nos. 2–3.

Plaintiffs' Document Request No. 4 seeks "All documents and communications concerning any locations where You store or have stored counterfeit or genuine ZIG–ZAG® Cigarette Paper Products, either temporarily or on a long-term basis, including but not limited to: warehouses, storage/self-storage facilities, residences, businesses, and/or vehicles; whether leased, rented, or owned by You, or otherwise under Your possession or control." Pls.' Doc. Reqs. No. 4. This request is overly broad. Plaintiffs do not need **\*372** every document concerning each location, but rather an identification of the locations and documents specific to ZIG–ZAG® cigarette paper products. Therefore, the request is modified to read, "Documents sufficient to identify any locations where You store or have stored counterfeit or genuine ZIG–ZAG® Cigarette Paper Products, either temporarily or on a long-term basis, including but not limited to: warehouses, storage/self-storage facilities, residences, businesses, and/or vehicles; whether leased, rented, or owned by You, or otherwise under Your possession or control. This request shall include all documents and communications concerning the storage, moving, or removal of counterfeit or genuine ZIG–ZAG® Cigarette Paper Products."

Plaintiffs' Document Request No. 5 seeks "All documents and communications concerning the location(s) and manner(s) in which You store records (hardcopy or electronically stored) in connection with the operation of You/Your business, including but not limited to: warehouses, storage facilities, residences, businesses, or vehicles; or on computers and other computing devices, computing networks/servers/drives, or 'cloud computing' systems, etc." Pls.' Doc. Reqs. No. 5. As with the preceding document request, Plaintiffs do not need every document concerning record storage, but rather an identification of storage methods. In addition, this request is narrowed to information relating to ZIG–ZAG® cigarette paper products. Therefore, the request is modified to read,

"Documents sufficient to identify the location(s) and manner(s) in which You store records (hardcopy or electronically stored) related to ZIG–ZAG® Cigarette Paper Products, including but not limited to: warehouses, storage facilities, residences, businesses, or vehicles; or on computers and other computing devices, computing networks/servers/drives, or 'cloud computing' systems, etc."

Plaintiffs' Document Request No. 6 seeks "All documents and communications concerning the importation of Cigarette Paper Products, in general, and ZIG–ZAG® Cigarette Paper Products, in particular." Pls.' Doc. Reqs. No. 6. Plaintiffs have not demonstrated that expedited discovery concerning cigarette paper products generally is warranted. Therefore, the request is modified to read, "All documents and communications concerning the importation of ZIG–ZAG® Cigarette Paper Products."

Plaintiffs' Document Request No. 7 seeks "All documents and communications between You and any of the other defendant(s) in the above-captioned action." Pls.' Doc. Reqs. No. 7. For the Defendants who share a business relationship—such as the Hookah Plus Defendants—this overbroad request would require discovery of every document and communication they have exchanged. Therefore, the request is modified to read, "All documents and communications concerning ZIG–ZAG® Cigarette Paper Products between You and any of the other defendant(s) in the above-captioned action."

Concerning New Line, Mr. Haroon and the Retailer Defendants, Plaintiffs' request cannot satisfy the reasonableness test for the same reasons Plaintiffs cannot establish good cause: there is insufficient evidence of New Line's and Mr. Haroon's (as separate from Manhattan Wholesalers') involvement, and the fifteen-month gap between the Retailer Defendants' alleged involvement and Plaintiffs' request strongly suggests that expedited discovery is not necessary as to those defendants. Thus, Plaintiffs' request to depose New Line, *see* Pls.' Proposed Findings 25, is denied because of the small likelihood of Plaintiffs' success on the merits concerning New Line. However, because of his relationship with Manhattan Wholesalers, Plaintiffs may depose Mr. Haroon on an expedited basis concerning his actions on behalf of that entity.

#### c. Plaintiffs' Request for Leave to Subpoena DHL

North Atlantic requests leave to subpoena third-party DHL for "documents and other information related to the individuals/entities appearing on [the DHL shipping label]." Hood Supp. Decl. ¶ 13. FRCP 45 permits the issuance of third-party subpoenas, with notice to each party. Fed. R. Civ. Proc. 45. However, as discussed above, "[a] party may not seek discovery from any source before the parties have conferred as required by Rule 26(f), except ... when authorized ... **\*373** by court order." Fed. R. Civ. Proc. 26(d)(1); *see K–Beech, Inc. v. Does 1–29,* No. 11 Civ. 3331(JTB)(ETB), 2011 WL 4401933, at \*1 (E.D.N.Y. Sept. 19, 2011) (discussing standards for pre-discovery subpoenas); *Desilva v. N. Shore–Long Island Jewish Health Sys. Inc.,* No. 10 Civ. 1341(JFB)(ETB), 2010 WL 3119629, at \*1 (E.D.N.Y. Aug. 9, 2010) (same).

**[8]** Requests for leave to issue to a subpoena to a third-party prior to the required FRCP 26(f) conference are subject to the same "reasonableness" and good cause test described above concerning expedited discovery. *See adMarketplace, Inc. v. Tee Support, Inc.,* No. 13 Civ. 5635(LGS), 2013 WL 4838854, at \*2 (S.D.N.Y. Sept.11, 2013) ("Courts in this district have found 'good cause' for expedited discovery to determine the identity of John Doe defendants where the plaintiff has stated a *prima facie* case and is unable to identify the defendants without a court-ordered subpoena."). [16]

**[9]** North Atlantic has not provided sufficient evidence to support its request for leave to issue a third-party subpoena prior to the FRCP 26(f) conference. Mr. Hood's Supplemental Declaration simply states that he discussed the DHL shipping label with Mr. Ezring. Hood Supp. Decl. ¶ 12. There is a vague reference to this shipping label being pertinent to the distribution of counterfeit product into the United States, but the same sentence suggests the shipping label may not be pertinent to proving Plaintiffs' claims. *Id.* ¶ 12 n. 2 (The shipping label exhibit "is not offered as proof of Plaintiffs' claims, but rather to demonstrate the manner and means by which the counterfeit ZIG–ZAG® Orange described above was distributed into the United States.").

North Atlantic has not established the need for the proposed subpoena to issue before the start of discovery. As an Initial Conference is scheduled in this action

for October 10, 2013 at 11:30 A.M., the Parties will soon be permitted to issue subpoenas without a court order. North Atlantic has not demonstrated a need for third-party discovery concurrent with the considerable opportunities for expedited discovery being granted by this Order. Moreover, it is not clear from Mr. Hood's Supplemental Declaration whether subpoenaing DHL concerning individuals or entities named on its shipping label would lead to identifying other defendants or other information relevant to Plaintiffs' claims. Plaintiffs have alternate means of investigating the named individuals or entities, such as through information provided by Mr. Ezring. In addition, Plaintiffs have not submitted, for this Court's review, the subpoenas "for documents and other information," *id.* ¶ 13, that they intend to make. Therefore, Plaintiffs' request for leave to subpoena DHL is denied at this time, with leave to renew should additional, relevant information become available.

### III. CONCLUSION

For the foregoing reasons, Plaintiffs' request for expedited discovery is granted in part and denied in part as follows:

1. Pursuant to FRCP 26, 30 and 34, North Atlantic may immediately serve discovery requests upon Evergreen, Mr. Ezring, the Hookah Plus Defendants, Manhattan Wholesalers and Mr. Rashidzada (the "Expedited Discovery Defendants") in the form submitted at the September 10, 2013 preliminary injunction hearing, as amended below, including:

a. *North Atlantic's First Request for the Production of Documents to Defendants,* which contains seven (7) requests for the production of documents (as amended below) to all Defendants, pursuant to FRCP 34 and the Local Rules ("North Atlantic's First Set of Document Requests"); and

**\*374** b. *Notices* of North Atlantic's intent to take depositions upon oral examination before a person authorized to administer oaths, to be served upon:

i. Evergreen Distributors, LLC;

ii. Mr. Douglas Ezring;

iii. Hookah Plus, Inc., d/b/a Hookah Plus;

iv. Mr. Hussein Hachem;

v. Manhattan Wholesalers N.Y. Corp., d/b/a Manhattan Wholesalers, Inc.;

vi. Mr. Majid Rashidzada; and

vii. Mr. Majid Haroon, concerning his relationship with and actions on behalf of Manhattan Wholesalers.

The Expedited Discovery Defendants shall serve responses to North Atlantic's First Set of Document Requests within ten (10) days of service thereof; and depositions of the above-identified individuals/entities may commence as early as ten (10) days thereafter. Absent further Order of this Court, the notice period for other depositions shall be such as is prescribed by the FRCP and case law interpreting them.

2. Plaintiffs' First Request for the Production of Documents to Defendants is modified as follows:

*Documents Requested*

1. The names, addresses, and telephone numbers of individuals likely to have discoverable information, as required by FRCP 26(a)(1)(A).

2. All documents and communications concerning the purchase, sale, or other distribution of ZIG–ZAG® Cigarette Paper Products (as defined in the Complaint), whether or not a sale actually occurred, including but not limited to all correspondence with, and any receipts/ invoices to or from, any person or entity.

3. All documents and communications concerning the process by which You buy or otherwise obtain ZIG–ZAG® Cigarette Paper Products, including but not limited to documents and communications (i) displaying the name, address, contact telephone number, and/or other identifying information of any person or entity You contact in order to buy or otherwise obtain ZIG–ZAG® Cigarette Paper Products; (ii) identifying or describing the location(s) of meetings where You purchase or otherwise obtain ZIG–ZAG® Cigarette Paper Products; (iii) identifying or describing how orders for ZIG–ZAG® Cigarette Paper Products are received and/or processed, either by You, or any other person or entity, and (iv) identifying or describing any third-parties involved in any way in the purchase, sale, and/or distribution of ZIG–ZAG®

Cigarette Paper Products, including, without limitation: banks and other payment processors; couriers, third-party delivery services, other common carriers, and/or freight forwarders; and any companies/vendors providing wire or electronic fund transfer capabilities.

4. Documents sufficient to identify any locations where You store or have stored counterfeit or genuine ZIG–ZAG® Cigarette Paper Products, either temporarily or on a long-term basis, including but not limited to: warehouses, storage/self-storage facilities, residences, businesses, and/or vehicles; whether leased, rented, or owned by You, or otherwise under Your possession or control. This request shall include all documents and communications concerning the storage, moving, or removal of counterfeit or genuine ZIG–ZAG® Cigarette Paper Products.

5. Documents sufficient to identify the location(s) and manner(s) in which You store records (hardcopy or electronically stored) related to ZIG–ZAG® Cigarette Paper Products, including but not limited to: warehouses, storage facilities, residences, businesses, or vehicles; or on computers and other computing devices, computing networks/servers/drives, or "cloud computing" systems, etc.

6. All documents and communications concerning the importation of ZIG–ZAG® Cigarette Paper Products.

7. All documents and communications concerning ZIG–ZAG® Cigarette Paper Products between You and any of the other defendant(s) in the above-captioned action.

**\*375** *Exhibit A: Definitions* [No modifications.]

*Exhibit B: Instructions*
[No modification to Paragraphs 1–7.]

8. The time period applicable to these requests is the immediately preceding 24 months.

In addition, Plaintiffs' request for leave to subpoena third-party DHL prior to the FRCP 26(f) conference is denied with leave to renew should additional, relevant information become available.

**Plaintiffs' counsel shall serve this Order on each Defendant and file proof of service within three days of the date of this Order.**

**SO ORDERED.**

**All Citations**

293 F.R.D. 363, 86 Fed.R.Serv.3d 1165

Footnotes

1       This request comes to the undersigned in connection with a request for a preliminary injunction which was referred to the
        undersigned by District Judge Edward R. Korman. The referral order was signed and entered by District Judge Margo
        K. Brodie as the duty District Judge on September 6, 2013. Order Den. *Ex Parte* TRO, Den. *Ex Parte* Seizure, Den.
        Expedited Disc. & Setting Order to Show Cause for Prelim. Inj. Hr'g ("Order to Show Cause") 2, Sept. 6, 2013, ECF No. 6.

2       Defendant Evergreen, the Louisiana entity, was served on September 12, 2013, after the September 10, 2013 show
        cause hearing, and proof of service was filed on September 18, 2013. Proof of Service, Sept. 17, 2013, ECF No. 19.
        By Order dated September 20, 2013, this Court ordered Plaintiffs to serve Evergreen and all *pro se* defendants with the
        Order giving Evergreen until September 27, 2013 to appear in the action and respond to the request for preliminary relief.
        ECF Docket (Order, Sept. 20, 2013). To date, Evergreen has not appeared or responded.

3       Defendants Evergreen, New Line and Mr. Ezring are referred to herein as the "Evergreen Defendants." Defendants
        Hookah Plus and Mr. Hachem are referred to herein as the "Hookah Plus Defendants." Defendants Manhattan
        Wholesalers, Mr. Rashidzada and Mr. Haroon are referred to herein as the "Manhattan Wholesalers Defendants."
        Defendants General Market, Gourmet Food Market and New Star Tobacco are referred to herein as the "Retailer
        Defendants."

4       It is not clear what Mr. Hood is referring to by "the counterfeit ZIG–ZAG® Orange described above." *Id.* It may be that
        Mr. Hood is referring to the counterfeit product in the photograph he received from Mr. Disotell, *see id.* ¶ 10(b) & Ex. A,
        or that he is referring to the 2,399 cartons he recovered from Mr. Ezring's Port Washington, New York address. *Id.* at ¶
        6. It is also possible that the recovered cartons represent some part of the twenty-four shipping boxes in the photograph.

5       As stated in the September 27, 2013 Report and Recommendation, Mr. Ezring's counsel should file this letter on ECF.
        R & R at 3 n. 4.

6       *But see OMG Fid., Inc. v. Sirius Techs., Inc.,* 239 F.R.D. 300, 303 (N.D.N.Y.2006) (stating that the four-factor test in
        *Notaro* "has greatly proliferated and literally taken on a life of its own, with many courts adhering to its dictates despite
        significant alteration of the discovery landscape in 2000"; also finding that the reasoning of the *Notaro* test would not apply
        where "[m]ore than thirty days have elapsed since the plaintiff filed suit" and the non-moving party was familiar with the
        claims and defenses); § 2046.11993 Discovery Moratorium Pending Discovery Plan, 8A Fed. Prac. & Proc. Civ. § 2046.1
        (3d ed.) ("Some courts have also treated the question in terms similar to the criteria for a preliminary injunction, although it
        must be obvious that permission to commence discovery is a much less aggressive order than a preliminary injunction.").

7       *See generally New York v. Mountain Tobacco Co.,* No 12. Civ. 6276(ADS)(ETB), —— F.Supp.2d ——, ——, 2013 WL
        3488262, at *6 (E.D.N.Y. July 11, 2013) (quoting *Ayyash,* 233 F.R.D. at 326–27, for the proposition that "employing
        a preliminary-injunction type analysis to determine entitlement to expedited discovery makes little sense, especially
        when applied to a request to expedite discovery in order to prepare for a preliminary injunction hearing"); *Standard Inv.
        Chartered, Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.,* No. 07 Civ.2014(SWK), 2007 WL 1121734, at *5 (S.D.N.Y. Apr.
        11, 2007) ("*Notaro* deals with specific circumstances, notably a request for expedited depositions in a politically volatile
        situation, that are not present here."); *see also Stern,* 246 F.R.D. at 457 (stating that the reasonableness test "is the
        better approach").

8       *See* Hr'g Tr. 24:11–32:14, 48:16–49:5, 52:16–55:13; Decl. of John M. Hood III in Supp. of Pls.' Mot. ("Hood Decl.") ¶¶ 6–
        17, Sept. 5, 2013, ECF No. 1–3; Hood Supp. Aff. ¶¶ 6–8; Pls.' Hr'g Ex. A, Sept. 10, 2013, ECF No. 24–1; Pls.' Hr'g Ex.
        B, Sept. 10, 2013, ECF Nos. 24–2; Decl. of Steven T. Gnadinger in Supp. of Pls.' Mot. ("Gnadinger Decl.") ¶¶ 7–8, 10
        & Exs. A–B, Sept. 5, 2013, ECF No. 1–2; Sturdivant Decl. ¶¶ 21–23.

9       *See* Hr'g Tr. 33:5–23, 37:19–43:20, 50:7–52:1; Hood Decl. ¶¶ 18–29; Sworn Affidavit of Meelan Hanna ("Hanna Aff."),
        August 30, 2013, ECF No. 24–10; Gnadinger Decl. ¶¶ 11–13 & Ex. D; Sturdivant Decl. ¶¶ 20–23.

10      *See* Hr'g Tr. 44:6–14; Hood Decl. ¶¶ 36–39.

11      Although in his Answer, Mr. Haroon denied any connection to Manhattan Wholesalers, *see* Haroon Answer ¶ 5, he
        submitted no declaration or other evidence to rebut the testimony offered by Plaintiffs.

12      *See Citibank, N.A. v. Citytrust,* 756 F.2d 273, 276 (2d Cir.1985) (vacating preliminary injunction in a trademark
        infringement action based, in part, on delay in commencing action; delay was ten weeks after plaintiffs' direct knowledge

and nine months after indirect knowledge of infringement threat); *Union Cosmetic Castle, Inc. v. Amorepacific Cosmetics USA, Inc.,* 454 F.Supp.2d 62, 68 (E.D.N.Y.2006) ("[A] plaintiff's undue delay in seeking injunctive protection can preclude, as a matter of law, the finding that the plaintiff will suffer irreparable harm if the provisional remedy is not granted."); *but see Marks Org., Inc. v. Joles,* 784 F.Supp.2d 322, 332–34 (S.D.N.Y.2011) (courts may excuse justifiable delay).

13    Plaintiffs presented hearsay evidence of late August and/or early September 2013 telephone calls from Evergreen to a Texas wholesaler, during which Evergreen attempted to sell thousands of cartons of possibly counterfeit ZIG–ZAG® Orange. *See* Hr'g Tr. 48:16–49:5, 52:16–54:17; Hood Decl. ¶¶ 14–17. In addition, after the September 10, 2013 show cause hearing, Mr. Hood recovered 2,399 cartons of purportedly counterfeit ZIG–ZAG® Orange from Mr. Ezring's address. *See* Hood Supp. Aff. ¶¶ 6–8.

14    According to Mr. Hood, as recently as mid-August 2013, the Hookah Plus Defendants were in active negotiations with undercover North Atlantic representatives supervised by Mr. Hood to sell hundreds of additional cartons of counterfeit ZIG–ZAG® Orange. *See* Hr'g Tr. 50:7–52:1; Hood Decl. ¶¶ 24–29.

15    Within the past several months, North Atlantic investigators under Mr. Hood's supervision observed cartons of suspected counterfeit ZIG–ZAG® Orange at the Manhattan Wholesalers Defendants' address; these cartons were not present on subsequent visits to that location. Hood Decl. ¶¶ 36–39.

16    *But see Arista Records, LLC v. Doe 3,* 604 F.3d 110, 119 (2d Cir.2010) (applying a five-factor test from *Sony Music Entertainment Inc. v. Does 1–40,* 326 F.Supp.2d 556, 564–65 (S.D.N.Y.2004), to determine if a motion to quash a subpoenas served on internet service providers to identify individual Internet users' identities); *Malibu Media, LLC v. John Does 1–10,* No. 12 Civ. 1146(JS)(ETB), 2012 WL 1020455, at *1 (E.D.N.Y. Mar. 26, 2012) (applying the five-factor test from *Sony Music Entm't Inc.* in deciding an unopposed motion for leave to issue a third-party subpoena pre-discovery).

---

**End of Document**    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

# *TAB 10*

35 Fed.R.Serv.2d 580

KeyCite Yellow Flag - Negative Treatment
Rejected by Semitool, Inc. v. Tokyo Electron America, Inc., N.D.Cal.,
April 19, 2002

95 F.R.D. 403
United States District Court, S. D. New York.

James F. NOTARO, George Longworth, and
Pearse M. O'Callaghan, for themselves and
all persons similarly situated, Plaintiffs,
v.
Edward I. KOCH, individually and as Mayor
of the City of New York and as candidate for
Governor of State of New York, Defendant.

No. 82 Civ. 5773 (DNE).
|
Sept. 17, 1982.

**Synopsis**

Officers and members of Liberal party, alleging that
candidate for Governor intended to fire Liberal party
members from state payroll if he was elected, brought suit
pursuant to section 1983, seeking permanent injunction.
On plaintiffs' request for leave of court to take candidate's
deposition within 30 days following commencement of
action, the District Court, Edelstein, J., held that plaintiffs
failed to meet requirements for expedited discovery.

Motion denied.

West Headnotes (3)

[1]     **Federal Civil Procedure**
        👉 Time and Place of Examination
        Courts should not grant leave to take
        deposition prior to expiration of 30 days after
        service of summons and complaint, without
        some showing of necessity for expedited
        discovery. Fed.Rules Civ.Proc. Rule 30(a), 28
        U.S.C.A.

        72 Cases that cite this headnote

[2]     **Federal Civil Procedure**
        👉 Time and Place of Examination

When plaintiff requests leave of court to
take deposition prior to expiration of 30
days after service of summons and complaint,
courts should require plaintiff to demonstrate
irreparable injury; some probability of success
on merits; some connection between expedited
discovery and avoidance of irreparable injury;
and some evidence that injury that will
result without expedited discovery looms
greater than injury that defendant will suffer
if expedited relief is granted. Fed.Rules
Civ.Proc. Rule 30(a), 28 U.S.C.A.

95 Cases that cite this headnote

[3]     **Federal Civil Procedure**
        👉 Time and Place of Examination
        In action alleging that candidate for state
        Governor intended to fire Liberal party
        members from state payroll if he was elected
        Governor, officers and members of Liberal
        party were not entitled to leave of court to
        take candidate's deposition prior to expiration
        of 30 days following commencement of
        action, where suit appeared to be premature,
        plaintiffs had not established that Liberal
        party members were actually afraid that
        threat would be carried out and plaintiffs
        had not yet formed a specific remedy.
        Fed.Rules Civ.Proc. Rule 30(a), 28 U.S.C.A.;
        U.S.C.A.Const.Amend. 1.

        6 Cases that cite this headnote

**Attorneys and Law Firms**

*404 Herzfeld & Rubin, Peter J. Kurshan, of counsel,
New York City, for plaintiffs.

Cleary, Gottlieb, Steen & Hamilton, Evan A. Davis, of
counsel, New York City, for defendant as candidate for
Governor.

Frederick A.O. Schwarz, Stephen Kramer, of counsel,
New York City, for defendant as Mayor.

Notaro v. Koch, 95 F.R.D. 403 (1982)
35 Fed.R.Serv.2d 580

MEMORANDUM OPINION

EDELSTEIN, District Judge:

The plaintiff James Notaro is Secretary and Executive Director of the Liberal Party of New York State ("Liberal Party"). The Plaintiff George Longworth is the Assistant Commissioner of the Division of Human Rights of New York State and a member of the Liberal Party. The Plaintiff Pearse O'Callaghan is the Director of the Division of Cemetaries of New York State and a member of the Liberal Party. These plaintiffs allege that the defendant, Edward Koch ("Koch"), as Mayor of the City of New York, individually and as a candidate for Governor of New York State in the Democratic primary, has violated their constitutional rights of freedom of speech and freedom of expression. Pursuant to 42 U.S.C. s 1983 they seek a permanent injunction.

The plaintiffs allege on the basis of newspaper reports that the defendant has, or that his campaign workers have, compiled lists of Liberal Party members in New York State. The plaintiffs contend that Koch intends to fire Liberal Party members from the state payroll if he is elected Governor of New York State. They further allege, that Koch has released, or has caused to be released, information indicating that he intends to so fire Liberal Party Members, and that these actions have threatened Liberal Party Members and chilled their First Amendment rights.

The plaintiffs request leave of the court to take the deposition of Koch within thirty days following the commencement of the action. Under Fed.R.Civ.P. 30(a), the plaintiff must obtain leave of the court "to take a deposition prior to the expiration of 30 days after service of the summons and complaint *405 upon any defendant," with exceptions not relevant here.

[1]  This provision protects defendants from unwarily incriminating themselves before they have a chance to review the facts of the case and to retain counsel. See 4A Moore's Federal Practice, P 30.54 (1982). This important protection maintains the fairness of civil litigation. Courts should not grant leave without some showing of the necessity for expedited discovery. The court must protect defendants from unfairly expedited discovery.

Few opinions discuss motions for expedited discovery. Those that do, focus on the availability of expedited discovery to depose a person who will soon become unavailable. [1]

There is a dearth of law on the availability of expedited discovery to speed relief where compelling need is shown. [2]  Nevertheless, in some cases a plaintiff could need expedited discovery to speed relief. [3]  In such cases, however, the court must fashion standards for granting leave that protect the defendant.

[2]  The plaintiffs herein do not seek an early deposition to protect the effectiveness of discovery. Plaintiffs contend that without expedited discovery and the resulting earlier trial they will suffer irreparable damage, which they assert establishes compelling need for expedited discovery. In such circumstances, courts should require the plaintiff to demonstrate (1) irreparable injury, (2) some probability of success on the merits, (3) some connection between the expedited discovery and the avoidance of the irreparable injury, and (4) some evidence that the injury that will result without expedited discovery looms greater than the injury that the defendant will suffer if the expedited relief is granted. [4]  The plaintiffs' papers are as yet incomplete in these requirements.

[3]  The plaintiffs have yet to fill in some gaps in their legal arguments. The defendant's actions do not fall within the rule that bars certain dismissals on the basis of political affiliation. Elrod v. Burns, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). That rule covers only actual or imminent dismissals. On this basis the suit would appear to be premature. Due to the prematurity problem their claim rests only on the allegation that a contingent threat, which cannot in any event be carried out for several months, nonetheless currently chills First Amendment rights.

But the plaintiffs must offer more evidence that a reasonable fear of the alleged threat exists. Before the threatened action can occur, the defendant must win the Democratic primary. He must then win the election. He must survive until he is inaugurated, and he must carry out the alleged threat despite his affidavit denying any intent to carry out any such threat.

35 Fed.R.Serv.2d 580

**\*406**  In addition, the plaintiffs have not established that Liberal Party members are actually afraid that the threat would be carried out. So far the only members to come forward are apparently fully advised that the law protects them from political dismissal, and the Liberal Party has shown no hesitancy to defend the rights of its members in court.

In addition, the plaintiffs have not yet framed a specific remedy. An injunction might prove difficult because it would impose restrictions on Koch's campaign and might restrict protected First Amendment activity. Finally, since the plaintiffs do not complain that Koch has acted in his capacity as Mayor of New York City, there may not be the necessary state action that would implicate the plaintiffs' federal, constitutional and civil rights. The plaintiffs have not yet touched on this jurisdictional aspect of their case.

The plaintiffs may well be able to overcome these obstacles. Some were neglected in the complaint; others were not fully discussed. As yet, however, the plaintiffs have not made a strong enough showing to justify expedited relief.

The plaintiffs have also not made a sufficient showing of irreparable injury. Possible plaintiffs are protected from political dismissal, which in any event cannot occur until January, 1983. True, if the defendant's actions affect Liberal Party members' behavior that in turn affects the election outcome, the harm might be irreparable, at least for four years. Nevertheless, that possibility appears speculative. The only support that the alleged threatened firing will occur is a newspaper article quoting a Koch campaign worker, and this has been contradicted by Koch's affidavit. Further, the eventuality of Koch becoming governor remains months distant and uncertain. There is no showing that many Liberal Party members feel threatened, or that they have changed their behavior, or that such a change could affect the election.

The plaintiffs have also failed to show the connection between the relief sought and the avoidance of the irreparable harm. There is time for relief before the November election even under the normal process of discovery.

On the final element for obtaining the expedited discovery, the plaintiffs have not shown that the irreparable injury looms greater than the injury to the defendant of expedited discovery. In a deposition of the defendant as a candidate under the inquisition of counsel for an opposition political party without sufficient advance notice, the possibility of an incidental embarrassment is great. [5]

In the heat of campaigning parties use many tactics to gain a political advantage. Before interfering in an election campaign, a court should find a strong legal basis and clear injury supporting judicial action. While this caution is not controlling, it warns this court away from an expedited discovery when weaknesses-as yet unexplained by the plaintiffs-exist in the arguments that attempt to establish the prerequisites for the relief the plaintiffs seek.

The plaintiffs motion for expedited discovery is denied. Nevertheless, the allegations of the plaintiffs if true, constitute a record of grave political wrongdoing. Hence this denial is without prejudice to the plaintiffs to move again for expedited discovery at such time as they can better establish their case.

**All Citations**

95 F.R.D. 403, 35 Fed.R.Serv.2d 580

**Footnotes**

1   The cases cited by parties on the question of expedited discovery do not control the issue here. All involved ex parte requests. Babolia v. Local 456, 11 F.R.D. 423, 424 (S.D.N.Y.1951), Gibson v. Bagas Restaurants, Inc., 87 F.R.D. 60, 62 (W.D.Mo.1980) and Schwartzbaum, Inc. v. Evans, Inc., 279 F.Supp. 422, 424 (S.D.N.Y.1968), although each implied in dicta that some unusual circumstances would be required for expedited discovery with notice.

2   Potential unavailability of a witness is not the only reason for courts to allow expedited discovery. Rule 30(b) expressly allows special notice and expedited deposition of an individual who might become unavailable through certain circumstances. Hence the leave of the court provision in Rule 30(a), which is discretionary, allows the court to grant expedited depositions for other reasons.

Nadeau v. Helgemoe, 561 F.R.D. 465 (1982)

35 Fed.R.Serv.2d 580

3    Usually a plaintiff can obtain a preliminary injunction if he needs speedy relief. Conceivably, however, a plaintiff could lack the information needed to succeed on a motion for a preliminary injunction, but still require fast relief. In such a case, expected to be a rare one, expedited depositions might serve justice.

4    The court finds support for these four elements in the law of remedies. These four requirements parallel those showings necessary to obtain a preliminary injunction. A preliminary injunction is another, more extreme way of speeding relief to plaintiffs, and these prerequisites have been established by courts to protect defendants from the potential damages of speeded up remedies.

5    The fact that the defendant has retained counsel does not indicate that he does not need the protection of the 30 day rule. Furthermore defendants would have to show more than that the underlying reason for the rule is partially absent here to obtain an exemption from it. The plaintiffs must show a "valid, affirmative reason" for expedited discovery. Balobia, supra at 424.

---

**End of Document**                                 © 2018 Thomson Reuters. No claim to original U.S. Government Works.

# *TAB 11*

298 F.R.D. 453
United States District Court, D.
South Dakota, Western Division.

OGLALA SIOUX TRIBE and Rosebud Sioux Tribe,
as parens patriae, to protect the rights of their tribal
members; and Rochelle Walking Eagle, Madonna
Pappan, and Lisa Young, individually and on behalf
of all other persons similarly situated, Plaintiffs,
v.
Luann VAN HUNNIK; Mark Vargo; Hon.
Jeff Davis; and Kim Malsam–Rysdon,
in their official capacities, Defendants.

CIV. No. 13–5020–JLV.
|
Signed Jan. 28, 2014.

**Synopsis**
**Background:** Indian tribes and parents filed motion to
expedite discovery in class action against state court judge
and state officials to challenge removal of Indian children
from their homes without timely and adequate hearings.
In preparation for motion for preliminary injunction,
tribes and parents sought chronological list of all 48–hour
hearings under Indian Child Welfare Act (ICWA) since
January 1, 2010.

**[Holding:]** The District Court, Jeffrey L. Viken, Chief
Judge, held that good cause existed to warrant expedited
discovery.

Motion granted.

West Headnotes (8)

**[1]** **Federal Civil Procedure**
👉 Discretion of Court

A federal district court has broad discretion
with regard to discovery motions. Fed.Rules
Civ.Proc.Rule 26(d), 28 U.S.C.A.

Cases that cite this headnote

**[2]** **Federal Civil Procedure**
👉 Depositions and Discovery

Under the good cause standard, party
requesting expedited discovery must show
that the need for expedited discovery, in
consideration of administration of justice,
outweighs prejudice to the responding party.

2 Cases that cite this headnote

**[3]** **Federal Civil Procedure**
👉 Depositions and Discovery

Factors commonly considered in determining
the reasonableness of an expedited discovery
request include (1) whether a preliminary
injunction is pending, (2) breadth of the
discovery requests, (3) purpose for requesting
the expedited discovery, (4) burden on
defendants to comply with the requests, and
(5) how far in advance of the typical discovery
process the request was made.

2 Cases that cite this headnote

**[4]** **Federal Civil Procedure**
👉 Depositions and Discovery

Pending motion by Indian tribes and parents
for preliminary injunction against removal
of Indian children from their homes without
timely and adequate hearings weighed in
favor of their motion for expedited discovery
of 48–hour hearings under Indian Child
Welfare Act (ICWA), even though state court
judge and state officials opposing motion
claimed that injunctive relief was unavailable
since declaratory relief was available and
tribes and parents did not allege violation
of a declaratory decree; injunctive relief was
available if tribes and parents prevailed on
merits, expedited discovery was necessary
to allow them to prepare for preliminary
injunction hearing, and they were not required
to prove availability of injunctive relief. 42
U.S.C.A. § 1983; Indian Child Welfare Act of
1978, § 2 et seq., 25 U.S.C.A. § 1901 et seq.;
Fed.Rules Civ.Proc.Rule 26(d), 28 U.S.C.A.

Cases that cite this headnote

**[5]** **Federal Civil Procedure**
👉 Discovery and Production of Documents and Other Tangible Things

Request by Indian tribes and parents for expedited discovery of 48–hour hearings under Indian Child Welfare Act (ICWA) since January 1, 2010, was narrowly tailored and not overly broad in action against state court judge and state officials to challenge removal of Indian children from their homes without timely and adequate hearings; officials needed only to look at file and determine whether an ICWA affidavit was filed or whether the court's order indicated ICWA applied, and tribes and parents requested list of hearings and sought transcripts for every third such hearing. Indian Child Welfare Act of 1978, § 2 et seq., 25 U.S.C.A. § 1901 et seq.

Cases that cite this headnote

**[6]** **Federal Civil Procedure**
👉 Depositions and Discovery

Timing and purpose of motion by Indian tribes and parents for expedited discovery of 48–hour hearings under Indian Child Welfare Act (ICWA) since January 1, 2010, were appropriate and weighed in favor of granting the motion in action against state court judge and state officials to challenge removal of Indian children from their homes without timely and adequate hearings; even though the records would not be destroyed or left unprotected, the requested expedited discovery would better enable the court to judge the parties' interests and respective chances for success on the merits at preliminary injunction hearing. Indian Child Welfare Act of 1978, § 2 et seq., 25 U.S.C.A. § 1901 et seq.

Cases that cite this headnote

**[7]** **Federal Civil Procedure**

👉 Discovery and Production of Documents and Other Tangible Things

Request by Indian tribes and parents for expedited discovery of 48–hour hearings under Indian Child Welfare Act (ICWA) since January 1, 2010, was not overly burdensome in action against state court judge and state officials to challenge removal of Indian children from their homes without timely and adequate hearings; since officials would be able to determine which files ICWA applied to by looking to see whether an ICWA affidavit was present or whether the temporary custody order indicated ICWA was applicable, no "in depth" review of each file would be required, and tribes indicated that, once the requested case information was obtained, they would take the necessary steps to obtain the transcripts. Indian Child Welfare Act of 1978, § 2 et seq., 25 U.S.C.A. § 1901 et seq.

Cases that cite this headnote

**[8]** **Federal Civil Procedure**
👉 Discovery and Production of Documents and Other Tangible Things

District Court had authority to order expedited discovery requested by Indian tribes and parents regarding 48–hour hearings under Indian Child Welfare Act (ICWA), in action alleging that state court judge and state officials removed Indian children from their homes without timely and adequate hearings required by due process clause and ICWA; even though transcripts were restricted or sealed, production of transcripts was necessary pursuant to the federal interest in discovering whether defendants had engaged in policies, practices, and customs which violated constitutional rights. U.S.C.A. Const.Amend. 14; Indian Child Welfare Act of 1978, § 2 et seq., 25 U.S.C.A. § 1901 et seq.

Cases that cite this headnote

Oglala Sioux Tribe v. Van Hunnik, 298 F.R.D. 453 (2014)

**Attorneys and Law Firms**

**\*455** Dana Hanna, Rapid City, SD, Stephen L. Pevar, ACLU Foundation, Hartford, CT, Rachel E. Goodman, ACLU, New York, NY, for Plaintiffs.

Robert L. Morris, Morris Law Firm, Belle Fourche, SD, J. Crisman Palmer, Sara Frankenstein, Gunderson, Palmer, Nelson & Ashmore, LLP, Nathan R. Oviatt, Goodsell Quinn, LLP, Rapid City, SD, Ann F. Mines, Steven R. Blair, Roxanne Giedd, Attorney General of South Dakota, Pierre, SD, for Defendants.

ORDER GRANTING MOTION
FOR EXPEDITED DISCOVERY

JEFFREY L. VIKEN, Chief Judge.

## INTRODUCTION

On April 9, 2013, plaintiffs filed a motion to expedite discovery requesting written transcripts of Indian Child Welfare Act ("ICWA") hearings held in Pennington County since January 1, 2010, in preparation for a motion for preliminary injunction. (Docket 4). Pursuant to Fed.R.Civ.P. 26(d), plaintiffs are requesting defendants create a chronological list of all 48–hour ICWA hearings which have occurred since January 1, 2010, then contact the court reporters for every third ICWA hearing on the chronological list and request they create an electronic transcript of those hearings at plaintiffs' expense. Plaintiffs want the transcripts on a rolling basis as each transcript is created.[1] *Id.* at p. 4.

Defendants oppose the motion in its entirety. (Dockets 17, 21, and 23). Defendants argue there is no good cause to order expedited discovery at this stage of the proceeding because: (1) injunctive relief is not available; (2) plaintiffs' request is overly broad; (3) plaintiffs have no need for expedited discovery; (4) plaintiffs' request is overly burdensome; and (5) plaintiffs' request is premature. (Docket 18). Defendants also contend plaintiffs' request seeks documents outside the scope of Fed.R.Civ.P. 34. *Id.*

## DISCUSSION

**[1]** A federal district court has broad discretion with regard to discovery motions. *See United States v. Washington,* 318 F.3d 845, 847 (8th Cir.2003). Fed.R.Civ.P. 26(d) provides that "[a] party may not seek discovery from any source before the parties have conferred as required by Rule 26(f), except in a proceeding exempted from initial disclosure under Rule 26(a)(1)(B), or when authorized by these rules, by stipulation or by court order." Fed.R.Civ.P. 26(d)(1).

When considering a motion for expedited discovery, courts use one of two standards. "Some courts apply a 'good cause' or 'reasonableness' standard, while others analyze a set of factors similar to those for obtaining a preliminary injunction." *Meritain Health Inc. v. Express Scripts, Inc.,* No. 4:12–CV–266–CEJ, 2012 WL 1320147, \*1 (E.D.Mo.). While the Eighth Circuit has not adopted either standard, district courts in this circuit have generally utilized the "good cause" standard. *Id.; see also Monsanto Co. v. Woods,* 250 F.R.D. 411, 413 (E.D.Mo.2008); *Dorrah v. United States,* 282 F.R.D. 442, 445 (N.D.Iowa 2012).

**[2]** **[3]** "Under the good cause standard, the party requesting expedited discovery must show that the need for expedited discovery, in consideration of administration of justice, outweighs prejudice to the responding party." *Meritain Health,* 2012 WL 1320147, at \*1. "Factors commonly considered in determining the reasonableness of an expedited discovery request include: (1) whether a preliminary injunction is pending; (2) the breadth of the discovery requests; (3) the purpose for requesting the expedited discovery; (4) the burden on the defendants to comply with the requests; and (5) how far in advance of the typical discovery process the **\*456** request was made." *Id.* at \*2 (citation omitted).

### 1. Whether a preliminary injunction is pending

**[4]** Plaintiffs' complaint seeks preliminary and permanent injunctive relief. (Docket 1). As part of the request for relief, plaintiffs requested expedited discovery in order to prepare a motion for preliminary injunction and in order to defend that motion at a preliminary injunction hearing. (Docket 6). Plaintiffs' complaint sets forth three claims for relief:

> This lawsuit challenges three policies, practices, and customs of the Defendants: (1) removing Indian

children from their homes without affording them, their parents, or their tribe a timely and adequate hearing as required by the Due Process Clause, (2) removing Indian children from their homes without affording them, their parents, or their tribe a timely and adequate hearing as required by the Indian Child Welfare Act, and (3) removing Indian children from their homes without affording them, their parents, or their tribe a timely and adequate hearing and then coercing the parents into waiving their rights under the Due Process Clause and the Indian Child Welfare Act to such a hearing.

(Docket 1 at p. 3). Plaintiffs contend they "cannot prevail on their request for preliminary injunctive relief unless they prove that members of the Plaintiff class are likely to be injured in the immediate future by the policies, practices, and customs that allegedly exist." (Docket 6 at p. 3). Plaintiffs assert the only practical way to show the policies, practices and customs exist is to obtain the written transcripts of prior 48–hour hearings. *Id.*

In *Meritain Health,* the plaintiffs sought expedited discovery in order to prepare for a preliminary injunction hearing. *Meritain Health,* 2012 WL 1320147, at *1. The court granted the request for expedited discovery, noting that "[e]xpedited discovery is generally appropriate in cases, such as this, where a party is attempting to prepare for a preliminary injunction hearing." *Id.* at *2; *see also Edudata Corp. v. Scientific Computers, Inc.,* 599 F.Supp. 1084, 1088 (D.Minn.1984) (ordering expedited discovery where it would "better enable the court to judge the parties' interests and respective chances for success on the merits" at a preliminary injunction hearing); *Ellsworth Assocs., Inc. v. United States,* 917 F.Supp. 841, 844 (D.D.C.1996) ("[e]xpedited discovery is particularly appropriate when a plaintiff seeks injunctive relief because of the expedited nature of injunctive proceedings.").

Defendants contend injunctive relief is not available to plaintiffs. (Docket 18 at p. 4). In support of their position, defendants cite 42 U.S.C. § 1983, which states, in part: "in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity,

injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable." 42 U.S.C. § 1983. Defendants assert because plaintiffs have not alleged a violation of a declaratory decree or that declaratory relief was unavailable, injunctive relief is not available in this case. (Docket 18 at p. 5).

The court considered this argument in its order on the defendants' motions to dismiss. The court found that injunctive relief is available if plaintiffs prevail on the merits. Expedited discovery is necessary for the preliminary injunction hearing. Additionally, nothing in Rule 26(d) requires the party seeking expedited discovery to prove that injunctive relief is available. The standard is whether "good cause" exists, and a pending preliminary injunction is but one factor the court may consider in determining whether good cause exists. This factor weighs in favor of expediting discovery.

**2. The breadth of the discovery request**

[5] Plaintiffs' complaint alleges defendants employ policies, practices and customs in their 48–hour ICWA hearings that cause plaintiffs to suffer irreparable injury. (Docket 1). Plaintiffs assert defendants have done so since 2010. *Id.* To that end, plaintiffs' discovery request seeks ICWA transcripts beginning January 1, 2010, through the entry of this order. (Docket 6). Although plaintiffs request that defendants produce a list encompassing all 48–hour ICWA hearings **\*457** since 2010, plaintiffs are seeking only the transcripts for every third hearing. *Id.* Plaintiffs have offered to contact the court reporters, order the transcripts and pay for the transcripts. *Id.*

Defendants contend plaintiffs' request is overly broad. Defendants claim plaintiffs have not specified "whether they seek transcripts from 48–hour hearings in which ICWA was applicable or from all matters where ICWA was suspected of being applicable, or both." (Docket 18 at p. 5). Defendants' query is disingenuous. As pointed out by plaintiffs, an ICWA affidavit must be filed in each 48–hour hearing involving an Indian child unless an ICWA expert testifies at the hearing. (Docket 26 at pp. 6–7) (citing South Dakota Guidelines for Judicial Process in Child Abuse and Neglect Cases, South Dakota Unified Judicial System ("Green Book"), at 46 ("An 'ICWA Affidavit' from a 'qualified expert' ... must be filed in the 48 hour/advisory hearing unless a 'qualified ICWA expert' is available to personally testify.")). The Green Book also requires each temporary custody order issued

at the conclusion of a 48–hour hearing to indicate whether ICWA applied to that hearing. Green Book at 113–14; *see also* Docket 1–4.

Plaintiffs are requesting information regarding 48–hour ICWA hearings conducted since January 1, 2010, in which "Pennington County officials had reason to believe at the time that the child involved in the hearing was an Indian child for purposes of SDCL Chap. 26–7A." (Docket 26–1). Based on the requirements set forth in the Green Book, the defendants need only look at the file and determine whether an ICWA affidavit was filed or whether the court's order indicated ICWA applied. The court finds plaintiffs' request is narrowly tailored and not overly broad.[2]

### 3. The timing and purpose for requesting the expedited discovery

[6]    As previously discussed, the purpose for requesting the expedited discovery is to prepare a motion for a preliminary injunction and to defend that motion at a preliminary injunction hearing. Defendants contend plaintiffs have no need for expedited discovery because there is no "chance that evidence could be destroyed" and "no urgency to protect the records plaintiffs seek." (Docket 18 at p. 6). Defendants misinterpret plaintiffs' request. The issue is not whether the records will be destroyed or left unprotected. Rather, plaintiffs request the records in order to support their position that injunctive relief is necessary. Expedited discovery in this case will "better enable the court to judge the parties' interests and respective chances for success on the merits" at a preliminary injunction hearing. *Edudata Corp.,* 599 F.Supp. at 1088.

The defendants also assert plaintiffs' request is premature because defendants have not had the opportunity to answer the complaint. (Docket 18 at p. 9). Since responding to the motion for expedited discovery, the defendants filed motions to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b). (Dockets 33, 36, 37 & 39). The court denied those motions. The court finds the timing and purpose of plaintiffs' request is appropriate.

### 4. The burden on the defendants to comply with the requests

[7]    Defendants argue plaintiffs' request is overly burdensome because of the amount of time it would

take to obtain the transcripts. Defendants believe that "in order to complete the discovery sought by Plaintiffs, a courthouse employee would have to manually sort through the hard files of all juvenile cases for the past three years .... some of [which] are stored in an off-site facility." (Docket 18 at p. 7). "Then, that person would have to segregate the [abuse and neglect] files from the Juvenile files, which **\*458** outnumber the [abuse and neglect] files by a ratio of approximately five to one, because these files are all maintained together." *Id.* "Of course, the employee in charge would then have to comb through the file to determine which cases involve Native America families. This would involve an in-depth review of the files before it could be accurately determined." *Id.* Defendants argue they then would have to determine which court reporter was working for which judge in order to determine who has the electronic transcript. *Id.* at p. 8.

As discussed above, defendants should be able to determine which files ICWA applied to by looking to see whether an ICWA affidavit is present or whether the temporary custody order indicates ICWA was applicable. This will not require an "in depth" review of the each file. The court finds that while the request may be time consuming, it is not overly burdensome. Furthermore, once the information is obtained, plaintiffs have indicated defendants can provide them with the requested case information and plaintiffs will take the necessary steps to obtain the transcripts.

### 5. Whether this court can grant plaintiffs' motion

[8]    Defendants claim plaintiffs are requesting the production of specific documents which are outside the scope of Fed.R.Civ.P. 34. (Docket 18 at p. 12). Defendants contend the requested documents are not in their possession or control. *Id.* Plaintiffs agree the defendants do not have possession or control over the requested documents. (Docket 26 at p. 10). However, plaintiffs assert they are not requesting the documents under Rule 34, but instead pursuant to Rule 33. *Id.* Plaintiffs attached a Rule 33 interrogatory to their reply brief. (Docket 26–1).

Plaintiffs are not requesting defendants turn over the transcripts. Rather, plaintiffs specifically request that defendants create a list of ICWA hearings conducted in Pennington County since January 1, 2010. After the list is created, defendants can either choose to contact the court reporter for each case and request an electronic transcript,

or defendants can provide plaintiffs with this information and plaintiffs will order the transcripts. The court finds Rule 34 is not applicable to plaintiffs' request.

Defendants also point out that the 48–hour hearing transcripts in abuse and neglect proceedings are restricted or sealed depending on the status of the case. (Docket 18 at p. 14). Defendants stress that a court order from the presiding state court judge finding the requesting party has a legitimate interest in the juvenile proceeding or that inspection is in keeping with the best interest of the child will be necessary to fulfill plaintiffs' discovery request. Defendants claim "if the Court were to grant Plaintiffs' Motion for Expedited Discovery, the Court would be superseding the state court's authority to determine what is in the best interests of the child, and making the broad-sweeping determination that the interests of the Plaintiffs in pursuing their claims override the compelling privacy interests of the children and families involved in these cases." (Docket 18 at pp. 15–16).

While plaintiffs agree the transcripts are sealed, they argue "federal courts face this 'privilege' issue so often in civil rights litigation than an entire body of law has been developed to address it." (Docket 26 at p. 11). In *Ginest v. Bd. of County Commis. of Carbon Cnty.,* 306 F.Supp.2d 1158, 1159 (D.Wyo.2004), plaintiffs alleged defendants' health care program suffered from three systematic deficiencies which they claimed violated a prior court order and the Eighth Amendment. The court noted that an Eighth Amendment violation could be "established by showing repeated instances of patients receiving improper health care—a pattern and practice of medical mistreatment." *Id.* Defendants took the position that inmate medical records could not be disclosed to plaintiffs unless counsel first obtained a signed release from the inmate whose files were being sought. *Id.*

The district court noted:

Admittedly, the custodian of these medical records (the institution) and the patients themselves have a privacy interest in keeping those records confidential. However, in class action institutional litigation of **\*459** [the] type at issue here, "the individual privacy interest and state policies, though cognizable, cannot prevail either as a constitutional or federal evidentiary matter." Individual and state privacy interests must yield to the federal interest in discovering whether public officials and public institutions are violating federal civil rights.

"In a civil rights action brought pursuant to a federal claim, state statutory privileges are not binding."

*Id.* at 1159–60 (citations omitted). The court also remarked that the "requested medical information 'is sought by professionals whose purpose it is to protect the constitutional rights of the Plaintiff class,' and class counsel will keep the information confidential except to the extent that disclosure is necessary to advise the Court of violations of federal law." *Id.* at 1160; *see also Sprint Comm'ns Co., L.P. v. Native American Telecom, LLC,* No. 10–4110–KES, 2011 WL 1883193 (D.S.D.2011) (ordering expedited discovery of confidential records under a protective order); *Doe v. Meachum,* 126 F.R.D. 444, 450 (D.Conn.1989) (compelling the production of inmate medical records in class action litigation involving HIV health care); *N.O. v. Callahan,* 110 F.R.D. 637, 646–47 (D.Mass.1986) (allowing access to medical records of students in school for the mentally handicapped); *Lora v. Board of Ed. of City of New York,* 74 F.R.D. 565, 584 (E.D.N.Y.1977) (finding "the individual privacy interest and state policies, though cognizable, cannot prevail, either as a constitutional or federal evidentiary matter" where the only way for plaintiff to establish a pattern of racial discrimination was to review the diagnostic and referral files of other handicapped children).

In this case, in order to be successful, plaintiffs must prove the defendants engaged in policies, practices and customs which violate the plaintiffs' constitutional rights. The only way to show that such policies, practices and customs exist is to review the transcripts of 48–hour ICWA hearings. The 48–hour ICWA hearing transcripts likely will be determinative of the issue. The court finds production of the requested 48–hour ICWA hearing transcripts is necessary in this case. "Individual and state privacy interests [though cognizable] must yield to the federal interest in discovering" whether the defendants in this action have engaged in policies, practices and customs which violate plaintiffs' constitutional rights. *Ginest,* 306 F.Supp.2d at 1159–60.

The court finds that expedited discovery is warranted in this case. Defendants shall provide plaintiffs with a complete list of 48–hour ICWA hearings from January 1, 2010, through the present containing the following information: (1) the name of the case and corresponding docket number; (2) the name of the presiding judge; (3) the date of the 48–hour hearing; and (4) the name, physical address and telephone number of the court reporter

assigned to the case. Plaintiffs will be responsible for obtaining the 48–hour hearing transcript for every third case at plaintiffs' expense.

## CONCLUSION

The court finds good cause to warrant expedited discovery. The transcripts plaintiffs seek to discover may prove or disprove their claims in the preliminary and permanent injunction hearing. Plaintiffs' discovery request is not overly burdensome to the defendants. The courts finds the request is narrowly tailored to a limited set of 48–hour ICWA hearing transcripts. Accordingly, it is hereby

ORDERED that plaintiffs' motion for expedited discovery (Docket 6) is granted consistent with this order.

IT IS FURTHER ORDERED that the parties shall propose a joint protective order to the court by February 18, 2014. If the parties are unable to agree on the terms of a joint protective order, the defendants can propose text for a protective order to the court by February 18, 2014. Plaintiffs will have until February 21, 2014, to respond to defendants' proposed protective order.

**All Citations**

298 F.R.D. 453

Footnotes

1    Alternatively, plaintiffs suggest defendants could provide the plaintiffs with the case file numbers of each third ICWA hearing and the contact information for the corresponding court reporter so plaintiffs can arrange for the preparation of the transcripts. (Docket 6 at p. 4).

2    Defendants also assert plaintiffs already obtained several 48–hour hearing transcripts. Plaintiffs argue the small number of transcripts in their possession are "insufficient to demonstrate Defendants' policies, practices, and customs over a three-year period." (Docket 26 at p. 7). However, plaintiffs agreed "if the Defendants will stipulate that their policies, practices, and customs are adequately visible in the three transcripts attached to Plaintiffs' complaint, the Plaintiffs will withdraw their request for expedited discovery." *Id.* at pp. 7–8.

**End of Document**                                              © 2018 Thomson Reuters. No claim to original U.S. Government Works.

*TAB 12*

2016 WL 9450407
Only the Westlaw citation is currently available.
United States District Court,
N.D. Georgia, Rome Division.

POWDERPAK INTERNATIONAL, LLC, Plaintiff,

v.

B.F. MACHINERY, LTD, et al., Defendants.

Civil Action File No.: 4:16–cv–0026–HLM
|
Signed 03/01/2016

**Attorneys and Law Firms**

Janna Satz Nugent, Joshua Benjamin Portnoy, Matthew
S. Johns, Michael James King, Greenberg Traurig, LLP,
Atlanta, GA, for Plaintiff.

Savannah Bryant Moore, Jonathan L. Bledsoe, Minor
Bell & Neal, P.C., Dalton, GA, for Defendants.

ORDER

Harold L. Murphy, UNITED STATES DISTRICT
JUDGE

**\*1** This case is before the Court on Defendant Challenger
Industries, Inc.'s ("Defendant Challenger") Motion to
Stay Discovery, or, in the Alternative, for Expedited
Discovery ("Motion to Stay") [30].

**I. Background**

On February 29, 2016, Defendant Challenger filed a
Motion to Dismiss in which, among other things,
Defendant Challenger argues that the Court lacks
personal jurisdiction over it because Plaintiff has not
served it properly with process. (See generally Br. Supp.
Mot. Dismiss (Docket Entry No. 28–2).) On that same
day, Defendant Challenger filed its Motion to Stay.
(Docket Entry No. 30.)

Plaintiff has not yet had an opportunity to respond to
Defendant Challenger's Motion to Stay. The Court finds
that no response from Plaintiff is necessary, and concludes
that the Motion is ripe for resolution.

**II. Motion to Stay**

Defendant Challenger argues that "[a]s Plaintiff
has failed to properly serve [Defendant] Challenger
with the Summons and Complaint in this matter,
personal jurisdiction over [Defendant] Challenger is
not established, and, as such, [Defendant] Challenger
cannot be compelled to respond to Plaintiff's discovery
requests." (Br. Supp. Mot. Stay (Docket Entry No. 30–
2) at 3.) For Defendant Challenger's benefit, the Court
notes that Plaintiff may serve Defendant Challenger
properly with process within ninety days after filing its
Complaint. Fed. R. Civ. P. 4(m). That ninety-day period
clearly has not yet expired, and Plaintiff can cure any
alleged deficiencies in its service of process on Defendant
Challenger simply by re-serving Defendant Challenger
with process in a proper fashion. As such, Defendant
Challenger's request to dismiss this case for lack of service
of process is premature. The Court also is not at all
impressed with Defendant Challenger's contention that
the Court lacks personal jurisdiction over it, particularly
where, as here, Defendant Challenger conducts regular
operations within the Northern District of Georgia.
Further, given the Court's earlier Order authorizing
expedited discovery in advance of the March 7, 2016,
preliminary injunction hearing, staying discovery pending
a ruling on Defendant Challenger's Motion, which will
not be ripe for resolution until long after the preliminary
injunction hearing date, is clearly not warranted. The
Court therefore declines to stay discovery in this action.

**III. Expedited Discovery**

Defendant Challenger, not to be outdone by Plaintiff,
argues in the alternative that it is entitled to seek
expedited discovery from Plaintiff. (See generally Br.
Supp. Mot. Stay.) Defendant Challenger contends that it
has shown good cause for expedited discovery "because
[it] is currently not aware of any evidence that supports
Plaintiff's claims, and [it] needs to know what evidence
Plaintiff claims exists and to review the same in order
to properly prepare for a preliminary injunction hearing
at which [it] could suffer harm should an injunction be
entered." (Id. at 5.) According to Defendant Challenger,
it is entitled to this discovery "out of fairness and to avoid
unfair surprise." (Id. at 8.) Defendant Challenger requests
that the Court order Plaintiff to respond to its expedited
discovery requests on or before March 4, 2016. (Id.)

**\*2** Federal Rule of Civil Procedure 26(d)(1) provides, in relevant part: "A party may not seek discovery from any source before the parties have conferred as required by Rule 26(f), except ... when authorized by these rules, by stipulation, or by court order." Fed. R. Civ. P. 26(d) (1). A party seeking expedited discovery must show good cause. Platinum Mfg. Int'l, Inc. v. Uninet Imaging, Inc., No. 8:08–CV–310–T–27MAP, 2008 WL 927558, at \*1 (M.D. Fla. Apr. 4, 2008); see also Arista Records LLC v. Does 1–7, No. 3:08–CV–18(CDL), 2008 WL 542709, at \*1 (M.D. Ga. Feb. 25, 2008) ("A court may allow expedited discovery upon a showing of good cause."). Here, the Court finds that Defendant Challenger has shown good cause for expedited discovery. The proposed discovery requests are reasonable in scope, are tailored to support Defendant Challenger's defense to Plaintiff's request for a preliminary injunction, and seek information within Plaintiff's exclusive possession that Defendant Challenger cannot ascertain without discovery. Further, requiring Plaintiff to respond to the discovery requests in an expedited fashion will not cause Plaintiff any significant prejudice, as it will have to produce evidence supporting its claims at the March 7 hearing. The Court therefore grants the Motion for Expedited Discovery. The Court, however, will allow Plaintiff to respond to the discovery requests via e-mail by 12:00 noon on Saturday, March 5, 2016.

### IV. Conclusion

ACCORDINGLY, the Court **GRANTS IN PART AND DENIES IN PART** Defendant Challenger's Motion to Stay [30]. The Court **DENIES** the portion of the Motion that seeks an Order staying discovery, but **GRANTS** the portion of the Motion seeking expedited discovery. Defendant Challenger may serve the proposed discovery requests attached as Exhibit A to that Motion [30-1] on Plaintiff. The Court **ORDERS** Plaintiff to provide responses to those discovery requests via e-mail **BY NO LATER THAN 12:00 NOON E.S.T. ON SATURDAY, MARCH 5, 2016**.

IT IS SO ORDERED, this the 1 st day of March, 2016.

### All Citations

Slip Copy, 2016 WL 9450407

---

**End of Document** © 2018 Thomson Reuters. No claim to original U.S. Government Works.

*TAB 13*

KeyCite Yellow Flag - Negative Treatment

Declined to Follow by Pearson Educ., Inc. v. Doe, S.D.N.Y., October 1, 2012

208 F.R.D. 273
United States District Court,
N.D. California.

SEMITOOL, INC., Plaintiff,

v.

TOKYO ELECTRON AMERICA,
INC., Tokyo Electron Kyushu Ltd.,
and Tokyo Electron Ltd., Defendants.
and
Related Counterclaims.

No. C–02–0288 CW (EMC).
|
April 19, 2002.

**Synopsis**

Owner of patent related to cleaning and processing of semiconductor wafers sued competitor for infringement. On plaintiff's motion for expedited discovery, the District Court, Chen, United States Magistrate Judge, held that: (1) test for expedited discovery is good cause; (2) good cause existed for expediting disclosure of defendant's documents and inspection of accused device; and (3) good cause did not exist for expedited discovery from third-parties.

Motion granted in part and denied in part.

West Headnotes (3)

**[1]**    **Federal Civil Procedure**
👉 Depositions and Discovery

Expedited discovery is available upon showing of good cause, i.e., where need for expedited discovery, in consideration of administration of justice, outweighs prejudice to responding party. Fed.Rules Civ.Proc.Rule 26(d), 28 U.S.C.A.

467 Cases that cite this headnote

**[2]**    **Patents**
👉 Particular documents or things

Good cause existed for permitting expedited discovery of details of accused device, in suit for infringement of patent related to cleaning and processing of semiconductor wafers; given patentee's lack of prior access to accused device, expedited disclosure of documents and physical inspection of device would permit it to determine if other patents were being infringed, and thus more promptly amend complaint, while not prejudicing defendant. Fed.Rules Civ.Proc.Rule 26(d), 28 U.S.C.A.

227 Cases that cite this headnote

**[3]**    **Patents**
👉 Proceedings to obtain

Plaintiff suing for infringement of patent related to cleaning and processing of semiconductor wafers failed to establish good cause for permitting expedited discovery from third-party buyers of accused device; time gained by expediting discovery was marginal, and information sought was unlikely to materially change plaintiff's assessment of its claim. Fed.Rules Civ.Proc.Rule 26(d), 28 U.S.C.A.

283 Cases that cite this headnote

**Attorneys and Law Firms**

**\*274** Robert M. Bodzin, Clark J. Burnham, Burnham Brown, Oakland, CA, Edgar H. Haug, Stephen J. Lieb, Grace L. Pan, Richard E. Parke, Frommer Lawrence & Haug LLP, New York City, for defendants.

Thomas J. Friel, Jr., Monica Kerstin Hoppe, Benjamin K. Riley, Cooley Godward LLP, San Francisco, CA, for plaintiff.

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR LIMITED EXPEDITED DISCOVERY (No. 8)**

CHEN, United States Magistrate Judge.

Plaintiff Semitool, Inc. (hereinafter "Plaintiff") is a corporation of the state of Montana and the owner of several patents, including, *inter alia,* U.S. Patent Number 5,784,797 (hereinafter "the 797 patent"). The 797 patent relates to the centrifugal cleaning and processing of semiconductor wafers. (Compl. ¶ 14.)

Defendant Tokyo Electron Ltd. is a Japanese corporation and the parent company of subsidiaries (and co-defendants) Tokyo Electron Kyushu, Ltd. and Tokyo Electron America, Inc. (hereinafter collectively "Defendants"). Defendants manufacture, sell and distribute a variety of tools for the centrifugal cleaning and processing of semiconductor wafers including their "PR200Z Cleaning System." (Compl. ¶ 16.)

Around the end of 2000, Plaintiff suspected that Defendants' PR200Z Cleaning System infringed one or more of Plaintiff's patents. (Thomas Friel Decl. ¶ 6; Masahiko Hamajima Decl. ¶ 5.) Plaintiff requested access to technical documents and an inspection of a PR200Z Cleaning System, and although Plaintiff and Defendants agreed in principle to permit such inspection, they failed to reach agreement on the terms of the inspection and disclosure. (Friel Decl. ¶¶ 6, 7; Richard Parke Decl. ¶¶ 2, 3.) Thus, the inspection never occurred and pre-litigation efforts failed to result in mutually satisfactory disclosures. (Friel Decl. ¶ 11; Hamajima Decl. ¶ 7.)

On January 16, 2002, Plaintiff filed suit against Defendants alleging that they had willfully infringed, and continue to willfully infringe, Plaintiff's 797 patent. Plaintiff maintains that some of its other patents may well be infringed but it is not in a position to advance any additional claims without access to the accused device and documents pertaining thereto.

On March 15, 2002, Plaintiff filed a motion for expedited discovery requesting: (1) the technical specifications, schematics, maintenance manuals, user or operating manuals, documents to show the physical configuration, documents to show the operation of the PR200Z Cleaning System; (2) a property inspection of any PR200Z Cleaning System; and (3) Rule 45 requests for documents and property inspections at two of Defendants' customers, International Business Machines (IBM) and Sematech,

Inc. Plaintiff's motion was referred to this Court on March 20, 2002, by Judge Wilken.

Based on the record in this case, the parties' briefs and the April 17, 2002 hearing on the motion, the Court makes the following determinations:

**[1] The Court will apply a good cause standard in determining whether expedited discovery is warranted**
Defendants contend that this Court should consider the *Notaro* test in determining whether expedited discovery should be allowed. In *Notaro v. Koch,* 95 F.R.D. 403 (S.D.N.Y.1982), the district court of New **\*275** York applied a four-prong test in determining whether expedited discovery was warranted. The *Notaro* court considered whether to allow the early deposition of the then mayor of the state of New York in conjunction with claims that the mayor intended to fire certain state employees if the mayor was elected governor. While the plaintiffs did not seek a preliminary injunction, the *Notaro* court required them to satisfy a standard akin to a preliminary injunctive relief:

> [1] irreparable injury; [2] some probability of success on the merits; [3] some connection between expedited discovery and avoidance of irreparable injury; and [4] some evidence that injury will result without expedited discovery looms greater than the injury that the defendant will suffer if the expedited relief is granted.

*Notaro,* 95 F.R.D. at 405. The court noted that these requirements, parallel to those necessary to obtain a preliminary injunction, "have been established by courts to protect defendants from the potential damages of speeded up remedies." *Id.* at 405 n. 4. In the end, the court found that the plaintiff did not meet any of these requirements. *See id.* at 405–06.

While a few courts have applied the *Notaro* factors in varying contexts, *see, e.g., Irish Lesbian and Gay Organization v. Giuliani,* 918 F.Supp. 728, 731 (S.D.N.Y.1996); *Crown Crafts, Inc. v. Aldrich,* 148 F.R.D. 151, 152 (E.D.N.C.1993), other courts have declined to apply *Notaro's* four-prong test. *See, e.g., Merrill Lynch, Pierce, Fenner & Smith, Inc. v. O'Connor,* 194 F.R.D.

618, 623 (N.D.Ill.2000); *Philadelphia Newspapers, Inc. v. Gannett Satellite Information Network, Inc.,* No. 98 CV 2782, 1998 WL 404820, *2 n. 1 (E.D.Pa.1998).* In *Merrill Lynch, supra,* the court reasoned that employing a preliminary-injunction type analysis to determine entitlement to expedited discovery made little sense, especially when applied to a request to expedite discovery in order to prepare for a preliminary injunction hearing. *See Merrill Lynch,* 194 F.R.D. at 624. Rather, "it makes sense to examine the discovery request, as we have done, on the entirety of the record to date and the *reasonableness* of the request in light of all the surrounding circumstances." *Id.* (emphasis in original).

The Ninth Circuit has not addressed the propriety of *Notaro* and only one district court within this circuit has even cited to the case. In *Yokohama Tire Corp. v. Dealers Tire Supply, Inc.,* 202 F.R.D. 612 (D.Ariz.2001), the district court for the state of Arizona mentioned *Notaro* and its four-prong test without explicitly endorsing or rejecting it. However, the court appears to have rejected *Notaro* in favor of the more general good cause standard for permitting expedited discovery in advance of the Federal Rule of Civil Procedure 26(f) scheduling conference: "[a]bsent credible authority to the contrary, the court adopts a good cause standard." *Yokohama Tire,* 202 F.R.D. at 614. Significantly, the court cited in support of its good cause holding, *Wirtz v. Rosenthal,* 388 F.2d 290 (9th Cir.1967) and *Johnson v. Mammoth Recreations, Inc.,* 975 F.2d 604 (9th Cir.1992) which applied the general good cause standard employed in Rules 34 and 15, respectively. Other courts have employed the good cause standard without the strictures of *Notaro. See Pod–Ners, LLC v. Northern Feed & Bean of Lucerne Ltd. Liability Co.,* 204 F.R.D. 675, 676 (D.Colo.2002) ("Rule 26(d), Fed.R.Civ.P., allows me to order expedited discovery upon a showing of good cause").

[1]   The Court rejects the rigid *Notaro* standard and is persuaded that the more flexible good cause standard applied in *Yokohama Tire, supra,* and other cases is the appropriate standard under Rule 26(d). It does so for several reasons.

First, *Notaro* was decided before the 1993 amendment to Rule 26. *Notaro* concerned leave of court to take a deposition within thirty days following commencement of the action, then otherwise barred by Rule 30(a). The driving concern of the *Notaro* court was undermining the

Rule 30(a) provision which "protects defendants from unwarily incriminating themselves before they have a chance to review the facts of the case and retain counsel." *Notaro,* 95 F.R.D. at 404. Currently under Rule 26, the bar on discovery extends until the Rule 26(f) conference which often takes place three or four months into the litigation—after the defendant has retained **\*276** counsel and responded to the complaint. The timing of discovery prescribed by Rule 26(d) focuses not on protecting the unwary and unrepresented defendant, but rather on orderly case management. The *Notaro* factors would not accommodate expedited discovery in circumstances even where such discovery would facilitate case management and expedite the case with little or no burden to the defendant simply because the plaintiff would not suffer "irreparable injury." Such a result is inconsistent not only with Rule 26(d), which requires the Court to consider, *inter alia,* "the interests of justice," but also the overarching mandate of Rule 1 which requires that the Rules "shall be construed and administered to secure the just, speedy, and inexpensive determination of every action." It also unduly circumscribes the wide discretion normally accorded the trial court in managing discovery. *See Little v. City of Seattle,* 863 F.2d 681, 685 (9th Cir.1988).

Accordingly, the Court declines to apply *Notaro* and instead applies the conventional standard of good cause in evaluating Plaintiff's request for expedited discovery. Good cause may be found where the need for expedited discovery, in consideration of the administration of justice, outweighs the prejudice to the responding party. It should be noted that courts have recognized that good cause is frequently found in cases involving claims of infringement and unfair competition. *See, e.g., Benham Jewelry Corp. v. Aron Basha Corp.,* No. 97 CIV 3841 RWS, 1997 WL 639037, *20 (S.D.N.Y. Oct. 14, 1997).

**[2] Good cause exists for permitting limited expedited discovery**

[2]   The relevance of the requested discovery is not at issue here. The technical specifications, schematics, maintenance manuals, user or operating manuals and documents to show the physical configuration and operation of the PR200Z Cleaning System are core documents central to the underlying case. In fact, Defendants admitted at the April 17, 2002 hearing that Plaintiff would receive said information during the course of normal discovery. The issue is whether there is good

cause to provide immediate access to the requested discovery rather than postponing its ultimate production during the normal course of discovery.

Judge Wilken has set the initial Case Management Conference for May 24, 2002. Therefore, pursuant to the Federal Rules, Plaintiff may begin propounding discovery requests upon Defendants, twenty-one days prior, on May 3, 2002, the date by which the parties are to confer in preparation for the conference. *See* Fed.R.Civ.P. 26(f). Therefore, what Plaintiff proposes is to advance the propounding of discovery by approximately three weeks. Plaintiff also seeks to shorten the response time for production from Defendants from thirty to ten days. Plaintiff contends that obtaining expedited documents pertaining to the accused device will permit it to determine which, if any, of its other patents are infringed, thereby expediting possible amendment to its complaint, facilitating a more complete and informed Case Management Conference and permit it to comply with its disclosure obligations under North District of California Patent Local Rule 3. [1] If expedited discovery is not permitted, Plaintiff argues this increases the likelihood that disclosures under Rule 3 will have to be amended at a later date, thereby slowing the entire litigation.

Thus, while Plaintiff has not argued that it will be irreparably harmed if it does not receive expedited discovery, it contends expedited discovery would ultimately conserve party and court resources and expedite the litigation.

The Court weighs this benefit to the administration of justice against the possible prejudice or hardship placed on Defendants. Defendants concede the requested information is relevant and will be produced in the normal course of discovery. It also has had notice that Plaintiff has been seeking this information for over a year as there were **\*277** pre-litigation disclosure requests made by Plaintiff, as well as extensive discussion between the parties regarding said requests. Moreover, Defendants have had notice of the instant motion and specific discovery sought for nearly a month.

Defendants contend it should not be subjected to expedited discovery without receiving the initial disclosures required by Patent Local Rule 3 and that it needs to know what patents are allegedly infringed before it should respond to discovery. Plaintiff argues, on the

other hand, that it needs this limited discovery in order to know what other patents may be infringed. However, this "chicken or egg" dilemma is largely irrelevant at this stage. It is clear that the core documents currently sought by Plaintiff are relevant and discoverable under the current complaint; it will remain so whether or not the complaint is enlarged to add additional claims. In short, Defendants are not prejudiced by responding to this limited discovery in advance of any amendment to the complaint or disclosure under Patent Local Rule 3. [2]

While Defendants claim some logistical inconvenience in responding to the request inasmuch as most of the documents are located in Japan and many may be in Japanese, the Court fails to see why given current communication technology, Defendants cannot respond quickly to the narrow requests propounded by Plaintiff, especially given that the request hardly comes as a surprise and that the Case Management Conference and attendant disclosures are fast approaching. Nonetheless, in view of potential logistical problems, the Court, as indicated below, will afford Defendants twenty days within which to respond the Plaintiff's discovery request as narrowed herein.

The Court's finding of good cause for expediting discovery under the circumstances of this case does not, of course, imply that expedited discovery is appropriate under Rule 26(d) in every infringement case in which the plaintiff might benefit therefrom in framing its complaint. Here, Plaintiff has made a clear showing that the narrow categories of documents and physical inspection of the device not otherwise accessible will substantially contribute to moving this case forward and facilitating compliance with the Patent Local Rules. The request directed to Defendants is narrowly tailored to this benefit. It entails not, e.g., a free ranging deposition for which a representative of Defendants may not have had sufficient time or information with which to prepare, but existing documents and a physical inspection. Moreover, this is a case where the parties are both represented by sophisticated counsel and have engaged in pre-litigation discussion for over a year. Hence, the Court is unable to discern any real prejudice to Defendants in advancing discovery by a modest amount of time.

**[3]** The Court reaches a different conclusion as to the third-party discovery propounded to IBM and Sematech, Inc. The benefits of expediting this particular is not nearly

as obvious. It is likely to be largely duplicative of the discovery permitted herein against Defendants. Even if it is not entirely duplicative (Plaintiff contends the accused device may be customized for each customer), Plaintiff has not made any showing how this additional discovery is likely to materially change its patent claims assessment. Moreover, Plaintiff concedes it cannot shorten the time within which IBM and Sematech, Inc. respond, so the net gain, at best, will be to advance discovery by three weeks. Given the likelihood of contention over these requests, it is doubtful this third-party discovery will be completed prior to the Case Management Conference and Patent Local Rule 3 disclosure. Balanced against the lack **278** of any substantial incremental benefit is the risk of prejudice or disruption to Defendants' business relations with these customers. The Court finds insufficient cause to permit expedited third-party discovery.

### ORDER

The motion by Plaintiff for limited expedited discovery (Docket No. 8) is **GRANTED IN PART and DENIED IN PART.**

Defendants shall produce within twenty days of the date of this Order, one set each of the technical specifications, schematics, maintenance manuals and user or operating manuals of the PR200Z Cleaning System. Defendants shall also produce one set of drawings and/or pictures showing the physical configuration of the PR200Z Cleaning System and a document (or documents) demonstrating how the PR200Z Cleaning System processes and cleans semiconductors. Defendants need not at this time produce "any and all documents" which are essentially duplicative of those ordered herein. Plaintiff may in the normal course of discovery propound a broader request for such documents under Federal Rule of Civil Procedure 26.

Defendants shall also provide access, within thirty days of the date of this Order, to a PR200Z Cleaning System at any of Defendants' facilities. Plaintiff will be permitted to inspect, observe, videotape and photograph any portion of the PR200Z Cleaning System.

Plaintiff will not be permitted to seek early discovery from Defendants' customers, IBM and Sematech, Inc., but may seek discovery from these entities in the normal course of discovery.

All discovery contemplated by the Court's Order shall be subject to the stipulated protective order to be entered into by the parties. In the absence of a stipulated protective order, all documents produced or generated by this discovery shall be treated as confidential pursuant to Patent Local Rule 2–2.

IT IS SO ORDERED.

### All Citations

208 F.R.D. 273

---

Footnotes

1    Patent Local Rules 3–1 and 3–2, require that within ten days after the initial case management conference, Plaintiff must submit a disclosure of asserted claims, which must include, *inter alia,* a claim of each patent allegedly infringed, the identification of each apparatus involved in the infringement and documents evidencing the patent allegedly infringed.

2    It should be noted that Patent Local Rule 2–5 states that a party may not object to a discovery request as premature because of the Patent Local Rules, with the exception of requests for: [a] claim construction; [b] a comparison by the patent claimant of the asserted claims and the accused item; [c] a comparison by the accused infringer of the asserted claims and the prior art; and [d] counsel opinions and related documents that the accused infringer intends to rely on as a defense, which may be considered premature in light of the production timetable set forth by Patent Local Rules 3–1 through 3–6. The fact that the information requested by Plaintiff is not identified as subject matter that may be considered premature under the Patent Local Rules further supports the appropriateness of expedited discovery herein.

---

# *TAB 14*

571 F.Supp.2d 1014
United States District Court,
N.D. Iowa,
Western Division.

WACHOVIA SECURITIES, L.L.C., a
Delaware limited liability company, Plaintiff,
v.
Donna STANTON, an individual, Defendant.

No. C 08–4058–MWB.
|
Aug. 5, 2008.

**Synopsis**
**Background:** Securities broker brought breach of contract action against former employee, seeking temporary restraining order and preliminary injunction to restrain former employee from allegedly pirating confidential client information and other employees for benefit of her new employer, a competing securities firm, pending disposition of arbitration proceedings on parties' dispute before Financial Industry Regulatory Authority (FINRA), and seeking expedited discovery.

**Holdings:** The District Court, Mark W. Bennett, J., held that:

[1] broker did not have substantial likelihood of success on merits of breach of contract claim;

[2] broker would not suffer irreparable harm in absence of temporary restraining order;

[3] balance of harms factor weighed against broker;

[4] public interest did not favor temporary restraining order; and

[5] broker was entitled to expedited discovery to prepare for preliminary injunction hearing.

Motion granted in part and denied in part.

West Headnotes (27)

**[1]** **Injunction**
 ☛ Operation and effect
The findings of fact and conclusions of law made by a court granting a preliminary injunction or temporary restraining order are not binding at trial on the merits.

1 Cases that cite this headnote

**[2]** **Injunction**
 ☛ Grounds in general;multiple factors
**Injunction**
 ☛ Balancing or weighing factors;sliding scale
The factors that courts must weigh to decide whether or not to grant a temporary restraining order or preliminary injunction are the following: (1) the movant's probability or likelihood of success on the merits, (2) the threat of irreparable harm or injury to the movant absent the injunction, (3) the balance between the harm to the movant and the harm that the injunction's issuance would inflict on other interested parties, and (4) the public interest. Fed.Rules Civ.Proc.Rule 65, 28 U.S.C.A.

11 Cases that cite this headnote

**[3]** **Injunction**
 ☛ Presumptions and burden of proof
The burden is on the movant to establish that preliminary injunctive relief is appropriate. Fed.Rules Civ.Proc.Rule 65, 28 U.S.C.A.

Cases that cite this headnote

**[4]** **Injunction**
 ☛ Balancing or weighing factors;sliding scale
When determining whether to grant a preliminary injunction, no single factor in itself is dispositive; in each case all

of the factors must be considered to determine whether on balance they weigh towards granting the injunction. Fed.Rules Civ.Proc.Rule 65, 28 U.S.C.A.

Cases that cite this headnote

**[5]** **Federal Courts**
   👉 Preliminary injunction;temporary restraining order

**Injunction**
   👉 Discretionary Nature of Remedy

A district court has broad discretion when ruling on requests for preliminary injunctions, and the appellate court will reverse only for clearly erroneous factual determinations, an error of law, or an abuse of that discretion. Fed.Rules Civ.Proc.Rule 65, 28 U.S.C.A.

Cases that cite this headnote

**[6]** **Federal Courts**
   👉 Abuse of discretion in general

The court abuses its discretion where the district court rests its conclusion on clearly erroneous factual findings or erroneous legal conclusions.

Cases that cite this headnote

**[7]** **Injunction**
   👉 Likelihood of success on merits

**Injunction**
   👉 Entitlement to relief;likelihood of success

For purposes of determining whether to issue preliminary injunction or temporary restraining order, the likelihood of success on the merits requires that the movant find support for its position in governing law.

2 Cases that cite this headnote

**[8]** **Injunction**
   👉 Preservation of status quo

**Injunction**
   👉 Likelihood of success on merits

**Injunction**
   👉 Equitable considerations in general

At the early stage of a preliminary injunction motion, the speculative nature of the likelihood of success inquiry militates against any wooden or mathematical application of the test; a court should flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined.

Cases that cite this headnote

**[9]** **Injunction**
   👉 Likelihood of success on merits

**Injunction**
   👉 Entitlement to relief;likelihood of success

When determining a party's likelihood of success on the merits, for purposes of temporary restraining order or preliminary injunction, the court is not deciding whether the movant for a preliminary injunction or a temporary restraining order will ultimately win.

2 Cases that cite this headnote

**[10]** **Federal Courts**
   👉 Substance or procedure; determinativeness

**Federal Courts**
   👉 Conflict of Laws;Choice of Law

In an action based upon diversity of citizenship jurisdiction, a federal district court must apply the substantive law of the state in which it sits, including its conflict-of-laws or choice-of-law rules.

Cases that cite this headnote

**[11]** **Action**
   👉 What law governs

Before any choice of law need be made in an action based upon diversity of citizenship

jurisdiction, there must be a true conflict between the laws of the possible jurisdictions on the pertinent issue.

Cases that cite this headnote

[12]    Contracts
        🔑 Grounds of action

To establish a claim of breach of contract under Iowa law, a plaintiff must establish the following elements: (1) the existence of a contract between the parties, (2) the terms and conditions of the contract, (3) plaintiff performed all the terms and conditions required under the contract, (4) defendant breached the contract in some particular way, and (5) plaintiff suffered damages as a result of the breach.

Cases that cite this headnote

[13]    Contracts
        🔑 Breach by failure of performance

Under Iowa law, a party breaches a contract when, without legal excuse, it fails to perform any promise which forms a whole or a part of the contract.

Cases that cite this headnote

[14]    Injunction
        🔑 Non-competition and non-solicitation issues

Securities broker seeking temporary restraining order restraining former employee from allegedly pirating confidential client information and other employees for benefit of competing securities firm, pending disposition of arbitration proceedings on parties' dispute before Financial Industry Regulatory Authority (FINRA), did not have substantial likelihood of success on merits of breach of contract claim against former employee under Iowa or Missouri law, as required for issuance of temporary restraining order, although dealer established existence of contract and that employee breached contract by soliciting customers; dealer failed to

establish that employee breached covenants in contract as to disclosure of client information or solicitation of employees, and restrictive covenants in contract may not have been enforceable.

Cases that cite this headnote

[15]    Contracts
        🔑 Restraint of Trade or Competition in Trade

Under Iowa law, a court determines if an employment contract containing a restrictive covenant is enforceable by posing three inquiries: (1) is the restriction reasonably necessary for the protection of the employer's business, (2) is it unreasonably restrictive of the employee's rights, and (3) is it prejudicial to the public interest.

Cases that cite this headnote

[16]    Contracts
        🔑 In restraint of trade

The court has the authority under Iowa law to modify or reform a restrictive covenant to make its limitations reasonable.

Cases that cite this headnote

[17]    Injunction
        🔑 Non-competition and non-solicitation issues

Securities broker seeking temporary restraining order restraining former employee from allegedly pirating confidential client information and other employees for benefit of competing securities firm, pending disposition of arbitration proceedings on parties' dispute before Financial Industry Regulatory Authority (FINRA), did not have substantial likelihood of success on merits of trade secrets claim against former employee under Iowa law, as required for temporary restraining order, although some client information was trade secret; broker failed to show that employee acquired trade

secrets by improper means. I.C.A. § 550.1 et seq.

1 Cases that cite this headnote

**[18] Federal Courts**

👉 Reversal or Vacation of Judgment in General

**Injunction**

👉 Irreparable injury

A party moving for a preliminary injunction is required to show the threat of irreparable harm, and the lack of irreparable harm is sufficient ground for denying or vacating a preliminary injunction.

1 Cases that cite this headnote

**[19] Injunction**

👉 Adequacy of remedy at law

Where the movant has an adequate legal remedy, a preliminary injunction will not issue.

Cases that cite this headnote

**[20] Injunction**

👉 Non-competition and non-solicitation issues

Securities broker failed to demonstrate that former employee violated covenants in employment agreements or that covenants were enforceable under Iowa law, and thus broker would not suffer irreparable harm in absence of temporary restraining order restraining former employee from allegedly pirating confidential client information and other employees for benefit of competing securities firm, pending disposition of arbitration proceedings on parties' dispute before Financial Industry Regulatory Authority (FINRA).

1 Cases that cite this headnote

**[21] Injunction**

👉 Non-competition and non-solicitation issues

Where the covenants at issue in a breach of contract action are non-disclosure covenants and a specific kind of non-competition covenant, a non-solicitation covenant, the mere violation of such a covenant suffices to show irreparable harm required for an injunction, because violation of such covenants involves much the same threat to goodwill and business relationships with customers as violation of a covenant not to compete.

4 Cases that cite this headnote

**[22] Injunction**

👉 Irreparable injury

**Injunction**

👉 Balancing or weighing hardship or injury

For purposes of a preliminary injunction, the irreparable harm analysis focuses on the harm or potential harm to the movant of the opposing party's conduct or threatened conduct; in contrast, the balance of harms analysis examines the harm of granting or denying the injunction upon both of the parties to the dispute and upon other interested parties, including the public.

1 Cases that cite this headnote

**[23] Injunction**

👉 Balancing or weighing hardship or injury

In conducting the balance of harms analysis required for a preliminary injunction, it is obvious that an illusory harm to the movant will not outweigh any actual harm to the nonmovant.

1 Cases that cite this headnote

**[24] Injunction**

👉 Non-competition and non-solicitation issues

Balance of harms factor weighed against securities broker alleging breach of contract claim against former employee, as required

for temporary restraining order restraining employee from allegedly pirating confidential client information and other employees for benefit of competing securities firm, pending disposition of arbitration proceedings on parties' dispute before Financial Industry Regulatory Authority (FINRA); broker failed to make sufficient showing of likelihood of success on merits of its claims, and employee's countervailing right to maintain her customer relationships outweighed broker's illusory harm.

Cases that cite this headnote

[25] **Injunction**
👉 Public interest considerations

When determining whether to issue temporary restraining order, the public interest factor frequently invites the court to indulge in broad observations about conduct that is generally recognizable as costly or injurious; however, there are more concrete considerations, such as reference to the purposes and interests any underlying legislation was intended to serve, a preference for enjoining inequitable conduct, and the public's interest in minimizing unnecessary costs to be met from public coffers.

Cases that cite this headnote

[26] **Injunction**
👉 Non-competition and non-solicitation issues

Public interest did not favor temporary restraining order restraining employee from allegedly pirating confidential client information and other employees for benefit of competing securities firm, pending

disposition of arbitration proceedings on parties' dispute before Financial Industry Regulatory Authority (FINRA), in securities broker's breach of contract action against former employee; public interest called into serious question enforceability of restrictive covenants at issue.

Cases that cite this headnote

[27] **Federal Civil Procedure**
👉 Depositions and Discovery

Securities broker was entitled to expedited discovery to prepare for preliminary injunction hearing in breach of contract action against former employee; expedited discovery could clarify matters that were outside of parties' knowledge and ultimately lead to prompt and efficient disposition of litigation and underlying dispute, and employee would not be prejudiced by permitting properly limited and focused discovery to prepare for preliminary injunction hearing, where she could also clarify matters outside of her knowledge.

8 Cases that cite this headnote

**Attorneys and Law Firms**

**\*1018** Daniel B. Shuck, Sioux City, IA, for Plaintiff.

## MEMORANDUM OPINION AND ORDER REGARDING PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND EXPEDITED DISCOVERY

MARK W. BENNETT, District Judge.

## TABLE OF CONTENTS

I. INTRODUCTION ................................................................. 1019

    A. *Factual Background* .......................................... 1019

        1. *The parties and their relationship* ........................... 1019

    2.   Stanton's resignation and new employment ..................................................... 1025

    3.   Stanton's post-employment conduct ................................................................ 1026

  B.  Procedural Background ........................................................................ 1030

II. LEGAL ANALYSIS ....................................................................................... 1031

  A.  Standards For A Temporary Restraining Order ......................................... 1031

  B.  Application Of The Standards ............................................................... 1033

    1.   Likelihood of success ..................................................................................... 1033

      a.   Breach of restrictive covenants ................................................................. 1034

        i. Arguments of the parties ..................................................................... 1034

        ii. Analysis ............................................................................................. 1035

      b.   Misappropriation of trade secrets .............................................................. 1041

        i. Arguments of the parties ..................................................................... 1041

        ii. Analysis ............................................................................................. 1042

    2.   Threat of irreparable harm .............................................................................. 1044

      a.   Arguments of the parties ........................................................................... 1045

      b.   Analysis .................................................................................................... 1045

    3.   Balance of harms ........................................................................................... 1047

      a.   Arguments of the parties ........................................................................... 1047

      b.   Analysis .................................................................................................... 1048

    4.   The public interest ......................................................................................... 1048

  C.  Expedited Discovery ........................................................................... 1049

III. CONCLUSION ............................................................................................. 1050

**\*1019** In this action, filed on July 30, 2008, a securities broker-dealer seeks a temporary restraining order and a preliminary injunction to restrain a former employee from allegedly pirating confidential client information and other employees for the benefit of her new employer, a competing securities firm, pending disposition of arbitration proceedings on the parties' dispute before

the Financial Industry Regulatory Authority (FINRA). The broker-dealer also seeks expedited discovery to aid in the disposition of the broker-dealer's motion for a preliminary injunction. Following a hearing on August 4, 2008, in which counsel for both parties participated, but no evidence or witnesses were presented, the court enters this order on the broker-dealer's request for a temporary restraining order and expedited discovery.

## I. INTRODUCTION

### A. Factual Background

 **[1]**    In a Complaint (docket no. 2), filed July 30, 2008, plaintiff Wachovia Securities, L.L.C., (Wachovia) seeks a temporary restraining order and a preliminary injunction against a former employee, defendant Donna Stanton, pending disposition of arbitration proceedings between the parties concerning various kinds of alleged misconduct by Stanton. Because of the preliminary nature of the proceedings, the factual background stated here is necessarily based primarily on the allegations in and documents in support of Wachovia's July 30, 2008, Complaint (docket no. 2), Wachovia's July 31, 2008, Motion For A Temporary Restraining Order And Preliminary Injunction And For An Order Permitting Expedited Discovery (docket no. 3), and Stanton's Opposition to Wachovia's Motion For A Temporary Restraining Order (docket no. 10). In making any findings of fact in this ruling, the court is mindful of the general rule that "the findings of fact and conclusions of law made by a court granting a preliminary injunction [or temporary restraining order] are not binding at trial on the merits." *University of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981); *accord United States Sec. and Exchange Comm'n v. Zahareas,* 272 F.3d 1102, 1105 (8th Cir.2001) ("[W]e have long held that 'findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding.' ") (quoting *Patterson v. Masem,* 774 F.2d 251, 254 (8th Cir.1985)); *National Credit Union Admin. Bd. v. Johnson,* 133 F.3d 1097, 1103 n. 5 (8th Cir.1998) (quoting this principle from *Camenisch); Henderson v. Bodine Aluminum, Inc.,* 70 F.3d 958, 962 (8th Cir.1995) (citing this statement from *Camenisch* as the "general rule" for findings of fact and conclusions of law in preliminary injunction rulings). Thus, all findings of fact in this ruling are provisional.

### 1. The parties and their relationship

Wachovia Securities, L.L.C., (Wachovia) is a corporation organized under the laws of the state of Delaware with its principal place of business in St. Louis, Missouri. [1] Wachovia is a securities broker-dealer and a member of the Financial Industry Regulatory Authority (FINRA), [2] the New York **\*1020** Stock Exchange, Inc., and all other major exchanges. Wachovia provides broker-dealer services to individual and institutional clients throughout the United States. In October 2007, Wachovia and A.G. Edwards & Sons, Inc., (Edwards) another securities broker-dealer, completed a merger. Thus, Wachovia alleges that it is a successor in interest to Edwards, which Stanton does not dispute. Wachovia has a branch office in Storm Lake, Iowa, which was formerly an Edwards office.

Defendant Donna Stanton had been employed at the Storm Lake office for Edwards, then Wachovia, for approximately twenty years as of July 2008. Wachovia alleges that Stanton was employed, first, as a "sales assistant" or "financial associate" for Edwards, then as a "registered sales assistant" for Wachovia. Wachovia contends that Stanton was responsible for providing a full range of administrative support services to Wachovia financial consultants in the Storm Lake office. There were two such financial consultants, or "senior brokers," in the Storm Lake office, who had combined assets under management of approximately $100 million. Wachovia contends that these assets generated more than $500,000 in combined revenue on an annualized basis. More specifically, Wachovia alleges that Stanton was the sales assistant to senior broker Tom McClinton. McClinton managed in excess of $40 million in assets for more than 300 of Wachovia's clients. Tom McClinton retired on July 18, 2008. Since McClinton's retirement, his clients have been reassigned to Alan Bowles, another Wachovia broker in the Storm Lake office. Wachovia alleges that, in addition to assisting McClinton with his clients, Stanton also had a small "book" of her own clients.

In a Declaration submitted in support of her Opposition, Stanton paints a quite different picture of her role at Wachovia. Although she concedes that she was originally hired by Edwards in 1988 as an unregistered sales assistant, she contends that, in 1996, she was asked to get her securities licenses. She contends that, at that time, she was told to sign the Sales Assistant Agreement (the 1996 Agreement), portions of which are set out below.

She contends that she was not given new employment in consideration for signing the 1996 Agreement, but only materials to help her study for her licensing examinations. Wachovia alleges that, in consideration for entering into an employment relationship with Edwards (and its successor Wachovia) and executing her employment agreement, Stanton was provided with significant benefits, including fair compensation, office facilities, health insurance, securities registration, and participation in Wachovia's 401(k) plan. The record does not support a finding that Stanton entered into new employment with Edwards or that her continued employment was contingent on executing the 1996 Agreement, but the Agreement does, by its terms, as quoted below, identify adequate consideration for the Agreement. Stanton asserts that, to her knowledge, no other Edwards employees in the Storm Lake office were required to sign a non-solicitation agreement. She also argues that the 1996 Agreement is inapplicable to her ultimate position as a financial consultant.

Stanton represents that, over the twelve years after becoming registered, she personally originated, developed, and serviced approximately 200 clients under her own production number and that she received 100% of the commissions for such customers. **\*1021** She contends that many of her customers were developed through friends and acquaintances of her prior customers, her personal network of friends and relations, and her personal reputation. Thus, she contends that she developed these customers largely independent of any marketing efforts by Edwards or Wachovia. Stanton concedes that she did assist Tom McClinton with servicing of approximately 100 to 150 of his clients, but she asserts that she and McClinton, who was semi-retired for the last three years that he worked for Edwards, split the commissions under a joint production number, and that she also provided full service to his clients, including research and recommendations, when he was out of the office, often for extended periods of time.

In a Declaration filed in support of Stanton's Opposition, McClinton confirms Stanton's description of her involvement with his clients and their commissions arrangement, adding that Stanton received 3 % of his gross commissions, as well. Stanton asserts that she also provided service to the clients of other financial consultants in the office, including Alan Bowles. Stanton asserts that she considered herself and her clients

considered her a financial consultant. She also asserts that Alan Bowles was the only person in the office who did not treat her as a peer, and that she believed that Bowles discriminated against her because of her gender —although she offers virtually no factual allegations to support this allegation.

On or about March 3, 1996, Stanton entered into the 1996 Agreement with Edwards. Complaint, Declaration of Joseph Wood, Exhibit B. The court finds the following paragraphs of that agreement to be significant to the present dispute:

> In consideration of such acceptance and employment, you agree that:

> 1. So long as you serve as an employee of Edwards, you will act only in Edwards' best interest. For that purpose, you will perform your work competently and diligently; and you will observe all directions given by officials of Edwards, all policies announced by Edwards, all regulations and procedures prescribed in Edwards' Policy and Procedures Manuals and Compliance Manuals as from time to time are altered or issued, and all applicable rules of regulatory authorities. You will conduct yourself as a loyal and faithful employee of Edwards, and you will in no event take any action which could harm Edwards' business or its relationships with its clients.

> 2. ALL RECORDS AND DOCUMENTS CONCERNING THE BUSINESS AND AFFAIRS OF EDWARDS INCLUDING WITHOUT LIMITATION THE NAMES, ADDRESSES, TELEPHONE NUMBERS AND ASSETS AND OBLIGATIONS CARRIED IN THE ACCOUNTS OF ITS CUSTOMERS, AND THE BOOKS, PAPERS, RECORDS AND RECORDINGS FURNISHED TO YOU DURING THE TRAINING PROGRAM AND THE RIGHT TO USE SUCH RECORDS, DOCUMENTS, BOOKS, PAPERS AND RECORDINGS ARE, AND SHALL ALWAYS BE, THE CONFIDENTIAL AND EXCLUSIVE PROPERTY OF EDWARDS. YOUR USE OF SUCH RECORDS AND DOCUMENTS, WHETHER GENERATED AND PREPARED BY YOU OR FURNISHED TO YOU BY EDWARDS, AS PERMITTED BY EDWARDS SHALL

CEASE IMMEDIATELY UPON THE FIRST OF THE FOLLOWING EVENTS TO OCCUR: YOUR (1) RESIGNATION, (2) RETIREMENT, **\*1022** (3) RELEASE, (4) DISCHARGE, (5) ACCEPTANCE OF OTHER EMPLOYMENT, OR (6) TERMINATION OF EMPLOYMENT FOR ANY OTHER REASON.

YOU (A) SHALL NOT REMOVE ANY SUCH RECORDS OR DOCUMENTS FROM THE PREMISES OF EDWARDS IN EITHER ORIGINAL, DUPLICATE OR COPIED FORM, EXCEPT IN THE ORDINARY COURSE OF CONDUCTING BUSINESS FOR, AND SUBJECT TO THE APPROVAL BY, EDWARDS AND (B) SHALL IMMEDIATELY DELIVER TO EDWARDS, PRIOR TO THE TERMINATION OF EMPLOYMENT, OR AT ANY OTHER TIME UPON EDWARDS' REQUEST, ANY SUCH RECORDS AND DOCUMENTS IN THE EMPLOYEE'S POSSESSION OR CONTROL.

YOU SHALL NOT (A) DISCLOSE TO ANY PERSON, FIRM, ASSOCIATION, PARTNERSHIP, CORPORATION OR OTHER ENTITY, THE CONTENTS, IN WHOLE OR IN PART, OF SUCH RECORDS AND DOCUMENTS, EXCEPT IN THE ORDINARY COURSE OF CONDUCTING BUSINESS FOR EDWARDS; (B) DIRECTLY OR INDIRECTLY SOLICIT OR AID IN THE SOLICITATION ON BEHALF OF ANY OTHER ORGANIZATION, ANY CUSTOMERS HAVING ACCOUNTS WITH EDWARDS WITH WHOM YOU SHALL HAVE HAD ANY DEALINGS WHATSOEVER DURING THE TERM OF YOUR EMPLOYMENT WITH EDWARDS WHEN SUCH OTHER ORGANIZATION DOES BUSINESS IN SECURITIES, COMMODITIES AND FINANCIAL FUTURES, INSURANCE OR OTHER LINES OF BUSINESS IN WHICH EDWARDS OR ANY OF ITS AFFILIATES IS ENGAGED; AND/OR (C) RECRUIT, ENTICE, INDUCE OR SOLICIT, DIRECTLY OR INDIRECTLY, ANY EMPLOYEE OF EDWARDS OR ANY OF ITS AFFILIATES FOR EMPLOYMENT WITH ANY OTHER ORGANIZATION WHICH DOES BUSINESS IN SECURITIES, COMMODITIES AND FINANCIAL FUTURES, INSURANCE OR ANY OTHER LINES OF BUSINESS IN WHICH EDWARDS OR ANY OF ITS AFFILIATES IS ENGAGED.

IN THE EVENT YOU BREACH ANY OF THE COVENANTS CONTAINED IN THIS PARAGRAPH, YOU ACKNOWLEDGE THAT EDWARDS' REMEDIES AT LAW FOR DAMAGES WILL BE INADEQUATE AND THAT EDWARDS SHALL BE ENTITLED TO INJUNCTIVE RELIEF TO PREVENT YOUR PROSPECTIVE OR CONTINUING BREACH OF THESE PROVISIONS. THIS PROVISION SHALL NOT BE CONSTRUED IN ANY WAY TO CONSTITUTE A WAIVER BY EDWARDS OF ANY AVAILABLE REMEDY AT LAW.

\* \* \*

*Termination*

\* \* \*

26. In the event that your employment with Edwards ends at any time either through termination by Edwards or through resignation by you, you will surrender all training materials, account records, customers' statements and customers' files to Edwards, and you agree, in such event, that such termination or resignation, as the case may be, will **\*1023** constitute the forfeiture by you of your right to receive any commission on transactions effected, insurance business placed or plan payments made subsequent to the date of such termination or resignation.

Complaint, Declaration of Joseph Wood, Exhibit B, 1996 Agreement, ¶¶ 1–2, 26 (capitalization and underlining in the original). The 1996 Agreement also provides as follows:

*Miscellaneous*

30. The terms of your employment and these standard provisions will enure to the benefit of, and be binding upon, both you and Edwards and our respective successors and assigns. This agreement shall be governed by and construed in accordance with the

laws of the State of Missouri even though you are not, or cease to be, a resident or employee of that state.

> Complaint, Declaration of Joseph Wood, Exhibit B, 1996 Agreement, ¶ 30 (underlining in the original). Thus, the court finds that the 1996 Agreement is binding upon and enforceable by Wachovia as Edwards's successor.

Stanton argues that the 1996 Agreement was inapplicable to her later position as a financial consultant. The court notes, however, that Stanton entered into the 1996 Agreement at the time that she was asked to obtain her securities licenses and, apparently, as a prerequisite to receiving materials from Edwards to assist her preparations to take the licensing examinations. Wachovia disputes that Stanton's position ever changed from "registered sales assistant" to "financial consultant," and Stanton argues only that she considered herself to be and that her clients considered her to be a financial consultant, not that her position or job title actually changed. No party has identified any provision of the 1996 Agreement that would have caused it to terminate because of a change in Stanton's duties, nor has any party produced a subsequent agreement superseding or terminating the 1996 Agreement or identifying Stanton's position as a "financial consultant" rather than a "registered sales assistant." Nevertheless, Stanton's evidence does considerably undermine Wachovia's contention that she only provided administrative support services to Wachovia financial consultants in the Storm Lake office.

Stanton contended, and Wachovia conceded, at the hearing on August 4, 2008, that the "financial consultants" in the Storm Lake office were not subject to non-solicitation agreements similar to the 1996 Agreement. Indeed, Wachovia's counsel represented that neither Edwards nor Wachovia required such a non-solicitation agreement for "financial consultants." When asked by the court to opine on the rationale for imposing such an agreement on sales assistants, but not financial consultants, counsel for Wachovia suggested that the reason is that sales assistants do not have their own clients, but instead service the clients of "financial consultants." Thus, the clients do not "belong" to sales assistants, while they "belong" to "financial consultants," and sales assistants can, therefore, legitimately be precluded from soliciting clients that were not "theirs."

Wachovia alleges, and the court finds, that Stanton was also bound by Edwards's confidentiality policy, as set forth in Section 9.2 of Edwards's Sales Practice Manual, which was made available to all of Edwards's employees. Complaint, Declaration of Joseph Wood, Exhibit C. That policy provides as follows:

> 9.2 Confidentiality of Client Account Information
>
> Client account confidentiality is a very serious matter that all employees should **\*1024** observe at all times. You should never discuss information regarding a client's transactions or account status with other employees, persons not authorized to transact business in the account (spouse, parent or child), or government or regulatory authorities.

Complaint, Declaration of Joseph Wood, Exhibit C.

Wachovia also alleges, and the court finds, that Stanton certified that she had read and understood Edwards's Code of Ethical Conduct. Complaint, Declaration of Joseph Wood, Exhibit D. That Code provided, in pertinent part, as follows:

> CONFIDENTIALITY
>
> Directors, officers and employees are obligated to maintain the confidentiality of information entrusted to them by A.G. Edwards, its vendors and/or other employees. Directors, officers and employees must further abide by A.G. Edwards' Privacy Policy as it pertains to the handling of nonpublic, client information and must maintain the confidentiality of information concerning other employees that they receive in performing their jobs. Exceptions to the nondisclosure of such information must be authorized by A.G. Edwards' management or mandated by legal or regulatory entities.
>
> No A.G. Edwards representative may provide nonpublic information to persons or organizations outside A.G. Edwards, including the media, unless authorized to do so. Should an A.G. Edwards representative receive an inquiry from the media, that inquiry should be referred immediately to the Public Relations Group in Corporate Communications. Any inquiry concerning A.G. Edwards' securities should be referred immediately to Investor Relations....

These restrictions regarding confidentiality apply to confidential information received by employees or officers prior to their employment with A.G. Edwards and continue after their employment with A.G. Edwards ends.

Complaint, Declaration of Joseph Wood, Exhibit D.

As part of her official duties at Wachovia, Stanton had access to extensive personal records and information about Wachovia's clients and personnel records of the financial consultants in the Storm Lake office. The client records included client identity information, such as social security numbers, addresses, telephone numbers, and also transactional histories, tax information, personal financial data, insurance and banking information, and investment objectives. The information concerning consultants included compensation details and performance reviews. Wachovia has invested substantial corporate resources in the development and maintenance of client information, often over a number of years, and at great expense. Indeed, Wachovia alleges, and the court finds, that its customer list is the "lifeblood" of its business. Wachovia contends, and the court finds, that some of the expenses incurred by Wachovia in obtaining clients are the costs of national and local advertising, training of Wachovia's sales force, support staff, clearing services, operations personnel, systems and support, management and compliance supervision, salaries, annual registration fees, computer services and equipment, phone, mail, research, literature, seminars, trade and other professional news publications, promotional events, retention of experts, and other expenditures to maintain goodwill in the securities industry. Wachovia alleges, and the court finds, that some client information, such as transactional histories, tax information, personal financial data, insurance and banking information, and investment objectives, is not publicly available, is proprietary and valuable, and would be  **\*1025**  especially useful to a competitor, and that a customer list, even to the extent that it includes publicly accessible information, such as addresses and telephone numbers, is a compilation that is not itself publicly available, is proprietary and valuable, and would be especially useful to a competitor.

Moreover, customer information such as transactional histories, tax information, personal financial data, insurance and banking information, and investment objectives, was also entrusted to Wachovia by its customers with the expectation that it would remain confidential and would not be disclosed to third parties. Applicable laws also required Wachovia to safeguard this information until such time as controlling authorities authorize its release. Wachovia also alleges, and the court finds, that Stanton had access to information such as customer lists and customers' transactional histories, tax information, personal financial data, insurance and banking information, and investment objectives solely by virtue of her employment with Wachovia and that Stanton was also obligated to maintain the confidentiality of such information pursuant to the contract, policy, and ethical provisions quoted above. Wachovia had in place internal policies and procedures, including the contracts and policies quoted above, that the court finds were reasonably designed to maintain the confidentiality of client information and records, such as customer lists, transactional histories, tax information, personal financial data, insurance and banking information, and investment objectives.

### *2. Stanton's resignation and new employment*

Stanton resigned from her position with Wachovia, without notice, by letter dated July 11, 2008, but not seen by Wachovia until July 14, 2008. Stanton's resignation came just shortly before the retirement of Tom McClinton, the senior broker whose clients Stanton had helped to service and with whom she had split commissions. Although Wachovia asserts that Stanton's resignation was "abrupt," Stanton asserts that she had become increasingly unhappy after Edwards merged with Wachovia because of changes in business practices and increasing sexual harassment and sexual discrimination to which she was subjected by Alan Bowles. Thus, she contends that, by July 2008, she had determined that staying at Wachovia was not a viable option. She also asserts that it is common practice in the securities industry to resign without notice.

The body of Stanton's July 11, 2008, resignation letter, in its entirety, runs as follows:

> The purpose of this letter is to announce my resignation from A.G. Edwards/Wachovia Securities, effective July 13, 2008.

> This was not an easy decision to make, on my part. The past 20 years have been very rewarding. I have enjoyed working for A.G. Edwards.

I have accepted a position as an Independent Investment Executive with Century Securities Associates, Inc., a subsidiary of Stifel Financial Corp. This opportunity gives me the chance to grow professionally and continue to work with my clients, in the manner to which they have become accustomed, while offering the same products.

I wish you and Wachovia Securities all the best.

Complaint, Alan Bowles Declaration, Exhibit A.

Immediately after her resignation, Stanton began employment with the brand new Storm Lake office of Century Securities Associates, Inc., (CSA), a subsidiary of Stifel Financial Corporation, a direct competitor of Wachovia. Neither Stifel nor CSA had an office in Storm Lake, Iowa, or in the surrounding area prior to July 2008. CSA's new office is in a building that is **\*1026** still under construction, some eight or ten blocks from Wachovia's Storm Lake office.

#### 3. Stanton's post-employment conduct

Wachovia alleges that, following her resignation, Stanton began to solicit Wachovia's clients. More specifically, Wachovia alleges that it has heard from numerous clients, most of whom had been serviced by McClinton, that Stanton has solicited them to move with her to CSA. In support of these allegations, Wachovia offers copies of two letters purportedly sent to Wachovia clients.

The first letter, dated July 14, 2008, to a specific client of Wachovia, is on CSA letterhead and is signed by Stanton. The body of the letter, in its entirety, runs as follows:

I am pleased to announce that I have joined Century Securities Associates, Inc. as an independent securities professional, effective July 14, 2008. I will continue to provide you with the same services as in the past. Century Securities is a wholly owned broker-dealer subsidiary of Stifel Financial Corp. Stifel, Nicolaus & Company, Incorporated will provide clearing services on your account. An exclusive relationship between Stifel and Century allows us to benefit from the vast resources and experience of Stifel Nicolaus. Century and I will provide you with the personal service and investment counseling you need.

As the clearing firm, Stifel Nicolaus is generally responsible for bookkeeping and safekeeping functions, including receipt and disbursement of all funds and securities. In addition, Stifel Nicolaus regulates and approves margin loans or other extensions of confirmations and statements [sic].

If you have any questions or concerns, you may call me at [telephone numbers deleted].

Stifel Nicolaus, Century Securities, and I thank you for the continued opportunity to be of service and look forward to a long and rewarding relationship.

Complaint, Alan Bowles Declaration, Exhibit B. The record presented so far does not indicate whether this particular recipient or any recipient of a similar letter was one of Stanton's "book" of clients, a client of McClinton's that she had helped service, or a client of McClinton or another Wachovia financial consultant that Stanton had never served.

A second letter offered by Wachovia, dated July 18, 2008, is also on CSA letterhead, but is without a specific addressee. The letter is signed by Stanton and Deb McAtee. McAtee had also been employed by Wachovia in its Storm Lake office as a sales assistant and receptionist. Wachovia alleges that, on July 14, 2008, McAtee purportedly started a two-week "vacation," but then sent Wachovia a resignation letter dated July 27, 2008, which Wachovia received on July 28, 2008. Thus, under Wachovia's version of events, McAtee signed the July 18, 2008, letter on CSA letterhead before she resigned from her employment with Wachovia. Wachovia alleges that Stanton improperly solicited McAtee to join her at CSA's new office in Storm Lake. Stanton contends, however, that she and McAtee were long-time friends, that McAtee had been as unhappy as Stanton was with changes in the office after Edwards merged with Wachovia, and that McAtee told her that if she left, McAtee wanted to join her. Indeed, Stanton contends that McAtee resigned after she learned that the locks of the Storm Lake office had been changed and that she had not been issued a new key. Stanton contends that McAtee then asked her for a **\*1027** job, and that Stanton hired McAtee only after McAtee had resigned from her job at Edwards.

The July 18, 2008, letter from Stanton and McAtee runs as follows:

Greetings,

By now, you have learned of Tom McClinton's retirement. What you may not know is that I too left Wachovia. I have gone to work for another brokerage firm, Century Securities, a division of Stifel Nicolaus, a St. Louis based company. Deb McAtee, who worked with us at Wachovia for the last 4 years will also be joining me. At Century, we are able to offer all the products and services you are accustomed to.

We are located in a new location just south of the Post Office, at 423 Cayuga St., Storm Lake, Iowa. We are able to work with you and provide the same great service you are used to.

We still have some contractors working here and invite you to stop by to check their progress and have a cup of coffee with us, or give us a call. We are happy to discuss any questions and concerns you may have. We look forward to working with you again.

Complaint, Alan Bowles Declaration, Exhibit C. Again, the record presented so far does not indicate how many of Wachovia's clients have received this letter or if the recipients were only in Stanton's own "book," clients that Stanton had jointly serviced with McClinton, or clients of Wachovia that Stanton had never serviced for herself, McClinton, or another financial consultant.

Wachovia alleges that Stanton used Wachovia's confidential and proprietary customer lists and other trade secret information to conduct what Wachovia describes as a "mass mailing" of these letters to clients, almost all of whom were McClinton's clients prior to his retirement. Indeed, Wachovia alleges that, considering the number of clients involved, it is unlikely that Stanton could send all of Wachovia's clients previously serviced by McClinton a letter without improperly taking Wachovia's confidential information. Wachovia also alleges that Stanton has been calling Wachovia's clients previously serviced by McClinton to solicit their business and to convince them to move their accounts from Wachovia to Stanton at CSA.

Stanton represents, however, that she did not take any trade secrets or, indeed, any information from Wachovia. More specifically, in her Declaration, Stanton represents as follows:

16. Wachovia's allegation that I have misappropriated its confidential information and trade secrets is entirely false. While I disagree with the assertion that publicly available customer contact information, such as name, address and phone number could possibly be a trade secret, the fact is that I did not remove from Wachovia *any* customer information and have not used or disclosed any such information.

17. Further, since I do not have any customer information from Wachovia in my possession, there is no possible threat that I will use or disclose any such information in the future.

* * *

23. As is standard procedure in the industry, after leaving Wachovia, I contacted as many of my customers as I could remember to advise them of my new place of employment.

24. I also sent a letter to Mr. McClinton's customers to advise them of my new place of employment. Other than that letter to Mr. McClinton's customers, I have not initiated any further contact with them. I have responded to those customers, when they have reached out to me.

**\*1028** 25. I used only publicly available information that I looked up to contact customers.

Opposition, Stanton Declaration, ¶¶ 16–17, 23–25 (emphasis in the original). Stanton also asserts that her clients have a right to know where she can be reached and to make informed decisions about where to place their accounts.

In his Declaration, McClinton avers that, in connection with his retirement, he advised his clients that they could pursue one of three courses: (1) leave their money with Wachovia to be managed by the new financial consultant assigned to them (Alan Bowles); (2) invest their money with Stanton at her own, independent CSA office in town; or (3) move their money to any other brokerage firm in town. McClinton avers that many of his clients have told him that they were happy to receive a contact letter from Stanton.

Stanton also asserts that, notwithstanding the 1996 Agreement, Edwards had a longstanding policy and

practice, indeed, a firm culture, of recognizing that the client relationship is owned by the financial advisor, not the firm, allowing departing financial consultants to take their clients' information and records with them, and allowing former financial consultants to solicit their clients to join them at their new employer, so long as they wait until after departing to make such a solicitation. She contends that this policy and culture were confirmed by statements of Edwards's chief executive officers, both before and after the merger with Wachovia was announced. *See* Opposition, Exhibits A and C. She also contends that when she and Alan Bowles joined Edwards's then-new office in Storm Lake, they had both left Piper Jaffray, then both brought to Edwards records concerning their clients at Piper Jaffray, and they immediately sent those clients mailings advising them of their new place of employment and asking them to transfer their accounts to Edwards.

McClinton also avers in his Declaration that it had always been the policy at Edwards and Wachovia that the client relationship belongs to the financial consultant, not the firm. He adds that, in his twenty-five years of experience in the securities industry, it is standard procedure for registered representatives who have changed firms to send out solicitation letters to clients they serviced at their former firm. Moreover, McClinton avers that, in his eighteen years with Edwards and Wachovia, he has seen several registered representatives change firms and then openly solicit their customers to join their new firms. Indeed, McClinton avers that he had never seen Edwards or Wachovia take legal action against any registered representative for such conduct prior to this action against Stanton. McClinton avers, further, that over 90% of his clients at the time that he retired had actually moved with him when he left Edward Jones in 1990 and joined Edwards.

Stanton also points out that both Edwards and Wachovia (but not CSA or Stifel) are signatories to the Protocol For Broker Recruiting, which is attached to her Opposition as Exhibit B. The Protocol provides, in pertinent part, as follows:

> The principal goal of the following protocol is to further the clients' interests of privacy and freedom of choice in connection with the movement of their Registered Representatives ("RRs") between firms. If departing RRs and their new firm follow this protocol, neither the departing RR nor the firm that he or she joins would

have any monetary or other liability to the firm that the RR left by reason of the RR taking the information identified below or the solicitation of the clients serviced by the RR at his or her prior firm, *provided,* however, **\*1029** that this protocol does not bar or otherwise affect the ability of the prior firm to bring an action against the new firm for "raiding." The signatories to this protocol agree to implement and adhere to it in good faith.

> When RRs move from one firm to another and both firms are signatories to this protocol, they may take only the following account information: client name, address, phone number, email address, and account title of the clients that they serviced while at the firm ("the Client Information") and are prohibited from taking any other documents or information. Resignations will be in writing delivered to local branch management and shall include a copy of the Client Information that the RR is taking with him or her. The RR list delivered to the branch also shall include the account numbers for the clients serviced by the RR. The local branch management will send the information to the firm's back office. In the event that the firm does not agree with the RR's list of clients, the RR will nonetheless be deemed in compliance with this protocol so long as the RR exercised good faith in assembling the list and substantially complied with the requirement that only Client Information related to clients he or she serviced while at the firm be taken with him or her.

> * * *

> RRs that comply with this protocol would be free to solicit customers that they serviced while at their former firms, but only after they have joined their new firms. A firm would continue to be free to enforce whatever contractual, statutory or common law restrictions exist on the solicitation of customers to move their accounts by a departing RR before he or she has left the firm.

Opposition, Exhibit B (underlining in the original). Stanton contends that, although she did not know of this Protocol at the time that she resigned from Wachovia, she did not choose her new employer on the basis of whether or not her new employer was a party to the Protocol, and she did not provide Wachovia with a list of the information that she was taking with her, her supposed "solicitation" conduct was actually more conservative than the conduct that the Protocol would have permitted,

because she did not take any client information from Wachovia.

Wachovia alleges that, unless Stanton's conduct in soliciting clients and employees of Wachovia is immediately restrained, Wachovia's other financial consultants and financial associates will be encouraged to engage in similar conduct, which would be highly disruptive to Wachovia's ability to conduct business in a stable manner or to maintain its goodwill with its customers and employees. Wachovia also alleges that, unless Stanton's conduct in soliciting clients and employees of Wachovia is immediately restrained, other competitors of Wachovia will also be encouraged to engage in the same kind of behavior, which will cause Wachovia severe and permanent damage. Wachovia also alleges that, by soliciting Wachovia's clients, Stanton has caused and will continue to cause irreparable injury to Wachovia that cannot be cured by monetary damages, including the following: (1) loss of personnel and harm to the Storm Lake office; (2) injury to Wachovia's reputation and goodwill in Iowa; (3) present economic loss, which cannot be ascertained at this time, and future economic loss, which could potentially be incalculable; (4) disclosure of trade secrets, customer and employee lists, and other proprietary and confidential business and customer information; and (5) loss of the confidence and trust of Wachovia's clients and employees and loss of business reputation.

### *1030  B. Procedural Background

On July 30, 2008, Wachovia filed its Complaint (docket no. 2) in this matter seeking a temporary restraining order and a preliminary injunction against Stanton, pending disposition of arbitration proceedings between the parties before the Financial Industry Regulatory Authority (FINRA) concerning various kinds of alleged misconduct by Stanton. [3] More specifically, Wachovia alleges that Stanton's misconduct constitutes (1) breach of her employment contract; (2) misappropriation of trade secrets in violation of the Iowa Uniform Trade Secrets Act, IOWA CODE CH. 550; (3) breach of fiduciary duty; (4) breach of duty of loyalty; (5) intentional interference with actual and prospective economic advantage; (6) negligent interference with actual and prospective economic advantage; (7) conversion; and (8) unfair competition.

Wachovia requests judgment as follows:

(A) entry of a temporary and preliminary injunction lasting until such time as FINRA Dispute Resolution renders an award in the underlying dispute, enjoining and restraining Stanton, directly or indirectly, and whether alone or in concert with others, including any director, officer, agent, employee, and/or representative of her new employer, from the following:

(1) soliciting or otherwise initiating any further contact or communication with any client of Wachovia whom Stanton served or whose name became known to her while in the employ of Wachovia, including but not limited to communicating with such clients for the purpose of advising them of Stanton's new affiliation with her new employer or for the purpose of inviting, encouraging, or requesting the transfer of any accounts from Wachovia;

(2)(a) soliciting the employment of any Wachovia employee or broker, (b) hiring any Wachovia employee or broker, (c) inducing any Wachovia employee or broker to leave the employ of Wachovia, and (d) taking any action to assist her new employer or any other entity employing Stanton from soliciting, inducing, or hiring any employee or broker to leave Wachovia; and

(3) using, disclosing, or transmitting for any purpose any confidential or proprietary information belonging to or concerning Wachovia, its customers or employees, including but not limited to the (a) names, addresses, social security numbers, phone numbers, financial information, investment objectives, and account information of Wachovia's clients, (b) the names, salaries, production, and other business information regarding Wachovia's brokers and employees, and (c) other confidential information, trade secrets, and commercially sensitive materials of Wachovia;

(B) ordering Stanton, and all those acting in concert with her, including but not limited to the directors, officers, employees, and agents of CSA and Stifel, to return to Wachovia all records, documents, and/or information in whatever form (whether original, copied, computerized, or handwritten), pertaining to Wachovia's customers, employees, and business, and purge all documents and information derived therefrom from the possession, custody, and control of Stanton; and

(C) granting such other and further relief as the Court deems just and proper.

On July 31, 2008, the day after filing its Complaint, Wachovia filed its Motion For A Temporary Restraining Order And Preliminary Injunction And For An Order **\*1031** Permitting Expedited Discovery (docket no. 3). By order (docket no. 5) dated July 31, 2008, the court found that an expedited hearing should be set on Wachovia's request for a temporary restraining order and expedited discovery to aid in the disposition of the motion for a preliminary injunction. Therefore, the court set a hearing on Wachovia's request for temporary restraining order and expedited discovery for August 4, 2008. The court also directed counsel for Wachovia to serve a copy of the order setting the hearing upon Stanton, to provide a copy to any known counsel for Stanton, and to file proof of such service prior to the hearing.

Although Wachovia did not file proof of service of the hearing order before the hearing, it is nevertheless clear that Stanton and her counsel received timely notice of the hearing, because her counsel contacted the court on August 1, 2008, to make certain arrangements for the hearing, she filed an extensive resistance to Wachovia's motion, and her counsel (both local and out-of-state) appeared for the hearing on August 4, 2008. Indeed, on August 3, 2008, Stanton filed her Brief In Opposition To Plaintiff's Motion For A Temporary Restraining Order And For A Preliminary Injunction (docket no. 10), which was accompanied by various declarations and exhibits.

At the hearing on August 4, 2008, plaintiff Wachovia was represented by Jordan D. Becker of Paduano & Weintraub, L.L.P., in New York, New York, who argued the motion, and by local counsel Daniel B. Shuck of the Heidman Law Firm in Sioux City, Iowa. Defendant Stanton was represented by Andrew J. Shapren of Buchanan, Ingersoll & Rooney, P.C., in Philadelphia, Pennsylvania, who appeared by telephone and argued the motion on Stanton's behalf, and by local counsel Rodney D. Vellinga of Corbett, Anderson, Corbett & Vellinga in Sioux City, Iowa. Neither party called any witnesses or offered any evidence in addition to the declarations and exhibits filed in their moving and resisting papers. Despite the short time between the filing of the motion and the hearing, counsel for both parties were extremely well

prepared and the arguments were particularly thorough, informative, and well presented.

Wachovia's requests for a temporary restraining order and expedited discovery are now fully submitted. [4]

## II. LEGAL ANALYSIS

### A. Standards For A Temporary Restraining Order

As this court has explained in past cases, it is well-settled in this circuit that applications for preliminary injunctions and temporary restraining orders are generally measured against the same factors, which were set forth in the seminal decision in *Dataphase Systems, Inc. v. C L Systems, Inc.,* 640 F.2d 109, 113 (8th Cir.1981) *(en banc). See Interbake Foods, L.L.C. v. Tomasiello,* 461 F.Supp.2d 943, 954–55 (N.D.Iowa 2006); *McLeodusa Telecommc'ns Servs., Inc. v. Qwest Corp.,* 361 F.Supp.2d 912, 918 (N.D.Iowa 2005); *Doctor John's, Inc. v. City of Sioux City, Iowa,* 305 F.Supp.2d 1022, 1033–34 (N.D.Iowa 2004); *Branstad v. Glickman,* 118 F.Supp.2d 925, 937 (N.D.Iowa 2000); *Uncle B's Bakery, Inc. v. O'Rourke,* 920 F.Supp. 1405, 1411 (N.D.Iowa 1996); *accord Straights and Gays for Equality v. Osseo Area Schools-Dist.,* 471 F.3d 908, 911 (8th Cir.2006) (same factors); *Lankford v. Sherman,* 451 F.3d 496, 503 (8th Cir.2006) (same factors). Nevertheless, the court must consider, at least briefly, whether any injunctive relief it may grant at this time in this case is a temporary **\*1032** restraining order or a preliminary injunction.

In both *McLeodUSA* and *Branstad,* this court discussed in some detail the differences between a temporary restraining order and a preliminary injunction. *See McLeodUSA,* 361 F.Supp.2d at 918 n. 1; *Branstad,* 118 F.Supp.2d at 935–937. Suffice it to say that, in those cases, the court found that the following factors should be considered to distinguish a TRO from a preliminary injunction: (1) whether the hearing was *ex parte* or adversarial; (2) whether the adversarial hearing allowed the basis for the relief requested to be strongly challenged; (3) whether the order expired, by its own terms, within the ten days provided by Rule 65(b); and (4) the "substance" of the order. *Id.; Branstad,* 118 F.Supp.2d at 935–37. In this case, the court held an "adversarial" rather than an *ex parte* hearing with the parties, because the court is

reluctant to grant even a temporary restraining order *ex parte.* Nevertheless, the court did not hold the sort of "adversarial hearing," including presentation of evidence beyond the affidavits and exhibits filed with Wachovia's Complaint and Motion and Stanton's Opposition, that would have allowed the basis for the requested order to be "strongly challenged," such that it would be " 'particularly unjustified' " to classify the resulting order as a temporary restraining order. *See id.* (quoting *Branstad,* 118 F.Supp.2d at 936, in turn quoting *Sampson v. Murray,* 415 U.S. 61, 87, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974)). Moreover, the court has every intention that, if injunctive relief is granted at this time, such relief will expire in ten days, unless within that time, good cause is shown for extending it for a like period, and that a more complete evidentiary hearing on Wachovia's motion for a preliminary injunction will follow in due course, whatever the court's disposition of the motion for a temporary restraining order. *Id.* (citing Fed.R.Civ.P. 65(b)). Finally, the "substance" of this order is intended to be a ruling on a request for a temporary restraining order, rather than a ruling on a motion for a preliminary injunction, not least because of the expedited nature of the proceedings and ruling and the limited nature of any relief that will be granted. *Id.* (citing *Baker Elec. Coop. v. Chaske,* 28 F.3d 1466, 1472 (8th Cir.1994)). Therefore, if this order grants injunctive relief, that relief will be a temporary restraining order, not a preliminary injunction. *Id.*

**[2]** **[3]** **[4]** **[5]** **[6]** The so-called "*Dataphase* factors" that courts must weigh to decide whether or not to grant a temporary restraining order or preliminary injunction are the following: (1) the movant's probability or likelihood of success on the merits, (2) the threat of irreparable harm or injury to the movant absent the injunction, (3) the balance between the harm to the movant and the harm that the injunction's issuance would inflict on other interested parties, and (4) the public interest. *Dataphase,* 640 F.2d at 114; *accord Interbake Foods, L.L. C.,* 461 F.Supp.2d at 955; *Doctor John's, Inc.,* 305 F.Supp.2d at 1033; *Branstad I,* 118 F.Supp.2d at 937 (quoting similar factors from *Entergy, Ark., Inc. v. Nebraska,* 210 F.3d 887, 898 (8th Cir.2000)); FED.R.CIV.P. 65(b)(1). The burden is on the movant to establish that injunctive relief is appropriate. *Lankford,* 451 F.3d at 503; *Baker Elec. Co-op., Inc. v. Chaske,* 28 F.3d 1466, 1472 (8th Cir.1994); *Modern Computer Sys., Inc., v. Modern Banking Sys., Inc.,* 871 F.2d 734, 737 (8th Cir.1989) *(en banc).* " ' 'No single *[Dataphase]* factor in itself is dispositive; in each case all

of the factors must be considered to determine whether on balance they weigh towards granting the injunction.' " *Baker Elec. Co-op.,* 28 F.3d at 1472 (quoting **\*1033** *Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc.,* 815 F.2d 500, 503 (8th Cir.1987) (citing *Dataphase)); accord Lankford,* 451 F.3d at 503 ("No single factor is dispositive, as the district court must balance all factors to determine whether the injunction should issue.") (citing *Baker Elec. Co-op.); Bandag, Inc. v. Jack's Tire & Oil, Inc.,* 190 F.3d 924, 926 (8th Cir.1999) ("These factors are not a rigid formula."). " 'A district court has broad discretion when ruling on requests for preliminary injunctions, and [the appellate court] will reverse only for clearly erroneous factual determinations, an error of law, or an abuse of that discretion.' " *Entergy, Ark., Inc.,* 210 F.3d at 898 (quoting *United Indus. Corp,* 140 F.3d at 1179); *accord Lankford,* 451 F.3d at 503. This court assumes that it has the same discretion in deciding whether or not to grant a temporary restraining order. The court abuses its discretion "where the district court rests its conclusion on clearly erroneous factual findings or erroneous legal conclusions." *Lankford,* 451 F.3d at 503–04.

### *B. Application Of The Standards*

As a matter of completeness, the court will consider, at least briefly, each of the four "*Dataphase* factors." *See Lankford,* 451 F.3d at 503 ("No single factor is dispositive, as the district court must balance all factors to determine whether the injunction should issue.") (citing *Baker Elec. Co-op.,* 28 F.3d at 1472). Indeed, Stanton challenges Wachovia's showing on each and every factor.

#### *1. Likelihood of success*

**[7]** **[8]** **[9]** The first "*Dataphase* factor" that courts must consider when ruling on an application for a temporary restraining order or preliminary injunction is the likelihood or probability of success on the merits. *Dataphase,* 640 F.2d at 114. Likelihood of success on the merits requires that the movant find support for its position in governing law. *See, e.g., Baker Elec. Co-op.,* 28 F.3d at 1473–74 (Indian tribe's sovereignty to regulate electrical services); *ILQ Inv., Inc. v. City of Rochester,* 25 F.3d 1413, 1416 (8th Cir.1994) (first amendment and prior restraint of expression); *City of Timber Lake v. Cheyenne River Sioux Tribe,* 10 F.3d 554, 556–58 (8th Cir.1993) (Indian tribe's regulatory authority and authority of states

to regulate activities on tribal lands); *Aziz v. Moore,* 8 F.3d 13, 15 (8th Cir.1993) (denial of injunctive relief was proper because federal courts "must abstain from imposing injunctions on prison officials [in an action under 42 U.S.C. § 1983 action] 'in the absence of a concrete showing of a valid claim and constitutionally mandated directives for relief,' " quoting *Rogers v. Scurr,* 676 F.2d 1211, 1214 (8th Cir.1982)). As the Eighth Circuit Court of Appeals has explained,

> [A]t the early stage of a preliminary injunction motion, the speculative nature of this particular ['likelihood of success'] inquiry militates against any wooden or mathematical application of the test. Instead, a court should flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined.

*United Indus. Corp. v. Clorox Co.,* 140 F.3d 1175, 1179 (8th Cir.1998) (internal citations and quotation marks omitted). Thus, the court is not deciding whether the movant for a preliminary injunction or a temporary restraining order will ultimately win. *Heather K. v. City of Mallard,* 887 F.Supp. 1249, 1258 (citing *Glenwood Bridge, Inc. v. City of Minneapolis,* 940 F.2d 367, 371 (8th Cir.1991)).

**[10]   [11]**   In this case, therefore, the court must determine whether there is support for Wachovia's position that Stanton has engaged in misconduct by soliciting **\*1034** Wachovia's clients and employees to join her at CSA. *See, e.g., Baker Elec. Co-op.,* 28 F.3d at 1473–74 (likelihood of success on the merits requires that the movant find support for its position in governing law). In its motion for a temporary restraining order, Wachovia argues that it is likely to succeed on its claims that the restrictive covenants in Stanton's employment contract are valid and enforceable and that Stanton has breached them by soliciting Wachovia's clients and employees. Wachovia also argues that it is likely to succeed on its claim that Stanton has misappropriated trade secrets. The "governing law" as to Wachovia's breach-of-contract claim is, according to the 1996 Agreement, Missouri law. *See* Complaint, Declaration of Joseph Wood, Exhibit B,

1996 Agreement, ¶ 30. Wachovia asserts, and Stanton does not dispute, that the result will be the same, whether the court applies Missouri law or finds that Iowa law is applicable, notwithstanding the choice-of-law provision in the 1996 Agreement, pursuant to Iowa's choice-of-law and conflict-of-laws rules. The court will apply both Missouri and Iowa law to the breach-of-contract claim, and determine which law applies only if the application of one state's law would yield a different result from application of the other state's law. [5] Only Iowa law is applicable to Wachovia's trade secrets argument, however, specifically, the Iowa Uniform Trade Secrets Act, IOWA CODE CH. 550.

### a. Breach of restrictive covenants

***i. Arguments of the parties.*** Wachovia argues that Stanton used confidential information held by Wachovia to solicit Wachovia's clients to cease doing business with Wachovia and, instead, to do business with CSA and also solicited Wachovia employees to leave Wachovia and join a direct competitor in violation of restrictive covenants in the 1996 Agreement. Wachovia also argues that such restrictive covenants **\*1035** are enforceable under Iowa (or Missouri) law. More specifically, Wachovia argues that the covenants are reasonably necessary, because an employer has a legitimate interest in protecting its existing clients or client base and Wachovia has devoted considerable effort and expense to building, and maintaining the confidentiality of, its client lists and client data. Wachovia also argues that the covenants are not unreasonably restrictive on Stanton, because they do not prevent her from earning a living in the financial services industry, even in the same small town and with a rival company, they just prevent her from soliciting Wachovia's clients and employees in order to do so. Wachovia also argues that enforcement of the restrictive covenants will not prejudice the public interest, because there is no public interest in permitting piracy of Wachovia's hard-earned customer information, especially where Stanton would not be in a position to contact the customers in question but for her unauthorized access to Wachovia's proprietary customer information. By the same token, Wachovia argues that the public interest is served by preserving the confidentiality of and thwarting the misuse of its client information.

Stanton argues, first, that the 1996 Agreement is inapplicable to her in her ultimate position as a financial

consultant. She also argues that the restrictive covenants in the 1996 Agreement are unenforceable, because they are not reasonably necessary to protect Wachovia where, pursuant to the Protocol For Broker Recruiting, and the policies and practices of Wachovia (and Edwards), Wachovia (and Edwards) acknowledged that the client relationship belongs to the financial consultant, not the firm, that departing financial consultants can take some client information with them, and that, after departing, financial consultants can solicit their clients to join them at their new firms. Next, Stanton contends that the restrictions on her rights are excessive, because the covenants include no time limit at all and would deprive her of the right to contact clients that she developed largely independent of Wachovia's assistance. She also argues that the covenants are not in the public interest, because they restrict customers' rights to choose their financial consultant. Even if the covenants in question are enforceable, Stanton argues that she has not breached them by improperly soliciting any Wachovia customer or employee to leave, because she has not used any protected information to contact her clients, and it is generally permissible for employees of a firm to agree among themselves, while still employed, to engage in future competition with their employer after termination, as long as they do not use the employer's confidential information, and Stanton contends that McAtee made her own decision to leave Wachovia and then sought employment with Stanton.

**[12]** **[13]** ***ii. Analysis.*** To establish a claim of breach of contract under Iowa law, Wachovia must establish the following elements: (1) the existence of a contract between the parties; (2) the terms and conditions of the contract; (3) Wachovia performed all the terms and conditions required under the contract; (4) Stanton breached the contract in some particular way; and (5) Wachovia suffered damages as a result of the breach. *Kaydon Acquisition Corp. v. Custum Mfg., Inc.,* 317 F.Supp.2d 896, 912 (N.D.Iowa 2004) (citing *Molo Oil Co. v. River City Ford Truck Sales, Inc.,* 578 N.W.2d 222, 224 (Iowa 1998)). "A party breaches a contract when, without legal excuse, it fails to perform any promise which forms a whole or a part of the contract." *Id.* (citing *Molo Oil,* 578 N.W.2d at 224, in turn citing **\*1036** *Magnusson Agency v. Public Entity Nat'l Co.-Midwest,* 560 N.W.2d 20, 27 (Iowa 1997)). Missouri law is not to the contrary. *See, e.g., Viacom Outdoor, Inc. v. Taouil,* 254 S.W.3d 234, 238 (Mo.Ct.App.E.D.2008) (" 'To establish a submissible case of breach of contract, a

plaintiff must first establish the existence of an agreement.' ") (quoting *Gateway Exteriors, Inc. v. Suntide Homes, Inc.,* 882 S.W.2d 275, 279 (Mo.Ct.App.E.D.1994)); *Midwest Bankcentre v. Old Republic Title Co. of St. Louis,* 247 S.W.3d 116, 128 (Mo.Ct.App.E.D.2008) ("The elements that must be proven in order for a party to recover for breach of contract are: (1) the existence of an enforceable contract between the parties; (2) mutual obligations arising under the terms of the contract; (3) one party's failure to perform the obligations imposed by the contract; and (4) the resulting damage to the other party.") (citing *McClain v. Papka,* 108 S.W.3d 48, 53 (Mo.Ct.App.E.D.2003).

**[14]** The court finds that Wachovia likely can establish the existence of Stanton's 1996 employment contract and that the contract prohibits her from using customer information, soliciting customers of Wachovia, and soliciting employees of Wachovia, at least sufficiently for present purposes. *See* Complaint, Declaration of Joseph Wood, Exhibit B, § 2 (quoted above, beginning on page 7); *see also Kaydon Acquisition Corp.,* 317 F.Supp.2d at 912 (first two elements of a breach-of-contract claim under Iowa law are existence of the contract and its terms); *see also Viacom Outdoor, Inc.,* 254 S.W.3d at 238 (first element under Missouri law is existence of a contract); *Midwest Bankcentre,* 247 S.W.3d at 128 (first two elements under Missouri law are existence of a contract and mutual obligations arising under the terms of the contract). [6] Stanton nevertheless contends that the 1996 Agreement is no longer applicable to her, because she was a "financial consultant," not just a "sales assistant." The court is inclined to agree with Stanton that she was a *de facto* financial consultant, not merely an assistant who provided administrative support, as Wachovia would have it, where she had her own substantial "book" of customers (some 200) that she had developed and for whom she received commissions under her own production number, as well as additional customers that she serviced with Tom McClinton and for whom she split commissions with Tom McClinton under a joint production number. Even so, the court finds that Stanton only asserts that she considered herself to be and that her clients considered her to be a financial consultant, not that her position or job title actually changed. No party has identified any provision of the 1996 Agreement that would have caused that Agreement to terminate because of a change in Stanton's duties, nor has any party produced a subsequent agreement superseding or terminating the

1996 Agreement or identifying Stanton's position as a "financial consultant" rather than a "registered sales assistant." Thus, the court concludes, at least for purposes of a temporary restraining order, that the terms of the 1996 Agreement apply to Stanton. On the present record, it also appears that Wachovia performed all of the terms and conditions required under the contract by providing Stanton with employment, pay, and benefits. *See id.* (the contract states that the **\*1037** covenants are "in consideration of such acceptance and employment"); *Kaydon Acquisition Corp.,* 317 F.Supp.2d at 912 (third element of a breach-of-contract claim under Iowa law).

Even so, Wachovia has not established, even to the extent necessary to warrant a temporary restraining order, that Stanton has breached the covenants as to disclosure of client information or solicitation of employees, although Wachovia may have made a sufficient showing that Stanton breached the contract by soliciting customers. *Kaydon Acquisition Corp.,* 317 F.Supp.2d at 912 (fourth element of a breach-of-contract claim under Iowa law is breach by the defendant); *Midwest Bankcentre,* 247 S.W.3d at 128 (third element under Missouri law is breach by the defendant). The "non-disclosure" provisions of the 1996 Agreement define information that cannot be disclosed as including the names, addresses, telephone numbers, and assets and obligations carried in the accounts of its customers, and states that use of such records and documents, whether generated and prepared by Stanton or furnished to Stanton by Edwards, as permitted by Edwards, shall cease immediately upon events including resignation and acceptance of other employment. Complaint, Declaration of Joseph Wood, Exhibit B, § 2. It also prohibits removal by Stanton of such records or documents from the premises of Edwards in either original, duplicate, or copied form, except in the ordinary course of conducting business for, and subject to the approval by, Edwards and also requires immediate delivery to Edwards, prior to the termination of employment, any such records and documents in the employee's possession or control. *Id.* Finally, the 1996 Agreement provides that Stanton shall not disclose to any person, firm, association, partnership, corporation or other entity, the contents, in whole or in part, of such records and documents, except in the ordinary course of conducting business for Edwards. *Id.* The problem is that Wachovia has offered only speculation, based on information and belief, not evidence, that Stanton has taken or disclosed any such information or that she has

any such information to return, while Stanton offers a sworn affidavit that she did not take or disclose any such information. It may be that a forensic analysis of computer records could or would show that Stanton did take such information, but there is no such evidence in the record yet, owing, perhaps, to the expedited nature of proceedings on motions for temporary restraining order in federal court. Further discovery might also establish that every client of Stanton and McClinton of any significance was contacted at or near the same time belying Stanton's claim that only some clients, drawn from memory, were contacted.

Similarly, the 1996 Agreement provides that Stanton shall not recruit, entice, induce or solicit, directly or indirectly, any employee of Edwards or any of its affiliates for employment with any other organization which does business in securities, commodities and financial futures, insurance or any other lines of business in which Edwards or any of its affiliates is engaged. *Id.* Again, Wachovia offers only speculation from the circumstances that Stanton induced McAtee to join her at CSA, but Stanton offers her sworn statement that she did not suggest that McAtee quit her job at Wachovia or offer her a job at CSA until McAtee had already resigned from Wachovia. The court declines to hold that "indirect" solicitation has occurred simply because, while the defendant and the allegedly solicited employee were co-employees, both expressed their desire to leave their employment and to continue to work together. *Cf. Crawford & Co. v. M. Hayes & Assocs., L.L.C.,* 13 Fed.Appx. 174, 176 (4th Cir.2001) (under Maryland law, no breach of fiduciary duty **\*1038** occurred where an employee did no more than unite a group of employees contemplating future competition with their employer).[7]

On the other hand, Wachovia has shown sufficiently, at least for purposes of obtaining a temporary restraining order, that Stanton improperly solicited Wachovia's customers. The 1996 Agreement prohibits Stanton from directly or indirectly soliciting or aiding in the solicitation on behalf of any other organization, any customers having accounts with Edwards with whom she had any dealings whatsoever during the term of her employment with Edwards when such other organization does business in securities, commodities and financial futures, insurance or other lines of business in which Edwards or any of its affiliates is engaged. Complaint, Declaration of Joseph Wood, Exhibit B, § 2. The July 18, 2008, letter

sent by Stanton and McAtee at least arguably asked some Wachovia customers to consider working with CSA, instead of Wachovia. *See* Complaint, Alan Bowles Declaration, Exhibit C (July 18, 2008, letter). The court finds that, although the July 18, 2008, letter attempts to stay in the "gray area" between notice that Stanton had moved to a new employer and outright solicitation of customers to join her, the letter actually crosses the line into solicitation. This is so, for example, because the letter states, "At Century, we are able to offer all the products and services you are accustomed to," that "We are able to work with you and provide the same great service you are used to," and "We look forward to working with you again." Complaint, Alan Bowles Declaration, Exhibit C. These statements strongly suggest an invitation to do business with CSA instead of Wachovia.

The July 14, 2008, letter from Stanton to specific customers is, perhaps, even further over the line, because it is not simply notification that Stanton has taken other employment, or advice that a customer now has a choice of brokers, but takes for granted that the addressee will continue to avail himself or herself of Stanton's services. This inference arises from statements that "I will provide you with the personal service and investment counseling you need," not that Stanton "can" or "would like to" provide those services, the closing, which thanks the customer "for the continued opportunity to be of service," and Stanton's statement that she "look[s] forward to a long and rewarding relationship." Complaint, Alan Bowles Declaration, Exhibit B. A customer receiving such a letter seems to be presented with a *fait accompli* that the customer's account will move or has moved with Stanton, not with a choice of whether or not to move the customer's account with Stanton to CSA.

Wachovia has also provided sufficient evidence, for purposes of a temporary restraining order, to show that Stanton's breach of the restrictive covenants by improperly soliciting customers has damaged or threatens to damage Wachovia in terms of loss of clients, business, and reputation. *Kaydon Acquisition Corp.,* 317 F.Supp.2d at 912 (last element of a breach-of-contract **\*1039** claim is damages to the claimant from the breach). This court has observed that, in similar circumstances, "it can be reasonably expected that some of the patrons or customers [the defendant] served while in [the plaintiff's] employment will follow h[er] to the new employment.' " *Pro Edge, L.P.,* 374 F.Supp.2d at 740 (quoting *Dental East, P.C. v.*

*Westercamp,* 423 N.W.2d 553, 555 (Iowa Ct.App.1988), with citation and quotation marks omitted).

**[15]** Of course, the contract term allegedly breached must be enforceable, and it is on this requirement that Wachovia's breach-of-contract claim founders. Under Iowa law, a court determines if an employment contract containing a restrictive covenant, such as the non-disclosure and non-solicitation provision at issue here, is enforceable by posing three inquiries: (1) Is the restriction reasonably necessary for the protection of the employer's business; (2) is it unreasonably restrictive of the employee's rights; and (3) is it prejudicial to the public interest? *Pro Edge, L.P. v. Gue,* 374 F.Supp.2d 711, 739 (N.D.Iowa 2005) (citing *Revere Transducers, Inc. v. Deere & Co.,* 595 N.W.2d 751, 761 (Iowa 1999), in turn citing *Lamp v. American Prosthetics, Inc.,* 379 N.W.2d 909, 910 (Iowa 1986), and *American Express Financial Advisors, Inc. v. Yantis,* 358 F.Supp.2d 818, 829 (N.D.Iowa 2005); *Lemmon v. Hendrickson,* 559 N.W.2d 278, 282 (Iowa 1997); *Iowa Glass Depot, Inc. v. Jindrich,* 338 N.W.2d 376, 381 (Iowa 1983); and *Cogley Clinic v. Martini,* 253 Iowa 541, 112 N.W.2d 678, 681 (Iowa 1962)). Restrictive covenants must also be "tightly limited" as to both time and area. *Id.* at 740. Again, Missouri law is not to the contrary. *See, e.g., Victoria's Secret Stores, Inc. v. May Dep't Stores Co.,* 157 S.W.3d 256, 260 (Mo.Ct.App.E.D.2004) (restrictive covenants in employment contracts require the court to determine reasonableness based on a balance of the needs of the employer and the employee, defined as "(1) the employer's need to protect legitimate business interests, such as trade secrets and customer lists; (2) the employee's need to make a living; and (3) the public's need to secure the employee's presence in the labor pool," and the restrictions must be reasonable as to time and place); *Schmersahl, Treloar & Co., P.C. v. McHugh,* 28 S.W.3d 345, 349 (Mo.Ct.App.E.D.2000) ("A restrictive covenant in an employment agreement is only valid and enforceable if it is necessary to protect one of two well-defined interests, trade secrets and customer contacts, and if it is reasonable as to time and place.").

The court finds that Wachovia has made sufficient showing on the first inquiry, that the restrictions are reasonably necessary for protection of its business, *see Pro Edge, L.P.,* 374 F.Supp.2d at 739; *Victoria's Secret Stores, Inc.,* 157 S.W.3d at 260, at least for purposes of a temporary restraining order. Here, Wachovia has

demonstrated sufficiently that client lists and confidential client information are the "lifeblood" of a financial services business, and where an improper solicitation has occurred, "it can be reasonably expected that some of the patrons or customers [an employee] served while in [the defendant's] employment will follow h[er] to the new employment.' " *Pro Edge, L.P.,* 374 F.Supp.2d at 740 (quoting *Dental East, P.C. v. Westercamp,* 423 N.W.2d 553, 555 (Iowa Ct.App.1988), with citation and quotation marks omitted). Contrary to Stanton's contentions, the court does not find that the Protocol For Broker Recruiting, signed by Edwards and Wachovia, but not by CSA or Stifel, demonstrates that the non-solicitation covenant is not reasonably necessary in every circumstance. The Protocol provides that, *where both the former firm and the new firm are signatories,* a departing registered representative may solicit his or her clients to move to the registered representative's new firm. *See* **\*1040** Opposition, Exhibit B (the Protocol applies "When RRs move from one firm to another and both firms are signatories to this protocol," and "RRs that comply with this protocol would be free to solicit customers that they serviced while at their former firms, but only after they have joined their new firms."). That provision does not mean, however, that there is no need for a non-solicitation covenant when the former firm *is* a signatory, but the new firm is *not* a signatory. Where both parties are signatories, they have essentially agreed to reciprocal "poaching" of registered representatives and the registered representative's clients from the former firm, apparently on the assumption that they will gain as much as they lose in the exchange. On the other hand, where the new firm is not a signatory, the old firm has no reciprocal benefit to look forward to, and a prohibition on solicitation of clients by a departing registered representative is still reasonably necessary to protect the former firm's client base from "poaching" by the new, non-Protocol firm. *Contra Merrill Lynch, Pierce, Fenner & Smith v. Brennan,* 2007 WL 632904, \*2 (N.D.Ohio Feb.23, 2007) (slip op.) (a Protocol firm "tacitly accepts" that registered representatives will leave and then solicit clients to move to their new firm, even if the new firm is a non-Protocol firm); *Smith Barney Div. of Citigroup Global Mkts., Inc. v. Griffin,* 23 Mass. L. Rptr. 457, 2008 WL 325269, \*7 (Mass.Super.2008) (a signatory firm cannot claim irreparable harm when a registered representative leaves for a non-signatory firm, then solicits clients to move to the new firm, where the signatory firm

has accepted such conduct if the registered representative moves to 38 other signatory firms).

 **[16]**   The court also has concerns that the restrictions are unreasonably restrictive on Stanton's rights, *Pro Edge, L.P.,* 374 F.Supp.2d at 739 (second inquiry); *Victoria's Secret Stores, Inc.,* 157 S.W.3d at 260 (same)—even though the restrictions do *not* impose any limitation at all on Stanton's employment with a competitor doing what she was doing for Wachovia, but only prevent her from using Wachovia's confidential client lists and other confidential information to do it—because there is no temporal limitation at all in the restriction on the solicitation of customers. *Compare id.* (finding geographic and temporal restrictions were not unreasonably restrictive on the employee, and the employee could still practice his business of veterinary medicine). It is possible that, on a fuller record, the lack of a time limitation in this case can be shown to be reasonable. Moreover, the court has the authority under Iowa law to modify or reform a restrictive covenant to make its limitations reasonable, *see, e.g., The Phone Connection, Inc. v. Harbst,* 494 N.W.2d 445, 449 (Iowa Ct.App.1992), and this court would do so if the covenant was otherwise enforceable but for the omission of an appropriate time limitation. Nevertheless, the absence of such a time limitation may suggest that the covenant may improperly impose on Stanton's rights.

The third inquiry, prejudice to the public interest, *Pro Edge, L.P.,* 374 F.Supp.2d at 739 (third inquiry); *Victoria's Secret Stores, Inc.,* 157 S.W.3d at 260 (same), presents further difficulties. Although the 1996 Agreement still applies to Stanton, despite her *de facto* position as a "financial consultant," the court finds that, because of her *de facto* position, the covenant *may* unduly interfere with the public's interest in choice of financial consultants and continuation of a client relationship that properly belongs to the client and the financial consultant, not to the firm, as Wachovia and Edwards have acknowledged. Wachovia's counsel acknowledged that part of the reason for imposing a non-solicitation covenant on a "sales assistant," but not on a "financial **\*1041** consultant," might be that the client relationship belongs to the financial consultant, not the firm, but that a sales assistant does not have his or her own clients. Here, at least on the present record, it appears that Stanton did have her own clients. Moreover, although the Protocol, signed by both Edwards and Wachovia,

does not make non-solicitation agreements unnecessary, the Protocol does recognize that its "principal goal" is "to further the clients' interests of privacy and freedom of choice in connection with the movement of their Registered Representatives ("RRs") between firms." Opposition, Exhibit B. Edwards also had a long-standing policy, practice, and firm culture, confirmed by statements of its chief executive officers, both before and after the merger with Wachovia was announced, see Opposition, Exhibits A and C, of recognizing that the client relationship is owned by the financial advisor, not the firm. Courts and FINRA arbitration panels have also recognized that restrictions on a financial consultant's ability to solicit former clients is contrary to the public interest. See, e.g., Smith Barney v. Burrow, 558 F.Supp.2d 1066, 1083–84 (E.D.Cal.2008) ("[T]he public interest is better served with open competition in the securities field and access to advisors of clients' choice. The balance of equities and public interest factors weigh in defendants' favor," warranting denial of a preliminary injunction to enjoin solicitation by defendant financial consultants of clients from a former employer); Wachovia Securities v. Gates, 2008 WL 1803612, *3 (E.D.Va.2008) (holding that customers, who were not parties to the non-solicitation agreement, should be free to maintain their relationship with departing account representatives, because restricting customer choice would not serve the public interest); A.G. Edwards & Sons, Inc. v. Stifel, Nicolaus & Co., Inc., FINRA Case No. 07–02897 (defendant's Opposition, Exhibit G) (Nov. 20, 2007) (denying a request for permanent injunction against account representatives, because customer rights are of "primary importance"); but see Merrill Lynch, Pierce, Fenner & Smith v. Maroca, 1999 WL 1253937 (NASD Feb. 17, 1999) (finding no imposition on rights and granting permanent injunctive relief); Dufour v. Merrill Lynch, Pierce, Fenner & Smith, 1999 WL 1485504 (NASD Sept. 29, 1999) (same); Merrill Lynch, Pierce, Fenner & Smith v. UBS Paine Webber, Inc., 2001 WL 1004178 (NASD June 6, 2001) (same).

The court is not willing at this time to hold that the covenants in the 1996 Agreement violate public policy per se, because the court believes that the question is a close one worthy of more review and reflection than the expedited proceedings on a temporary restraining order permit. Nevertheless, where whether the covenants in the 1996 Agreement are valid or invalid on public interest grounds is a close question, the public interest

concern raised by the covenants is sufficient to call into serious question the enforceability of those covenants. The concern about enforceability of the covenants, in turn, weighs against Wachovia's likelihood of success on the merits of its breach-of-contract claim.

### b. Misappropriation of trade secrets

[17] The court must also consider whether Wachovia has sufficient likelihood of success on its "trade secrets" claim to warrant a temporary restraining order. The court begins its analysis of that question with a summary of the arguments of the parties.

*i. Arguments of the parties.* Wachovia argues that it has sufficient likelihood of success on its claim that Stanton has misappropriated trade secrets to warrant a temporary restraining order. Wachovia argues that the information it is seeking to **\*1042** protect is a "trade secret," because courts have recognized that customer lists are trade secrets, in that they are useful to a competitor and would require time and effort to duplicate, so that the information has independent economic value, and Wachovia has taken reasonable steps to maintain the secrecy of the information. Wachovia also argues that it has made an adequate showing that Stanton has misappropriated its trade secrets, because Stanton used trade secret customer information to solicit Wachovia's customers to switch their accounts to CSA, and she knew that the trade secrets were acquired under circumstances giving rise to a duty to maintain their secrecy or to limit their use.

Stanton argues that she simply did not take any information at all from Wachovia and that the customer information in question is not all "trade secrets," even if she had taken it. More specifically, she argues that she could properly contact, and did contact, customers whose identities she retained in her memory and she then contacted them using only publicly available address and telephone number information. She also contends that Wachovia cannot claim that it took reasonable efforts to maintain the secrecy of some of the client information, if it is trade secret information, where Edwards and Wachovia repeatedly told financial consultants that client relationships belonged to the financial consultants, not the firm; that Edwards has always allowed departing financial consultants to take customer information and to use that information to solicit customers to follow them; and that both Edwards and Wachovia have signed the Protocol

For Broker Recruiting permitting departing financial consultants to take certain information with them. Stanton argues that various courts have recognized that information covered by the Protocol does not constitute a trade secret. Even in the absence of the Protocol, however, Stanton argues that courts have recognized that it is securities industry practice for financial consultants to take certain client information with them when they change employers.

***ii. Analysis.*** Wachovia's trade secrets claim is based on the Iowa Uniform Trade Secrets Act, Iowa Code Ch. 550. This court recently examined the Iowa Uniform Trade Secrets Act in some detail in a preliminary injunction case, *Interbake Foods, L.L.C., v. Tomasiello,* 461 F.Supp.2d 943, 962–68 (N.D.Iowa 2006). This court noted that the Iowa Supreme Court has previously discussed the essential features of the Trade Secrets Act in *Economy Roofing & Insulating Co. v. Zumaris,* 538 N.W.2d 641 (Iowa 1995):

Iowa Code section 550.3(1) (1991) provides that "[t]he owner of a trade secret may petition the district court to enjoin an actual or threatened misappropriation." Iowa Code section 550.4(1) provides that "an owner of a trade secret is entitled to recover damages for the misappropriation."

> Iowa Code section 550.2(4) defines a trade secret as information, including but not limited to a formula, pattern, compilation, program, device, method, technique, or process that is both of the following:
>
> a. Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by a person able to obtain economic value from its disclosure or use.
>
> b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Iowa Code § 550.2(4).

**\*1043** Iowa Code section 550.2(3) in pertinent part defines misappropriation as doing any of the following:

> a. Acqui[ring] a trade secret by a person who knows that the trade secret is acquired by improper means.
>
> b. Disclos[ing] or us[ing] a trade secret by a person who uses improper means to acquire the trade secret.
>
> c. Disclos[ing] or us[ing] a trade secret by a person who at the time of disclosure or use, knows that the trade secret is derived from or through a person who had utilized improper means to acquire the trade secret.

Iowa Code § 550.2(3).

"Improper means" is defined as "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage, including but not limited to espionage through an electronic device." Iowa Code § 550.2(1).

*Economy Roofing,* 538 N.W.2d at 646; *see* 205 *Corp. v. Brandow,* 517 N.W.2d 548, 550 (Iowa 1994) (noting that sections 550.4 and 550.5 provide for damages or injunctions as recourse for misappropriation of trade secrets, respectively, and also quoting the statute's definition of trade secrets in 550.2(4)). Thus, in order to prevail on a statutory claim of misappropriation of trade secrets under Iowa law, a plaintiff must prove the following: (1) the existence of a trade secret, as defined by IOWA CODE § 550.2; (2) acquisition of the secret by improper means, as defined by IOWA CODE § 550.2(1); and (3) unauthorized use or disclosure of the secret, as defined in IOWA CODE § 550.2(3). *Cf. Sioux Biochemical, Inc. v. Cargill, Inc.,* 410 F.Supp.2d 785, 806 (N.D.Iowa 2005) (describing the second element as acquisition of the trade secret as a result of a confidential relationship, citing *Lemmon v. Hendrickson,* 559 N.W.2d 278, 279 (Iowa 1997)).

Here, the court finds that Wachovia has made sufficient showing, at least for purposes of obtaining a temporary restraining order, that at least some of the client information in question is a trade secret within the meaning of IOWA CODE § 550.2(4). *See Sioux Biochemical, Inc.,* 410 F.Supp.2d at 806 (first element). The client information is "information," and perhaps more specifically still, a "compilation," that "[d]erives independent economic value, actual or potential, from not being generally known to, and not being readily

ascertainable by proper means by a person able to obtain economic value from its disclosure or use," and "[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Iowa Code § 550.2(4). Even where some of the information contained in a client list, such as telephone numbers and addresses, is not itself a trade secret, the compilation of such information in a client list *is* a trade secret. Again, Wachovia has demonstrated sufficiently that client lists and confidential client information are the "lifeblood" of a financial services business and that it has gone to considerable expense and effort, often over a period of years, to accumulate such information. Wachovia has also shown that it has taken reasonable efforts to maintain the secrecy of such information, for example, by imposing both contractual and policy limitations on the use and disclosure of such information, as set forth in Stanton's employment contract, *see* Complaint, Declaration of Joseph Wood, Exhibit B, § 2 (quoted above, beginning on page 7), and Section 9.2 of Edwards's Sales Practice Manual, which was made available to all of Edwards's employees. Complaint, Declaration of Joseph Wood, Exhibit C, § 9.2 (quoted above, beginning on page 11). For essentially the same reasons that the court ruled above, with regard to Wachovia's breach-of-contract claim, that the Protocol **\*1044** does not make restrictions on solicitation of clients by a departing financial consultant not reasonably necessary, the court now concludes that the Protocol does not demonstrate that Wachovia did not take reasonable steps to protect trade secret client lists and client information against disclosure to a non-Protocol firm.

The element on which Wachovia's trade secrets claim fails, however, is a sufficient showing that Stanton acquired the trade secrets by improper means, as defined by IOWA CODE § 550.2(1). *See Sioux Biochemical, Inc.,* 410 F.Supp.2d at 806 (first element). Wachovia has not pointed to evidence that Stanton could only have obtained the trade secrets by breaching her duty to maintain secrecy of the information, as required by the contract and policy provisions identified above. IOWA CODE § 550.2(1) (defining "improper means," *inter alia,* as breach of a duty to maintain secrecy of the information). On the other hand, Stanton has presented sworn testimony that she simply did not take any client information from Wachovia. Similarly, where Wachovia cannot show that Stanton took any trade secret information, Wachovia has not made sufficient showing, even for present purposes,

that Stanton made unauthorized use or disclosure of the secret, as defined in IOWA CODE § 550.2(3). *See Sioux Biochemical, Inc.,* 410 F.Supp.2d at 806 (third element).

Therefore, upon the present record, the court finds that Wachovia also does not have sufficient likelihood of success on its misappropriation of trade secrets claim to warrant a temporary restraining order to restrain further misappropriation.

### *2. Threat of irreparable harm*

**[18]** Although the court has found that Wachovia does not have sufficient likelihood of success on the merits of its breach-of-contract or trade secrets claims to warrant a temporary restraining order, the court will nevertheless consider the remaining "*Dataphase*" factors." The second "*Dataphase*" factor" is the threat of irreparable harm to the movant absent the injunction. *Dataphase,* 640 F.2d at 114. In this circuit, "a party moving for a preliminary injunction is required to show the threat of irreparable harm," *Baker Elec. Co-op.,* 28 F.3d at 1472 (citing *Modern Computer Sys.,* 871 F.2d at 738, and *Dataphase),* and the lack of irreparable harm is sufficient ground for denying or vacating a preliminary injunction. *Aswegan v. Henry,* 981 F.2d 313, 314 (8th Cir.1992) (citing *Modern Computer Sys.,* 871 F.2d at 738). Stated differently, "[t]he threshold inquiry is whether the movant has shown the threat of irreparable injury." *Glenwood Bridge,* 940 F.2d at 371 (quoting *Gelco Corp. v. Coniston Partners,* 811 F.2d 414, 418 (8th Cir.1987)). More specifically, the Eighth Circuit Court of Appeals has held that

> the movant's failure to sustain its burden of proving irreparable harm ends the inquiry "and the denial of the injunctive request is warranted." [*Gelco,* 811 F.2d] at 420. *Accord Modern Computer Sys.,* 871 F.2d at 738; *Dataphase,* 640 F.2d at 114 n. 9. We must inquire, then, whether [the movant] has met its burden of proving that it will suffer irreparable harm absent a preliminary injunction.

*Id.* The Eighth Circuit Court of Appeals has also explained,

> "[T]he basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 506–07, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959). Thus, to warrant a preliminary injunction, the moving party

must demonstrate a sufficient threat of irreparable harm. *See Adam–Mellang v. Apartment Search, Inc.,* 96 F.3d 297, 299 (8th Cir.1996).

**\*1045** *Bandag, Inc. v. Jack's Tire & Oil, Inc.,* 190 F.3d 924, 926 (8th Cir.1999); *see Baker Elec. Co-op.,* 28 F.3d at 1472 ("No single factor in itself is dispositive; in each case all of the factors must be considered to determine whether on balance, they weigh towards granting the injunction. However, a party moving for a preliminary injunction is required to show the threat of irreparable harm.") (internal quotation marks and citations omitted).

**[19]** Sufficient showing on this second factor in the *Dataphase* analysis can be made, for example, by showing that the movant has no adequate remedy at law. *Baker Elec. Co-op.,* 28 F.3d at 1473. Conversely, where the movant has an adequate legal remedy, a preliminary injunction will not issue. *Frank B. Hall & Co. v. Alexander & Alexander, Inc.,* 974 F.2d 1020, 1025 (8th Cir.1992) (but finding in that case that the district court's conclusion that there was an adequate remedy was based on an erroneous legal premise, and requiring a proper balance of *Dataphase* factors).

### a. Arguments of the parties

Wachovia argues that it has suffered or is likely to suffer irreparable harm, for which there is no adequate remedy at law, because it is extremely difficult to quantify the future economic losses that it will suffer from loss of its clients and their accounts to a competitor, let alone to quantify the value of the loss of confidence, goodwill, and reputation that may arise from compromising clients' expectations of privacy as a result of Stanton's conduct. Wachovia also argues that the Iowa Supreme Court has recognized that injunctive relief is the sole means of restoring an employer to the position it would have enjoyed had an employee not violated a restrictive covenant.

Stanton argues that Wachovia has not suffered and is not threatened with any irreparable harm. She argues that, by signing the Protocol, both Edwards and Wachovia acknowledged that they would have no irreparable harm from a departing financial consultant's retention and use of certain client information. She argues that courts have so held, even where the financial consultant's new firm was not a signatory to the Protocol, if the former firm was a signatory. She also argues that, contrary

to Wachovia's contentions, Wachovia has an adequate remedy at law. She argues that mere loss of income is not an irreparable harm, and the securities industry is such that economic losses from competition by a former employee is determinable.

### b. Analysis

In *Pro Edge,* this court observed,

Initially, the court notes that "[i]ntangible injuries, such as injury to goodwill and business relationships with customers, may be found to constitute irreparable harm." *American Express Fin. Advisors, Inc. v. Yantis,* 358 F.Supp.2d 818, 835 (N.D.Iowa 2005) (citing *Moore Bus. Forms, Inc. v. Wilson,* 953 F.Supp. 1056 (N.D.Iowa 1996)). On many occasions, courts in a number of states, as well as this court, have held that the mere violation of a valid covenant not to compete supports an inference of the existence of a threat of irreparable harm. *See, e.g., Moore Bus. Forms, Inc.,* 953 F.Supp. at 1056 (citing cases arising in other states finding irreparable harm from the violation of a valid covenant not to compete); *Uncle B's Bakery [v. O'Rourke],* 920 F.Supp. 1405, 1434–36 [ (N.D.Iowa 1996) ] (finding threat of irreparable harm in form of trade secret misappropriation in violation of confidentiality agreement where former employee went to work for competitor); [374 F.Supp.2d at 750] *Curtis 1000 [v. Youngblade],* 878 F.Supp. 1224, 1273 [ (N.D.Iowa 1995) ] (finding irreparable harm arising from covenant not to compete). The Eighth **\*1046** Circuit Court of Appeals has previously adopted and employed this approach without consideration or reference to any particular state's law. *See N.I.S. Corp. v. Swindle,* 724 F.2d 707, 710 (8th Cir.1984).

*Pro Edge, L.P.,* 374 F.Supp.2d at 749–50.

**[20]** **[21]** The court concludes that, where, as here, the covenants at issue are non-disclosure covenants and a specific kind of non-competition covenant, a non-solicitation covenant, the mere violation of such a covenant also suffices to show irreparable harm, because violation of such covenants involves much the same threat to goodwill and business relationships with customers as violation of a covenant not to compete. *Cf. id.* Indeed, Stanton acknowledged as much by entering into her employment contract, which states the following in § 2:

IN THE EVENT YOU BREACH ANY OF THE COVENANTS CONTAINED IN THIS PARAGRAPH, YOU ACKNOWLEDGE THAT EDWARDS' REMEDIES AT LAW FOR DAMAGES WILL BE INADEQUATE AND THAT EDWARDS SHALL BE ENTITLED TO INJUNCTIVE RELIEF TO PREVENT YOUR PROSPECTIVE OR CONTINUING BREACH OF THESE PROVISIONS. THIS PROVISION SHALL NOT BE CONSTRUED IN ANY WAY TO CONSTITUTE A WAIVER BY EDWARDS OF ANY AVAILABLE REMEDY AT LAW.

Complaint, Declaration of Joseph Wood, Exhibit B, § 2. Thus, *if* Wachovia had demonstrated violations of these covenants, it would also have demonstrated sufficiently for present purposes that loss of confidential customer information involves a threat of irreparable harm for which there is no adequate remedy at law, *see Baker Elec. Co-op.,* 28 F.3d at 1473 (an adequate showing on this factor can be made, for example, by showing that the movant has no adequate remedy at law), because it is extremely difficult to quantify the future economic losses that it will suffer from loss of its clients and their accounts to a competitor, let alone to quantify the value of the loss of confidence, goodwill, and reputation that may arise from compromising clients' expectations of privacy as a result of Stanton's conduct. [8]

The problem, again, is that Wachovia *has not* demonstrated for purposes of obtaining **\*1047** a temporary restraining order that covenants were violated or that, if they were violated, they are enforceable. Under these circumstances, Wachovia cannot demonstrate irreparable harm, either. Thus, on the present record, Wachovia not only has not shown that it has sufficient likelihood of success on the merits to warrant a temporary restraining order, it also cannot show any irreparable harm.

### 3. Balance of harms

 **[22]**   The third "*Dataphase* factor" is the "balance of harms." *See Dataphase,* 640 F.2d at 114 (the third factor is the balance between the harm and the injury that the injunction's issuance would inflict on other interested parties). The "balance of harms" analysis is not identical to the "irreparable harm" analysis. *Pottgen v. Missouri State High Sch. Activities Ass'n,* 40 F.3d 926, 929 (8th Cir.1994). Irreparable harm focuses on the harm or potential harm to the movant of the opposing party's conduct or threatened conduct. *Dataphase,* 640 F.2d at 114. In contrast, the balance of harms analysis examines the harm of granting or denying the injunction upon both of the parties to the dispute and upon other interested parties, including the public. *Id.; see also Glenwood Bridge,* 940 F.2d at 372 (considering the effect of granting or denying the injunction on the public's interest in a public works construction project as well as upon the parties in the balance of harm analysis); *Modern Computer Sys.,* 871 F.2d at 737–38 (harm to other interested parties also considered).

 **[23]**   In conducting the "balance of harms" analysis required under *Dataphase,* it is obvious that an illusory harm to the movant will not outweigh any actual harm to the nonmovant. *Frank B. Hall,* 974 F.2d at 1023. To determine what must be weighed, the court finds that courts of this circuit have looked at the threat to each of the parties' rights that would result from granting or denying the injunction. *Baker Elec. Co-op.,* 28 F.3d at 1473. Also, the potential economic harm to each of the parties and to interested third parties of either granting or denying the injunction is relevant. *Id.* Another consideration in the balance of harms calculus is whether the defendant has already voluntarily taken remedial action. *Sanborn Mfg.,* 997 F.2d at 489. Where the non-movant has taken such action, the balance of harms is readjusted, because the potential for economic or other harm to the movant has been eliminated. *Id.* (citing *Burdy Corp. v. Teledyne Indus., Inc.,* 748 F.2d 767, 774 (2d Cir.1984), which held that injunctive relief was "wholly unnecessary" when the defendant had voluntarily brought his product labeled with the UL mark into compliance with UL standards and where there was not a likelihood of repetition or hazard to the public). Similarly, present harm as the result of past misconduct is not sufficient to justify the injury to the non-movant of granting a preliminary injunction requiring some additional corrective action,

because such relief "goes beyond the purpose of a preliminary injunction." *Id.* at 490.

### a. Arguments of the parties

Wachovia argues that Stanton has no potential harm or detriment that outweighs **\*1048** the irreparable harm to Wachovia that it has already demonstrated. Wachovia argues that Stanton has breached her contractual and fiduciary commitments to Wachovia and has induced, solicited, or assisted Wachovia's customers and employees to join her at her new firm. Thus, Wachovia argues that equity does not favor Stanton. Wachovia also argues that Stanton cannot complain of any financial detriment that results from her own breach of her duties to maintain confidentiality of the information that she has pirated. Wachovia also argues that the temporary restraining order will do no more than maintain the status quo pending arbitration, so that Stanton will not be prejudiced.

Stanton argues that, while Wachovia has no irreparable harm to support a temporary restraining order, she would suffer irreparable harm if she is forced to rebuild her career from scratch by injunctive relief that bars her from contacting any of her former clients. She also argues that Wachovia should be barred by unclean hands and equitable estoppel from seeking the injunctive relief at issue here.

### b. Analysis

**[24]** The court must look at the threat to each of the parties' rights that would result from granting or denying the injunction. *Baker Elec. Co-op.,* 28 F.3d at 1473, but finds no substantial threat to Wachovia's right to maintain the secrecy of its client lists and to retain its customer base, where it has not made sufficient showing of likelihood of success on the merits of its claims to warrant a temporary restraining order, so that the countervailing right on Stanton's part to maintain her customer relationships outweighs Wachovia's illusory harm. *Frank B. Hall,* 974 F.2d at 1023 (an illusory harm to the movant will not outweigh any actual harm to the non-movant). Therefore, the balance of harms factor also weighs against granting Wachovia's request for a temporary restraining order.

### 4. The public interest

**[25]** The final "*Dataphase* factor" is "the public interest." *See Branstad I,* 118 F.Supp.2d at 943; *see also Pottgen,* 40 F.3d at 929; *Dataphase,* 640 F.2d at 114. The "public interest" factor frequently invites the court to indulge in broad observations about conduct that is generally recognizable as costly or injurious. *Id.* However, there are more concrete considerations, such as reference to the purposes and interests any underlying legislation was intended to serve, a preference for enjoining inequitable conduct, and the public's interest in minimizing unnecessary costs to be met from public coffers. *B & D I,* 231 F.Supp.2d at 912 (citations and quotation marks omitted).

**[26]** Wachovia argues that Stanton's conduct is unethical and inequitable, so that the public interest favors a temporary restraining order on such conduct. Wachovia also argues that the public will suffer no detriment if Stanton is restrained, because the public's choice of brokers is not thereby limited. Stanton argues, however, that the public interest will be serious impinged by an injunction that interferes with the public's right to information about and choice of brokers. She argues that customers' rights are paramount.

For essentially the same reasons that the court found, above, beginning on page 42, that the public interest called into serious question the enforceability of the restrictive covenants at issue here, for purpose of Wachovia's breach-of-contract claim, the court now concludes that the public interest does not favor granting a temporary restraining order, as required by the final "*Dataphase* factor." To put it another way, public policy concerns about the enforceability of the covenants ripens **\*1049** into a public policy bar on a temporary restraining order, in light of public interest favoring customer choice of brokers and recognizing that the client relationship belongs to the financial consultant, not the firm. Where whether the covenants in the 1996 Agreement are valid or invalid on public interest grounds is a close question, the public interest concern raised by the covenants is sufficient to call into serious question the enforceability of those covenants. The public interest concern about enforceability of the covenants, in turn, weighs against Wachovia's likelihood of success on the merits of its breach-of-contract claim, one "*Dataphase* factor," and also weighs against satisfaction of the "public interest," another "*Dataphase* factor."

That conclusion certainly does not mean that either "public interest" issue—either as to enforceability of covenants or as to appropriateness of preliminary injunctive relief—is resolved finally against Wachovia. To the contrary, it may well be that on a rather more complete record and a fuller opportunity to review the authorities and to reflect upon the matter, the public interest concerns will be resolved in Wachovia's favor.

Nevertheless, the court finds that the public interest weighs against Wachovia's request for a temporary restraining order. Moreover, because none of the pertinent factors ultimately weigh in favor of a temporary restraining order in this case, a temporary restraining order will not issue.

### C. Expedited Discovery

[27] Wachovia requests expedited discovery "in aid of preliminary injunction proceedings before this Court." The court finds that such a request may be all the more urgent, where the court has denied Wachovia's request for a temporary restraining order, but has left open the question of whether Wachovia is nevertheless entitled to a preliminary injunction. In short, more satisfying evidence than Wachovia has thus far marshaled will be required for Wachovia to show that it is entitled to a preliminary injunction.

Wachovia made no argument for such expedited discovery nor any explanation of the anticipated nature or scope of such expedited discovery in its moving papers. At the hearing on August 4, 2008, however, Wachovia suggested that it would like to depose Stanton and possibly other persons to try to determine, *inter alia*, whether and what confidential information of Wachovia she acquired and used to mount her solicitation campaign.

As a colleague in the Eastern District of Missouri recently explained,

> Courts use one of two standards to determine whether a party is entitled to conduct expedited discovery. Some courts apply a "good cause" or "reasonableness" standard, while others analyze a set of factors similar to those for obtaining a

preliminary injunction. *See Special Situations Cayman Fund, L.P. v. Dot Com Entertainment Group, Inc.,* 2003 WL 23350128 at *1, n. 7 (W.D.N.Y.2003)* (slip op.). The Court of Appeals for the Eighth Circuit has not adopted either standard.

*Monsanto Co. v. Woods,* 250 F.R.D. 411, 413, 2008 WL 821717, *2 (E.D.Mo. March 25, 2008). That court found that the "good cause" standard, which the court explained as follows, was the appropriate standard in that case:

> Under the good cause standard, the party requesting expedited discovery must show that the need for expedited discovery, in consideration of administration of justice, outweighs prejudice to responding party. *Semitool, Inc. v. Tokyo Electron Am., Inc.,* 208 F.R.D. 273, 276 (N.D.Cal.2002); *Qwest Comm. Int'l, Inc. v. WorldQuest Networks, Inc.,* 213 F.R.D. 418, 419 (D.Colo.2003); *Yokohama* **\*1050** *Tire Corp. v. Dealers Tire Supply, Inc.,* 202 F.R.D. 612, 613–14 (D.Ariz.2001). *Cf. Merrill Lynch, Pierce, Fenner & Smith v. O'Connor,* 194 F.R.D. 618, 624 (N.D.Ill.2000) ("[W]here a plaintiff seeks expedited discovery to prepare for a preliminary injunction hearing, it makes sense to examine the discovery request ... on the entirety of the record to date and the reasonableness of the request in light of all the surrounding circumstances.").

*Monsanto Co.,* 250 F.R.D. at 413, 2008 WL 821717 at *2. The court found "good cause" in that case, because the plaintiffs had made reasonable attempts to gather the relevant evidence with defendant's cooperation and had narrowly tailored their request for expedited discovery to a limited set of documents and physical samples, and, as time passed, the likelihood of discovering relevant evidence decreased, where some of the physical evidence in question was subject to deterioration. *Id.; see also id. at 414, 2008 WL 821717, *3 (finding that, even under the preliminary injunction-style analysis, expedited discovery was appropriate).

This court agrees that, in general, the "good cause" standard should be applied to requests for expedited discovery, balancing the need for expedited discovery, in the administration of justice, against the prejudice to the responding party, and considering the entirety of the record to date and the reasonableness of the request in

light of all of the surrounding circumstances. *Id.* Here, the court finds good cause for expedited discovery, in the administration of justice, because such expedited discovery may clarify matters that were outside of Wachovia's (or Stanton's) knowledge and may ultimately lead to the prompt and efficient disposition of this litigation and the parties' underlying dispute. Moreover, the court does not find that Stanton will be prejudiced by permitting properly limited and focused discovery to prepare for the preliminary injunction hearing, where she may also clarify matters outside of her current knowledge.

The court finds that, in the interests of the administration of justice, the number of interrogatories and depositions should be strictly limited. Therefore, the court will permit each party to propound not more than fifteen interrogatories, including discrete subparts, and to notice and conduct depositions of not more than five persons. Such discovery requests shall be made within five days of the date of this order, and responses shall be returned and depositions shall be completed within fourteen days after requests are served. The court cannot reasonably determine prospectively the scope of requests for production of documents, however. Nevertheless, the court urges the parties to make only as narrowly focused requests as possible to further the disposition of Wachovia's motion for preliminary injunction. If the parties are unable to resolve any differences about the scope of document requests, they are urged to submit such differences promptly to Chief United States Magistrate Judge Paul A. Zoss.

### III. CONCLUSION

Although this court has not hesitated to enforce restrictive covenants in employment contracts in appropriate circumstances, *see Interbake Foods, L.L. C. v. Tomasiello, 461 F.Supp.2d 943 (N.D.Iowa 2006)* (enjoining disclosure of trade secrets, but not former employee's employment with competitor); *Pro Edge, L.P., 374 F.Supp.2d at 711* (enforcing restrictive covenant with preliminary

injunction); *Uncle B's Bakery, Inc. v. O'Rourke, 938 F.Supp. 1450 (N.D.Iowa 1996)*; *Curtis 1000, Inc. v. Youngblade, 878 F.Supp. 1224 (N.D.Iowa 1995)*, each case involving a restrictive covenant turns on its facts. Here, on the record so far presented, the facts do **\*1051** not warrant the issuance of a temporary restraining order. Under the circumstances, however, the court does find it appropriate to grant Wachovia's request for expedited discovery to help the parties prepare for a preliminary injunction hearing.

THEREFORE,

1. Wachovia's July 31, 2008, Motion For A Temporary Restraining Order And Preliminary Injunction And For An Order Permitting Expedited Discovery (docket no. 3) is **granted in part and denied in part,** as follows:

    a. Wachovia's request for a temporary restraining order is **denied;** and

    b. Wachovia's request for expedited discovery in aid of preliminary injunction proceedings before this court is **granted,** with the limits stated above.

2. The court **reserves ruling** at this time on that part of Wachovia's July 31, 2008, Motion For A Temporary Restraining Order And Preliminary Injunction And For An Order Permitting Expedited Discovery (docket no. 3) seeking a preliminary injunction.

3. **A hearing** on Wachovia's July 31, 2008, Motion For A Preliminary Injunction (docket no. 3) **is scheduled for 8:30 a.m. on Monday, September 8, 2008,** in the third floor courtroom of the United States Courthouse in Sioux City, Iowa.

**IT IS SO ORDERED.**

**All Citations**

571 F.Supp.2d 1014

---

Footnotes

1    Wachovia is wholly owned by Wachovia Securities Financial Holdings, L.L.C., which is also a corporation organized under the laws of the state of Delaware with its principal place of business in St. Louis, Missouri.

2    Wachovia represents that FINRA was created in July 2007 through the consolidation of the National Association of Securities Dealers, Inc., (NASD) and the member regulation, enforcement, and arbitration functions of the New York

Stock Exchange. Wachovia also contends that, as a registered financial associate with Wachovia, Stanton executed a Form U–4 Uniform Application for Securities Industry Registration or Transfer, and that by executing such a Form U–4, Stanton agreed to submit to arbitration any disputes, claims, and controversies arising between herself and Wachovia. The Form U–4 executed by Stanton is not in the record at this time. Nevertheless, Stanton nowhere contests Wachovia's right to seek arbitration of their dispute.

**3**  Wachovia asserts, and Stanton does not dispute, that an arbitration in this matter is proper pursuant to Rule 13804 of the Code of Arbitration Procedures for the FINRA.

**4**  Again, this order does not address Wachovia's request for a preliminary injunction.

**5**  The court has confronted the often knotty problem of what law applies to specific common-law and statutory claims in a diversity action a number of times in recent years. *See John Morrell & Co. v. Halbur,* 476 F.Supp.2d 1061, 1074–75 (N.D.Iowa 2007); *Jones ex rel. Jones v. Winnebago Indus. Inc.,* 460 F.Supp.2d 953, 963–72 (N.D.Iowa 2006); *Jones Distrib. Co., Inc. v. White Consol. Indus., Inc.,* 943 F.Supp. 1445, 1458 (N.D.Iowa 1996); *Harlan Feeders, Inc. v. Grand Labs., Inc.,* 881 F.Supp. 1400 (N.D.Iowa 1995); *Curtis 1000 v. Youngblade,* 878 F.Supp. 1224, 1251–54 (N.D.Iowa 1995). To resolve the issue of which state's law applies to Wachovia's breach-of-contract claim, the court looks to the conflict-of-laws or choice-of-law rules of the state of Iowa, because in an action based upon diversity of citizenship jurisdiction, a federal district court must apply the substantive law of the state in which it sits, including its conflict-of-laws or choice-of-law rules. *Harlan Feeders, Inc.,* 881 F.Supp. at 1403–04 (citing, *inter alia, Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)); *accord Colonial Ins. Co. of Cal. v. Spirco Envtl., Inc.,* 137 F.3d 560, 561–62 (8th Cir.1998) (" 'Federal district courts must apply the choice-of-law rules of the state in which they sit when jurisdiction is based on diversity of citizenship.' ") (quoting *Whirlpool Corp. v. Ritter,* 929 F.2d 1318, 1320 (8th Cir.1991)); *Penney v. Praxair, Inc.,* 116 F.3d 330, 333 n. 4 (8th Cir.1997) ("Sitting in diversity, a district court is bound to apply the choice of law rules of the state in which it sits...."). However, before any choice of law need be made, there must be a "true conflict" between the laws of the possible jurisdictions on the pertinent issue. *Id.* at 1404; *accord Phillips v. Marist Soc'y of Wash. Province,* 80 F.3d 274, 276 (8th Cir.1996) (agreeing with the statement of Judge Richard A. Posner that " 'before entangling itself in messy issues of conflict of laws a court ought to satisfy itself that there actually is a difference between the relevant laws of the different states.' *Barron v. Ford Motor Co. of Canada, Ltd.,* 965 F.2d 195, 197 (7th Cir.1992), *cert. denied,* 506 U.S. 1001, 113 S.Ct. 605, 121 L.Ed.2d 541 (1992)," and simply applying the law of the forum where there was no true conflict).

**6**  Stanton has not asserted that Wachovia does not stand in Edwards's shoes with respect to the rights under and the enforcement of the 1996 Agreement. The court notes that the 1996 Agreement does contain an express "successors" clause in ¶ 30, and Stanton does not dispute that Wachovia and Edwards merged, with Wachovia emerging as the surviving entity, so that Wachovia has made sufficient showing for purposes of obtaining a temporary restraining order that it is a "successor" to Edwards entitled to enforce the 1996 Agreement. *See* Complaint, Declaration of Joseph Wood, Exhibit B, § 30.

**7**  The court disagrees, however, with Stanton's suggestion that either *Crawford & Co.* or *PFS Distrib. Co. v. Raduechel,* 492 F.Supp.2d 1061, 1075 (S.D.Iowa 2007), stands for the proposition that an employee may arrange with fellow employees to compete with their employer. *See Crawford & Co.,* 13 Fed.Appx. at 176 (citing *Duane Jones Co. v. Burke,* 306 N.Y. 172, 117 N.E.2d 237, 245 (N.Y.1954), for the proposition that a breach of duty occurs where an employee recruits subordinate employees and customers prior to resignation); *PFS Distrib. Co.,* 492 F.Supp.2d at 1077 (finding breach of a duty of loyalty where an employee began talking with other employees about beginning a rival firm months before quitting).

**8**  Again, the court finds that the Protocol For Broker Recruiting signed by both Edwards and Wachovia, but not by CSA or Stifel, would not change this hypothetical analysis, if Wachovia had proved a violation of one of the covenants in question. The Protocol provides that, *where both the former firm and the new firm are signatories,* a departing registered representative may solicit his or her clients to move to the registered representative's new firm, and the former firm cannot claim damages, let alone irreparable harm. *See* Opposition, Exhibit B (the Protocol applies "When RRs move from one firm to another and both firms are signatories to this protocol," and "RRs that comply with this protocol would be free to solicit customers that they serviced while at their former firms, but only after they have joined their new firms."). That provision does not mean that there is no need for a non-solicitation covenant and no irreparable harm when the former firm *is* a signatory, but the new firm is *not* a signatory. Where both parties are signatories, they have essentially agreed to reciprocal "poaching" of registered representatives and the registered representative's clients from the former firm, apparently on the assumption that they will gain as much as they lose in the exchange. On the other hand, where the new firm is not a signatory, the old firm has no reciprocal benefit to look forward to, and a prohibition on solicitation of clients by a departing registered representative is still reasonably necessary to protect the former firm's client base from "poaching"

by the new, non-Protocol firm, and such "poaching" by a non-Protocol firm could cause irreparable harm. *Contra Merrill Lynch, Pierce, Fenner & Smith v. Brennan,* 2007 WL 632904, *2 (N.D.Ohio Feb. 23, 2007) (slip op.) (a Protocol firm "tacitly accepts" that registered representatives will leave and then solicit clients to move to their new firm, even if the new firm is a non-Protocol firm); *Smith Barney Div. of Citigroup Global Mkts., Inc. v. Griffin,* 23 Mass. L. Rptr. 457, 2008 WL 325269, *7 (Mass.Super.2008) (a signatory firm cannot claim irreparable harm when a registered representative leaves for a non-signatory firm, then solicits clients to move to the new firm, where the signatory firm has accepted such conduct if the registered representative moves to 38 other signatory firms).

---

**End of Document**                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

# *TAB 15*

Case 1:18-cv-00475-SEB-TAB   Document 1-2   Filed 02/16/18   Page 415 of 440 PageID #: 427

§ 72.3. Motion to advance case on court's docket for trial, 10 Ind. Prac., Procedural...

**10 Ind. Prac., Procedural Forms With Practice Commentary § 72.3 (3d ed.)**

Indiana Practice Series TM   |   December 2017 Update
Procedural Forms With Practice Commentary
Stephen E. Arthur [a0]

Part X. Trials
Chapter 72. Assignment of Cases for Trial

§ 72.3. Motion to advance case on court's docket for trial

*[Caption]*

**MOTION TO ADVANCE CASE ON COURT'S DOCKET FOR TRIAL**

Plaintiff, by counsel, moves the court to advance this action on the court's docket for an immediate trial, and in support
states:

1. This action is presently set for trial by jury on the court's docket as seventh choice on *[date]* and second choice on
*[date]*.

2. Because of medical disabilities, plaintiff has been unable to work for several years prior to the time the accident at
issue in this action caused the death of his wife and children.

3. At the time of the accident, plaintiff's wife was the sole means of his support.

4. Injuries sustained in the accident coupled with recent illnesses have made it impossible for plaintiff to work to support
himself.

5. Plaintiff is presently without funds or income, has no means of support and is in need of ongoing medical care.

6. Delay in the trial of this action will work great and possibly irrevocable hardship on plaintiff and he therefore requests
a trial within the next thirty days.

WHEREFORE, plaintiff, by counsel, requests the court to advance this matter on its docket for an immediate trial.

_____
Attorney for Plaintiff
*[Attorney Bar Number]*
*[Address]*
*[Telephone Number]*

§ 125. Motion to advance case on court's docket for trial, 10 Ind. Prac., Procedural...

**Notes**

**Commentary**

Trial Rule 40 does not provide for expediting actions that are not entitled to expedition by statute or rule. However, the court clearly has the power to expedite matters upon motion pursuant to Trial Rule 40(A)(2) through its inherent power to control the court's trial docket.

Westlaw. © 2017 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

**Footnotes**

a0                              Indianapolis, Indiana.

End of Document                                    © 2018 Thomson Reuters. No claim to original U.S. Government
                                                                                                        Works.

# *TAB 16*

**8A Fed. Prac. & Proc. Civ. § 2046.1 (3d ed.)**

Federal Practice & Procedure   |   April 2017 Update
Federal Rules Of Civil Procedure
The Late Charles Alan Wright [a120], Arthur R. Miller [a121], Mary Kay Kane [a122], Richard L. Marcus [a123], A. Benjamin Spencer [a124], Adam N. Steinman [a125]

Federal Rules of Civil Procedure
Chapter 6. Depositions And Discovery
Richard L. Marcus [a435]

Rule 26. Duty to Disclose; General Provisions Governing Discovery
E. Sequence and Timing of Discovery

§ 2046.1 1993 Discovery Moratorium Pending Discovery Plan

Link to Monthly Supplemental Service

---

**Primary Authority**

•    Fed. R. Civ. P. 26

---

**Forms**

•    West's Federal Forms §§ 3251 to 3290.5

---

The 1993 amendment to Rule 26(d) moved further from the pre–1970 rule of priority. That amendment added the provision in Rule 26(d) that in general [1] no formal discovery may be undertaken until the parties have conferred pursuant to Rule 26(f) and discussed a discovery plan. [2] That discovery plan, discussed in another section, [3] may include provisions regarding scheduling. Except for depositions that may by rule be taken prior to the Rule 26(f) conference, [4] the moratorium applies to all discovery. Since there is no requirement for a second Rule 26(f) conference if new parties are added after the conference has occurred, however, discovery from new parties is not subject to a moratorium. [5]

The parties may stipulate, however, to commence formal discovery before the conference, although it might in many cases seem more expedient to accelerate the holding of the conference. Presumably such an agreement would have to include all the parties to be effective.

Absent such an agreement of all the parties, the moratorium may be removed by court order. Usually leave to proceed before the Rule 26(f) conference should be granted only after notice to the other parties. [6]

Effective 2015, however, Rule 26(d) was amended to permit early Rule 34 requests. [6.10] This exception to the general moratorium on formal discovery was not prompted by misgivings about the wisdom of the moratorium, but instead by a desire to make the Rule 26(f) conference and discovery plan more useful. As the Committee Note accompanying the amendment explained: "This relaxation of the discovery moratorium is designed to facilitate focused discussion during the Rule 26(f) conference. Discussion at the conference may produce changes in the requests." [6.20] There are time limits on early requests, however. No such requests may be delivered until 21 days after the summons and complaint are served on a party. At that point, any other party may deliver such requests to that party, and that party may serve Rule 34 requests on any plaintiff and any other party who has been served. The early "delivery" authorized by the 2015 amendment is not "service" that triggers the time to file a Rule 34(b) response. Instead, the early Rule 34 request is considered served at the parties' first Rule 26(f) conference. [6.30]

Although the rule does not say so, it is implicit that some showing of good cause should be made to justify such an order, and courts presented with requests for immediate discovery have frequently treated the question whether to authorize early discovery as governed by a good cause standard. [7] The Committee Note that accompanied the 1993 addition of Rule 26(d) suggested that relief would be appropriate in cases involving requests for a preliminary injunction or motions challenging personal jurisdiction. [8] Some courts have also treated the question in terms similar to the criteria for a preliminary injunction, although it must be obvious that permission to commence discovery is a much less aggressive order than a preliminary injunction. [9]

In general, decisions whether to grant [10] or deny leave [11] for early discovery depend on the specific justifications offered in support of the application. Often, the courts authorize such discovery limited to specific topics advanced to justify the early commencement of discovery. [12]

The fact that the Rule 26(d) moratorium has ended does not tie the court's hands; in individual cases the judge may defer discovery for a longer time if warranted by a showing of good cause. [13] Despite the discovery moratorium of Rule 26(d), a party may file a motion to dismiss or for summary judgment before discovery. [14] The pendency of such a motion may, but need not, provide a ground for an order deferring discovery until the motion is decided. [15] The court's general control of sequence and timing of discovery is discussed further in a later section. [16]

Westlaw. © 2017 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

Footnotes

| | |
|---|---|
| a120 | Charles Alan Wright Chair in Federal Courts, The University of Texas. |
| a121 | University Professor, New York University. Formerly Bruce Bromley Professor of Law, Harvard University. |
| a122 | John F. Digardi Distinguished Professor of Law, Chancellor and Dean Emeritus, University of California, Hastings College of the Law. |
| a123 | Horace O. Coil ('57) Chair in Litigation, University of California, Hastings College of the Law. |
| a124 | Earle K. Shawe Professor of Law, University of Virginia School of Law. |
| a125 | Frank M. Johnson Faculty Scholar & Professor of Law, University of Alabama. |
| a435 | Horace O. Coil ('57) Chair in Litigation, University of California, Hastings College of the Law. |
| 1 | **In general** |

Case 1:18-cv-00475-SEB-TAB Document 1-2 Filed 02/16/18 Page 420 of 440 PageID #: 432

§ 2046.1 1963 Discovery Moratorium Pending Discovery Plan, 8A Fed. Prac. & Proc...

The Rule 26(d) moratorium does not apply in proceedings exempted from initial disclosure under Rule 26(a)(1)(B). Although this exemption might be worrisome, it was not expected to unleash large numbers of premature discovery forays: "Although there is no restriction on commencement of discovery in these cases [exempted under Rule 26(a)(1)(E)], it is not expected that this opportunity will often lead to abuse since there is likely to be little or no discovery in most such cases. Should a defendant need more time to respond to discovery requests filed at the beginning of an exempted action, it can seek relief by motion under Rule 26(c) if the plaintiff is unwilling to defer the due date by agreement." Committee Note to 2000 Amendment to Rule 26, 192 F.R.D. at 386–87.

**No formal discovery before Rule 26(f) conference**

The parties had not held a discovery conference yet, which rendered plaintiff's discovery requests premature. As a result, plaintiff's motion to compel discovery would be denied. All the parties had done was exchange a few brief emails on jurisdictional discovery, but they had not discussed settlement, dispositive motions, amended pleadings or other subjects required to be discussed at a discovery conference. American Action Network, Inc. v. Cater America, LLC, 983 F. Supp. 2d 112 (D.D.C. 2013).

Pro se plaintiff's efforts to pursue written discovery were premature, for the parties had not conferred as required nor agreed to conduct discovery, the court had not held an initial scheduling conference because of pending motions to dismiss, and the court had not entered a scheduling order. Wada v. U.S. Secret Service, 525 F. Supp. 2d 1 (D.D.C. 2007).

**See also**

Defendant did not waive objections to pre–removal discovery by failing to assert them as required by state law. After removal the federal rules govern, and plaintiff could not seek discovery before the discovery conference. Riley v. Walgreen Co., 233 F.R.D. 496 (S.D. Tex. 2005).

**Discovery plan**

See § 2051.1.

**Depositions prior to conference**

Rule 30(a)(2)(A)(iii) allows a party to notice a deposition of a person about to leave the country prior to the conference. See § 2105.

The interests of justice precluded adjourning the deposition of a party, although it was scheduled to occur before the initial discovery conference and only shortly after the objecting defendant filed its answer. The party, whose claim was limited to one for loss of services, was a foreign citizen of limited means and would be leaving the country upon the expiration of her visa within a few weeks. Rodriguez v. Biltoria Realty LLC, 203 F. Supp. 2d 290 (E.D. N.Y. 2002).

**Compare**

Plaintiff's conduct in taking a deposition before even serving summons and complaint was improper and violated court rules on conduct of litigation. Along with other items of misconduct, it provided reason for dismissing plaintiff's action with prejudice. Ortiz–Rivera v. Mun. Government of Toa Alta, 214 F.R.D. 51 (D.P.R. 2003).

It was improper for plaintiffs to have served deposition notices along with the complaint. Accordingly, the notices were defective and unenforceable because no scheduling order had been entered and counsel had not agreed to commence discovery early. Keller v. Edwards, 206 F.R.D. 412 (D. Md. 2002).

**See also**

The discovery moratorium did not apply to later–added parties. There is no requirement that there be a further Rule 26(f) conference after the initial conference involving the initial parties. Steppes Apartment, Ltd. v. Armstrong, 188 F.R.D. 642 (D. Utah 1999).

**Parties joined after initial conference**

Discovery can go forward from later joined parties without a further discovery planning conference. The added party may request a conference to plan discovery, and may seek the court's relief regarding discovery if differences cannot be ironed out, but there is no rule

Case 1:18-cv-00475-SEB-TAB Document 1-2 Filed 02/16/18 Page 421 of 440 PageID #: 433

§ 2046.1 1993 Discovery Moratorium Pending Discovery Plan, 8A Fed. Prac. & Proc.

requiring that discovery be deferred until that conference has occurred. Steppes Apartment, Ltd. v. Armstrong, 188 F.R.D. 642 (D. Utah 1999).

**See also**

Note that the 2000 amendments to Rule 26(a)(1) explicitly deal with the initial disclosure obligations of parties added to the case after the Rule 26(f) conference. See § 2053.

| | |
|---|---|
| 6 | **Notice to other parties** |

The court would not entertain plaintiff's ex parte motion for expedited discovery. The motion did not show why defendant's authorized representative should not be given notice of the request to proceed with early discovery. Plaintiff's statement of its belief that it was urgent to proceed expeditiously was not sufficient. Yokohama Tire Corp. v. Dealers Tire Supply, Inc., 202 F.R.D. 612 (D. Ariz. 2001), **quoting Wright, Miller & Marcus.**

| | |
|---|---|
| 6.10 | **Early Rule 34 requests** |

See Rule 26(d)(2).

| | |
|---|---|
| 6.20 | **Facilitate discussion at Rule 26(f) conference** |

Committee Note to 2015 amendment.

| | |
|---|---|
| 6.30 | **Served at first Rule 26(f) conference** |

See Rule 26(d)(2)(B).

| | |
|---|---|
| 7 | **Good cause for leave to conduct early discovery** |

The factors commonly considered in determining the reasonableness of an expedited discovery request include (1) whether a preliminary injunction motion is pending, (2) breadth of the discovery requests, (3) purpose for requesting the expedited discovery, (4) burden on defendants to comply with the requests, and (5) how far in advance of the typical discovery process the request is made. Oglala Sioux Tribe v. Van Hunnik, 298 F.R.D. 453 (D.S.D. 2014).

The courts apply either a good cause standard or a preliminary injunction standard to evaluate motions for early discovery. Under the good cause standard, the party seeking expedited discovery must show that the need outweighs prejudice to the responding party. In this case, the government established good cause for an order requiring plaintiff to provide answers to 14 interrogatories that called for "yes" or "no" answers. The burden of answering would be slight. Dorrah v. U.S., 282 F.R.D. 442 (N.D. Iowa 2012).

Good cause existed for granting an ex parte request for expedited discovery in a copyright infringement suit brought by owner of adult film against John Doe users of Internet peer-to-peer file-sharing program. The owner had alleged a prima facie case of infringement, the IP address of 176 John Doe users had already been obtained, and the owner had no way, absent subpoena, of determining their identities. Digital Sin, Inc. v. Does 1-176, 279 F.R.D. 239 (S.D. N.Y. 2012).

Under the "reasonableness standard" for determining whether to allow expedited discovery, the court analyzes the reasonableness of the request in light of all the surrounding circumstances, including the purpose for the discovery, the ability of the discovery to avoid demonstrated irreparable harm, and the burden on the responding party. Wilcox Industries Corp. v. Hansen, 279 F.R.D. 64 (D.N.H. 2012).

Applying a reasonableness standard, the court would allow plaintiff in § 1983 action to serve interrogatory seeking identity of officers and employees of police department at scene of his arrest, and another to identify those supervisors who participated. They were narrowly tailored and sought identities of those involved in his claim. Ibarra v. City of Chicago, 816 F. Supp. 2d 541 (N.D. Ill. 2011).

Holders of patent on crop seed established good cause for expedited discovery in patent infringement suit. Plaintiffs made reasonable attempts to gather the relevant evidence with defendant's cooperation and narrowly tailored their request for expedited discovery to a limited set of documents and physical samples. Plaintiffs also alleged that, as time passed, the likelihood of discovery of the evidence they needed would decrease, due to intentional destruction or transfer of evidence by defendant's farming operations. Monsanto Co. v. Woods, 250 F.R.D. 411 (E.D. Mo. 2008).

Plaintiff who brought putative class action established good cause to engage in limited discovery relevant to the issues raised by class certification prior to the discovery conference.

Case 1:18-cv-00475-SEB-TAB Document 1-2 Filed 02/16/18 Page 422 of 440 PageID #: 434

§ 2046.1 1993 Discovery Moratorium—Pending Discovery Plan, 8A Fed. Prac. & Proc...

Defendant had defaulted, had not entered an appearance in the action, and there was no known authorized representative with whom to confer. Moreover, absent limited discovery plaintiff could not pursue his claims. Sheridan v. Oak Street Mortg., LLC, 244 F.R.D. 520 (E.D. Wis. 2007).

Plaintiff in civil RICO case established good cause for expedited discovery about the location of defendants' possible assets within the United States. Plaintiff made a strong evidentiary showing of the substantiality of his claims. Defendants were foreign individuals and corporations who had both the incentive and capacity to hide their assets. Ayyash v. Bank Al–Madina, 233 F.R.D. 325 (S.D. N.Y. 2005).

A party seeking expedited discovery has the burden of showing good cause for the departure from the usual discovery procedures. Plaintiff's argument that it needed to determine whether it had to file a motion for a preliminary injunction was not sufficient. Qwest Communications Intern., Inc. v. WorldQuest Networks, Inc., 213 F.R.D. 418 (D. Colo. 2003).

Expedited discovery is available on a showing of good cause. In this case, good cause existed for permitting expedited discovery of the details of an accused device in a patent infringement suit, given the patentee's lack of prior access to the accused device. But there was no such justification for expedited discovery from third–party buyers of the accused device. Semitool, Inc. v. Tokyo Electron America, Inc., 208 F.R.D. 273 (N.D. Cal. 2002).

**Preliminary injunction or personal jurisdiction**

Committee Note to 1993 amendment, 146 F.R.D. at 640.

When determining a motion for expedited discovery, the court utilizes a four-factor test considering (1) irreparable injury, (2) some probability of success on the merits, (3) some connection between the expedited discovery and the avoidance of irreparable injury, and (4) some evidence that the injury that will result without expedited discovery looms greater than the injury that defendant will suffer if expedited discovery is granted. North Atlantic Operating Co., Inc. v. Evergreen Distributors, LLC, 293 F.R.D. 363 (E.D. N.Y. 2013).

**But see**

Cellular phone users did not show good cause for discovery before the scheduling order was entered. Although they claimed that they only sought to preserve evidence, their motion in fact went beyond preservation of evidence and asked the defendant to answer interrogatories and provide documents. The company indicated that it had placed a litigation hold on all internal documents. Hossfeld v. Government Employees Ins. Co., 88 F. Supp. 3d 504 (D. Md. 2015).

Expedited discovery was not warranted. Plaintiff argued that it was necessary to support his motion for a preliminary injunction. But he sought relatively broad discovery on issues going to the merits of the entire case, rather than narrowly tailored discovery limited to the preliminary injunction. Moreover, reasonableness dictated that the court first consider defendant's pending motion to dismiss before requiring extensive and expensive discovery. Guttenberg v. Emery, 26 F. Supp. 3d 88 (D.D.C. 2014).

Expedited discovery would not be allowed even though it supposedly related to manufacturer's potential preliminary-injunction motion. The technology discovery sought was relevant to determining the viability of the claims asserted in the case, which arguably should have been determined before the action was filed. The manufacturer would not need knowledge about customers of competitor if competitor was enjoined from selling the product at all. Wilcox Industries Corp. v. Hansen, 279 F.R.D. 64 (D.N.H. 2012).

Expedited discovery is not automatically granted merely because a party seeks a preliminary injunction. American LegalNet, Inc. v. Davis, 673 F. Supp. 2d 1063 (C.D. Cal. 2009).

**Similar to preliminary–injunction criteria**

Courts evaluating motions for expedited discovery apply one of two standards to analyze whether good cause exists: (1) a four-part inquiry that is similar to a preliminary injunction standard, and (2) a reasonableness standard that assesses the reasonableness of the request in light of all the circumstances. Laughlin v. Orthofix Intern., N.V., 293 F.R.D. 40 (D. Mass. 2013).

A party seeking expedited discovery must show (1) irreparable injury; (2) some probability of success on the merits; (3) some connection between the expedited discovery and avoidance

Case 1:18-cv-00475-SEB-TAB Document 1-2 Filed 02/16/18 Page 423 of 440 PageID #: 435

§ 30:61.1933 Discovery Moratorium Pending Discovery Plan, 8A Fed. Prac. & Proc...

of irreparable injury; and (4) some evidence that the injury that will result without expedited discovery looms greater than the injury defendant will suffer if the expedited discovery is allowed. In this case that showing was not made even though plaintiff was seeking injunctive relief. Litwin v. OceanFreight, Inc., 865 F. Supp. 2d 385 (S.D. N.Y. 2011).

Former employees of bank failed to identify any irreparable injury they would suffer if denied expedited discovery, and did not address their likelihood of success on the merits. Accordingly, they would not be allowed to conduct expedited discovery to identify Doe defendants in their action against the FDIC for actions it took as bank's receiver. There was a likelihood that the discovery would be quite broad in this case, and the motion to proceed now came in well in advance of typical discovery. Landwehr v. F.D.I.C., 282 F.R.D. 1 (D.D.C. 2010).

Grounds for expedited discovery were not established. To justify such early discovery, a party must show (1) irreparable injury; (2) some probability of success on the merits; (3) some connection between the expedited discovery and success on the merits; and (4) some evidence that the injury that will result without expedited discovery is greater than the injury a party will suffer if the expedited discovery is allowed. Edgenet, Inc. v. Home Depot U.S.A., Inc., 259 F.R.D. 385 (E.D. Wis. 2009).

The factors typically weighed in determining whether good cause exists for lifting the bar on pre–conference discovery include the purpose of the discovery, the ability of the discovery to preclude demonstrated irreparable harm, the plaintiff's likelihood of success on the merits, the burden of discovery on the defendant, and the degree of prematurity. McMann v. Doe, 460 F. Supp. 2d 259 (D. Mass. 2006).

Among the factors to be considered in determining an application for expedited discovery are (1) irreparable injury, (2) some probability of success on the merits, (3) some connection between the expedited discovery and the avoidance of the irreparable injury, and (4) some evidence that the injury that will result without expedited discovery looms greater than the injury that the defendant will suffer if expedited relief is granted. In this case, plaintiff failed to establish probability of success on the merits sufficient to warrant expedited discovery. Cecere v. County of Nassau, 258 F. Supp. 2d 184 (E.D. N.Y. 2003).

**Decisions granting early discovery**

There was good cause for expedited discovery to learn the identity of putative defendants and establish a basis for the court's jurisdiction. But plaintiff must have at least a good faith basis for believing that the fruits of the discovery will establish a basis for jurisdiction. Malibu Media, LLC v. Doe, 109 F. Supp. 3d 165 (D.D.C. 2015)

The owner of copyrighted music had good cause for immediate discovery by third-party subpoena on an internet service provider so that service of process could be effectuated in copyright infringement action. Defendant could not be identified or served without this discovery, and expedited discovery was necessary to prevent data from being lost forever due to routine deletions by ISP. Rotten Records, Inc. v. Doe, 108 F. Supp. 3d 132 (W.D. N.Y. 2015).

Good cause existed for expedited discovery. Plaintiff alleged that defendants were engaged in an ongoing effort to facilitate unlawful business practices involving unauthorized sale of plaintiff's prepaid airtime minutes. Plaintiff provided a declaration from its fraud investigations manager regarding steps it had taken to prevent this activity and declarations from customers who had purchased airtime through the scheme. Tracfone Wireless, Inc. v. Adams, 304 F.R.D. 672 (S.D. Fla. 2015).

The state's request for expedited discovery was reasonable even though it broadly sought all documents concerning cigarette sales and distribution. It was narrowly tailored to a limited time period, and the state indicated it would give defendant manufacturer more time to gather the documents. New York v. Mountain Tobacco Co., 953 F. Supp. 2d 385 (E.D. N.Y. 2013).

The court would allow expedited discovery in an action by the holder of the copyright to a movie against "John Doe" users of peer-to-peer file-sharing software. A subpoena on nonparty Internet service providers would be allowed in effort to identify individuals who downloaded or shared copyrighted material. Bicycle Peddler, LLC v. Does 1-12, 295 F.R.D. 274 (N.D. Ill. 2013).

10

Case 1:18-cv-00475-SEB-TAB   Document 1-2   Filed 02/16/18   Page 424 of 440 PageID #: 436

§ 26:61 1993 Discovery Moratorium Pending Discovery Plan, 8A Fed. Prac. & Proc...

Expedited discovery may be helpful in counterfeiting cases, since it may lead to evidence of continuing infringement, future plans to infringe, or additional infringing merchandise. In determining whether to allow expedited discovery, the court applies a flexible standard of reasonableness. North Atlantic Operating Co., Inc. v. Evergreen Distributors, LLC, 293 F.R.D. 363 (E.D. N.Y. 2013).

Good cause supports early discovery for the sole and limited purpose of identifying unknown defendants sufficiently to name them as defendants and serve the complaint on them. Accordingly, copyright infringer would be allowed to obtain discovery from internet service providers to obtain this information. Patrick Collins, Inc. v. Does 1-79, 286 F.R.D. 160 (D. Mass. 2012).

Copyright holder was permitted to use expedited discovery to identify remaining defendant. Plaintiff alleged a prima facie case of copyright infringement, but was unable to identify infringer without a court-ordered subpoena. Next Phase Distribution, Inc. v. John Does 1-27, 284 F.R.D. 165 (S.D. N.Y. 2012).

A bank would be given leave to conduct expedited discovery to determine the location of missing art that was pledged as collateral for a promissory note on which the bank was seeking to recover in this action. JP Morgan Chase Bank, N.A. v. Reijtenbagh, 615 F. Supp. 2d 278 (S.D. N.Y. 2009).

Plaintiff was entitled to expedited discovery to prepare for a preliminary injunction hearing in a breach of contract action against a former employee. The discovery could clarify matters that were outside the parties' knowledge and ultimately lead to prompt and efficient disposition of the litigation. The employee would not be prejudiced by allowing properly limited and focused discovery to prepare for the hearing, and she could also clarify matters outside her knowledge. Wachovia Secs., L.L.C. v. Stanton, 571 F. Supp. 2d 1014 (N.D. Iowa 2008).

Expedited discovery would be ordered in defamation action against author of book about celebrity's death. In the book there was a statement that family nannies claimed that celebrity liked to watch a video of claimant and another of the celebrity's male friends having gay sex. There was a basis for concluding that the author wrote the account without contacting the nannies, and that the author since then had offered money if the nannies would meet with her. Stern v. Cosby, 246 F.R.D. 453 (S.D. N.Y. 2007).

Plaintiff's request to proceed with expedited discovery at pre–answer stage would be granted even though defendant had announced its intention to file a motion to dismiss. Dismissal at this stage was unlikely, the burden of responding to the proposed discovery was not great, and plaintiff would be prejudiced in preparing its contemplated motion for a preliminary injunction if discovery were not permitted. OMG Fidelity, Inc. v. Sirius Technologies, Inc., 239 F.R.D. 300 (N.D. N.Y. 2006).

Expedited discovery was warranted in action by glass manufacturer against equipment manufacturer for misappropriation of technology. This discovery would result in prompt disclosure by manufacturer of its project files, apparently necessary for plaintiff to determine whether defendant had learned proprietary information. Asahi Glass Co., Ltd. v. Toledo Engineering Co., Inc., 262 F. Supp. 2d 845 (N.D. Ohio 2003).

Plaintiff's motion to expedite discovery would be granted in a copyright infringement action. There was a need to assure preservation of records on computer hard drives which were being constantly overwritten. Antioch Co. v. Scrapbook Borders, Inc., 210 F.R.D. 645 (D. Minn. 2002).

**Decisions denying early discovery**

Expedited discovery was not warranted in a trademark infringement action. Plaintiffs failed to establish that any delay in discovery would provide defendant with time to alter, dispose of, or destroy records and inventory related to alleged counterfeiting activity. Simpson Performance Products, Inc. v. Wagoner, 133 F. Supp. 3d 1130 (N.D. Ind. 2015).

Early discovery was not warranted regarding an FDIC report on examination of a bank that failed. The parties had yet to confer on a proposed pretrial schedule for the FDIC's lawsuit

11

against the bank's president and directors. F.D.I.C. v. Milbauer, 119 F. Supp. 3d 939 (D. Minn. 2015).

As a general rule, discovery takes place only after defendant has been served. In some cases, however, discovery before that may be warranted to permit plaintiff to identify defendant. But courts should deny motions for expedited discovery when it clear that discovery will not uncover the identities of defendants that are to be served, or that the complaint will be dismissed on other grounds. Attkisson v. Holder, 113 F. Supp. 3d 156 (D.D.C. 2015)

Expedited discovery would not be granted to Muslim plaintiffs in their action against New York City alleging violation of their equal protection rights due to police surveillance. Although plaintiffs claimed that the level of police activity directed to them had increased since they filed this case, they were well aware of the scope of investigative activities relating to them. Raza v. City of New York, 998 F. Supp. 2d 70 (E.D. N.Y. 2013).

The benefit of discovery relating to the identity and conduct of certain corporate actors prior to discovery conference was outweighed by the burden and expense discovery would inflict upon defendant and third parties. Sky Angel U.S., LLC v. National Cable Satellite Corp., 296 F.R.D. 1 (D.D.C. 2013).

Good cause was not shown in copyright infringement suit for expedited discovery. Plaintiff claimed defendant was marketing counterfeit "Angry Birds" plush toys, and sought expedited discovery on the ground that there would not later be a chance for meaningful discovery due to defendants' deceptive practices, and also because there was a pending motion for a preliminary injunction. But there was no indication that defendants were predisposed to destroy or hide evidence. Moreover, plaintiff's discovery requests were not narrowly tailored to obtain information relevant to the preliminary injunction. Rovio Entertainment Ltd. v. Royal Plush Toys, Inc., 907 F. Supp. 2d 1086 (N.D. Cal. 2012).

Good cause did not exist to justify expedited discovery by defendant FDIC. Plaintiff insurer sought a declaratory judgment that there was no coverage under director's and officer's liability policy issued to insured bank for which FDIC was receiver. The FDIC did not allege that the information it sought was at risk of destruction, and did not demonstrate any other pressing need for immediate discovery. Progressive Cas. Ins. Co. v. F.D.I.C., 283 F.R.D. 556 (N.D. Iowa 2012).

Adult entertainment content producer's request for expedited deposition of a non-party was not justified. Plaintiff asserted that it needed this deposition to obtain identity of alleged copyright infringer. But it did not need conclusive evidentiary support for its case in order to name and serve account holder, assuming it had a good-faith basis for its claims. Moreover, the deposition would have been open-ended and one-sided, exposing the account holder to the risk of incriminating himself before being named as a defendant. Hard Drive Productions, Inc. v. Doe, 283 F.R.D. 409 (N.D. Ill. 2012).

Defendant in trademark infringement dispute would not be granted expedited discovery. It failed to indicate what specific information it believed should be subject to discovery for the limited purpose of responding to plaintiff's motion for a preliminary injunction. Boathouse Group, Inc. v. TigerLogic Corp., 777 F. Supp. 2d 243 (D. Mass. 2011).

Defendant failed to show good cause for expedited discovery of product samples, packaging, and packing inserts for plaintiff's next generation products. It argued that plaintiff's future products would be relevant to deciding plaintiff's motion for a preliminary injunction, which raised issues about the risk of consumer confusion between defendant's products and plaintiff's products. But plaintiff's allegations had to do with its current products, not future products. Apple Inc. v. Samsung Electronics Co., Ltd., 768 F. Supp. 2d 1040 (N.D. Cal. 2011).

Good cause did not exist to warrant expedited depositions in Lanham Act suit. The alleged harm caused by a discrepancy between applicant's complaint and previous deposition testimony given by applicant's president, if any, did not necessitate expedited discovery. St. Louis Group v. Metals and Additives Corp., 275 F.R.D. 236 (S.D. Tex. 2011).

Copyright holder did not make a showing justifying expedited discovery in its action against a former employee. Plaintiff had not limited its discovery requests to topics pertinent to its

Case 1:18-cv-00475-SEB-TAB   Document 1-2   Filed 02/16/18   Page 426 of 440 PageID #: 438

§ 2066.1 1993 Discovery Moratorium Pending Discovery Plan, 8A Fed. Prac. & Proc. ...

motion for a preliminary injunction and it did not provide evidence supporting its allegations, or show that it would suffer irreparable injury if it did not obtain early discovery. American LegalNet, Inc. v. Davis, 673 F. Supp. 2d 1063 (C.D. Cal. 2009).

Plaintiffs offered no reason that there was an immediate need for the extensive information they sought on an expedited basis. 2815 Grand Realty Corp. v. Goose Creek Energy, Inc., 656 F. Supp. 2d 707 (E.D. Ky. 2009).

The showing plaintiff made did not indicate anything that expedited discovery would solve about defendant's alleged misuse of plaintiff's intellectual property to coerce customers to switch to defendant's product by a date that had already passed. Plaintiff had not requested a preliminary injunction and had consented to postpone the due date for defendant's answer. Edgenet, Inc. v. Home Depot U.S.A., Inc., 259 F.R.D. 385 (E.D. Wis. 2009).

Plaintiffs' request for expedited discovery in aid of a motion for a preliminary injunction was not reasonable. The relief sought on the motion for a preliminary injunction was dramatically greater and more demanding than what plaintiffs sought originally. Thus, plaintiffs were not seeking expedited discovery to gain evidence to persuade the court to preserve the status quo, but to gather all the evidence they would need to radically transform the status quo. Disability Rights Council of Greater Washington v. Washington Metropolitan Area Transit Authority, 234 F.R.D. 4 (D.D.C. 2006).

Expedited discovery was not warranted in consolidated stockholder derivative actions. Plaintiffs had yet to file a consolidated complaint, and there was no showing that irreparable injury would result if expedited discovery were not ordered. In re Fannie Mae Derivative Litigation, 227 F.R.D. 142 (D.D.C. 2005).

Employer's request for expedited discovery in anticipation of its impending preliminary injunction motion was not reasonable. The employer had not even filed the motion yet, and at least that would identify the areas in which discovery might be necessary. And the discovery requested was not narrowly tailored to such issues. Dimension Data North America, Inc. v. NetStar-1, Inc., 226 F.R.D. 528 (E.D. N.C. 2005).

Expedited discovery would not be allowed. The reasons were to use the results of the discovery in a related suit pending in Mexico, and the possibility of seeking injunctive relief in the present case. El Pollo Loco, S.A. de C.V. v. El Pollo Loco, Inc., 344 F. Supp. 2d 986 (S.D. Tex. 2004).

**See also**

The court would phase discovery, but would not limit it, as defendant employer requested. Defendant sought to limit discovery to the EEOC's basis for its charges of discrimination, but that would leave the employer free to pursue all discovery while curtailing the EEOC's discovery. EEOC v. PMT Corp., 124 F. Supp. 3d 904 (D.Minn.2015).

12    **Discovery focused on certain topics**

Record companies would be permitted to serve limited, immediate discovery on third–party university, which was an internet service provider, seeking the true identities of defendants, including each defendant's true name. Arista Records LLC v. John Does 1–19, 246 F.R.D. 28 (D.D.C. 2007), opinion vacated in part, 551 F. Supp. 2d 1 (D.D.C. 2008).

Copyright holder was entitled to take early discovery in an infringement action to identify the name, address, and telephone number of each person whom alleged infringers sold products bearing plaintiff's "Pizza Man" image. Defendants had not explained how the information would violate the terms of any protective order entered in the case, and each buyer could be directly liable to the extent that it distributed the copyrighted image. Stockart.com, LLC v. Caraustar Custom Packaging Group, Inc., 240 F.R.D. 195 (D. Md. 2006).

Physician was entitled to conduct limited expedited discovery in an effort to buttress her claim that bad faith or extraordinary circumstances would provide a ground for an exception to Younger abstention. But this discovery would be limited to claims for injunctive relief, and limited to a total of not more than ten document requests and three depositions. Sica v. Connecticut, 331 F. Supp. 2d 82 (D. Conn. 2004).

13    **Showing for further delay of discovery**

A defendant who had been indicted in connection with the matters at issue in this case was not entitled to an indefinite stay of discovery absent a showing that the issues sufficiently

Case 1:18-cv-00475-SEB-TAB   Document 1-2   Filed 02/16/18   Page 427 of 440 PageID #: 439

§ 2006.1 1993 Discovery Moratorium Pending Discovery Plan, 8A Fed. Prac. & Proc...

overlapped. A stay would unnecessarily delay proceedings involving other defendants, and this defendant had already opted against asserting his Fifth Amendment privilege against self–incrimination. State Farm Mut. Auto. Ins. Co. v. CPT Medical Services, P.C., 375 F. Supp. 2d 141 (E.D. N.Y. 2005).

**14**     **Motion to dismiss**

Thrower v. Barney, 849 F. Supp. 1445 (N.D. Ala. 1994).

**15**     **Pendency of motion as grounds for deferring discovery**

The district court did not abuse its discretion in limiting discovery pending its resolution of a motion to dismiss for failure to state a claim. Flaim v. Medical College of Ohio, 418 F.3d 629 (6th Cir. 2005).

The requirement for a Rule 26(f) conference about a discovery plan would be stayed pending resolution of defendants' motion to dismiss and plaintiff's motion for partial summary judgment. Both motions raised significant issues, and their resolution would likely shape any discovery that would be needed. Plaintiff had decided to file an early motion for summary judgment, and thus could not ask that the court authorize discovery in support of that motion. Sai v. Department of Homeland Security, 99 F. Supp. 3d 50 (D.D.C. 2015).

There was good cause to stay discovery pending the outcome of a motion to dismiss. The defendant raised substantial legal issues about whether plaintiff had any right to recover. Prosperity Partners, Inc. v. Bonilla, 374 F. Supp. 2d 290 (E.D. N.Y. 2005).

Defendant was entitled to a stay of discovery pending determination of his motion for summary judgment on grounds of qualified or absolute immunity. Plaintiff made no showing of why discovery was needed to respond to the motion. Immunity should be resolved before discovery if at all possible. Zamora v. City of Belen, 229 F.R.D. 225 (D.N.M. 2005).

Defendant was entitled to a stay of discovery pending resolution of its motion to dismiss the suit, despite plaintiffs' assertion that the scope of discovery was not outrageously large. Defendant presented substantial arguments for dismissal of many, if not all, of the claims. Spencer Trask Software and Information Services, LLC v. RPost Intern. Ltd., 206 F.R.D. 367 (S.D. N.Y. 2002).

**Compare**

A stay of discovery pending resolution of defendants' pending motion to dismiss was not warranted. When asked for such a stay, the court must take a preliminary peek at the motion to determine whether it appears clearly meritorious and case dispositive. In this case, it was not clear whether defendants' motion would be granted, and plaintiffs appeared to state at least some viable claims. Sprint Solutions, Inc. v. Cell Xchange, Inc., 49 F. Supp. 3d 1074 (M.D. Fla. 2014).

Good cause did not exist to warrant a stay of all discovery pending a ruling on employer's anticipated motion to dismiss the action on the ground that it would not satisfy the amount–in–controversy requirement. The merits of this argument were difficult to assess, given that the employer had not filed a motion to dismiss and the affidavits in support of the motion for a stay did not include records demonstrating how the calculations purporting to show that the employee was overcompensated were reached. The employee had a legitimate need to depose four other employees with personal and exclusive knowledge of the employer's records and billing practices, and staying discovery would likely severely prejudice the plaintiff. Lithgow v. Edelmann, 247 F.R.D. 61 (D. Conn. 2007).

Defendants' motions to stay depositions pending resolution of their motion to compel arbitration would be denied. The mere filing of a dispositive motion did not require a stay, and the broad and conclusory statements that the depositions would be burdensome did not support the motion. Plaintiff would be prejudiced by granting the motion, having expended considerable funds and efforts in pretrial discovery. Gerald Chamales Corp. v. Oki Data Americas, Inc., 247 F.R.D. 453 (D.N.J. 2007).

A defendant who had been indicted in connection with the matters at issue in this case was not entitled to an indefinite stay of discovery absent a showing that the issues sufficiently overlapped. A stay would unnecessarily delay proceedings involving other defendants, and this defendant had already opted against asserting his Fifth Amendment privilege against self–

Case 1:18-cv-00475-SEB-TAB Document 1-2 Filed 02/16/18 Page 428 of 440 PageID #: 440

§ 2046.1 1993 Discovery Moratorium Pending Discovery Plan, 8A Fed. Prac. & Proc...

incrimination. State Farm Mut. Auto. Ins. Co. v. CPT Medical Services, P.C., 375 F. Supp. 2d 141 (E.D. N.Y. 2005).

A defendant who was the subject of a criminal investigation was not entitled to a stay of discovery in the FTC's civil action to enjoin alleged violations of the FTC Act. F.T.C. v. Pacific First Ben., LLC, 361 F. Supp. 2d 751 (N.D. Ill. 2005).

Defendant's motion to stay mandatory disclosure pending decision of its motion to dismiss was denied. In re Lotus Development Corp. Secs. Litigation, 875 F. Supp. 48 (D. Mass. 1995).

**See also**

For discussion of the automatic discovery stay triggered by motions to dismiss in cases governed by the Private Securities Litigation Act, see § 2046.2.

A stay of discovery was warranted in favor of parallel federal criminal investigation against some of the defendants. The stay would last until shortly after issuance of indictments that were expected soon. Ashworth v. Albers Medical, Inc., 229 F.R.D. 527 (S.D. W. Va. 2005).

16 **Authority discussed further**

See § 2047.

---

End of Document · · · © 2018 Thomson Reuters. No claim to original U.S. Government Works.

STATE OF INDIANA       ) IN THE HAMILTON COUNTY SUPERIOR COURT

                                ) SS:

COUNTY OF HAMILTON     ) CAUSE NO. 29C01-1802-CT-001154

| | |
|---|---|
| JOSEPH HIPPS, Individually and on Behalf of All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| BIGLARI HOLDINGS, INC., SARDAR BIGLARI, PHILIP L. COOLEY, KENNETH R. COOPER, JAMES P. MASTRIAN, RUTH J. PERSON, NBHSA INC., and BH MERGER COMPANY, | ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

## [PROPOSED] ORDER GRANTING PLAINTIFF'S MOTION FOR EXPEDITED PROCEEDINGS

WHEREAS, Plaintiff Joseph Hipps ("Plaintiff") filed a Motion for Expedited Proceedings on February 8, 2018 (the "Motion") requesting that the Court: (1) schedule a hearing on Plaintiff's Motion for Preliminary Injunction, filed on February 8, 2018 (the "P.I. Motion"); (2) permit Plaintiff to conduct limited discovery on an expedited basis in advance of the hearing on the P.I. Motion and, in connection therewith, order Defendants[1] to (a) respond to Plaintiff's First Request for Production of Documents Directed to All Defendants dated February 8, 2018 (the "Document Requests") and substantially complete production of documents in response to the Document Requests within five (5) days of the date of the Order, and (b) produce a privilege and redaction log within seven (7) days of the date of the Order; and (3) direct the parties to meet and confer

---

[1] As used herein, "Defendants" means defendants Biglari Holdings Inc., NBHSA Inc., BH Merger Company, Sardar Biglari, Philip L. Cooley, Kenneth R. Cooper, James P. Mastrian, and Ruth J. Person, collectively.

regarding a proposed schedule governing further proceedings in this matter including, but not limited to, discovery and a briefing schedule in connection with the P.I. Motion.

WHEREAS, the Motion has been fully briefed by the parties to the litigation;

WHEREAS, the Court held a hearing on the Motion on February 20, 2018;

NOW, this _____ day of _____, 2018, upon consideration of Plaintiff's Motion and the arguments of the parties in support of and opposition thereto, it is hereby ORDERED that the Motion is GRANTED.  Accordingly, it is hereby further ORDERED that:

1.      The hearing on the P.I. Motion will take place on _____ _____, 2018 at __:___ _.m.;

2.      Plaintiff shall be entitled to the following discovery in advance of the hearing on the P.I. Motion:

| Event | Deadline |
|---|---|
| Defendants to respond to Plaintiff's Document Requests | Within five (5) days of the date of this Order |
| Substantial completion of document production in response to Plaintiff's Document Requests | Within five (5) days of the date of this Order |
| Defendants to produce privilege and redaction log | Within seven (7) days of the date of this Order |

3.      Counsel for Plaintiff and counsel for Defendants shall meet and confer and file with the Court within one (1) day of the date of this Order a proposed agreed-upon scheduling order governing further proceedings in this matter, including, but not limited to, discovery and a briefing schedule in connection with the P.I. Motion.  In the event that Plaintiff and Defendants cannot reach agreement on a proposed schedule, each shall file with the Court within two (2) days of the date of this Order competing scheduling orders for the Court's consideration.

IT IS SO ORDERED this _____ day of _____ 2018.

_____

STEVEN R. NATION, Judge
Hamilton Superior Court No. 1

Distribution To:

Brad Catlin
PRICE WAICUKAUSKI JOVEN &
CATLIN, LLC
301 Massachusetts Avenue
Indianapolis, IN 46204
bcatlin@price-law.com

Biglari Holdings, Inc.
17802 IH 10 West, Suite 400
San Antonio, TX 78257-2509

Eric L. Zagar
J. Daniel Albert
Justin O. Reliford
Christopher M. Windover
KESSLER TOPAZ MELTZER & CHECK,
LLP
280 King of Prussia Road
Radnor, PA 19087
ezagar@ktmc.com
dalbert@ktmc.com
jreliford@ktmc.com
cwindover@ktmc.com

Philip L. Cooley
438 Bentley Mnr
Shavano Park, TX 78249-2023

Ruth J. Person
2404 Tamarack Ct.
Ann Arbor, MI 48105-9660

Peter B. Andrews
Craig J. Springer
ANDREWS & SPRINGER LLC
3801 Kennett Pike
Building C, Suite 305
Wilmington, DE 19807
pandrews@andrewsspringer.com
cspringer@andrewsspringer.com

Kenneth R. Cooper
18814 Cierra Sur
San Antonio, TX 78258-4021

James P. Mastrian
210 Bella Colinas Dr
Austin, TX 78738-7631

Jeremy Friedman
Spencer Oster
David Tejtel
FRIEDMAN OSTER & TEJTEL

Sardar Biglari
138 Manchester Way
Shavano Park, TX 78249-2023

PLLC
240 East 79th Street, Suite A
New York, NY 10075
jfriedman@fotpllc.com
soster@fotpllc.com
dtejtel@fotpllc.com

# EXHIBIT 8

Filed: 2/13/2018 8:12 PM
Tammy Baitz
Clerk
Hamilton County, Indiana

STATE OF INDIANA      )   IN THE HAMILTON COUNTY CIRCUIT COURT

                                         )   SS:

COUNTY OF HAMILTON    )   CAUSE NO. 29C01-1802-CT-001154

|  |  |
|---|---|
| JOSEPH HIPPS, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| BIGLARI HOLDINGS, INC., SARDAR BIGLARI, PHILIP L. COOLEY, KENNETH R. COOPER, JAMES P. MASTRIAN, RUTH J. PERSON, NBHSA, INC., and BH MERGER COMPANY, | ) ) ) ) ) ) ) |
| Defendants. | ) ) |

## MOTION TO TRANSFER

Plaintiff, Joseph Hipps, by counsel, moves to transfer this case to Hamilton County Superior Court 1 pursuant to Hamilton County Local Administrative Rule 104.50. In support of this motion, Plaintiff states as follows:

1.    This is a shareholder class action which alleges breaches of fiduciary duty and asks for preliminary and permanent injunctive relief and declaratory relief in connection with a plan to reclassify stock in a publicly-held corporation by its controlling shareholder.  Defense counsel have informed Plaintiff's counsel that they expect the shareholder vote on whether to approve the proposal to reclassify the stock will take place within the next 30-60 days, and that they would not agree to expedite these proceedings.

1

2.    On January 29, 2018, Plaintiff filed a substantially similar action in Hamilton County Superior Court 1 against all of the defendants in the instant action except NBHSA, Inc. (New BH) and BH Merger Company (Merger Sub). The case was captioned *Hipps v. Bilgari Holdings, Inc., et al.*, Hamilton County Cause No. 29D01-1801-CT-00760 (*Hipps I*). On February 5, 2018, Superior Court 1 set a hearing in that matter for February 20, 2018.

3.    On February 6, 2018, Defendants removed *Hipps I* to federal court. However, Bilgari Holdings, Inc. is an Indiana corporation, so removal of *Hipps I* is improper under 28 U.S.C. § 1441(b)(2) because Biglari Holdings Inc. (Biglari Holdings) was served as a necessary party and properly joined as a defendant in that litigation. Plaintiff has moved to have that case remanded back to Hamilton County Superior Court 1.

4.    In order to ensure that this matter would be given prompt judicial attention and to immunize against another removal, Plaintiff filed the instant action on February 7, 2018, which adds New BH and Merger Sub as defendants and claims for declaratory judgment and injunctive relief against the defendants that are Indiana citizens, namely Biglari Holdings, New BH and Merger Sub. The matter was assigned to the Hamilton County Circuit Court.

5.    Plaintiff understands that Hamilton County Superior Court 1 is ready and willing to accept this case, and has kept the hearing previously scheduled in *Hipps I* for February 20, 2018 open to hear pending motions. Hamilton County Local Administrative Rule 104.50 authorizes such a transfer.

2

6.  It would advance judicial economy if this case were transferred to Hamilton County Superior Court 1, as that is the Court to which *Hipps I* will be remanded, and the cases could be more easily consolidated if they are in the same Court.

WHEREFORE, Plaintiff respectfully requests that this Court transfer this matter to Hamilton County Superior Court 1.

Respectfully submitted,

PRICE WAICUKAUSKI JOVEN & CATLIN, LLC

/s/ Brad A. Catlin
Brad A. Catlin, Atty. No. 21570-29
The Hammond Block Building
301 Massachusetts Avenue
Indianapolis, IN 46204
Phone: (317) 633-8787
Fax: (317) 633-8797
Email: bcatlin@price-law.com
*Counsel for Plaintiff*

OF COUNSEL:

**KESSLER TOPAZ MELTER & CHECK, LLP**
Eric L. Zagar
J. Daniel Albert
Justin O. Reliford
Christopher M. Windover
280 King of Prussia Road
Radnor, PA 19087
(610) 667-7706

**FRIEDMAN OSTER & TEJTEL PLLC**
Jeremy Friedman
Spencer Oster
David Tejtel
240 East 79th Street, Suite A
New York, NY 10075
(888) 529-1108

3

**ANDREWS & SPRINGER LLC**
Peter B. Andrews
Craig J. Springer
3801 Kennett Pike
Building C, Suite 305
Wilmington, DE 19807
(302) 504-4957

## CERTIFICATE OF SERVICE

I certify that on this 13th day of February 2018, Plaintiff's Motion for Transfer

was served via U.S. Mail, postage prepaid upon the following:

Biglari Holdings Inc.
c/o Corporation Service Company,
Registered Agent
135 N. Pennsylvania St., Suite 1610
Indianapolis, IN 46204

BH Merger Company
c/o Corporation Service Company,
Registered Agent
135 N. Pennsylvania St., Suite 1610
Indianapolis, IN 46204

NBHSA Inc.
c/o Corporation Service Company,
Registered Agent
135 N. Pennsylvania St., Suite 1610
Indianapolis, IN 46204

James P. Mastrian
210 Bella Colinas Dr.
Austin, TX 78738-7631

Sardar Biglari
138 Manchester Way
Shavano Park, TX 78249-2023

Kenneth R. Cooper
18814 Cierra Sur
San Antonio, TX 78258-4021

Philip L. Cooley
438 Bentley Mnr.
Shavano Park, TX 78249-2023

Ruth J. Person
2404 Tamarack Ct.
Ann Arbor, MI 48105-9660

/s/ Brad A. Catlin
Brad A. Catlin

4

# EXHIBIT 9

STATE OF INDIANA      )    IN THE HAMILTON COUNTY CIRCUIT COURT
                                    )    SS:
COUNTY OF HAMILTON   )    CAUSE NO. 29C01-1802-CT-001154

|  |  |  |
|---|---|---|
| JOSEPH HIPPS, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) | |
| Plaintiff, | ) ) | **FILED**<br>February 14, 2018<br><br>CLERK OF THE HAMILTON<br>CIRCUIT COURT |
| v. | ) ) | |
| BIGLARI HOLDINGS, INC., SARDAR BIGLARI, PHILIP L. COOLEY, KENNETH R. COOPER, JAMES P. MASTRIAN, RUTH J. PERSON, NBHSA, INC., and BH MERGER COMPANY, | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## ORDER GRANTING PLAINTIFF'S
## MOTION FOR TRANSFER

This Matter comes before the Court upon the Motion of Plaintiff to Transfer this case to Hamilton County Superior Court 1 pursuant to Hamilton County Local Administrative Rule 104.50 and the Court being so duly advised, hereby GRANTS same.

IT IS THEREFORE ORDERED, that this matter is transferred as of the date of this Order to Hamilton County Superior Court No. 1.

Dated: **February 14, 2018**

_____
Paul A. Felix, Judge
Hamilton County Circuit Court

1

Distribution to:

Brad Catlin
PRICE WAICUKAUSKI JOVEN &
CATLIN, LLC
301 Massachusetts Avenue
Indianapolis, IN 46204
bcatlin@price-law.com

Eric L. Zagar
J. Daniel Albert
Justin O. Reliford
Christopher M. Windover
KESSLER TOPAZ MELTZER &
CHECK, LLP
280 King of Prussia Road
Radnor, PA 19087
ezagar@ktmc.com
dalbert@ktmc.com
jreliford@ktmc.com
cwindover@ktmc.com

Peter B. Andrews
Craig J. Springer
ANDREWS & SPRINGER LLC
3801 Kennett Pike
Building C, Suite 305
Wilmington, DE 19807
pandrews@andrewsspringer.com
cspringer@andrewsspringer.com

Jeremy Friedman
Spencer Oster
David Tejtel
FRIEDMAN OSTER & TEJTEL
PLLC
240 East 79th Street, Suite A
New York, NY 10075
jfriedman@fotpllc.com
soster@fotpllc.com
dtejtel@fotpllc.com

Biglari Holdings, Inc.
17802 IH 10 West, Suite 400
San Antonio, TX 78257-2509

Philip L. Cooley
438 Bentley Mnr
Shavano Park, TX 78249-2023

Ruth J. Person
2404 Tamarack Ct.
Ann Arbor, MI 48105-9660

Kenneth R. Cooper
18814 Cierra Sur
San Antonio, TX 78258-4021

James P. Mastrian
210 Bella Colinas Dr
Austin, TX 78738-7631

Sardar Biglari
138 Manchester Way
Shavano Park, TX 78249-2023

2